**Exhibit 2**

*Gary M. Vilke, M.D., FACEP, FAAEM*

March 20, 2019

Justin Brunner
Thomas, Mamer & Haughey, LLP
30 E. Main Street, Suite 500
Champaign, Illinois 61820-3629

*RE: Turner v. City of Champaign, et al.*
*U.S. District Court Case No. 17 CV 2261*

**Introduction**

    I am a board-certified emergency department physician with substantial experience in sudden cardiac arrest and sudden cardiac death, including my service as the Medical Director of the American Heart Association Training Center at the University of California, San Diego Center for Resuscitation Science for over seven years. I am also an independent researcher on the effects of position and weight force on human physiology, neck holds, and in-custody cardiac arrest and deaths.

    I have been retained as an expert to review relevant materials and provide expert opinion on this matter, including the state of the medical and scientific literature as of the date of the incident, November 16, 2016, and today, and to consider and render expert opinion on whether the restraining process was contributory to Mr. Richard Turner's cardiac arrest and death. After careful review, it is my opinion to a reasonable degree of medical certainty that Mr. Turner's cardiac arrest

Defendants 7110

was not caused by the restraining process, but rather from his combination of an enlarged heart with exertion and agitation. These opinions and related opinions are set forth in the expert report.

## Materials Reviewed

I have reviewed extensive materials pertaining to the above referenced case. This includes, but is not limited to:

### Case-Specific Materials

1. Amended Complaint (Doc. No. 24)
2. Defendant City of Champaign's Answer to Amended Complaint and Affirmative Defenses (Doc. No. 25)
3. Defendant Young's Answer to Amended Complaint and Affirmative Defenses (Doc. No. 29)
4. Defendant Wilson's Answer to Amended Complaint and Affirmative Defenses (Doc. No. 28)
5. Defendant Talbott's Answer to Amended Complaint and Affirmative Defenses (Doc. No. 27)
6. Defendant Frost's Answer to Amended Complaint and Affirmative Defenses (Doc. No. 26)
7. Text Order dated October 15, 2018
8. Text Order dated December 13, 2018
9. Plaintiff's Disclosures Pursuant to Fed. R. Civ. P. 26 (a)(1)
10. Plaintiff's Responses to Defendants' Interrogatories to Plaintiff
11. Plaintiff's Response to Defendants Request for Production
12. [Defendants] Rule 26(a)(1) Initial Disclosures (without attached documents)
13. Answers to Plaintiff's First Set of Interrogatories to Defendant, City of Champaign
14. First Amended Answers to Plaintiff's First Set of Interrogatories to Defendant City of Champaign
15. Defendant Young's Answers to Plaintiff's First Set of Interrogatories
16. Defendant Wilson's Answers to Plaintiff's First Set of Interrogatories
17. Defendant Talbott's Answers to Plaintiff's First Set of Interrogatories
18. Defendant Frost's Answers to Plaintiff's First Set of Interrogatories
19. Response to Plaintiff's First Request for Production to Defendant City of Champaign
20. Deposition of Chris Young

Defendants 7111

21. Deposition of Andrew Wilson

22. Deposition of Michael Talbott (with errata)

23. Deposition of Thomas Frost (with errata)

24. Defendants 1-34 – Champaign Police reports

25. Defendants 35-239 – ISP report

26. Defendants 484-500 – Dispatch

27. Defendants 1807-1816 – Professional Standards Review

28. Defendants 1871-1874 – Officer photos;

29. Defendants 1875 – Field Training Officer Report

30. Defendant 1876-1982 – 2014-2016 Reports responding to Turner mental health issues

31. Defendants 2139 – Further text of D1964

32. Defendants 2140-2959 – Coroner's subpoena response

33. Defendants 2960-3012 – Sheriff's subpoena response

34. Defendants 3013-3104 – Probation's subpoena response

35. Defendants 3105-6710 – Presence subpoena response

36. CD containing Defendants 6711 – CPD photos taken by ISP

37. Defendants 6712-6962 – Carle's subpoena response

38. Turner 1-303

39. Disc 1 of squad videos (includes Squad 30 for Sergeant Frost)

40. Disc 2 (zip drive) of squad videos (includes Squad 52 for Officers Talbott/Wilson)

41. METCAD audio (2 CD's)

42. University of Illinois Milestone videos (see Defendants 95-98)

43. Recordings of Arrow Ambulance personnel (see Defendants 29)

44. ISP crime scene photos (see Defendants 30)

45. CD labeled C16010659 Final Video

**Medical and Scientific Literature**

Chan TC, Vilke GM, Neuman T, Clausen JL: Restraint position and positional asphyxia. Ann Emerg Med 1997;30(5):578-586.

Chan TC, Vilke GM, Neuman T: Reexamination of custody restraint position and positional asphyxia. Am J Forensic Med Pathol 1998;19(3):201-205.

Defendants 7112

Vilke GM, Chan TC, Neuman T, Clausen JL:  Spirometry in normal subjects in sitting, prone, and supine positions.  Respir Care 2000;45(4):407-410.

Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T:  The impact of oleoresin capsicum spray on respiratory function in human subjects in the sitting and prone maximal restraint positions, final report.  NCJ 182433.  Washington, DC: United States Department of Justice, National Institute of Justice, 2000, 68 pages.

Chan TC, Vilke GM, Clausen J, Clark RF, Schmidt P, Snowden T, Neuman T:  The effect of oleoresin capsicum "pepper" spray inhalation on respiratory function.  J Forensic Sci 2002; 47(2):299-304.

Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM:  Weight force during prone restraint and respiratory function.  Am J Forensic Med Pathol 2004;25(3):185-189.

Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW.  Ventilatory and metabolic demands during aggressive physical restraint in healthy adults.  J Forensic Sci 2007;52(1):171-175.

Reay DT, Howard JD, Fligner CL, Ward RJ.  Effects of positional restraint on oxygen saturation and heart rate following exercise. Am J Forensic Med Pathol. 1988 Mar;9(1):16-8.

Schmidt P, Snowden T. The effects of positional restraint on heart rate and oxygen saturation. J Emerg Med 1999;17:777-782.

Savaser DJ, Campbell C, Castillo EM, Vilke GM, Sloane C, Neuman T, Hansen AV, Shah S, Chan TC.  The effect of the prone maximal restrained position with and without weight force on cardiac output and other hemodynamic measures.  J Forens Leg Med. 2013 Nov;20(8):991-5. Epub 2013 Aug 30.

Sloane C, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM.  Evaluation of the Ventilatory Effects of the Prone Maximum Restraint Position (PMR) on Obese Human Subjects. Forens Sci Int 2014;237:86-9. Epub 2014;46(6):865-72. Epub 2014 Feb 14.

Cary NRB, et al: The effect of simulated restraint in the prone position on cardiorespiratory function following exercise in humans. J Physiol 1998;525:30.

Ho JD, Dawes DM, Moore JC, Caroon LV, Miner JR: Effect of position and weight force on inferior vena cava diameter--implications for arrest-related death. Forensic Sci Int. 2011 Oct 10;212(1-3):256-9.

Kroll MW, Still GK, Neuman TS, Graham MA, Griffin LV.  Acute forces required for fatal compression asphyxia: A biomechanical model and historical comparisons.  Med Sci and the Law.  2017 Jan 1:25802417695711. [Epub ahead of print]

Rossen R, Kabat H, Anderson JP.  Acute arrest of cerebral circulation in man. Arch NeurPsych1943;50(5):510-28.

Defendants 7113

Iserson K. Strangulation: a review of ligature, manual and postural compression injuries. Annotated Emerg Med 1984;13:179-185.

Koiwai EK. Deaths allegedly caused by the use of "choke holds" (shime-waza). J Forens Sci 1987;32:419-432.

Koiwai EK. Fatalities associate with judo. Physic and Sports Med 1981;9:61-66.

Kornblum RN. Medical analysis of police choke holds and general neck trauma (part 2) Trauma 1986;28:13-64.

Kornblum RN. Medical analysis of police choke holds and general neck trauma (part 1) Trauma 1986;27:7-60.

Reay DT, Eisele JW. Death from law enforcement neck holds. Am J Forens Med Path 1982;3:253-258.

Mitchell JR, Roach, DE, Tyberg JV, et al.  Mechanism of Loss of Consciousness During Vascular Neck Restraint.  J Appl Physiol 2012; 112:396-402.

Denk W, Helmer M, Missliwetz J.  Blood Flow in Carotid and Vertebral Arteries at "Choke Holds" in Ultrasound Doppler.  Z Rechtsmed. 1990;103:369-377.

Schroeder GD, Hsu WK. Vertebral Artery Injuries in Cervical Spine Surgery.  Surg Neurol Int. 2013;2(Supple 5):S362-S367.

### Overview of Opinions
### (all opinions within this report are to a reasonable
### degree of medical or scientific probability)

An overview of my opinions is as follows with more description of each below:

1. **The restraining process did not cause the sudden cardiac arrest and death in Mr. Turner.**

2. **There was no evidence of blunt force trauma to Mr. Turner that caused or contributed to his cardiac arrest and death.**

3. **There was no evidence of neck compression on Mr. Turner and there is no evidence that neck compression caused or contributed to his cardiac arrest and death.**

4. **Mr. Turner had an enlarged heart that placed him at significant risk of going into**

Defendants 7114

**sudden cardiac arrest and dying, that coupled with his agitation and resistance was the probable cause of his cardiac arrest and death.**

5. **The use of an automatic external defibrillator (AED) by the officers and the initiation of CPR by EMS while Mr. Turner was still handcuffed did not have an impact on his ultimate outcome.**

Analysis

After reviewing the above listed materials, it appears that at about 0850 on November 16, 2016, Champaign Police officers contacted Mr. Richard Turner, who was 54 years old, weighed 252 lbs and was 5'5" tall at the time. The officers had been dispatched regarding a disorderly subject who was reportedly pulling trash out of garbage cans and drinking wine.

Mr. Turner was acting erratically and the officers were going to have Mr. Turner evaluated by ambulance personnel. Mr. Turner was not compliant with the officers' instructions and ran away across the street into a side street. Three officers worked to get Mr. Turner restrained. Mr. Turner was eventually handcuffed with two sets of handcuffs and had a hobble restraint placed around his feet. Shortly after being secured, Mr. Turner stopped yelling. The officers checked his breathing and determined he was not breathing. An automatic external defibrillator (AED) was retrieved from one of the police cars and placed onto Mr. Turner. The AED determined that no cardiac shock was indicated and by that point, the paramedics were arriving.

When the paramedics assessed him, they confirmed that Mr. Turner was in cardiac arrest, with an initial rhythm of asystole (flatline) on their monitor. CPR was started, and resuscitative treatments were initiated. Mr. Turner was transported to the emergency department in CPR status. He had ongoing care but never regained a pulse or consciousness. After several more rounds of attempts to resuscitate him, the emergency physician pronounced Mr. Turner dead at 0942.

Defendants 7115

An autopsy was performed, and the cause of death was listed by the medical examiner as "cardiac arrhythmia due to cardiomegaly with left ventricular hypertrophy." Also listed on the autopsy as other significant conditions contributing to death was chronic cardiac and neuropsychological toxicities of cocaine abuse, morbid obesity, schizophrenia, physical and mental stress during restraint by law enforcement.

Given this history, there are a number of issues that need to be addressed in more detail below. All opinions given are to a reasonable, or higher, degree of medical probability based on the information currently available.

### Detailed discussion and basis of opinions

1. ***The restraining process did not cause the sudden cardiac arrest and death in Mr. Turner.***

During the period that Mr. Turner was being handcuffed, he was restrained in a prone position with possibly a certain amount of weight placed on him initially to gain control over him. After Mr. Turner was cuffed he was reported to continue resisting. He was yelling and breathing without any reported evidence of respiratory or ventilatory difficulty during this time. Mr. Turner was not reported to complain of shortness of breath or difficulty breathing after being restrained.

The weight force used on Mr. Turner was described as follows: Officer Young had his right knee on Mr. Turner's left shoulder blade and used his right hand to stop Mr. Turner's head from lifting and turning. Officer Wilson was holding Mr. Turner's right side. Officer Wilson used a knee to hold Mr. Turner's arm to the ground then he had one hand on Mr. Turner's shoulder with the other pulling Mr. Turner's hand back to handcuff. Officer Talbott arrived on scene just before the cuffing occurred and controlled Mr. Turner's legs. Officer Wilson and Officer Young then secured

Defendants 7116

Mr. Turner's hands with two sets of handcuffs. Sergeant Frost arrived after the handcuffing and secured Mr. Turner's legs with a leg hobble. The timeline based on available video demonstrates that Mr. Turner heads off screen towards the alley at approximately 09:02:55. A second officer heads off screen towards the alley about 17 seconds later. A third officer heads off screen to the alley almost a minute later. At 09:04:44, Officer Talbott radioed for the hobble, which was right after the handcuffs were placed based on his deposition testimony. Sergeant Frost arrives at the alley at approximately 09:05:15 and then what sounds like Mr. Turner moaning at 09:05:20 can be heard on the audio. At 09:06:00, moaning can no longer be heard and at 09:07:15, one of the officers asks if Mr. Turner is still breathing. So, based on the timing in the video, Mr. Turner was yelling and moaning for well over a minute after the handcuffs were placed. The up to 3 minutes that it took the officers to get Mr. Turner handcuffed would not be long enough to cause asphyxiation. Additionally, Mr. Turner was clearly moving air in and out of his lungs after being handcuffed as evidenced by his continued yelling and moaning for over a minute after being handcuffed. This could not be asphyxiation from the restraining process to handcuff Mr. Turner, as he was clearly alive after the weight force used to handcuff him had been removed. Asphyxiation does not occur in delayed fashion.

      It should also be noted that the majority of the weight force was not even on Mr. Turner in such a position that would have created the potential to limit ventilation. The weight on the legs would have no impact on ventilation. The weight placed on the shoulders while cuffing would not significantly limit ventilations enough to cause asphyxiation. Pinning the arm down to the ground would not limit ventilations. Research using up to 220 lbs. of weight on a subject's back has not shown to cause physiologic changes that would imply asphyxiation is even possible with that amount of weight.

      Finally, the end-tidal $CO_2$ noted by paramedics when they arrived was low at 12 mm Hg. If

Defendants 7117

Mr. Turner had been asphyxiated by the restricting of chest wall movement due to weight and compression, he would not have been able to ventilate and breathe out carbon dioxide ($CO_2$). Over the time of asphyxiation, he would have built up high levels of $CO_2$, the earliest clinical indicator of asphyxiation. This would have led to a buildup of $CO_2$ in the lungs and when the paramedics started ventilating him with the breathing tube, the end tidal $CO_2$ that they measured would have been extremely high. In the case of Mr. Turner, the end tidal $CO_2$ levels were abnormally low, meaning this could not be asphyxiation. The low $CO_2$ levels at the time of initiating ventilations are consistent with a cardiac arrest not related to ventilatory failure, but rather cardiac arrest, caused by a sudden cardiac dysrhythmia.

Given that Mr. Turner was alive and resisting before, during, and after the hand-cuffing, and that the cardiac arrest occurred suddenly later in time, the effort to restrain and handcuff him did not cause or contribute to Mr. Turner's death. Additionally, the amount of weight, the location of the weight and the duration of weight placement would not be consistent with causing asphyxiation. Finally, there is not any evidence that Mr. Turner was asphyxiated particularly, but not solely, based on the end tidal $CO_2$ levels noted by the paramedics. Therefore, there is no evidence that position, restraint or body weight during the restraining process caused or contributed to Mr. Turner' death.

2. ***There was no evidence of blunt force trauma to Mr. Turner that caused or contributed to his cardiac arrest and death.***

Mr. Turner was reported to have fallen to the ground with officers and was involved in a scuffle during the attempts to gain control of him and place handcuffs. There was no reported use of weapons like a nightstick or asp during the encounter. There were also no reports of punches, kicks or distraction blows used by officers during the encounter. On autopsy, there were no contusions or fractures identified and reported. The medical examiner in his autopsy under the

Defendants 7118

gross anatomic description section noted, "Evidence of injury: none."  Additionally, in the "Findings" section on the autopsy, the medical examiner wrote, "No evidence of trauma."  There is no evidence that any significant blunt force trauma occurred during the encounter between officers and Mr. Turner to get him handcuffed, nor that blunt force trauma caused or contributed to Mr. Turner's sudden cardiac arrest and death.

3. ***There was no evidence of neck compression on Mr. Turner and there is no evidence that neck compression caused or contributed to his cardiac arrest and death.***

There was no evidence based on the review of the reports that a neck hold was attempted or placed on Mr. Turner.  The medical examiner in his autopsy reported that the neck has an intact hyoid bone as well as thyroid and cricoid cartilages.  The larynx was unremarkable, and the epiglottis was without swelling or trauma. The musculature and vasculature of the anterior neck were unremarkable, and the trachea and spine were in the midline, with no traumatic injuries or pathological lesions.

Neck holds can cause injury and possible death by blocking the airway and asphyxiating an individual by a bar hold or by blocking off blood flow to the brain for so long, that brain damage occurs from a hypoxic (low oxygen level) injury which then leads to a cardiac arrest.  In the case of Mr. Turner, there are no clinical findings of a bar hold.  A bar hold is when the arm is pulled across the airway hard enough to cause asphyxiation.  When this occurs, there is crushing of the anterior neck structures, leading to significant damage, including to the thyroid and laryngeal cartilage.  On autopsy, these findings were not present.

Additionally, there was no report of a carotid "sleeper" restraint, also known as the lateral vascular neck restraint (LVNR), being placed on Mr. Turner.  The pathophysiology and safety of the LVNR are relatively straightforward and well delineated in many texts.  The purpose is to place

Defendants 7119

the arm around the neck of the subject to be controlled. The crook of the elbow is placed at the anterior (front) region of the neck and the forearm and upper arm come around the sides and are used to place pressure on the lateral aspects of the neck where the carotid arteries are located. Pressure placed on the arteries diminishes blood flow to the brain, quickly rendering the subject unconscious. This takes time to occur. And if released once unconsciousness occurs, this hold has been deemed safe for many years of use in martial arts. If the hold is left on for a prolonged period, restricting blood flow to the brain, there is a theoretical risk of stroke and possibly death. However, there was no report of an LVNR being placed, let alone one being maintained for a prolonged period of time after the hold rendered the subject unconscious. And again, there were no bruises of the neck muscles or damage to the neck whatsoever noted on autopsy. Thus, there is no evidence that a neck hold was ever used and there is no evidence that a neck hold caused or contributed to Mr. Turner's sudden cardiac arrest and death.

4. ***Mr. Turner had an enlarged heart that placed him at significant risk of going into sudden cardiac arrest and dying, that coupled with his agitation and resistance was the probable cause of his cardiac arrest and death.***

Mr. Turner had a heart that was significantly enlarged, weighing 520 grams. The normal sized heart for a male is typically 300-350g and some sources note possibly up to 400g depending on body size. One of the more common causes of an enlarged heart, like Mr. Turner has, is cocaine abuse, which was listed as one of the findings on Mr. Turner's autopsy and noted throughout his medical records.

Mr. Turner's agitated state and continued exertion through his resistance would continue to stress this already abnormally enlarged heart. This significant physical enlargement of the heart in and of itself can place an individual at increased risk for sudden cardiac arrest and death from an

irregular heartbeat but the continued exertion Mr. Turner was exhibiting, increased this risk for sudden cardiac arrest.

Contributing to his agitated and exertional state, Mr. Turner had a diagnosis of schizophrenia and a history of non-compliance with taking his medications to treat this disorder. Mr. Turner had multiple episodes of decompensation due to schizophrenia requiring urgent medication treatment and hospitalizations. The most recent episode was in April 2016. It should be noted that on autopsy, there was no evidence of any medications to treat schizophrenia found in Mr. Turner's blood. This finding, along with his clinical presentation on November 16, 2016 was consistent with another episode of medication non-compliance by Mr. Turner. During his repeated times of medication non-compliant decompensations of schizophrenia, Mr. Turner was noted to get agitated and behave similarly to November 16, 2016. This non-compliance led to agitation and ongoing resistance and struggling during his interaction with the officers on this date.

This exertional activity creates lactic acid by the muscles working so hard and increases the work of the heart. Lactic acid is the chemical that builds up when a person exercises and feels the muscles "burn." That burn is from the lactic acid and when in the blood stream, will also lower the pH and make the blood more acidic. The acidic blood is also a cardiac irritant, increasing the risk for sudden cardiac arrest.

Thus, in summary, Mr. Turner was non-compliant with his medications, was agitated and exerting himself, including running across the street and resisting officers. This led to increased metabolic demands and increased blood acidosis, which were stressing his abnormally enlarged heart, until the heart finally failed and went into cardiac arrest. Thus, I agree with the findings of the medical examiner who opined, that Mr. Turner died of "cardiac arrhythmia due to cardiomegaly with left ventricular hypertrophy," in that the exertion in combination with his enlarged heart was the probable cause of Mr. Turner's sudden cardiac arrest and death.

Defendants 7121

5. ***The use of an automatic external defibrillator (AED) by the officers and the initiation of CPR by EMS while Mr. Turner was still handcuffed did not have an impact on his ultimate outcome.***

The police officers placed the AED onto Mr. Turner while he was still handcuffed. This would not affect the operation or effectiveness of the AED in it being able to interpret the cardiac rhythm and deliver a shock if appropriate. Once the paramedics arrived, they started CPR and moved Mr. Turner onto the paramedic gurney. After they moved Mr. Turner, they removed one of the handcuffs to remove his hands from behind his back. The short period of time in doing chest compressions with the hands cuffed behind the back would not significantly impact the ability to do effective chest compressions nor would it have affected the ability to resuscitate Mr. Turner.

## Background

My background is that I am a full-time faculty member in the department of emergency medicine at the University of California, San Diego Medical Center. I am residency trained and board certified in Emergency Medicine. I work full time as a practicing clinician in the Emergency Department of a busy urban hospital and serve as the clinical operations chief for our two emergency departments with a combined annual census of approximately 70,000 visits. I currently serve as the Medical Director for Risk Management for the UC San Diego Health System. I also serve as the UCSD Medical Center's Medical Risk Management Committee Chair and Allocation Committee Co-Chair, as well as previously having served as the Chair of the Patient Care and Peer Review Committee, each of which are charged with the task of reviewing medical records and making determinations of standard of care. I am also the former Chief of Staff for the UCSD Medical Center.

I have worked for over 20 years as a faculty emergency physician at an urban-based

Defendants 7122

emergency department that is contracted to receive patients who in custody, both as field arrests and for on-going care while incarcerated.  I served as the UCSD Director of Custody Services overseeing hospital services for the San Diego County Sheriff's Department Medical Services for 16 years.   I also have worked in a jail setting for over 18 years, staffing weekly sick call clinics on site at the San Diego Sheriff's jails throughout San Diego County.

I am knowledgeable of peer-reviewed medical and scientific research on the physiological effects of positional restraint and positional asphyxia conducted by others. I have also performed extensive clinical research on human subjects who have been restrained in various positions and with various amounts of weight being placed (articles included in my curriculum vitae) which includes having directly been involved with hundreds of subjects being restrained and studied, hundreds of patients restrained during my work in the emergency department and have personally been restrained with weights placed on me as well.   I have been invited to lecture nationally and internationally on this subject.  Given my own interests in this area, I regularly perform a complete review of the literature regarding restraints and in custody death.

I am knowledgeable of peer-reviewed medical and scientific research on neck holds.  I have written several peer reviewed papers and textbook chapters on this topic and have been invited to lecture on this topic.  I am trained as a second-degree black belt in tae kwon do and have been trained in neck holds and have even been personally "choked out" to the point of unconsciousness.  Given my own interests in this area, I regularly perform a complete review of the literature regarding neck restraint use.

I am knowledgeable of peer-reviewed medical and scientific research for cardiac arrest and CPR practices.   I was the Principle Investigator for San Diego's Resuscitative Outcomes Consortium (ROC) site, a National Institute of Health (NIH) funded study for ten years that involved over 200,000 cardiac arrest patients to evaluate treatment options for out of-hospital

Defendants 7123

cardiac arrest and severe traumatic injury. I have published many peer-reviewed papers on the topic of cardiac arrest and cardiac resuscitation, including publications in the New England Journal of Medicine, JAMA, and Circulation. I also served as the Medical Director of the American Heart Association Training Center at the University of California, San Diego Center for Resuscitation Science almost ten years, teaching Advanced Cardiac Life Support (ACLS) both locally and being asked to give lectures on cardiac arrest internationally. I had been an ACLS instructor for over 20 years. I also work at a busy urban comprehensive emergency department where I care for patients in cardiac arrest on a regular basis.

As per Rule 26 formatting, Appendix A is a copy of my current Curriculum Vitae, which includes a list of all publications authored by me. Appendix B is a list of all cases in which I have testified as an expert in trial or deposition within the preceding four years. Appendix C is my fee schedule. The knowledge base that I utilize has been developed over time from my years of clinical practice and experience, reading and training as well as research. Under penalty of perjury, I hereby swear that the opinions stated above are true and correct within a reasonable degree of medical probability.

Respectfully submitted,

[signature redacted]

Gary M. Vilke, M.D., FACEP, FAAEM
Professor of Clinical Emergency Medicine
Vice-Chair, Clinical Operations Emergency Medicine
Medical Director, Risk Management, UC San Diego Health System
Medical Director, Carlsbad Fire Department and AirLinkUSA

Defendants 7124