E-FILED
Wednesday, 26 June, 2019 04:04:25 PM
Clerk, U.S. District Court, ILCD

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
2

3

   CHANDRA TURNER, as Special          )
4  Administrator of the Estate of      )
   RICHARD TURNER, deceased, and       )
5  CHANDRA TURNER, individually,       )
                                       )
6          Plaintiff,                  )
                                       )
7  vs.                                 ) No. 17 CV 2261
                                       )
8  CITY OF CHAMPAIGN, a municipal      )
   corporation, CHAMPAIGN POLICE       )
9  OFFICER YOUNG; CHAMPAIGN POLICE     )
   OFFICER WILSON; CHAMPAIGN           )
10 POLICE OFFICER TALBOTT;             )
   CHAMPAIGN POLICE SERGEANT           )
11 FROST,                             )
                                       )
12         Defendants.                 )

13

14

15

16           **CONTAINS CONFIDENTIAL PORTIONS**
                  **BOUND SEPARATELY**
17                  PAGES 93-100
            DEPOSITION OF OFFICER ANDREW WILSON
18           TAKEN ON BEHALF OF THE PLAINTIFF
                  October 10, 2018
19

20

21

22

23                              **Exhibit 3**
24 Job No. 148762

25

Contains Confidential Portions

1

2                         I N D E X

3    QUESTIONS BY                           Page

4

5    MR. HENDERSON                              5

6    MR. BRUNNER                              107

7    MR. CARMICHAEL                           108

8    MR. BRUNNER                              110

9

10

11                       E X H I B I T S

12   EXHIBIT                                 Page

13

14   Wilson Exhibit No. 1  Police Report       106

15   Wilson Exhibit No. 2  Field Training       106
                           Program Document

16

17

18

19

20

21

22

23

24

25

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS

2

3

     CHANDRA TURNER, as Special          )
4    Administrator of the Estate of      )
     RICHARD TURNER, deceased, and       )
5    CHANDRA TURNER, individually,       )
                                         )
6         Plaintiff,                     )
                                         )
7    vs.                                 ) No. 17 CV 2261
                                         )
8    CITY OF CHAMPAIGN, a municipal      )
     corporation, CHAMPAIGN POLICE       )
9    OFFICER YOUNG; CHAMPAIGN POLICE     )
     OFFICER WILSON; CHAMPAIGN           )
10   POLICE OFFICER TALBOTT;             )
     CHAMPAIGN POLICE SERGEANT           )
11   FROST,                              )
                                         )
12        Defendants.                    )

13

14        DEPOSITION OF OFFICER ANDREW WILSON, produced,
15   sworn and examined on October 10, 2018, between the
16   hours of 11:00 a.m. and 3:00 p.m. of that day, at the
17   offices of Thomas, Mamer & Haughey, LLP, 30 East Main
18   Street, 5th Floor, Champaign, Illinois 61824-0560,
19   before Sandra J. Rynders, a Certified Shorthand Reporter
20   (IL), and Registered Professional Reporter, in a certain
21   cause now pending in the United States District Court
22   for the Central District of Illinois, East St. Louis
23   Division, between Chandra Turner et al, Plaintiff, vs.
24   City of Champaign et al, Defendants; on behalf of the
25   Plaintiff.

                    A P P E A R A N C E S


          For the Plaintiff:


                  Mr. Christopher Carmichael, Esq.
                  Henderson Parks
                  140 South Dearborn Street
                  Chicago, Illinois 60603



          For the Defendants:


                  Mr. Justin Brunner, Esq.
                  Mr. David Krchak, Esq.
                  Thomas, Mamer & Haughey
                  30 East Main Street
                  Champaign, Illinois 61820




          Also present:    Ms. Susan Wozniak, Paralegal,
                            City of Champaign






Court Reporter:
Sandra J. Rynders, CSR
Illinois CSR #084-004861

1        OFFICER ANDREW WILSON

2            IT IS HEREBY STIPULATED AND AGREED by and

3    between counsel for the Plaintiff and counsel for the

4    Defendants that this deposition may be taken in

5    shorthand by Sandra J. Rynders, a Certified Shorthand

6    Reporter (IL), and Registered Professional Reporter and

7    afterwards transcribed into typewriting; and the

8    signature of the witness is expressly waived.

9                *    *    *    *    *

10           (The deposition began at 11:15 a.m.)

11               *    *    *    *    *

12            OFFICER ANDREW WILSON,

13    of lawful age, produced, sworn and examined on behalf of

14    the Plaintiff, deposes and says:

15                    EXAMINATION

16    BY MR. HENDERSON:

17        Q.    All right.  Could you state your name for

18    the record.

19        A.    Andrew Wilson.

20        Q.    And, Mr. Wilson, where do you currently

21    work?

22        A.    I currently work with two employers, the

23    Champaign Police Department and the Illinois Army

24    National Guard.

25        Q.    And we're here today about something that

1   OFFICER ANDREW WILSON

2   happened on November 16, 2016 involving Richard Turner.

3          Do you recall that event?

4          A.   Yes.

5          Q.   On November 16 of 2016 did you believe that

6   Richard Turner needed medical assistance?

7          A.   Yes.

8          Q.   Did you call for an ambulance to take him to

9   the hospital?

10         A.   No.

11         Q.   You did not call for an ambulance?

12         A.   Not to take him to the hospital necessarily.

13  I called for an ambulance to come evaluate him.

14         Q.   And why did you call for an ambulance?

15         A.   I called for an ambulance to evaluate if Mr.

16  Turner was capable of taking care of himself.

17         Q.   Did you call for an ambulance because Mr.

18  Turner was acting strangely?

19         A.   I called an ambulance because I wanted to

20  ensure that he was taking care of himself and I noticed

21  that his behavior was not what it usually is.

22         Q.   And what about his behavior prompted you to

23  feel that way?

24         A.   I would say his behavior was more aggressive

25  and confrontational than normal.

Contains Confidential Portions

1    OFFICER ANDREW WILSON

2        Q.   And when you say more aggressive and

3    confrontational what do you mean?

4        A.   The incident that stands out is shortly

5    after I arrived he grabbed a sign off of a nearby

6    building and just threw it across the sidewalk and into

7    the street.

8        Q.   And that was a little tag that was probably

9    about the size of a do not disturb tag for a -- of a

10   hotel room, right?

11       A.   I don't recall exactly how large it was.

12       Q.   Was it fairly small?

13       A.   I don't know.

14       Q.   A couple inches by a couple inches?

15       A.   I would say it was a larger than that.

16       Q.   Okay.  Anything else?

17       A.   He was also, according to METCAD, walking in

18   the street, crossing the street multiple times, and then

19   he was touching the ground and failing to comply with

20   officers telling him to leave.

21       Q.   Was Mr. Turner speaking unintelligibly?

22       A.   He was speaking unintelligibly and then at

23   other times would offer responses that intelligible but

24   were irrelevant to the conversation that we were

25   attempting to have with him.

1          OFFICER ANDREW WILSON

2          Q.   You know, for example if somebody asks

3   somebody how their day was and they answer purple, would

4   that be an example of a response that would be

5   understandable but irrelevant?

6          A.   I suppose that would be an example.

7          Q.   Okay.  Were you aware that Mr. Turner had

8   mental health issues?

9          A.   I had heard that he had mental health issues

10  from other officers.

11         Q.   In any of your interaction with him had you

12  seen anything that indicated he had mental health

13  issues?

14         A.   I don't think that I'm qualified to

15  diagnosis somebody with mental health issues just based

16  off of casual observation.  But he did display strange

17  behavior, talking to himself, et cetera.

18         Q.   You followed Mr. Turner into what's I guess

19  a walkway on Green Street?

20         A.   Yes.

21         Q.   And it's between two buildings?

22         A.   Yes.

23         Q.   Were you the first officer to touch Mr.

24  Turner?

25         A.   Yes.

OFFICER ANDREW WILSON

Q.   And what were you attempting to do when you touched Mr. Turner?

A.   I was attempting to stop him from wondering away before he was evaluated by medical personnel.

Q.   Where did that walkway lead to?

A.   It leads to an alley just north of that walkway north of Green Street.

Q.   And you were -- at the time you were following Mr. Turner, correct?

A.   Yes.

Q.   When did you decide to take Mr. Turner into custody?

A.   I never decided to take Mr. Turner into custody.

Q.   Is there anything in particular that precipitated you touching Mr. Turner?

A.   Could you repeat the question.

Q.   Is there anything in particular that precipitated you touching Mr. Turner?

A.   I don't understand the question.

MR. BRUNNER:  Do you know what the word precipitated means?

THE WITNESS:  Yes.  But I don't understand it in this context.

1        OFFICER ANDREW WILSON

2        Q.   (By Mr. Carmichael)  So let me try to

3   rephrase.  Mr. Turner was walking down the walkway, and

4   you were following him, correct?

5        A.   Right.  Walking, running, kind of a mixture

6   of the two, and I was following him.

7        Q.   Okay.  And I was trying to understand what

8   -- in particular if there was anything that prompted you

9   to go ahead and touch him.

10        A.   He wasn't responding to verbal commands.  So

11   that's when I decided to touch him.

12        Q.   Okay.  And what were those commands?

13        A.   I believe once we were in the alleyway that

14   I told him to stop because he was still walking away.

15   And prior to that I asked him to sit and wait on the

16   curb, and he did not obey.

17        Q.   And do you know how many times in the

18   walkway you told him to stop?

19        A.   I don't remember.

20        Q.   Okay.  Did you say anything else besides

21   stop?

22        A.   I don't remember.

23        Q.   Were the only -- were you the only person

24   telling Mr. Turner anything in the walkway?

25        A.   I think so.

1        OFFICER ANDREW WILSON

2        MR. BRUNNER:  At what point in time,

3    counsel, just for clarification?

4        Q.  (By Mr. Carmichael)  Just before you, you

5    know, touched Mr. Turner was anyone else giving him any

6    directions or talking to him?

7        A.  I don't think anybody was.  No.

8        Q.  How about Officer Young?

9        A.  I don't remember clearly.

10        Q.  And Mr. Turner, what was he doing in the

11    walkway, just walking away from you or running away from

12    you?

13        A.  Right.  Yes.

14        Q.  Was he doing anything else?

15        A.  No.

16        Q.  Was there anyone else in the walkway?

17        A.  Not that I remember.  No.

18        Q.  Was Mr. Turner doing anything in the walkway

19    that indicated he was an immediate danger to someone

20    else?

21        A.  No.

22        Q.  Was Mr. Turner doing anything in the walkway

23    that indicated he was an immediate danger to himself?

24        A.  No.

25        Q.  Where did you first touch Mr. Turner?

Contains Confidential Portions

1        OFFICER ANDREW WILSON

2        A.   I touched him on the shoulder.

3        Q.   And did Mr. Turner try to keep walking as

4   you touched his shoulder?

5        A.   Yes.  He tried to pull away.

6        Q.   And as he tried to pull away did you grab

7   harder then or not let him?  I'm just trying to --

8        A.   I didn't let go.

9        Q.   Okay.

10       A.   But I didn't pull back or anything either.

11       Q.   So as he tried to keep going or get away you

12   kept your hold on him?

13       A.   Yes.

14       Q.   And that was on the shoulder?

15       A.   Yes.

16       Q.   At that point did you consider disengaging

17   or pulling back?

18       A.   No.

19       Q.   Did you consider calling for Officer

20   Talbott's assistance?

21       A.   No.

22       Q.   Did you know Officer Young was behind you?

23       A.   Yes.

24       Q.   Did you consider calling for Sergeant

25   Frost's assistance?

1          OFFICER ANDREW WILSON

2       A.   No.

3       Q.   Did you consider asking Officer Talbott or

4  Sergeant Frost to circle around into the alley?

5       A.   No.

6       Q.   At the time did you know that Sergeant Frost

7  was a certified member of the crisis intervention team?

8       A.   No.

9       Q.   Did -- as you were in the alley with Mr.

10  Turner and you put your hand onto his shoulder did you

11  have access to your radio?  Could you have called for

12  assistance?

13       A.   At what time?

14       Q.   When you were in the walkway with Mr. Turner

15  and you put your hand on his shoulder did you access to

16  your radio?  Could you have called for assistance?

17       A.   Yes.

18       Q.   Okay.  There's also a panic button on your

19  radio; is that correct?

20       A.   Yes.

21       Q.   And you could hit that as well?

22       A.   Yes.

23       Q.   When did you join the Champaign Police

24  Department?

25       A.   I joined in 2015.

1                    OFFICER ANDREW WILSON

2          Q.    What month, do you recall?

3          A.    August or September.

4          Q.    And what did you do before you became a

5    police officer?

6          A.    I was a student at the University of

7    Illinois and a soldier with the Illinois National Guard.

8          Q.    Did you graduate?

9          A.    Yes.

10         Q.    And what type of degree did you get?

11         A.    I got a sociology degree.

12         Q.    Did you graduate in 2015?

13         A.    I completed all my coursework in 2015, but I

14   didn't file my paperwork to actually graduate until

15   later.

16         Q.    Okay.  Do you recall when they formally

17   awarded you your degree then?

18         A.    I think that I requested it a year later or

19   so.

20         Q.    Okay.  Was that the last degree you've

21   completed?

22         A.    Yes.

23         Q.    And when you were hired by the Champaign

24   Police Department did you go through any training?

25         A.    Yes.

OFFICER ANDREW WILSON

1
2      Q.    Okay.  Could you tell me about that.

3      A.    I attended the Police Training Institute at

4 the University of Illinois.

5      Q.    For how long?

6      A.    I believe the course was three months.

7      Q.    And just for my own understanding when you

8 attend that institute are you actually hired by the

9 police department at that point or you were hired after

10 you complete that?

11      A.    Hired prior.

12      Q.    Okay.  Did you -- is there a graduation or a

13 test after you go through the training institute?

14      A.    Yes.

15      Q.    Did you complete that?

16      A.    Yes.

17      Q.    What happens after you graduate from the

18 Police Training Institute?

19      A.    After you graduate the Police Training

20 Institute you go to the police department and you

21 complete essentially in processing training there.

22      Q.    And how long does that go on for?

23      A.    The initial training I believe is a week.

24      Q.    How about after that?

25      A.    After that you go into the field training

1                OFFICER ANDREW WILSON

2  program.

3        Q.   And how long does the field training program

4  last?

5        A.   I don't recall exactly how long the field

6  training program lasted, but it's around a year.

7        Q.   Were you still in the field training program

8  in November of 2016?

9        A.   Yes.

10       Q.   And in November of 2016 -- on November 16th

11 of 2016 were you riding with a field training officer?

12       A.   Yes.

13       Q.   Who was that officer?

14       A.   It was Officer Talbott.

15       Q.   And what was the purpose of that, you riding

16 with Officer Talbott on that day?

17       A.   The purpose of riding with Officer Talbott

18 was so that he could monitor -- basically monitor me

19 until he could evaluate me at the end of the shift.

20       Q.   And was he riding with you for just one day

21 or multiple days?

22       A.   I think at that stage of FTO it was multiple

23 days.

24       Q.   And do you remember about how long after

25 that ride-along you completed your field training?

Contains Confidential Portions

1          OFFICER ANDREW WILSON

2      A.   I completed it in December.

3      Q.   Okay.  And then you would have gone from a

4  probationary officer to a full officer?

5      A.   Yes.

6      Q.   Okay.  And prior to that you were what's

7  called a probationary officer?

8      A.   Yes.

9      Q.   Is there any limitations on your duties when

10  you're a probationary officer?

11     A.   No.

12     Q.   Are there things that you're supposed to not

13  do as a probationary officer or have supervisory people

14  with you?

15     A.   No.

16     Q.   What's the significance of being a

17  probationary officer?

18     A.   Could you rephrase the question.

19     Q.   Yeah.  I just wanted to get an

20  understanding.  So you're a probationary officer?

21     A.   Right.

22     Q.   Does that generally mean that for example I

23  guess if you don't complete that satisfactorily, you

24  could be discharged?

25     A.   Yes.

1           OFFICER ANDREW WILSON

2       Q.   And possibly more easily than if you were a

3   full officer?

4       A.   Yes.

5       Q.   Okay.  Beyond that do they put any -- say,

6   you know, you're a probationary officer, we don't want

7   to you to do this particular activity without help?

8            MR. BRUNNER:  In that particular step that

9   he was in in November of 2016 or at other points in

10  time?

11           MR. CARMICHAEL:  Just generally.

12           THE WITNESS:  It would depend on what step

13  you're in.

14       Q.   (By Mr. Carmichael)  Okay.  So as you go

15  through steps it changes?

16       A.   Yes.

17       Q.   Okay.  And you were -- in November of 2016

18  what step were you in?

19       A.   I believe I was in Step 4.

20       Q.   Is that the final step?

21       A.   I think it is just prior to the final step.

22       Q.   And what does Step 4 mean?

23       A.   It means that I'm expected to operate

24  independently and then be evaluated by an officer at the

25  end of my shift.

Contains Confidential Portions

1          OFFICER ANDREW WILSON

2          Q.   And what's Step 5?

3          A.   Step 5 is where you operate independently

4     without a field training officer with you except for

5     occasional check rides.

6          Q.   Okay.  In January of 2017 were you trained

7     and certified in crisis intervention?

8          A.   I believe so.

9          Q.   Do you recall what that training entailed?

10          A.   Yes.

11          Q.   Could you tell me about it.

12          A.   The crisis intervention training to become a

13     CIT officer -- if that's the training that you're

14     talking about -- it entails essentially classroom

15     training on how to deal with the mentally ill or

16     disabled, and then you do reenactments with actors so

17     that you can practice those techniques.

18          Q.   And about how long is the training?

19          A.   I don't remember.

20          Q.   Was it a day, more than one day?

21          A.   Its been a while.  I don't remember exactly

22     how many days it was.

23          Q.   Okay.  Was there a certification you get at

24     the end?

25          A.   Yes.

OFFICER ANDREW WILSON

Q.   And what's that certification?

A.   You are a crisis intervention officer.

Q.   So now you're one of the crisis intervention officers for Champaign?

A.   Right, in the sense that I'm certified through that course.

Q.   And as being a certified crisis intervention officer other officers could call on you for assistance if they feel that they would like to have your skills?

A.   Yes.

Q.   And you mentioned learning about dealing with persons with mental health issues.  What did the training teach you about that?

A.   The training taught us that you need to be careful when dealing with the mentally ill, that they won't necessarily respond the same way that others would.

Q.   And you say be careful.  What do you mean?

A.   Just to realize that they have their own sets of needs compared to other people, other citizens.

Q.   When you say sets of needs, what do you mean?

A.   They might not be able to communicate well, et cetera.

1        OFFICER ANDREW WILSON

2        Q.    And you said they might respond differently.

3   What do you mean by that?

4        A.    If they don't understand how you're speaking

5   or what you're saying, they may not follow your

6   instructions or, you know, do what you tell them to do.

7        Q.    Did the crisis intervention training cover

8   any possible physical aspects of mental illness that --

9   you know, the physical symptoms or manifestations it

10  might have on someone with mental illness?

11        MR. BRUNNER:  Physically observable, is that

12  what you're saying or like actual physical?

13        Q.    (By Mr. Carmichael)  I'm just trying to

14  understand if there was anything that your training

15  touched upon that someone with mental illness might also

16  have some other physical ailments.

17        A.    Not that I recall.

18        Q.    Is there anything from that training, the

19  crisis intervention training that you feel could have

20  helped you in dealing with Richard Turner?

21        A.    Yes.

22        Q.    And what specifically from that training

23  could have helped you?

24        A.    I think the best thing from that training

25  would be to help me understand how the mentally ill can

1          OFFICER ANDREW WILSON
2   have a hard time communicating.
3          Q.   Did that training also touch upon management
4   of situations with mentally ill persons?
5          A.   Possibly.  I don't recall.
6          Q.   How about -- how about diffusing a situation
7   with a mentally ill person, did it touch upon techniques
8   for that?
9          A.   Yes.
10          Q.   And maybe conflict deescalation, did it
11   touch upon those issues?
12          A.   I believe so.
13          Q.   And what type of things did you learn about
14   management and deescalation?
15          A.   The only thing that comes to mind right now
16   -- I guess it wouldn't be considered deescalation, but
17   talking in a soft voice and presenting yourself in a
18   non-threatening manner.
19          Q.   Prior to the encounter in November of 2016
20   had you had any familiarity with Richard Turner?
21          A.   Yes.
22          Q.   And how many times had you encountered him?
23          A.   I don't know how many times that I
24   encountered him.  I mean it depends.  As a student or as
25   an officer or --

OFFICER ANDREW WILSON

1

2    Q.   Well, tell me both.  How many times had you
3  encountered him as both a student and an officer?
4    A.   I would say when I say that it's -- that I
5  don't know it's because it's probably too many for me to
6  really count.  I mean I saw him all the time while I was
7  working that area.
8    Q.   So -- and Richard Turner, he -- he
9  frequented the area along Green Street; is that right?
10    A.   Yes.
11    Q.   And that's a main road into campus, right?
12    A.   Yes.
13    Q.   So if you were I guess attending the
14  university, you might have seen him when you were
15  attending the university?
16    A.   Yes.
17    Q.   Did you interact with him at all?
18    A.   Yes.
19    Q.   And what were your interactions with Richard
20  Turner?
21    A.   I gave him money a couple times.
22    Q.   Okay.  Was he asking for money, or did you
23  just give him money?
24    A.   He would sometimes panhandle.  Yeah.  So he
25  was asking for money.

Contains Confidential Portions

1          OFFICER ANDREW WILSON

2          Q.   Did you see other people engage with him as

3   well?

4          A.   Yes.

5          Q.   Did they talk to him?

6          A.   Yes.

7          Q.   Did they give him money?

8          A.   Yeah.

9          Q.   Did you talk to him yourself?

10         A.   Just the normal thank you, hello.

11         Q.   Was he able to talk to you at those times?

12         A.   Yes.  He was talking to himself a lot.

13         Q.   Okay.  And as an officer what were the

14   reasons that you would encounter Richie?

15         A.   I would be doing patrols and see him and

16   just talk to him.

17         Q.   You would stop and talk to him?

18         A.   Right, or talk to him in passing.

19         Q.   Okay.  And was there a particular reason you

20   would talk to him or just because you were in the area

21   and you just --

22         A.   Right, just doing patrols.

23         Q.   Okay.  You weren't specifically called to

24   deal with him?

25         A.   Right.  Right.

1        OFFICER ANDREW WILSON

2        Q.    And the times you encountered Richie as an

3    officer generally what was he doing?

4        A.    Generally he was either sitting down or

5    sleeping.

6        Q.    In that same Green Street area?

7        A.    Yes.

8        Q.    And I think this kind of goes without

9    saying, but I want to ask you.  You knew Richie was

10   homeless, correct?

11       A.    Yes.

12       Q.    When you encountered Richie as an officer

13   were you able to talk to him then?

14       A.    Yes and no.  I would say hello or something,

15   but he didn't really want to talk to me I don't think.

16       Q.    Did -- did it change from when you were a

17   student to wearing a uniform?

18       A.    Yes.

19       Q.    So you think he wanted to engage you less

20   maybe when you were wearing the uniform than when you

21   were a student?

22       A.    Yes.

23       Q.    When you did engage Richie was he alert?

24   Did he appear to understand you and appear to -- that

25   you were talking to him?

1          OFFICER ANDREW WILSON

2      A.   Yeah.

3      Q.   I guess besides maybe sleeping and

4  panhandling, were there any other things that you saw

5  Richie do?

6      A.   Just walk up and down the street talking to

7  other people.

8      Q.   When you saw Richie was he ever aggressive

9  with anyone?

10      A.   No.

11      Q.   As an officer were you aware that Richie had

12  been admitted to the hospital for mental health

13  evaluations?

14      A.   No.

15      Q.   As an officer were you aware that Richie had

16  been admitted to the hospital?

17      A.   Not directly, no.

18      Q.   Had you -- had you heard or understood that

19  he had been admitted to the hospital involuntarily by

20  other officers on occasion?

21      A.   Yes.

22      Q.   I think I asked you before, but I just

23  wanted to be clear, was anyone else riding with you in

24  the squad car on November 16 of 2016?

25      A.   Yes.

1          OFFICER ANDREW WILSON

2          Q.    And who was that?

3          A.    Officer Talbott.

4          Q.    And he was there as a field training

5     officer?

6          A.    Yes.

7          Q.    You were dispatched on November 16th of 2016

8     to the area of Sixth and Green Street as backup; is that

9     correct?

10         A.    Yes.

11         Q.    Where -- do you recall where you were at

12    when you were dispatched?

13         A.    I was not dispatched.

14         Q.    Okay.

15         A.    I volunteered myself to go to the call.  I

16    was on a traffic call -- a traffic related call.

17         Q.    Okay.  So you heard the call and then you

18    offered to go there as well?

19         A.    Yes.

20         Q.    All right.  Had you heard Officer Young

21    either be dispatched or answer the call before you?

22         A.    Yes.

23         Q.    Is there a particular reason you decided to

24    go in addition?  Is there some kind of protocol or was

25    that just of your own volition?

1          OFFICER ANDREW WILSON

2          MR. BRUNNER:  Objection, form.

3     Q.   (By Mr. Carmichael)  It has two parts.

4     A.   Yeah.  Uh-huh.  I went voluntarily because

5  he was by himself on a call.

6     Q.   Okay.  And is there a preference in the

7  department to have more than one officer on a call?

8     A.   Yes.

9     Q.   I was just curious, when does the camera in

10  your car turn on?

11     A.   It activates when an officer pushes a button

12  or when you turn the lights on.

13     Q.   Okay.  Because I noticed that for your squad

14  it appeared to turn on I think at what would be Fifth

15  and Green Street.  I don't know if you watched the video

16  again, but am I accurate in that?

17     A.   Yes.

18     Q.   Would that have been because you pressed a

19  button?

20     A.   Yes.

21     Q.   In responding to this call did you activate

22  your lights?

23     A.   No.

24     Q.   And did you exceed the speed limit?

25     A.   I don't recall, but I don't think so.

1                    OFFICER ANDREW WILSON

2          Q.   It wasn't an emergency call?

3          A.   Right.

4          Q.   And when you arrived you didn't activate

5     your lights at that point either?

6          A.   No.

7          Q.   You just parked your car?

8          A.   Yeah.

9          Q.   And what did you see when you arrived at the

10    Fifth and -- I'm sorry -- Sixth and Green Street area?

11         A.   I saw Officer Young had his vehicle parked

12    at the same area that I parked at and that Richard

13    Turner was in the area.

14         Q.   Do you recall what he was doing?  I am

15    sorry.  I should have said do you recall what Richard

16    Turner was doing since there were two people you

17    referred to there.

18         A.   At that exact moment that I was pulling up I

19    don't recall what he was doing.

20         Q.   And what did you do when you pulled up?  Did

21    you park behind Officer Young?

22         A.   Yes.

23         Q.   And what did you do after you parked behind

24    Officer Young?

25         A.   I got out of my squad car and spoke with

1          OFFICER ANDREW WILSON

2    Officer Young.

3          Q.   And what did -- what did you say to Officer

4    Young and what did he say to you?

5          A.   I don't remember specifically what was said,

6    but I was asking him what was going on.

7          Q.   Do you remember him telling you what was

8    going on?

9          A.   I think he told me that he asked Richard to

10   leave.

11         Q.   Leave that area?

12         A.   Yes.

13         Q.   And was Richard still in the area?

14         A.   Yes.

15         Q.   So he had not I guess followed Officer

16   Young's directions yet?

17         A.   Right.

18         Q.   Once you arrived did Officer Young -- did he

19   again tell Richie to leave the area?

20         A.   I don't remember if he said it again after I

21   arrived, but I think so.

22         Q.   In parking your car, the -- the camera in

23   the vehicle is in the front of it, correct?

24         A.   Yes.

25         Q.   And in parking your car the camera is

Contains Confidential Portions

1    OFFICER ANDREW WILSON

2    pointed kind of away from where the -- where most of the

3    events happened?

4        A.   Yes.

5        Q.   Is there any protocol for trying to park

6    your car where the camera can see?

7        A.   I don't recall if there's a protocol

8    specifically saying that.  Our protocol is mostly

9    concerned with parking where it's safe.

10       Q.   Okay.  Is there any kind of preference or

11   directive you've been given to try and park where the

12   camera can see?

13       A.   I don't know.

14            MR. BRUNNER:  Can see what, counsel?

15       Q.   (By Mr. Carmichael) Can see whatever the --

16   the events that are transpiring.

17       A.   I don't know.

18       Q.   Okay.  I think after you arrived Richie

19   crossed the street.  Is that when he took off the

20   construction tag that you were talking about earlier?

21       A.   Yes.

22       Q.   Okay.  That was on the opposite side of the

23   street that you were on?

24       A.   Yes.

25       Q.   And what happened when he took that tag off

OFFICER ANDREW WILSON

1  and you said threw it to the ground?

3  A.  He took the tag off, threw it to the ground,
4  and that's what happened.

5  Q.  And what did you do after that?

6  A.  I didn't do anything after that.

7  Q.  Did anyone else do anything?

8  A.  Officer Young told him to pick it up.

9  Q.  Okay.  And what happened?

10  A.  He picked it up.

11  Q.  What was Richie doing?  Besides I guess
12  playing with the tag, was he walking around at the time?

13  MR. BRUNNER:  Objection, form as to playing
14  with the tag.  If you understand his question, you can
15  answer.

16  THE WITNESS:  Could you repeat the question.

17  Q.  (By Mr. Carmichael)  Yeah.  So Richie had
18  grabbed that tag.  After he did that was he walking
19  around places or did he kind of remain still?

20  A.  I don't remember what he did after he threw
21  the tag on the ground and picked it up.

22  Q.  When you were there on the scene was Richie
23  kind of moving around constantly?

24  A.  He was moving around, taking pauses.

25  Q.  He didn't sit down anywhere?

OFFICER ANDREW WILSON

1

2      A.   Not that I remember.

3      Q.   We had talked about the construction tag

4 before.  Was there anything else about Richie's behavior

5 at that point that struck you as unusual?

6      A.   Not leaving when officers asked him to leave

7 and touching the ground with his hands.

8      Q.   Anything else?

9      A.   No.

10      Q.   You said not leaving when officers told him.

11 In prior instances had Richie been told to leave and he

12 went ahead and did that?

13      A.   Yes.  From what I've been told also he

14 sometimes leaves just upon seeing police.

15      Q.   And you said touching the ground with his

16 hands.  What was kind of odd about that for you?

17      A.   Just strange behavior.  Normally he would

18 not do that, just I mean randomly dragging his hands

19 across the ground.  I had never seen him do that before.

20      Q.   Was he kind of bent over and dragging his

21 hands across the ground?

22      A.   Yes.

23      Q.   Okay.  He wasn't like getting down on the

24 ground?

25      A.   No.

OFFICER ANDREW WILSON

Q.    While Richie was exhibiting this behavior
did you and Officer Young talk about Richie and the
behavior at all?

A.    Yes.

Q.    And do you recall what was said?

A.    I don't recall exactly what was said.
Something to the effect that he was acting strangely.

Q.    Is that when you suggested you might call an
ambulance for an evaluation?

A.    Yes.

Q.    And you did call an ambulance for an
evaluation?

A.    Yes.

Q.    And that type of call to the ambulance, is
that an emergency call?

A.    No.

Q.    So that they would have just been directed
to the area, is that how it works?

A.    Yes.

Q.    In the same -- in the same way you kind of
went to the area as well, you know, normally obeying
speed limits and --

A.    Yes.

Q.    Okay.  Did Officer Young comment at any

OFFICER ANDREW WILSON

1  point that you and Richie were friends?

3       A.   I don't remember that.

4       Q.   Did Officer Young comment that since he felt

5  you and Richie were friends you could handle it and he

6  was going to leave?

7       A.   I don't remember that.

8       Q.   Did Officer Young at some point get into his

9  car as if he was going to leave?

10      A.   Yes.

11      Q.   And did you have the understanding Officer

12 Young was going to leave at that point?

13      A.   To clarify, I don't know if he got into his

14 car as though he were going to leave.  He did get into

15 his car.  I didn't know if he was going to leave at that

16 point or not.

17      Q.   You don't recall if he told you he was going

18 to leave?

19      A.   I don't remember that, no.

20      Q.   And when Officer Young got into his car did

21 you talk to Officer Talbott and tell him you were going

22 to keep an eye on Richie for a little bit?

23      A.   I remember telling either Young or Talbott

24 that.  I don't remember which one.

25      Q.   Okay.  And Officer Talbott -- while and you

Contains Confidential Portions

1                    OFFICER ANDREW WILSON

2    and Officer Young were interacting with Richie and while

3    you were talking to Officer Young, Officer Talbott, he

4    remained in the squad car; is that correct?

5              A.    I believe so.

6              Q.    Did you yourself tell Mr. Turner at some

7    point that he needed to leave?

8              A.    I think so.  Yes.

9              Q.    Do you recall if that was before or after

10   you had called for the ambulance?

11             A.    I believe that would have been before

12   calling for the ambulance.

13             Q.    Okay.  When speaking with Officer Young did

14   you indicate to him you didn't believe Richie was going

15   to leave the area?

16             A.    No.

17             Q.    After you called the ambulance did you tell

18   Richie to do anything else?

19             A.    I told him to come to me, and then I told

20   him to sit down.

21             Q.    Did Richie come over to your area?

22             A.    Yes.

23             Q.    About how close did he get to you?

24             A.    About the same distance that you and I are.

25             Q.    Okay.  A couple feet?

1                    OFFICER ANDREW WILSON

2           A.    Yes.

3           Q.    And what was Richie doing when he came over

4    to you?

5           A.    When he came over to me is when he did the

6    thing where he touched his hands on the ground.

7           Q.    Was he talking to himself at that point?

8           A.    I don't remember if he was at that point.

9           Q.    He was at some point talking to himself?

10          A.    He does that often.

11          Q.    Was it understandable?

12          A.    No.

13          Q.    And after Richie came over to you and he

14   dragged his hands across the ground what happened after

15   that?

16          A.    At that time I began asking him questions.

17          Q.    What type of questions did he ask him?

18          A.    I asked questions to evaluate his mental

19   state to see if he could care for himself.

20          Q.    Okay.  And just generally what were those?

21          A.    What -- what's today's date or what day is

22   it?

23          Q.    And what were his responses?

24          A.    I believe he said that it was November 2nd.

25          Q.    Okay.

1            OFFICER ANDREW WILSON

2      A.   And he may have said something else.

3      Q.   Okay.  And did he say anything else besides

4 that?

5      A.   Yes, but I couldn't understand what he was

6 saying.

7      Q.   Okay.  Did you ask him any other questions

8 besides what day it was?

9      A.   I don't think so.

10     Q.   When you call the ambulance do you get some

11 kind of confirmation that they're responding?

12     A.   Yes.

13     Q.   So when you did call the ambulance did you

14 get some kind of confirmation that someone was

15 responding to it?

16     A.   Actually now that I think about it we don't

17 typically get a confirmation unless we ask for it.

18     Q.   Okay.

19     A.   And, no, I had not asked for a confirmation.

20     Q.   Okay.  But when you call for an ambulance

21 are you --

22     A.   It's assumed as long as it's --

23          MR. BRUNNER:  You got to let him get his

24 question all the way out before you start answering.

25     Q.   (By Mr. Carmichael)  Yeah.  I was about to

1          OFFICER ANDREW WILSON

2  ask you what you were answering, which was when you call

3  for an ambulance do they actually come?

4          A.   Yes.

5          Q.   Okay.  And it's assumed that they will

6  respond unless somebody tells you otherwise?

7          A.   Yes.

8          Q.   All right.  And did they give you any type

9  of ETA?

10         A.   No.

11         Q.   If you asked for it, could they give you

12  one?

13         A.   Yes.

14         Q.   Okay.  And since I'm not familiar with it,

15  the ambulance, is that affiliated with the hospital here

16  or a private ambulance?

17         A.   There are multiple ambulance companies.

18         Q.   Okay.  Are the ambulance companies attached

19  to the fire departments?

20         A.   I believe that they're attached to the

21  hospitals.

22         Q.   Okay.  I was just trying to understand that

23  a little bit because where I'm from the ambulance is

24  part of the fire department.

25         A.   Uh-huh.

                    OFFICER ANDREW WILSON

1
2     Q.   So I take it up here they're -- they're not

3     part of the fire department; is that right?

4     A.   The companies that I typically use are

5     associated with Carle and what used to be Provena.

6     Q.   With the hospitals.  Okay.

7          MR. BRUNNER:  You nodded your head there.

8     You have to say something out loud.

9          THE WITNESS:  Yes.

10    Q.   (By Mr. Carmichael)  Sorry.  I caught you

11    with the coffee.

12          And when you say you typically use, do you

13    call for a specific one or do you just call for an

14    ambulance?

15    A.   You can call for a specific one.

16    Q.   Okay.  In this particular instance do you

17    recall if you called for a specific one or just for an

18    ambulance?

19    A.   Just for an ambulance.

20    Q.   So you told Richie to come there, you talked

21    to him.  What happened -- and he dragged his hands

22    across the ground.  What happened after that?

23    A.   He started to walk away.

24    Q.   Okay.  And where was he headed?

25          MR. BRUNNER:  Objection, foundation.

1
2          THE WITNESS:  I don't know.

3          Q.   (By Mr. Carmichael)  He walked in the
4   opposite direction of you?

5          A.   Away from me.

6          Q.   Away from you.  And did you say anything to
7   him when he started to walk away?

8          A.   I told him to come to me and sit down.

9          Q.   And did Richie respond?

10         A.   Initially I think he may have stopped and
11  began coming towards me, but ultimately he kept moving
12  away from me.

13         Q.   And where did he go as he moved away from
14  you?

15         A.   He crossed the street.

16         Q.   Was that Green Street?

17         A.   Yes.

18         Q.   And I'm not -- I'm not familiar with the
19  directions, but which way did he head?

20         A.   He began moving northwest.

21         Q.   Okay.  And along Green Street?

22         A.   He crossed at a diagonal.  It's an
23  intersection.

24         Q.   He crossed the Green and Sixth Street
25  intersection?

Contains Confidential Portions

1    OFFICER ANDREW WILSON

2         A.    Yes.

3         Q.    And he stayed on -- or he went -- you guys

4    were on Sixth Street, and he went to Green Street?

5         A.    Yes.

6         Q.    And I'm not sure which side that would be.

7    Is that the north side?

8         A.    He went -- yeah.  He went from the southeast

9    corner to the northwest corner.

10        Q.    Okay.  And he was moving down Green Street?

11        A.    He moved from the southeast corner of the

12   intersection to the northwest corner of the intersection

13   and then moved west down Green Street.

14        Q.    Okay.  Did he stop at any point?

15        A.    No.

16        Q.    And what did you do when he started to do

17   that?

18        A.    Following him.

19        Q.    And how were you moving when you followed

20   him?

21        A.    I was walking briskly.

22        Q.    When Richie was moving away from you were

23   his pants kind of falling down?

24        A.    Yes.

25        Q.    Was he having trouble moving very fast?

1           OFFICER ANDREW WILSON

2      A.   Yes.

3      Q.   Was he kind of shuffling?

4      A.   Yes.

5      Q.   And were you able to catch up to him walking

6  briskly?

7      A.   Yes.

8      Q.   And so he had proceeded west down Green

9  Street.  Did he turn at some point?

10     A.   Yes.

11     Q.   And is that when he went into this walkway?

12     A.   Yes.

13     Q.   And that's near a hotel?

14     A.   Yes.

15     Q.   And the walkway, that's probably five or six

16 feet wide?

17     A.   Approximately, yeah.

18     Q.   As Richie was moving -- continued to move

19 away from you and go down the walkway were you talking

20 to him?

21     A.   Yes.

22     Q.   And what were you saying?

23     A.   Prior to that I was calling out his name to

24 get a response, and then I told him to stop.

25     Q.   And were you telling him to stop repeatedly?

1        OFFICER ANDREW WILSON

2        A.   I don't remember.

3        Q.   Was Mr. -- did Richie respond in any way --

4        A.   No.

5        Q.   -- that you could -- did he make any audible

6   noises that you could hear?

7        A.   Other than what he's normally doing, no.

8        Q.   Kind of talking to himself?

9        A.   Right.

10       Q.   So he continued to do that?

11       A.   I believe so.

12       Q.   As Richie moved away from you did you talk

13   to Officer Young?

14       A.   No.

15       Q.   You just started following Richie?

16       A.   Yes.  I remember looking and exchanging

17   looks with Officer Young, but I don't recall saying

18   anything.

19       Q.   Did Officer Young come with you?  Did you

20   see him come with you?

21       A.   He followed behind me.

22       Q.   You were aware that Officer Young was

23   following with you then?

24       A.   Yes.

25       Q.   As you entered the walkway where was Richie?

1          OFFICER ANDREW WILSON

2       A.   Approximately halfway down the walkway.

3       Q.   Okay.  And was there anybody else that you

4  could see in the walkway besides you and Richie?

5       A.   No.

6       Q.   Had Richie slowed down at all as he entered

7  the walkway?

8       A.   No.

9       Q.   Was he breathing hard at all from moving

10  around?

11       A.   I don't know.

12       Q.   Did Richie sit down in the walkway?

13       A.   No.

14       Q.   As you entered the walkway did you know

15  where Officer Young was at?

16       A.   Yes.

17       Q.   And where was he at?

18       A.   He was at the front of the walkway -- or the

19  front of the alley.

20       Q.   Okay.  And as you caught up to Richie -- I'm

21  sorry.

22            When you caught up to Richie where were you

23  two located in that walkway?

24       A.   When I caught up to Richie he was a little

25  farther than halfway down the alley, and Officer Young

1  OFFICER ANDREW WILSON

2  was at the mouth of the alley.

3      Q.   Okay.  Had you looked back to see where

4  Officer Young was at then at some point?

5      A.   Yes.

6      Q.   Did Richie initiate physical contact with

7  you?

8      A.   No.

9      Q.   And could you tell me generally what

10  happened in the alley.

11      A.   I told Richard Turner to stop, he did not

12  stop.  I jogged a little bit to catch up to him, put my

13  hand on his shoulder.  He tried to pull away, and then

14  he turned around and shoved me.

15      Q.   When you say he turned around and shoved

16  you, he used one of his hands and put it on your body?

17      A.   Yes.

18      Q.   Okay.  And where did he put his hand?

19      A.   I don't recall exactly where he put his

20  hand, but I know that in that push and the ensuing

21  flailing that he was doing that he knocked my radio off

22  of my chest.  So I believe it was the chest area.

23      Q.   Okay.  And was it just one hand?

24      A.   I don't remember.

25      Q.   When you say he knocked the radio off, you

1              OFFICER ANDREW WILSON

2     mean the cord part with the microphone that's --

3          A.   Yes.

4          Q.   -- up on your lapel?

5              MR. BRUNNER:  You got to let him get his

6     question all the way out before you answer.  Okay?

7              THE WITNESS:  Okay.

8              MR. BRUNNER:  So listen to his whole

9     question again and then answer.

10         Q.   (By Mr. Carmichael)  Yeah.  You mean the

11    corded part that's up on your -- hanging from your

12    shoulder I guess?

13         A.   Yes.

14         Q.   And those things do fall off all the time,

15    don't they?

16             MR. BRUNNER:  Objection, form.

17             THE WITNESS:  No.

18         Q.   (By Mr. Carmichael)  I mean you can -- you

19    could knock that thing off getting in or out of your

20    car, right?

21         A.   I suppose it's possible.

22         Q.   So as Richard pushed you with his hand what

23    happened after that?

24         A.   After he pushed me and struggled with me and

25    knocked in my radio off I tried to kind of get a better

1        OFFICER ANDREW WILSON

2  grip, a better hold of him, and Officer Young came to

3  me.

4          Q.    When you say a grip, what were you trying to

5  grip, his arm?

6          A.    I was trying to at that time grab his

7  shoulder and one of his hands.

8          Q.    Would that have been his right side?

9          A.    Yes.

10         Q.    Okay.  And then Officer Young approached.

11 And did he grab his left side?

12         A.    Yes.

13         Q.    And what happened after Officer Young had

14 arrived and grabbed Richie's left side?

15         A.    We managed to get his arms under control and

16 then, because he was still struggling and trying to pull

17 away from us, we took him down to the ground.

18         Q.    When you say you took him down to the

19 ground, how did you do that?

20         A.    I don't remember exactly how we did that,

21 but I think we walked forward to the point where we

22 could put him down on the ground.

23         Q.    Okay.  And when Richie went down on the

24 ground did he just go falling forward?  Did he go on his

25 knees and then down?

Contains Confidential Portions

<sup>1</sup>           OFFICER ANDREW WILSON

2       A.   I don't remember exactly how he went down,

3   but between the way that we were doing it and the fact

4   that we were holding his arms I don't believe that he

5   went down very quickly.

6       Q.   Okay.  When you say he didn't go down very

7   quickly, is that because you were holding him, trying

8   to, you know, I guess manage him going down?

9       A.   Right.

10      Q.   Okay.  Did you and Officer Young exchange

11  any words or anything that lead you guys to decide you

12  were going to put him on the ground?

13      A.   Yes, I think so.

14      Q.   Okay.  Do you know what if anything you

15  said?

16      A.   I think just that we needed to put him on

17  the ground, something along those lines.

18      Q.   Okay.  Could you have attempted to handcuff

19  Richie while he was standing?

20      A.   Not with the way that he was moving.  No.

21      Q.   Was he still trying to get away?

22      A.   Yes.

23      Q.   So when Richie was on the ground was he on

24  his stomach?

25      A.   Yes.

1      OFFICER ANDREW WILSON

2      Q.    Okay.  And what did you do when Richie was

3   on the ground on his stomach?

4      A.    Began to handcuff him.

5      Q.    What did Officer Young do?

6      A.    Helped me handcuff him.

7      Q.    Okay.  Did you see where he was holding

8   Richie or what he was doing?

9      A.    Other -- I know that he was holding his left

10  arm.

11     Q.    Did you see Officer Young put his knee on to

12  Richie's body?

13     A.    I don't remember that.

14     Q.    Did you see Officer Young grab Richie's head

15  with his hand?

16     A.    I don't remember that.

17     Q.    Did you put your knees on Richie's body?

18     A.    I don't think that I did.

19     Q.    Did you use your knees to -- to pin his arm?

20     A.    Yeah.  I think -- I think that I did.

21     Q.    Okay.  And how -- how did you do that?

22     A.    I think that I used my knee to help keep his

23  arm in a position along with my hand so that we could

24  handcuff.

25     Q.    Okay.  Would you have used your -- did you

1                    OFFICER ANDREW WILSON

2    use your knee to keep his arm down on the ground?

3         A.    No.   To -- I think I used it to push his arm

4    closer to his other arm.

5         Q.    Okay.   And that was behind it to cuff him

6    behind his back?

7         A.    Yes.

8         Q.    And what was Richie doing while you and

9    Officer Young had him on the ground?

10        A.    He was struggling still and yelling.

11        Q.    When you say struggling, what do you mean?

12   Was he rocking?   Was he -- what was he doing?

13        A.    Rocking in a way that somebody would I guess

14   if they were trying to get free.

15        Q.    Did he try to get his legs under him so he

16   could stand back up?

17        A.    I think so.

18        Q.    And what did you do to try and prevent that?

19        A.    I just focused on keeping his right arm

20   under control so I could get him in handcuffs.

21        Q.    Okay.   Did anyone else arrive at any point

22   to help you and Officer Young?

23        A.    Yes.

24        Q.    And who was that?

25        A.    Sergeant Frost.

1          OFFICER ANDREW WILSON

2     Q.   Okay.  And do you recall when he arrived?

3     A.   I believe he arrived after we had managed to

4  handcuff Mr. Turner.

5     Q.   Did Officer Talbott arrive at any point?

6     A.   Yes.

7     Q.   Do you recall when Officer Talbott arrived?

8     A.   I believe he arrived shortly before Sergeant

9  Frost.

10     Q.   Okay.  And what did Officer Talbott do?

11     A.   I don't recall what he was doing at that

12  time.

13     Q.   Okay.  Do you recall Officer Talbott being

14  on Richie's legs?

15     A.   Yes.

16     Q.   Okay.  Did you have Richie in the cuffs by

17  the time Officer Talbott got there, or do you recall

18  that sequence?

19     A.   I don't remember if we had handcuffed him

20  prior him arriving or not.

21     Q.   And when you handcuffed Richie how did you

22  do that?

23     A.   I had my one hand on his shoulder, another

24  hand on his hand with it behind his back, and then put

25  the handcuffs on.  Pretty standard procedure.

1          OFFICER ANDREW WILSON

2      Q.   And did you have to use more than one set?

3      A.   I believe we used two sets.

4      Q.   Okay.  And why is that?

5      A.   Because of Richard Turner's size.  He's a

6  little wider than typical.

7      Q.   After you got the handcuffs on him was

8  anything else put on Richie to restrain him?

9      A.   I think hobbles were used.  Yeah.

10      Q.   Okay.  And what's a hobble?

11      A.   Like a hobble is a strap with a mechanism

12  that you can use to bind someone's feet together.

13      Q.   And was one of those put onto Richie's legs?

14      A.   Yes.

15      Q.   Was more than one put onto him?

16      A.   No, I don't think so.

17      Q.   Was anyone holding the strap once the hobble

18  was put on?

19      A.   I don't know if anybody was holding the

20  strap after it was put on.

21      Q.   Because what a hobble does is it puts the

22  people -- puts the person's legs together, right?

23      A.   Yes.

24      Q.   So you could move your legs, you just have

25  to move both of them at once?

OFFICER ANDREW WILSON

1

2      A.   Yes.

3      Q.   But if somebody holds the strap to the
4  hobble, then it's harder for the person to move their
5  legs, right?

6      A.   Yeah.  If the person's actively stopping
7  them from moving their legs.  Yeah.

8      Q.   After Richie Turner was cuffed and hobbled
9  what happened then?

10     A.   After he was cuffed and hobbled he stopped
11  yelling at some point.

12     Q.   You're not -- are you sure when that
13  happened?

14     A.   I don't remember when he stopped yelling.

15     Q.   And after he stopped yelling -- I guess
16  after he was cuffed and hobbled and you had noticed he
17  stopped yelling what happened next?

18     A.   After that we checked to see if he was
19  breathing.

20     Q.   Was there a particular reason that you
21  checked to see if he was breathing?

22     A.   Sergeant Frost directed us to see if he was
23  breathing.

24     Q.   Okay.  Do you know if there was a reason why
25  Sergeant Frost said check and see if he's breathing?

1              OFFICER ANDREW WILSON

2           MR. BRUNNER:  Objection, foundation.

3           THE WITNESS:  I don't know.  I think it was

4 because he stopped yelling.

5       Q.   (By Mr. Carmichael)  Okay.  Was there

6 anybody that had noticed that -- that Richard Turner had

7 stopped breathing?

8           MR. BRUNNER:  Same objection.

9           THE WITNESS:  Sorry.  Could you repeat the

10 question.

11       Q.   (By Mr. Carmichael)  Yeah.  I was just

12 asking if there was any of you who appeared to notice

13 that Richard Turner had stopped breathing?

14       A.   No.

15       Q.   Okay.  So who checked to see if Turner was

16 still breathing?

17       A.   I checked.

18       Q.   And what did you do to check?

19       A.   I put my head near his nose and mouth to see

20 if I could feel anything on my face as far as exhalation

21 or inhalation of air, and then I checked to see his --

22 if his chest was rising and falling.

23       Q.   And this was when he was still face down on

24 the ground?

25       A.   No.  I believe he was turned to his side.

OFFICER ANDREW WILSON

1

2     Q.   Okay.  You had -- so when Sergeant Frost

3  asked you to check the breathing did you move Richie

4  Turner?

5     A.   Yes.

6     Q.   Okay.  And how did you move him?

7     A.   Moved him onto his side.

8     Q.   Did you pick him up and push him to one side

9  or lift up one side I guess?

10     A.   Yeah, I think so.

11     Q.   Did you need help?

12     A.   I think it was myself and someone else.

13     Q.   Okay.  I just remember you saying he was a

14  bigger guy.  So I assumed that you would probably need

15  some help.

16          MR. BRUNNER:  He said he was a wider guy.

17     Q.   (By Mr. Carmichael)  A wider guy.  When you

18  -- I guess he was on -- he was on his side.  Was he kind

19  of balanced on his arm then, his cuffed --

20     A.   I think that he would have been laying on

21  one arm.

22     Q.   Okay.  And what did you find when you

23  checked for breathing?

24     A.   That he was not breathing.

25     Q.   Okay.  Did you hear anything when you

1          OFFICER ANDREW WILSON

2    checked to see if he was breathing?

3          A.    Anything?

4          Q.    Any -- any exhalation or any gasps of air?

5          A.    No.

6          Q.    Okay.  Did any of the other officers

7    indicate they had heard him gasp for air or exhale air?

8          A.    No.

9          Q.    And when you looked at his stomach to see --

10   or I'm sorry -- his chest to see if it was rising and

11   falling did you see anything?

12         A.    No.

13         Q.    And what happened next?

14         A.    After that we got an AED.

15         Q.    And when you say we got an AED, who was

16   that?

17         A.    I believe it was myself and Officer Talbott.

18         Q.    Where did you get it from?

19         A.    The rear of Sergeant Frost's squad car.

20         Q.    Why did two of you go to get the AED?

21         MR. BRUNNER:  Objection, foundation.  You

22   can answer if you understand.

23         THE WITNESS:  I went to get the AED just to

24   go get it because I think I was closest.  I don't know

25   why the second officer came.

1        OFFICER ANDREW WILSON

2        Q.   (By Mr. Carmichael)  Did you -- what

3  happened when you went to get the AED?  What happened

4  next?

5        A.   Brought it back to Mr. Turner and applied

6  it.

7        Q.   And where was Mr. Turner when you came back?

8  Where was he positioned?

9        A.   He was positioned on his side or on his back

10 kind of partway just laying on his hands or laying on

11 his arm.

12       Q.   Okay.  Had he been -- I guess had he at that

13 point been rolled to more be on his back then?

14       A.   Even when he was on his side it was I think

15 kind of a halfway position.  I think he was still in

16 that position.

17       Q.   Okay.  Was Mr. Turner -- when you came back

18 with the AED was he still cuffed?

19       A.   Yes.

20       Q.   And his arms were cuffed behind his back?

21       A.   I believe so.

22       Q.   And was he still hobbled?

23       A.   I believe so.

24       Q.   And when you came back with the AED you said

25 you applied it.  What does that mean?

Contains Confidential Portions

OFFICER ANDREW WILSON

1

2   A.   You take the contact patches and put them on

3   his chest in order to get the machine to work.

4   Q.   Okay.  Had somebody cut his shirt so you

5   could apply those patches?

6   A.   I don't remember if somebody cut his shirt

7   or opened his shirt, but his chest was bare.

8   Q.   Okay.  And what happened when you applied

9   the AED?

10  A.   It advised that there was a heartbeat and do

11  not shock.

12  Q.   Prior to you applying the AED had anyone

13  checked his -- Mr. Turner's pulse?

14      MR. BRUNNER:  Objection, foundation.

15      THE WITNESS:  I don't know.

16  Q.   (By Mr. Carmichael)  What happened after you

17  applied the AED and it said there was a pulse?

18  A.   Began to prepare for CPR.

19  Q.   And when you say began to prepare, what's

20  that?

21  A.   Getting a face mask ready.

22  Q.   And where was that located?

23  A.   My pocket with medical equipment.

24  Q.   In the AED?

25  A.   No.  Officers' pockets.

1          OFFICER ANDREW WILSON

2          Q.   Okay.  And you said began preparing.  What

3     happened after you began preparing?

4          A.   The ambulance arrived.

5          Q.   Okay.  So did anyone start CPR on Mr.

6     Turner?

7          A.   I don't think so.  No.

8          Q.   Okay.  Was he still wearing the handcuffs

9     and the hobble when you were preparing to start CPR?

10         A.   Yes.

11         Q.   And what happened when the ambulance

12    arrived?

13         A.   The EMTs took over.

14         Q.   Did they start CPR?

15         A.   I don't recall exactly.  I think they did.

16         Q.   Did they start CPR when Mr. Turner was on

17    the ground or at some other point?

18         A.   I don't remember.

19         Q.   At some point Mr. Turner was loaded onto I

20    guess a gurney or something to be loaded into the

21    ambulance?

22         A.   Yes.

23         Q.   Was he still handcuffed at that point?

24         A.   I don't know.

25         Q.   Was he still wearing the hobble?

1          OFFICER ANDREW WILSON

2     A.    I don't know.

3     Q.    Did you help load Mr. Turner into the

4 ambulance?

5     A.    No.

6     Q.    Once the EMTs arrived what did you do?

7     A.    Gave them space to work.  I think I was

8 talking to other officers.

9     Q.    Okay.  Did you ride with the EMTs or

10 anything to the hospital?

11     A.    No.

12     Q.    Did you during this process at all call for

13 a full medical response from the ambulance?

14     A.    I don't believe I did.

15     Q.    Did you hear someone else?

16     A.    Yes, I think so.

17     Q.    Okay.  And what does that mean?

18     A.    It means for them to expedite their

19 response.

20     Q.    Did you hear the ambulance arriving?

21     A.    Yes.

22     Q.    They had turned on their lights and sirens?

23     A.    Yes.

24     Q.    Do you know how long elapsed between you

25 attempting to start CPR and the ambulance arriving?

1          OFFICER ANDREW WILSON

2     A.    No.

3     Q.    Have you had CPR training before?

4     A.    Yes.

5     Q.    Have you had training in using the mask?

6     A.    Yes.

7     Q.    Do you know about how long it takes you to

8  get that ready to use?

9     A.    A few seconds.

10     Q.    Okay.  Did Richie have any weapons on him?

11     A.    No.

12     Q.    When Richie was in the alley had -- had he

13  attempted to attack anybody?

14     A.    No.

15     Q.    Could you have continued to follow Richie

16  down that alley?

17     A.    Yes.

18     Q.    Could you have asked for a backup to come

19  and assist you?

20     A.    Yes.

21     Q.    Could you have asked for either Officer

22  Talbott or Sergeant Frost to circle around and cut

23  Richie off?

24     A.    Yes.

25     Q.    Could you have waited for the ambulance to

OFFICER ANDREW WILSON

1          OFFICER ANDREW WILSON

2    arrive before you attempted to take Richie into custody?

3          A.   Yes.

4          Q.   Were crisis intervention -- certified crisis

5    intervention officers available for you to contact?

6          A.   Yes.

7          Q.   Could you have contacted one of those?

8          A.   Yes.

9          Q.   When you perform your job do you rely on

10   your training?

11         A.   Yes.

12         Q.   And do you generally follow your training

13   when performing your job?

14         A.   Yes.

15         Q.   I know we talked a little bit earlier about

16   some of your training.  Do you also receive training

17   periodically as an officer?

18         A.   Yes.

19         Q.   Does that consist of some classroom

20   training?

21         A.   Yes.

22         Q.   You also have some materials you're assigned

23   to read on your own time?

24         A.   Yes.

25         Q.   And you also try to stay current on

```
 1              OFFICER ANDREW WILSON
 2  department policies and procedures?
 3        A.   Yes.
 4        Q.   Is part of your job to try to follow
 5  department policies and procedures?
 6        A.   Yes.
 7        Q.   And do you generally try to follow
 8  department policies and procedures when you do your job?
 9        A.   Yes.
10        Q.   Do you recall when was the last time you had
11  CPR training?
12        A.   No.
13        Q.   Do you recall how often you're trained in
14  CPR?
15        A.   Every year.
16        Q.   Okay.  Is there a certification that comes
17  along with that?
18        A.   Yes.
19        Q.   And you do that about once a year?
20        A.   Yes.
21        Q.   Do you recall in the November 2016 time
22  period how recent your CPR training had been?
23        A.   No.
24        Q.   Have you -- does your CPR training touch on
25  performing CPR on someone in handcuffs?
```

<sup></sup>

OFFICER ANDREW WILSON

1

2      A.   No.

3      Q.   Does a person wearing handcuffs inhibit in

4  any way you performing chest compressions?

5      A.   I don't know.

6      Q.   Have you ever done CPR on someone in

7  handcuffs?

8      A.   No.

9      Q.   Do you recall when the last time you had use

10  of force training was?

11      A.   No.

12          MR. BRUNNER:  Chris, when you get a chance

13  can we have a break when you get to a good break spot.

14          MR. CARMICHAEL:  I'm at one now actually.

15                   (Recess taken.)

16      Q.   (By Mr. Carmichael)  So, Officer Wilson, do

17  you recall when your last use of force training was?

18      A.   No.

19      Q.   How often are you trained on use of force?

20      A.   I believe we're trained on use of force once

21  a year as well.

22      Q.   Is there a particular time of year that

23  occurs?

24      A.   I don't know if there's a particular time or

25  if it's just scheduling.

1                    OFFICER ANDREW WILSON

2          Q.   Do you recall when prior to November of 2016

3     you had received use of force training?

4          A.   No.

5          Q.   Was use of force training part of your

6     initial three-month training?

7          A.   Yes.

8          Q.   And then when you were on the job as a

9     probationary officer did you receive any additional use

10    of force training?

11         A.   Yes.

12         Q.   In your use of force training do you recall

13    anything in that training that says it's okay to kneel

14    on someone's back?

15         A.   I don't recall that specifically.

16         Q.   Okay.  In your use of force training is it

17    ever discussed that a person could potentially

18    suffocate?

19         A.   Yes.

20         Q.   And what -- what was discussed about

21    potential suffocation?

22         A.   They discussed -- the part that I remember

23    is they discussed a concept called the piggy pile where

24    there's too many officers on one person, that they can

25    suffocate.

1               OFFICER ANDREW WILSON

2          Q.   Were there words or terms used about

3     positional asphyxia?  Is that --

4          A.   Yes.

5          Q.   Do you recall that?

6          A.   Yes.  That was part of the training as well.

7          Q.   Okay.  And what was talked about positional

8     asphyxia?

9          A.   That if a person is put into a certain

10    position, that they can suffocate.

11         Q.   And what position or positions would that

12    be?

13         A.   Face down with pressure on top of them.

14         Q.   And what are you taught about -- about the

15    possibility of suffocation?  What are you taught to do

16    in response to that?

17         A.   To be careful to avoid those positions.

18         Q.   And you used a term that -- maybe more of a

19    colloquialism -- piggy pile?

20         A.   That's right.  Like you said, a

21    colloquialism.

22         Q.   And that's when there's several officers and

23    they're on top of a person?  Is that --

24         A.   Yes.

25         Q.   Okay.  And what can happen then?

1          OFFICER ANDREW WILSON

2       A.   Positional asphyxia.

3       Q.   Okay.  Besides I guess trying to avoid that,

4   is there anything else that can be done in response to

5   that issue of positional asphyxia?

6       A.   What do you mean?

7       Q.   I mean is there any particular, you know,

8   response that happens if -- is there a concern that then

9   you do something besides trying to avoid it?

10       A.   If you discover that somebody's not

11   breathing, then you do CPR and AED, et cetera.

12       Q.   Okay.  If somebody is in one of those

13   positions that could lead to positional asphyxia, is

14   that something that should -- is their breathing

15   something that should be checked on right away?

16            MR. BRUNNER:  Objection, form, incomplete

17   hypothetical.

18            THE WITNESS:  I think their breathing should

19   be checked if it's determined that they're not

20   breathing.

21       Q.   (By Mr. Carmichael)  Have you received any

22   training on deescalation?

23       A.   Yes.

24       Q.   And what type of training have you received?

25       A.   I believe that it was covered during the

1                    OFFICER ANDREW WILSON

2     police academy.

3          Q.   Have you received any training subsequent to

4     that on deescalation?

5          A.   I received deescalation training in the CIT

6     class that we previously discussed.

7          Q.   And what type of training did you receive on

8     deescalation?

9          A.   Deescalation is a part of the use of force

10    training.

11         Q.   And what were you trained as far as

12    deescalation goes?

13         A.   To -- to try to avoid going up with a

14    escalation scale if possible and to talk to people when

15    possible.

16         Q.   And what's an escalation scale?

17         A.   So the use of force scale begins with verbal

18    and then moves up in intensity depending on the

19    effectiveness of your previous actions.

20         Q.   And in deescalation training is there

21    discussions about how to I guess use those different

22    levels?

23         A.   Deescalation training would entail going

24    down the scale.

25         Q.   Okay.  So if for example you had gone up

OFFICER ANDREW WILSON

1   from verbal to some type of physical, you might go back

2   down?  Is that what you're saying?

3       A.   Yes.

4       Q.   Okay.  And were there particular situations

5   that you were trained in to do that?

6       A.   Yes.

7       Q.   Okay.  What types of situations?

8       A.   An example of the situation would be a

9   suicidal individual.

10      Q.   Okay.  Besides a suicide, any other

11  situations where you were trained to try and use some

12  deescalation?

13      A.   I don't recall specifics.  I generally try

14  to deescalate whenever possible.

15      Q.   Could you give me an example of where you've

16  actually done a deescalation?

17      A.   I think the best example would be suicidal

18  callers.  Do you want a specific example?

19      Q.   Yeah.  I just want you to give me sort of

20  how it went up and how you went back down.

21      A.   Off the top of my head if you have a vehicle

22  that comes back stolen or something, that immediately

23  due to the nature of the crime would denote an

24  escalation of the use of force scale to possible use of

OFFICER ANDREW WILSON

1
2 firearms.  But then by talking or determining what's
3 happening to the suspect or whoever is involved, then
4 you can move it back down to a hands-on or even just a
5 verbal in the situation.
6        Q.   In dealing with use of force and
7 deescalation is there any discussion and training about
8 giving people time to comply?
9        A.   Yes.
10        Q.   Okay.  In those trainings is there any
11 discussion of I guess multiple uses of the same level
12 before you escalate?
13        A.   Yes.
14        Q.   Okay.  Are -- in your use of force and
15 deescalation training are there times where you should
16 avoid going up in escalating force?
17        A.   Yes.
18        Q.   Okay.  Could you give me any examples of
19 those.
20        A.   This is speaking generally, but if it's a
21 child, a pregnant woman, something along those lines
22 it's really situation dependent.
23        Q.   Okay.  Have you received any training on
24 dealing with people with mental health issues?
25        A.   Yes.

OFFICER ANDREW WILSON

1

2       Q.    Okay.  When did you receive that training?

3       A.    I received training in that regard at PTI

4  and the crisis intervention training.

5       Q.    And PTI stands for?

6       A.    The Police Training Institute.

7       Q.    That was the three months --

8       A.    Yes.

9       Q.    -- when you were initially hired?

10      A.    Yes.

11      Q.    Okay.  And what did you learn from those

12 trainings?

13      A.    During the crisis intervention training I

14 think everything that we learned was covered in your

15 previous question.  And PTI it's hard for me to

16 distinguish which training was when because its been so

17 long, but generally how to deal with people who are

18 mentally ill.

19      Q.    Is the approach you take in dealing with

20 people who are mentally ill different from how you might

21 approach an ordinary person?

22      A.    Yes.

23      Q.    Okay.  In what ways?

24      A.    They have a harder time communicating.

25      Q.    Do they have a harder time understanding as

OFFICER ANDREW WILSON

1
2  well?

3      A.   I think it's a case-by-case basis.  Mentally
4  ill is a pretty -- a pretty wide field of people.

5      Q.   Can people with mental illness have trouble
6  understanding directions?

7      A.   Yes.

8      Q.   When approaching someone who has mental
9  illness is your approach more like one of a firefighter
10 or a paramedic rather than maybe a law enforcement
11 capacity?

12         MR. BRUNNER:  Objection, form.

13         THE WITNESS:  I don't know how to answer
14 that question.  Law enforcement capacity is a wide
15 ranging field as well.

16     Q.   (By Mr. Carmichael)  Well, when you approach
17 someone with mental illness are you there more to
18 provide assistance than necessarily arrest someone?

19     A.   It depends on what is going on with the
20 mentally ill person.

21     Q.   Okay.  When someone is mentally ill can
22 their actions be out of their own control?

23     A.   Yes.

24     Q.   Is that part of the consideration that you
25 received in that training?

1          OFFICER ANDREW WILSON

2     A.    Yes.

3     Q.    And so when you're approaching someone who

4  is acting in ways that they can't control how does your

5  training tell you to deal with that?

6     A.    To be understanding of that.

7     Q.    Be more patient?

8     A.    Yes.

9     Q.    Have you received any training on dealing

10  with people that might have what's called excited

11  delirium?

12     A.    Yes.

13     Q.    And when did you receive that training?

14     A.    I received excited delirium training during

15  the Police Training Institute.

16     Q.    Any other time?

17     A.    I believe there was also departmental

18  training.

19     Q.    What did you learn from that training?

20     A.    That there is a condition called excited

21  delirium which can be caused by any number of things but

22  generally results in a -- I guess a generalized

23  situation where the person is displaying certain

24  symptoms.

25     Q.    And what were those?  What are some of the

1          OFFICER ANDREW WILSON

2    symptoms that you recall?

3          A.    Aggressiveness, either unintelligible speech

4    or something along the lines that they can't -- they're

5    saying things that are out of context, sweating, taking

6    clothes off, disproportionate strength.

7          Q.    Any others you recall?

8          A.    None that come to mind off the top of my

9    head.

10         Q.    And do you recall how you then approach

11   dealing with someone who might or could have this

12   excited delirium?

13         A.    Yes.

14         Q.    Okay.  How do you approach someone like

15   that?

16         A.    For an individual with excited delirium you

17   wait for backup and wait for a ambulance and sedative,

18   and then detain the person and sedate them.

19         Q.    And why is the person sedated?

20         A.    Because they're dangerous typically or that

21   they are not in control of their actions.

22         Q.    And has anything in particular happened when

23   people with excited delirium have been encountered?

24              MR. BRUNNER:  Objection, form and

25   foundation.

Contains Confidential Portions

OFFICER ANDREW WILSON

1

2      Q.   (By Mr. Carmichael)  So I guess I was asking

3  more specifically about, you know, does anything happen

4  to the person with excited delirium?

5      A.   They are transported to the hospital

6  typically.

7      Q.   Okay.  And were -- I guess were there

8  encounters with people with excited delirium where those

9  people had heart attacks or medical conditions as a

10  result of their encounter with the police?

11           MR. BRUNNER:  Objection, foundation.

12           THE WITNESS:  The situation of excited

13  delirium, whatever is causing the excited delirium I

14  think can cause other health problems.

15      Q.   (By Mr. Carmichael)  Well, I was just trying

16  to get an understanding if the protocol you described

17  for handling someone that could have excited delirium

18  was put into place because of instances where people

19  with that possible condition had had some type of heart

20  attack or some type of medical condition.

21      A.   I don't know why the policy was put into

22  place.

23      Q.   Okay.  When you were dealing with Richard

24  Turner did you consider the possibility that he might

25  have had some of the symptoms for excited delirium?

OFFICER ANDREW WILSON

1

2       A.    No.

3       Q.    And why not?

4       A.    Because he wasn't displaying what I had been

5  taught was the symptoms for excited delirium.

6       Q.    And what symptoms did you feel he should

7  have displayed for you to have understood that he might

8  have excited delirium?

9       A.    I think more violent tendencies, being more

10 verbal than is maybe expected, or the overheating and

11 the sweating and removing of clothing.

12      Q.    Prior to November of 2016 had you personally

13 encountered anybody that had excited delirium or was

14 identified as having that?

15      A.    I have dealt with individuals with excited

16 delirium before.  I don't remember if it was before or

17 after.

18      Q.    Okay.  In I guess the instances you dealt

19 with people with excited delirium what types of symptoms

20 did they exhibit?

21      A.    So do you want a specific example?

22      Q.    Yeah.  Sure.

23      A.    One case of excited delirium that I

24 responded to the individual was completely naked,

25 visibly sweating, was destroying everything in their

OFFICER ANDREW WILSON

1 apartment, had thrown a chair that was in their kitchen
2 all the way across their living room through the living
3 room window, and had gone across the courtyard of the
4 apartment complex that I was in.
5          This individual then proceeded to punch out
6 a glass window.  And then while his arm was in the hole
7 created by his fist used the sides of his arms to break
8 out the glass surrounding that window and had
9 lacerations all up and down his body.
10          He was bleeding all over the room, continued
11 to vacate all the furniture in the apartment and was
12 standing in piles of glass and was claiming that he was
13 Jesus Christ and that he was going to be God.
14     Q.   Do you happen to remember the person's name
15 or where it occurred?
16     A.   I don't remember the person's name, and I
17 know that it considered on campus in the morning.
18     Q.   Okay.  You say on campus?
19     A.   Around the campus area, Campustown of
20 Champaign.
21     Q.   Okay.  And any other instances where you
22 encountered anybody with excited delirium?
23     A.   I can't recall any other instances right
24 now.

OFFICER ANDREW WILSON

1

2  Q.   Okay.  Do you remember what happened in

3  response to you encountering that person?

4  A.   Yes.

5  Q.   What happened?

6  A.   Backup was called.  After officers and an

7  ambulance arrived the individual was handcuffed and

8  sedated and transported to the hospital.

9  Q.   Did -- were you the first person there?

10  A.   No.

11  Q.   Okay.  Did you make the assessment that the

12  person might have excited delirium?

13  A.   I -- do you mean -- what do you mean by

14  that?

15  Q.   Well, I mean had the officer that preceded

16  you or officers made that determination before you had

17  gotten there, or was that --

18  A.   I don't recall who made the determination of

19  whether the person was in excited delirium or not.

20  Q.   Okay.

21  A.   But after -- after I arrived it became

22  apparent.

23  Q.   Did the person allow you to handcuff them?

24  A.   No.  They did not allow us to handcuff them.

25  Q.   Okay.

1        OFFICER ANDREW WILSON

2            MR. BRUNNER:  And I'm afraid that may be

3    misconstrued.  Are you saying were handcuffs eventually

4    applied or was the person voluntarily allowing

5    handcuffs?

6            MR. CARMICHAEL:  When I said allowed I meant

7    volunteer -- voluntary.

8            MR. BRUNNER:  Okay.

9            THE WITNESS:  No.

10       Q.   (By Mr. Carmichael)  Okay.  Have you

11   received training in preparing police reports?

12       A.   Yes.

13       Q.   And what type of training have you received

14   on preparing police reports?

15       A.   We received scenarios and prepare reports

16   while in PTI.

17       Q.   And is there a particular way they tell you

18   to prepare reports or you were trained to prepare

19   reports?

20       A.   To prepare them to the best of your ability

21   to include details that you can remember.

22       Q.   And how soon after something happens are you

23   supposed to prepare a report?

24       A.   It depends on the situation.

25       Q.   Is there a general rule that a report is

1          OFFICER ANDREW WILSON

2    supposed to be completed within a certain amount of

3    time?

4          A.   Reports are typically completed within a day

5    of the occurrence.

6          Q.   Okay.  Are reports typically completed at

7    the end of the shift?

8          A.   Yes.

9          Q.   Do you speak with other officers before

10   preparing your reports?

11         A.   Could you clarify.

12         Q.   Well, if other officers were involved, do

13   you speak with those officers before preparing your

14   report?

15         A.   I don't typically, no.

16         Q.   When you prepared your report for the

17   incident involving Richard Turner did you speak with any

18   officers before you prepared your report?

19         A.   I spoke with many officers.  Do you mean

20   about the situation or could you clarify a little bit

21   more.

22         Q.   Yes.  Yeah.  Did you speak with any of the

23   other officers about your preparation of your report or

24   about the events so you could prepare your report?

25         A.   I don't remember specifically speaking with

1       OFFICER ANDREW WILSON

2  any other officers about the particulars of my report.

3       Q.   Okay.  So immediately before preparing your

4  report did you talk with the officers about the events

5  that happened?

6       A.   I don't remember talking to them

7  specifically about the events that happened.  I may have

8  talked with officers after the call prior to -- you

9  know, when they were loading him into the ambulance

10  about what was happening during the call.

11       Q.   After that do you recall speaking with the

12  other officers about what happened?

13       A.   No.

14       Q.   I believe you prepared your report the next

15  day, November 17th, 2016.  So you waited a day to

16  prepare your report?

17       A.   No.  I -- my report was submitted on the

18  17th.

19       Q.   It was submitted.  Okay.  So when did you

20  start preparing your report?

21       A.   I started preparing my report on the 16th.

22       Q.   Okay.  You hadn't finished it?

23       A.   I belive I had finished it on the 16th.

24       Q.   Okay.  You just hadn't turned it in?

25       A.   Correct.

Contains Confidential Portions

1          OFFICER ANDREW WILSON

2          Q.   Did you show any of the other officers or

3    your supervisor your report before you submitted it?

4          A.   Yes.

5          Q.   Who did you show it to?

6          A.   I believe I showed my report to a supervisor

7    prior to it getting approved.

8          Q.   And who did you show it to?

9          A.   I believe I showed it to Lieutenant Myer

10   (ph).

11         Q.   And why did you show your report to

12   Lieutenant Myer?

13         A.   To be approved for grammatical errors and et

14   cetera.

15         Q.   Did you make any changes to your report?

16         A.   I don't believe that I did.  I don't

17   remember.

18         Q.   When you prepared this report did you

19   prepare -- or I guess did you work on it more than on

20   more than one occasion?

21         A.   Yes, I think so.

22         Q.   Do you remember how many times you went in

23   and worked on the report?

24         A.   Because it was so long ago I don't recall

25   exactly how many times I worked on this report.

1    OFFICER ANDREW WILSON

2        Q.   Do you have a particular way you do things

3    that you kind of typically do reports?

4        A.   Could you clarify.

5        Q.   Well, I was trying to figure out, you know,

6    if you prepare like an initial draft of the report and

7    then you go back and take a look at it and see if you're

8    going --

9        A.   I typically will create a report as a rough

10   draft, read it, and review it, correct anything, and

11   then submit to a supervisor.

12       Q.   And when you say submit it to a supervisor,

13   is that before you formally turn in the report?

14       A.   That's before it is submitted to records.

15       Q.   Okay.  And before it's submitted it's -- I

16   guess is it still in draft form then?

17       A.   Yes.

18            MR. BRUNNER:  Before it's submitted to

19   which?

20            MR. CARMICHAEL:  To records.  I'm sorry.

21            THE WITNESS:  Yes.

22       Q.   (By Mr. Carmichael)  Is there a particular

23   program you use to prepare reports?

24       A.   Yes.

25       Q.   Okay.  What's that?

1          OFFICER ANDREW WILSON

2          A.   It is A.R.M.S.

3          Q.   A.R.M.S.  And can you save drafts in

4    A.R.M.S.?

5          A.   Yes.

6          Q.   Does it save individual versions of drafts

7    or does it just kind of save over?

8          A.   Save over I think.  I don't know how the

9    A.R.M.S. software works.  I just use it.

10         Q.   Okay.  When you use it it doesn't appear to

11   have versions?

12         A.   No, not that I've seen.

13         Q.   Okay.  In your encounter with Mr. Turner I

14   believe you were wearing a microphone; is that right?

15         A.   Yes.

16         Q.   And what was the purpose of wearing that

17   microphone?

18         A.   To record the interaction.

19         Q.   And I guess were you doing that as part of

20   your training or just generally you were doing that?

21         A.   As part of our training.

22         Q.   Was that so Officer Talbott could listen?

23         A.   It's for a record -- for general

24   recordkeeping purposes same as the report.

25         Q.   Okay.  I was just trying to figure out if

1          OFFICER ANDREW WILSON

2  that was specific to you being a probationary officer or

3  that just occurs generally.

4          A.   Generally.

5          Q.   Okay.  Do you wear a microphone currently

6  when you do your job?

7          A.   I'm not serving as patrol currently.

8          Q.   Okay.  When you were serving in patrol did

9  you continue to wear a microphone --

10         A.   Yes.

11         Q.   -- when you weren't a probationary officer?

12         A.   Yes.

13         Q.   And how is that recorded?

14         A.   It -- you turn it on -- or it's the same as

15  the camera system on the car that I described earlier.

16         Q.   Okay.  Does that activate when you activate

17  the camera system on the car or is that activated a

18  different time?

19         A.   They activate simultaneously.

20         Q.   Okay.  So when you turned on the camera

21  system for the car your microphone turned on as well?

22         A.   Yes.  With the exception of -- and this is

23  probably too much detail.  But the 30 seconds prior to

24  turning on your camera the camera has that saved and it

25  records it but there's no audio.

OFFICER ANDREW WILSON

1

2    Q.    Okay.  Have you ever I guess curtailed a

3    conversation with another officer because you were

4    wearing a microphone and you knew you were being

5    recorded?

6    A.    No.

7    Q.    Have you ever avoided discussing something

8    with another officer because you knew you were being

9    recorded?

10   A.    Private conversations, these generally don't

11   happen during calls.

12   Q.    Can you shut the microphone off?

13   A.    Yes.

14   Q.    And how can you do that?

15   A.    By flipping a switch on the bottom of the

16   receiver.

17   Q.    Is that receiver attached to you?

18   A.    Yes.

19   Q.    Is there a general policy for when you're

20   supposed to turn the microphone on and off?

21   A.    Yes.

22   Q.    Can you tell me what that is.

23         MR. BRUNNER:  Are you talking about now or

24   back then?

25         MR. CARMICHAEL:  Back then in 2016.

OFFICER ANDREW WILSON

THE WITNESS:  The policy to the best of my knowledge because its been a while is to activate your camera system which includes the microphone prior to enforcement action.

Q.   (By Mr. Carmichael)  And when you say enforcement action I just wanted to understand what you mean.

A.   It's a general term.  It's really up to interpretation.

Q.   Okay.  Does that include stopping to talk to someone?

A.   Again, it's up to interpretation by individual officers.  I typically turn mine on whenever I speak with somebody.

(Off the record discussion.)

Q.   (By Mr. Carmichael)  I wanted to ask you about when Mr. Turner had put his hand on you and pushed you back or pushed you or shoved you you said.

A.   Uh-huh.

Q.   Did that move you physically?

A.   Yes.

Q.   Okay.  And how did it?

A.   Moved me backwards, but I retained a grip on his shoulder or his clothing.

1          OFFICER ANDREW WILSON

2     Q.    And did you get any bruises from that?

3     A.    No.

4     Q.    Suffer any injuries?

5     A.    No.

6     Q.    And when I asked you before about

7 approaching someone with mental illness I think I

8 inartfully or inarticulately described or tried to

9 compare your approach on that to maybe the approach a

10 firefighter or a ambulance driver might take.

11          Do you remember me doing that?

12     A.    Yeah.

13     Q.    Do you recall from any of your training

14 about approaching someone with mental illness the phrase

15 or statement that a call for service involving someone

16 with mental illness does not necessarily warrant the use

17 of police authority or enforcement?

18     A.    Do I recall that phrase?

19     Q.    Yeah.  Do you recall learning that in

20 training?

21     A.    I don't recall learning that specific

22 phrase.

23     Q.    Okay.  Do you recall learning that point

24 during training?

25     A.    Yes.

OFFICER ANDREW WILSON

1
2      Q.    Okay.  And why do calls involving somebody
3   with mental illness may not call for the use of police
4   authority or enforcement?
5      A.    Because in my interpretation of it it would
6   be because the call isn't related necessarily to
7   enforcing laws, but it is related to that person's
8   well-being.
9      Q.    In your crisis intervention training did you
10  learn techniques about how to obtain control of a
11  situation without using force?
12     A.    Yes.
13     Q.    And what are some of those techniques?
14     A.    To use a calm voice even if they can't
15  understand what you're saying, to make yourself seem as
16  non-threatening as possible.
17     Q.    And are there particular ways that you learn
18  to try to seem non-threatening?
19     A.    To use your first name, introduce yourself
20  as a friend, possibly have somebody speak on your behalf
21  if they have anybody who they're more familiar with.
22     Q.    When you approach someone who appears to
23  have what you may believe to be excited delirium are you
24  instructed to treat the person as if they had a medical
25  emergency and require immediate medical attention?

OFFICER ANDREW WILSON

1

2      A.   That sounds correct.

3      Q.   Is that one of the reasons that the EMS is

4 dispatched and you wait for them to arrive?

5      A.   Yes.

6      Q.   When speaking with someone with mental

7 illness should more than one officer attempt to engage

8 that person?

9      A.   I believe the training indicates that it's

10 better to do one-on-one.

11      Q.   And why is that?

12      A.   I believe it's again to appear as

13 non-threatening as possible.

14      Q.   And more officers may appear more

15 threatening?

16      A.   Right.

17      Q.   When a training is in-service what does that

18 mean?

19      A.   In-service training?

20      Q.   Yes.

21      A.   I believe that means training administered

22 by the department.  I'm not sure exactly that

23 terminology.  I don't know where you're getting that

24 term from.  I don't know where you're getting that term

25 from, so I'm not sure exactly what the context is.

1          OFFICER ANDREW WILSON

2        Q.   Do you remember what particular organization

3   provided that certification for the -- for the certified

4   intervention training?

5        A.   I do not remember the exact name of the

6   organization that administered it.

7

8   (CONFIDENTIAL PORTIONS CONTINUE ON NEXT PAGE)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    OFFICER ANDREW WILSON

2          Q.    (By Mr. Carmichael)   What did you do to get

3     ready for the deposition today?

4          A.    I reviewed my report.  I reviewed video of

5     the incident that was available, and I spoke with the

6     lawyers present.

7          Q.    (By Mr. Carmichael)   And about how long did

8     you spend doing those things?

9          A.    Well, the videos were however long the

10    videos were; although, I did not watch all of the videos

11    that was present in one section because they were

12    disjointed.  So I don't know how long I spent doing

13    that.

14               Approximately maybe an hour watching videos,

15    maybe less.  And then 15 minutes, 20 minutes of reading

16    my report over the course of, you know, multiple weeks

17    just perusing it.  And then I don't remember -- two

18    hours yesterday approximately speaking with the city

19    counsel.

20         Q.    Did you look at any other documents besides

21    your report?

22         A.    Not that I can recall.

23         Q.    And the videos you watched, do you recall

24    which ones those were?

25         A.    I watched my squad car video.  I watched the

OFFICER ANDREW WILSON

video from Gameday Spirit.  I watched video from an ATM

across the street, and I watched video from I think

Hometown Pantry.  That was the disjointed video where I

did not watch all of them.

Q.   The Hometown Pantry video?

A.   Yes.

Q.   Was that a video of kind of of the sidewalk?

A.   It was a video of the two corners of the

store and the sidewalk.

Q.   Okay.  And when you say the two corners,

were they on separate feeds?

A.   I don't know how their camera system is set

up, but it looks like they have one camera aiming down

one way and another camera aiming down the other street.

Q.   Okay.  Were you able to watch those videos

simultaneously or were they played separately?

A.   You had to locate each video separately and

play it and try to put it together yourself.

Q.   Did you watch any of the other squad videos?

A.   I only watched my squad video.

Q.   Did reviewing all this material help you

refresh your recollection?

A.   Correction.  I do remember now also watching

Sergeant Frost's squad video.

OFFICER ANDREW WILSON

Q.   Okay.

A.   Sorry.

Q.   Did -- reviewing this material and watching those videos, did it help you remember events?

A.   Yes.

Q.   Did anything in the videos or reading your report -- anything in particular stand out to you that helped you specifically remember something?

A.   Not particularly, no.

Q.   I was just trying to figure out if, you know, when you watched it you would be like oh, I had forgotten that occurred, if anything struck you like that.

A.   Maybe dialog.  But nothing struck me as being surprising or anything.

Q.   Dialog between you and someone else?

A.   Because of the way the videos are recorded it's mostly the dialog involving me and others.

Q.   Okay.  Besides talking to the attorneys did you talk to anybody else about your deposition today?

A.   Yes.

Q.   Who else?

A.   I spoke with an FOP lawyer, and then later I spoke with my current girlfriend.

OFFICER ANDREW WILSON

1

2          MR. CARMICHAEL:  Okay.  All right.  We can

3    stop for a minute, and I'll review everything and see if

4    I'm all done.

5              (Recess taken.)

6          Q.    (By Mr. Carmichael)  All right.  Could Mr.

7    Turner have been trying to get away from you in the

8    alley because he didn't know who you were?

9              MR. BRUNNER:  Objection, foundation.

10             THE WITNESS:  I don't know really what he

11   was thinking.

12         Q.    (By Mr. Carmichael)  When you were on the

13   ground with Mr. Turner could he have been struggling

14   because he was having difficulty breathing?

15             MR. BRUNNER:  The same objection.

16             THE WITNESS:  He could have.  I don't know.

17         Q.    (By Mr. Carmichael)  When Mr. Turner you

18   said had pushed you --

19         A.    Uh-huh.

20         Q.    -- did he do anything else besides that?

21         A.    Yes.  It's hard to describe because of how

22   erratic his movements were, but it was pushing and then

23   trying to get away while simultaneously flailing his

24   arms.  I don't know if it was at me or in general, but

25   flailing wildly.

Contains Confidential Portions

1      OFFICER ANDREW WILSON

2      Q.   Okay.  And in flailing wildly did he make

3    contact with you?

4      A.   Yes.  And that's also how my radio was

5    knocked off.

6      Q.   Okay.  And when you say made contact with

7    you when he knocked off your radio, do you know where he

8    had made contact with you?

9      A.   No.

10     Q.   Okay.  And you said that that's because he

11   was flailing his arm about?

12     A.   Uh-huh.

13     Q.   That would be the arm that you didn't have

14   -- you had grabbed onto one of his arms, right?

15     A.   I had grabbed onto the clothing above his

16   right shoulder.

17     Q.   Okay.  Then at some point did you grab his

18   arm?

19     A.   Yes.

20     Q.   Okay.  And what was his other arm doing?

21     A.   Flailing with that arm until Officer Young

22   controlled it.

23     Q.   Okay.  And was that moments after you were

24   able to grab Mr. Turner's arm?

25     A.   I don't know the timeframe between grabbing

1        OFFICER ANDREW WILSON

2   my arm -- or between grabbing his arm and Officer Young

3   grabbing the other arm.  Several seconds would be my

4   best judgment.

5        Q.   Did Mr. Turner make contact with you

6   anywhere else that you recall?

7        A.   Not that I recall.

8        Q.   Okay.  How about his legs, did he kick you

9   at all?

10        A.   I don't believe he kicked me.  No.

11        Q.   Okay.  And principally he was flailing his

12   arms and trying to get away.  Is that an accurate

13   description?

14        A.   I don't know why he was flailing his arms.

15        Q.   Okay.  But he was trying to get away from

16   where you had grabbed him?

17        A.   He was pulling away from me.  Yes.

18            MR. CARMICHAEL:  Okay.  And I do want to

19   mark his report as -- we'll just mark it as Exhibit 1.

20            Okay.  That's all I have.

21       (Wilson Exhibit No. 1 was marked for identification.)

22            MR. BRUNNER:  Can I mark Exhibit 2.  This is

23   Defendant's 1310.

24       (Wilson Exhibit No. 2 was marked for identification.)

25

Contains Confidential Portions

1      OFFICER ANDREW WILSON

2       EXAMINATION

3 BY MR. BRUNNER:

4   Q. Sir, I've shown this exhibit to counsel, and

5 I'm now showing to you what's been marked as Exhibit

6 Number 2.

7   Taking a look at this document does it

8 refresh your memory about of what step of the field

9 training program you were in at the time of the incident

10 on November 16th, 2016?

11   A. Yes. This document indicates that I was on

12 Step 5.

13   Q. And beyond what the document indicates, is

14 that consistent with your memory, that you were in Step

15 5 at the time of the November 2016 event with Mr.

16 Turner?

17   A. Yes.

18   Q. You've been asked a number of questions

19 today about your training as I understand from 2015

20 through at least January of 2017. Do you remember all

21 the details of those trainings?

22   A. No.

23   Q. Would you defer to the training materials as

24 to what you were trained on?

25   A. Yes.

OFFICER ANDREW WILSON

1

2      Q.    I want to make sure I did not misunderstand

3  your testimony about your report.

4            Did you ever show your report to anyone in

5  your chain of command prior to it being submitted for

6  approval by Lieutenant Myers?

7      A.    No.

8      Q.    And did you make any changes to your report

9  based on a comment from someone in your chain of command

10 prior to it being submitted to Lieutenant Myers for

11 approval?

12     A.    No.  Not that I recall with the exception of

13 possibly a minor grammatical error.

14     Q.    Do you remember that for sure?

15     A.    No.

16           MR. BRUNNER:  Okay.  That's all the

17 questions I have.

18

19                      EXAMINATION

20 BY MR. CARMICHAEL:

21     Q.    I just wanted to ask you one thing.

22           What's -- your chain of command, what does

23 that mean?

24     A.    That would indicate -- chain of command as a

25 patrol officer I would be patrol officer, and then you

1              OFFICER ANDREW WILSON

2    have your immediate supervisor which is a sergeant.

3    Which then the supervisor above that would be a

4    lieutenant.  And then the supervisor above that is the

5    deputy chief.  Then the supervisor above that is the

6    chief of police, and that's the chain of command.

7         Q.   And who was your supervising sergeant in

8    November of 2016?

9         A.   I don't recall who my supervising sergeant

10   was that day.

11        Q.   Okay.  I'm just trying to understand if you

12   were showing something to your chain of command who

13   might that be?

14        A.   If I was showing somebody something in my

15   chain of command?

16        Q.   Yes.  If you were showing somebody a report.

17        A.   The supervising -- it's usually whatever

18   supervisor is available.  Typically it would be the

19   sergeant of that shift of that section.

20        Q.   Okay.  Do you consider other patrol officers

21   in your chain of command?

22        A.   No.  Another patrol officer would not be in

23   the chain of command.

24             MR. CARMICHAEL:  Okay.  That's all I have.

25

1          OFFICER ANDREW WILSON

2                EXAMINATION

3    BY MR. BRUNNER:

4          Q.   Did you show any of your patrol officers who

5    were not in your chain of command your report prior to

6    submitting it for approval?

7          A.   No.

8          Q.   Did you make any changes to your report

9    based upon any comment from any patrol officer who was

10   not in your chain of command?

11         A.   No.

12              MR. BRUNNER:  That's all the questions I

13   have.

14              MR. CARMICHAEL:  Okay.  We're done.

15              MR. BRUNNER:  Sir, you have the opportunity

16   to receive a copy of your transcript if you would like

17   to review it for transcription errors and sign off on

18   that, or you can waive that right.

19              Do you choose to do one or the other?

20              THE WITNESS:  I'll waive that right.

21              MR. BRUNNER:  Okay.  Thank you.

22              (The deposition concluded at 2:05 p.m.)

23

24

25

1              ERRATA SHEET

2  Case Name:

3  Deposition Date:

4  Deponent:

5  Pg.  No. Now Reads       Should Read  Reason

6  ____ ____ _____    _____    _____

7  ____ ____ _____    _____    _____

8  ____ ____ _____    _____    _____

9  ____ ____ _____    _____    _____

10 ____ ____ _____    _____    _____

11 ____ ____ _____    _____    _____

12 ____ ____ _____    _____    _____

13 ____ ____ _____    _____    _____

14 ____ ____ _____    _____    _____

15 ____ ____ _____    _____    _____

16 ____ ____ _____    _____    _____

17 ____ ____ _____    _____    _____

18 ____ ____ _____    _____    _____

19 ____ ____ _____    _____    _____

20

                         _____

21                        Signature of Deponent

22 SUBSCRIBED AND SWORN BEFORE ME

23 THIS ____ DAY OF _____, 2018.

24 _____

25 (Notary Public)  MY COMMISSION EXPIRES:_____

1

2                 CERTIFICATE OF REPORTER

3

4          I, Sandra J. Rynders, a Certified Shorthand

5    Reporter (IL), do hereby certify that the witness whose

6    testimony appears in the foregoing deposition was duly

7    sworn by me pursuant to 5 ILCS 255/2 (from Ch. 101,

8    par.2); that the testimony of said witness was taken by

9    me to the best of my ability and thereafter reduced to

10   typewriting under my direction; that I am neither

11   counsel for, related to, nor employed by any of the

12   parties to the action in which this deposition was

13   taken, and further that I am not a relative or employee

14   of any attorney or counsel employed by the parties

15   thereto, nor financially or otherwise interested in the

16   outcome of the action.

17   Dated: October 23, 2018

18

19          _____

                    Sandra J. Rynders

20

21

22

23

24

25