E-FILED
Wednesday, 26 June, 2019  04:04:25 PM
Clerk, U.S. District Court, ILCD

1                          M. TALBOTT

2        IN THE UNITED STATES DISTRICT COURT

          FOR THE CENTRAL DISTRICT OF ILLINOIS

3

4                        ---

5  CHANDRA TURNER, as Special  )

    Administrator of the Estate )

6  of RICHARD TURNER, deceased,)

    and CHANDRA TURNER,        )

7  individually,           )

                          )

8          Plaintiff,     )

                          )

9      vs.             )  No. 17-CV-2261

                          )

10  CITY OF CHAMPAIGN, a     )

    municipal corporation,    )

11  CHAMPAIGN POLICE OFFICER   )

    YOUNG, CHAMPAIGN POLICE    )

12  OFFICER WILSON; CHAMPAIGN   )

    POLICE OFFICER TALBOTT,    )

13  CHAMPAIGN POLICE SERGEANT  )

    FROST,                 )

14                     )

          Defendants.    )

15

16

17         DEPOSITION OF MICHAEL TALBOTT

18            Champaign, Illinois

19          Thursday, October 4, 2018

20   *CONTAINS CONFIDENTIAL PORTIONS TO BE BOUND SEPARATELY*

21             PAGES 47-51

22

23  Reported by:  Lisa Hahn Peterman, CSR, RMR

24  License No.   084-002149

25  Job No. 148760

**Exhibit 4**

1                          M. TALBOTT

2

3

4                     October 4, 2018

5                     1:30 p.m.

6

7

8

9          Deposition of MICHAEL TALBOTT, held at the

10   offices of Thomas, Mamer & Haughey, 30 East Main

11   Street, 5th Floor, Champaign, Illinois, before Lisa

12   Hahn Peterman, an Illinois Certified Shorthand

13   Reporter, a Registered Professional Reporter,

14   Registered Merit Reporter and Notary Public of the

15   State of Illinois.

16

17

18

19

20

21

22

23

24

25

```
 1                        M. TALBOTT

 2   APPEARANCES:

 3       HENDERSON PARKS

 4       Attorneys for Plaintiff

 5           140 South Dearborn Street

 6           Chicago, IL 60603

 7       BY: CHRISTOPHER CARMICHAEL, ESQ.

 8

 9       THOMAS MAMER & HAUGHEY

10       Attorneys for Defendant

11           30 East Main Street

12           Champaign, IL 61824

13       BY: DAVID KRCHAK, ESQ.

14           JUSTIN BRUNNER, ESQ.

15

16   ALSO PRESENT:

17           SUSAN WOZNIAK

18           Paralegal, City of Champaign

19

20

21

22

23

24

25
```

```
 1                    M. TALBOTT

 2

 3        MICHAEL TALBOTT, produced, sworn and

 4    examined on behalf of the Plaintiff, testified and

 5    deposed as follows:

 6                    EXAMINATION

 7    BY MR. CARMICHAEL:

 8        Q.  Officer Talbott, have you ever testified

 9    before?

10        A.  Yes.

11        Q.  About how many times?

12        A.  I don't know.

13        Q.  More than half a dozen?

14        A.  Yes.

15        Q.  Were the times that you testified all in

16    connection with your role as a police officer?

17        A.  Yes.

18        Q.  Have you ever been deposed before?

19        A.  Yes.

20        Q.  How many times?

21        A.  One.

22        Q.  One time.  Was that also in your connection

23    with your role as a police officer?

24        A.  Yes.

25        Q.  How long have you been a police officer?
```

1                    M. TALBOTT

2       A.   For approximately 13 years.

3       Q.   How long have you been with the Champaign

4  Police Department?

5       A.   The entire time.

6       Q.   And what roles or what ranks have you held

7  with the Champaign Police Department?

8       A.   I'm sorry?

9       Q.   What rank have you held with the Champaign

10 Police Department?

11      A.   Patrol officer.

12      Q.   And what type of roles have you held with

13 the Champaign Police Department?

14      A.   Patrol officer.

15      Q.   Have you sought any promotions?

16      A.   Not a promotion, no.

17      Q.   Have you sought to do a different role

18 other than patrol?

19      A.   I had tested for investigations.

20      Q.   What did you do before you became a police

21 officer?

22      A.   Construction.

23      Q.   And how long were you in construction for?

24      A.   Approximately two years.

25      Q.   What did you do before that?

1                    M. TALBOTT

2      A.   Went to college.

3      Q.   Where did you go to college?

4      A.   Western Illinois.

5      Q.   Did you graduate?

6      A.   Yes.

7      Q.   And what type of degree did you get?

8      A.   Law Enforcement and Justice Administration.

9      Q.   Would that have been a Bachelor's degree?

10     A.   Yes.

11     Q.   When did you graduate?

12     A.   2002.

13     Q.   Did you do anything to get ready for

14   today's deposition?

15     A.   Yes.

16     Q.   And what did you do?

17     A.   Met with Dave and Justin and Susan.

18     Q.   And besides that, did you do anything else?

19     A.   I reviewed my report.

20     Q.   Anything else besides your report?

21     A.   My FTO log from that day.

22     Q.   And what's the FTO log?

23     A.   The peer training evaluation log.

24     Q.   Okay.  And what's that completed in

25   connection with?

1                    M. TALBOTT

2      A.   Observations that day.

3      Q.   Okay.  Would that have been your

4  observations of Officer Wilson?

5      A.   Yes.

6      Q.   Were those the only documents you reviewed?

7      A.   I reviewed video from that day as well.

8      Q.   Do you recall which videos you reviewed?

9      A.   Some in-car video from Officer Wilson and

10  some surveillance video.

11      Q.   Is there any audio connected with either of

12  the videos?

13      A.   Yes.

14      Q.   Which ones had audio?

15      A.   The in-car.

16      Q.   Did looking over the reports or reviewing

17  the videos help refresh your recollection of the

18  events?

19      A.   Yes.

20      Q.   I just wanted you to identify this one.  I

21  won't mark it as an exhibit.  Is this the FTO log

22  that you reviewed?

23      A.   Yes.

24      Q.   Okay.

25           MR. BRUNNER:  Do you want to refer to the

1                    M. TALBOTT

2    Bates number?

3           MR. CARMICHAEL:  It's Defendant's 1875.

4           MR. BRUNNER:  Thank you.

5    BY MR. CARMICHAEL:

6        Q.  Did you -- have you received any training

7    in preparing reports?

8        A.  I'm sorry.  Training in what?

9        Q.  In how to prepare reports.

10       A.  Yes.

11       Q.  What were you trained in in connection with

12   preparing reports?

13       A.  Generally, how our report writing software

14   works, the boxes that need to be completed with the

15   information that is being requested.

16       Q.  Are there guidelines or rules on completing

17   reports as far as the content of the report?

18       A.  Yes.

19       Q.  And what are those?

20       A.  Just a clear and accurate summary of the

21   event.

22       Q.  Are you taught to be as comprehensive and

23   detailed in preparing your reports as you can be?

24       A.  It's detailed, but it's not a complete

25   detailed reflection of the events, it's a summary.

1                    M. TALBOTT

2      Q.  A summary of what you remember?

3      A.  Correct.

4      Q.  Is there guidelines on when you should

5  prepare a report as well?

6      A.  Yes.

7      Q.  How soon after an event are you supposed to

8  prepare a report?

9      A.  There's nothing about how soon.  Typically,

10  reports can be completed that day or the next

11  workday.

12      Q.  Okay.  So within 24 hours roughly?

13      A.  Generally, yes.

14      Q.  Unless there's some extenuating

15  circumstances?

16      A.  Yes.

17      Q.  In connection with getting ready, you

18  reviewed your report for this incident, correct?

19      A.  Yes.

20      Q.  When you prepared that report, did you

21  speak with any of the other officers that were

22  involved?

23      A.  No.

24      Q.  Prior to preparing your report for this

25  particular instance, did you have any discussion

                         M. TALBOTT

1

2    with any of the other officers about what happened?

3        A.  Not about what happened.

4        Q.  Did you have any discussions with the other

5    officers?

6        A.  Yes.

7        Q.  Okay.  What about?

8        A.  Just the general -- the initial call, what

9    happened at the hospital, and that's about it, all I

10   can remember.

11       Q.  Prior to the encounter that we're talking

12   about today that happened on November 16, 2016, had

13   you previously had interactions with Richie Turner?

14       A.  Yes.

15       Q.  Do you recall how many?

16       A.  I don't.

17       Q.  Was it more than two or three?

18       A.  I don't know.

19       Q.  Could you tell me generally what your

20   experience was with Richie Turner prior to the

21   November 2016 incident?

22       A.  As far as what?

23       Q.  I mean, why were you interacting with him?

24   What was his demeanor?

25       A.  I don't recall his demeanor.  We would

1                          M. TALBOTT

2    often get called because he was homeless, and he

3    would stay on campus, and either somebody would call

4    or a friend of his would call for assistance,

5    something along those lines.

6         Q.  When someone would call for assistance, was

7    it to check on him to see if he was okay?

8         A.  Sometimes, yes.

9         Q.  And generally what would happen when you

10   would respond to a call like that?

11        A.  Check on him, speak with him, and then

12   depending on what the call was, what was going on,

13   it would obviously kind of dictate what happened

14   from there.

15        Q.  When you responded with him, were you able

16   to speak with him?

17        A.  I had spoken with him before, yes.

18        Q.  Was he able to communicate back with you?

19        A.  Yes.

20        Q.  Did you understand what he was saying?

21        A.  I don't recall any specific conversation

22   with him.

23        Q.  But you were able to talk with him, you

24   know, interact with him?

25        A.  I have spoken with him before.

1               M. TALBOTT

2      Q.  Okay.  Were there any instances where --

3  that you encountered Richie where he needed to be

4  taken for medical attention?

5      A.  I don't recall specifically if I have.

6      Q.  Would you -- do you think you might recall

7  if you had to involuntarily commit somebody for

8  medical attention?

9          MR. BRUNNER:  Objection, speculative.

10          THE WITNESS:  Not necessarily.

11  BY MR. CARMICHAEL:

12      Q.  Okay.  Were there particular areas that

13  Richie frequented?

14      A.  Generally campus.

15      Q.  Were there particular streets that you

16  would often find him at?

17      A.  I don't know specifically where all he

18  would be at.  I mean, I know Green Street's a main

19  street on campus.

20      Q.  Okay.  Is that generally where you recall

21  encountering Richie before?

22      A.  I don't recall specifically.

23      Q.  When you encountered Richie before, what

24  was his appearance like?

25      A.  I don't recall specifically.

1                          M. TALBOTT

2      Q.  I mean, he appeared to be a homeless

3  person, correct?

4      A.  I don't know.

5      Q.  Well, I mean, he had the appearance.  I

6  mean, his clothes and stuff, he appeared to be

7  homeless.

8          MR. BRUNNER:  Objection, asked and

9  answered.

10          THE WITNESS:  What's the appearance?

11  BY MR. CARMICHAEL:

12      Q.  Well, I mean, you're a patrol officer,

13  right?  You kind of know when you see somebody that

14  they might be homeless.

15      A.  I knew he was homeless.  I don't know based

16  on his appearance if he's going to be homeless or

17  not.

18      Q.  Okay.  When you encountered Mr. Turner

19  before, were you aware he had mental health issues?

20      A.  Yes.

21      Q.  Were you aware that Mr. Turner had been

22  admitted to the hospital for mental health issues?

23      A.  No.

24      Q.  Were you aware that other officers had to

25  complete voluntary committal forms to get him

1              M. TALBOTT

2   committed to the hospital?

3       A.   I'm not aware of any specifically.

4       Q.   Whenever -- were there any times that you

5   had encountered Mr. Turner and he appeared to be

6   having a mental breakdown or mental issues?

7       A.   I'm sorry?

8       Q.   Were there any instances where you

9   encountered Mr. Turner, besides the one we're here

10  today about, where he appeared to have a mental

11  breakdown or mental issues?

12      A.   I don't remember.

13      Q.   Did you ever take Mr. Turner into custody

14  or arrest him?

15      A.   I don't remember.

16      Q.   On November 16, 2016, did you respond to a

17  call in the area of Sixth and Green Street in

18  connection with Mr. Turner?

19      A.   Yes.

20      Q.   Was anyone else with you?

21      A.   Yes.

22      Q.   Who else was with you?

23      A.   Officer Wilson.

24      Q.   Who was driving?

25      A.   Officer Wilson.

1                    M. TALBOTT

2        Q.  Do you know what type of call you were

3   responding to?

4        A.  Specifically, I don't remember what type

5   was dispatched.  I believe disorderly subject.

6        Q.  In responding to that call, was it an

7   emergency?

8        A.  No.

9        Q.  Did Officer Wilson activate the squad

10  sirens or lights?

11       A.  No.

12       Q.  In responding to that call, were you and

13  Officer Wilson acting as a backup to another

14  officer?

15       A.  I don't remember specifically if we were a

16  backup or a -- or if the other officer was a backup,

17  but I know there was another officer going.

18       Q.  What happened when you arrived with Officer

19  Wilson at Sixth and Green Streets?

20       A.  Officer Wilson made contact with Richard

21  and I waited in the car.

22       Q.  Where did Officer Wilson park the car?

23       A.  On Sixth Street a little bit south of

24  Green.

25       Q.  And which way was the car facing?

1                          M. TALBOTT

2        A.   South.

3        Q.   Would that be toward the intersection or

4    away from the intersection?

5        A.   It would be away from Green Street.

6        Q.   Okay.  And you stayed in the car?

7        A.   Yes.

8        Q.   About how far away from the intersection

9    was the car parked?

10       A.   I don't remember specifically.  I would say

11   maybe a hundred feet.

12       Q.   Did you see Mr. Turner when you arrived at

13   that intersection?

14       A.   Yes.

15       Q.   And do you recall where he was at?

16       A.   He wasn't in one location.  He was moving

17   around the Sixth and Green Street intersection.

18       Q.   Near the intersection?

19       A.   Yes.

20       Q.   And why did you stay in the car?

21       A.   At that time I was working as a field

22   training officer with Officer Wilson.  He was in the

23   check ride phase of his training, so he was

24   operating as a solo patrol officer, and I was there

25   to answer any question he may have and to evaluate

1                    M. TALBOTT

2    his job performance.

3         Q.  And what did you do when Officer Wilson got

4    out of the car?

5         A.  I remained in the car, monitored parts of

6    the conversation through the video and waited for

7    him to let me know what he was going to do.

8         Q.  And you said monitor parts of the

9    conversation.  Was that the parts you could hear?

10        A.  Correct.

11        Q.  And through the video, I just need a little

12   description.  I'm not familiar with that.

13        A.  The computer in the vehicle, there's a

14   button that you can push that the audio that's being

15   recorded will play through the computer at the same

16   time.

17        Q.  Okay.  So is there a camera and audio in

18   the car that's recording?

19        A.  There's a camera in the back seat.

20        Q.  Okay.  And is that pointed out of the

21   vehicle?

22        A.  Well, no.  Specifically, in the car there's

23   a camera in the back seat for the back seat.  There

24   is a second camera that points out of the vehicle

25   through the front windshield.

1                           M. TALBOTT

2        Q.   Okay.  So you were listening to the camera

3   that's in the back seat?

4        A.   No, the audio that would be on Officer

5   Wilson's person.

6        Q.   Oh, on Officer Wilson's person.

7        A.   Yes.

8        Q.   Okay.  So he had a body camera?

9        A.   No.

10        Q.   I'm just trying to understand how you were

11   listening to the audio.

12        A.   The camera has a recorder that captures the

13   audio while you're out of the car.

14        Q.   Oh, okay.  And what's the source it's

15   capturing from?  Where is it located?

16        A.   It would be what you would say.

17        Q.   No, I'm just trying to figure out where the

18   microphone would be.

19        A.   I'm sorry?

20        Q.   I'm not quite understanding you.  Where

21   would the microphone be that's capturing the audio?

22   Where is it located?

23        A.   The officer would wear it.

24        Q.   So he doesn't have a body camera but he has

25   a microphone on him?

                        M. TALBOTT

1

2      A.  Correct.

3      Q.  Now, I understand you.  Sorry.  I didn't

4   catch that part at first.

5          And what did Officer Wilson do once he

6   exited the car?

7      A.  I don't know specifically.

8      Q.  Okay.  Were you able to see him?

9      A.  I saw him for some time and some time I

10  could not see him.

11     Q.  And were you able to overhear him?

12     A.  Yes.

13     Q.  And what did you hear?

14     A.  I heard him speaking with Richard and he

15  spoke with Officer Young as well.

16     Q.  And what was Officer Wilson saying to

17  Richard?

18     A.  I don't remember specifically what he said.

19     Q.  How about Richard?  Did you -- do you see

20  him do anything or say anything?

21     A.  I saw him -- he ran across the street, ran

22  across Sixth Street to the west.  I saw him take a

23  sign off of a door.  I saw him throw the sign onto

24  the ground and then he ran back behind our squad to

25  the north out of my sight.

                         M. TALBOTT

1

2      Q.   Okay.  Could you hear Mr. Turner saying

3   anything at all?

4      A.   I could hear him saying things.  I don't

5   know specifically what he was saying.

6      Q.   Did it appear to be gibberish?

7      A.   Parts of it, yes.

8      Q.   At any point did you see Mr. Turner waving

9   his arms in the air?

10     A.   Yes.

11     Q.   Based on your prior experiences with

12  Mr. Turner, had he done similar things?

13     A.   I don't remember specifically.  I don't

14  remember specific incidents with him in the past.

15     Q.   Do you remember any instances in the past

16  where Mr. Turner was speaking gibberishly and waving

17  his arms in the air?

18     A.   I don't remember specifically.

19     Q.   At any point did Officer Wilson get on the

20  radio and call for any assistance?

21     A.   He called for medical assistance to

22  respond.

23     Q.   And do you know why he did that?

24     A.   To assist in checking Richard, making sure

25  that he was in a condition that he could take care

1                        M. TALBOTT

2    of himself.

3         Q.  Did you hear Officer Wilson or Officer

4    Young talking to Mr. Turner, asking him to do

5    anything?

6         A.  Not specifically, no.

7         Q.  You don't recall anything?

8         A.  No, I don't recall.

9         Q.  When Mr. Turner left your field of view and

10   walked -- I think you said north, is that right?

11        A.  Yes.  He would have walked north.

12        Q.  He went north.  What did he do as he left

13   your field of view?

14        A.  I don't know if he was behind me.

15        Q.  Okay.  Did he cross the street and go out

16   of your field of view?

17        A.  No.  I was on Sixth Street, so he walked

18   north behind my squad.

19        Q.  Okay.  Would that be toward Green Street?

20        A.  Yes.

21        Q.  And you lost sight of him?

22        A.  Yes.

23        Q.  And what did Officer Wilson and Officer

24   Young do?

25        A.  I don't know specifically.

                    M. TALBOTT

1

2      Q.  Did you lose sight of them at some point,

3  too?

4      A.  Yes.

5      Q.  And what did you do then?

6      A.  I continued to listen as -- what I could

7  hear, either through the radio or the camera as to

8  what was going on.

9      Q.  And what did you hear?

10     A.  At one point Officer Wilson said that

11 Richard had ran westbound on Green Street.

12     Q.  And what did you do then?

13     A.  At that time I exited my car and went to

14 assist Officer Wilson and Officer Young.

15     Q.  And why at that particular point did you

16 exit your car?

17     A.  At that time medical was coming.  Wilson --

18 I'm sorry.  Richard was running down Green Street.

19 I just went to assist Officer Young and Officer

20 Wilson.

21     Q.  Previously when you had remained in the

22 car, you didn't feel that Officer Wilson and Officer

23 Young needed assistance?

24     A.  Correct.

25     Q.  You got out of the car.  What did you do

                              M. TALBOTT

1

2   next?

3        A.  I walked down towards Green Street.  That

4   was the last place that they said they were at, and

5   then I looked on Green Street to see if I could see.

6        Q.  And what did you see?

7        A.  I could not see them at all at that point.

8        Q.  And what did you do?

9        A.  Officer Wilson advised -- had last advised

10  that he was westbound on Green Street, so I started

11  walking west, assuming that was the correct

12  direction to see if I could relocate them.

13       Q.  Okay.  And what happened when you started

14  walking west down Green Street?

15       A.  A little ways down Green Street, I looked

16  down an alleyway, walkway to the north, and then I

17  saw Officer Wilson, Officer Young, and Richard in an

18  alley.

19       Q.  And what were Officer Wilson and Officer

20  Young and Richard doing down the alleyway or

21  walkway?

22       A.  I don't know specifically what they were

23  doing.  It appeared that they were wrestling or

24  fighting and they were on the ground.

25       Q.  They were on the ground when you saw them?

1                          M. TALBOTT

2        A.   Yes.

3        Q.   And what did you do when you saw them on

4    the ground?

5        A.   I ran down to their location to assist.

6        Q.   Prior to that point you had been walking,

7    correct?

8        A.   Yes.

9        Q.   And then once you saw them, you started

10   running?

11       A.   Yes.

12       Q.   And did you run across what -- would that

13   be Green Street?

14       A.   Yes.

15       Q.   Had you heard either Officer Wilson or

16   Officer Young use their radio to call for

17   assistance?

18       A.   Not at that time, no.

19       Q.   How about Sergeant Frost?  Had you heard

20   him on the radio at that point?

21       A.   I believe he was on the radio, but I don't

22   remember exactly what he said.

23       Q.   Did you at some point hear Sergeant Frost

24   request additional officers to the area?

25       A.   I don't remember him requesting additional

1                          M. TALBOTT

2    officers.

3         Q.   Okay.  If he had, would you have advised

4    him that you were in the area and on your way.

5              MR. BRUNNER:  Objection, speculative.

6              THE WITNESS:  It would depend, based on the

7    situation.

8    BY MR. CARMICHAEL:

9         Q.   So you saw Officer Wilson, Officer Young

10   and Mr. Turner on the ground down the walkway.

11   About how far were they down that walkway?

12        A.   They were at the far north end of the

13   walkway.  I don't know specifically how far it would

14   be.

15        Q.   And you saw them from where you were

16   standing on the -- that would be the south side of

17   Green Street?

18        A.   Yes.  I walked down the south sidewalk of

19   Green Street, so we look across north from Green

20   Street, the sidewalk and then the walkway.

21        Q.   Okay.  And as you got closer, could you see

22   what was going on?

23        A.   Yes.

24        Q.   And could you tell me what you saw?

25        A.   As I got up to them, I could see all three

                        M. TALBOTT

1

2   of them on the ground.  Richard was kicking his

3   legs, flailing his arms about, not responding to any

4   of the commands, and Officer Wilson and Officer

5   Young were both struggling to get him under control.

6        Q.  When you say commands, what were the

7   commands?

8        A.  I don't remember specifically what the

9   commands were being given.

10       Q.  When you say commands, that would have been

11  Officer Wilson and Officer Young telling Richard to

12  do something?

13       A.  Correct.

14       Q.  Do you recall if they were shouting,

15  talking loudly?

16       A.  I don't recall specifically.

17       Q.  Mr. Turner, how was he on the ground?  Was

18  he on his stomach?

19       A.  When I first got there, I don't recall if

20  he was on his stomach or his side or exactly how he

21  was positioned.

22       Q.  Okay.  And was Officer Wilson on one side

23  of him and Officer Young on the other side of him?

24       A.  Everyone was moving around quite a bit.  I

25  don't remember specifically which side or if they

1                           M. TALBOTT

2      were on separate sides or what.

3           Q.   When you got there, did Officer Young have

4      his knee on Richard?

5           A.   I did not see anything as far as a knee or

6      legs or anything.

7           Q.   Okay.  And when you got there, what did you

8      do?

9           A.   He was kicking at that time, so I went to

10     control his legs.  I put one knee on one of his legs

11     and then used my hands to hold the other leg to try

12     to get them under control.  He was pulling his legs

13     up or his knees up towards his upper body, like he

14     was attempting to stand up or reposition himself, so

15     I tried to hold those still.

16          Q.   Okay.  And you said you put -- did you put

17     both knees on one of his legs?

18          A.   I don't remember if it was one knee or two

19     knees.

20          Q.   And then you used your hands on his other

21     leg?

22          A.   Correct.

23          Q.   Were you able to get his legs to stop

24     moving?

25          A.   Partially.  I wasn't entirely successful

1                         M. TALBOTT

2    but I was able to control him somewhat.

3        Q.  And when you got there, had Officers Wilson

4    and Young handcuffed Richard?

5        A.  No.

6        Q.  When you got there and you started to help

7    with the legs, were they able to get Richard

8    handcuffed?

9        A.  Yes.

10       Q.  About how long after you got there?

11       A.  I don't know.  Within probably a few

12   seconds.

13       Q.  And what happened with Richard's legs once

14   they got him handcuffed?

15       A.  I continued to hold onto his legs and I

16   requested on the radio for another officer when they

17   arrived to bring a hobble.

18       Q.  And did someone bring a hobble?

19       A.  Yes.

20       Q.  Did that happen fairly quickly after you

21   requested it?

22       A.  Relatively quickly, yes.

23       Q.  And who brought the hobble?

24       A.  Sergeant Frost.

25       Q.  And did you put that on to Richard?

1                          M. TALBOTT

2       A.   I continued to hold his legs and he applied

3  it.

4       Q.   What happened once you applied the hobble?

5       A.   The first time we applied it, Richard

6  kicked one of the legs out of it and defeated the

7  hobble, so I regained control of his legs and

8  Sergeant Frost put it on a second time.

9       Q.   Was anyone helping you with his legs at

10 that point?

11      A.   I don't believe so.

12      Q.   When you arrived and started helping with

13 Richard's legs, did you talk with either Officer

14 Wilson or Officer Young?

15      A.   We had some communication, yes.

16      Q.   Do you recall what that was?

17      A.   Not specifically.  I know Officer Wilson

18 advised he had lost his radio, couldn't contact

19 anybody, and I know they were continuing to give him

20 commands.

21      Q.   When you say him, you mean Richard?

22      A.   I'm sorry?

23      Q.   You said they were continuing to give him

24 commands.  Did you mean they were continuing to give

25 Richard commands?

1                    M. TALBOTT

2      A.   Yes.  They were continuing to give Richard

3  commands.

4      Q.   Did anybody tell you, you know, can you get

5  his legs?

6      A.   I don't remember if somebody asked me to or

7  if that's just the area that I went to assist with.

8      Q.   Okay.  At any point did you put your whole

9  body onto Richard's legs?

10     A.   No.

11     Q.   At any point did the hobble get connected

12 to the handcuffs?

13     A.   No.

14     Q.   What's called, I guess, hog tieing?

15     A.   No.

16     Q.   After Richard was handcuffed and hobbled,

17 what happened next?

18     A.   I stepped away.  I caught my breath for,

19 you know, a moment, and then at that point moved

20 back and we realized that he was basically not

21 moving at all, which is a distinct contrast from

22 what was going on just a few seconds prior.

23     Q.   And did anybody say anything at that point?

24     A.   Sergeant Frost recognized the same thing.

25 I believe he asked somebody if he was breathing at

1                    M. TALBOTT

2    that time.

3         Q.  And did anybody check?

4         A.  Yes.

5         Q.  Who?

6         A.  Officer Young, I believe.

7         Q.  And how did Officer Young check

8    Mr. Turner's breathing?

9         A.  I don't recall specifically.

10        Q.  Did anybody roll Mr. Turner over?

11        A.  Somebody did, but I don't know.  At that

12   point I walked away, went back to across the car in

13   his direction and retrieved an AED.

14        Q.  Did you go and retrieve the AED after it

15   was indicated that Mr. Turner was not breathing?

16        A.  It was all relatively simultaneous.  He

17   asked if he was breathing, directing me to go get

18   the AED, so as they were checking, I went and left

19   and got the AED.

20        Q.  And where was Sergeant Frost's police car

21   parked?

22        A.  It would have been in the alleyway directly

23   north of our location.

24        Q.  Okay.  Do you know how far away that was

25   from where you were at with Mr. Turner?

1                         M. TALBOTT

2      A.   Maybe approximately 30 feet.

3      Q.   And did you return with the AED?

4      A.   No.  I got it out of the car.  Officer

5  Wilson had gone over there and he was near the front

6  of the car, so I tossed it to him and he took it

7  back up there.

8      Q.   Okay.  Did you go back to where Mr. Turner

9  was located then?

10      A.   I started to walk back there, but at that

11  time I could hear the ambulance in the area and I

12  could see them, so based on where we were located

13  at, we were kind of confined around several

14  buildings, so I started to walk around Sixth Street

15  to flag them down and point out our exact location.

16      Q.   That's because of the walk you were in was

17  kind of narrow, right?

18      A.   Correct, yeah.  I referred to that as an

19  alleyway, but it was more of a sidewalk, and then

20  perpendicular to that was an alleyway that would be

21  wide enough for a vehicle.

22      Q.   And the alleyway went down, there was like

23  the backs of the businesses and parking structure,

24  right?

25      A.   Correct.

1                    M. TALBOTT

2        Q.  And the walkway is probably only, like,

3    five or six feet wide?

4        A.  I don't know specifically but it was

5    sidewalk-type width.

6        Q.  And did you bring the ambulance then into

7    the alleyway?

8        A.  Yes.

9        Q.  And what happened next?

10        A.  At that point medical personnel were on

11    scene, so I stood back, allowed them to do their

12    medical treatment.

13        Q.  And then what happened once the medical

14    personnel started treatment?

15        A.  Eventually, they put him in the ambulance.

16    They asked for somebody to drive and I told them I

17    would drive to the hospital.

18        Q.  Did you stay at the hospital?

19        A.  Yes.

20        Q.  And what happened at the hospital?

21        A.  I waited outside the emergency room until

22    the doctors pronounced him deceased, at which time I

23    notified my command.

24        Q.  When you were riding with Officer Wilson,

25    was he still a probationary officer?

                           M. TALBOTT

1

2      A.  Yes.

3      Q.  Prior to you getting out of the vehicle,

4  had you spoken with Officer Young?

5      A.  Yes.

6      Q.  And what did you two talk about?

7      A.  Him and I, we had an unrelated conversation

8  to the incident and I believe that was it.

9      Q.  That was when you were still in the car?

10     A.  Yes.

11     Q.  So Officer Wilson, was he over with

12  Mr. Turner and then you and Officer Young were

13  talking?

14     A.  Yes.

15     Q.  And I think Officer Young described it as

16  busting your balls.  Is that what he was doing?

17     A.  Yes.

18     Q.  When Mr. Turner was on the ground and you

19  were over assisting, was Mr. Turner saying anything?

20     A.  He was.  I don't remember specifically what

21  he was saying.

22     Q.  It appeared to be gibberish again?

23     A.  Yes.

24     Q.  Have you received any training on crisis

25  management or crisis intervention?

1                          M. TALBOTT

2          A.  A little bit, yes.

3          Q.  And what type of training did you receive?

4          A.  I don't remember specifically.  Not a full

5     crisis intervention training, just a general

6     overview.

7          Q.  Are there crisis intervention officers?

8          A.  Yes.

9          Q.  Are you able to get access to or ask for

10    assistance from crisis intervention officers?

11             MR. BRUNNER:  Are you talking about what

12    timeframe?

13             MR. CARMICHAEL:  In 2016?

14             THE WITNESS:  Yes.

15    BY MR. CARMICHAEL:

16         Q.  And did you receive any training about

17    dealing with people with mental health issues?

18         A.  Yes.

19         Q.  What type of training do you receive?

20         A.  I don't remember specifically on classes,

21    but there have been in-service training on that

22    topic.

23         Q.  And do you remember how many times you've

24    been trained on that topic?

25         A.  No.

                         M. TALBOTT

1

2      Q.  Had you ever been trained prior to 2016 on

3  mental health issues?

4      A.  Yes.

5      Q.  Have you received any training on dealing

6  with people who might have delirium?

7      A.  Yes.

8      Q.  Did you receive that training prior to

9  2016?

10     A.  Yes.

11     Q.  Do you remember what type of training that

12 was?

13     A.  That was in-service department training.

14     Q.  Do you remember how long the training was?

15     A.  I don't remember.

16     Q.  Do you remember anything about the

17 training?

18     A.  Yes.

19     Q.  Could you tell me about that?

20     A.  I just went over the response procedures

21 for engaging in a subject who would be possibly ED

22 and how we would respond and try to contain that

23 subject.

24     Q.  Did you -- do you recall any part of that

25 training dealing with how to identify a subject who

1                          M. TALBOTT

2  might have ED?

3      A.  Yes.

4      Q.  And what types of indicators might indicate

5  that someone would have ED?

6      A.  There's a variety of different indicators

7  possible.

8      Q.  What do you recall?

9      A.  Sweating, stripping their clothes off,

10  unresponsiveness.  I don't remember the entire list.

11      Q.  Would the inability to communicate, would

12  that be a potential indicator as well?

13      A.  I don't remember specifically on that.

14      Q.  How about talking nonsense?  Is that a

15  potential indicator of ED?

16      A.  I don't remember specifically.

17      Q.  When you are performing your job duties, do

18  you rely on the training you've received?

19      A.  Yes.

20      Q.  Do you try to follow your training?

21      A.  Yes.

22      Q.  Did you receive training when you joined

23  the Champaign Police Department?

24      A.  Yes.

25      Q.  What type of training did you receive?

1                    M. TALBOTT

2      A.   I went to the Police Training Institute.

3      Q.   For how long?

4      A.   Twelve weeks.

5      Q.   And after going to the training institute,

6  have you received any additional training?

7      A.   Yes.

8      Q.   And what type of training have you

9  received?

10     A.   There's been continuing in-service training

11 on a variety of topics, both through the department

12 and through the mobile training unit.

13     Q.   When you say in-service training, is that

14 training you might receive that might take a day

15 where you would be trained instead of maybe working

16 a shift?

17     A.   It would be anything from a five- or

18 ten-minute long briefing training to -- yes, or a

19 one or multiple day training class.

20     Q.   I think you mentioned, was the mental

21 health training you received an in-service training?

22     A.   Yeah.  It was training after the academy.

23     Q.   And delirium training, was that an

24 in-service training as well?

25     A.   Correct.  That was after the academy.

1                    M. TALBOTT

2       Q.  Do you remember about how long any of the

3   trainings were?

4       A.  I don't remember.

5       Q.  Does the department have policies and

6   procedures?

7       A.  Yes.

8       Q.  Do you try to follow those policies and

9   procedures when you're doing your duties?

10      A.  Yes.

11      Q.  Do you receive training and keep apprised

12  of the department's policies and procedures?

13      A.  Yes.

14      Q.  And do you try to incorporate those

15  procedures into your performance of your duties?

16      A.  Yes.

17      Q.  Have you received any training on

18  deescalation?

19      A.  I don't remember specifically deescalation.

20          MR. BRUNNER:  I'm sorry.  Are you talking

21  about as a standalone course or as part of another

22  course?

23          THE WITNESS:  Just generally.  It's been

24  discussed in other courses, yes.

25  BY MR. CARMICHAEL:

1                       M. TALBOTT

2    Q.  Okay.  Have you received that training as

3  part of dealing with people with mental health

4  issues?

5    A.  I'm sorry?

6    Q.  Have you received deescalation in dealing

7  with people with mental health issues?

8    A.  I don't remember what courses it would have

9  been discussed in.

10    Q.  In your training on dealing with people

11  with mental health issues, is the training -- does

12  the training try to refocus your attention on how

13  you approach those issues?

14    A.  I'm sorry.  Can you say that again?

15    Q.  Yeah.  I was trying to -- what did you

16  learn from the training of dealing with people with

17  mental health issues?

18    A.  There's a variety of different issues

19  there.

20    Q.  Well, I'm just trying to understand what

21  you might have learned, so if you could give me an

22  overview.

23    A.  I mean, it's been a variety of classes.  I

24  don't remember any specific issues from at a

25  specific class.

1                          M. TALBOTT

2        Q.   When you approach somebody that might have

3   a mental health issue, is your approach to that

4   person more of potentially providing medical

5   assistance than maybe law enforcement?

6        A.   Yes.  There's a lot of interactions with

7   mentally ill that wouldn't be for an arrest.  It

8   would be simply for their safety, their wellbeing,

9   and medical treatment.

10       Q.   You, yourself, are you on a crisis

11  intervention team?

12       A.   No.

13       Q.   Do you know officers that are?

14       A.   I know officers who are.  I don't know

15  specifically who is on the team.

16       Q.   When you're out on patrol, are you able to

17  call on an officer that might be on a crisis

18  intervention team for help?

19       A.   Generally, yes.  It would depend on if

20  anybody would be available and working.

21       Q.   In getting training on crisis intervention,

22  is one of the things you learn as part of that

23  working on obtaining control of people without the

24  use of physical force?

25       A.   Yes.

                         M. TALBOTT

1

2      Q.   And crisis intervention training is one of

3   the things that you learn that people that are

4   having a mental health issue can potentially have an

5   additional medical problem as part of that?

6      A.   Yes.

7      Q.   In your training on excited delirium, do

8   you recall if one of the indicators might be that

9   someone is rambling and incoherent?

10     A.   There's a list.  I don't remember

11  specifically if that's on the list.

12     Q.   Okay.  I'm going to show you what we marked

13  earlier as Young 1, if you could take a look at that

14  for me.  Have you seen Exhibit 1 before?

15     A.   Yes.

16     Q.   Did you review that as part of your

17  training?

18     A.   Yes.

19     Q.   Is one of the indicators that someone might

20  have excited delirium is that they're rambling and

21  incoherent?

22     A.   It talks about being paranoid and shouting,

23  but it doesn't specifically say rambling or

24  incoherent.

25     Q.   Okay.  Take a look maybe at the second

                        M. TALBOTT

1

2   paragraph under recognizing delirium in about the

3   third sentence.

4       A.   Yeah.   It talks about the area of speech,

5   maybe, rambling, incoherence.   The list of exhibits

6   below does not include that.

7       Q.   Okay.   Is disorientation another thing that

8   the person might exhibit?

9       A.   Yes.

10      Q.   Have you encountered anybody who exhibited

11  symptoms like these?

12      A.   Yes.

13      Q.   When?

14      A.   I don't remember specifically.

15      Q.   Okay.   Do you know how long ago it was?

16      A.   I don't remember.

17      Q.   Have you encountered more than one person

18  that exhibited, like, these?

19      A.   Yes.

20          MR. BRUNNER:   All of the symptoms listed in

21  Exhibit 1?

22          MR. CARMICHAEL:   No, symptoms like those.

23          MR. BRUNNER:   Any of them.

24          THE WITNESS:   Any of the symptoms, yes,

25  more than once.

1                      M. TALBOTT

2    BY MR. CARMICHAEL:

3         Q.  In those instances, what have you done?

4         A.  It's varied, depending on the situation at

5    hand.

6         Q.  Just give me a -- for example, what did you

7    do in the times that you've encountered?

8         A.  There's been multiple situations, so I

9    don't remember a specific situation for a specific

10   set of circumstances on what exactly was done.

11        Q.  Do you remember how many times that you've

12   encountered somebody that exhibited these types of

13   symptoms?

14        A.  No.

15        Q.  More than four, more than five?

16        A.  Yes.

17        Q.  During these instances, did you call for

18   anybody on the crisis intervention team?

19        A.  I don't remember if I specifically called

20   for some, but I know there has been officers on the

21   scene with other instances.

22        Q.  Where someone exhibited these symptoms?

23        A.  I don't remember specifically.  If you have

24   a specific incident possibly, but...

25        Q.  Do you remember in those incidents what

                          M. TALBOTT

1

2   happened?  Is the person taken to a medical

3   institution?

4       A.  It would depend on the situation and the

5   circumstances at the time.

6       Q.  In any of the instances where you saw

7   somebody exhibit any of these symptoms, did anybody

8   die?

9       A.  Not for me personally, no.

10      Q.  I'm sorry?

11      A.  Not for me.  Not with me.

12      Q.  Not with you.  And when you say with you,

13  what do you mean?

14      A.  Not any incident that I was a part of.

15      Q.  Okay.  All right.  In this particular

16  instance when you were dealing with Richard Turner,

17  did you call for anyone from the crisis intervention

18  team?

19      A.  No.

20      Q.  Until you went to assist Officers Young and

21  Wilson, were you more in an observation role?

22      A.  Yes.

23      Q.  Did you -- at the point before you went to

24  assist Officers Young and Wilson, did you let those

25  two officers take the lead in deciding how to handle

1                          M. TALBOTT

2    the situation?

3         A.  Yes.

4         Q.  At the time of the incident involving

5    Mr. Turner, was Officer Young the senior officer on

6    the scene?

7         A.  Yes.

8         Q.  Would you have deferred to Officer Young at

9    that point since he was the senior officer there?

10        A.  As far as -- what do you mean?

11        Q.  As far as decisions about what to do.

12        A.  No, not necessarily.

13        Q.  If you had a difference of opinion, you

14   might have told him?

15        A.  Yes.

16        Q.  At the time of the incident, did you have

17   a -- speak to Officer Young and let him know that

18   you had a difference of opinion about how things

19   were being handled?

20        A.  No.

21                  (Following portion deemed confidential

22                   and included under separate cover.)

23

24

25

 1                          M. TALBOTT

 2                  (Continued from confidential portion of

 3                  the transcript.)

 4    BY MR. CARMICHAEL:

 5        Q.   In November of 2016 when you approached

 6    Mr. Turner, was he armed?

 7        A.   I don't remember for sure.

 8        Q.   When he was rolled over and wasn't

 9    breathing, did he appear to be armed in any way?

10        A.   No.

11             MR. CARMICHAEL:  Why don't we take a break

12    for a minute.  I think I can wrap up.

13             MR. KRCHAK:  Okay.

14                  (A brief recess was taken.)

15    BY MR. CARMICHAEL:

16        Q.   Officer Talbott, could you tell me -- I may

17    not recall, but why did you exit the car?  Is that

18    because Officer Wilson and Young obscured your field

19    of view?

20        A.   No.  I exited the car at the time when he

21    said they were running westbound on Green Street, so

22    I went to assist with them at that point.

23        Q.   Okay.  Had Officer Young and Wilson

24    specifically called for assistance at that point, or

25    that was just your interpretation?

1                         M. TALBOTT

2      A.  It was my interpretation.

3      Q.  And when you saw Officer Wilson, Young and

4  Richie on the ground in the walkway, you don't know

5  how they got that way?

6      A.  Correct.

7      Q.  As a field training officer for Officer

8  Wilson when you filled out your report, did you

9  indicate you felt Officer Wilson had acted

10 appropriately in the instance?

11     A.  I know I completed a report.  I don't

12 remember exactly what I said in the report.

13     Q.  If you don't mind, I'll let you look at my

14 copy if you want to refresh your recollection there.

15          MR. KRCHAK:  Do you want to make that an

16 exhibit?

17          MR. CARMICHAEL:  1875.  It's Defendant's

18 1875.

19          MR. BRUNNER:  And you have some

20 highlighting on this document.  You're not referring

21 him to that specific highlighted portion, are you?

22          MR. CARMICHAEL:  No.

23          THE WITNESS:  I'm sorry.  What was your

24 question?

25 BY MR. CARMICHAEL:

 1                    M. TALBOTT

 2      Q.  My question was when you evaluated Officer

 3  Wilson's performance, did you feel he had acted

 4  appropriately in that circumstance?

 5      A.  Yes.  Generally, he was given appropriate

 6  scores.

 7      Q.  Okay.  And you did that as part of your

 8  observation as the field training officer?

 9      A.  Yes.

10      Q.  And that's something you do as a field

11  training officer is evaluate the probationary

12  officer?

13      A.  Yes.

14          MR. CARMICHAEL:  That's all I have.

15          MR. BRUNNER:  No questions.

16  Officer Talbott, you have the opportunity to review

17  and sign your deposition if you'd like.  Do you want

18  to exercise that opportunity?

19          THE WITNESS:  Yes, please.

20              (Time noted:  2:40 p.m.)

21          _____

22                   MICHAEL TALBOTT

23  Subscribed and sworn to before me

24  this_____ day of _____, 20_____

25  _____.

1

2                    C E R T I F I C A T E

3    STATE OF ILLINOIS   )
                          )     SS
4    COUNTY OF MACON      )

5

6          I, LISA HAHN PETERMAN, a Notary Public

7    within and for the State of Illinois, do hereby

8    certify:

9          That MICHAEL TALBOTT, the witness whose

10   deposition is hereinbefore set forth, was duly sworn

11   by me and that such deposition is a true record of

12   the testimony given by such witness.

13         I further certify that I am not related to

14   any of the parties to this action by blood or

15   marriage; and that I am in no way interested in the

16   outcome of this matter.

17         IN WITNESS WHEREOF, I have hereunto set my

18   hand this 28th day of November, 2018.

19

20         _____

21         LISA HAHN PETERMAN, CSR, RMR, RMR

22

23

24

25