1                IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF ILLINOIS
2

3

      CHANDRA TURNER, as Special            )
4     Administrator of the Estate of        )
      RICHARD TURNER, deceased, and         )
5     CHANDRA TURNER, individually,         )
                                            )
6          Plaintiff,                       )
                                            )
7     vs.                                   ) No. 17 CV 2261
                                            )
8     CITY OF CHAMPAIGN, a municipal        )
      corporation, CHAMPAIGN POLICE         )
9     OFFICER YOUNG; CHAMPAIGN POLICE       )
      OFFICER WILSON; CHAMPAIGN             )
10    POLICE OFFICER TALBOTT;               )
      CHAMPAIGN POLICE SERGEANT             )
11    FROST,                                )
                                            )
12         Defendants.                      )
13

14

15

16          DEPOSITION OF SERGEANT THOMAS FROST
             TAKEN ON BEHALF OF THE PLAINTIFF
17                Champaign, Illinois
                   October 9, 2018
18

19

20

21

22

23

24    Sandra J. Rynders, CSR(IL), RPR
25    Job No. 148761                        **Exhibit 5**

INDEX

QUESTIONS BY                                    Page

    MR. HENDERSON:                              5


EXHIBITS

EXHIBIT                                         Page

    Frost Exhibit No. 1                         92
    Frost Exhibit No. 2                         93
    Frost Exhibit No. 3                         130
    Frost Exhibit No. 4                         130

1                IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF ILLINOIS
2

3

        CHANDRA TURNER, as Special         )
4       Administrator of the Estate of     )
        RICHARD TURNER, deceased, and      )
5       CHANDRA TURNER, individually,      )
                                           )
6            Plaintiff,                    )
                                           )
7       vs.                                ) No. 17 CV 2261
                                           )
8       CITY OF CHAMPAIGN, a municipal     )
        corporation, CHAMPAIGN POLICE      )
9       OFFICER YOUNG; CHAMPAIGN POLICE    )
        OFFICER WILSON; CHAMPAIGN          )
10      POLICE OFFICER TALBOTT;            )
        CHAMPAIGN POLICE SERGEANT          )
11      FROST,                             )
                                           )
12           Defendants.                   )

13

14           DEPOSITION OF SERGEANT THOMAS FROST, produced,
15      sworn and examined on October 9, 2018, between the hours
16      of 1:00 p.m. and 5:00 p.m. of that day, at the offices
17      of Thomas, Mamer & Haughey, LLP, 30 Main Street, 5th
18      Floor, Champaign, Illinois 61820, before Sandra J.
19      Rynders, a Certified Shorthand Reporter (IL), and
20      Registered Professional Reporter, in a certain cause now
21      pending in the United States District Court for the
22      Southern District of Illinois, East St. Louis Division,
23      between Chandra Turner et al, Plaintiff, vs. City Of
24      Champaign et al, Defendants; on behalf of the Plaintiff.

25

1                    A P P E A R A N C E S
2

          For the Plaintiff:
3

               Victor Henderson
4              Henderson Parks
               140 South Dearborn Street
5              Chicago, Illinois 60603
6

7

          For the Defendants:
8

               Justin Brunner
9              David Krchak
               Thomas, Mamer & Haughey
10             30 E. Main Street
               Champaign, Illinois 61820
11

12

13

          Also present:    Ms. Susan Wozniak, Paralegal,
14                          City of Champaign
15

16

17

18

19

20   Court Reporter:
     Sandra J. Rynders, CSR
21   Illinois CSR #084-004861
     Alaris Litigation Services
22   711 North Eleventh Street
     St. Louis, Missouri 63101
23   (314) 644-2191
     1-800-280-DEPO
24

25

1          SERGEANT THOMAS FROST

2          IT IS HEREBY STIPULATED AND AGREED by and

3   between counsel for the Plaintiff and counsel for the

4   Defendants that this deposition may be taken in

5   shorthand by Sandra J. Rynders, a Certified Shorthand

6   Reporter (IL), and Registered Professional Reporter and

7   afterwards transcribed into typewriting; and the

8   signature of the witness is expressly reserved.

9                *     *     *     *     *

10          (The deposition began at 1:30 p.m.)

11                *     *     *     *     *

12          SERGEANT THOMAS FROST,

13   of lawful age, produced, sworn and examined on behalf of

14   the Plaintiff, deposes and says:

15                    EXAMINATION

16   BY MR. HENDERSON:

17          Q.   Sir, would you be kind enough to state your

18   first name and last name for the court reporter.

19          A.   My first name is Thomas.  My last name is

20   Frost.

21          Q.   And would you spell Frost please.

22          A.   F-R-O-S-T.

23          Q.   And are you currently employed?

24          A.   Yes.

25          Q.   With whom?

SERGEANT THOMAS FROST

1

2      A.   The City of Champaign, Illinois.

3      Q.   And your title?

4      A.   I am a police sergeant.

5      Q.   Is it okay if I call you Sergeant during the

6 deposition?

7      A.   Sure.

8      Q.   Okay.  Sergeant, have you had your

9 deposition taken before?

10     A.   Yes.

11     Q.   How many times?

12     A.   Once.

13     Q.   And what context?

14     A.   It was another civil proceeding.

15     Q.   Okay.  And tell me a little bit about it.

16     A.   It was many years ago.  My estimate would be

17 20.  A young man had been arrested and put in jail and

18 hung himself while in a jail cell.

19     Q.   Were you a defendant in that case?

20     A.   Yeah.

21     Q.   How did the case resolve itself?

22     A.   It was dismissed.

23     Q.   Okay.  Where was the case pending?

24     A.   Champaign County.

25     Q.   Okay.  Is that state court?

SERGEANT THOMAS FROST

1
2     A.   I -- I don't recall.

3     Q.   Okay.  That's fine.  So I'm going to ask you

4  a series of questions this afternoon, and there are a

5  few ground rules.

6          Number one, I will do my best to ask

7  questions that you understand.  And if I don't, then

8  you'll let me know.  Do you understand that?

9     A.   Yeah.

10    Q.   Okay.  Number two, do your best to answer in

11  words; yes, no, I don't know.  Try to avoid grunting or

12  nodding or using forms of communication that we

13  ordinarily use but that the court reporter can't take

14  down.  Do you understand that?

15    A.   Yes.

16    Q.   Okay.  Next, if you need a break at any time

17  for any reason, you just let me know.  Do you understand

18  that?

19    A.   Yes.

20    Q.   If I ask you a question and you don't

21  understand it, just ask me to repeat it.  Do you

22  understand that?

23    A.   Yes.

24    Q.   Tell me when you first became employed by

25  the City of Champaign.

SERGEANT THOMAS FROST

1

2      A.    June 1991.

3      Q.    Have you been continuously employed with the

4  City of Champaign since that time?

5      A.    Yes.

6      Q.    And have you worked for the police

7  department the entire time?

8      A.    Yes.

9      Q.    And how many different positions have you

10  had with the police department approximately?

11      A.    Two.

12      Q.    Okay.  And if I ask you something and you

13  don't remember, just tell me you don't remember.  I

14  don't want you to guess.  I'm working under the

15  assumption that your lawyers have told you the same

16  thing.  If you don't remember, just tell me you don't

17  remember and we'll move forward.  I don't need you to

18  guess.  Okay?

19      A.    Yes.

20      Q.    All right.  So what was the first position

21  that you held?

22      A.    Patrol officer.

23      Q.    And what was the second?

24      A.    Police sergeant.

25      Q.    And you were a patrol officer from when to

1          SERGEANT THOMAS FROST

2    when?

3          A.    Approximately 1991 to 2001.

4          Q.    And you've been a sergeant from 2001 to the

5    present?

6          A.    Correct.  Yes.

7          Q.    What are your duties as a sergeant?

8          A.    Overall supervision of the daily activities

9    of the patrol officers.

10         Q.    Okay.  And for a layperson who doesn't

11   understand what that means, what does it mean?

12         A.    Ensuring that they are adhering to policies,

13   directives, city ordinances, and state laws.

14         Q.    And when you say policies, what are those?

15         A.    Department policies.

16         Q.    And so part of your job is to adhere to the

17   department policies yourself; is that correct?

18         A.    Yes.

19         Q.    And to ensure that the officers who report

20   to you do the same?

21         A.    Yes.

22         Q.    And are the duties that you just described

23   to me the ones that were in effect for you in or around

24   November of 2016?

25         A.    Yes.

SERGEANT THOMAS FROST

1

2     Q.    In 2016 what -- in November were you always

3   on the same shift or did your shift change?

4     A.    I've been on the same shift for

5   approximately -- I don't know -- five to eight years.

6     Q.    And what shift were you on in or around

7   November of 2016?

8     A.    The day shift.

9     Q.    And the day shift starts at what time and

10  ends at what time?

11     A.    7 a.m. to 5 p.m.

12     Q.    And how many sergeants are on duty with you

13  during the day shift especially in the November of 2016

14  timeframe?

15     A.    That varies depending on the day.  We have

16  different staffing levels given different times of the

17  day.

18     Q.    In November of 2016 did Officers Young,

19  Talbott, and Wilson report to you?

20     A.    Officer Talbott did.

21     Q.    Did Young?

22     A.    No.

23     Q.    And tell me why not.

24     A.    On that day we have two sergeants employed.

25  I supervised the north side of the community, and

SERGEANT THOMAS FROST

1  another sergeant supervised the south community.

2          Officer Young and Officer Wilson were

3  assigned to the south side of the city, and therefore

4  they were under the supervision of another sergeant.

5          Q.   And the incident involving Richie Turner,

6  where did that take place?

7          A.   The south side of the community.

8          Q.   Okay.  And who was the sergeant in charge of

9  the south side that day?

10          A.   Sergeant Oleson.

11          Q.   Spell the last name.

12          A.   O-L-E-S-O-N.

13          Q.   Is there a dividing line in the city between

14  the north side and the south side?

15          A.   In theory, yes.

16          Q.   And in theory what is that dividing line?

17          A.   University Avenue.

18          Q.   And how far from University Avenue did the

19  incident involving Richie Turner take place?

20          A.   Six blocks south.

21          Q.   Okay.  What do you understand about -- and

22  tell me the other sergeant's name again.

23          A.   Sergeant Oleson.

24          Q.   Oleson.  You responded to the incident

1  SERGEANT THOMAS FROST

2  involving Richie Turner, correct?

3       A.   Yes.

4       Q.   Why didn't Sergent Oleson respond as best

5  you know?

6       A.   I do not know.

7       Q.   Have you spoken to him about it since then?

8       A.   No.

9       Q.   And Talbott worked on the north side,

10  correct?

11       A.   Traditionally, yes.

12       Q.   What do you understand about why he

13  responded to the incident involving Richie Turner?

14       A.   He was acting as a field training officer on

15  that day so he was riding with Officer Wilson.

16       Q.   So Talbott that day was where he was

17  supposed to be?

18       A.   Correct.

19       Q.   And on that particular day he was in the --

20  you called it the south side of the city or --

21       A.   The south district.

22       Q.   The south district.  How did it come to pass

23  that you went to the incident in the south district

24  given that you were covering the north district?

25       A.   I heard the call go out and noted Sergent

1                   SERGEANT THOMAS FROST

2      Oleson wasn't responding so I did.

3           Q.   Did you try to reach Sergent Oleson

4      yourself?

5           A.   No.

6           Q.   Did you take any steps directly or

7      indirectly to get to Sergent Oleson?

8           A.   No.

9           Q.   Do you take lunch during your shift?

10          A.   Yes.

11          Q.   When you take lunch are you still supposed

12     to be accessible if there is an incident?

13          A.   Yes.

14          Q.   So based on what you understand about how

15     the police department works -- and again I don't want

16     you to guess -- as you understand it should Sergent

17     Oleson have been accessible as it related to the Richie

18     Turner intersection?

19               MR. BRUNNER:  Objection, form as to

20     accessible.

21               MR. HENDERSON:  You can answer.

22               THE WITNESS:  Could you repeat the question.

23          Q.   (By Mr. Henderson)  Sure.  Just like you

24     hear over the radio or you get a call you're supposed to

25     go, right?

SERGEANT THOMAS FROST

1

2     A.    Correct.

3     Q.    Based on what you know on that particular

4  day Sergent Oleson should have responded to that call,

5  correct?

6     A.    I don't know that I have enough information.

7  Sergent Oleson may have been in a meeting or he may have

8  been tied up on something that I was unaware of.

9     Q.    All right.  If he is going to be

10  unavailable, what's the procedure when -- for example,

11  what's the procedure if you're going to be unavailable,

12  tied up in a meeting?  What are you supposed to do?

13     A.    I would notify my dispatcher that I was

14  unavailable.

15     Q.    And who was the dispatcher on that day?

16     A.    I do not know.

17     Q.    Did dispatch tell you that Sergent Oleson

18  was unavailable?

19     A.    They did not tell me that.

20     Q.    Okay.  Did anybody on that particular day

21  tell you that Sergeant Oleson was unavailable?

22     A.    No.

23     Q.    Okay.  As you understand the way the police

24  department works if one of the officers who reports to

25  you doesn't respond to a call, do you try to find out

SERGEANT THOMAS FROST

1   what happened?

2       A.    Yes.

3       Q.    Could that officer be subject to discipline

4   if he is not where he is supposed to be?

5       A.    Yes.

6       Q.    Okay.  Do you know whether there was any

7   investigation taken into why Sergeant Oleson was not

8   available that day?

9       MR. BRUNNER:  Objection, foundation.  You

10  haven't established that Oleson reports to him.

11      MR. HENDERSON:  You can answer my question.

12      THE WITNESS:  Could you repeat the question.

13      Q.    (By Mr. Henderson)  Sure.  Sergent Oleson

14  didn't show up to the south district that day, correct?

15      A.    After the fact, yes.

16      Q.    Oh, so he did come after the fact?

17      A.    Uh-huh.

18      Q.    So you did see him on the scene?

19      A.    Correct.

20      Q.    Okay.  What would tell me -- if I'm looking

21  for a timeline what could I look at that would help me

22  determine when Sergeant Oleson eventually showed up?

23      A.    The computer generated dispatch ticket.

24      Q.    What is your -- do you have a badge or star

SERGEANT THOMAS FROST

1

2 number?

3        A.   Uh-huh.

4        Q.   What is that?

5        A.   Mine is 902.

6        MR. KRCHAK:  You have to remember to say yes

7 or no.

8        Q.   (By Mr. Henderson)  And do you know what the

9 star or badge number is for Sergent Oleson?

10       A.   I do not recall.

11       Q.   Based on what you know was there any

12 investigation into why Sergent Oleson showed up when he

13 did?

14       A.   Could you repeat the question.

15       MR. HENDERSON:  If you could read that back

16 for me please to him.

17   (The court reporter read back the previous question.)

18       THE WITNESS:  I do not know.

19       Q.   (By Mr. Henderson)  Did you have any

20 conversation with Sergent Oleson at any time about why

21 he showed up when he did?

22       A.   No.

23       Q.   Under police department policy if one of

24 your colleagues doesn't act properly as it relates to

25 the job, are you supposed to report that?

SERGEANT THOMAS FROST

1

2      A.   Yes.

3      Q.   Okay.  Did you make a report about Sergent

4 Oleson not appearing at the incident?

5      A.   No.

6      MR. BRUNNER:  Objection, misstates

7 testimony.

8      Q.   (By Mr. Henderson)  Tell me what you heard

9 that let you know that Sergent Oleson wasn't responding.

10      A.   I'm sorry?

11      Q.   Tell me what you heard that let you know

12 that Sergent Oleson wasn't responding to the call

13 relating to Richie Turner?

14      A.   I don't understand your question.

15      Q.   Well, let me ask it a different way.

16      You told me that you showed up when you

17 heard that -- or figured out that Sergeant Oleson wasn't

18 showing up, right?

19      A.   Correct.

20      Q.   What did you hear or learn or see that

21 prompted you to figure out -- I'm sorry.

22      What did you hear or see that made you

23 figure out that Sergeant Oleson wasn't responding?

24      A.   I didn't hear him on the radio advising that

25 he was on his way.

1          SERGEANT THOMAS FROST

2          Q.   And why were you listening for that?

3          A.   I listen to all the radio traffic all day

4     long.  So that wouldn't be something that I would be

5     listening for.

6          Q.   Okay.  So that's part of your job

7     responsibility?

8          A.   Yes.

9          Q.   Okay.  And why is it important for a

10    sergeant to show up on the scene?

11         A.   Depending on the call, if it's going to be

12    something that is complicated, to assist the officers

13    with the call.

14         Q.   And is part of your job responsibility to

15    give direction to the officers who report to you?

16         A.   At times.

17         Q.   So if you feel like they need direction,

18    then you give it, correct?

19         A.   Correct.

20         Q.   And if you feel like they need guidance, you

21    give it, correct?

22         A.   Yes.

23         Q.   And as a general rule you're more

24    experienced than the officers who report to you, right?

25         A.   Yes.

SERGEANT THOMAS FROST

1
2          Q.    And in your experience in your 20-some-odd
3     years, close to 30 years showing up on time can be a
4     life and death matter, right?
5                MR. BRUNNER:  Objection, form.
6                MR. HENDERSON:  You can answer.
7                THE WITNESS:  Yes.
8          Q.    (By Mr. Henderson)  Okay.  Do you remember
9     where you were when you decided to show up to the
10    incident?
11         A.    No.
12         Q.    Were you -- so let me break it down.  I'm
13    going to ask some additional questions.
14               Were you in a squad car or were you in the
15    office?
16         A.    A squad car.
17         Q.    Okay.  Were you with somebody or by
18    yourself?
19         A.    Myself.
20         Q.    And did you tell me that you were six blocks
21    away from the incident when you decided to go there?  Is
22    that right or is that wrong?
23         A.    No.
24         Q.    You did not tell me that?
25         A.    No.

SERGEANT THOMAS FROST

1

2     Q.   Okay.  I'm sorry.  You told me that the

3 incident is about six blocks from -- University is the

4 dividing line?

5     A.   Yes.

6     Q.   And the incident happened about six blocks

7 from University?

8     A.   Yes.

9     Q.   Okay.  And so you don't have any idea of how

10 many blocks away you were from University -- strike

11 that.

12           Were you in the north district and went to

13 the south district?  Is that right?

14     A.   I do not know.

15     Q.   Okay.  Let me ask the question a different

16 way.

17           Ordinarily would you have expected yourself

18 to be in the north district?

19     A.   Yes.

20     Q.   And how big is the north district?

21     A.   I don't know mileage or anything like that.

22     Q.   How many blocks is it from -- for a mile in

23 the city of Champaign?

24     A.   Repeat the question.

25     Q.   Do you know how many blocks constitute a

SERGEANT THOMAS FROST

1  
2  mile in the city of Champaign?

3       A.  No.

4       Q.  Six blocks, eight blocks, 12 blocks?

5       A.  No.

6       Q.  You are a certified crisis negotiator; is

7  that right?

8       A.  Yes.

9       Q.  Do you know whether Sergeant Oleson is?

10      A.  I do not know.

11      Q.  Do you know when he started?

12      A.  I do not know.

13      Q.  Who did you report to on the day of the

14 incident?

15      A.  Lieutenant Vogelzang.

16      Q.  Spell the last name for us.

17      A.  V-O-G-E-L-Z-A-N-G.

18      Q.  Do you know who Sergeant Oleson reported to

19 on the day of the incident?

20      A.  Lieutenant Vogelzang.

21      Q.  And do who did the lieutenant report to if

22 anybody?

23      A.  Deputy Chief Gallo.

24      Q.  Spell the last name please.

25      A.  G-A-L-L-O.

SERGEANT THOMAS FROST

1

2          Q.    And then going up one more level, who did

3    the deputy chief report to?

4          A.    The chief of police.

5          Q.    And what was his name in November of 2016?

6          A.    Chief Cobb, C-O-B-B.

7          Q.    And is Chief Cobb still in office now?

8          A.    Yes.

9          Q.    Did you meet with anybody to prepare for

10   your deposition today?

11         A.    Yes.

12         Q.    And who did you meet with?

13         A.    The two gentlemen to my right.

14         Q.    Okay.  And how many times did you meet with

15   them?

16         A.    Once.

17         Q.    And when was that?

18         A.    Yesterday.

19         Q.    And how long did you meet with them for?

20         A.    I believe an hour and a half.

21         Q.    Okay.  And what time did your meeting with

22   them start approximately?

23         A.    I believe it was 10 a.m.

24         Q.    And it was over at around what time?

25         A.    11:30.

SERGEANT THOMAS FROST

1

2  Q. And when you met with the two lawyers was

3  anybody else in the room with you?

4  A. Uh-huh.

5  Q. Who else was there?

6  A. Susan.

7  Q. Okay. And you understand Susan to be whom?

8  A. She works for the city legal department.

9  Q. Okay. So you understand her to be a lawyer

10 as well?

11 A. No.

12 Q. Besides the three of you -- I'm sorry.

13 Besides the two lawyers and Susan was

14 anybody else in the room?

15 A. No.

16 Q. Okay. Have you at any time sat in on the

17 deposition preparation for any of the other officers in

18 this case?

19 A. No.

20 Q. So I'm going to ask more detailed questions.

21 Do you know whether or not Officer Young was prepared

22 for his deposition?

23 MR. BRUNNER: Objection, form, foundation.

24 MR. HENDERSON: You can answer.

25 THE WITNESS: Could you repeat the question.

1          SERGEANT THOMAS FROST

2          MR. HENDERSON:  If you can read it back for

3   him please.

4      (The court reporter read back the previous question.)

5          THE WITNESS:  I do not know if he was

6   prepared.

7          Q.   (By Mr. Henderson)  What about Officer

8   Talbott, do you know whether or not he met with the

9   lawyers to prepare for his deposition?

10         A.   He did meet with the lawyer.

11         Q.   And how do you know that?

12         A.   Because I received a -- I'm his supervisor,

13   and I received notice that he would be attending.

14         Q.   Attending his deposition?

15         A.   Correct.

16         Q.   But you didn't help in his preparation; is

17   that correct?

18         A.   No.

19         Q.   No meaning you did not participate, correct?

20         A.   No.

21         Q.   Okay.  You did not participate.  Am I right?

22         A.   I did not participate.

23         Q.   Okay.  And what about Officer Wilson?  Do

24   you know whether or not he was prepared by the lawyers

25   for his deposition?

1                    SERGEANT THOMAS FROST

2          A.   He was prepared by the lawyer.

3          Q.   And how do you know that?

4          A.   I received notice as a supervisor that he

5    would be attending.

6          Q.   And did you participate in Wilson's

7    preparation?

8          A.   I did not participate.

9          Q.   Do you know whether Sergeant Oleson

10   participated in the preparation for any of those

11   officers?

12         A.   I do not know.

13         Q.   When you met with the two lawyers yesterday

14   did you look at documents?

15         A.   Yes.

16         Q.   All right.  And what documents did you look

17   at?

18         A.   I looked at my police report.

19         Q.   All right.  Did you look at anything else?

20         A.   No.

21         Q.   Did you look at any photos?

22         A.   No.

23         Q.   Did you listen to any audio?

24         A.   No.

25         Q.   Did you look at any video?

SERGEANT THOMAS FROST

1

2          A.    No.

3          Q.    Did you keep a Taser in your car on the day

4    of the incident?

5          A.    I wear it, yes.

6          Q.    Okay.  Do all officers wear Tasers or just

7    certain officers?

8          A.    Just certain officers.

9          Q.    And in November of 2016 specifically on the

10   16th do you know what officers wore Tasers?

11         A.    I do not know.

12         Q.    So could it have been officers below the

13   rank of sergeant?

14         A.    Yes.

15         Q.    So if they were trained to wear a Taser,

16   then they could have one, correct?

17         A.    Yes.

18         Q.    So it didn't matter what rank as you

19   understood it back then; is that right?

20         A.    Yes.

21         Q.    Do you know whether or not -- on November

22   16, 2016 whether Officer Oleson wore a Taser?

23         A.    Yes.

24         Q.    And you know that how?

25         A.    Because he was trained in the use of it and

SERGEANT THOMAS FROST

1
2  can carry it.

3       Q.   Was there any investigation into how the
4  involved officers handled the Richie Turner situation?

5       A.   Yes.

6       Q.   Okay.  And do you -- was there a particular
7  person or officer who was the lead in handling that
8  investigation?

9       A.   Are you referring to the department or --

10      Q.   Yes.

11      A.   Our point of contact would have been
12  Lieutenant Myers.

13      Q.   Do you know whether he created a written
14  report?

15      A.   I believe so, yes.

16           MR. HENDERSON:  Can we go off the record for
17  a second?

18           (Off the record discussion.)

19      Q.   (By Mr. Henderson)  Do you know whether or
20  not Lieutenant Myers reached a conclusion as it relates
21  to that report?

22      A.   I believe he did.

23      Q.   And what was the conclusion?

24      A.   I don't know.

25      Q.   And were you interviewed in connection with

SERGEANT THOMAS FROST

1

2 his -- the investigation that he was involved in?

3     A.   No.

4     Q.   Do you know what he did to investigate what

5 happened?

6     A.   No.

7     Q.   Do you know whether he spoke to any of the

8 other involved officers?

9     A.   I do not know.

10     Q.   Have you been disciplined as a police

11 officer within the last ten years?

12     A.   I don't recall.

13     Q.   Okay.  Beyond the past ten years have you

14 been disciplined?

15     A.   Yes.

16     Q.   For what -- how many times?

17     A.   I -- I would have to refer to my employee

18 jacket, but I would say maybe twice.

19     Q.   And what was the first time for?

20     A.   A traffic crash.

21     Q.   And what was the second time?

22     A.   I believe it was also a traffic crash.

23     Q.   Prior to the incident involving Richie

24 Turner had you been involved in incidents involving the

25 death of citizens?

SERGEANT THOMAS FROST

2       A.   No.

3       MR. BRUNNER:  Just for clarification you're

4 not talking about like a homicide?  You're talking about

5 a police associated death?

6       MR. HENDERSON:  Anything while he was on

7 duty.

8       MR. BRUNNER:  Anything where a citizen ever

9 died?

10       MR. HENDERSON:  While he was on duty.

11       THE WITNESS:  Then I would like to re-answer

12 that.

13       MR. HENDERSON:  Okay.  Please do.

14       THE WITNESS:  I've investigated a lot of

15 homicides, found dead bodies, people that have died from

16 old age, et cetera.

17       Q.  (By Mr. Henderson)  But nothing where there

18 was a death in realtime where you were acting is an

19 officer similar to what happened with Richie Turner?

20       A.   Correct.

21       Q.   Tell me how tall you are.

22       A.   Five-seven.

23       Q.   And were you the same height in 2016?

24       A.   Yes.

25       Q.   And how much do you weigh?

SERGEANT THOMAS FROST

A.    220.

Q.    Roughly the same as in 2016?

A.    Yes.

Q.    What's the highest level of education you completed?

A.    College.

Q.    A four-year degree?

A.    Uh-huh.

Q.    Is that a yes?

A.    Yes.

Q.    And what year did you receive it ballpark?

A.    1990.

Q.    Did the police report that you reviewed yesterday help you remember the events of the incident?

A.    Yes.

Q.    Okay.  What did it help you remember?

A.    The event.

Q.    Tell me what you recall, how your recollection was refreshed by looking at that document.

A.    It -- it aided me in remembering where I observed -- where I first noted where they were interacting at.

Q.    They being who?

A.    Mr. Wilson and the officer.

SERGEANT THOMAS FROST

Q.   You mean Mr. Turner?

A.   I'm sorry.  Yes, Mr. Turner.

Q.   And where do you recall seeing them first interact?

A.   On Sixth Street south of Green.

Q.   How far is that from here, where we are now in the PNC Bank?

A.   Approximately a mile.

Q.   What else did looking at that document help you remember?

A.   That I saw Richard running down the alleyway, the walkway.

Q.   What else did it help you remember?

A.   That was it.

Q.   During your tenure as a police officer you've taken quite a few classes; is that right?

A.   Yes.

Q.   And the classes included learning how to complete reports, correct?

A.   Yes.

Q.   What's your goal in preparing a report?

A.   Could you repeat that.

Q.   Sure.  What is your goal when you're preparing a report?

1                  SERGEANT THOMAS FROST

2          A.    To document the event.

3          Q.    What else?

4          A.    To record my actions.

5          Q.    Okay.  Anything else?

6          A.    No.

7          Q.    And is it your goal to put everything that

8   you deem to be important in the report?

9          A.    No.

10         Q.    So if it's important, you might leave it

11  out?

12         A.    No.

13         Q.    So if it's important, you put it in?

14         A.    If it's a -- depending on the type of

15  report, depends on the information I include in it.

16         Q.    Well, let's focus on the report for --

17  relating to Richie Turner on that day.  Was it your goal

18  to put the important information in the report?

19         A.    Yes.

20         Q.    Now, the report relating to Richie Turner,

21  did you prepare it on scene?

22         A.    No.

23         Q.    Did you prepare it that day?

24         A.    No.

25         Q.    Why did you not prepare the report on scene?

SERGEANT THOMAS FROST

A.   We don't write reports on the scene.

Q.   Okay.  Why didn't you prepare the report that day?

A.   Our protocol is that any time an officer is involved in a critical incident he is allowed time off to rest.

Q.   How much time off?

A.   That would be determined by the chief I believe.

Q.   So did you have a conversation with the chief on the day of the incident?

A.   I didn't receive -- it was not -- it was not a conversation.  It was a statement from him.

Q.   And so did he say something to you?

A.   Yes.

Q.   What did he say?

A.   He ordered us not to discuss this.

Q.   Meaning the incident?

A.   With each other.

Q.   And that was told to you on the day of the incident?

A.   Yes.

Q.   What else did he say to you?

A.   That was it.

SERGEANT THOMAS FROST

Q.   Did he tell you to delay writing your report until -- strike that.

Did he tell you not to fill out your report that day?

A.   No.

Q.   Then why didn't you fill it out that day?

A.   The time was offered so I took it.

Q.   Who offered it to you?

A.   I believe it was the FOP attorney in conjunction with the -- the department.

Q.   And so who was the FOP attorney?

A.   I don't recall.

Q.   And you say in conjunction with the department.  Who at the department told you to take the time?

A.   I don't recall.

Q.   You would agree with me as a general rule that the sooner you write down the report the better; is that correct?

A.   No.

Q.   Okay.  Do you think your memory gets better over time from the further away that you get from an incident when you're writing a report?

A.   I think in a short time period, yes.  With

SERGEANT THOMAS FROST

1

2      rest and reflection, absolutely.

3          Q.    So you rested and reflected prior to writing

4      the report relating to Richie Turner's death; is that

5      right?

6          A.    Yes.

7          Q.    And you were instructed not to discuss that

8      event with any of the other officers?

9          A.    Correct.

10              MR. BRUNNER:  Objection, asked and answered.

11              MR. HENDERSON:  No.  I didn't ask that.  He

12      volunteered that.

13          Q.    (By Mr. Henderson)  And who was it who told

14      you not to discuss it with the other officers?

15          A.    I believe it was the chief.

16          Q.    Did the chief tell you that in the presence

17      of the other officers?

18          A.    Yes.

19          Q.    So the four of you were together?

20          A.    Yes.

21          Q.    And where were the four of you when the

22      chief told you not to discuss it?

23          A.    I don't recall.

24          Q.    Were you at the station or someplace else?

25          A.    Yes.

1                SERGEANT THOMAS FROST

2        Q.    So you were at the station?

3        A.    Yes.

4        Q.    Where in the station?

5        A.    I don't recall.

6        Q.    Did the chief tell you why he didn't want

7   you guys talking about it with one another?

8        A.    I don't recall.

9        Q.    How much time elapsed between the time that

10  Mr. Turner passed and the time you were at the station

11  when the chief told you guys not to discuss it with one

12  another?

13       A.    I don't recall.

14       Q.    Was it more than an hour or less than an

15  hour?

16       A.    I don't recall.

17       Q.    Was it more than three hours or less than

18  three hours?

19       A.    I don't recall.

20       Q.    Did you discuss Mr. Turner's passing with

21  the other officers on scene?

22       A.    No.

23       Q.    So Mr. Turner passed, and the four of you --

24  no one said anything to each other?

25       A.    Correct.

SERGEANT THOMAS FROST

1

2      Q.    Why not?

3      A.    We're trained not to.

4      Q.    What training is that?

5      A.    You write your report to document the event.

6      Q.    So you said you're trained not to talk with

7  one another?

8      A.    We know not to because then we can be used

9  against each other.

10     Q.    Well, you said -- but you told me you were

11 trained not to do that; is that correct?

12     A.    We are told not to.

13     Q.    Okay.  Who told you not to talk with the

14 other officers about the event?

15     A.    On this specific event?

16     Q.    No, just in general.

17     A.    In general it's training from the Fraternal

18 Order of Police.

19     Q.    That's -- the FOP is not your employer,

20 correct?

21     A.    Correct.

22     Q.    That's a union that you're in?

23     A.    Yes.

24     Q.    Okay.  And what's the rationale behind

25 telling the officers not to speak with one another?

1                    SERGEANT THOMAS FROST

2              MR. BRUNNER:  Objection, foundation.

3              MR. HENDERSON:  You can answer.

4              THE WITNESS:  I just told you.

5         Q.  (By Mr. Henderson)  Which is what?

6         A.   Because if we communicate with each other,

7    we have to testify against each other.  There is no

8    attorney-client privilege.

9         Q.   Any other reasons why the FOP told you not

10   to communicate with the other officers?

11        A.   I do not know.

12        Q.   Do you remember when it was that someone in

13   the FOP told you not to communicate with the other

14   officers?

15        A.   I do not remember.

16        Q.   Did you receive that type of training once

17   or more than once?

18        A.   More than once.

19        Q.   Okay.  Do you go to training periodically

20   with the FOP, once a year or every couple years,

21   something like that?

22        A.   No.

23        Q.   Do you remember who it was at the FOP that

24   told you all not to talk with one another?

25        A.   No.

SERGEANT THOMAS FROST

Q.    Are there any City of Champaign Police
Department directives that tell the officers not to
speak with one another relating to an incident?

A.    Yes.

Q.    What -- what directive or order is that?

A.    We carry a card in our -- the sergeants
carry a card in our pocket.  When we respond to an
officer involved shooting we will ask very brief
questions and tell them do not discuss this.

Q.    Do you have that card with you now?

A.    I don't know.

Q.    Could you look please.

A.    This.

Q.    Now, is that a City of Champaign card or is
that a FOP card?

A.    City of Champaign.

Q.    May I see it please.  Thank you.

Can we just leave that there?  I can get a
copy of it later if that's okay.  Okay.  Thank you.

You drove to the incident by yourself and
you left the incident by yourself; is that right or is
that wrong?

A.    That's correct.

Q.    Do you drive the same squad car every day?

SERGEANT THOMAS FROST

1

2      A.    No.

3      Q.    Okay.  In November of 2016 do you remember

4  what squad car you were driving?

5      A.    Yes.

6      Q.    Which one was it?

7      A.    Squad 30.

8      Q.    And so you drove 30 to the incident in

9  November of 2016?

10      A.    Yes.

11      Q.    And did you take 30 -- when you left the

12  incident were you in 30?

13      A.    Yes.

14      Q.    Okay.  So your testimony is that you didn't

15  speak to any of the other involved officers prior to

16  filling out your report; is that correct?

17      A.    Yes.

18      Q.    And is it also your testimony that none of

19  them spoke to you before they filled out their reports?

20  Is that right?

21      A.    Yes.

22      Q.    Where did you fill out your report?

23      A.    At the police station.

24      Q.    Do you remember what time you filled out

25  your report?

1                    SERGEANT THOMAS FROST

2          A.    No.

3          Q.    When you looked at your report yesterday you

4    saw the date that you prepared it; is that right?

5          A.    No.

6          Q.    But you recall that you filled out the

7    report the day after the incident; is that right?

8          A.    Yes.

9          Q.    Okay.  And do you remember what time the

10   incident happened approximately?

11         A.    9 a.m.

12         Q.    Okay.  And do you remember what time the

13   following day that you filled out your report?

14         A.    No.

15         Q.    Do you know was it before -- was it within

16   24 hours, do you know?

17         A.    Yes.

18         Q.    So you know that you filled out your report

19   before 9 a.m. the following day?

20         A.    Started writing it, yes.

21         Q.    Okay.  Did you finish it before 9 a.m. the

22   following day?

23         A.    No.

24         Q.    Do you remember what time you finished it?

25         A.    No.

SERGEANT THOMAS FROST

Q.   Did you work the following day?

A.   No.

Q.   Did you report to the station the following day?

A.   Yes.

Q.   Okay.  Why did you report to the station?

A.   To write the report.

Q.   And the report was written in its entirety at the station, or did you write some of it elsewhere?

A.   At the station.

Q.   Did you have to clock in on the day after the incident?

A.   No.

Q.   Did you clock out the day after the incident?

A.   No.

Q.   When you filled out your report you knew by that time that Richie Turner had passed, correct?

A.   Yes.

Q.   And would you agree with me that it was a big deal that he passed?

MR. BRUNNER:  Objection, form.

MR. HENDERSON:  You can answer.

THE WITNESS:  Yes.

SERGEANT THOMAS FROST

Q.    (By Mr. Henderson)  Why was it a big deal?

A.    Are you asking professionally or personally?

Q.    Let's started professionally.

A.    It is a big deal any time we have a citizen
of the community that passes.

Q.    And why personally?

A.    He was my friend.

Q.    Okay.  And what about your relationship with
him results in you calling him your friend?

A.    Every day that I would jog down Green Street
I would always say good morning to him, and he would
always express good morning to me and we would kick it
back and forth a little bit.

Q.    Anything else?

A.    Over the course of my career I've looked out
for Richie to the point of when he was leaving with his
parents in town that I looked out for he and his family.

Q.    How so?

A.    If they needed a little extra cash or if
they needed a little extra something, I would work with
them to try to help them have a little bit better choice
of living.

Q.    Had you been to his house?

A.    As a rookie, yes.  In the early '90s they

SERGEANT THOMAS FROST

1  used to live up on North Champaign Street.

2          Q.   So you went to his house in the early '90s?

3          A.   Uh-huh.

4          Q.   Is that a yes?

5          A.   Yes.

6          Q.   And at that time he was living with his family?

7          A.   Yes.

8          Q.   Besides the early '90s had you ever been to his house?

9          A.   No.

10        Q.   Did you know him to -- on the day of the incident did you know him to be homeless or did you know him to live someplace?

11        A.   Homeless.

12         Q.   Okay.  And I apologize for having to ask a pretty basic question.  But what was your understanding -- when you say he was homeless, what do you mean by that?

13        A.   I couldn't --

14         Q.   When you say that he was homeless, what do you mean by that?

15        A.   He did not live under a roof.  He lived on the street.

SERGEANT THOMAS FROST

1

2     Q.   Is there a shelter in Downtown Champaign?

3     A.   Yes.

4     Q.   Is there a shelter that homeless people are

5  able to take advantage of in and around Green Street?

6     A.   Not that I'm aware of.

7     Q.   Do you know whether or not Richie ever took

8  advantage of a homeless shelter?

9     A.   I do not know.

10     Q.   So prior to November 16, 2016 how many times

11  had you encountered Richie?

12     A.   Numerous.

13     Q.   More than ten?

14     A.   Yes.

15     Q.   More than 20?

16     A.   Yes.

17     Q.   In those instances did you ever know him to

18  commit any felonies?

19     A.   No.

20     Q.   Did you ever know him to be violent with

21  anybody?

22     A.   Yes.

23     Q.   How so?  Physically violent?

24     A.   Yes.

25     Q.   Who was he -- did you ever write him up for

1          SERGEANT THOMAS FROST

2     being physically violent?

3          A.    No.

4          Q.    Did you ever observe him being physically

5     violent?

6          A.    Yes.

7          Q.    Okay.  Why didn't you write him up?

8          A.    It was all due to mental health issues.

9          Q.    So you knew he had mental health issues?

10         A.    Yes.

11         Q.    When did you learn that he had mental health

12    issues?

13         A.    I don't recall.

14         Q.    You've known him since at least the early

15    1990s, correct?

16         A.    Yes.

17         Q.    Did you know he had mental health issues in

18    the early '90s?

19         A.    No.

20         Q.    As best you know did he have mental health

21    issues in the early '90s?

22         A.    I don't know.

23         Q.    When did you come to the conclusion that he

24    had mental health issues?

25         A.    And last few years.

SERGEANT THOMAS FROST

1

2      Q.   And give me years.

3      A.   Six.

4      Q.   So six years prior to the time he passed?

5      A.   Yes.

6      Q.   So in and around the 2010 timeframe?  And I

7   know it's not exact, but he passed --

8      A.   Approximately.

9      Q.   Okay.  And what made you conclude that he

10   had mental health issues?

11      A.   His behaviors were such that he had to be

12   taken to the hospital for mental health treatment.

13      Q.   And so explain to me the behaviors because I

14   have never met him.  So tell me what you saw.

15      A.   Very wild flailing of his arms, quick head

16   jerks, looking at -- looking through you not at you;

17   salivating all over himself; having snot, everything

18   coming out of his nose and very unkempt; not showering;

19   having a very distinct odor of urine and feces.

20      Q.   Anything else?

21      A.   No.

22      Q.   And so what you just described, was that

23   pretty much how he was when you saw him during that

24   six-year period prior to him passing more or less?

25          MR. BRUNNER:  Form as to pretty much.

SERGEANT THOMAS FROST

1

2          MR. HENDERSON:  You can answer.

3          THE WITNESS:  Frequently, yes.

4          Q.   (By Mr. Henderson)  Okay.  And you said you

5     took him at times to a mental -- to the hospital or to a

6     mental health clinic?

7          A.   Various officers have, yes.

8          Q.   Taken him where?

9          A.   To one of the local hospitals.  Most likely

10    now called OSF.

11         Q.   Order of St. Francis?

12         A.   Uh-huh.

13         Q.   Is that a yes?

14         A.   Yes.

15         Q.   And prior to it being called OSF what was

16    it?

17         A.   Provena Covenant.

18         Q.   Provena --

19         A.   Covenant.

20         Q.   Spell the second word for me.

21         A.   C-O-V-E-N-E-N-T (sic).

22         Q.   Did you ever take him to Provena Covenant?

23         A.   No.

24         Q.   Did you ever take him to OSF?

25         A.   No.

SERGEANT THOMAS FROST

1

2     Q.   But you believe other officers took him?

3     A.   Yes.

4     Q.   Did you ever see him with a gun?

5     A.   No.

6     Q.   Did you ever see him with a knife?

7     A.   No.

8     Q.   Did you ever know him to hurt anybody?

9     A.   No.

10    Q.   Did he have other homeless people as

11    friends?

12    A.   Yes.

13    Q.   Do you know some of their names?

14    A.   Yes.

15    Q.   Tell me some of their names.

16    A.   Kevin Love.

17    Q.   Who else?

18    A.   I don't know many of the street people, but

19    Kevin is one I'm aware of.

20    Q.   Can you recall any other names besides Kevin

21    Love?

22    A.   No.

23    Q.   So when you would run into or see Richie

24    would he be with Kevin Love sometimes?

25    A.   Yes.

SERGEANT THOMAS FROST

1

2      Q.    And did Kevin Love have the same general

3  appearance that Richie had?

4      A.    No.

5      Q.    What was Kevin Love's appearance like?

6      A.    Much cleaner, more sanitary, and not

7  suffering from mental health issues.

8      Q.    Part of your training involves being able to

9  identify people with mental health issues; is that

10  right?

11      A.    Yes.

12      Q.    Okay.  Because you encounter lots of

13  different types of people on the street, correct?

14      A.    Yes.

15      Q.    Some people speak English, and some don't;

16  is that right?

17      A.    Yes.

18      Q.    Okay.  Some people hear well, and some

19  people are hard of hearing; is that right?

20      A.    Yes.

21      Q.    And so you have to -- when you encounter

22  people you have to try to figure out what's going on

23  with each person, correct?

24      A.    Yes.

25      Q.    And you have to figure that out in order to

SERGEANT THOMAS FROST

1

2    determine how to interact with that person, correct?

3         A.   Yes.

4         Q.   And so tell me what you recall about being

5    trained in terms of dealing with people with mental

6    health illnesses.

7         A.   Could you be more specific.

8         Q.   Well, you have received training as a police

9    officer in terms of dealing with people who have mental

10   health issues, right?

11        A.   Correct.

12        Q.   Okay.  Tell me what some of the hallmarks of

13   that training are.

14        A.   More of just signs and symptoms out of the

15   ordinary.  As I stated with Richard, looking through you

16   not at you, at times thrashing about, arms flailing,

17   legs kicking, doing things that sane people don't do

18   whether it's putting their fist through a window,

19   kicking a fire hydrant, things such as that.

20        Q.   And when you run across people who have

21   mental illness what does your training tell you you're

22   supposed to do?

23        A.   Engage them and start up a conversation to

24   assess their situation.

25        Q.   Anything else?

SERGEANT THOMAS FROST

A.    Are you asking for a step-by-step process?

Q.    I want you to tell me what you remember from your training.

A.    If -- if they -- if I recognize that they're not oriented to the date and the time, that they don't know common answers to common questions like who the president is, things such as that, then that's probably where we need to call an ambulance to come do a more thorough evaluation.

Q.    What else do you remember from your training?

A.    We are -- with the CIT training in particular we deal a lot with elderly subjects.  We also -- I'm sorry.  We are trained on dealing with elderly subjects whether it's Alzheimer's or whether it's someone much younger in dealing with autism or Down's, things like that.

Specifically with autism people, a lot of times they are set off quickly by something you may do or you may say, by flashing objects.  You also have to be very aware of where your weapons are because a lot of times they will reach out for things not meaning harm, but reach for them and try to take them.

Q.    So you try not to excite people like that?

SERGEANT THOMAS FROST

1

2      A.   We are taught to deescalate situations.

3      Q.   Deescalate.  And that includes trying to

4  talk to the people calmly, correct?

5      A.   Yes.

6      Q.   And that includes having one person at a

7  time maybe interact with -- one officer at a time

8  interact with the citizen, correct?

9      A.   Yes.

10      Q.   And that includes keeping your voice down,

11  correct?

12      A.   Yes.

13      Q.   And that includes trying to calm and assure

14  the person that things are going to be okay, correct?

15      A.   Yes.

16      MR. BRUNNER:  And you're talking in the

17  context of the CIT training for Alzheimer's, autism, and

18  Down's, or are you talking about any kind of mental --

19      Q.   (By Mr. Henderson)  Mental health.  Some of

20  the things that you're taught are similar, correct,

21  whether it's mental health or autism?

22      In other words, deescalate the situation

23  when possible, correct?

24      A.   Yes.

25      Q.   Okay.  As it relates to Richie were you

SERGEANT THOMAS FROST

1

2  aware of any other habits?  For example, when you would

3  see him when you were on duty was he typically hanging

4  out around the same place?

5        A.   Yes.

6        Q.   And where was that?

7        A.   The 600 block of East Green.

8        Q.   Were there stores or --

9        A.   It's a business district -- campus business.

10       Q.   Were there stores in that area where he

11  might frequent or hang out?

12       A.   Yes.

13       Q.   Where?

14       A.   The 600 -- the entire block.

15       Q.   That was his kind of hangout?

16       A.   Yeah.

17       Q.   Did he ask people for food, do you know?

18       A.   Yes.

19       Q.   Did he ask for money?

20       A.   Yes.

21       Q.   And you told me earlier that you know that

22  he had been admitted to the hospital for mental health

23  issues, correct, prior to today of the incident?

24       A.   Yes.

25       Q.   Did you know that he might experience a

SERGEANT THOMAS FROST

1  mental breakdown if he wasn't medicated?

2      A.   Could you repeat that.

3      Q.   Sure.  Did you know that when he went to the

4  hospital they would give him medication?

5      A.   I do not know.

6      Q.   Do you know whether he took medication?

7      A.   I do not know.

8      Q.   So on the day of the incident you were not

9  dispatched to Sixth and Green; is that correct?

10      A.   Correct.

11      Q.   You went voluntarily when you realized that

12  Sergeant Oleson was not responding, correct?

13      A.   Yes.

14      Q.   Did you let dispatch know that you were

15  going to Sixth and Green, or did you just go?  And if

16  you don't remember, just --

17      A.   I don't remember.

18      Q.   And what did you hear over the radio about

19  what was going on at Sixth and Green?

20      A.   I heard that Richard was walking in the

21  street, was drinking, and was pulling things out of the

22  trash can.

23      Q.   Was that normal or abnormal behavior for

24  him?

SERGEANT THOMAS FROST

1

2      A.   Abnormal.

3      Q.   Okay.  What was abnormal about it?

4      A.   That would indicate to me that he was having

5 some type of mental health issue.

6      Q.   Okay.  And why is that?

7      A.   He didn't normally walk in the street.

8      Q.   Okay.  Any other reasons why you knew

9 something different was going on that particular day?

10     A.   No.

11     Q.   And how much time passed -- and if I asked

12 this before, I apologize.

13          But how much time passed before you decided

14 that you were going to go to Sixth and Green?

15     A.   I don't recall.

16     Q.   Did you activate your lights or siren when

17 you went to the scene?

18     A.   No.

19     Q.   Did you drive at a normal pace or at a

20 hastened pace?

21     A.   Normal.

22     Q.   And why did you go normal pace?

23     A.   It was not a exigent circumstance, a crime

24 in progress.

25     Q.   Did you go through any red lights on your

                    SERGEANT THOMAS FROST

1

2   way to the scene?

3        A.   No.

4        Q.   So you just obeyed the traffic laws as

5   normal on your way to the scene?

6        A.   Yes.

7        Q.   And that's what you remember about the

8   incident; is that correct?  You're telling me from

9   memory or are you telling me from looking at your

10  report?  How do you know that on that particular day you

11  obeyed the traffic laws?

12       A.   That particular type of call does not

13  require an expedited response.  So I would not have been

14  running lights and sirens.

15       Q.   So on that day no report of a gun, no

16  weapon, no felony, correct?

17            MR. BRUNNER:  Objection, form.

18            MR. HENDERSON:  You can answer.

19            THE WITNESS:  On this particular incident?

20            MR. HENDERSON:  Yes.

21            THE WITNESS:  Correct, no weapons.

22       Q.   (By Mr. Henderson)  No gun?

23       A.   No gun.

24       Q.   No felony?

25       A.   No felony.

SERGEANT THOMAS FROST

Q.   No exigent circumstance?

A.   No.

Q.   No emergency?

A.   No.

Q.   You have filled out -- had you filled out other police reports about Richie prior to this incident?

A.   I don't recall.

Q.   And do you recall who it was that you heard over the radio that made you go to Sixth and Green?  So in other words, was it a dispatcher or was it another officer?  Do you recall who was talking?

A.   No one made me go.

Q.   But you heard something over the radio that made you show up, correct?

A.   Uh-huh.  Yes.

Q.   And did you hear something -- do you know who it was whose voice you heard that made you go to Sixth and Green?

A.   I didn't hear a voice that made me go to Sixth and Green.

Q.   Okay.  So you didn't hear something over dispatch; is that correct?

A.   No.

1          SERGEANT THOMAS FROST

2          Q.    Okay.

3          A.    I heard the dispatch.

4          Q.    Okay.  So you heard the dispatcher; is that

5     right?

6          A.    Yes.

7          Q.    Okay.  Did you hear anybody besides the

8     dispatcher?

9          A.    I heard the other officers en route to the

10    call.

11         Q.    Okay.  And the other officers being who?

12         A.    Officer Wilson riding with Officer Talbott,

13    and Officer Young.

14         Q.    So Wilson was riding with Talbott.  And was

15    Young on his own, do you know?

16         A.    Yes.

17         Q.    What rank was Wilson?

18         A.    They're all patrol officers.

19         Q.    Okay.  And why were Wilson and Talbott

20    together?

21         A.    Wilson was assigned to a monthly check ride.

22         Q.    And what is a monthly check ride?

23         A.    Where a newer officer is required to ride

24    with a field training officer just to make sure that

25    everything is -- he doesn't need any additional

1                    SERGEANT THOMAS FROST

2    training.

3              Q.   And who was the newer officer?

4              A.   Officer Wilson.

5              Q.   So Talbott was the senior of the two?

6              A.   Yes.

7              Q.   And so Young was riding by himself?

8              A.   Yes.

9              Q.   Do you know who got to Sixth and Green

10   first --

11             A.   No.

12             Q.   -- between those three officers?

13             A.   No.

14             Q.   Do you know who got there second?

15             A.   No.

16             Q.   So you don't know in what order they got to

17   Sixth and Green?

18             A.   I do not recall.

19             Q.   Were the three of them there when you got

20   there?

21             A.   Yes.

22             Q.   Do you -- could you tell from listening to

23   the radio traffic whether someone had reported Richie to

24   dispatch or whether someone had reported Richie to a

25   combination of Wilson, Talbott, and Young?

SERGEANT THOMAS FROST

A.    I believe people of the community had called
dispatch and requested officers to respond.

Q.    And why do you believe that?

A.    Based on the dispatch ticket.

Q.    That you heard or read?

A.    I remember perusing it on the way there, and
I think there were multiple people who had called about
him.

Q.    Okay.  And what do you recall was the
request?

A.    For officers to come and assist him, to
check welfare.

Q.    Check welfare meaning what?

A.    To make sure he was okay and didn't need
help.

Q.    Do you recall hearing anything else over
dispatch?

A.    That he was walking in the street, things
such as that.

Q.    And when you say things such as that, just
tell me what you remember.  What else do you remember?

A.    Well, as I told you a little bit ago,
walking in the street, pulling things out of the garbage
can, and drinking wine I believe is what they said.

SERGEANT THOMAS FROST

1

2      Q.   So Wilson, Talbott, and Young were all the

3  same rank, correct?

4      A.   Yes.

5      Q.   Were there any other sergeants on a duty at

6  that time besides you and Oleson?

7      A.   I do not know.

8      Q.   And so you went to show up as the senior man

9  at the scene, correct?

10      A.   Yes.

11      Q.   Do you know how long Wilson, Talbott, and

12  Young had been at the scene before you got there?

13      A.   No.

14      Q.   And when you got to the scene a combination

15  of Wilson, Talbott, and Young were interacting with

16  Richie, correct?

17      A.   Yes.

18      Q.   So they were involved in some sort of

19  scuffle by the time you got there, right?

20      A.   No.

21      Q.   Okay.  What did you see?

22      A.   You're asking what I initially saw them

23  doing?

24      Q.   Yes.

25      A.   I saw Officer Wilson attempting to

SERGEANT THOMAS FROST

1  communicate with Richie on Sixth Street south of Green,

2  and the other two officers were not.

3          Q.    Were what?

4          A.    Not.

5          Q.    Okay.  Where was Wilson?  Wilson was on foot

6  by that time?

7          A.    Yes.

8          Q.    And where was Talbott?

9          A.    I believe he was seated in his car at that

10  time.

11          Q.    And where was Young?

12          A.    I believe he was outside Talbott's car.

13          Q.    So Wilson was the one who was closest to

14  Richie?

15          A.    Yes.

16          Q.    And Wilson was the most junior of those

17  officers?

18          A.    Yes.

19          Q.    How long had Wilson been on the force at

20  that time?

21          A.    I do not know.

22          Q.    But you know that particular day he was

23  being trained --

24          A.    Yes.

SERGEANT THOMAS FROST

Q.    -- by Talbott?

A.    Not necessarily trained, but Talbott is riding to observe what Officer Wilson does and to hear what he does.

Q.    And how long does that -- so Talbott was the field training officer?

A.    Yes.

Q.    How long does an officer undergo field training like Talbott was doing?

A.    Each -- each officer is different depending on their probationary period.

Q.    And on average how long does one get visits from the field training officer?

A.    I -- I could give you an approximate.

Q.    Sure.

A.    18 months.

Q.    So does that make you believe that Wilson had been on the force for 18 months or less approximately?

A.    Yes.

Q.    Is Wilson what you would call a rookie officer, or was he a rookie officer at that point?

A.    Yes.

Q.    And is that a term that you guys use in the

SERGEANT THOMAS FROST

1 police department?

3  A. Not professionally but when we're behind

4 closed doors, yeah.

5  Q. In the locker room or --

6  A. Yes.

7  Q. Okay.  So when you got to Sixth and Green

8 you told me that you saw Wilson talking to Richie,

9 correct?

10  A. Yes.

11  Q. And Talbott was in his car?

12  A. Yes.

13  Q. And Young was near Talbott's car?

14  A. Yes.

15  Q. And how far away was the car from where

16 Richie and Wilson were?

17  A. I don't recall.

18  Q. More than ten feet, less than ten feet?

19  A. Less than.

20  Q. So where was the car parked that Wilson and

21 Talbott were in?

22  A. On Sixth Street south of Green.

23  Q. And what about the car that Young was in?

24  A. I don't recall.

25  Q. What did you see next?

SERGEANT THOMAS FROST

A.    I saw Richie take off running.  He ran to the intersection of Sixth and Green, cut across diagonally, and then went running westbound down Green Street on the north sidewalk.

Q.    And what did you do when you saw him do that?

A.    I allowed the officers to run in front of me -- more of a jog in front of me, and then I turned right and went westbound on Green Street as well.

Q.    So you stayed in your car?

A.    Yes.

Q.    And you stayed in your car to do what, look for Richie?

A.    Correct.

Q.    And the three officers were on foot at that point?

A.    Yes.

Q.    Were any of them in vehicles at that point?

A.    No.

Q.    And at that point he hadn't committed a crime, correct?

MR. BRUNNER:  Objection, foundation.

MR. HENDERSON:  You can answer.

THE WITNESS:  Yes, he had.

SERGEANT THOMAS FROST

1

2    Q.    (By Mr. Henderson)  And what crime was that?

3    A.    He had been walking in the street and I

4 believe drinking alcohol.

5    Q.    What crime is that?

6    A.    It would be open alcohol -- consuming

7 alcohol in a public place and a pedestrian in the

8 roadway.

9    Q.    Is that a felony or a misdemeanor?

10    A.    It would be a misdemeanor.  And resisting an

11 officer I assume.  I don't know.

12    Q.    Well, so you say you don't know.  You don't

13 know whether he was resisting one way or the other; is

14 that correct?

15    A.    When someone is standing with an officer --

16 and again not being there with them, not hearing what

17 they're telling him, or what's being communicated, I

18 could only provide conjecture as to what was going on.

19    Q.    So you don't know one way or the other

20 whether he was resisting at least as you sit here now;

21 is that correct?

22    A.    Normally when someone runs away from an

23 officer that's conducting an investigation I would

24 consider that to be resisting.

25    Q.    So did you make a determination that he was

SERGEANT THOMAS FROST

1
2  resisting on November 16th?

3       A.   Yes.

4       Q.   Did you write that in the report?

5       A.   No -- well, yes.  I put that he was running

6  away from them.

7       Q.   Did you use the term resisting in your

8  report?

9       A.   I don't recall.

10      Q.   Was there any alcohol bottles or beer cans

11 confiscated from Richie in connection with the incident?

12      A.   I do not know.

13      Q.   But that was the crime you said he was

14 committing was that he was drinking, right?

15      A.   That was what was reported.

16      Q.   Did you see him drinking?

17      A.   I did not.

18      Q.   And so when you say reported, reported over

19 the dispatch air waves that you heard?

20      A.   Correct.

21      Q.   Okay.  But you didn't see him doing that

22 when you saw him, correct?

23      A.   I did not.

24      Q.   Okay.  And do you know whether or not any of

25 the officers confiscated or took into custody an

SERGEANT THOMAS FROST

1  alcoholic beverage that he had been drinking?

2        A.    I do not know.

3        Q.    Did you speak to anybody who said they saw

4  him drinking?

5        A.    I did not.

6        Q.    Do you know whether any of the other

7  officers spoke to anybody who said they saw Richie

8  drinking?

9              MR. BRUNNER:  Objection, foundation.

10             MR. HENDERSON:  You can answer.

11             THE WITNESS:  I do not know.

12       Q.    (By Mr. Henderson)  Okay.  Well, you were at

13  the scene, right?

14       A.    Yes.

15       Q.    And you saw them at the scene, right?

16       A.    Yes.

17       Q.    So did you see them speaking to anybody who

18  said that they saw Richie drinking?

19       A.    I do not know.

20       Q.    Based on what you saw and observed at the

21  scene did you see any of them talk to somebody who said

22  oh, yeah, I just saw Richie drinking?

23       A.    I did not see that.  No.

24       Q.    Okay.  So when you saw Richie take off you

1                    SERGEANT THOMAS FROST

2    said you stayed in your car, correct?

3           A.   Yes.

4           Q.   What made you decide to stay in your car as

5    opposed to get out?

6           A.   To try and get ahead of Richard to get him

7    to stop.

8           Q.   And it was easier for you to do that in the

9    car, correct?

10          A.   Yes.

11          Q.   Now, tell me what you recall about the

12   height and weight of Young at that time, ballpark.

13          A.   Five-eight, 160.

14          Q.   And age?

15          A.   46.

16          Q.   And what about height and weight for

17   Talbott?

18               MR. BRUNNER:  These are all approximate?

19               MR. HENDERSON:  Yes.

20               THE WITNESS:  Five-nine, 230.

21          Q.   (By Mr. Henderson) Age?

22          A.   33.

23          Q.   Wilson?

24          A.   Six foot, 125 maybe.

25          Q.   Age?

SERGEANT THOMAS FROST

1

2      A.    I would have no idea.  Approximate 25.

3      Q.    And height and weight for Richie?

4      A.    Probably five-ten, 240.

5      Q.    Age?

6      A.    My approximate would be 50.

7      Q.    Okay.  He was not in good shape, was he?

8            MR. BRUNNER:  Objection, form.

9            THE WITNESS:  No.

10     Q.    (By Mr. Henderson)  In your opinion just as

11     a layperson he wasn't in good shape, was he?

12     A.    No.

13     Q.    When you saw Richie what did you see that

14     day?  When you drove up to the scene what did you see?

15     A.    I saw him standing on Sixth Street south of

16     Green talking to Officer Wilson.

17     Q.    What else did you see as it relates to

18     Richie?

19     A.    I saw him flailing his arms up and down,

20     quick head jerks, he appeared to have stuff in his

21     facial hair, kind of moving back and forth.  I wouldn't

22     call it pacing, but he was just very manic acting.

23     Q.    Agitated?

24     A.    I would describe it as manic.

25     Q.    And when you use the term manic, what does

SERGEANT THOMAS FROST

1
2 that mean?

3     A.   Flailing his arms, you know, not able to
4 control his body movements.

5     Q.   Okay.  Anything else you saw?

6     A.   No.

7     Q.   Did you hear him say anything?

8     A.   No.

9     Q.   And what was the distance between you and
10 Richie when you saw that when you first pulled up?

11     A.   40 yards.

12     Q.   Could you hear what Wilson was saying?

13     A.   No.

14     Q.   Did it look like Richie was having a
15 breakdown?

16     A.   Yes.

17     Q.   Okay.  And what makes you -- based on what
18 you had seen in the past and what you saw that day, what
19 did you see that made you think he was having a
20 breakdown?

21     A.   His manic behaviors; his head twitching;
22 quick head thrust left, right, up, down; arms flailing
23 around.

24     Q.   Did you tell -- let's go one at a time.  Did
25 you tell Young that Richie was acting abnormally?

SERGEANT THOMAS FROST

A.   No.

Q.   Did you tell Talbott that Richie was acting abnormally?

A.   No.

Q.   Did you tell Wilson that Richie was acting abnormal?

A.   No.

Q.   You could communicate with them at the scene either with your voice or with the radio, correct?

A.   I would have had to have communicated with the radio.

Q.   Why did you not tell them that Richie was acting abnormal?

A.   Because they were seemingly observing it with their own eyes.

Q.   But you knew based on prior experience that that was -- whatever he was doing was unusual even for Richie, correct?

A.   Yes.

Q.   Do you know whether or not Wilson had prior experience with Richie?

A.   I believe he did.

Q.   Based on what?

A.   If he was assigned to the campus district as

SERGEANT THOMAS FROST

1

2 he was that day, everybody knows Richard.

3          Q.   And what about Talbott?  Do you know whether

4 Talbott knew that Richie was acting abnormally that day?

5          A.   Based on his mannerisms, his manic behaviors

6 that's not normal for anyone.

7          Q.   And did Young know the same thing?

8          A.   Yes.

9          MR. HENDERSON:  Can we take a break for five

10 minutes?

11                    (Recess taken.)

12          Q.   (By Mr. Henderson)  Okay.  So you saw Richie

13 moving around like he was having a mental breakdown?

14          A.   Yes.

15          Q.   Did you ever hear him speak?

16          A.   No.

17          Q.   Did you hear any of the officers speak to

18 Richie?

19          A.   No.

20          Q.   Eventually you got close enough to Richie

21 though to get a hobble, right?

22          A.   Yes.

23          Q.   So when you got that close you were within

24 an arm length of Richie, right?

25          A.   Yes.

SERGEANT THOMAS FROST

1

2      Q.   At that point in time did you hear the

3  officers speaking to Richie?

4      A.   Yeah.

5      Q.   Okay.  And what were they saying?

6      A.   They were just saying Mr. Turner, calm down

7  as I recall.

8      Q.   And they were on top of him, right?

9      A.   No.

10      Q.   Were they in contact with his body?

11      A.   Yes.

12      Q.   Tell me what you saw as it relates to Wilson

13  and what you remember.

14      A.   They were on the sides of him up by his

15  shoulders.

16      Q.   Okay.  Nobody was on his back?

17      A.   No.

18      Q.   Were they preventing him from moving?

19      A.   Yes.

20      Q.   He was struggling, right?

21      A.   He was, yes, resisting.

22      Q.   Okay.  Well, you now know that he died

23  because he suffocated, right?

24           MR. BRUNNER:  Objection, foundation.

25      Q.   (By Mr. Henderson) You know that, right?

SERGEANT THOMAS FROST

1

2     A.    No.

3     Q.    Do you know how he died?

4     A.    No.

5     Q.    So two years after the fact you didn't

6  inquire about how he died?

7     A.    No.

8     Q.    It wasn't important to you?

9     A.    No.

10    Q.    Why not?

11    A.    The less I know about this case, the less I

12  have to recall.

13    Q.    Okay.  Were you -- was it important to you

14  as the senior officer on duty to figure out whether or

15  not anybody did anything wrong?

16    A.    Yes.

17    Q.    Okay.  Did you undertake an investigation on

18  your own to see if anybody did anything wrong?

19    A.    No.

20    Q.    Did you do anything to see if anybody did

21  anything wrong?

22    A.    Yes.

23    Q.    What did you do?

24    A.    I recommended to Lieutenant Vogelzang that

25  we start finding the people who had called on Richard's

SERGEANT THOMAS FROST

1
2  actions and behaviors because they would be witnesses.

3  I recommended obtaining video from the University of

4  Illinois if available that would have recorded Richard's

5  actions and the officers' actions as well as

6  interviewing any persons that were still in the area to

7  see if they had witnessed any of the actions of the

8  officers or Mr. Turner.

9          Q.   Did you make any other recommendations?

10         A.   No.

11         Q.   Okay.  Did you ever look at any of the

12 video?

13         A.   No.

14         Q.   So you never looked yourself to see whether

15 or not the officers did anything wrong?

16         A.   No.

17         Q.   Okay.  And you couldn't see what was

18 officers were doing the entire time, could you?

19         A.   No.

20         Q.   And is today the first time that you're

21 hearing that Richie in effect suffocated?

22              MR. BRUNNER:  Objection.  Misstates evidence

23 and facts not in evidence.

24         Q.   (By Mr. Henderson)  We're not at trial so

25 there's no evidence.

SERGEANT THOMAS FROST

1  

2          So just tell me what you heard about him

3  dying.

4          MR. BRUNNER:  Same objection,

5  mischaracterization of the cause of death.

6          MR. HENDERSON:  I'm not trying to

7  characterize it.  I want you to tell me what you know.

8          MR. KRCHAK:  Go ahead.

9          THE WITNESS:  I had heard that it was

10  undetermined.

11       Q.  (By Mr. Henderson)  That's what you heard.

12  Who told you that?

13       A.  I don't recall.

14       Q.  When were you told that?

15       A.  I don't recall.

16       Q.  Were you told that within three months of

17  his passing?

18       A.  I don't recall.

19       Q.  Were you told that within three months of

20  today going backwards?  In the last three months -- were

21  you told that in the last three months?

22       A.  I've known for some time.  I have no idea

23  when I was told.

24       Q.  Okay.  And what you were told was the cause

25  of death was undetermined?

SERGEANT THOMAS FROST

A. Undetermined.

Q. Okay. And that's what the coroner's conclusion was, that the cause of death was undetermined? That's what you heard?

A. I had heard they were unable to tell what specifically caused his death.

Q. Did you ever look at the coroner's report?

A. No.

Q. Okay. And do you remember who told you that they couldn't determine what his cause of death was?

A. As I told you, no.

Q. Okay. Did you see any of the officers raise their voice at Richie?

A. No.

Q. Okay. They were cool, calm, and collected the whole time?

A. Yes.

Q. That's what you saw?

A. Yes.

Q. Okay. And did you see more than one officer talking to Richie?

A. I don't recall.

Q. Do you recall who was talking to Richie?

A. Can I ask a clarifying question?

SERGEANT THOMAS FROST

1

2      Q.   Sure.

3      A.   Are you talking about when they were on

4 Sixth Street or when they were in the walkway?

5      Q.   In the walkway.

6      A.   I don't recall who was talking to him

7 specifically.

8      Q.   Was there more than one person talking to

9 him or one person?

10     A.   I don't recall.

11     Q.   Okay.  That's important, isn't it?

12          MR. BRUNNER:  Objection, form.

13          MR. HENDERSON:  You can answer.

14          THE WITNESS:  I don't think it necessarily

15 matters because at that point they were just trying to

16 get him to calm down.

17     Q.   (By Mr. Henderson)  Well, but didn't you

18 tell me your training said ideally that one person at a

19 time speaks to somebody who's having a mental breakdown?

20          MR. BRUNNER:  Objection, form.

21          MR. HENDERSON:  Okay.  Go ahead.

22          THE WITNESS:  As you said, ideally.  At the

23 same time Richard was beyond being able to comprehend

24 based on his mental capacity -- I'm sorry -- his mental

25 health issues.

SERGEANT THOMAS FROST

Q.   (By Mr. Henderson)  So again my question is
you told me that in an ideal circumstance one person
talks to him, right?

A.   If a person is able to understand and
comprehend what is being told, one works best ideally.
If the person is so far suffering from mental health
issues where they're not comprehending what's being told
to them, I don't think it matters one or two just as
long as someone is communicating with him trying to keep
him calm.

Q.   And the officers struggled with Richie on
the ground, didn't they?

A.   I don't know.

Q.   Well, you watched some of it, didn't you?

A.   No.

Q.   You never saw them physically interact with
him on the ground?

A.   I saw them holding him on the ground.

Q.   Was there a struggle?

A.   His feet were kicking, so yes.

Q.   Okay.  And were his arms flailing or was he
attempting to flail his arms?

A.   No.

Q.   Okay.  You ever see anybody struggle to gasp

1                    SERGEANT THOMAS FROST

2    for air?

3          A.    In movies, yes.

4          Q.    Okay.  And you said that Richie was

5    resisting, right?

6          A.    Yes.

7          Q.    What's the difference between somebody

8    resisting and somebody gasping for air?

9          A.    I would say somebody gasping for air would

10   be attempting to suck in air.  Somebody resisting would

11   be kicking their feet back and forth trying to get away.

12         Q.    Did you see Richie trying to get air?

13         A.    No.

14         Q.    You didn't see that?

15         A.    No.

16         Q.    Did anybody call for an ambulance?

17         A.    Yes.

18         Q.    Do you know who called for an ambulance?

19         A.    Yes.

20         Q.    Who?

21         A.    Officer Wilson.

22         Q.    Did anybody else call for an ambulance?

23         A.    No.

24         Q.    Okay.  And did you hear Wilson call for an

25   ambulance?  Did you see him call?  What did you --

SERGEANT THOMAS FROST

1

2     A.    I heard him call.

3     Q.    Over the dispatch radio?

4     A.    Uh-huh.  Yes.

5     Q.    And when did you hear him call, before you

6  got to the scene or after you got to the scene?

7     A.    When they were standing on Sixth Street

8  south of Green is when he called for the ambulance.

9     Q.    So you were there at that time?

10     A.    Yes.

11     Q.    So you were at the scene and you heard him

12  call over the radio; is that right?

13     A.    Yes.

14     Q.    And is that before or after they had

15  approached Richie?

16     A.    That was after.

17     Q.    Was that before or after Richie was on the

18  ground?

19     A.    Before.

20     Q.    Now, you said there was no emergency on the

21  way over to the scene.  Was it an emergency once you got

22  to the scene?

23     A.    Not initially, no.

24     Q.    Okay.  When did the emergency happen?

25     A.    Once we recognized Richard was not

1    SERGEANT THOMAS FROST

2    breathing.

3         Q.    And that was after the ambulance was called,

4    correct?

5         A.    The ambulance was already on its way.

6         Q.    Okay.  Why didn't you and the other officers

7    wait for the ambulance to arrive before you attempted to

8    take Richie into control?

9              MR. BRUNNER:  Objection, foundation as to

10   other officers.

11        Q.    (By Mr. Henderson) You were the senior guy

12   on the scene, right?

13        A.    Yes.

14        Q.    Okay.  So you're in charge, right?

15        A.    Yes.

16        Q.    And you're in charge of what you do, right?

17        A.    Yes.

18        Q.    And you're in charge of what the guys who

19   are underneath you do, right?

20        A.    To some degree yes.

21        Q.    Well, I mean you're the boss on the scene,

22   right?

23        A.    Yes.

24        Q.    So if you give them an order, they're

25   supposed to follow it, right?

SERGEANT THOMAS FROST

1

2          A.    Yes.

3          Q.    So did you tell them let's wait until the

4     ambulance arrives before we physically engage with

5     Richie?

6          A.    They didn't physically engage until after he

7     ran away.

8               MR. HENDERSON:   No.   My question is

9     different.   Read my question back to him please.

10       (The court reporter read back the previous question.)

11               THE WITNESS:   No.

12          Q.    (By Mr. Henderson)   Why not?

13          A.    Because they did not engage him physically

14     until after he ran.

15          Q.    Well, he ran --

16          A.    They were waiting for the ambulance.

17          Q.    So Richie ran before the ambulance got

18     there, right?

19          A.    Yes.

20          Q.    So my question is why didn't you say hey,

21     let's just wait for the ambulance to get here before we

22     start physically engaging with him?

23          A.    There was no opportunity.

24          Q.    Explain that to me.

25          A.    When they're running down the sidewalk

SERGEANT THOMAS FROST

1

2 they're not engaging him.  I didn't see any of the

3 engagement.

4     Q.   Well, they chased him, right?

5     A.   Yes.

6     Q.   So that's a form of engagement, right?

7     A.   Yes.

8     Q.   Okay.  And at that point in time had he

9 committed any crime other than the drinking?

10     A.   Walking in the roadway.

11     Q.   Okay.  What crime is that?

12     A.   Pedestrian in the roadway.

13     Q.   Okay.  And that's a crime why?

14     A.   It's a violation of the Illinois Vehicle

15 Code.

16     Q.   Okay.  And is that also a misdemeanor?

17     A.   Uh-huh.

18     Q.   Is that a yes?

19     A.   Yes.

20     Q.   And when he was walking in the roadway you

21 also knew that he was suffering from a mental breakdown,

22 right?

23     A.   Could you repeat the question.

24     Q.   When he was walking in the roadway you also

25 knew at that time that he was suffering from a mental

1  SERGEANT THOMAS FROST

2  breakdown, right?

3      A.   I didn't see him in the roadway.

4      Q.   Okay.  Somebody else told you that he was in

5  the roadway?

6      A.   That was why we were dispatched to that

7  location.

8      Q.   Okay.  So when you got to the scene you

9  never saw him in the roadway yourself, correct?

10     A.   I saw him run across the middle of the

11 intersection.

12     Q.   Okay.  Was that a crime?

13     A.   Yes.

14     Q.   Okay.  Why?

15     A.   Because it was a pedestrian in the roadway

16 not going with the traffic lights.  In that particular

17 intersection you're only allowed to go diagonally at

18 that other intersection.  That one is not marked to

19 allow that movement.

20     Q.   And so when you saw him go across the

21 roadway you knew at that moment that he was having a

22 mental breakdown, right?

23     A.   I suspected he was, yes.

24     Q.   Okay.  Did -- at any time before the

25 ambulance arrived did you tell the junior officers hey,

SERGEANT THOMAS FROST

just wait until the ambulance gets here before we engage

Richie?

    A.   No.

    Q.   And tell me why you didn't tell them that.

    A.   The first reason would be because I wasn't

on scene with them when they were on Sixth Street and

Green.  I can't hear what's being said.  I'm visually

watching their actions.

    Once he took off running, again they went

out of my sight.  I can't hear what they're saying.  I

can't see what they're doing either.

    Q.   So Richie went off running and then they --

the officers went off running after him, correct?

    A.   I would call it a slow jog.

    Q.   So they were in pursuit, right?

    A.   Yes.

    Q.   And when they were in pursuit is that

escalating or deescalating the situation?

    MR. BRUNNER:  Objection, form.

    MR. HENDERSON:  You can answer.

    THE WITNESS:  I would say Mr. Turner's

actions escalated it.

    Q.   (By Mr. Henderson)  And what about the

officers when they were in pursuit of him, is that

SERGEANT THOMAS FROST

2    escalating or deescalating the situation?

3         A.    I would say Mr. Turner's escalating makes

4    them -- they have to respond to his actions.

5         Q.    Okay.  So my question again is -- well, they

6    don't have to respond.  They're in control of the

7    situation, right?

8         A.    Not at that time.

9         Q.    But the officers get to choose how they

10   respond to the situation, right?

11        A.    Correct.

12        Q.    They can pull a gun out sometimes, right?

13   You have to make choices on the scene, right?

14        A.    Yes.

15        Q.    So you choose whether to take a gun out or a

16   Taser, right?

17        A.    Yes.

18        Q.    Sometimes you choose to do nothing, right?

19        A.    Yes.

20        Q.    Sometimes you choose to call the ambulance,

21   right?

22        A.    Yes.

23        Q.    So my question is when they made the choice

24   to -- as you describe to jog behind him, did that

25   escalate or deescalate the situation?

1          SERGEANT THOMAS FROST

2          A.   I don't think it --

3               MR. BRUNNER:  Objection, form as to only two

4     options.

5               MR. HENDERSON:  You can answer.

6               THE WITNESS:  I don't think it did either.

7          Q.   (By Mr. Henderson)  Okay.  How long were

8     they out of your field of view?

9          A.   I don't know.

10         Q.   Was it more than 30 seconds or less than 30

11    seconds?

12         A.   I don't know.

13         Q.   More than 15 seconds or less than 15

14    seconds?

15         A.   I don't know.

16         Q.   So when they were out of your field of

17    view -- meaning you Richie and the officers -- you don't

18    know what's going on at that point, right?

19         A.   I did not know.

20         Q.   In everyday layman's terms Richie wasn't a

21    very fast guy, was he?

22         A.   No.

23         Q.   This is not necessarily a nice thing to say,

24    but he was kind of fat and out of shape, right?

25         A.   Yes.

SERGEANT THOMAS FROST

1

2        Q.   And when the officers were in pursuit of him

3   he wasn't about to endanger anybody based on what you

4   could see, right?

5        A.   He was endangering himself.

6        Q.   Okay.  Was he endangering any other

7   citizens?

8        A.   Not that I know.

9        Q.   Was he endangering any of the officers?

10        A.   No.

11        Q.   And how was he a danger to himself when he

12   was leaving -- running away from the officers?

13        A.   Running into the middle of the street he

14   could have been hit by a car or a bus or something of

15   that nature.

16        Q.   And so when they caught up to him he was no

17   longer in the middle of the street, right?

18        A.   Yes.

19        Q.   And when they caught up to him he was

20   actually in an alley, right?

21        A.   Yes.

22        Q.   Now, at some point in time did you start

23   running or did you never run?

24        A.   I never ran.

25             MR. HENDERSON:  Would you mark this as Frost

SERGEANT THOMAS FROST

1   1 for us please.

2       (Frost Exhibit No. 1 was marked for identification.)

3       Q.   (By Mr. Henderson)  Sergeant, I'm going to

4   hand you what the court reporter has just marked as

5   Frost 1.

6           Why don't you take a look at it, and after

7   you've had a chance to look at it let me know.

8           MR. BRUNNER:  Counsel, do you have a Bates

9   number for that?

10          MR. HENDERSON:  There is no Bates number,

11  but we'll let the court reporter keep the exhibits.

12          THE WITNESS:  Okay.

13      Q.   (By Mr. Henderson)  Have you had a chance to

14  see it?

15      A.   Just now, yes.

16      Q.   Does that look familiar to you?

17      A.   Yes.

18      Q.   What do you see in that picture?

19      A.   I see a sidewalk, a grayish colored wall, a

20  black brick wall, a black colored downspout, a sidewalk,

21  doors, brick buildings, walkways.

22      Q.   Is that the alley where the officers

23  encountered Richie?

24      A.   It looks like it, yes.

1        SERGEANT THOMAS FROST

2              MR. HENDERSON:  Mark that for me as Frost 2

3    if you would.

4       (Frost Exhibit No. 2 was marked for identification.)

5              Q.   (By Mr. Henderson) Take a look at Frost 2

6    and after you've had a chance to look at it let me know.

7              MR. BRUNNER:  Just for the record none of

8    these photos have Bates labels, right?

9              MR. HENDERSON:  That's correct.

10             MR. BRUNNER:  So if there's others that go

11   in, we can rely on that too and I don't have to keep

12   saying it?

13             MR. HENDERSON:  We'll let the court reporter

14   keep Frost 1 and 2.

15             THE WITNESS:  Okay.

16        Q.   (By Mr. Henderson)  It's that same alley

17   where the officers encountered Richie; is that right?

18        A.   I believe so, yes.

19        Q.   And when he was on the ground and the

20   officers were physically engaged with him it was in this

21   alley, right?

22        A.   Yes.

23        Q.   Now, you got to the alley because you got

24   out of your car; is that right?

25        A.   I got to the -- I got to the alley because I

SERGEANT THOMAS FROST

1   drove my car to that area.  Yes.

2        Q.   And when you say to that area, where was

3   your car?

4        A.   I drove through the parking garage, and it

5   exits into part of that alley.

6        Q.   So did you come from one direction and the

7   officers came from another?

8        A.   Yes.

9        Q.   Okay.  And what direction -- so when you

10  were walking or moving towards Richie what direction

11  were you travelling in?

12       A.   I walked east --

13       Q.   East?

14       A.   -- towards him.

15       Q.   And the officers came from behind him from

16  the west; is that right?

17       A.   They would have chased him from the south of

18  where he was at.

19       Q.   Okay.  So they chased him from the south,

20  but by the time everybody got into the alley did you

21  come from one direction and the officers came from the

22  other?

23       A.   The officers would have been running north,

24  and I would have walked towards the east.

SERGEANT THOMAS FROST

1

2      Q.    Was Richie cornered in effect?

3      A.    No.

4      Q.    There was -- was there someplace for him to

5 -- if he could have run away from you guys, could he

6 have gone someplace else?

7      A.    Yes.

8      Q.    Where was that?

9      A.    He could have continued running into the

10 alley and into the parking deck, or he could have turned

11 to the right and went to the east.

12     Q.    He didn't do those things, did he?

13     A.    No.

14     Q.    So the four of you at some point converged

15 on Richie, right?

16     A.    Yes.

17     Q.    And when you got to the alley were -- was

18 Richie on the ground?

19     A.    Yes.

20     Q.    Was Wilson on the ground?

21     A.    Yes.

22     Q.    Was Young on the ground?

23     A.    Yes.

24     Q.    Was Talbott on the ground?

25     A.    Yes.

1           SERGEANT THOMAS FROST

2          Q.    And what were they doing?

3          A.    Officer Talbott was at Richie's feet trying

4    to control his feet from kicking or hitting him or

5    hurting himself.  Officers Wilson and Young were up on

6    the sides around the shoulders of Richie.

7          Q.    And so be specific with respect to Wilson.

8          A.    I don't remember specific locations or what

9    they were holding or where they were at.  I was focused

10   on Talbott because I was bringing the hobble.

11         Q.    And tell me what you remember about Young.

12         A.    Again, he was on the side of Richie up

13   around his shoulder area.

14         Q.    And do you remember that distinctly?

15         A.    I remember they both were on -- up about the

16   shoulder area of Richie.

17         Q.    Is that in your report, the fact that both

18   of them were around the shoulder area?

19         A.    I don't believe so.

20         Q.    Is that an important detail?

21               MR. BRUNNER:  Objection, form.

22               MR. HENDERSON:  You can answer.

23               THE WITNESS:  I don't write what the other

24   officers do because --

25         Q.    (By Mr. Henderson)  No.  I'm talking about

SERGEANT THOMAS FROST

1  in terms of your report.  Was that important?

2       A.   Not for my report.

3       Q.   Okay.  Why not?

4       A.   Because I only report what I do.  I don't

5  report what other officers do.

6       Q.   Well, don't you also report what you see?

7       A.   At times.

8       Q.   So if you see something important no matter

9  who does it, you put it in your report, right?

10      A.   No.

11      Q.   Okay.  So if you see something important,

12 you might choose to leave it out?

13           MR. BRUNNER:  Again, objection as to form of

14 the use of the word important.

15      Q.   (By Mr. Henderson)  Well, you used the word

16 important before.  You told me that you try to put

17 important stuff in your report, right?

18      A.   You used that word to me, so I agreed yes.

19      Q.   Okay.  So you agree with me if it's

20 important you try to put it in your report, right?

21      A.   Yes.

22      Q.   Okay.  So now you're telling me that Wilson

23 and Young were on the shoulders, but that's not in your

24 report, is it?

1                SERGEANT THOMAS FROST

2        A.    That's not what I just told you.

3        Q.    What did you tell me?

4        A.    I told you Officer Young and Officer Wilson

5   were up on the sides of Richie.  I didn't ever say they

6   were on him.

7        Q.    Okay.  So they were on the side?

8        A.    They were on the side of Richie.

9        Q.    Okay.  And is that in your report?

10       A.    No.

11       Q.    Are the other officers in the Fraternal

12   Order of Police?

13       A.    I don't know.

14       Q.    Okay.  You don't know whether Young or

15   Talbott or Wilson are in the FOP?

16       A.    I can't speak to whether they are or not.

17       Q.    Do you believe they are?

18       A.    Yes.

19       Q.    Why do you believe they are?

20       A.    Because I believe they also had FOP

21   representation there.

22             (Court reporter interruption.)

23       A.    I believe they had Fraternal Order of Police

24   representation.

25       Q.    When did the FOP show up, at the scene

SERGEANT THOMAS FROST

1    itself?

2           A.   No.

3           Q.   When did you first encounter the FOP, the
4    next day?

5           A.   That day at the police department.

6           Q.   And you spoke to a lawyer for the FOP; is
7    that right?

8           A.   Yes.

9           Q.   And the other -- and Young, Talbott, and
10   Wilson also spoke to the same FOP rep?

11          A.   I don't know.

12               MR. BRUNNER:  Objection, foundation.

13          Q.   (By Mr. Henderson)  You saw them speak to an
14   FOP rep though, right?

15          A.   No.

16          Q.   Then you just told me that you thought they
17   were in the FOP because you saw somebody talk to them
18   from the FOP, right?

19               MR. BRUNNER:  Objection.  Misstates
20   testimony.

21               MR. HENDERSON:  You can answer.

22               THE WITNESS:  We were -- they were taken out
23   of the room to meet with whoever met with them.  I did
24   not witness or observe them speaking to anyone.

SERGEANT THOMAS FROST

1

2      Q.    In what room?

3      A.    It's a conference room on the second floor.

4      Q.    Does the room have a number?

5      A.    I don't know what the number would be.

6      Q.    So this is a conference on the second floor

7  at the police station, correct?

8      A.    Uh-huh.

9      Q.    Is that a yes?

10      A.    Yes.

11      Q.    And the four of you were in that room; is

12  that right?

13      A.    I was in the room.  I don't know if they

14  were.

15      Q.    I thought you told me they got taken out of

16  the room?

17      A.    Right.  You can't see that room.

18      Q.    So they were in the conference with you at

19  some point, right?

20      A.    We were in a break room for a short period

21  of time to get refreshments, and then when the FOP

22  attorney showed up individually the officers go out one

23  door around the hall, and where they went and what they

24  did I don't know.

25      Q.    How long were the four of you in the break

1                    SERGEANT THOMAS FROST

2    room?

3            A.   I have no idea.

4            Q.   More than five minutes?

5            A.   I have no idea.

6            Q.   More than 15 minutes?

7            A.   I have no idea.

8            Q.   More than an hour?

9            A.   I have no idea.

10           Q.   Who was in the break room with the four of

11   you?

12           A.   I don't recall.

13           Q.   Was anybody else in the break room besides

14   the four of you?

15           A.   Yes.

16           Q.   Who?

17           A.   There would have been companion officers

18   assigned to each officer.

19           Q.   And who were those companion officers?

20           A.   I don't recall.

21           Q.   Who was your companion officer?

22           A.   Lieutenant Myers.

23           Q.   How long was Myers in the room with you?

24           A.   The entire time.

25           Q.   Okay.  And how long was the entire time?

SERGEANT THOMAS FROST

1

2     A.   I don't know.

3     Q.   And do you recall who any of the other

4 companion officers were besides Myers?

5     A.   I already told you no.

6     Q.   When the -- you walked up and you saw Richie

7 on the ground with Young, Talbott, and Wilson.  Was

8 Richie handcuffed at that point?

9     A.   Yes.

10    Q.   Was he handcuffed with just one set of cuffs

11 or more than one set of cuffs?

12    A.   More.

13    Q.   How many set of cuffs?

14    A.   I don't know.

15    Q.   And were the cuffs just on the hands?

16    A.   Yes.

17    Q.   Were there any cuffs on his feet?

18    A.   No.

19    Q.   And Richie was on his stomach, correct?

20    A.   Correct.

21    Q.   And Young had Richie -- was Young on

22 Richie's left side?

23    A.   I don't recall specific who was on which

24 side.

25    Q.   And did -- so Young was on one side and

SERGEANT THOMAS FROST

1

2   Wilson was on the other; is that right?

3       A.   Yes.

4       Q.   And did Young put his knee on Richie's

5   shoulder to keep Richie from -- to keep him down on the

6   ground?

7       A.   I don't know.

8       Q.   You don't recall one way or the other?

9       A.   I don't know.

10      Q.   Okay.  What about Wilson?  Did Wilson put a

11  knee on Richie's shoulder to keep him down on the

12  ground?

13      A.   I don't know.

14      Q.   Okay.  You were there and you saw it.  So

15  when you say you don't know, you don't remember?

16      A.   I don't know.

17          MR. BRUNNER:  Well, what timeframe are you

18  talking about, counsel?

19      Q.   (By Mr. Henderson) Well, when you walked up

20  and saw the four of them on the ground, Richie is on the

21  ground and Talbott has his feet and Wilson and Young are

22  you told me on the sides, right?

23      A.   Yes.

24      Q.   And does anybody have a knee on his

25  shoulder?

SERGEANT THOMAS FROST

1

2          A.    Not that I recall.

3          Q.    So -- so it's your testimony then that

4    Talbott had his feet and Young and Wilson just had his

5    arms?  Is that what you're telling me?

6          A.    I'm telling you all I saw was the two

7    officers up in the shoulder area of him on his sides.  I

8    don't know what they were holding.  I have no clue.  All

9    I can testify is I was told they needed a hobble.  So my

10   job is to go to the feet, and I'm focusing on Officer

11   Talbott and what he's battling initially.

12         Q.    And so the battle was between who?

13         A.    Could you rephrase that.

14         Q.    Yeah.  You said Talbott was battling.  The

15   battle was between who?

16         A.    He was trying to hold his feet to keep him

17   from kicking the officers or from being able to -- to

18   hurt himself.

19         Q.    But Richie is on his stomach, right?

20         A.    Yeah.

21         Q.    Did you use your radio to call for

22   assistance at any time?

23         A.    Yes.

24         Q.    When was that?

25         A.    I specifically made a couple of different

1    SERGEANT THOMAS FROST

2  requests.

3         Q.   What did you ask for?

4         A.   I asked for the ambulance to upgrade their

5  response to a full code, run lights and sirens.  The

6  other request would have been for Lieutenant Vogelzang

7  to respond.

8         Q.   Any other requests?

9         A.   Not that I recall.

10        Q.   And why did you ask the ambulance to upgrade

11 its response?

12        A.   Because Richard was not breathing at that

13 time.

14        Q.   So what do you understand about the initial

15 request for the ambulance?  Were they told just to come

16 whenever you get here?

17        A.   We don't dictate the ambulance responses.

18 That's a completely private organization business

19 entity, and they base their responses on what the

20 symptoms are of the patient.

21             Initially they would have responded with the

22 flow of traffic as we discussed earlier today.  But once

23 I notify them we have a medical emergency now, I need

24 you to run lights and sirens, they will do that because

25 I've updated them to let them know that he's not

1                    SERGEANT THOMAS FROST

2   breathing.

3          Q.   As you understand it who made the initial

4   call to the ambulance?

5          A.   I believe it was Officer Wilson.

6          Q.   So your understanding is Wilson just told

7   the ambulance to just get there in normal due time

8   following the regular traffic pattern, correct?

9          A.   Correct.

10         Q.   And why did you ask the lieutenant to come

11  to the scene?

12         A.   Because Richard was not breathing.

13         Q.   Did the lieutenant show up?

14         A.   Yes.

15         Q.   How long from the time you called the

16  lieutenant did it take for him to show up?

17         A.   I don't know.

18         Q.   More than five or less than five minutes?

19         A.   I don't know.

20         Q.   And so who asked you to get the hobble?

21  Talbott you said?

22         A.   I don't recall who specifically.  I would

23  venture to guess Talbott.

24         Q.   But you're not sure?

25         A.   No.

1

2      Q.    And so did you get to Richie's body and then

3  go back to the car to get the hobble?

4      A.    No.

5      Q.    You brought the hobble with you from the

6  moment you got out of your car?

7      A.    Yes.

8      Q.    Okay.  So the request for the hobble was

9  made while you were in your car?

10      A.    Yes.

11      Q.    What does a hobble do?

12      A.    It restrains the feet.

13      Q.    Does it do anything else?

14      A.    No.

15      Q.    Can it be used for anything else?

16      A.    Not by our department.

17      Q.    That's the primary purpose of the hobble, to

18  restrain the feet?

19      A.    Yes.

20      Q.    And did you place the hobble on Richie's

21  feet?

22      A.    Yes.

23      Q.    And then did anybody help you put the hobble

24  on his feet?

25      A.    Office Talbott helped me.

SERGEANT THOMAS FROST

1

2      Q.    And then once you placed the hobble on his

3  feet then what happened?

4      A.    The initial time we put it on he was able to

5  get his foot out of it.  So in speaking with Talbott we

6  had to control his feet again and reposition the hobble

7  to be a little bit higher up around his ankles, and then

8  it was secured.

9      Q.    And did -- did Richie get out of the hobble,

10 or did you all fail to put it on properly the first

11 time?

12     A.    He got out of it.

13     Q.    How did he get out?

14     A.    He pulled his foot quick enough as I was

15 trying to get it on that he got his foot out of it.

16     Q.    So you never -- you didn't get it securely

17 on him the first time around, correct?

18     A.    Probably not.

19     Q.    Did you put your knee on Richie's leg?

20     A.    No.

21     Q.    Did Talbott put his knee on Richie's leg?

22     A.    I don't know.

23     Q.    Do you know what hog-tying is?

24     A.    Yes.

25     Q.    What's hog-tying?

SERGEANT THOMAS FROST

1

2    A.    That is when people have their hands behind

3  their back and their feet are tied and connected

4  together from behind the back.

5    Q.    Was Richie hog-tied?

6    A.    No.

7    Q.    So after Richard was cuffed and hobbled what

8  happened next?

9    A.    As soon as he was hobbled I quickly took an

10 assessment to see where everybody was at and make sure

11 everybody was okay, and I immediately noticed that

12 Richard didn't appear to be breathing.

13    Q.    And what were your thoughts at that moment

14 when he wasn't breathing about how that happened?

15    A.    I didn't have any thoughts about how it

16 happened.

17    Q.    So you didn't think at that moment did we do

18 something wrong?

19    A.    No.

20    Q.    You didn't think at that moment did he have

21 a heart attack?

22    A.    I thought he might be having a heart attack.

23    Q.    So you did have some thoughts?

24    A.    Yes.

25    Q.    Okay.  So what were your thoughts?

SERGEANT THOMAS FROST

2    A.   I thought he was having a heart attack.

3    Q.   What were your other thoughts?

4    A.   We needed to help him.

5    Q.   Okay.  And what other thoughts did you have?

6    A.   I knew I had AED in the car.

7    Q.   Okay.  And that stands for?

8    A.   Automatic external defibrillator.

9    Q.   And so tell me what happened next.

10   A.   I again asked the officers to assess
Richard.  They said they didn't believe he was
breathing.  I told them to roll him over to make sure
that his airway was clear and he was able to breathe.

Once they confirmed he was not breathing, I
directed the officers to go get my AED and return with
it.

17   Q.   And when they rolled him over were the
handcuffs still on his hands?

19   A.   Yes.

20   Q.   So he was on his back and his hands were
cuffed underneath him, correct?

22   A.   I don't recall.

23   Q.   The handcuffs were never taken off of him
though, right?

25   A.   No.

1          SERGEANT THOMAS FROST

2          Q.    And the handcuffs were behind his back,

3    right?

4          A.    At that time, yes.

5          Q.    And so who went to get the AED?

6          A.    I believe it was Officer Wilson and Talbott.

7          Q.    Out of your car?

8          A.    Yes.

9          Q.    And when they brought it back then what

10   happened?

11         A.    We applied the AED to him.

12         Q.    And what did you learn by -- by doing that?

13         A.    That no shock was necessary.

14         Q.    In layman's terms what does that mean?

15         A.    The AED specifically told us no shock is

16   necessary meaning don't shock the patient.

17         Q.    So was his heart still beating?

18         A.    Yes.

19         Q.    And the AED showed that?

20         A.    I believe so, yes.

21         Q.    Did the AED show anything else?

22         A.    I don't know.

23         Q.    Did he appear to be breathing after you did

24   the AED test?

25         A.    No.

SERGEANT THOMAS FROST

Q.    What other actions did you take?

MR. BRUNNER:  What other what?  I'm sorry.

Q.    (By Mr. Henderson) Actions did you take.

A.    Well, the -- the other actions was just
assisting Officer Young in prepping him for the -- to
get the pads on.  Richie had a lot of clothes on,
shirts, jackets.  I can't remember specifically, but
Officer Young had a knife, and we cut all of his
clothing open so we would have access to perform chest
compressions.

Q.    And then what else did you do?  Did you
perform chest compressions?

A.    We did not.

Q.    Why not?

A.    About the same time that we applied the pads
the ambulance was on scene.

Q.    Did you all take the pads off or leave them
on?

A.    They were left on.

Q.    Did anybody ever do mouth-to-mouth?

A.    I don't know.

Q.    Did you order anybody to do mouth-to-mouth?

A.    I did not.

Q.    Are the officers trained to do

1                    SERGEANT THOMAS FROST

2    mouth-to-mouth?

3         A.    Yes.

4         Q.    And what is the purpose of mouth-to-mouth?

5         A.    To provide air for the patient.

6         Q.    When you're doing your job do you rely on

7    your training?

8         A.    Yes.

9         Q.    And you follow the training that you

10   receive, right?

11        A.    Yes.

12        Q.    And your training is sometimes in a

13   classroom, correct?

14        A.    Yes.

15        Q.    Sometimes you get materials to read?

16        A.    Yes.

17        Q.    And part of your job is to learn the

18   department's processes and procedures, right?

19        A.    Yes.

20        Q.    And you follow department process and

21   procedure in doing your job, right?

22        A.    Yes.

23        Q.    And you received training on deescalation?

24        A.    Yes.

25        Q.    How many times have you received

1           SERGEANT THOMAS FROST

2  deescalation training?

3           A.   I don't recall.

4           Q.   And what's CIT training?

5           A.   It stands for Crisis Intervention Team.

6           Q.   Or Crisis Intervention Training?  Crisis

7  Intervention Training?

8           A.   Yes.

9           Q.   And you've received this CIT training,

10  right?

11          A.   Yes.

12          Q.   How many times?

13          A.   Twice.

14          Q.   And you're CIT certified, right?

15          A.   Yes.

16          Q.   When did you become CIT certified?

17          A.   I don't recall.

18          Q.   More than five years ago?

19          A.   I don't recall.

20          Q.   And is that a designation that you

21  periodically have to I guess get recertified as a CIT

22  trainer?

23          A.   They provide updates occasionally.

24          Q.   And so you avail yourself of whatever there

25  is, right?

SERGEANT THOMAS FROST

1

2          A.    Yes.

3          Q.    Were you the only CIT trained officer at the

4    scene?

5          A.    I don't know.

6          Q.    Do you have any information to suggest that

7    any of the other three officers were CIT trained?

8          A.    I don't know.

9          Q.    Tell me what the CIT officer does versus

10   somebody who's not CIT trained?

11               MR. BRUNNER:   In what situation?

12         Q.    (By Mr. Henderson) In general.

13         A.    In general they learn how to recognize, as

14   we discussed earlier, some of the issues associated with

15   mental health patients, whether it be autism, knowing

16   there's certain parameters.  A lot of times there's

17   specific things that you can do and can't do that might

18   cause issues for a patient with autism.

19               Other things just as far as how to talk to

20   people and how to deescalate their anger or their

21   frustration.

22         Q.    Did you put your CIT training to use on the

23   -- on the day of the incident?

24         A.    No.

25         Q.    Why not?

SERGEANT THOMAS FROST

1

2      A.    At the time I arrived with Richard he was

3  beyond conversation.

4      Q.    Any other reasons why you didn't use it that

5  day?

6      A.    No.

7      Q.    When you approached Richie did you consider

8  at any time that he might have been experiencing excited

9  delirium?

10     A.    Could you repeat that again.

11     Q.    When you approached Richie that day did at

12  any time you consider whether he was experiencing

13  excited delirium?

14     A.    I did not.

15     Q.    So you didn't consider it one way or the

16  other?

17     A.    I did not.

18     Q.    Based on your training tell me what are the

19  basic hallmarks you would use when you're approaching a

20  person who has mental health issues who's talking

21  gibberish.

22     A.    What would -- the techniques that I would

23  use?

24     Q.    Yes.

25     A.    I would use a very calm, soothing voice.  I

1           SERGEANT THOMAS FROST

2  would keep a distance so I didn't make them feel

3  threatened and attempt to get them to listen to my voice

4  only.

5           Q.   Anything else?

6           A.   Not that I can think of.

7           Q.   And was it within your power to tell the

8  officers not to approach Richie until the ambulance

9  arrived?

10          A.   They were already approached upon my

11 arrival.

12          Q.   Okay.  Did you have the ability to tell them

13 to back off?

14          A.   Are you referring to on Sixth Street south

15 of Green?

16          Q.   Yes.  You said they had already approach

17 him.  So --

18          A.   Yes.

19          Q.   -- you could have told them hey, guys, back

20 up?

21          A.   I could have, yes.

22          Q.   And you didn't do that, did you?

23          A.   No.

24               MR. BRUNNER:  Are we talking about at the

25 point where just Wilson was talking to him?

1                    SERGEANT THOMAS FROST

2                    MR. HENDERSON:  No.  I'm talking about when

3      they're all physically on him.  You could tell them --

4                    THE WITNESS:  I just asked you --

5                    MR. BRUNNER:  In the walkway?  I'm sorry.

6      I'm just trying to narrow it down on what time.

7                    Q.   (By Mr. Henderson)  In -- in the alley you

8      could have told them to back up, right?

9                    A.   I just asked you if we were talking about

10     Sixth and Green or if we were talking about the alley,

11     and you said yes, Sixth and Green.

12                   Q.   Well, we'll talk about both.

13                   A.   Okay.

14                   Q.   At Sixth and Green you could have told them

15     back up, let's wait until the ambulance gets here,

16     right?

17                   A.   Yes.

18                   Q.   And in the alley once they were engaged with

19     him on the ground you could have said hey, back up,

20     let's wait until the ambulance gets here, right?

21                   A.   No.  Because they have already detained him.

22                   Q.   Well, but you can tell them to let him go,

23     get up until the ambulance comes, right?

24                   A.   Yes.

25                   Q.   Prior to the incident when was the last time

SERGEANT THOMAS FROST

1

2  you had received use of force training?

3         A.   I don't know.

4         Q.   How often do you -- did you receive use of

5  force training prior to the incident; once a year, every

6  other year?

7         A.   I believe we're mandated once a year.

8         Q.   Were there cameras in your squad car?

9         A.   Yes.

10         Q.   As far as you know are there cameras in all

11  cars?

12         A.   All patrol cars, yes.

13         Q.   And what's the purpose of the car?

14         A.   The purpose of the car?

15         Q.   The purpose of the camera in the car.

16         A.   To record primarily traffic stops or

17  encounters with citizens in the community.

18         Q.   Were the -- were any cameras in your car or

19  any of the other cars at the scene pointed towards how

20  the officers were interacting with Richie?

21         A.   I don't know.

22         Q.   Was your car pointed in such a way where the

23  camera could record how the officers were interacting

24  with Richie?

25         A.   My camera was pointed in that direction, but

SERGEANT THOMAS FROST

1
2    I was not out of the car yet to where I was going to

3    activate it.

4        Q.   Did you ever activate the camera in your

5    car?

6        A.   Yes.

7        Q.   Okay.  Did it capture the interaction

8    between the officers and Richie?

9        A.   Once I arrived in the alleyway it captured

10   the audio but not the video.

11       Q.   Why didn't it get the video?

12       A.   Because they were behind a wall that was not

13   viewable from where my car had to be parked.

14       Q.   Did you have any trouble locating the

15   location of where Richie was?

16       A.   Yes.

17       Q.   Okay.  Why so?

18       A.   That specific areas there's some nooks and

19   crannies, some walkways that I was not familiar with.  I

20   wasn't really familiar with that one.  So it was kind of

21   a struggle to determine where they -- the officers

22   finally ended up.

23       Q.   So you're more familiar with the -- for lack

24   of a better term -- nooks and crannies in the north

25   district, right?

SERGEANT THOMAS FROST

1

2      A.   I'm not more familiar with -- yeah.  Yes.

3      Q.   You're less familiar with the nooks and

4 crannies in the south district, right?

5      A.   Yes.

6      Q.   You said that Turner was resistant, correct?

7      A.   Yes.

8      Q.   It is possible that he was just trying to

9 get them off of him so he could breathe?

10          MR. BRUNNER:  Objection as to foundation and

11 form.  Calls for speculation.

12          MR. HENDERSON:  You can answer.  You saw it.

13 No.  I'm just asking what you saw.

14          THE WITNESS:  I don't know.

15      Q.   (By Mr. Henderson) Well, you made a

16 determination that he was resisting, right?

17      A.   Yes.

18      Q.   Based on what you saw, right?

19      A.   Yes.

20      Q.   So now I'm asking you in hindsight is it

21 possible that he was trying to get them off of him so he

22 could breathe?

23      A.   I don't know.

24      Q.   Why don't you know?

25      A.   Because by the time I got there and saw

SERGEANT THOMAS FROST

1  Richard and I tried to talk to him -- I just said -- as

2  I walked up as is recorded on my video I said hey,

3  Richie, how you doing?  And you could hear him grunting

4  on my audio or talking in a very bizarre voice.  I

5  wouldn't even describe it as talking.

6           And by the time I got up there he was not

7  really communicating very well.  He was just making

8  noises.

9           Q.   Were you trained to use a hobble?

10          A.   Yes.

11          Q.   And hobbles are authorized equipment

12  provided by the department?

13          A.   Yes.

14          Q.   So when you approached the officers Richie

15  was on his stomach, right --

16          A.   Yes.

17          Q.   -- in the alley?  So you couldn't tell at

18  that point in time whether Richie was breathing or not,

19  could you?

20          A.    I could hear him yelling and you could hear

21  it.  If you would watch my video, you can hear him

22  yelling.  So I would assume that he was able to breathe.

23          Q.   Who first noticed that Richie was not

24  breathing?

SERGEANT THOMAS FROST

1

2      A.   I can't speak to who noticed that first.

3  But as soon as I started assessing the situation I

4  noticed that his -- his back was not rising and falling.

5      Q.   This was after he was turned over?

6      A.   No.  This was as soon as I put the hobble on

7  and I'm looking to make sure everybody is okay.  I

8  immediately noticed that Richard's shoulder blades

9  aren't rising up and down breathing.

10      Q.   And this is when he was on his stomach,

11  right?

12      A.   Correct.

13      Q.   And at that point in time he's wearing the

14  handcuffs and the hobble, right?

15      A.   Yes.

16      Q.   Did anybody do CPR on him?

17      A.   The officers did not.

18      Q.   The ambulance personnel did CPR?

19      A.   I believe so.

20      Q.   Was Turner wearing the handcuffs and the

21  hobble when they did the CPR?

22      A.   No.

23      Q.   They had been removed?

24      A.   Yes.

25      Q.   Who removed the handcuffs?

1                  SERGEANT THOMAS FROST

2          A.    I don't know.

3          Q.    Who removed the hobble?

4          A.    I would have to refer to my report.

5          Q.    Did anybody do chest compressions and

6    breathing?  Was that the ambulance personnel?

7          A.    I believe they did.

8          Q.    Were the cuffs off by the time Turner was

9    put in the ambulance?

10         A.    Yes.

11         Q.    And was the hobble off by the time he was

12   placed in the ambulance?

13         A.    Yes.

14         Q.    Did the ambulance have trouble finding the

15   scene if you know?

16         A.    No.

17         Q.    You don't know or it didn't?

18         A.    I don't know.

19         Q.    You told me earlier that Wilson and Talbott

20   went to get the AED; is that right?

21         A.    I believe so.

22         Q.    Why did two of them have to go get it?

23         A.    I don't know.

24         Q.    Did you tell two of them to get it?

25         A.    I don't know.

SERGEANT THOMAS FROST

1

2      Q.   Does it take two people to get it?

3      A.   No.

4      Q.   So you looked at the report that you

5 completed relating to Richie's passing, correct?  You

6 told me you looked at it yesterday?

7      A.   Yes.

8      Q.   And there's a line in your report that says

9 in regards to his actions and behaviors on this day they

10 appear to be a mirror image from April.

11           Do you remember saying that or writing that

12 down?

13      A.   Yes.

14      Q.   Okay.  So he was taken to a hospital in

15 April of 2016, right?

16      A.   Yes.

17      Q.   What was different?  Since you're saying it

18 was the exact same thing, you say mirror image.  In

19 regards to his actions and behaviors on this day they

20 appear to be a mirror image from April, right?

21      A.   Uh-huh.  Yes.

22      Q.   In April he didn't die, right?

23      A.   Correct.

24      Q.   And in November he did, right?

25      A.   Yes.

1                    SERGEANT THOMAS FROST

2          Q.    What was different?

3          A.    He didn't run in April.

4          Q.    Well, you said it was a mirror image.    In

5    regards to his actions and behaviors on this day they

6    appear to be a mirror image from April.    You wrote that,

7    right?

8          A.    Yeah.

9          Q.    So his behavior was virtually the same, it

10   was a mirror image, right?

11         A.    Yes.

12         Q.    So did the officers do something different

13   in April versus November?

14         A.    Yes.

15         Q.    What was -- what did the officers do

16   differently?

17         A.    They had to chase Richard.

18         Q.    Why did they have to chase him in November,

19   but they didn't chase him in April?

20         A.    Because in April they were able to coax him

21   into an ambulance.

22         Q.    They coaxed him in?

23         A.    Yes.

24         Q.    Okay.    Did they try to coax him into the

25   ambulance in November?

SERGEANT THOMAS FROST

A.   The ambulance was not on scene.

Q.   So they didn't try to coax him into an ambulance, right?

A.   No.

Q.   So in April they waited for the ambulance to get there, right?

A.   They approached him and started speaking with Richard in April just like they did in November.

Q.   And then in --

A.   And the ambulance responded, and Richard by that time was coaxed into the ambulance and went with them.

Q.   So in April the officers waited for the ambulance to arrive, right?

A.   I don't get your point.

Q.   I'm just asking a question.  In April they waited for the ambulance to arrive, right?

A.   Just like they did in November.

Q.   Well, no.  You said they coaxed him into an ambulance in April, correct?

A.   Yes.

Q.   But they didn't try to coax him into an ambulance in November, did they?

A.   Richard didn't afford them the opportunity

1          SERGEANT THOMAS FROST

2    to get into the ambulance.

3          Q.   So is it Richard didn't afford them the

4    opportunity, or is it the officers didn't wait?

5          A.   Richard didn't afford them the opportunity

6    because he ran.

7          Q.   Who's in control of the situation, the

8    officers or Richard?

9          A.   I would say it's a negotiation at that

10   point.

11         Q.   Who's got the stronger bargaining position,

12   the officers or Richard?

13              MR. BRUNNER:  Objection to form.

14              MR. HENDERSON:  You can answer.

15              THE WITNESS:  I don't believe Richard was of

16   the mind-set that he knew what he was doing.

17         Q.   (By Mr. Henderson)  In April or November?

18         A.   In -- in either.

19         Q.   Okay.  Was Wilson involved in the incident

20   in April?

21         A.   I don't know.

22         Q.   Was Talbott involved in the incident in

23   April?

24         A.   I don't know.

25         Q.   Was Young involved in the incident in April?

SERGEANT THOMAS FROST

1

2        A.    I don't know.

3        Q.    You were involved in the incident in April?

4        A.    Yes.

5        Q.    And you wrote in your report I grabbed the

6   hobble from the glove compartment of my squad, I walked

7   to their location, and saw he was already double cuffed

8   and was face down on the concrete path.  That's what you

9   wrote in your report, isn't it?

10       A.    Yes.

11       Q.    Now, in your report it says I directed

12  Wilson and Talbott to go to my squad and get the AED.

13             Do you recall writing that in your report?

14       A.    I don't recall that.

15       Q.    Okay.  So this is what's in your report.

16  Working upon the assumption that what you wrote is true,

17  why did you tell them both to go get the AED?

18       A.    I didn't direct it at both of them.

19       Q.    Let me show you your report.

20       A.    Let me explain it to you.

21       Q.    Okay.  I'm sorry.

22       A.    They're both up.  We're trying to help

23  Richard, and I say go to my car, get my AED.  The mere

24  fact they both take off running to my car is what I'm

25  trying to -- to document.  I probably didn't word it as

1                    SERGEANT THOMAS FROST

2     best suited.

3                    MR. HENDERSON:  Okay.  You want to take a

4     break?  I don't have too much more.

5                              (Recess taken.)

6       (Frost Exhibit No. 3 was marked for identification.)

7            Q.   (By Mr. Henderson)  Sergeant, just tell me

8     what's reflected by Deposition Exhibit Number 3.

9            A.   That is a card I carry in my pocket for

10    officer involved shootings, questions to ask them.

11                   MR. HENDERSON:  Perfect.  Okay.  Thank you.

12    And then I'm going to hand the court reporter what I'm

13    going to ask her to mark as Frost 4, and it's Bates

14    stamps Defendant's 1975, 76, 77, 78, 79, 80, 81, and 82.

15    Please mark that Frost 4.

16      (Frost Exhibit No. 4 was marked for identification.)

17           Q.   (By Mr. Henderson) Sergeant, why don't you

18    take a look at Frost 4.  And after you've had a chance

19    to look at it let me know.

20                   Have you had a chance to look at it?

21    A.   Yes.

22           Q.   A couple of questions.  Number one can you

23    tell me -- and as it relates to Frost Exhibit Number

24    74 --

25                   MR. BRUNNER:  Number 4.

1          SERGEANT THOMAS FROST

2               MR. HENDERSON:  I'm sorry.  Frost Exhibit

3     Number 4.  Did I not say Number 4?

4               MR. BRUNNER:  You said 74.

5          Q.   (By Mr. Henderson)  It's getting late in the

6     day.  I'm ready to go.  He's even more ready to go.

7               Can you tell me who the involved officers

8     were on Frost Exhibit Number 4.

9          A.   I can tell you Officer Leibach wrote the

10    report.

11         Q.   Spell the last name for me.

12         A.   Sure.  L-E-I-B-A-C-H.

13         Q.   Okay.

14         A.   Officer Leibach is the one who wrote the

15    report.

16         Q.   Okay.  And you were involved in that

17    incident though, correct?

18         A.   Yes.

19         Q.   All right.  The next question, can you tell

20    me who else was involved that particular day?

21         A.   Yes.

22         Q.   Who else?

23         A.   I believe it was Officer Karbach that

24    responded.

25         Q.   Spell the last name for me.

1                    SERGEANT THOMAS FROST

2          A.    K-A-R-B-A-C-H.

3          Q.    Okay.

4          A.    It appears Officer McDonald was also

5    assigned, M-C-D-O-N-A-L-D.

6          Q.    Anybody else?  So four officers, correct?

7          A.    Correct.

8          Q.    I'm sorry.  You and three officers, correct?

9          A.    Correct.

10         Q.    And where was the location?

11         A.    600 East Green.

12         Q.    The same place?

13         A.    The same general area, not the same exact

14   location.

15         Q.    Okay.  So that particular day you were also

16   in the south district?

17         A.    Yes.

18         Q.    Can you tell me why on that day you were in

19   the south district?

20         A.    As a rule if that district sergeant is not

21   working that day or if he's tied up on another call, we

22   -- generally sergeants will bounce all over the city to

23   assist officers with their call.

24               Just because I'm assigned to the north

25   district doesn't mean I'm not limited to go everywhere

SERGEANT THOMAS FROST

1  in the city to help officers with their calls, and we

2  frequently do that.

3      Q.   Do you remember what happened on that

4  particular day, why you were in the south district?

5      A.   To assist officers with this call.

6      Q.   Right.  But do you recall why the sergeant

7  who was assigned to the south district wasn't there that

8  day?

9      A.   I would have no idea.

10     Q.   Okay.  And the date of the incident was

11 when?

12     A.   April 5th, 2016.

13     Q.   And when was that report filled out?

14     A.   I don't know when the officer wrote it.  I

15 can tell you the time of the dispatch.

16     Q.   So the incident was on April 5?

17     A.   Uh-huh.  Yes.

18     Q.   And then look on Page 1976.  Is that the

19 officer who submitted the report?

20     A.   Yes.

21     Q.   And what's his name?

22     A.   Officer Leibach.

23     Q.   And what's the date?

24     A.   April 5th.

SERGEANT THOMAS FROST

1

2      Q.   So he submitted the report on the same day

3   that it happened, right?

4      A.   Yes.

5      Q.   Okay.  And it was approved on the same day

6   that it happened, right?

7      A.   Yes.

8      Q.   And who approved it?

9      A.   Lieutenant Rea, spelled R-E-A.

10      Q.   All right.  As it relates to the April

11   incident were there -- was there a hobble used?

12      A.   No.

13      Q.   Okay.  As it relates to the incident in

14   April were there double handcuffs used?

15      A.   No.

16      Q.   Different involved officers, right?

17      A.   Yes.

18      Q.   I asked you earlier about a video, and I

19   think you told me you had not seen one.  You want to

20   change your answer to that or amend it or update it?

21           MR. BRUNNER:  Well, just for the record I

22   think when we were on a break I represented to you that

23   I wasn't sure the call -- the question asked

24   specifically about watching a video other than on the

25   day before today.  So I wanted to try and help clarify

SERGEANT THOMAS FROST

1   that.

2

3         Q.   (By Mr. Henderson)  Okay.  Did you review a

4   video in connection with preparing for your deposition?

5         A.   Yes.

6         Q.   When did you do that?

7         A.   Back in September.

8         Q.   Of 20 --

9         A.   '18.

10         Q.   -- 18.  Okay.  Why did you review the video

11   then?

12         A.   To prepare myself for today.

13         Q.   And was anybody with you when you reviewed

14   it?

15         A.   Yes.

16         Q.   Who?

17         A.   Dave Krchak and Susan.

18         Q.   Okay.  And where did that happen?

19         A.   At the city building in a conference room.

20         Q.   Okay.  And who else was there besides the

21   three -- you and the two people you just mentioned?

22         A.   No one.

23         Q.   Do you know whether anybody else reviewed

24   the video?

25         A.   I do not know.

SERGEANT THOMAS FROST

1

2      Q.   How long were you with Mr. Krchak and Susan?

3      A.   I'm going to guess an hour.

4      Q.   Did you go over documents that day?

5      A.   No.

6      Q.   Okay.  So you spent an hour with them.  And

7 were you preparing for your deposition?

8      A.   Yes.

9      Q.   Okay.  So besides looking at the video what

10 else did you do to prepare for your deposition that day?

11      A.   That day all we did was review video and

12 discuss it.

13      Q.   Okay.  Besides yesterday and the time you

14 met with Mr. Krchak and Susan in September did you meet

15 with anybody to prepare for your deposition at any other

16 time?

17      A.   No, sir.

18      Q.   So just those two times?

19      A.   Yes, sir.

20      Q.   There was a double handcuff used in the

21 November 2016 incident, correct?

22      A.   I believe so, yes.

23      Q.   No handcuffs at all in the April 2016

24 incident, correct?

25      A.   No handcuffs in April.

SERGEANT THOMAS FROST

1

2      Q.   Now, in the April incident the report says

3  that Richie showed his penis to a lady, didn't it?

4      A.   It did.

5      Q.   As best you recall there was no report that

6  Richard showed his penis to anybody in November of 2016,

7  did he?

8      A.   As far as I know, no.

9           MR. HENDERSON:  I don't think I have any

10 further questions.

11           MR. BRUNNER:  No questions.

12           MR. HENDERSON:  Officer, you have the right

13 to review the transcript and reserve your signature or

14 waive it.  And I'm sure your lawyer will advise you what

15 to do.

16           MR. BRUNNER:  We've discussed it.  You have

17 the right to decide if you want to review it or not.

18           What did you decide?

19           THE WITNESS:  I'll review it.

20           (The deposition was concluded at 4:40 p.m.)

21

22

23

24

25

1              CERTIFICATE OF REPORTER

2

3          I, Sandra J. Rynders, a Certified Shorthand

4    Reporter (IL), do hereby certify that the witness whose

5    testimony appears in the foregoing deposition was duly

6    sworn by me pursuant to 5 ILCS 255/2 (from Ch. 101,

7    par.2); that the testimony of said witness was taken by

8    me to the best of my ability and thereafter reduced to

9    typewriting under my direction; that I am neither

10   counsel for, related to, nor employed by any of the

11   parties to the action in which this deposition was

12   taken, and further that I am not a relative or employee

13   of any attorney or counsel employed by the parties

14   thereto, nor financially or otherwise interested in the

15   outcome of the action.

16   Dated: October 9, 2018

17

18

19

                    _____

20                          Sandra J. Rynders

21

22

23

24

25