1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE CENTRAL DISTRICT OF ILLINOIS

3           CHANDRA TURNER, as Special
            Administrator of the Estate of RICHARD
4           TURNER, deceased, and CHANDRA TURNER,
            individually,
5
                         Plaintiff,
6
            vs.                        Case No. 17 CV 2261
7
            CITY OF CHAMPAIGN, a municipal
8           corporation, CHAMPAIGN POLICE
            OFFICER YOUNG; CHAMPAIGN POLICE
9           OFFICER WILSON; CHAMPAIGN POLICE
            OFFICER TALBOTT; CHAMPAIGN POLICE
10          SERGEANT FROST,

11                       Defendants.

12                                              /

13

14

15   VIDEOCONFERENCE DEPOSITION OF GARY M. VILKE, M.D.

16          Taken at San Diego, California

17              April 22, 2019

18

19

20
            Reported by Dana E. Simon - CSR
21          Certificate No. 12683

22

23

24                                   **Exhibit 11**

25

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    2

```
1                        I N D E X

2    VIDEOCONFERENCE DEPOSITION OF GARY M. VILKE, M.D.
     APRIL 22, 2019
3

4    EXAMINATION                                    PAGE

5    BY MR. BROOKS                                  4

6    BY MR. KRCHAK                                  85

7

8                    INDEX OF EXHIBITS

9    EXHIBIT 1      Autopsy Report of Richard Turner    20

10   EXHIBIT 2      Fee Schedule for Dr. Gary M. Vilke;  11
                    Bates Defendants 7096 - 7099
11
     EXHIBIT 3      Documents provided for review;       --
12                  Bates Defendants 7102 - 7103
                    (Not marked in deposition)
13
     EXHIBIT 4      Report prepared by Gary M. Vilke,    14
14                  M.D.; Bates Defendants 7110 - 7124

15   EXHIBIT 5      Appendix B, Testimony for Last       4
                    4 Years; Bates Defendants 7216 -
16                  7225

17   EXHIBIT 6      Curriculum Vitae for Gary M.         85
                    Vilke, M.D., Bates Defendants
18                  7125 - 7215

19

20

21

22

23

24   Witness Signature Page                         88

25   Certificate/Stipulation page                   89
```

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    3

```
 1              On Monday, April 22, 2019, commencing at the
 2   hour of 2:18 p.m., at 501 West Broadway, Suite 1330, in
 3   the City of San Diego, County of San Diego, State of
 4   California, before me, Dana E. Simon, Certified
 5   Shorthand Reporter in and for the State of California,
 6   personally appeared:
 7                       GARY M. VILKE, M.D.,
 8   called as a witness by the plaintiffs, who, being by me
 9   first duly sworn, was thereupon examined and testified
10   in said cause:
11                  A P P E A R A N C E S
12   FOR THE PLAINTIFFS:
13       HENDERSON PARKS
         BY:  MELVIN BROOKS, ESQ.
14       (Appearing by videoconference)
         140 South Dearborn Street, Suite 1020
15       Chicago, Illinois 60603
         (312) 262-2905
16
     FOR THE DEFENDANTS:
17
         THOMAS, MAMER & HAUGHEY, LLP
18       BY:  DAVID E. KRCHAK, ESQ.
         P.O. Box 560
19       30 East Main Street, 5th Floor
         Champaign, Illinois 61824-0560
20       (217) 351-1500
         krchak@tmh-law.com
21
22
23
24
25
```

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    4

1          SAN DIEGO, CALIFORNIA; APRIL 22, 2019; 2:18 P.M.

2

3                   GARY M. VILKE, M.D.,

4      having been first duly sworn, testified as follows:

5

6                        EXAMINATION

7    BY MR. BROOKS:

8        Q    Doctor, would you state your full name for the

9    court reporter and spell your last name.

10       A    Sure.  Gary Michael Vilke, V-as-in-Victor,

11   i-l-k-e.

12       Q    The record should reflect that this is the

13   discovery deposition of Dr. Michael Vilke taken pursuant

14   to the Federal Rules of Civil Procedure.

15            Doctor, I received a fair amount of materials

16   concerning your background, and one of the things I

17   received is a list of testimony that you had given, I

18   believe, over the last four years starting in May of

19   2015.  Have you had a chance to review that by chance?

20       A    I didn't review it particularly for the

21   deposition, but I prepared it obviously.

22            MR. BROOKS:  Ms. Reporter, could you hand the

23   witness what should be marked as Deposition Exhibit No.

24   5.

25            (Plaintiff's Exhibit No. 5 was marked.)

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    5

```
1    BY MR. BROOKS:
2         Q    Doctor, you have in front of you what has been
3    marked as deposition Exhibit No. 5?
4         A    Yes.
5         Q    That document basically comprises testimony
6    that you've given in the last four years whether by
7    deposition or in trial?
8         A    Correct.
9         Q    In terms of the cases that you may have been
10   retained on during that period of time going back to May
11   8, 2015, would this exhibit encompass all of those
12   matters, or is it just limited to testimony?
13        A    Just limited to testimony.
14        Q    Can you give me a sense of how many matters
15   you've been retained in from the standpoint of legal
16   consultation since May of 2015?
17        A    I'd have to estimate.  It's an estimate of, you
18   know, numbers of cases.  It's probably maybe half of
19   them go to deposition, something along those lines.  So
20   maybe -- you know, there may be twice that many cases
21   that I've been involved in at some level.  Hard to --
22   it's just an estimate.
23        Q    Sure.  In looking at Exhibit No. 5, there
24   appears to be 61 cases that are listed.  That's just my
25   count.  I might be off one or two.  But there's
```

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    6

1   approximately 61 cases.

2           Are you aware of that?

3       A    I didn't count them.  And if you're counting

4   trial and deposition, a lot of them that were deposed

5   went to trial.  So it would be a repeat of the case.  If

6   you're going completely through it to get to the 61,

7   there's probably some redundancy.

8       Q    All right.  So you're saying in some of the

9   matters that are listed, you would list deposition

10  testimony separate from trial testimony?

11      A    Correct.  And if I had to go back for a second

12  trial, that would be listed a second time.  So at least

13  one case that was trial twice.  And so it would be the

14  same case, but two separate entries into this list.

15      Q    But for the most part, you've listed individual

16  cases?

17      A    I mean, they're all individual cases.  But if I

18  had a deposition on one date and a trial on a different

19  date, they would both be listed separately.

20      Q    In looking at these cases it appears that --

21  and I'm going to use the number 61 in terms of the total

22  matters that are listed.

23          In terms of those 61 matters, it appears that

24  five of those matters you were retained by a plaintiff.

25  Is that a fair assessment?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    7

1      A    I haven't looked at it specifically.  But if

2  you're looking at the overall numbers there, I'd have to

3  look, but it's possible.  Sure.

4      Q    You would agree that most folks who retained

5  your service in legal matters, typically those

6  individuals are defendants in lawsuits, correct?

7      A    The majority of the cases that I do are

8  defendants' work, yes.

9      Q    And at least from my estimation, about

10  90 percent or more of the cases you've been retained in

11  in the last five years, you've actually testified on

12  behalf of the defendant, correct?

13      A    When testimony goes on, yes.  If you're using

14  61, it's probably a little high.  But 90 percent, 80 to

15  90 percent.  Something like that's probably fair.

16      Q    Without question, the majority of the

17  individuals who've retained you, they are not

18  plaintiffs.  They're not the injured parties, right?

19      A    The majority of the time I am retained by

20  defense, yes.

21      Q    In this particular case the firm that retains

22  you, have they ever retained you before?

23      A    Not to my knowledge, no.

24      Q    Do you know how it is that the firm came to

25  retain you in terms of getting knowledge of you?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    8

1      A    I don't know.  It may have been referral from
2  another law firm.  But I don't know specifically off the
3  top of my head.
4      Q    In the matters that are listed in Exhibit No.
5  5, those legal matters, can you tell me if in any of
6  those matters you were asked to offer an opinion
7  regarding cause of death?
8      A    Yes.  There are cases in which I was offering
9  opinion on cause of death.
10     Q    And can you point out specifically any of
11  those?
12     A    Sure.  Let's see, I think going through them,
13  Frederick Ronald Thomas versus the City of Fullerton.
14  And Bridget Wiseman versus City of Fullerton.  Basically
15  the same incident, different trials -- or different
16  depositions.  I apologize.  Russell versus City of Los
17  Angeles.  V.W. minor versus the City of Vallejo.  Aimee
18  Bevan versus Santa Fe County I think was a cause of
19  death, as well.
20          I think -- I can't remember if I was -- it
21  was -- I think Bordegaray versus the County of Santa
22  Barbara, I believe I was also giving opinions on cause
23  of death.  Donald Liess versus the City of Los Angeles.
24  Rose versus Coconino County, C-o-c-o-n-i-n-o, County.  I
25  think Marden versus Midland County.

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    9

1      Q     Doctor, let me stop you right there.  I believe

2  you're now on the third page that's listed on Exhibit

3  No. 5?

4      A     That is correct, yes.

5      Q     All right.  Of those cases you've just made

6  reference to, was cause of death a disputed issue?

7      A     I believe in some of them -- or the majority of

8  them probably was.

9      Q     When you were retained in this particular

10  case -- and I understand you were retained sometime in

11  December of 2018; is that right?

12      A     Sounds about right.

13      Q     When you were retained in this particular case,

14  were you contacted by telephone?

15      A     By telephone.

16      Q     In terms of someone reaching out to you to

17  discuss the case in some fashion.

18      A     Yeah.  There may have been an e-mail asking for

19  a telephone call or a call directly.  I don't know which

20  came first.  Or if there was an e-mail or not, but....

21      Q     Presuming you were contacted by e-mail, were

22  you told any -- in an e-mail anything specific about the

23  nature of the case?

24      A     I don't remember any e-mails with any details

25  of the case.  My e-mails are very generic about dates

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                         10

1   and times for calls and things like that.  But not case

2   specific materials.

3        Q    So at some point you're contacted or at least

4   there's a telephone communication, right?

5        A    I know of a telephone conversation, yes.

6        Q    Now, that telephone conversation, did it take

7   place in December or before that or after that?  And I'm

8   talking about December of 2018, of course.

9        A    Sure.  I'll be honest, I don't have my phone

10  records with me, so I don't know exactly when it was.

11  But it was -- you know, it was basically around the time

12  I was retained.  So I think it was back in December, but

13  I don't remember specifically.

14       Q    Do you know who you spoke with?

15       A    Is it Justin Hopner or --

16            MR. KRCHAK:  Brunner.

17            THE WITNESS:  Brunner, yeah.  Thank you.

18  Justin Brunner was the one I spoke with first.

19  BY MR. BROOKS:

20       Q    That's an attorney?

21       A    Correct.

22       Q    When you spoke with Mr. Brunner, what did he

23  tell you in reference to this particular matter that he

24  was seeking to retain you?

25       A    As far as details of the phone call, I don't

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    11

1   remember the specifics.  But they wanted me to review

2   the case with regards to restraint and sort of cause of

3   death concerns.  And I don't remember if it was on the

4   phone call or subsequent phone calls after I reviewed

5   the material.  But basically looking at the events.  Was

6   there a possibility of asphyxiation or some other cause

7   of death that may have been involved with this?  Sort of

8   a 10,000 foot view of that.

9        Q    Prior to your receiving any materials

10  concerning this matter, whether police report, autopsy

11  report, anything of that nature, do you recall a more

12  specific conversation with details about Mr. Turner, his

13  medical condition, things of that nature?

14       A    I don't, no.

15            MR. BROOKS:  Mr. Reporter, would you show the

16  Doctor what has been marked as Deposition Exhibit No. 2.

17            (Exhibit No. 2 was marked.)

18  BY MR. BROOKS:

19       Q    Dr. Vilke, you have in front of you what has

20  been marked as Deposition Exhibit No. 2.  I only want to

21  focus on the first page.  In fact, Exhibit 2 should have

22  been limited to the first page, which is your fee

23  schedule.

24       A    Okay.

25       Q    Do you see that?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    12

1        A     I do.

2        Q     Is that fee schedule currently accurate in

3   terms of what you charge for legal matters of this

4   nature when you're retained?

5        A     Yes, it is.

6        Q     About how many hours do you believe you've put

7   into this case prior to sitting for this deposition?

8        A     I believe I've billed about 22 or 23 hours of

9   material review and report writing.  And I've got a

10  handful of more hours in preparation for the deposition.

11       Q     Okay.  So if I understand things correctly, you

12  previously submitted an invoice in this matter to

13  defense counsel?

14       A     Yes.

15       Q     I don't have it handy, but I understand it's

16  somewhere above $11,000?

17       A     Yeah.  It's between 10 and 12.  I don't

18  remember exactly what that was, but somewhere in that

19  range.

20       Q     So in addition to the hours that you billed at

21  that particular time that prior invoice was submitted,

22  you believe you have two additional hours as far as

23  preparation in anticipation of this deposition?

24       A     Probably closer to three or four hours.

25       Q     Did you meet with defense counsel today?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                     13

1      A    Just five minutes, ten minutes before the video

2  feed was being hooked up.

3      Q    When was the last time you met with defense

4  counsel?

5      A    I never met with defense counsel physically.

6      Q    I take it you've had telephone conversations,

7  though, right?

8      A    Correct.  I may have talked with him, but I

9  haven't met with him, yeah.

10      Q    Have you had a conversation with defense

11  counsel prior to today in preparation for the

12  deposition?

13      A    Yes.

14      Q    When was that?

15      A    I think it was last -- it was last week.  I

16  think it was Thursday, if I remember correctly.

17      Q    Did you call defense counsel or did he call

18  you?

19      A    Oh, geez, I don't remember who initiated the

20  call, to be honest.  I'm mean, I'm not sure who started

21  the call.

22      Q    All right.  Can you give me a sense of how long

23  the conversation lasted?

24      A    It was about 15 minutes or so.

25      Q    And tell me, Doctor, the best as you recall

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    14

1   what defense counsel said to you and what you said to

2   defense counsel?

3       A    Basically whatever the deposition notice

4   confirmed.  It wasn't a videotaped deposition, so I

5   didn't have to put a tie on for you.

6       Q    Right.

7       A    Went over some of the -- in my report a little

8   bit, just some of the basics of my report.  And not a

9   whole lot more that I recall specifically.

10      Q    The portions of your report which you went

11  over, can you tell me what portions of the report were

12  specifically discussed at that time?

13      A    The portions more about the position in the

14  restraint and a little bit about the cause of death

15  aspect of things.  The cardiomyopathy.

16          MR. BROOKS:  Ms. Reporter, can you show the

17  doctor or hand to the doctor what has been marked as

18  Deposition Exhibit No. 4.

19          (Plaintiff's Exhibit No. 4 was marked.)

20  BY MR. BROOKS:

21      Q    Okay.  Doctor, Exhibit No. 4, is that the

22  report that you prepared in connection with this matter?

23      A    Yes.  This is the report absent the

24  attachments, which are just the logistical stuff with

25  the Rule 26 formatting.

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                          15

1      Q     Well, the report itself should be comprised of

2   15 pages?

3      A     Yes.

4      Q     All right.  And so in the report you identified

5   the materials that you had reviewed for purposes of

6   preparing the report?

7      A     Correct.

8      Q     You identify on pages 2 and 3 a total of four

9   depositions.  Do you see that?  Probably at the bottom

10  of page 3 going -- I'm sorry -- page 2 and carrying over

11  to page 3.

12     A     That's what I see as well, yes.

13     Q     In terms of deposition testimony that you

14  reviewed and considered in preparing your report as of

15  March 20th, 2019, that was the extent of the deposition

16  testimony you reviewed, right?

17     A     The best I recall, yes.

18     Q     Doctor, I just want to go back for a minute in

19  terms of your litigation consulting.  Of the litigation

20  consulting that you've done since 2015, let's say in law

21  enforcement matters, is it fair to say that more than

22  90 percent of the time when law enforcement is involved,

23  you testify on behalf of law enforcement?

24     A     That's probably a fair assessment of it.  Sure.

25     Q     Could it be a little higher than that?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    16

1      A    Could be.  Could be a little higher than that.

2   I'd have to look specifically.  But it's above

3   90 percent.

4      Q    By the way, Doctor, how long have you been

5   doing legal consulting of this nature or litigation

6   consulting?

7      A    My first litigation consultant work or expert

8   testimony work was back in 1999.

9      Q    Can you tell me as best as you recall the

10  nature of the case?

11     A    Strange enough, I do remember that one.  It was

12  an epidural abscess medical malpractice case.

13     Q    All right.  Can you tell me as best as you

14  recall, when were you first retained for litigation

15  purposes by a law enforcement jurisdiction?

16     A    That I don't know.  It was probably the early

17  2000s, though.  I'd have to think.

18     Q    Doctor, in terms of income that you receive

19  from litigation consulting, can you tell me what

20  percentage of that comprises your income on a yearly

21  basis?

22     A    I think best estimate's about 20 percent of my

23  annual income comes from legal consulting.

24     Q    And has that been the case for the most part

25  since the early 2000s?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                           17

1      A    I think it's grown over the years.  But at
2   least for the last, you know, ten years it's probably
3   been around that.
4      Q    And so can you give us a sense of what the
5   range would be over that, let's say, last ten years in
6   terms of approximate amounts per year?
7      A    Yeah, I don't have that data.  You know,
8   everything goes to my tax person.  He puts it all
9   together.  But I don't actually keep total numbers per
10  year.
11     Q    Is that something you can, I take it, gather
12  easily from your accountant if you need to?
13     A    Actually, I don't know.  I know that they do
14  the deductions and all the stuff that goes with it
15  there.  So I don't know if he actually keeps track of
16  specifically what was legal consulting work and other
17  things.
18     Q    Can you give me any estimate of how much you
19  earned for legal consulting last year?
20     A    Yeah.  I don't know the hard numbers because of
21  all the parts that come out of it.  Travel comes out of
22  it and stuff like that, so....
23     Q    Are you able to give me any type of range?
24     A    I can't, no.  It would be a real, real guess
25  more than an estimate.

1      Q    Can you give us a general sense of how many

2  cases from an active standpoint you have in a given

3  year?

4      A    I probably pick up one to two cases a month.

5  Maybe a little bit more; maybe a little bit less

6  depending on the month.  Actively, there's probably

7  about 20 cases sitting out there at various stages that

8  are floating around.

9      Q    And it's fair to say that the majority of those

10  cases involve some law enforcement jurisdiction?

11      A    I'm not sure it's a true majority.  I do a fair

12  amount of med/mal work, as well, reviewing ER cases or

13  jail medical care cases.  But not necessarily law

14  enforcement involvement cases.  So it's in that range of

15  maybe 50/50 or so.  Something along those lines.

16      Q    When you do medical malpractice work, is it

17  typically for the defense as opposed to for the

18  plaintiff?

19      A    I'm about probably 75 for the defense; maybe

20  25 percent for the plaintiffs.  Something along those

21  lines.

22      Q    Doctor, one of the things you reviewed is the

23  autopsy report which was prepared in this matter,

24  correct?

25      A    I did, yes.

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    19

1       Q    Do you use the autopsy report as part of the

2    basis for your opinions in this case?

3       A    In part, sure.

4       Q    In terms of, let's say, opinions specifically

5    associated with cause of death, would you defer to a

6    forensic pathologist as opposed to an emergency medicine

7    physician like yourself?

8       A    For cause of death?

9       Q    Yeah.

10      A    I think it depends on the over -- the specific

11   cause of death, meaning as far as physiology goes and

12   process to dying.  I as an emergency physician have a

13   lot of experience with that because that's what I do.

14   People come in trying to die, and we try to diagnosis

15   what's -- what's trying to kill them and try to reverse

16   that.

17           So if it's a process in which somebody dies, I

18   feel very comfortable in certain aspects in opining

19   cause of death.  If it's something a little different

20   that requires anatomic findings at autopsy, then it

21   would be different, and then that might be where I would

22   defer at times to a medical examiner.

23      Q    All right.  Part of the determination that was

24   made by the pathologist in this case is due to an

25   anatomical analysis.  Would you agree with that?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    20

1      A    There is a definite anatomical analysis in this

2    case with regards to the heart, yes.

3           MR. BROOKS:  All right.  Ms. Reporter, could

4    you show the Doctor what has been marked as Deposition

5    Exhibit No. 1.

6           (Plaintiff's Exhibit No. 1 was marked.)

7           THE WITNESS:  All right.

8    BY MR. BROOKS:

9      Q    Doctor, Deposition Exhibit No. 1, that is the

10   autopsy that was performed by the coroner's office in

11   Champaign County, correct?

12     A    Correct.

13     Q    And just so I am correct, it looks like the

14   pathologist is Shiping Bao or -- B-a-o.  I'm not sure

15   how it's pronounced.  But actually if you look on page

16   2, there appears to be a signature.

17     A    There we go.  I skipped right past page 2.

18   Yes.  Shiping, S-h-i-p-i-n-g; last name Bao, B-a-o.

19     Q    I'm sorry.  Is it Bayo?  Or how do you

20   pronounce it?

21     A    I pronounce it Bow {phonetic.}

22     Q    Bao?

23     A    Yeah.

24     Q    All right.  Very good.  This is one of the

25   documents, as we discussed earlier, that you use as the

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    21

1   basis for your -- let me restate it.

2          Exhibit No. 1, the autopsy report, is part of

3   the basis that you used to formulate your opinions in

4   this case, right?

5       A    Well, it's part of the materials I reviewed in

6   totality to come to opinions.  A portion of the specific

7   findings on the autopsy are referred to in my report.

8    (Technical difficulties.  Discussion off the record.)

9   BY MR. BROOKS:

10      Q    All right.  Doctor, you were explaining to me

11  the terms of the basis for your opinions.  One of the

12  bases would conclude the autopsy report that was

13  prepared by Champaign County, correct?

14      A    Well, it's one of the materials I reviewed to

15  help formulate my opinions, and some of the details of

16  the autopsy are included in my report.

17      Q    All right.  Do you disagree with the conclusion

18  that the pathologist, the forensic pathologist, came up

19  with in terms of cause of death in this particular

20  matter?

21      A    In this matter they came to the conclusion of

22  the cardiac arrhythmia due to cardiomegaly with left

23  ventricular hypertrophy.  I don't disagree with that.

24      Q    On page 2 you also see where the forensic

25  pathologist makes reference to other significant

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                                    22

1    contributing factors leading to death, right?

2         A    I do see that, yes.

3         Q    Do you disagree with that?

4         A    I didn't say that.

5         Q    Well, that's my question:  Do you disagree with

6    that?

7         A    Oh, I'm sorry.  I thought you were making a

8    statement.  Sorry.  The cardiac and neuropsychological

9    toxicities of cocaine abuse, I don't disagree with that.

10   The morbid obesity, he had that.  I don't disagree

11   that's there.  The schizophrenia, we know he had that,

12   so it's part of it.

13         And then there's the physical and mental stress

14   during restraint by law enforcement, and that's sort of

15   an area of we know that there was a struggle and

16   resistance.  The restraint itself I don't think was

17   causing the issues.  I think it was the struggling and

18   resisting against the restraint that was more

19   contributory.  So I guess if there's going to be a

20   mincing of words or the way, you know, it depends on how

21   they define it.  That's where I would -- that would make

22   how the words are exactly written in there.

23         Q    All right.  The pathologist concludes that one

24   of the significant factors contributing, a contributor

25   to Mr. Turner's death, is the physical stress which

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                          23

1   occurred as a result of his restraint by law

2   enforcement, correct?

3           MR. KRCHAK:  Show my objection to attempting to

4   use the opinions of the medical examiner as expert

5   testimony.  But you may proceed and answer.

6   BY MR. BROOKS:

7       Q    You can answer the question.

8       A    Sure.

9       Q    You can answer, Doctor.

10      A    Okay.  Thank you.

11          MR. BROOKS:  Actually, can I just have it read

12  back just so there's no understanding?

13          (The record was read.)

14          THE WITNESS:  So the physical stress, it's --

15  he is struggling.  The restraint itself is not creating

16  a physical stress.  Actually it's containing him.  But

17  during the restraint, he was struggling and fighting

18  against that.  So in a sense, the way the words are

19  exactly written, unless they're interpreted, I wouldn't

20  agree with.  But I agree with the concept that during

21  his process of being restrained, he was struggling, and

22  that did put a physiologic physical stress to him.

23  BY MR. BROOKS:

24      Q    I understand your position, Doctor.  I'm only

25  asking whether or not the forensic pathologist concludes

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    24

1  that a significant factor contributing to Mr. Turner's

2  death was the physical stress that occurred as a result

3  of restraint by law enforcement.

4          Is that what the report says?

5          MR. KRCHAK:  Objection.  The report speaks for

6  itself.  But you may answer.

7  BY MR. BROOKS:

8      Q    You can answer it.

9      A    Sure.  The report says:  "Physical and mental

10 stress during restraint by law enforcement."

11     Q    All right.  So in addition to the physical

12 stress, one of the other factors, significant factors

13 that the forensic pathologist found as a contributor to

14 Mr. Turner's death is the mental stress that occurred as

15 a result of restraint by law enforcement, correct?

16     A    That's what they wrote there, yes.

17     Q    You say you disagree to some extent in terms of

18 how it's worded, correct?

19     A    Well, it depends what the wording is intending

20 to mean.  So mental stress during law enforcement, we

21 know that he has a history of schizophrenia.  Didn't

22 have any of his medications on there.  So any

23 physiologic changes in him or outside activities could

24 be causing him his own stress from the schizophrenia

25 component.  But there may be a mental component during

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                          25

1    the restraint, as well.  So I don't disagree with the

2    mental component because we don't know what's really

3    going on in his head.  So I'm not sure how to answer the

4    question about the mental part.

5         Q    All right.  So as far as the, let's say,

6    anatomical findings from the autopsy, we do know that

7    Mr. Turner has an enlarged heart, right?

8         A    We do, yes.

9         Q    Okay.  And that's cardiomegaly?

10        A    That's --

11        Q    Is that how you would --

12        A    I'm sorry.  Yes.  It's cardiomegaly yes.

13        Q    All right.  Now, someone who has cardiomegaly,

14   potentially an enlarged heart, are they more susceptible

15   to cardiac arrest?

16        A    Compared to somebody without an enlarged heart,

17   yes.

18        Q    Yes.  So when someone has an enlarged heart,

19   let's say like Mr. Turner, when they are under stress --

20   let's focus on physical stress.  Police are restraining

21   him, and he's physically moving about, struggling or

22   something of that nature -- would that cause his heart

23   to work harder just to get oxygen?

24        A    So let me -- that's a two-part question.  He's

25   working harder and to get oxygen.

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    26

1     Q    Fair enough.  Fair enough.

2     A    So as far as his struggle against any attempts

3    to restrain him would increase his activity level, which

4    would increase his heart work.  As far as the oxygen

5    component, that's a different piece there.  So typically

6    you have good oxygen going through your system, so the

7    struggling and the fighting increasing your heart rate

8    doesn't necessarily bring more oxygen to you.  It's

9    continuing to bring oxygen.  That's why I wanted to make

10   sure that was clear.

11    Q    All right.  Let's say a normal heart versus an

12   enlarged heart, the mere fact that someone has an

13   enlarged heart, does that mean that more oxygen is

14   required to essentially accommodate, for lack of a

15   better word, the hard work that the heart now has to do

16   because of the facts?

17    A    In short the answer is no.  I mean, the

18   percentage of oxygen in your blood would be the same for

19   a larger heart than a smaller heart.  You know, your --

20   it's the percentage of oxygen in your blood, not the

21   total amount, if that makes sense.  So you want the

22   blood cells carrying the right percentages around.

23    Q    All right.  So if a person has an enlarged

24   heart, there has to be a higher percentage of oxygen to

25   the heart as opposed to someone with a normal heart?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                27

1      A     For --

2      Q     Is that a fair statement?

3      A     That's not what I'm saying, no.  I'm saying the

4  percentages of oxygen would be the same needs for an

5  enlarged heart versus a regular heart.  Meaning just for

6  regular function, you want to have -- it would be the

7  same percentages going around to either of those.

8      Q     All right.  I want to go back to the autopsy

9  report, which is part of the basis for your opinions in

10  this case, and I want to ask you some questions about

11  the Findings section.

12     A     Okay.

13     Q     Do you disagree with this particular finding by

14  the forensic pathologist that Mr. Turner collapsed

15  during restraint by law enforcement?

16     A     I think that's a reasonable use of the

17  language.  A lot of people think of collapse as fell

18  down and collapsed.  He was already down.  So as long as

19  the idea was a cardiac arrest collapse, that I think

20  it's a reasonable use of that word.

21     Q     Okay.  Fair enough.  So it's fair to say that

22  Mr. Turner experienced cardiac arrest during restraint

23  by law enforcement, correct?

24     A     That is fair.  Sure.

25     Q     All right.  When the findings I'm looking at,

1    No. 3, which says morbid obesity, is that based on the

2    fact that his body mass index is 40?

3        A    That's what it's based on, yes.

4        Q    All right.  Now, in terms of Mr. Turner's

5    overall health, various internal systems were examined

6    in his body, correct?

7        A    The organs were examined, yes, and some

8    histology.

9        Q    All right.  And in terms of Mr. Turner's

10   overall health, is it fair to say that there were no

11   abnormal issues with his liver, kidney, things of that

12   nature, his lungs?

13       A    Right.  So they did a microscopic examination,

14   at least on this report here, of the myocardium, which

15   is the heart, the lungs and the liver.  I'd have to go

16   back and look at the details of it to give you it

17   specifically.  But they report non-contributory on

18   microscopic examination of these.  Although,

19   non-contributory doesn't mean they were normal.  It just

20   means that they weren't contributing to the cause of

21   death.  So I'd have to actually look at those again to

22   answer that question specifically.

23       Q    All right.  Can you take a quick look at the

24   autopsy report where it focuses on the liver, and let us

25   know if there's any findings of abnormality.

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                     29

1          MR. KRCHAK:  Show my objection that the

2    document speaks for itself.  But you may answer.

3          THE WITNESS:  So it says liver weighs 1940

4    grams.  Focal patchy yellow discoloration due to mild

5    fatty metamorphosis is present.  The hepatic parenchyma

6    is yellow-brown, homogenous and congested.  I don't see

7    a specific review of the microscopy, other than it says

8    microscopic examination of the myocardium, lungs and

9    liver are non-contributory.  So I don't see the actual

10   results, but nothing's jumping out saying that he had

11   significant liver disease.

12   BY MR. BROOKS:

13      Q    All right.  So there's nothing to suggest that

14   Mr. Turner had any significant disease process or any

15   disease process for the most part in his lungs, liver --

16   lungs and liver, right?

17      A    I'll just take a quick look at the lungs just

18   to be complete.

19          MR. KRCHAK:  Show my same objection.

20          THE WITNESS:  Yeah.  I don't see anything

21   specifically in the lungs either.

22   BY MR. BROOKS:

23      Q    The one abnormality that they identified, and

24   when I say "they," the pathologist identified, relates

25   to the heart, correct?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    30

1      A     They definitely did reflect the heart was

2   enlarged and had left ventricular hypotrophy, yes.

3      Q     Do you know whether or not Mr. Turner was

4   hypertensive?

5      A     I don't recall a history of hypertension in

6   him, as far as that goes.  So I don't remember a

7   specific diagnosis of hypertension.

8      Q     Is hypertension typically associated with an

9   enlarged heart?

10     A     If it's untreated and prolonged, it can cause

11   cardiac enlargement, yes.

12     Q     You just don't know whether in Mr. Turner's

13   case, his cardiomegaly was associated with hypertension?

14     A     I don't specifically know that by his history.

15   Correct.

16     Q     We know from the circumstances, actually from

17   this incident, that the police did not use a taser on

18   Mr. Turner, right?

19     A     Correct.

20     Q     We also know that they did not use OC spray,

21   correct?

22     A     Correct.

23     Q     Now, in the materials that you have identified

24   as part of your basis, you make reference to certain

25   articles or literature that you've reviewed, correct?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                              31

1      A      Correct.

2      Q      And some of that literature focuses on the use

3   of OC spray and also tasers.  Can you tell me the

4   significance of making reference to that as part of the

5   basis for your opinion?

6      A      The OC spray is based on -- it's actually a

7   restraint position study.  So besides getting sprayed

8   with OC spray, we put people into certain positions

9   there that would be part of the reasons for the -- base

10  the opinions on the OCs aspect itself.  And I'm trying

11  to see which taser papers you're referring to.  I

12  didn't --

13     Q      I think I can help you out a little bit,

14  Doctor.

15     A      Thank you.

16     Q      I actually thought I had them marked.  I'm

17  sorry, Doctor.  I thought I had it marked.  I don't see

18  it here.  But one of the things that we can rule out in

19  this particular case is that in terms of force used by

20  the police, they did not put Mr. Turner in a chokehold,

21  right?

22     A      Or any neck hold, I agree.

23     Q      All right.  And so one of your opinions focuses

24  on the fact that you saw no evidence of neck

25  compression, right?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                          32

1      A     Correct.

2      Q     Is it fair to state that in terms of all the

3   actual materials you gathered, no one ever made a

4   statement that Mr. Turner was put in a chokehold, right?

5      A     Agreed.

6      Q     So, again, what would be the relevancy of the

7   articles?  It looks like there's three or four articles

8   where you reference either specifically police

9   chokeholds, neck trauma, and death caused by chokeholds.

10     A     If I recall, I think defense counsel had asked

11  me to review with regards -- or an eye towards, was

12  there anything that would be interpreted as a neck hold

13  or chokehold; that there may be some allegations along

14  those lines.  So as part of my review, they asked me to

15  review it for that perspective.

16          I agree with you.  I didn't see anything in any

17  materials that implied that occurred.  But those

18  articles are referencing that part of my opinion that

19  says I don't think there was a neck hold in this case.

20     Q     All right.  Fair to say in terms of forming

21  your opinions specifically related to mechanism or cause

22  of death, the articles which focus on chokeholds,

23  they're not relevant factually to the information you

24  received in this case, is it?

25     A     They're only relevant with respect to

1    supporting that there was no chokehold.  But it does

2    not -- they do not form into the opinions on the actual

3    cause of death.

4        Q    All right.  Doctor, I think one of the things

5    that you referenced in your report is the fact that

6    Mr. Turner may have had a history of narcotic use,

7    right?

8        A    I'm not sure if I put that in there or not.  I

9    know it was referenced by the medical examiner, if I

10   remember correctly.

11       Q    Right.  But you took that information from the

12   medical examiner's report, correct?

13       A    If I referenced it.  I'm not sure I referenced

14   it.  That's why I'm just trying to confirm that.  I did

15   reference it as in my Opinion No. 4:  "One of the more

16   common causes of an enlarged heart, like Mr. Turner has,

17   is cocaine abuse, which was listed as one of the

18   findings on Mr. Turner's autopsy and noted throughout

19   his medical records."  So I did reference that from the

20   autopsy as well as his medical records.

21       Q    So when you say it is referenced in the

22   findings from the autopsy report, is that -- is that

23   based on historical information that is provided to the

24   pathologist, or is there anatomical -- specific

25   anatomical evidence that ties any condition in Mr.

1   Turner directly to cocaine use or narcotic use?

2        A    Right.  I seem to recall that the medical

3   examiner had some findings that -- where he felt were

4   consistent with cocaine use history as part of that.

5   Not just historical only.  But I'd have to look through

6   it and try to figure out what it was exactly.  And

7   obviously the medical records had reference to his use

8   of it in the past.

9        Q    Can you tell me, just based on your review if

10  you need to review the autopsy report, wherein you see

11  anatomical findings that support the statement regarding

12  this reported history of cocaine abuse?

13       A    In this autopsy you've supplied me -- and I

14  don't know if there's any additional discussions or

15  microscopic examinations available -- I don't see

16  anything in what you've given me as Exhibit 1.

17       Q    All right.  And it wasn't in the autopsy report

18  that you reviewed?

19       A    I definitely reviewed this part.  I just can't

20  remember if there was additional pages or not that are

21  not seen here.  Certainly that toxicology report because

22  it was part of the autopsy.  I thought there was some

23  microscopy specifics, as well.  But, again, I can't

24  remember off the top of my head.

25       Q    Okay.  Would you have that specific information

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                              35

1   with you in terms of what you reviewed that may have

2   been in addition to the autopsy report, which is marked

3   as Exhibit No. 1 so I know exactly what it is?

4       A    Do I have more, you mean?  Is that what you're

5   asking?

6       Q    Yes.  Do you have it with you?

7       A    Oh, no.  I didn't bring -- I have a whole box

8   of stuff that I didn't bring with me, so....

9       Q    All right.  You didn't bring any of your file

10  with you.  Is that what you're saying?

11      A    Correct.  I brought the deposition notice and

12  my report.

13      Q    All right.  Does your report make reference to

14  any specific anatomical information other than what's

15  included in Exhibit No. 1, the autopsy report?

16      A    Let me check here.  Yeah.  All I'm seeing is

17  some reference to the coroner's subpoena response.  But

18  I don't see anything with regards -- I know I reviewed

19  toxicology because it's -- but I don't see that attached

20  as part of the autopsy record, which I usually consider

21  is part of it.  So that's why I was questioning whether

22  there was more information that I reviewed when I first

23  saw it and is actually included here.

24      Q    All right.  You believe that there may be some

25  additional information beyond what's contained in the

1  autopsy report?

2      A    Well, I --

3      Q    I'm sorry.  That's the way it goes to this

4  issue of anatomical evidence supporting cocaine abuse?

5      A    Well, I know there's more material.  I don't

6  know specifically if it's addressing that issue or not

7  without having review it again.  But I know that there

8  was a toxicology screen, which of course is -- evidences

9  more material.  And, again, I thought there was

10 microscopy that sometimes shows changes that can be

11 chronic or not.  That's why I question whether it's

12 available in my file or not.

13     Q    One of the things you reviewed was the

14 toxicology screening?

15     A    Correct.

16     Q    Now, in the toxicology screening Mr. Turner did

17 not have any illegal substances in his system, did he?

18     A    Not the ones that were tested for, correct.

19     Q    So there was no cocaine in his system at the

20 time of his death, right?

21     A    That is correct, yes.

22     Q    There was no cocaine metabolite in his system

23 as well, correct?

24     A    Correct.

25     Q    That would suggest if in fact Mr. Turner had a

1   history of cocaine abuse, at least at the time of his

2   death, there was absolutely no evidence of cocaine use

3   in the toxicology screening?

4       A    Correct.  The toxicology screen reflects no

5   recent use of cocaine.

6       Q    And "recent use" would mean either it's present

7   or there's a metabolite for cocaine in his system,

8   correct?

9       A    That's the way I would look and define the

10  recent use, yes.

11      Q    Was it your understanding that the police

12  officers involved in this incident had some knowledge of

13  Mr. Turner prior to November 16th, 2016?

14      A    It was my impression that there was some prior

15  knowledge of who he was, yes.

16      Q    Is it also your impression or understanding

17  that these police officers knew that Mr. Turner had some

18  mental deficiencies that existed at the time of his

19  incident?

20      A    I'm pretty sure that was the case.  I know they

21  were going to have him medically evaluated.  And I think

22  it's in part because of his background.

23      Q    Doctor, from a factual standpoint, did you

24  review any record which specifically identified Mr.

25  Turner prior to the police laying their hands on him

1    wherein he violated the law?

2        A    I'm not a legal expert, so I didn't really look

3    at it from that perspective, to be honest.

4        Q    Fair enough.  What is your understanding in

5    terms of what led the police to have some initial

6    interaction with Mr. Turner?

7        A    So it was sort of odd, bizarre behavior out in

8    public.  I guess there was, you know, the things that he

9    was doing was irregular, and that is how I think they

10   originally got called.  I think somebody thought he

11   might have been drinking or may have been intoxicated in

12   public, was maybe where the first call came from to have

13   the police come and take a look.

14       Q    And of course the toxicology screening shows

15   that Mr. Turner was not intoxicated, right?

16       A    The blood alcohol did not reflect that,

17   correct.

18       Q    The behavior of Mr. Turner would be consistent

19   with someone who has some degree of diminished mental

20   capacity.  Would you agree with that?

21       A    It could be consistent with that.  Sure.

22       Q    Doctor, do you have any opinion whether or not

23   someone with diminished mental capacity may have some

24   difficulty in terms of responding accurately to requests

25   by police or direction by police?

1      A    Do I have an opinion on that?

2      Q    Yes.

3      A    I guess I probably do have an opinion.  Sure.

4      Q    What's your opinion?

5      A    I think it depends on the degree of incapacity

6  or decompensation and what's causing it as far as the

7  etiology of that decompensation.  But there are

8  certainly times where people will have difficulty

9  understanding or following commands.

10      Q    And you would agree that someone who has

11  diminished mental capacity is more likely than not, as

12  opposed to someone with full capacity, to have some

13  difficulties understanding directions and orders given

14  to them?

15      A    I wouldn't say more likely than not.  I would

16  say that somebody with a diminished capacity would

17  have -- would be more likely to have a difficult time

18  compared to somebody with full capacity.

19      Q    Doctor, will stress -- let me restate it.

20          Can stress and anxiety bring about cardiac

21  arrhythmia in a person who has an enlarged heart?

22      A    Make sure I understood that.  Can stress and

23  dieting?  Is that what you said?

24      Q    No.  Stress and anxiety.

25      A    Anxiety.  We lost the first part of your word

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                          40

1    there.   That makes more sense.

2         Q    Okay.   Can stress and anxiety in a person who

3    has an enlarged heart cause cardiac arrhythmia?

4         A    It can, sure.

5         Q    Would you agree that in terms of Mr. Turner's

6    interaction with police, at some point his stress level

7    was increased as a result of that interaction?

8         A    There's different stressors that you're

9    referring to.   There's physical stressors or physiologic

10   stressors.   Then there's emotional or mental stressors.

11   I would break them apart.   I think that his --

12        Q    Fair enough.

13        A    I think that his sprint across the street for

14   his body size and level of what appears to be more of a

15   sedentary, less active lifestyle was probably a good

16   physical or physiologic stressor.   And his continued

17   resistance would have some physiologic impact.   But

18   probably not as much as running.   So, actually, being

19   held and restrained reduces oxygen consumption.   And

20   that -- but his continued physical activity trying to

21   fight it would have some physical stress, but not as

22   much as running.

23            With regards to emotional and mental stress, we

24   don't know what was going on in his head.   You know,

25   being off his medications, being a history of

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    41

1   schizophrenia and paranoid delusional type thoughts.  We

2   certainly know he had some stuff going on prior to the

3   police arriving, which is why they got called, and

4   probably something going on while he was being

5   restrained.  But we will never know exactly what was

6   going on or how that impacted his levels of emotional or

7   mental stress anxiety.  But there could be some

8   increase, to answer your first question, but we don't

9   know for certain.

10      Q    We may not be able to quantify it.  But is it

11  fair to say someone who is mentally impaired in some

12  fashion in an encounter with police is more likely than

13  not to have increased mental stress?

14      A    It depends on their relationship with the

15  police and what's going on with their mental capacity.

16  But it certainly can occur.

17      Q    In this particular situation we know that the

18  police gave Mr. Turner certain orders and he was

19  noncompliant, correct?

20      A    There were times, yes.

21      Q    Ultimately because of Mr. Turner's

22  noncompliance, the police put their hands on him, didn't

23  they?

24      A    At some point they did put their hands on him.

25  I'm not really interpreting why they did or why they

1    chose at that time, whether it's compliance or other

2    concerns.  But I know they did at some point put their

3    hands on him.

4        Q    And at some point once the police put their

5    hands on Mr. Turner, they physically put him to the

6    ground, didn't they?

7        A    He was brought to the ground at some point

8    during their altercation, yes.

9        Q    Would you consider an action of that nature,

10   where officers are using physical force against an

11   individual and in essence take them to the ground, if

12   the person is resisting during that situation, their

13   physical stress level increases, correct?

14       A    It's a long question.  I want to make sure I

15   understand what your asking.  But is there --

16       Q    I can restate it if you want to.

17       A    That would be great.  Thank you.

18       Q    It's up to you.

19       A    I was going to recap it and make sure I'm

20   answering the question you're looking for to make sure

21   we're on the same page.  But there was a physical --

22       Q    Fair enough.

23       A    There was a physical component in taking him to

24   the ground.  There's an emotional or mental capacity

25   issue in that he may not be able to understand and

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                                    43

1   comply.  And because of being taken to the ground and

2   this mental challenge that he's having, the capacity

3   issue, that it would increase his physical stress, is I

4   think how you put it.

5       Q    Yes.

6       A    The physical stress is what physically is

7   happening.  If he is fighting more because of all of

8   that, and he's resisting more, then yes, there's an

9   increase in physical stress.  But, again, if you're

10  comparing it to the physical physiologic changes that

11  occur internally, running and sprinting across the

12  street is much more physiologically stressful than being

13  restrained and held in a position and struggling against

14  that.

15      Q    Doctor, can you tell me based on your review of

16  the materials in this case how much time passed from the

17  point, as you describe Mr. Turner running across the

18  street, to the point police actually put their hands on

19  him?

20      A    From running across the street to their putting

21  their hands on him was probably less than a minute or

22  so.

23      Q    Now, prior to the police putting their hands on

24  Mr. Turner and his either stopping or being stopped

25  after he ran across the street, he didn't collapse,

1  right?

2      A    Collapse meaning going into cardiac arrest, he

3  did not.

4      Q    Yes.  Right.  He collapsed and went into

5  cardiac arrest only after he had been taken to the

6  ground and restrained, correct?

7      A    That is when it occurred, yes.

8      Q    I want to ask you about the restraint used by

9  the police.  In terms of putting Mr. Turner to the

10  ground, would you agree that the police had to use a

11  certain amount of physical force against him?

12      A    To get a standing person to the ground, some

13  force has to be used, sure, unless the person falls over

14  themselves.

15      Q    All right.  And that's not the case.  Mr.

16  Turner didn't simply fall over, did he?

17      A    I don't recall that occurring.  I believe the

18  police helped bring him to the ground.

19      Q    The police physically forced him to the ground,

20  correct?

21      A    I'd have to review specifically.  But I know

22  that they brought him to the ground.  I don't remember

23  the exact details of how he arrived there.

24      Q    Is it fair to say that it took more than one

25  police officer to take Mr. Turner to the ground?

Transcript of Gary M. Vilke, M.D.

Conducted on April 22, 2019                    45

1      A    I'd have to review the reports again.  I don't

2    remember that specifics.  But I thought that there may

3    have been two officers that brought him to the ground

4    and then a third one arrived.  And I'd have to

5    double-check that.

6      Q    I think you're pretty accurate, Doctor.

7           I want to focus on the two officers that forced

8    Mr. Turner to the ground.  Is it your understanding that

9    Mr. Turner was resisting during that process?

10     A    I don't remember specifically what they did.  I

11   believe he wasn't compliant.  So as far as that goes,

12   there probably was some degree of resistance.  I just

13   don't remember specifically what they reported he was

14   doing when they were trying to get him down.  But I

15   would assume there was potentially some resistance.

16     Q    When Mr. Turner was taken to the ground, was he

17   put on his stomach?

18     A    Initially he was, yes.

19     Q    Okay.  Would you agree that when a person is

20   placed on their stomach and they have, let's say, human

21   force preventing them from getting off their stomach,

22   that that is a physical stressor that the person is

23   undergoing, the one who's on the ground?

24     A    It is physical restraint.  The stressor is --

25   it's not a physical stressor in the sense that the

1  holding there is not a physical stress.  If he is

2  fighting and struggling, then there would be a

3  physiologic response to that restraint.  But the

4  restraint itself is not a physical stressor.

5      Q    Okay.  The restraint itself is designed to

6  prevent the person from moving, though, right?

7      A    Keep them in a position where you want to keep

8  them, sure.  That's I think the purpose of it.

9      Q    So if the purpose is to keep the person from

10  moving, a certain amount of force has to be used to

11  impede the person's movement, correct?

12      A    There would have to be some force if the person

13  is trying to move.  Sure.

14      Q    You don't know how much force the police were

15  using to prevent Mr. Turner from moving while he was on

16  his stomach, do you?

17      A    If you're talking about exact numbers of -- of

18  force and measurements of energy, no.  If you're talking

19  about positions and where they were located, I'm

20  familiar with what the reports reflect.

21      Q    What is your understanding of where these two

22  officers were located when they had Mr. Turner on his

23  stomach on the ground?

24      A    One officer was on I believe the left side,

25  with a knee on the shoulder to try to hold Mr. Turner in

1 place.  The other officer was on the other side, with a

2 knee or leg holding the arm down to the ground so that

3 he would not lift up and roll over.

4      Q    And just so I have an accurate picture of this,

5 these officers, the one on the left side and the one on

6 the right side was holding -- using pressure to hold Mr.

7 Turner down, one, so he couldn't move his arms from the

8 ground.  Would you agree with that?

9      A    I think that there was a component to keep

10 those arms from being moved and pushing off them.  Sure.

11      Q    They were also positioned in such a fashion so

12 that he could not, Mr. Turner, move from the ground off

13 his belly, correct?

14      A    To maintain him in a prone position, I believe

15 that was part of the intent there so they could get him

16 handcuffed, yes.

17      Q    And at some point when Mr. Turner is on the

18 ground and there are officers forcing both sides of his

19 body down to the ground, was there an effort made by the

20 police to prevent Mr. Turner from moving his head to the

21 left or the right?

22      A    I believe one of the officers was maintaining

23 position of the head so that he couldn't do turning on

24 it.  I'm not sure exactly what direction he was holding

25 him, but he was holding him.

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                                    48

1      Q     Yeah.  What is your understanding of how the

2    officer was able to prevent Mr. Turner from turning his

3    head to the left or the right?

4      A     I believe he had the knee on the shoulder, had

5    a hand on the head, and the other trying to grab the

6    arm.

7      Q     In terms of his head, though, you recall an

8    officer actually pushing Mr. Turner's head down so it

9    wouldn't move to the left or the right or raise up?

10     A     I'd have to look at that.  I don't remember it

11   being -- I remember there was some force being used to

12   help hold it in position.  I don't remember exactly

13   where the -- what the intent of that position was.

14     Q     What was your understanding of why the officers

15   were using force on Mr. Turner's head?  What's your

16   understanding as to why that was done?

17     A     You know, I would have to look back as to their

18   intent of why they were doing that.  I'd only be

19   speculating on why one would do that just based on

20   experience.  But, specifically, I'd have to look at

21   their reports.

22     Q     I'm actually looking at the report that was

23   prepared by Officer Christopher Young.  And you read his

24   deposition, right?

25     A     I did, yes.  I believe so.

1      Q    You also had a chance to review the report that

2   he prepared?

3      A    I had reviewed it, yes.

4           MR. BROOKS:  Some little note just popped up.

5   I'm not sure what it is.

6   (Interruption in the proceedings.  Discussion held off

7                        the record.)

8           MR. BROOKS:  Can I just have the last question

9   and answer read?  I think there was a question I was

10  getting ready to ask.

11          (The record was read.)

12  BY MR. BROOKS:

13     Q    So one of the reports you reviewed is the

14  reports that would have been prepared by the various

15  police officers in this case?

16     A    Correct.

17     Q    Do you use those reports as part of the overall

18  basis for opinions you wish to offer in this case?

19     A    Typically it's part of the materials I review

20  that goes with the totality of the review.  Sure.

21     Q    So in terms of the totality of your review,

22  various reports or testimony given by the police

23  officers would be important to some extent?

24     A    It can be.  Sure.

25     Q    All right.  Officer Young says -- and I'm

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                                    50

1  reading from his report, page 4 of 5.  It says:  "I used

2  my right hand to stop Richard's head from lifting and

3  turning."  Do you have any understanding of how he did

4  that?

5      A    Off the top of my head, I couldn't explain

6  exactly what he would have described, no.

7      Q    Do you know if Officer Young was to the left or

8  the right of Mr. Turner's body?

9      A    Double-checking.  So he had his right knee on

10 Mr. Turner's left shoulder blade.

11     Q    You're referring to Officer Young?

12     A    Yes.

13     Q    So when Officer Young said he used his right

14 hand to stop Richard's head from lifting, that would

15 indicate that he's applying force to Mr. Turner's head

16 to keep it down, correct?

17     A    Or just keep it from lifting.  You know, you

18 don't have to push down.  You just have to resist the

19 part that's going up.  If he's not lifting his head, you

20 don't have to put force on it.  But if he tries to lift

21 it, you put force at that time.

22     Q    Well, would you take from that statement that

23 Mr. Turner was trying to lift his head at some point --

24     A    That's -- yeah.

25     Q    -- if the officer described it as using his

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                        51

1   hands to stop Richard's head from lifting?

2        A    Sure.  I would assume that at some point Mr.

3   Turner tried to lift his head, which is why the hand was

4   placed to keep him from lifting it.

5        Q    Officer Young also said that he was using his

6   right hand to prevent or stop Richard from turning his

7   head.

8        A    Correct.

9        Q    Which would suggest, again, he's applying some

10  type of force?

11       A    During the times when he's moving his head, it

12  would imply that that was occurring at some point.

13  Sure.

14       Q    So if you have a scenario such as this where

15  you have police officers positioned on the right and

16  left side of an individual's body, they have at least a

17  knee on his shoulder blade, and they are basically

18  applying force to prevent his head from lifting and

19  turning, would you agree that that will, in essence,

20  increase the physical stress that that person is

21  enduring at the time?

22            MR. KRCHAK:  Show my objection.  Misstates the

23  evidence.  But you can answer.

24            THE WITNESS:  I would say if you're holding

25  somebody in a position, it could create some emotional

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    52

1    stress.  Physical stress, I always think of it as

2    creating more activity and more -- more -- increasing

3    your heart rate, those types of things.  So I think

4    maybe, potentially, some emotional stress, depending

5    what his ability to comprehend what was going on around

6    him, was there.

7    BY MR. BROOKS:

8        Q    So you would describe it as more emotional

9    stress as opposed to physical stress?

10       A    Correct.  They were holding him in place.  If

11   he's resisting against it and fighting against it, that

12   would be a physical stress that he was inducing.  But to

13   hold somebody in place isn't creating a stressor to the

14   physiology of that person.

15       Q    Could part of the reason that Mr. Turner was

16   trying to lift his head was to give him a better ability

17   to get oxygen?

18           MR. KRCHAK:  Objection.  Foundation.

19           THE WITNESS:  Physiologically being on your

20   stomach is a relatively neutral position, so

21   physiologically neutral.  So to raise your head back up

22   would not be a typical physiologic maneuver to try to

23   get more oxygen.  So your point of, could it possibly

24   be?  I guess anything is possible depending on what was

25   going on in his head.  But from a physiologic

1  perspective, I wouldn't expect that.

2  BY MR. BROOKS:

3      Q     Would you agree with the proposition that if

4  Mr. Turner was trying to turn his head to the right or

5  the left, and force was being applied to prevent it,

6  that that could impede his ability to breathe to some

7  extent?

8      A     I think that in turning your head to the side

9  left or right, it actually tends to have more of a

10  negative impact on your airway and narrowing it.  So

11  keeping it neutral would actually be a preferred

12  position to optimize airway movement.

13      Q     So, Doctor, are you telling us that the

14  mechanism where the police are forcing Mr. Turner's head

15  face down so it doesn't move to the left or the right or

16  move upward, that that actually puts him in a better

17  breathing position?

18      A     That keeps him more physiologically aligned.

19  That's how we manage people when they're on their back.

20  We don't turn their head to the side, left or right.  We

21  manage them straightforward.  And we don't hyperextend

22  them, as well.  So it's a physiologically neutral

23  position.  Just happens to be in the prone position.

24      Q     So in other words, are you saying that being in

25  that position with the face down, so the person cannot

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    54

1   turn to the left or the right or lift their head from

2   the ground, that that is a better breathing position as

3   opposed to his head being turned to the left or the

4   right or lifted up?

5        A    Or hyperextended, yeah.  I don't -- I will say

6   that the position of neutral is the optimal position.

7   So left or right would not be a better position for it.

8   And if he's trying to hyperextend his head up and the

9   officer's keeping him in a neutral position from doing

10  that, that would also not impede the airway and probably

11  would actually optimize it.

12       Q    Would you agree with me that any resistance by

13  Mr. Turner would be in direct result to the force that's

14  being used by the police to restrain him?

15       A    I wouldn't agree with that, no.

16       Q    Why not?

17       A    Because if there's force just holding in

18  position there, if he's fighting it for other reasons,

19  if he's having paranoid thoughts because of being off

20  his medications and he's having, you know, thinks that

21  people are trying to kill him or the CIA or other things

22  that happen with our paranoid schizophrenic population,

23  that might be the driver of his actions more than some

24  physical restraint or holding him in place.

25       Q    Doctor, just to make sure we're on the same

1   page, fair to say that the combination of Mr. Turner

2   running across the street, as you've described, which

3   you say could be exhaustive, and the police having him

4   on his stomach with someone forcing or keeping his head

5   to the ground, he didn't go into cardiac arrest, did he?

6        A    I'm not sure I follow your question.  With

7   regards to the head, I was understanding that he was not

8   letting him turn his head left or right or raise it up.

9   Not forcing it into the ground.  It was more of a

10  holding position rather than a -- you're describing more

11  of a face pushed into the ground thing.  So that's

12  different than I understand it.

13       Q    All right.  Your understanding is that they

14  were not pushing Mr. Turner's face down to the ground?

15       A    They were holding him in position to keep him

16  from raising his head up or turning left and right.

17       Q    So in other words, your understanding is that

18  they did not put his face to the ground?

19       A    Well, the face may have gotten to the ground at

20  some point.  I'm not saying it wasn't there.  But the

21  description was holding him from moving.

22       Q    Would you agree with me, even while the police

23  are holding Mr. Turner's head, whether you want to call

24  it forcing his head down or preventing it from turning

25  to the right or left -- {interruption in the

1   proceedings.  Technical difficulties.}

2            THE REPORTER:  One second.  We lost you there.

3   BY MR. BROOKS:

4        Q    You would agree with me that up until the point

5   Mr. Turner had run across the street, two police

6   officers had taken him to the ground, and one officer

7   was holding his head face down so it couldn't raise up

8   and turn to the right or left, Mr. Turner had not

9   experienced cardiac arrest, correct?

10       A    Correct.

11       Q    And the police had used a certain amount of

12  force to at least get him to the ground on his stomach

13  and keep him on the ground, correct?

14       A    There was some force being used to keep him in

15  position.

16       Q    Doctor, is it your opinion that excluding any

17  force used by the police in this particular incident --

18  let's exclude any force used by the police -- Mr. Turner

19  was going to die on that particular day?

20       A    So if the police had never basically

21  encountered him, is that the thought there?  I can't say

22  that would have happened.

23       Q    If the police never used any physical force

24  against him, more precisely.

25       A    Sure.  So basically never went hands-on?  I

1    can't say that he would have died that day, no.

2        Q    You agree that a combination of factors

3    contributed to Mr. Turner's death on November 16th,

4    2016?

5        A    I do, yes.

6        Q    And the pathologist, the forensic pathologist

7    described a number of contributing factors leading to

8    Mr. Turner's death on November 16th, 2016?

9        A    They have contributing factors to the cause of

10   death, yes.

11       Q    Doctor, help me a little bit in terms of

12   understanding the -- in terms of force that was used by

13   police, the restraint measures which were used, is it

14   your position that the restraint measures themselves

15   were not forceful?

16       A    And just to clarify, you're referring to the

17   knee and the hand?  Not the handcuffs and the hobble,

18   correct?

19       Q    Yes.

20       A    Yeah.  The knee and the hand had some force

21   associated to hold him in position.  There was police

22   and force involved with that.

23       Q    Do you believe that the force was a

24   contributing factor to Mr. Turner's death?

25       A    I do not, in and of itself, the actual force.

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                                    58

1    The resistance to the force, yes.  The fact that it was

2    placed and then he fought against it, yes.  But the

3    force itself, the weight, amount, the locations, did not

4    contribute to the death.

5        Q    Are we playing semantics a little bit in terms

6    of how you want to describe the mechanics of force that

7    was used?

8        A    I'm not trying to be semantical.  I'm just

9    trying to be clear.  Because I think earlier you asked

10   me if there was no force used, would he have died?  And

11   so then, of course, the jump is, well, force contributed

12   to his death.  But what I'm saying is that the force in

13   holding him in position doesn't cause increased

14   physiology if he just didn't resist.  It doesn't cause

15   increased physical stress if he didn't resist.  It

16   doesn't cause increased emotional distress if he's not

17   emotionally incapacitated by mental disability or

18   freaked out or anxious.

19           So the restraint itself doesn't create the

20   death.  But it's the response to the restraint process.

21   If he would have just laid there, put his hands behind

22   his back and not resisted, then if your question was

23   would he have died, I would say more likely than not he

24   would not have.

25       Q    You're saying potentially if he was compliant,

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    59

1    he would not have died?

2         A     Correct.

3         Q     Correct?

4         A     Correct.

5         Q     All right.  Fair to say that if the police had

6    not placed their hands on Mr. Turner that day, he would

7    not have died?

8         A     So if the police did not place their hands on

9    him and there was no other events going on that required

10   him to have somebody else place hands on him, then we'd

11   be -- it would be -- he probably would not have had that

12   response to the physical contact and probably would not

13   have died, in and of itself.

14        Q     I want to go back to the factual scenario here.

15              So give me your best understanding of how long

16   Mr. Turner would have been on the ground on his stomach

17   before the hobble device was used?

18        A     Before the hobble device was used; is that

19   right?

20        Q     Yes.

21        A     So the timeline that I have in my report, based

22   on my review of the video, that he heads off screen

23   towards the alley about 9:02:55.  Another officer gets

24   into the alley about 17 second later.  So a little after

25   9:03.  And then a third one comes in about a minute

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    60

1    after that.

2              The radio request for the hobble by Officer

3    Talbott was at about 9:04:44.  So about two -- a little

4    under two minutes after he first gets off screen to the

5    alleyway.  And based -- based on the information of

6    Dr. Talbott, this radio request was right after the

7    handcuffs were placed.

8              MR. KRCHAK:  It's Officer Talbott, correct?

9              THE WITNESS:  Officer Talbott.

10   BY MR. BROOKS:

11       Q    Yes.  Officer.  Got it.

12       A    And, then, so that's when the hobble was

13   requested.  And then Officer Frost -- I'm sorry --

14   Sergeant Frost arrives at the alley about 9:05:15.  And

15   that's roughly the time that the hobble was placed.

16       Q    What time is that again, Doctor?  I couldn't

17   hear you very well.

18       A    I have it as Sergeant Frost arrives at the

19   alley about 9:05:15.  And I believe that's when the

20   hobble was placed.

21       Q    So sometime after 9:05:15?

22       A    Yes.  Around that time, yes.

23       Q    All right.  Do you recall approximately what

24   time the police were first called about Mr. Turner's,

25   let's say, erratic behavior?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                        61

1        A     I have it looks like -- well, I don't know
2    about the call.  But at about 8:50 is when the officers
3    I think first contacted Mr. Turner.  I'm not sure about
4    the time the call came in.
5        Q     So let's take your time of approximately 8:50.
6              So from 8:50 to 9:05, Mr. Turner is still
7    responsive and breathing despite his interaction with
8    police, correct?
9        A     At 9:05 he still was interactive and breathing,
10   yes.
11       Q     And at that particular time Mr. Turner is still
12   on his belly, and he is in double handcuffs at that
13   time?
14       A     Correct.
15       Q     Correct?
16       A     Correct.
17       Q     Do you know prior to the hobble restraint being
18   used on Mr. Turner, whether or not he was rolled on his
19   side, either the left side or the right side, or more
20   importantly, he was removed off of his stomach?
21       A     I believe he was not on his side, not quite on
22   his stomach, but sort of listed just a little bit.
23       Q     You've got to describe that for me, Doctor.
24       A     Sure.  So not pure straight down, not pure on
25   his side, but more of a tilt.  So the belly is sort of

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                 62

1   off the side a little bit, but not completely on is how

2   I understood it.

3       Q    Where do you get that information from that he

4   would have been tilted in some fashion?

5       A    I thought I saw that in one of the reports.

6   But for the most part, he was more on his belly than

7   not.  But it wasn't a -- he was not rolled onto his

8   side.

9       Q    The best description would be he was more on

10  his belly than any other parts of his body for the most

11  part?

12      A    I think that's probably a fair statement.

13      Q    Do you know if anyone was still holding his

14  head down, which Officer Young described earlier,

15  moments before the hobble was used?

16      A    As I understood it, after they got him double

17  handcuffed, they didn't need to hold him down as much as

18  he was prior to getting him handcuffed.

19      Q    You would agree that the hobble device is a

20  restraint?

21      A    It is a restraint, yes.

22      Q    It is a restraint which basically immobilizes

23  the lower extremities for the most part, right?

24      A    It holds the feet together so they can't

25  independently move.

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                         63

1        Q     All right.  Again, it's a method to prevent

2     movement in a person?

3        A     It does restrict movement, yes.

4        Q     From your understanding, factually when the

5     hobble is placed on Mr. Turner's leg, his upper

6     extremities are immobilized to the extent it restricts

7     his movement?

8        A     The upper extremities are immobilized, is that

9     what you said?

10       Q     Right.

11       A     Yeah.  The upper extremities were handcuffed,

12    and they could not move beyond what you can wiggle with

13    your arms and shoulders.  And the lower extremities had

14    the wrap around the feet there to help keep those from

15    independently moving.

16       Q     When the hobble was being placed on Mr. Turner,

17    was it your understanding that Mr. Turner was still

18    moving his shoulders either to the left, right,

19    wiggling, or anything of that nature?

20       A     I don't know off the top of my head what his

21    level of movement activity was.  I know he was still,

22    you know, breathing and talking.  But I don't know what

23    his level of movement of his shoulders were at that

24    time.

25       Q     Fair to say that when the hobble device was

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                          64

1  used on Mr. Turner, he was still moving his legs in some

2  fashion, right?

3      A    That's why I understood it was being placed,

4  yes.

5      Q    Ultimately these police officers sought to put

6  Mr. Turner in a position where his upper extremities and

7  lower extremities would be restricted, correct?

8      A    That would be the result of the handcuffs and

9  the hobble, yes.

10     Q    Would you agree with me that someone who has

11  diminished mental capacity, if you restrict their

12  movement of their upper extremities and lower

13  extremities, they are going to undergo some elevated

14  anxiety?

15     A    If they are able to perceive increased levels

16  of anxiety, that could happen from being restricted.

17  Sure.

18     Q    They are going to undergo some increased mental

19  stress:  Would you agree?

20     A    Again, if they're able to comprehend and have a

21  change in that, then that is a possibility as well.

22  Sure.

23     Q    Increased anxiety and mental stress in a person

24  who has an enlarged heart can cause cardiac arrest:

25  Would you agree with that?

1      A     Depending on degrees, it could happen.  Sure.

2      Q     And we know in this case Mr. Turner had an

3  enlarged heart, correct?

4      A     We do know that based on the autopsy, yes.

5      Q     We also know that Mr. Turner had some mental

6  health issues?

7      A     He had a history of that, yes.  Mh-hmm.

8      Q     Okay.  And these officers knew prior to putting

9  Mr. Turner in restraints that he had mental health

10  issues?

11         MR. KRCHAK:  Objection to foundation.  But you

12  may answer.

13         THE WITNESS:  I know at least one of the

14  officers knew about him and some of his history.  So I

15  don't know if all of them did, but there was some known

16  background on him.

17  BY MR. BROOKS:

18      Q     In reading the depositions in this case are you

19  familiar with the concept of crisis intervention?

20      A     I have some knowledge and awareness of that,

21  yes.

22      Q     What is your understanding of crisis

23  intervention in the context of law enforcement?

24      A     That some agencies have crisis intervention

25  teams that they can use for certain types of patient

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    66

1    interaction or subject interactions.

2        Q    And you know in this particular case a crisis

3    intervention team was never called in with reference to

4    handling Mr. Turner who had impaired mental capacity,

5    right?

6        A    I didn't look through the details of whether

7    there was a call-out or not for it.  I don't believe

8    they ever came.  So I didn't see that in any of the

9    videos.

10       Q    Doctor, based on your review of the materials

11   in this case, can you tell me how long Mr. Turner would

12   have been restrained with the hobble device prior to his

13   inability to breathe?

14       A    I want to make sure I'm answering the question

15   you're asking me.  His inability to breathe versus he

16   stopped breathing with the cardiac arrest.  I don't

17   think he ever had an inability to breathe.  He was

18   always in a physiologically appropriate position to

19   breathe.  But at some point he went into cardiac arrest

20   and stopped breathing.  And if that's the time point

21   you're looking for, I can try to answer that.

22       Q    Now, let's focus on that.  Tell me as best as

23   you understand from the factual information you reviewed

24   when Mr. Turner went into cardiac arrest after being put

25   in the hobble restraint?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    67

1       A    So somewhere at 09:06, is sort of when he

2   stopped making noises and having the sounds of air

3   moving in and out.  And then at about 9:07, a little

4   over a minute later, is when the query was, is Mr.

5   Turner still breathing?  And that's when they started

6   looking to see if he was breathing or not and didn't

7   find him breathing.

8       Q    Doctor, would you agree with me that a person

9   who has an enlarged heart, if they experienced cardiac

10  arrest, obviously time becomes important in terms of

11  providing medical care to correct the problem?

12      A    Whether the heart's enlarged or not, if

13  somebody's in cardiac arrest, medical care is a timely

14  issue.  Sure.

15      Q    Okay.  Fair enough.  In this particular case,

16  someone such as Mr. Turner, wouldn't the preferred

17  method of immediate medical care simply have been

18  initiating CPR?

19      A    When establishing that he does not have a pulse

20  and is breathing and the AED does not have him as a

21  quick shockable rhythm, CPR is part of the evaluation if

22  you think they're in cardiac arrest, yes, or treatment

23  in cardiac arrest.

24      Q    And so in this particular case we know that --

25  let me restate it.  What's your understanding of when

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    68

1  the paramedics arrived?

2      A    They arrived shortly after they tried to place

3  the AED -- or after they placed the AED on Mr. Turner

4  and couldn't find a shockable rhythm at that point.

5      Q    Okay.  Do you know what time that was

6  approximately?

7      A    Oh, I'd have to -- I'm not sure I wrote that

8  down in my report here.  But it was -- the ambulance

9  backed up within a couple minutes, but I don't remember

10 exactly what that was.

11     Q    So from the point Mr. Turner stopped breathing

12 until the point paramedics arrived, CPR was never

13 performed on him, correct?

14     A    Yes.  The paramedics were the ones that

15 initiated the CPR as I understand.

16     Q    Had CPR been performed on Mr. Turner when he

17 stopped breathing, would that enhance the likelihood of

18 his survival?

19     A    Bystander CPR is helpful, but the data doesn't

20 reflect that a couple minutes prior to the arrival of an

21 EMS unit and starting CPR makes a difference compared to

22 the traditional, which is eight to twelve minutes of

23 delay by standard CPR.  So his one or two minutes of not

24 getting CPR, for example, if the timeline is correct

25 with regards to prior to the ambulance arrival, wouldn't

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    69

1   have substantially increased his survival rates.  He was

2   not in a shockable rhythm.

3       Q    And you say it wouldn't substantially have

4   enhanced, but it would have enhanced his potential for

5   survival, wouldn't it?

6       A    You know, the first three minutes to six

7   minutes or so, about three to five minutes is considered

8   the electrical phase of cardiac arrest.  And the

9   survival rates there are typically as good as you get

10  throughout that time period.  It's when you have the

11  longer time periods where the CPR makes a difference in

12  priming the heart to receive a shock and improve

13  survival rates.

14          So a couple minutes in the beginning truly

15  would have no measurable way of looking at survival

16  increase.  One would think that there might be a

17  difference, but the reality is once they're all in that

18  first few minutes there, they sort of lump together and

19  have about the same survival rate if they're in

20  shockable rhythm.

21      Q    So, Doctor, you're presuming that from the

22  point Mr. Turner stopped breathing, it was only a couple

23  of minutes later thereafter that the paramedics arrived?

24      A    I'm trying to recall the specifics of that.  I

25  believe that was the case.  It was he stopped breathing.

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                        70

1    They put the AED on.  And then as that was interpreting

2    whether he had a shockable rhythm, which is the thing

3    that actually tends to save the most lives was not

4    there, then the paramedics had gotten there and started

5    to take over, roughly.

6         Q    I'm just saying just from a timing standpoint,

7    you believe only a couple minutes had transpired from

8    the point Mr. Turner stopped breathing until the

9    paramedics arrived?

10        A    I'd have to double-check that.  I don't have

11   that in my notes here in my report, so I'd have to

12   double-check that.  But I know there was the getting an

13   AED, coming back, putting it on, and then the

14   paramedics.  So it could have been three or four

15   minutes.  I just don't remember specifically.

16        Q    If it's more than three to four minutes, would

17   you agree that if CPR had been performed on Mr. Turner

18   prior to the arrival of paramedics, that that in and of

19   itself would have enhanced Mr. Turner's likelihood of

20   survival?

21             MR. KRCHAK:  Objection.  Misstates his

22   testimony.

23             THE WITNESS:  I don't believe that a few

24   minutes of CPR and doing that, instead of putting the

25   AED on to try to see if you can actually save his life,

1  would have improved his likelihood of survival more than

2  putting the AED on.  That's why I would want the AED

3  placed first, and after that, consider starting the CPR.

4  But that's -- that's sort of the order of things.

5  BY MR. BROOKS:

6      Q    So when someone goes into cardiac arrest, you

7  wouldn't necessarily recommend starting CPR as opposed

8  to use of a defibrillator?

9      A    If you have an AED immediately available,

10  that's what you want to use.  And I mean immediately

11  available, running, getting it out of the car and coming

12  back.  Not waiting for an ambulance to show up.  That's

13  preferred because if it's ventricular fibrillation, the

14  earlier you convert it, the better it does.  If it's

15  not, then at that point you can start CPR because

16  they're in a rhythm that's not shockable, which places

17  them into a category that's typically highly lethal.  So

18  the CPR is good, but it's not going to significantly

19  enhance outcomes when you're not in a shockable rhythm.

20      Q    And I understand it won't significantly enhance

21  it, Doctor.  Can you just modify it in some fashion in

22  terms of survival?

23      A    The data isn't set up for minute-to-minute

24  changes.  The data is looking at no CPR for ten minutes

25  and the paramedics arrive, and then they do CPR, versus

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                                72

1   CPR's done for eight or nine of those ten minutes and

2   then paramedic arrive.  They're not looking at if we did

3   one minute of CPR prior to medical arrival, or two

4   minutes, that survival rates increase.

5         The data tends to show that it doesn't make a

6   measurable difference.  It's the longer periods of time

7   or the earlier shocks that make the difference.  So a

8   couple minutes of CPR really isn't shown to say that's

9   going to significantly or even demonstrate at any level

10  that you can actually increase outcomes.

11        The logic is sure, it should help, but the data

12  doesn't support that in the sense that I can say one

13  minute makes a difference and two minutes makes, you

14  know, 30 percent more difference.  And there's no data

15  to support that.

16    Q    Is it your opinion to a reasonable degree of

17  medical certainty that if the police personnel had

18  administered CPR to Mr. Turner prior to arrival by

19  paramedics, that that would not have made any difference

20  in the potential for survival?

21    A    That's a lot of "anys" and "potentials."  And I

22  can't say -- I can't quote you any data that says a

23  minute or two of CPR prior to the arrival of paramedics

24  and in case -- in lieu of an AED would improve survival.

25        I should go the opposite way and say that the

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    73

1   AED is the biggest chance for survival that a person in

2   cardiac arrest has of being turned around and surviving

3   rather than one or two minutes of CPR prior to the EMS

4   arrival.

5        Q    So, Doctor, going back to the factual scenario

6   that we have here, you would agree that cardiac arrest

7   occurred shortly after police used the additional

8   restraint on Mr. Turner, which is the hobble device,

9   correct?

10       A    Yes.  That's the timeline that I have.  It

11  happened after the hobble was placed.

12       Q    Right.  Can you rule out the hobble restraint

13  as being a contributing factor to Mr. Turner's death?

14       A    I think the hobble restraint is physiologically

15  neutral from a physiologic perspective, meaning

16  ventilations and blood flow.  So I don't think it had

17  any contributing affect there.  And at that point he was

18  not as -- he was struggling, but not nearly as much as

19  he was from the very beginning.  So I don't think the

20  hobble itself had any negative physiologic impact on

21  him.  I don't recall him kicking and bucking and

22  fighting the hobble as an increased emotional stressor

23  that might create more of a physiologic metabolic

24  demand.  So I don't recall that being the case.  I know

25  he was still moving and struggling enough that they

1    wanted to place it, but not so much that he kept

2    fighting afterwards.

3        Q    Doctor, I want to go back to your report that

4    you prepared in this case.  Do you have it in front of

5    you?

6        A    I do.

7        Q    I believe it's Exhibit No. 4.

8        A    Okay.

9        Q    On the page 5 of your report you indicate that,

10   essentially, you're giving an overview of what appears

11   to be five opinions, right?

12       A    Correct.

13       Q    Opinion No. 2 which talks about no evidence of

14   blunt force trauma, has anyone in connection with this

15   case indicated to you that there was some type of blunt

16   force trauma that was used against Mr. Turner?

17       A    Nobody indicated that it was used.  The opinion

18   is there because they asked me to opine on it because

19   there may be some allegations from the plaintiff's side

20   that that did occur.

21       Q    All right.  But based on everything that you've

22   read in terms of the plaintiff's complaint, the police

23   report, the medical examiner's report, factually no one

24   has put forth an argument that there was blunt force

25   trauma contributing to Mr. Turner's death?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                          75

1           MR. KRCHAK:  Objection.  Asked and answered.

2   But you can answer it.

3           THE WITNESS:  That's how I understand it, yes.

4   BY MR. BROOKS:

5     Q     So you only included that opinion because

6   defense counsel specifically asked you to address what

7   appears to be a non-issue in the case?

8           MR. KRCHAK:  Objection.  That's not his

9   testimony.

10          THE WITNESS:  He asked me to take a look at it

11  and see if there's any factual basis for it with regards

12  to the review of the materials, because there might be a

13  criticism from the plaintiff's side and they wanted that

14  to be addressed in my report.

15  BY MR. BROOKS:

16    Q     And you know up to this point plaintiffs have

17  not raised that issue, correct?

18    A     I've heard that it hasn't come up since the

19  original conversation back then.  So I have not seen

20  anything that supported that that's coming up, as well.

21    Q     All right.  Now, Opinion No. 3 which talks

22  about no evidence of neck compression, I presume that

23  that's going to the issue of whether or not there was

24  some type of chokehold or some restraint maneuver that

25  impacted Mr. Turner's neck, correct?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    76

1     A    Right.  This is the stuff we talked about

2   earlier with regards to the possibility of a neck hold

3   being placed, allegations along those lines, and was

4   there any evidence for that.

5     Q    And, again, that was an issue that the defense

6   asked you to take a look, just in case the plaintiffs

7   raised that issue?

8     A    Basically, yes.

9     Q    And that appears to be a non-issue factually in

10  terms of the materials you reviewed, correct?

11    A    Yeah.  And I don't know if it was just in case

12  or they had heard something.  But either way they asked

13  me to review it, sure.  And I saw no facts to support

14  it.

15    Q    I want to ask you a little bit about your

16  fourth opinion where you say:  "Mr. Turner had an

17  enlarged heart that placed him at significant risk of

18  going into sudden cardiac arrest and dying."

19         Do you see that?

20    A    I do, yes.

21    Q    And I think you told us earlier Mr. Turner

22  simply -- let me restate it.

23         I believe you told us earlier that if we

24  totally exclude Mr. Turner's interaction with police on

25  November 16th, 2016, more likely than not, with that

1  exclusion, he would have survived on that day, correct?

2      A    Provided he did not have a subsequent encounter

3  later that day, correct.

4      Q    And so this sudden cardiac arrest that you talk

5  about associated with the enlarged heart, you believe

6  that coupled with other factors led to Mr. Turner's

7  death?

8      A    Yes.

9      Q    One of the factors you believe that in

10  combination with the enlarged heart caused Mr. Turner's

11  death was certain agitation he experienced as a result

12  of his interaction with police?

13      A    The agitation he had in part due to his

14  paranoid schizophrenia being untreated, and then in

15  part, by the way he inter with the police, yes.

16      Q    You also believe that this condition of an

17  enlarged heart with Mr. Turner -- which Mr. Turner had,

18  that you have to couple that with the agitation he

19  experienced in this encounter with police, along with

20  resistance.  That's your term, right?

21      A    Resistance is what he was doing based on my

22  report.  Sure.

23      Q    And you describe your resistance a little

24  different than how the medical examiner uses that term,

25  right?

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    78

1        A    I used a different word.  I consider resistance

2    rather than -- than -- I forgot what the medical

3    examiner used.  But it causes -- it can cause a

4    physiologic stress, but it's caused by the activity --

5    the volitional activity of the individual, not by the

6    activity being put on them to hold them in position.

7        Q    Now, this fifth opinion which talks about the

8    AED.

9        A    Yes.

10       Q    Is it your position that if Mr. Turner was

11   handcuffed when the AED was used, and additionally when

12   CPR was administered, the handcuffing itself was not a

13   contributing factor?

14       A    Correct.

15       Q    Factually, where did you get that information

16   from?  I'm trying to understand that in terms of the

17   handcuffing and being handcuffed at the time CPR was

18   administered.

19       A    As I understood it, initially when he was noted

20   not to be breathing and found to have no pulse, they

21   rolled him over to get access to him to put the AED on

22   him.  But they didn't take the time to un-handcuff him

23   to be faster getting the AED on him.  And so my opinion

24   was really saying that the fact that his hands were

25   behind his back versus off to the side when placing the

1   AED in the initial CPR wouldn't have made a difference

2   or doesn't make a difference in the ability to assess

3   him and try to convert him if he had a shockable rhythm.

4       Q    If the CPR was administered while he was

5   handcuffed, wouldn't the cuffing of his hands behind his

6   back interfere with the effectiveness of the CPR?

7       A    The hands behind the back wouldn't effectively

8   impact the CPR to any measurable amount.  If you're

9   doing good chest compressions, if you're compressing the

10  chest, you're compressing the chest whether his hand's

11  below you or not.  Ideally, we'd put him on a hard

12  surface and don't have handcuffs.  But from a

13  physiologic CPR perspective, it's not going to have any

14  measurable affect on that.

15      Q    Okay.  It will have some affect?

16      A    Not that you could really measure.  If you're

17  getting good chest compression, you're squishing the

18  heart between the ribs, the sternum and the spine, the

19  arms have no impact on that.  You know, more of an

20  impact on the wrists and the arms being squished for

21  over a period of time, but not on the quality of the CPR

22  being performed.

23      Q    Doctor, in terms of materials you reviewed,

24  audio recordings, police communications, you know that

25  at some point while Mr. Turner is restrained or being

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    80

1    restrained, he is moaning to some extent, right?

2        A    He is making noises and sounds like he's

3    moaning, yes.

4        Q    Moaning could be consistent with someone in

5    pain, correct?

6        A    It can be.  Sure.

7        Q    It could be consistent with someone who's

8    experiencing discomfort?

9        A    It could be.  Sure.

10       Q    Any reason to believe that during this

11   restraint process, Mr. Turner was not experiencing

12   discomfort or pain?

13       A    Any reason to not believe that?

14       Q    Yes.

15       A    Beyond having your hands handcuffed behind your

16   back, which may be uncomfortable, having your legs

17   hobbled, which may be uncomfortable, and having some

18   weight put on you, the interpretation of pain is sort of

19   in the individual.  It can be sore and uncomfortable,

20   but as far as frank pain, yeah, I think you're sort of

21   defining things.  I certainly would acknowledge that it

22   can be uncomfortable to be in that position.

23       Q    Okay.  You just don't know whether or not he

24   was actually in pain?

25       A    Yeah, that's a fair statement.  I don't know.

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    81

1    Q    So Mr. Turner could have been in pain during

2  this process, and that would explain one of the reasons

3  why he was moaning?

4    A    He could have interpreted these handcuffs and

5  the position to be uncomfortable and then interpreted

6  that as pain, and the moaning could possibly be related

7  to that.  Sure.

8    Q    Does pain bring about increased stress or

9  anxiety?

10    A    If one is able to sense the pain or have levels

11  of anxiety that were low enough that could be increased,

12  then theoretically a painful stimuli could increase

13  one's stress or anxiety.

14    Q    Mr. Turner's moans and groans could be his

15  reaction in response to anxiety and pain?

16         MR. KRCHAK:  Objection to the form of the

17  question.  But you may answer.

18         THE WITNESS:  Among other things, that could be

19  one of the interpretations of the moans.

20  BY MR. BROOKS:

21    Q    And would you agree with me that if Mr. Turner

22  was in pain and expressed that pain through moans and

23  groans, that would increase the probability of him

24  experiencing cardiac arrest given his enlarged heart?

25    A    Could either we reread that one or you repeat

1  that one?  I apologize.

2       Q    I'll just -- all right.  Can we have the court

3  reporter reread it?  And if you don't understand it,

4  Doctor, I'll restate it.

5       A    Thank you.

6            (The record was read.)

7            THE WITNESS:  I mean, as a hypothetical I guess

8  if you're taking somebody with an enlarged heart and

9  inducing them to pain, versus having someone with an

10 enlarged heart and not having any induction of pain,

11 theoretically, the pain is causing enough physiologic

12 and emotional stress to stress out things, I guess in

13 theory it's a possibility to have an increased risk.

14 But that's sort of a very, very minor affect, if any, at

15 all.

16 BY MR. BROOKS:

17      Q    All right.  But an increased risk of cardiac

18 arrest?

19      A    Compared to somebody with no pain and, again,

20 it's all the qualifications of how much pain, how much

21 of it.  How does it affect you physiologically?  Does it

22 increase your heart rate?  Does it increase your blood

23 pressure?  Does it increase your adrenaline?  If it's

24 that type of pain, then I guess theoretically, yes, it

25 could increase a risk.

1      Q    Is it fair to say you can't quantify how much

2   pain Mr. Turner experienced as a result of his

3   interaction with police and the restraint measures which

4   were used against him by police?

5      A    Yeah.  I can't quantify if he was having any

6   pain versus just paranoid thoughts from his

7   schizophrenia and all the delusions that go on in his

8   hear versus something else external.  Yeah, you can't

9   quantify one way or the other.

10      Q    So you can't rule out Mr. Turner actually

11   experiencing pain during this encounter with police?

12      A    I can't say, you know, 100 percent that he

13   didn't have pain from being handcuffed behind his back

14   and being held down.  I can't say that, no.

15      Q    Doctor, other than the opinions you have

16   included in your report dated March 20th, 2019, do you

17   anticipate doing any additional work in this case?

18      A    Only if requested and more materials arrive.

19   But from the perspective of what I've reviewed, this

20   is -- these are my current opinions.

21      Q    All right.  Doctor, just a few more questions.

22           In terms of your CV I see you're

23   board-certified in emergency medicine?

24      A    Correct.

25      Q    And you have to renew that certification

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    84

1   periodically?

2       A     I do, yes.

3       Q     Is your certification current?

4       A     It is, yes.

5       Q     Are you board-certified in any other

6   specialties as far as medicine is concerned?

7       A     I am not.

8       Q     All right.  So you don't have any special

9   training in the area of pathology, forensic or

10  otherwise, do you?

11      A     No specialized training, no.

12      Q     You don't have any specialized training in

13  cardiology, do you?

14      A     I am not board-certified in cardiology, but I

15  have lots of training in cardiology as an emergency

16  physician.

17      Q     Can you give me a general sense of what that

18  would include?

19      A     Sure.  Basically, I have experience with

20  cardiac arrest, dysrhythmias; treatments of irregular

21  beats; treatments of heart attacks and other cardiac

22  medical conditions; diagnosing and stabilizing.  I don't

23  do CATs.  I don't -- you know, I don't take care of

24  patients on the in-patient service.  But from the acute

25  management of cardiac events, that's a lot of what

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                        85

1    emergency medicine is.

2         Q    I don't think I have any other questions,

3    Doctor.

4         A    Thank you very much.  Pleasure talking with

5    you.

6              MR. KRCHAK:  I just have a couple.

7                        EXAMINATION

8              MR. KRCHAK:  What I'm going to ask be marked is

9    the curriculum vitae of Dr. Vilke.  It's listed as

10   Defendant's 7125 to Defendant's 7215.  I'm going to ask

11   that that be marked, and we can mark it either Exhibit

12   6, or we can mark it defense Exhibit 1.  It doesn't

13   matter to me.  Does it matter to you, sir?

14             MR. BROOKS:  Let's go ahead and mark it as 6.

15             (Exhibit No. 6 was marked.)

16   BY MR. KRCHAK:

17        Q    That's fine.  Doctor, I'm showing you what's

18   been marked as Exhibit 6 for identification.  Do you

19   recognize that document?

20        A    That's my curriculum vitae.

21        Q    And is it current and accurate?

22        A    I haven't gone line by line.  It's probably

23   pretty close to being current.  There may be a paper or

24   two more that I've added on the last couple months.

25        Q    Was it current and accurate at the time that

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    86

1   your opinions were disclosed?

2       A    Yes.

3       Q    Okay.  The autopsy report that was marked as

4   Exhibit 1, when you reviewed the forensic pathologist's

5   report, did it include a medical history?

6       A    I believe there was some background material

7   that had been obtained.  But I can't remember

8   specifically because I don't have my file in front of

9   me.

10      Q    Okay.  And that background information

11  regarding medical history is not included in Exhibit 1,

12  correct?

13      A    That is correct.

14      Q    Okay.  And, Doctor, does schizophrenia mean

15  diminished capacity?

16      A    It does not, no.

17      Q    What's the distinction between schizophrenia

18  and diminished capacity?

19      A    Schizophrenia is a diagnosis, a psychiatric

20  diagnosis.  And many people are treated and have no

21  diminished capacity.  Diminished capacity may be from

22  drugs, it may be from other medical conditions, or it

23  could be from decompensated schizophrenia.

24      Q    And are you aware that at least there was a

25  theory put forward at one point in the case that

Transcript of Gary M. Vilke, M.D.
Conducted on April 22, 2019                    87

```
1    positional asphyxia had something to do with the death
2    of Mr. Turner?
3         A     I was aware of that, yes.
4         Q     Okay.  And that would have to do with some
5    position he was placed in or some force that was used
6    against him that might cause him to be unable to
7    breathe, correct?
8         A     Ventilated adequately to survive, yes.
9         Q     Okay.  And you found no evidence of that?
10        A     Correct.
11              MR. KRCHAK:  That's all I have.  Thank you.
12              MR. BROOKS:  I don't have any follow-up
13   questions.
14              MR. KRCHAK:  Thank you very much.
15              THE WITNESS:  Thank you.
16              MR. BROOKS:  Thank you so much.
17
18         (The deposition was concluded at 4:31 p.m.)
19
20
21
22
23
24
25
```

1              DECLARATION UNDER PENALTY OF PERJURY

2

3

4        I, GARY M. VILKE, M.D., the witness herein, declare

5    under penalty of perjury that I have read the foregoing

6    in its entirety; and that the testimony contained

7    therein, as corrected by me, is a true and accurate

8    transcription of my testimony elicited at said time and

9    place.

10

11           Executed this        day of        2019, at

12                           ,                        .

13       (City)                       (State)

14

15

16

17

18                                GARY M. VILKE, M.D.

19

20

21

22

23

24

25

```
 1    STATE OF CALIFORNIA)

 2                      )ss.

 3    COUNTY OF SAN DIEGO)

 4          I, Dana E. Simon, Certified Shorthand Reporter

 5    No. 12683, for the State of California, do hereby

 6    certify:

 7          That, prior to being examined, the witness named

 8    in the foregoing deposition was duly sworn to testify to

 9    the truth, the whole truth and nothing but the truth;

10          That said deposition was taken down by me in

11    shorthand at the time and place therein named, and was

12    thereafter reduced by me to typewritten form, and that

13    the same is a true, correct, and complete transcript of

14    said proceedings;

15          Before completion of the deposition, review of

16    the transcript {x} was { } was not requested.  If

17    requested, any changes made by the deponent (and

18    provided to the reporter) during the period allowed are

19    appended hereto.  I further certify that I am not

20    interested in the outcome of the action.

21          Witness my hand this 16th day of May 2019.

22

23

24

25          Dana E. Simon, CSR No. 12683
```