E-FILED
Wednesday, 14 August, 2019  11:14:17 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| CHANDRA TURNER, as Special Administrator of the Estate of RICHARD TURNER, deceased, and CHANDRA TURNER, individually,<br><br>       Plaintiff,<br><br>   v.<br><br>CITY OF CHAMPAIGN, a municipal corporation, CHAMPAIGN POLICE OFFICER YOUNG; CHAMPAIGN POLICE OFFICER WILSON; CHAMPAIGN POLICE OFFICER TALBOTT; CHAMPAIGN POLICE SERGEANT FROST<br><br>       Defendants. | No. 17 CV 2261<br><br>Magistrate Judge Eric I. Long<br><br>Jury Trial Demanded |

## PLAINTIFFS' COMBINED RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

Richard Turner was historically known to the Champaign Police Department (CPD) as a non-violent homeless man suffering from mental illness who frequently and harmlessly panhandled in Champaign's Green Street corridor.  When he died, Richard was unarmed and had committed no crime except for jaywalking.  But on November 16, 2016, Defendant Wilson -- a probationary police officer -- and Defendant Young killed Richard after subjecting him to objectively unreasonable excessive force while conducting a purported "welfare check."  The Defendants seek summary judgment, offering their sanitized characterization of the facts about Richard's death, erroneously arguing that their conduct was objectively reasonable

and/or that they are entitled to qualified immunity, even where their conduct was in direct violation of CPD policies governing interaction with persons in mental health crisis.

Usually Richard was unkempt and exhibiting "manic" behavior, but never armed nor did he engage in physical violence towards other people. These officers knew all of that. Yet they needlessly escalated the situation from non-emergency to tragedy when Richard simply did what the officers knew he always did when he saw the police: walked away, unarmed, without harming anyone. They needlessly grabbed Richard when they knew that he was "beyond understanding their commands" and forcefully took him the ground, forced him to lay face down on his stomach by placing pressure to his back, arms and head as they handcuffed and "hobbled" him until Richard lost consciousness, stopped breathing and died. All of this happened because Richard was homeless, unkempt, rummaging in trash cans and after he did not immediately comply with the Officers' initial verbal command to *leave* Green street.

Summary judgment should be denied as to all of the Defendants because the Fourth Amendment clearly prohibited: (1) officers (Wilson, Talbott, and Young) to kill an unarmed man with known mental health issues simply for attempting to walk away from a purported "welfare check"; or (2) other officers (Talbott and Frost) to ignore or stand idle as fellow officers kill a human being. There can be no basis for conferring qualified immunity upon the Individual Defendants given the

material disputed facts about whether force was ever truly necessary, making the Defendants' response obviously unlawful under clearly established law.

Nor can the Individual Defendants secure summary judgment by offering a narrative that characterizes their use of force as objectively reasonable when that narrative depends on credibility determinations that cannot be fully disputed by a dead man killed by excessive force. To grant summary judgment under these circumstances would require this court to make impermissible credibility determinations which only a jury can make. *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (holding that summary judgment is improper in fatal excessive force cases because evidence concerning the reasonableness of the officer's use of force is often susceptible of different interpretations which *cannot* be disputed by a key witness: the dead victim).

Summary judgment should also be denied as to the City of Champaign. There are genuine issues of material fact about whether the moving force behind Richard's death was the CPD's pattern or practice of permitting its officers to ignore CPD's express policies for interacting with mentally ill persons -- such as Richard -- causing his November 16, 2016 death. Because resolution of all of these material issues of fact depend on making credibility determinations, summary judgment should be denied and this matter set for jury trial.

## II.    RESPONSE TO DEFENDANTS' STATEMENTS OF FACT

Pursuant to Local Rule 7.1(D) (2), Plaintiffs responds to Defendants' statement of facts as follows:

- 3 -

## A.  Undisputed[1] Material Facts of the Defendant Officers

The material facts recited in Defendants' statement of facts at ¶¶1-45, 50-55, 57-60, 62, 64-67, 69-103 are undisputed.

## B.  Disputed Material Facts of the Defendant Officers

The following material facts are disputed.

¶¶46-49, 56, 61 and 63. Plaintiffs admit that Richard had an encounter on Green Street (and in an adjacent alley) with the officer defendants and admit that the interaction was triggered by a citizen call for a well-being check given Richard's exhibited behavior on November 16, 2016.  But Plaintiffs deny Defendants' *characterizations* of Richard's behavior, such as "*aggressively* reaching and grabbing" (¶46), implications Richard intentionally reached for Young's gun (¶47), *intentionally* trying to defeat restraint/handcuffing (¶¶48, 49 and 61), disobeying officer commands (¶56), or suggestions Richard was intentionally trying to kicking or pulling his legs (¶63).   Such *characterizations* are directly contradicted by numerous officer testimony that Richard's behavior was attributable to his mental illness about which numerous CPD officers had knowledge, including all of the Individual Defendants.  The officers admit that Richard's police contacts were the result of his known mental health issues and that he was never observed possessing weapons or hurting people, including November 16, 2016 when Richard was killed.

---

[1] Defendants' motion erroneously identifies numerous material facts as "undisputed," but Defendants' *characterizations*, particularly the video footage, are improper.  Defendants' characterization should be disregarded where they conflict with actual evidence.

Ex. 1 (Wilson), 11: 18-24, 26: 3-10; Ex. 2 (Talbott), 10: 19-25, 11: 1-14;  Ex. 3
(Young), 25: 20-25, 26: 1-4, 67: 1-9;   Ex. 4 (Frost), 45: 10-25, 46: 1-25; 47: 1-25; 48: 1-
25; 49: 1-9.

¶68, Plaintiffs dispute this paragraph because the Defendants rendered
conflicting testimony about *who* checked Richard's breathing; Wilson testified that
he did while Talbott and Young testified that Young did. Ex. 1 (Wilson), 55: 15-17;
Ex. 2 (Talbott), 31:3-9; Ex. 3 (Young), 63:5-25.

### C. Undisputed Material Facts of Defendant Champaign

¶¶1, 3 and 5 are admitted.

### D. Disputed Material Facts of Defendant Champaign

¶2 Denied.  Defendant Champaign misstates Epperson's testimony.  His
*complete* testimony was "[b]ecause you have a policy – CPD – Champaign Police
Department has a policy, and their policy is pretty robust, a very thorough policy.
*And the reason why I said yes or no is because I have seen a lot of agencies that have
good policies, but their follow-through is really abysmal.*" Ex. 5 (Epperson Dep.),
152: 3-9.

¶4 Denied.  Defendant Champaign misstates Epperson's testimony.  His
*complete* testimony reveals that Epperson acknowledged that Defendants Wilson
and Talbott attended a training titled "Mental Health First Aid for Public Safety"
on or about June 16, 2016.  But Epperson could not opine about the substance or
quality of that training because no lesson plans or course materials for that training
had been included in the officers' training records produced by Defendant

Champaign.  Defense counsel's follow-up reference question about Epperson had reviewed Bates Label "D 1293" revealed nothing about the substance of the training because that page was simply the title card for the training and *not* lesson plan or course materials for the training. Ex. 5 (Epperson), 171: 9-25, 172:1-3.  A true and correct copy of the title card is attached as Exhibit 6.

¶6 Denied.  Defendant Champaign misstates Epperson's testimony. His *complete* testimony, when asked whether a specific section of the CPD's Use of Force Policy was violated, Epperson testified "*[o]n Champaign policy use of force, 13.1, Subsection A, force necessary to accomplish a lawful objectiveness – objectives.*"  Ex. 5 (Epperson), 39:16-24, 40:1-24.

¶7 Denied.  Defendant Champaign misstates the cited portion of Epperson's testimony.  In the preceding question, defense counsel conceded that Epperson had criticized the officer's and expressed criticisms about the manner in which they used of force was taught in the context of crisis intervention. Epperson then was asked whether he was criticizing Defendant Champaign for failing to train officers generally, *outside* the context of CIT or mental health incidents, to which Epperson indicated that he was not. Ex. 5 (Epperson), 254: 19-24, 255: 1-8.

¶8 Denied.  Defendant Champaign misstates Epperson's testimony.  Epperson was asked about his opinion in Paragraphs 37 through 47 of his Rule 26(a)(2) report which discussed the CPD's Conflict Management and Crisis Intervention Policy.  Epperson testified that written policy was robust, but then criticized how, in *practice*, the written policy was actually applied in the field by the

individual defendants which lead to Richard Turner's death, including how the individual officers were allowed to escalate the situation due to improper supervision from the on CIT-trained officer – Sergeant Frost – who was not actively engaged in the situation until it was too late and how the entire situation was *avoidable.* Ex. 5 (Epperson), 150: 9-24, 151: 1-24, 152: 1-24, 160: 7-13, 163: 2-16, 164: 11-17, 166: 1-24, 167: 1-10, 172: 13-24, 173: 1, 176: 9:14, 177: 17-24, 178: 9-23, 186: 17-24, 187: 1-16, 193: 14-24, 194: 1-24, 195: 1-24, 196: 1-24, 197: 1-24, 198: 14-19 ("*my opinion would be . . . what they ultimately did is, he ended up dying, and that was avoidable.*").

### E. Plaintiffs' Additional Material Facts[2]

#### 1. Wilson was a probationary "rookie" cop on November 16, 2016.

1.      Behind closed doors, CPD officers refer to probationary officers as "rookies." Ex. 4 (Frost Dep.), 64: 22-25, 65:1-6.

2.      Wilson was a probationary officer who had joined the CPD in August or September 2015.  Ex. 1 (Wilson Dep.), 13: 23-25, 14: 1-2, 17: 3-8; Ex. 2 (Talbot) 33: 24-25, 34: 1; Ex. 3 (Young Dep.) 69: 4-6; Ex. 4; Ex. 4 (Frost), 64: 22-25, 65:1-6.

3.      Wilson knew that as a probationary officer he could be discharged from CPD if he did not satisfactorily perform his probationary employment cycle.  Ex. 1 (Wilson Dep.), 17: 20-25.

4.      After graduating from the Police Training Institute (PTI), Wilson went to "the police department and [he] complete essentially in process training there"

---

[2] Plaintiffs' Statement of Additional Facts are cited herein as "SAF¶__."

and then matriculated into field training. Ex. 1 (Wilson Dep.), 15: 3-25, 16: 1-25.

5.     On November 16, 2016, Wilson was still a probationary officer in field training and was assigned to patrol with his field training officer (FTO), Talbott. Ex. 1 (Wilson Dep.), 16: 7-14, 26: 22-25, 27: 1-2; Ex. 2 (Talbott Dep.), 33: 24-25, 34: 1.

6.     As Wilson's FTO, Talbott was assigned to ride along with Wilson for multiple days, monitor Wilson, and evaluate Wilson at the end of each shift. Ex. 1 (Wilson Dep.), 16: 17-23.

## 2. CPD knew Richard was a harmless homeless man suffering from mental illness.

7.     All of the Individual Defendant Officers -- Wilson, Talbott, Young and Frost -- knew Richard from prior encounters, either personal or professional.  Ex. 1 (Wilson Dep.) 22: 19-25, 23: 1-25; Ex. 2 (Talbott Dep.), 12:1-25, 13: 1-25; Ex. 3 (Young Dep.), 15: 21-25, 16: 1-25; Ex. 4 (Frost Dep.) 43: 8-25, 44: 1-25; 45.

8.     Sergeant Frost saw Richard on Green Street almost daily and has known him for so long that he considered himself to be Richard's friend. Ex. 4 (Frost Dep.) 43: 1-25

9.     CPD Officers knew that Richard was homeless and frequently panhandled on Green street. Ex. 1 (Wilson), 26: 3-10; Ex. 2 (Talbott Dep.) 10: 19-25, 11: 1-14; Ex. 3 (Young), 25: 20-25, 26: 1-4, 67: 1-9;   Ex. 4 (Frost Dep.), 45: 10-25, 46: 1-25; 47: 1-25; 48: 1-25; 49: 1-9.

10.     CPD officers knew that Richard would often walk away when the police appeared.  Ex. 1 (Wilson Dep.) 25: 1-25; Ex. 3 (Young Dep.), 17: 13-16.

11.     CPD officers knew that Richard was mentally ill and knowledge of Richard's mental illness was known within the CPD. Ex. 1 (Wilson Dep.), 8:7-11; Ex. 2 (Talbott Dep.), 13: 18-20; Ex. 4 (Frost Dep.) 43: 1-25.

12.     Sergeant Frost testified that he was aware of Richard's mental health challenges as early as 2010, stating that Richard exhibited several "indicators" of mental illness, including flailing his arms, quick head jerks, salivating over himself, and having an unkempt appearance with significant body odor.  Ex. 4 (Frost Dep.), 46: 1-25, 47: 1-25.

13.     Despite his frequent contacts with police, Richard was never observed being in possession of weapons or physically harming other people. Ex. 1 (Wilson Dep.) 26: 3-10, 62: 10-14; Ex. 2 (Talbott Dep.), 52: 5-10; Ex. 3 (Young Dep.), 25:23-25, 26: 1-5; Ex. 4 (Frost Dep.), 49: 4-9.

### 3. The November 16, 2016 dispatch call concerning Richard was not an emergency, but a purported "welfare check."

14.     Officer Young was dispatched to go to the corner of 6th and Green Street to conduct a well-being check on Richard based on a citizen report that he had been, among other things, wandering the street and removing trash from trash cans. Ex. 3 (Young Dep.), 21: 3-19; Ex. 4 (Frost Dep.) 55: 9-25, 56: 1-25, 57: 1-25, 58: 1-5; 61: 12-25.

15.     Sergeant Frost testified that it was reported that Richard was "walking in the street, pulling things out of the garbage can, and drinking wine I believe is what they said" and that he had heard "Richard was walking in the

street, was drinking and was pulling things out of the trash can." Ex. 4 (Frost Dep.), 55: 19-25, 61: 21-25.

16.    Wilson, Talbott and Frost were not dispatched to the call, but volunteered to go to the scene assist Young. Ex. 1 (Wilson Dep.), 27: 7-25, 28: 1-25, 29: 1-3; Ex. 2 (Talbott Dep.), 14: 1-25; Ex. 3 (Young Dep.), 21: 3-19; Ex. 4 (Frost Dep.), 55: 1-25, 56: 1-25, 57: 1-25.

17.    Frost did not arrive at the scene until after Richard was laying face-down on his stomach on the ground, handcuffed behind his back by the other officers. Ex. 4 (Frost Dep.), 122: 7-17.

### 4. Young and Talbott were "busting balls" while probationary officer Wilson engaged Richard alone, which escalated into all three officers chasing Richard down Green Street.

18.    Young testified that he "was more or less busting [Officer Talbott's] balls" as they had a conversation unrelated to Richard as rookie officer Wilson attempted to conduct the welfare check of Richard by himself. Ex. 2 (Talbott), 34: 1-17; Ex. 3 (Young Dep.), 35: 1-11.

19.    Wilson approached Richard and initially commanded him to leave the Green Street area. Ex. 3 (Young Dep.), 36: 6-8.

20.    Wilson observed that Richard was acting "strangely," evidenced by him grabbing a nearby construction tag and throwing it to the ground, dragging his hands across the ground and speaking in gibberish. Ex. 1 (Wilson Dep.), 31: 18-25, 32: 1-25, 33: 1-25, 34: 1-25, 35: 1-25, 36:1-25, 37:1-25.

21.     Wilson called for an ambulance and then commanded Richard to come by Wilson and to sit down, contradicting his earlier command that Richard should leave.   Richard initially complied with Wilson's request and began to walk toward Wilson.  Ex. 1 (Wilson Dep.), 34: 17-22.

22.     Richard then walked past Wilson, crossed Green Street at the 6th Street intersection. (*Id.*)

23.      Richard tried to avoid confrontation with police and his common reaction to the presence of police was to walk away. Ex. 1 (Wilson Dep.), 26:8-10, 33: 10-14.

24.     Richard was not an immediate danger to himself while on Green Street. Ex. 1 (Wilson Dep.), 11: 22-24; Ex. 4 (Frost Dep.), 56:16-25

25.     On November 16, 2016, Wilson never considered disengaging from Richard or calling for assistance. Ex. 1 (Wilson Dep.), 11: 1-25, 12: 1-25.

26.     Wilson had a panic button on his radio and never used it while interacting with Richard.   Wilson was able to call for assistance if he required it, but never did on November 16, 2016. Ex. 1 (Wilson Dep.), 11: 1-25, 12: 1-25.

27.     Richard was perceived by the officers to be "aggressive" but Richard did not harm anyone on Green street and was not observed by the officers being in possession of weapons or consuming any alcohol. Ex. 1 (Wilson Dep.) 26: 3-10, 62: 10-14; Ex. 2 (Talbott Dep.), 52: 5-10; Ex. 3 (Young Dep.), 25: 1-25, 67:4-17; Ex. 4 (Frost Dep.), 49: 4-9.

28.     The only "crime" officers observed Richard commit on November 16, 2016 was the misdemeanor of walking in the street against traffic, despite prior unconfirmed reports that Richard had also been drinking on the public street.  Ex. 4 (Frost Dep.), 66: 21-25, 67: 1-25, 68: 1-25, 69: 1-24.

29.     Sergeant Frost testified that "I don't believe Richard was of the mind-set that he knew what he was doing." Ex. 4 (Frost Dep.), 128: 15-18.

30.     Officer Wilson and Officer Young knew Richard Turner had a history of mental illness and alcohol abuse based on past interactions. Ex. 1 (Wilson Report, pg. 1); Ex. 2 (Young Dep.), 19:24-20:13.

31.     Officer Wilson had seen Richard Turner display erratic behavior in the past. Ex. 1 (Wilson Report, pg. 2.)

32.     Officer Wilson reported that Officer Young repeatedly ordered Richard Turner to leave the area. Ex. 1 (Wilson Report, pgs. 1-2.)

33.     Officer Young inconsistently testified that he did not tell Turner to leave the area.  Ex. 3 (Young Dep.), 26:24-27:5.

34.     Officer Wilson told Richard Turner to remain in the area, after he stated that Officer Young had told Turner to leave the area.  Ex. 1 (Wilson Report, pgs. 1-2.)

35.     On the video, Officer Young can be heard telling Officer Wilson, during the encounter with Richard Turner, that Turner was "his buddy" and he could deal

with him, and that Officer Young was leaving.[3]

36.      Richard went away from Officer Wilson and toward a small walkway that is five feet wide and runs a half a block into a parking alley and parking structure. Ex. 3 (Young Dep.), 40:21-21; Ex. 1 (Wilson Report, pg. 2)

37.      Officer Wilson followed Richard, and told Richard to stop and sit down. Ex. 1 (Wilson Report, pg. 3.)

38.      Officer Young followed Richard and Officer Wilson, and "put on latex gloves" as he walked. Ex. 3 (Young Report, pg. 3.)

39.      Richard did not initiate physical contact with the officers.  Ex. 1 (Wilson Dep.), 46:6:8.

40.      Richard "disregarded" Officer Wilson's order to stop, so Officer Wilson grabbed Turner's clothing on his right shoulder "to prevent him from running any further." Ex. 1 (Wilson Dep.), 46:11-14, 105:15-16; Ex. 1 (Wilson Report, pg. 3)

41.      Richard tried to pull away from Officer Wilson's shoulder grip, but Officer Wilson did not let go of Turner.  Ex. 1 (Wilson Report, pg. 3); Ex. 1 (Wilson) 12:6-18.  Officer Wilson stated that Turner was "placed on the ground."  Ex. 1 (Wilson Report, pg. 3.)

42.      Officer Young stated that he, Turner, and Wilson "all fell to the ground."  Ex. 3 (Young Report, pg. 3.)

---

[3] A "composite" of some of the video footage was previously tendered with Defendants' summary judgment.

**5. The tragic moments in the alley on November 16, 2016 created by the Defendants.**

43.    Richard walked down Green street, entering an alley between two buildings. Wilson testified that Richard was unarmed and that "when Richie was in the alley [he] had not attempted to attack anyone." Ex. 1 (Wilson Dep.), 62: 10-14.

44.    Sergeant Frost testified that because of his mental health issues, Richard was beyond understanding what the officers were saying to him while in the alley. Ex. 4 (Frost Dep.), 80: 22-25.

45.     Sergeant Frost testified that while in the alley he saw Richard acting in a "manic" manner, which Frost described as "flailing his arms up and down, quick head jerks, he appeared to have stuff in his beard, kind of moving back and forth . . . he was just very manic acting." Ex. 4 (Frost Dep.) 71: 19-25, 72: 1-25.

46.    Officer Wilson admits that it is possible that Richard's "struggling" during the alley encounter was triggered by Richard's inability to breathe. Ex. 1 (Wilson Dep.), 104: 12-16.

47.    Sergeant Frost testified that when he arrived at the alley, it was within his power to tell the officers to not approach Richard and to back off Richard until the ambulance arrived. Ex. 4 (Frost Dep.), 117: 7-13.

48.    Sergeant Frost testified that while he could have ordered the officers to back off Richard but that he chose not do to do so. Ex. 4 (Frost Dep.), 117: 19-23.

**6. Richard's "Mirror Image" April 2016 Incident.**

49.    Sergeant Frost testified that in preparing his report concerning the November 16, 2016 incident, he referenced what Frost described as a "mirror

image" incident involving Richard that transpired earlier in April 2016. Ex. 4 (Frost Dep.), 125: 4-25. In addition to Frost's testimony, records produced by the City of Champaign related numerous other prior incidents involving mental health episodes involving the homeless, including Richard. Ex. 11 (Defendants 1876-1982, police reports and involuntary admission records).

50.     Frost testified that Richard's behavior in the April 2016 and November 2016 incidents was "virtually the same." Ex. 4 (Frost Dep.), 126: 1-25.

51.     Frost testified that "I don't believe that Richard was of the mind-set that he knew what he was doing . . . in either . . . April or November [2016]." Ex. 4 (Frost Dep.) 128: 1-18.

52.     Frost said that the November 2016 incident was different from the April 2016 incident because, unlike in April, the officers chased Richard and did not wait for the ambulance and attempt to coax him into the ambulance as they had previously done during the April incident. Ex. 4 (Frost Dep.), 126: 1-5, 127: 1-25, 128: 1-18.

53.     Frost testified that he was the "boss on the scene" and that if he gave a command at the scene the other officers are supposed to obey his order. Ex. 4 (Frost Dep.), 84: 18-25.

54.     Frost testified that during the November 16, 2016 incident that he never instructed the other officers to not engage Richard before the ambulance arrived.    Ex. 4 (Frost Dep.), 85: 20-25, 86: 1-25, 87: 1-25, 88: 1-4.

### 7. Defendants' knowledge and training on dealing with mentally ill persons.

55.     Wilson testified that he has received training on how to deal with mentally ill persons. Ex. 1 (Wilson Dep.), 72: 1-25.

56.     Wilson testified that according to training, how an officer approaches a mentally ill person is different than how an officer might approach an ordinary person. Ex. 1 (Wilson Dep.), 72: 19-25.

57.     Wilson testified that according to training, mentally ill persons "have a harder time communicating." Ex. 1 (Wilson Dep.), 72: 23-24.

58.     Wilson testified that people with mental illness may have trouble understanding directions. Ex. 1 (Wilson Dep.), 73: 5-7.

59.     Wilson testified that according to training, when someone is mentally ill their actions can be out of their control and that must be taken into account by an officer when deciding how to respond to the person. Ex. 1 (Wilson Dep.), 73: 21-25, 74: 1-8.

60.     Wilson testified that according to training, officers should be more patient and understanding with mentally ill people because they cannot control their actions. Ex. 1 (Wilson Dep.), 74: 2-8.

61.     Wilson testified that while at the Police Training Institute he was trained about "excited delirium," where a person exhibits "aggressiveness, either unintelligible speech or something along the lines that they can't – they're saying things that are out of context, sweating, taking clothes off, disproportionate strength."  Ex. 1 (Wilson Dep.), 74: 14-25, 75: 1-6.

- 16 -

62.     Sergeant Frost testified that when he approached Richard on November 16, 2016, Frost did not consider -- one way or another -- whether Richard was experiencing excited delirium. Ex. 4 (Frost Dep.), 116: 11-17.

63.     Sergeant Frost testified that he was certified in Crisis Intervention Training (CIT) prior to the November 16, 2016 incident but that he did not use his training on the date of the incident because by the time Frost "had arrived" Richard "was beyond conversation." Ex. 4 (Frost Dep.), 115: 22-25, 116: 11-17.

64.     Sergeant Frost testified that there was no other reason why he did not utilize his CIT training with Richard on November 16, 2016. Ex. 4 (Frost Dep.), 116: 4-6.

65.     Sergeant Frost testified that the difference between officers who have received CIT training and those who have not is that the trained officers have learned "how to talk to people and deescalate their anger or frustration." Ex. 4 (Frost Dep.), 115: 13-21.

66.     Wilson testified that according to training, calls involving persons with mental illness may not call for the use of police authority or enforcement. Ex. 1 (Wilson Dep.), 89: 13-25, 90: 1-8.

67.     Wilson testified that during to crisis intervention training, Wilson learned techniques to obtain control of situation without using force. Ex. 1 (Wilson Dep.), 90: 1-8.

68.     Wilson testified that according to training, it is better for officers engage mentally ill persons "one-to-one" because engagement by multiple officers may appear more threatening to a mentally ill person. Ex. 1 (Wilson Dep.), 90: 6-18.

## 8. Medical Evidence

69.     In Illinois, the Coroner determines the manner of death, selecting among five categories (natural, accident, suicide, homicide, or undetermined). Ex. 7 (Northrup Dep.), 30:9-31:3.

70.     A death determined to be of "natural" cause by the Coroner "mean[s] there was nothing from the investigation and/or the autopsy, toxicology, anything else combined in our investigation that led us to believe that the death was anything other than natural causes.  No trauma.  You know, typically it's no trauma.  It's some sort of natural disease process." Ex. 7 (Northrup Dep.), 32:15-23.

71.     A death that is "accidental" as determined by the Coroner if:  "There was some sort of external occurrence that caused or contributed to the death." Ex. 7 (Northrup), 33:20-34:10.  The Coroner determined the manner of Richard Turner's death to be accidental.  Ex. 7, (Northrup, 47:4-21); Ex. 14 (Certificate of Death Worksheet, Box 29.)

72.     The Coroner determined the manner of Richard Turner's death to be accidental.  Ex. 7 (Northrup Dep.), 47:4-21.

73.     The Coroner reached the determination of "accidental" as the cause of death, rather than "natural," based on the circumstances of Mr. Turner's arrest by the police.  Ex. 7 (Northrup Dep.), 49:25-50-7; 54:4-55:8.

74.    The Coroner tested Mr. Turner's body for over 300 substances and only found negligible amounts of caffeine and nicotine.  Ex. 7 (Northrup Dep.), 57:21-61:13; 63:18-65:16; Ex. 8 (Bao Dep.), 14:13-16:7; Ex. 15, Toxicology Results.)

75.    A person with cardiomegaly (enlarged heart) has an increased risk of arrhythmia in instances of physical exertion or stress.  Ex. 8 (Bao Dep.), 99:21-100:1.

76.    Stress or physical exertion can cause cardiopulmonary arrest.  Ex. 9 (Cherian Dep.), 44:3-6; Ex. 10 (Vilke Dep.), 40:2-4.

77.    Richard Turner experienced cardiac arrest during restraint by the Champaign Police Department (the Defendants). Ex. 10 (Vilke Dep.), 27:21-24.

78.    Richard Turner collapsed and went into cardiac arrest only after he had been restrained by the Champaign Police Department (the Defendants).  Ex. 10 (Vilke Dep.), 44:4-6.

79.    A contributing factor in Richard Turner's death was the stress brought on by the restraint by law enforcement. Ex. 8 (Bao Dep.), 37:8-22; Ex. 10 (Vilke), 57:2-5; Ex. 16 (Autopsy Report).

80.    While Richard Turner had certain underlying medical conditions, those conditions would not have necessarily caused him to die on November 16, 2016. Ex. 7 (Northrup Dep.), 51:19-52:8.

81.    If Richard Turner had not encountered the police that day, he may not have died.  Ex. 10 (Vilke Dep.), 56:16-57:1.)

### 9.  CPD's Crisis Intervention Team Policies

82.    CPD has a policy governing Crisis Intervention Training (CIT) the purpose of which is to "afford people who have mental illnesses or disabilities the same rights, dignity, and access to police services as are provided to all citizens." Ex. 12 (CPD Policy and Procedure, 41.13.1, Defendants 248)

83.    CPD recognizes that "mental illness can result in calls for service." Ex. 12 (CPD Policy and Procedure, 41.13.1 A, Defendants 248)

84.    According to policy, the CPD recognizes that mental illness is not a crime. Ex. 12  (CPD Policy and Procedure, 41.13.1, A 1, Defendants 248)

85.    CPD recognizes that "[i]nvolvement in unusual or criminal conduct may be an unintentional symptom of a person's mental illness or a failure to receive treatment for the illness, rather than intentional wrongdoing." Ex. 12  (CPD Policy and Procedure, 41.13.1, A 3, Defendants 248)

86.    CPD recognizes that "[m]any calls for service do not warrant the use of policy authority or enforcement." Ex. 12 (CPD Policy and Procedure, 41.13.1, B, Defendants 248)

87.    "It is the policy of the [CPD] that no individual shall be arrested for behavioral manifestations of mental illness that are not criminal in nature." Ex. 12 (CPD Policy and Procedure, 41.13.1, B, Defendants 248)

88.    CPD recognizes that "some mentally ill people generate repeat calls involving non-criminal incidents.  In such cases, it is important for the responders to look beyond the immediate incident, to consider the underlying conditions that

prompted the call, and to tailor a more lasting solution for the situation." Ex. 12 (CPD Policy and Procedure, 41.13.1, D, Defendants 248)

89.     CPD maintains specially trained and certified CIT officers who will respond, when possible, to individuals with mental illnesses. Ex. 12 (CPD Policy and Procedure, 41.13.2, A, Defendants 248)

90.     The standard of care for CIT officers in reaching the disposition in a call involving an individual with mental illness will include considering first the least restrictive environment possible to meet the needs of the individual and community. Ex. 12 (CPD Policy and Procedure, 41.13.2, A 1, Defendants 248)

91.     CPD "recognizes the need to provide continuous access to crisis intervention services." Ex. 12 (CPD Policy and Procedure, 41.14.1, Defendants 249)

92.     CPD personnel responding to situations involving mental illness shall consider the full range of available options, assess their effectiveness, and work to improve the links between local agencies who provide such care and service. Ex. 12 (CPD Policy and Procedure, 41.14.1, Defendants 249)

93.     The recognized objectives of CPD policy is to "provide officers with awareness of the basic precautions that should be taken to ensure officer and citizen safety and survival during police response to various conflict situations." Ex. 12 (CPD Policy and Procedure, 41.14.2, Defendants 249)

94.     CPD personnel are to "provide officer intervention as a calm third party, to reduce tension and hostility, and to restore order without unnecessary force." Ex. 12 (CPD Policy and Procedure, 41.14.2, B 1, Defendants 249)

95.     CPD personnel should "present themselves in a calm, authoritative manner so as not to contribute to the conflict." Ex. 12 (CPD Policy and Procedure, 41.14.4, C, Defendants 250)

96.     CPD officers and supervisors are strongly encouraged to seek CIT assistance and guidance when engaged with an individual who is believed to be in a behavioral health crisis, even if the individual's mental state is not believed to be the primary impetus of the incident." Ex. 12 (CPD Policy and Procedure, 41.14.5, E, Defendants 250)

97.     CPD policy recognizes that "[o]fficers should avoid arresting individuals for behavioral manifestations of mental illness that are not criminal in nature and investigate other available options." Ex. 12 (CPD Policy and Procedure, 41.14.7, C 1, Defendants 251)

**10. Chet Epperson's opinions.**

98.     Epperson stated that the CPD Conflict Management and Crisis Intervention Policy and Procedure, noting that the policy outlines the procedures from the initial call for assistance.  Epperson opined that "[a] policy is only as good if police personnel abide by their policy." Ex. 5 (Epperson, ¶37)

99.     Epperson opined that the "actions of the [CPD] do not align with their stated policy." Ex. 5 (Epperson Report, ¶37)

100.    Epperson opined that, in contravention of policy, the officers responding to the November 16, 2016 incident "did not consider the available options when interacting with Richard Turner." Ex. 5 (Epperson, ¶38)

101.    Epperson noted that Defendants Frost, Wilson, Young and Talbott all had prior experience with Richard and were aware that he had mental health issues, but none of them requested the dispatch of a CIT officer. Ex. 5 (Epperson Report, ¶39)

102.    Epperson opined that Defendants Young, Wilson and Talbott "failed to intervene early-on with their interaction with Richard Turner in an attempt to diffuse the situation.  The officers failed because they did not consider, appreciate, and or assess their options. The officers 'lost control' of the incident scene and, by default, resorted to physical force against Richard Turner as their only option." Ex. 5 (Epperson, ¶43)

103.    Epperson opined that "Turner committed no crime; the officers did not verify if he was publicly drinking; [Turner] removed himself from the officers and he was not resisting arrest while the officers ran after him.  The officers used force due to their lack of capacity and awareness of a mental health condition. Ex. 5 (Epperson, ¶43)  Epperson further opined that sometimes "as weird as it sounds . . . pushing and shoving kind of comes with the job" and that officers are expected to exhibit a higher tolerance when dealing with the mentally ill. Ex. 5 (Epperson), 210:10-22.

104.    Epperson opined that "[i]n the 62 minutes from the initial time of dispatch to Richard Turner's death in their interaction, the officers did not assess, consider, and or appreciate this option to diffuse the situation.  The officers failed

their assessment of this important option, which could have prevented the death of Richard Turner." Ex. 5 (Epperson, ¶44)

105.    Epperson opined that Defendants Young, Talbott, Wilson and Frost were indifferent to CPD policy and constitutional and policing standards relative to how to deal with persons in mental health crisis and that by deliberately ignoring available options caused the death of Richard Turner. Ex. 5 (Epperson, ¶47)

106.    Epperson opined that Frost "did not take control and or provide sound supervision for this incident" and that "the incident escalated because of his lack of supervision." Ex. 5 (Epperson, ¶60)

107.    Epperson opined that the officers used excessive force under the circumstances because a physical seizure of Richard was unnecessary because he had committed no crime apart from petty and minor offenses. Ex. 5 (Epperson, ¶84)

108.    Epperson opined that under the *Graham v. Connor* factors, officers Wilson, Young and Talbott were unjustified in touching, struggling or taking Richard Turner to the ground. (Epperson, ¶85)  Further, these officers should have consulted with Sergeant Turner before seizing Turner. Ex. 5 (Epperson, ¶85)

109.    Epperson opined that Officers Young, Wilson, Talbott and Frost, through their actions, used unnecessary and excessive force against Richard Turner and that their actions and non-actions contributed to Richard Turner's death. Ex. 5 (Epperson, ¶95)

110.    Epperson opined that a reasonably trained police officer's response to the situation on Green street was not to apply any physical force to detain Richard,

but rather to "[l]et [Richard] go.  He hasn't committed a crim.  As I said before, follow him, get ahold of a family member."  Ex. 5 (Epperson Dep.), 195: 14-17.

## III.   ARGUMENT

This is an excessive force case and "summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations."  *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (citing *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009)).  "This principle is particularly relevant where, as here, the one against whom force was used has died, because the witness most likely to contradict the officer's testimony—the victim—cannot testify."  *Id* (citing *Gregory v. County of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008)).  Only a *jury* can decide whether Richard's November 16, 2016 death did (or did not) result from the application of objectively reasonable force by the Defendants because the key moments in the alley immediately preceding his death are *not* capable of objective observation or analysis because there is no video footage capturing what actually transpired.

### A. Summary judgment should be denied as to the excessive force claims in Count 1 against Wilson, Young and Talbott.

#### 1.  Defendants' use of force was objectively unreasonable under the totality of the circumstances known to the Defendants.

The Fourth Amendment prohibits the use of excessive force during the execution of a seizure, and a claim that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure must be evaluated according to the Fourth Amendment's reasonableness standard.

- 25 -

*Graham v. Connor*, 490 U.S. 386, 395-96 (1989).  The reasonableness of an officer's use of force is measured from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and the officer's subjective good *or* bad intentions do *not* enter into the analysis." *Graham*, 490 U.S. at 396-97 (emphasis added).  Instead, the factors that a court must consider are: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.  *Id*. at 396.

The Court also should consider whether the individual was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his or her duties.  *McDonald v. Haskins*, 966 F.2d 292, 292-93 (7th Cir. 1992).  Ultimately, the excessive force inquiry "looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers—if left unattended." *Id*. at 294.

Tellingly, Defendants' recitation of facts repeatedly *characterizes* Richard as "aggressive," falsely suggesting Richard was a danger to either himself or the officers.  But Defendants' obvious attempts to use the stigma of Richard's mental health challenges as a basis to justify their use of force is undermined by the officers' actual testimony.  Their testimony show that the force was unreasonable under the *Graham* factors because Richard had committed no crime, was not a threat to himself or others and was not actively resisting to avoid arrest.  To the

contrary, for purposes of summary judgment this Court *must accept as true* that the Defendants actually knew that on November 16, 2016, Richard: (1) historically, was a non-violent homeless man who frequently and harmlessly panhandled in Champaign's Green Street corridor (SAF¶9); (2) historically, sought *avoid* police confrontations by simply walking away from them, as he did on November 16, 2016 (SAF¶10, 23); (3) suffered from mental illness that caused him that often caused him to *not* be in control of his actions (SAF¶11); (4) was the subject of the "welfare check" dispatch call, which was *not* an emergency situation or involving a crime in progress (SAF¶14); (5) committed no crime in the officers' presence other than *jaywalking*, which is attributed as an involuntary action caused by Richard's mental illness (SAF¶¶27-28); (6) was not perceived as a "threat" to any of the officers' personal safety, as is evident from how rookie officer Wilson initiated the welfare check by himself and how none of the Defendants radioed for assistance or a crisis intervention team, nor pressed panic buttons on their microphones (SAF¶26); (7) had no prior history of carrying weapons or harming other people and was unarmed and had inflicted no physical harm to anyone that day (SAF¶27); (8) was not in possession of weapons, nor physically harmed anyone when the officers arrived on scene or when they "followed" Richard down Green street and into the alley (SAF¶13); (9) was never considered to be in immediate danger of causing harm to himself (SAF¶24); and (10) was exhibiting "manic" type behavior -- "flailing his arms up and down, quick head jerks" -- that was *virtually identical* to an earlier April 2016 episode incident where he exhibited the same behavior but CPD was

able to coax Richard into an ambulance and transport him to the hospital *without* using *any* form of force. (SAF¶45)

Put simply, the totality of the circumstances demonstrate that Richard was homeless, unkempt and rummaging through trash cans on Green street and occasionally stepping into the street, causing citizens to call CPD, the catalyst for the "welfare check."  The most senior officers -- Young and Talbott -- did not perceive Richard as a threat, which is why they allowed rookie cop Wilson to approach Richard alone to do a "welfare check."  But when Richard walked away, they did not take what was the objectively reasonable course of action based on prior experience (*i.e.* Richard's April 2016 incident) or CPD policy.  *See United States v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017) ("Despite its strong language, [*Thompson v. City of Chicago*] should not be understood as establishing a rule that evidence of police policy or procedure will never be relevant to the objective-reasonableness inquiry.").  Compliance, or lack thereof, with CPD's crisis intervention policy by the Defendants is material and dictates under the facts presented that summary judgment should be denied.  An officer is trained in a certain manner based on policy, and that training factors into how an officer approaches a situation.  While the violation of policy, by itself, does not establish a constitutional violation, the policy and training can be part of the inquiry into the reasonableness of the officer's behavior.

Rather than address the totality of these undisputed circumstances, the Defendants choose to dodge them, erroneously arguing that "pre-seizure conduct is

not subject to Fourth Amendment scrutiny." (Dkt. #43)  Defendants misstate the law.  This is an excessive force claim.  "The sequences leading up to the seizure is relevant because the reasonableness of the seizure is evaluated in light of the totality of the circumstances." *Estate of Williams v. Indiana State Police Dep't*, 797 F.3d 468, 483 (7th Cir. 2015); *see also Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) ("police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force.").

No crime had been committed and the Defendants created their own exigency.  In the absence of any immediate life-threatening emergency to themselves, Richard or others, the Defendants transformed a non-emergency "welfare check" into an unruly scenario.  They chased down the street after an unarmed, mentally ill man who was "beyond understanding their commands," spoke only "gibberish" and lacked self-control.   Richard only did what the Defendants always knew him to do when he saw police -- *i.e.*, walk away -- using that conduct as justification to violently take Richard to the ground, placing pressure to his back, arms and head as they handcuffed and "hobbled" him, until Richard lost consciousness, stopped breathing and died.  The totality of these circumstances clearly dictate that the Defendants' actions were objectively unreasonable to a reasonably trained officer based on what the Defendants knew as the situation transpired.  Defendants' arguments to the contrary raise questions of fact about

their subjective intent which can only be answered by a jury.  Summary judgment should therefore be denied.

### 2. Defendants' use of force was obviously unconstitutional, stripping them of qualified immunity.

In *Saucier v. Katz*, the Supreme Court articulated a two-part test for determining whether an actor is entitled to qualified immunity:  (1) *"Taken in light most favorable to the party asserting the injury*, do the facts alleged show the officer's conduct violated a constitutional right?" and (2) "If a violation could be made out on a favorable view of the parties" submissions, the next, sequential step is to ask whether the right was clearly established."  533 U.S. 194, 201 (2001) (emphasis added).

Defendants offer an alternative set of facts in an attempt to show the officers' conduct did not constitute excessive force.  Defendants ignore the facts that show Richard was not dangerous to himself or others because he was going down a small walkway that went into alley and parking garage.  At best, Richard had crossed a street against the light.  The circumstances presented did not warrant the use of force.  *See Pantaleo v. Hayes*, No. 08 C 6419, 2013 U.S. Dist. LEXIS 135122, at *33-34 (N.D. Ill. Sep. 20, 2013) ("The court considers the specific circumstances of the seizure, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'") (citing and quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989).

"Force is reasonable only when exercised in proportion to the threat posed," and the officers freely admit that Richard presented no threat at all.  *Cyrus*, 624 F.3d at 863.  Moreover, the officers, knowing Richard's mental health issues, should not have elected to use force merely because Richard did not immediately comply with a verbal command to stop.  *Id.* ("There is a commonsense need to mitigate force when apprehending a non-resisting suspect, particularly when the suspect is known to have diminished capacity.  An arrestee may be physically unable to comply with police commands."); *McAllister v. Price*, 615 F.3d 877, 883 (7th Cir. 2010) (finding knowledge of arrestee's diabetic condition relevant to excessive force analysis); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004), ("The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted.").

Nor did Richard's "pulling away" from Officer Wilson justify escalation in the use of force.  *See Phillips v. Community Insurance Corp.*, 678 F.3d 513, 524-25 (7th Cir. 2012) ("The officers argue that Phillips demonstrated continuous 'defiance' by failing to follow their commands to exit the vehicle.  This characterization strains credulity given the circumstances.").  The Defendants had no justifiable basis to wrestle Mr. Turner to the ground, climb on top of him, handcuff him, and the bind his legs.  *See Cyrus*, 624 F.3d at 863.  When viewed in a light most favorable to the Plaintiff, the force used was excessive and in violation of the Constitution.

The fact that the officers' use of force against Richard was excessive was clearly established.[4]  *See Abbott v. Sangamon County*, 705 F.3d 706, 732 (7th Cir. 2013) ("Prior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects."); *Shannon v. Koehler*, 616 F.3d 855, 864 (8th Cir. 2010) ("Long before September 13, 2006, this court (among others) had announced that the use of force against a suspect who was not threatening and not resisting may be unlawful.").  As the Seventh Circuit held in *Cyrus*:  Summary judgment was also inappropriate because a jury could conclude that Czarnecki's use of force was excessive in light of the other Graham factors. Cyrus had, at most, committed a misdemeanor offense under Wisconsin law, and he was not exhibiting violent behavior . . .  Moreover, Czarnecki was familiar with Cyrus and was aware of his mental illness; he testified at his deposition that Cyrus had never acted violently toward him."  *Cyrus*, 624 F.3d at 863.  *Cyrus*, *Abbott*, and *Shannon* are all sufficiently analogous that the law was clearly established about the use of force against someone who had, at most, committed jaywalking and had mental health issues.

A case need not present precisely the same fact pattern for the right to be clearly established.  The "exact same fact pattern" or "all fours" argument has been repeatedly rejected in the qualified immunity context.  *See Estate of Perry v. Wenzel*, 872 F.3d 439, 460 (7th Cir. 2017) ("The defendants urge us . . . to conclude that

---

[4] The officers knew all of this because they received case updates, including an update on the *Pantaleo v. Hayes* case.  (Exhibit 13, Training Bulletin and Confirmation of Review (Defendants 342))

because there is no case with the exact same fact pattern, qualified immunity

applies.  That is not what the qualified immunity analysis requires us to do.");

*Canen v. Chapman*, 847 F.3d 407, 412 (7th Cir. 2017) ("This requirement . . . does

not mean that a plaintiff must be able to point to a case 'on all fours' with the

defendant officer's alleged misconduct. But there must be settled authority that

would cause him to understand the illegality of the action.").

Defendants further attempt to justify their use of force arguing it was

necessary to effectuate an involuntary mental health commitment and complied

with established law under *Fitzgerald v. Santoro*, 707 F.3d 725, 732 (7th Cir. 2013).

Defendants' reliance on *Fitzgerald* is misplaced because it merely reiterates that

force used to effectuate an involuntary civil commitment is governed by the *Graham*

objective reasonableness standard.  707 F.3d at 732-33.  *Fitzgerald* then concluded

that the single application of an arm-bar to secure a plaintiff perceived to be

suicidal was objectively reasonable. *Id.*  Richard was not a threat to himself or

others and Defendants did considerably than apply an arm-bar to Richard.

Moreover, Plaintiff's expert Epperson *never* agreed with the officers' choices

of action and defendants' contrary argument is demonstrably false.  Epperson

opined that it was the officers who "forced the issue to be combative with Richard

Turner . . . and thus it ends up in a struggle and in a use of force event." He

ultimately concluded under *Graham*, that the totality of the circumstances dictated

that a reasonable police officer would have "[l]et [Richard] go" because "he [hadn't]

committed a crime." (SAF¶110)

- 33 -

When the Court applies the *Graham* factors to this case, viewing the actual evidence in a light most favorable to Plaintiff (and not Defendants' sanitized narrative), the Defendants violated the Fourth Amendment.  Richard was exhibiting classic signs of a mental health.  Indeed, Defendants' motion summarizes many of them: "walking in the street with his buttocks exposed, flailing his arms, throwing a construction tag, speaking unintelligibly, acing abnormally and fleeing through a busy intersection." (Dkt. #43, p. 21).  There were no exigent circumstances warranting force until the Defendants created them by needlessly subjecting Richard to physical force, which was not only counter-productive, but ultimately lethal for Richard.  As Epperson explained, persons in mental health crisis require assistance -- not force -- and reasonably trained officers are expected to have a higher tolerance level when dealing with mentally ill people without resorting to force because "pushing and shoving kind of comes with the job." (SAF¶103)

But Defendants continue to miss this point.  They were not lay persons. They were officers who actually knew Richard's history for non-violence, how he often ran from police to avoid confrontation, and how he was not perceived to be an actual threat.  They could have simply allowed him to walk away, followed him, and later acquired him when an ambulance was ready – the same way it was handled in April 2016 when Sergeant Frost had interaction with Richard which was the "mirror image" of the November 2016 encounter.  Summary judgment on the basis of qualified immunity should therefore be denied as to all Defendants.

### B. Summary judgment cannot be granted for lack of evidence of proximate cause attributable to Defendants' use of force.

Richard was alive and walking around before the Defendants arrived. By the time the Defendants climbed off of Richard, he had stopped breathing and was dead. The Defendants assert that they had nothing to do with Richard's death and that he just happened to die of natural causes while they were on top of him. Neither the facts nor common sense support this argument. The Coroner determined Richard Turner's death was "accidental," *i.e.*, caused by outside forces. (SAF¶¶71-73) The medical examiner created a report where he found that the police triggered the cardiopulmonary arrest that Richard Turner suffered during the encounter with police. (*Id*.) Multiple medical personnel testified that the stress of an arrest could cause the cardiopulmonary arrest that Richard Turner experienced. (SAF¶¶74-81) And, Defendants' own expert conceded that Turner would likely have lived had he not encountered the police that day. (SAF¶81) While Defendants' expert attempted to blame Richard Turner for "resisting," even he agreed that the struggle led to Richard's death. (*Id*.)

The fact that Richard had pre-existing health conditions does not exculpate the Defendants from liability. As other federal courts have repeatedly held when addressing similar in-custody deaths and the same argument raised by the Defendants here: "According to the autopsy report, Lucas died of 'sudden cardiac death due to hypertensive and atherosclerotic cardiovascular disease during physical restraint.' Harris County's argument that Lucas's injury and death did not result from the use of force is based on Lucas' preexisting medical

conditions.  Harris County's argument fails to recognize that the eggshell skull rule is applicable in §1983 excessive force cases."  *Salcido v. Harris County*, No. H-15-2155, 2018 U.S. Dist. LEXIS 212983, at *12 (S.D. Tex. Dec. 18, 2018); *Darden v. City of Fort Worth*, 880 F.3d 722, 728 (5th Cir. 2018) (reversing grant of summary judgment based on preexisting medical condition that increased the risk of death during the encounter with police).

### C. Summary judgment should be denied as to the failure to intervene claims in Count 2 against Talbott & Frost

Section 1983 also imposes liability upon officers who fail to take reasonable efforts to attempt to stop the use of excessive force by fellow officers.  *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994); *Sanchez v. City of Chicago*, 700 F.3d 919, 925-26 (7th Cir. 2012).  To prevail on a failure to intervene claim, Plaintiffs must show that the officer had reason to know that excessive force was being used or that *any* constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring. *Yang*, 36 F.3d at 285.  A "realistic opportunity" to intervene exists when an officer could have called for help, or when an officer could have cautioned the officer using excessive force to stop.  *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005).

Summary judgment should be denied as to the failure to intervene claims against Sergeant Frost because he admitted that he knew about Richard's mental health history and his virtually identical prior April 2016 incident where Richard was safely "coaxed" into an ambulance without killing him.  Frost was the "boss" on

scene who had the power to order all of the officers to cease from violently taking down Richard. Such a command would have prevented the escalation of the situation leading to Richard's death.

Similarly, it is undisputed that Talbott was Wilson's field training officer who was more focused on "busting balls" with Young, instead of observing Wilson and directing Wilson to cease attempts to grab or otherwise restrain Richard who was clearly in mental health crisis. Talbott was on scene, in close proximity to the entire unfolding event and did nothing. For these reasons, summary judgment as to the failure to intervene claims should be denied.

### D. "Blanket immunity" does not entitle Defendants summary judgment as to Plaintiffs' state law claims

Governmental immunities are the exception, not the rule; and, "[u]nless the defendant can demonstrate an applicable immunity under the statute, there is no immunity." *Williams v. Board of Education of Clinton Community Unit School District No. 15*, 52 Ill.App.3d 328, 336 (4th Dist. 1977). Defendants' reliance on 745 ILCS 10/4-102 is misplaced. Section 102 is entitled "Failure to provide adequate police protection" and addresses a community declining to provide police services, the adequacy of police services that are provided, and the failure to "detect or solve a crime." That exception is inapplicable where the police are actually engaged in police activity. *Cf. West v. Kirkham*, 147 Ill. 2d 1, 14 (1992) (drawing the distinction between a municipality not providing an improvement and failing to maintain improvements, and holding that "[o]nce a public improvement was actually constructed, the municipality had a duty to maintain it in a reasonably safe

condition.").  Inaction is not why this case was brought, and section 102 has no applicability.

Section 202 applies whenever a police officer is engaged in the "execution or enforcement" of any law.  745 ILCS 10/2-202 (providing that public employees are liable for willful and wanton acts or omissions "in the execution or enforcement of any law"); *Glover v. Chicago*, 106 Ill. App. 3d 1066, 1074, 436 N.E.2d 623, 630 (1st Dist. 1982) ("Under the Tort Immunity Act, a public employee is not immune from liability when, while enforcing or executing a law, he acts willfully and wantonly.").  Here, Defendants purported to detain Richard for failing to follow commands, jaywalking, and for involuntary commitment.  Defendants were clearly engaged in the execution or enforcement of law.  *See Thompson v. Chicago*, 108 Ill.2d 429, 433 (1985) ("Enforcing the law is rarely a single, discrete act, but is instead a course of conduct.").  Moreover, "[g]enerally, the question of whether a police officer is executing and enforcing the law is a factual determination which must be made in light of the circumstances involved." *Simpson v. Chicago*, 233 Ill.App.3d 791, 792 (1st Dist. 1992).  To the extent there is some dispute about the Defendants' conduct, that is for the jury to determine.  *Chelios v. Heavener*, 520 F.3d 678, 693 (7th Cir. 2008) ("[U]nder [Plaintiff's] version of the facts, he is entitled to have a jury determine whether [Defendant] engaged in actions for which he can be held liable under Illinois law."); *Davis v. Village of Fox Lake*, No. 03 C 8324, 2005 U.S. Dist. LEXIS 30892, at *24 (N.D. Ill. Nov. 30, 2005) ("Again, here, there is a genuine question of fact as to whether the actions of the individual Defendants were

willful or wanton.").  As Defendants raise no other arguments as a basis to dismiss Plaintiffs' state law claims, summary judgment should be denied.

### E. Summary judgment should be denied as to Plaintiffs' *Monell* claim in Count 9 against the City of Champaign

Defendant Champaign seeks summary judgment by mischaracterizing Plaintiffs' *Monell* claim and misstating the testimony and opinions of Plaintiff's expert, Chet Epperson.

First, Plaintiffs are *not* alleging that Richard's November 16, 2016 death was caused by the CPD's CIT *policy*.  To the contrary, Epperson opined that the CIT policy, as written, is adequate and comports with the CIT recommendations of the International Association of Chiefs of Police.  The premise for Plaintiffs' *Monell* claim is that CPD officers have a clear *practice* of not following the CIT policy which, in this instance, caused Richard's untimely death. *Monell* claims can, and most often are, based on unconstitutional *practices* and require no proof of an unconstitutional written policy to impose liability under Section 1983. *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) ("A municipality may be liable for damages under § 1983 only if the unconstitutional act is caused by . . . a governmental practice or custom that, although not officially authorized, is widespread and well settled.").

Second, the Seventh Circuit has declined to create a "bright line" rule about how frequently the alleged practice must occur in order to meet the requisite "widespread" level Plaintiffs need only show that this was more than a "random event." *Thomas*, 604 F.3d at 303.  Tellingly, Defendant Champaign's argument

focuses solely on the November 16, 2016, ignoring evidence of other mental health crises events, including the April 2016 "mirror image" episode (SAF¶36), in addition to multiple episodes that CPD documented and were produced in discovery.  (*Id.*)

Third, citing *Estate of Williams v. Indiana State Police*, 26 F.Supp.3d 824, 857-61 (S.D. Ind. 2014), Defendant Champaign erroneously asserts that courts have rejected *Monell* claims accusing municipalities of failing to give officers better training to handle persons in mental health crises.  That argument fails because Plaintiffs' *Monell* claim does not allege that the unconstitutional practice is a failure to train its officers in CIT.  Plaintiffs' *Monell* theory is that it is the practice of officers to disregard an explicit policy which causes them to needlessly escalate a situation and create physical confrontations with mentally ill that can have fatal consequences, as happened here.  There was a trained CIT officer available -- Sergeant Frost -- and he could have taken command, ordered the officers to cease and desist, and chose not to do so in the face of an obvious mental health episode. This was not a lack of training, but a lack of compliance with CPD policy which, under the totality of the circumstances, resulted in the application of objectively unreasonable force.  The outcome of *Estate of Williams* does not matter because Plaintiffs do not raise a failure-to-train theory.

Plaintiffs' Statement of Additional Facts show that Epperson has opined in exhaustive detail that there is sufficient basis to impose *Monell* liability because the deliberate choice of Sergeant Frost and the other individual officers to not follow CPD's CIT policies was more than a violation of internal policy, but under the

- 40 -

circumstances, rose to the level of a Fourth Amendment violation, because it resulted in them using impermissibly excessive force on an a mentally ill man who was unarmed, committed no crime, and posed no danger to himself, the officers or others.

Summary judgment should therefore be denied as to Plaintiffs' *Monell* claim. Moreover, because Plaintiffs have established a factual and legal basis to impose liability against the individual defendants, Defendant Champaign's arguments in support of summary judgment on the issues of indemnification and/or *respondeat superior* are rendered moot.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment should be denied.

Respectfully submitted,

**PLAINTIFF CHANDRA TURNER, as Special Administrator of the Estate of RICHARD TURNER, deceased, and CHANDRA TURNER, individually,**

By: /s/Christopher W. Carmichael
    One of her Attorneys

Victor P. Henderson
Christopher W. Carmichael
Devlin J. Schoop
**HENDERSON PARKS, LLC**
140 South Dearborn Street, Suite 1020
Chicago, Illinois 60603
Telephone: (312) 262-2900
vphenderson@henderson-parks.com
ccarmichael@henderson-parks.com
dschoop@henderson-parks.com

## **CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION**

I hereby certify that the preceding response brief complies with the type volume limitations imposed by Central District of Illinois Local Rule 7.1 (4)(b)(1) because the argument section of this summary judgment response brief contains 4,406 words using the Microsoft Word 2016 used to prepare this document, including footnotes, headings, and quotation marks and italics.

/s/Christopher W. Carmichael

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on **August 14, 2019** the foregoing **Plaintiff's Combined Response Brief in Opposition to Defendants' Motions for Summary Judgment** was filed using the Central District of Illinois' electronic Case filing (ECF) system and served by the ECF system on counsel of record, who are registered ECF filers.

<u>s/Christopher W. Carmichael</u>