E-FILED
Wednesday, 14 August, 2019  11:14:18 PM
Clerk, U.S. District Court, ILCD

# Exhibit 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
 2

 3

    CHANDRA TURNER, as Special        )
 4  Administrator of the Estate of    )
    RICHARD TURNER, deceased, and     )
 5  CHANDRA TURNER, individually,     )
                                      )
 6        Plaintiff,                  )
                                      )
 7  vs.                               ) No. 17 CV 2261
                                      )
 8  CITY OF CHAMPAIGN, a municipal    )
    corporation, CHAMPAIGN POLICE     )
 9  OFFICER YOUNG; CHAMPAIGN POLICE   )
    OFFICER WILSON; CHAMPAIGN         )
10  POLICE OFFICER TALBOTT;           )
    CHAMPAIGN POLICE SERGEANT         )
11  FROST,                            )
                                      )
12        Defendants.                 )
13

14

15

16          **CONTAINS CONFIDENTIAL PORTIONS**
                 **BOUND SEPARATELY**
17                  PAGES 93-100
            DEPOSITION OF OFFICER ANDREW WILSON
18           TAKEN ON BEHALF OF THE PLAINTIFF
                   October 10, 2018
19

20

21

22

23

24  Job No. 148762
25
```

Contains Confidential Portions

Page 2

1

2                          I N D E X

3    QUESTIONS BY                              Page

4

5    MR. HENDERSON                                5

6    MR. BRUNNER                                107

7    MR. CARMICHAEL                             108

8    MR. BRUNNER                                110

9

10

11                        E X H I B I T S

12   EXHIBIT                                   Page

13

14   Wilson Exhibit No. 1  Police Report       106

15   Wilson Exhibit No. 2  Field Training      106
                           Program Document
16

17

18

19

20

21

22

23

24

25

Contains Confidential Portions

Page 3

1                IN THE UNITED STATES DISTRICT COURT
                FOR THE CENTRAL DISTRICT OF ILLINOIS
2

3

     CHANDRA TURNER, as Special          )
4    Administrator of the Estate of      )
     RICHARD TURNER, deceased, and       )
5    CHANDRA TURNER, individually,       )
                                         )
6           Plaintiff,                   )
                                         )
7    vs.                                 ) No. 17 CV 2261
                                         )
8    CITY OF CHAMPAIGN, a municipal      )
     corporation, CHAMPAIGN POLICE       )
9    OFFICER YOUNG; CHAMPAIGN POLICE     )
     OFFICER WILSON; CHAMPAIGN           )
10   POLICE OFFICER TALBOTT;             )
     CHAMPAIGN POLICE SERGEANT           )
11   FROST,                              )
                                         )
12          Defendants.                  )

13

14          DEPOSITION OF OFFICER ANDREW WILSON, produced,
15   sworn and examined on October 10, 2018, between the
16   hours of 11:00 a.m. and 3:00 p.m. of that day, at the
17   offices of Thomas, Mamer & Haughey, LLP, 30 East Main
18   Street, 5th Floor, Champaign, Illinois 61824-0560,
19   before Sandra J. Rynders, a Certified Shorthand Reporter
20   (IL), and Registered Professional Reporter, in a certain
21   cause now pending in the United States District Court
22   for the Central District of Illinois, East St. Louis
23   Division, between Chandra Turner et al, Plaintiff, vs.
24   City of Champaign et al, Defendants; on behalf of the
25   Plaintiff.

Contains Confidential Portions

Page 4

1              A P P E A R A N C E S
2

         For the Plaintiff:
3

             Mr. Christopher Carmichael, Esq.
4            Henderson Parks
             140 South Dearborn Street
5            Chicago, Illinois 60603
6
7

         For the Defendants:
8

             Mr. Justin Brunner, Esq.
9            Mr. David Krchak, Esq.
             Thomas, Mamer & Haughey
10           30 East Main Street
             Champaign, Illinois 61820
11
12
13

         Also present:   Ms. Susan Wozniak, Paralegal,
14                        City of Champaign
15
16
17
18
19
20   Court Reporter:
     Sandra J. Rynders, CSR
21   Illinois CSR #084-004861
22
23
24
25

Contains Confidential Portions

Page 5

1              OFFICER ANDREW WILSON

2          IT IS HEREBY STIPULATED AND AGREED by and

3    between counsel for the Plaintiff and counsel for the

4    Defendants that this deposition may be taken in

5    shorthand by Sandra J. Rynders, a Certified Shorthand

6    Reporter (IL), and Registered Professional Reporter and

7    afterwards transcribed into typewriting; and the

8    signature of the witness is expressly waived.

9              *     *     *     *     *

10         (The deposition began at 11:15 a.m.)

11             *     *     *     *     *

12             OFFICER ANDREW WILSON,

13   of lawful age, produced, sworn and examined on behalf of

14   the Plaintiff, deposes and says:

15                  EXAMINATION

16   BY MR. HENDERSON:

17         Q.   All right.  Could you state your name for

18   the record.

19         A.   Andrew Wilson.

20         Q.   And, Mr. Wilson, where do you currently

21   work?

22         A.   I currently work with two employers, the

23   Champaign Police Department and the Illinois Army

24   National Guard.

25         Q.   And we're here today about something that

Contains Confidential Portions

Page 6

1                  OFFICER ANDREW WILSON

2     happened on November 16, 2016 involving Richard Turner.

3                  Do you recall that event?

4          A.   Yes.

5          Q.   On November 16 of 2016 did you believe that

6     Richard Turner needed medical assistance?

7          A.   Yes.

8          Q.   Did you call for an ambulance to take him to

9     the hospital?

10         A.   No.

11         Q.   You did not call for an ambulance?

12         A.   Not to take him to the hospital necessarily.

13    I called for an ambulance to come evaluate him.

14         Q.   And why did you call for an ambulance?

15         A.   I called for an ambulance to evaluate if Mr.

16    Turner was capable of taking care of himself.

17         Q.   Did you call for an ambulance because Mr.

18    Turner was acting strangely?

19         A.   I called an ambulance because I wanted to

20    ensure that he was taking care of himself and I noticed

21    that his behavior was not what it usually is.

22         Q.   And what about his behavior prompted you to

23    feel that way?

24         A.   I would say his behavior was more aggressive

25    and confrontational than normal.

Contains Confidential Portions

1                    OFFICER ANDREW WILSON

2          Q.    And when you say more aggressive and

3    confrontational what do you mean?

4          A.    The incident that stands out is shortly

5    after I arrived he grabbed a sign off of a nearby

6    building and just threw it across the sidewalk and into

7    the street.

8          Q.    And that was a little tag that was probably

9    about the size of a do not disturb tag for a -- of a

10   hotel room, right?

11         A.    I don't recall exactly how large it was.

12         Q.    Was it fairly small?

13         A.    I don't know.

14         Q.    A couple inches by a couple inches?

15         A.    I would say it was a larger than that.

16         Q.    Okay.  Anything else?

17         A.    He was also, according to METCAD, walking in

18   the street, crossing the street multiple times, and then

19   he was touching the ground and failing to comply with

20   officers telling him to leave.

21         Q.    Was Mr. Turner speaking unintelligibly?

22         A.    He was speaking unintelligibly and then at

23   other times would offer responses that intelligible but

24   were irrelevant to the conversation that we were

25   attempting to have with him.

Contains Confidential Portions

1              OFFICER ANDREW WILSON

2        Q.    You know, for example if somebody asks

3  somebody how their day was and they answer purple, would

4  that be an example of a response that would be

5  understandable but irrelevant?

6        A.    I suppose that would be an example.

7        Q.    Okay.  Were you aware that Mr. Turner had

8  mental health issues?

9        A.    I had heard that he had mental health issues

10  from other officers.

11        Q.    In any of your interaction with him had you

12  seen anything that indicated he had mental health

13  issues?

14        A.    I don't think that I'm qualified to

15  diagnosis somebody with mental health issues just based

16  off of casual observation.  But he did display strange

17  behavior, talking to himself, et cetera.

18        Q.    You followed Mr. Turner into what's I guess

19  a walkway on Green Street?

20        A.    Yes.

21        Q.    And it's between two buildings?

22        A.    Yes.

23        Q.    Were you the first officer to touch Mr.

24  Turner?

25        A.    Yes.

Contains Confidential Portions

1          OFFICER ANDREW WILSON

2          Q.   And what were you attempting to do when you

3     touched Mr. Turner?

4          A.   I was attempting to stop him from wondering

5     away before he was evaluated by medical personnel.

6          Q.   Where did that walkway lead to?

7          A.   It leads to an alley just north of that

8     walkway north of Green Street.

9          Q.   And you were -- at the time you were

10    following Mr. Turner, correct?

11         A.   Yes.

12         Q.   When did you decide to take Mr. Turner into

13    custody?

14         A.   I never decided to take Mr. Turner into

15    custody.

16         Q.   Is there anything in particular that

17    precipitated you touching Mr. Turner?

18         A.   Could you repeat the question.

19         Q.   Is there anything in particular that

20    precipitated you touching Mr. Turner?

21         A.   I don't understand the question.

22         MR. BRUNNER:  Do you know what the word

23    precipitated means?

24         THE WITNESS:  Yes.  But I don't understand

25    it in this context.

Page 10

1              OFFICER ANDREW WILSON

2         Q.    (By Mr. Carmichael)  So let me try to

3    rephrase.  Mr. Turner was walking down the walkway, and

4    you were following him, correct?

5         A.    Right.  Walking, running, kind of a mixture

6    of the two, and I was following him.

7         Q.    Okay.  And I was trying to understand what

8    -- in particular if there was anything that prompted you

9    to go ahead and touch him.

10        A.    He wasn't responding to verbal commands.  So

11   that's when I decided to touch him.

12        Q.    Okay.  And what were those commands?

13        A.    I believe once we were in the alleyway that

14   I told him to stop because he was still walking away.

15   And prior to that I asked him to sit and wait on the

16   curb, and he did not obey.

17        Q.    And do you know how many times in the

18   walkway you told him to stop?

19        A.    I don't remember.

20        Q.    Okay.  Did you say anything else besides

21   stop?

22        A.    I don't remember.

23        Q.    Were the only -- were you the only person

24   telling Mr. Turner anything in the walkway?

25        A.    I think so.

Page 11

1          OFFICER ANDREW WILSON

2          MR. BRUNNER:  At what point in time,

3   counsel, just for clarification?

4          Q.   (By Mr. Carmichael)   Just before you, you

5   know, touched Mr. Turner was anyone else giving him any

6   directions or talking to him?

7          A.   I don't think anybody was.  No.

8          Q.   How about Officer Young?

9          A.   I don't remember clearly.

10          Q.   And Mr. Turner, what was he doing in the

11   walkway, just walking away from you or running away from

12   you?

13          A.   Right.  Yes.

14          Q.   Was he doing anything else?

15          A.   No.

16          Q.   Was there anyone else in the walkway?

17          A.   Not that I remember.  No.

18          Q.   Was Mr. Turner doing anything in the walkway

19   that indicated he was an immediate danger to someone

20   else?

21          A.   No.

22          Q.   Was Mr. Turner doing anything in the walkway

23   that indicated he was an immediate danger to himself?

24          A.   No.

25          Q.   Where did you first touch Mr. Turner?

Contains Confidential Portions

Page 12

1                    OFFICER ANDREW WILSON

2          A.    I touched him on the shoulder.

3          Q.    And did Mr. Turner try to keep walking as

4    you touched his shoulder?

5          A.    Yes.  He tried to pull away.

6          Q.    And as he tried to pull away did you grab

7    harder then or not let him?  I'm just trying to --

8          A.    I didn't let go.

9          Q.    Okay.

10         A.    But I didn't pull back or anything either.

11         Q.    So as he tried to keep going or get away you

12   kept your hold on him?

13         A.    Yes.

14         Q.    And that was on the shoulder?

15         A.    Yes.

16         Q.    At that point did you consider disengaging

17   or pulling back?

18         A.    No.

19         Q.    Did you consider calling for Officer

20   Talbott's assistance?

21         A.    No.

22         Q.    Did you know Officer Young was behind you?

23         A.    Yes.

24         Q.    Did you consider calling for Sergeant

25   Frost's assistance?

Contains Confidential Portions

Page 13

1              OFFICER ANDREW WILSON

2        A.    No.

3        Q.    Did you consider asking Officer Talbott or

4   Sergeant Frost to circle around into the alley?

5        A.    No.

6        Q.    At the time did you know that Sergeant Frost

7   was a certified member of the crisis intervention team?

8        A.    No.

9        Q.    Did -- as you were in the alley with Mr.

10  Turner and you put your hand onto his shoulder did you

11  have access to your radio?  Could you have called for

12  assistance?

13       A.    At what time?

14       Q.    When you were in the walkway with Mr. Turner

15  and you put your hand on his shoulder did you access to

16  your radio?  Could you have called for assistance?

17       A.    Yes.

18       Q.    Okay.  There's also a panic button on your

19  radio; is that correct?

20       A.    Yes.

21       Q.    And you could hit that as well?

22       A.    Yes.

23       Q.    When did you join the Champaign Police

24  Department?

25       A.    I joined in 2015.

Contains Confidential Portions

Page 14

```
 1            OFFICER ANDREW WILSON

 2       Q.   What month, do you recall?

 3       A.   August or September.

 4       Q.   And what did you do before you became a

 5  police officer?

 6       A.   I was a student at the University of

 7  Illinois and a soldier with the Illinois National Guard.

 8       Q.   Did you graduate?

 9       A.   Yes.

10       Q.   And what type of degree did you get?

11       A.   I got a sociology degree.

12       Q.   Did you graduate in 2015?

13       A.   I completed all my coursework in 2015, but I

14  didn't file my paperwork to actually graduate until

15  later.

16       Q.   Okay.  Do you recall when they formally

17  awarded you your degree then?

18       A.   I think that I requested it a year later or

19  so.

20       Q.   Okay.  Was that the last degree you've

21  completed?

22       A.   Yes.

23       Q.   And when you were hired by the Champaign

24  Police Department did you go through any training?

25       A.   Yes.
```

Contains Confidential Portions

Page 15

1            OFFICER ANDREW WILSON

2        Q.   Okay.  Could you tell me about that.

3        A.   I attended the Police Training Institute at

4    the University of Illinois.

5        Q.   For how long?

6        A.   I believe the course was three months.

7        Q.   And just for my own understanding when you

8    attend that institute are you actually hired by the

9    police department at that point or you were hired after

10   you complete that?

11       A.   Hired prior.

12       Q.   Okay.  Did you -- is there a graduation or a

13   test after you go through the training institute?

14       A.   Yes.

15       Q.   Did you complete that?

16       A.   Yes.

17       Q.   What happens after you graduate from the

18   Police Training Institute?

19       A.   After you graduate the Police Training

20   Institute you go to the police department and you

21   complete essentially in processing training there.

22       Q.   And how long does that go on for?

23       A.   The initial training I believe is a week.

24       Q.   How about after that?

25       A.   After that you go into the field training

Contains Confidential Portions

Page 16

1          OFFICER ANDREW WILSON

2  program.

3          Q.   And how long does the field training program

4  last?

5          A.   I don't recall exactly how long the field

6  training program lasted, but it's around a year.

7          Q.   Were you still in the field training program

8  in November of 2016?

9          A.   Yes.

10         Q.   And in November of 2016 -- on November 16th

11  of 2016 were you riding with a field training officer?

12         A.   Yes.

13         Q.   Who was that officer?

14         A.   It was Officer Talbott.

15         Q.   And what was the purpose of that, you riding

16  with Officer Talbott on that day?

17         A.   The purpose of riding with Officer Talbott

18  was so that he could monitor -- basically monitor me

19  until he could evaluate me at the end of the shift.

20         Q.   And was he riding with you for just one day

21  or multiple days?

22         A.   I think at that stage of FTO it was multiple

23  days.

24         Q.   And do you remember about how long after

25  that ride-along you completed your field training?

Contains Confidential Portions

Page 17

1          OFFICER ANDREW WILSON

2       A.   I completed it in December.

3       Q.   Okay.  And then you would have gone from a

4  probationary officer to a full officer?

5       A.   Yes.

6       Q.   Okay.  And prior to that you were what's

7  called a probationary officer?

8       A.   Yes.

9       Q.   Is there any limitations on your duties when

10  you're a probationary officer?

11       A.   No.

12       Q.   Are there things that you're supposed to not

13  do as a probationary officer or have supervisory people

14  with you?

15       A.   No.

16       Q.   What's the significance of being a

17  probationary officer?

18       A.   Could you rephrase the question.

19       Q.   Yeah.  I just wanted to get an

20  understanding.  So you're a probationary officer?

21       A.   Right.

22       Q.   Does that generally mean that for example I

23  guess if you don't complete that satisfactorily, you

24  could be discharged?

25       A.   Yes.

Contains Confidential Portions

Page 18

1                    OFFICER ANDREW WILSON

2           Q.    And possibly more easily than if you were a

3     full officer?

4           A.    Yes.

5           Q.    Okay.  Beyond that do they put any -- say,

6     you know, you're a probationary officer, we don't want

7     to you to do this particular activity without help?

8                 MR. BRUNNER:  In that particular step that

9     he was in in November of 2016 or at other points in

10    time?

11                MR. CARMICHAEL:  Just generally.

12                THE WITNESS:  It would depend on what step

13    you're in.

14          Q.    (By Mr. Carmichael)  Okay.  So as you go

15    through steps it changes?

16          A.    Yes.

17          Q.    Okay.  And you were -- in November of 2016

18    what step were you in?

19          A.    I believe I was in Step 4.

20          Q.    Is that the final step?

21          A.    I think it is just prior to the final step.

22          Q.    And what does Step 4 mean?

23          A.    It means that I'm expected to operate

24    independently and then be evaluated by an officer at the

25    end of my shift.

Contains Confidential Portions

Page 19

1                    OFFICER ANDREW WILSON

2          Q.   And what's Step 5?

3          A.   Step 5 is where you operate independently

4     without a field training officer with you except for

5     occasional check rides.

6          Q.   Okay.  In January of 2017 were you trained

7     and certified in crisis intervention?

8          A.   I believe so.

9          Q.   Do you recall what that training entailed?

10         A.   Yes.

11         Q.   Could you tell me about it.

12         A.   The crisis intervention training to become a

13    CIT officer -- if that's the training that you're

14    talking about -- it entails essentially classroom

15    training on how to deal with the mentally ill or

16    disabled, and then you do reenactments with actors so

17    that you can practice those techniques.

18         Q.   And about how long is the training?

19         A.   I don't remember.

20         Q.   Was it a day, more than one day?

21         A.   Its been a while.  I don't remember exactly

22    how many days it was.

23         Q.   Okay.  Was there a certification you get at

24    the end?

25         A.   Yes.

Contains Confidential Portions

Page 20

1                    OFFICER ANDREW WILSON

2          Q.   And what's that certification?

3          A.   You are a crisis intervention officer.

4          Q.   So now you're one of the crisis intervention

5     officers for Champaign?

6          A.   Right, in the sense that I'm certified

7     through that course.

8          Q.   And as being a certified crisis intervention

9     officer other officers could call on you for assistance

10    if they feel that they would like to have your skills?

11         A.   Yes.

12         Q.   And you mentioned learning about dealing

13    with persons with mental health issues.  What did the

14    training teach you about that?

15         A.   The training taught us that you need to be

16    careful when dealing with the mentally ill, that they

17    won't necessarily respond the same way that others

18    would.

19         Q.   And you say be careful.  What do you mean?

20         A.   Just to realize that they have their own

21    sets of needs compared to other people, other citizens.

22         Q.   When you say sets of needs, what do you

23    mean?

24         A.   They might not be able to communicate well,

25    et cetera.

Contains Confidential Portions

Page 21

1                 OFFICER ANDREW WILSON

2          Q.    And you said they might respond differently.

3     What do you mean by that?

4          A.    If they don't understand how you're speaking

5     or what you're saying, they may not follow your

6     instructions or, you know, do what you tell them to do.

7          Q.    Did the crisis intervention training cover

8     any possible physical aspects of mental illness that --

9     you know, the physical symptoms or manifestations it

10    might have on someone with mental illness?

11              MR. BRUNNER:  Physically observable, is that

12    what you're saying or like actual physical?

13          Q.    (By Mr. Carmichael)  I'm just trying to

14    understand if there was anything that your training

15    touched upon that someone with mental illness might also

16    have some other physical ailments.

17          A.    Not that I recall.

18          Q.    Is there anything from that training, the

19    crisis intervention training that you feel could have

20    helped you in dealing with Richard Turner?

21          A.    Yes.

22          Q.    And what specifically from that training

23    could have helped you?

24          A.    I think the best thing from that training

25    would be to help me understand how the mentally ill can

Contains Confidential Portions

1                OFFICER ANDREW WILSON

2   have a hard time communicating.

3         Q.   Did that training also touch upon management

4   of situations with mentally ill persons?

5         A.   Possibly.  I don't recall.

6         Q.   How about -- how about diffusing a situation

7   with a mentally ill person, did it touch upon techniques

8   for that?

9         A.   Yes.

10        Q.   And maybe conflict deescalation, did it

11  touch upon those issues?

12        A.   I believe so.

13        Q.   And what type of things did you learn about

14  management and deescalation?

15        A.   The only thing that comes to mind right now

16  -- I guess it wouldn't be considered deescalation, but

17  talking in a soft voice and presenting yourself in a

18  non-threatening manner.

19        Q.   Prior to the encounter in November of 2016

20  had you had any familiarity with Richard Turner?

21        A.   Yes.

22        Q.   And how many times had you encountered him?

23        A.   I don't know how many times that I

24  encountered him.  I mean it depends.  As a student or as

25  an officer or --

Contains Confidential Portions

1          OFFICER ANDREW WILSON

2          Q.    Well, tell me both.  How many times had you

3    encountered him as both a student and an officer?

4          A.    I would say when I say that it's -- that I

5    don't know it's because it's probably too many for me to

6    really count.  I mean I saw him all the time while I was

7    working that area.

8          Q.    So -- and Richard Turner, he -- he

9    frequented the area along Green Street; is that right?

10         A.    Yes.

11         Q.    And that's a main road into campus, right?

12         A.    Yes.

13         Q.    So if you were I guess attending the

14   university, you might have seen him when you were

15   attending the university?

16         A.    Yes.

17         Q.    Did you interact with him at all?

18         A.    Yes.

19         Q.    And what were your interactions with Richard

20   Turner?

21         A.    I gave him money a couple times.

22         Q.    Okay.  Was he asking for money, or did you

23   just give him money?

24         A.    He would sometimes panhandle.  Yeah.  So he

25   was asking for money.

Contains Confidential Portions

Page 24

1        OFFICER ANDREW WILSON

2        Q.   Did you see other people engage with him as

3   well?

4        A.   Yes.

5        Q.   Did they talk to him?

6        A.   Yes.

7        Q.   Did they give him money?

8        A.   Yeah.

9        Q.   Did you talk to him yourself?

10       A.   Just the normal thank you, hello.

11       Q.   Was he able to talk to you at those times?

12       A.   Yes.  He was talking to himself a lot.

13       Q.   Okay.  And as an officer what were the

14  reasons that you would encounter Richie?

15       A.   I would be doing patrols and see him and

16  just talk to him.

17       Q.   You would stop and talk to him?

18       A.   Right, or talk to him in passing.

19       Q.   Okay.  And was there a particular reason you

20  would talk to him or just because you were in the area

21  and you just --

22       A.   Right, just doing patrols.

23       Q.   Okay.  You weren't specifically called to

24  deal with him?

25       A.   Right.  Right.

Contains Confidential Portions

Page 25

1                    OFFICER ANDREW WILSON

2          Q.    And the times you encountered Richie as an

3    officer generally what was he doing?

4          A.    Generally he was either sitting down or

5    sleeping.

6          Q.    In that same Green Street area?

7          A.    Yes.

8          Q.    And I think this kind of goes without

9    saying, but I want to ask you.  You knew Richie was

10   homeless, correct?

11         A.    Yes.

12         Q.    When you encountered Richie as an officer

13   were you able to talk to him then?

14         A.    Yes and no.  I would say hello or something,

15   but he didn't really want to talk to me I don't think.

16         Q.    Did -- did it change from when you were a

17   student to wearing a uniform?

18         A.    Yes.

19         Q.    So you think he wanted to engage you less

20   maybe when you were wearing the uniform than when you

21   were a student?

22         A.    Yes.

23         Q.    When you did engage Richie was he alert?

24   Did he appear to understand you and appear to -- that

25   you were talking to him?

Contains Confidential Portions

Page 26

1            OFFICER ANDREW WILSON

2        A.   Yeah.

3        Q.   I guess besides maybe sleeping and

4   panhandling, were there any other things that you saw

5   Richie do?

6        A.   Just walk up and down the street talking to

7   other people.

8        Q.   When you saw Richie was he ever aggressive

9   with anyone?

10       A.   No.

11       Q.   As an officer were you aware that Richie had

12  been admitted to the hospital for mental health

13  evaluations?

14       A.   No.

15       Q.   As an officer were you aware that Richie had

16  been admitted to the hospital?

17       A.   Not directly, no.

18       Q.   Had you -- had you heard or understood that

19  he had been admitted to the hospital involuntarily by

20  other officers on occasion?

21       A.   Yes.

22       Q.   I think I asked you before, but I just

23  wanted to be clear, was anyone else riding with you in

24  the squad car on November 16 of 2016?

25       A.   Yes.

Contains Confidential Portions

Page 27

OFFICER ANDREW WILSON

1

2        Q.    And who was that?

3        A.    Officer Talbott.

4        Q.    And he was there as a field training

5   officer?

6        A.    Yes.

7        Q.    You were dispatched on November 16th of 2016

8   to the area of Sixth and Green Street as backup; is that

9   correct?

10        A.    Yes.

11        Q.    Where -- do you recall where you were at

12   when you were dispatched?

13        A.    I was not dispatched.

14        Q.    Okay.

15        A.    I volunteered myself to go to the call.  I

16   was on a traffic call -- a traffic related call.

17        Q.    Okay.  So you heard the call and then you

18   offered to go there as well?

19        A.    Yes.

20        Q.    All right.  Had you heard Officer Young

21   either be dispatched or answer the call before you?

22        A.    Yes.

23        Q.    Is there a particular reason you decided to

24   go in addition?  Is there some kind of protocol or was

25   that just of your own volition?

Contains Confidential Portions

Page 28

1          OFFICER ANDREW WILSON

2          MR. BRUNNER:  Objection, form.

3     Q.   (By Mr. Carmichael)  It has two parts.

4     A.   Yeah.  Uh-huh.  I went voluntarily because

5     he was by himself on a call.

6     Q.   Okay.  And is there a preference in the

7     department to have more than one officer on a call?

8     A.   Yes.

9     Q.   I was just curious, when does the camera in

10    your car turn on?

11    A.   It activates when an officer pushes a button

12    or when you turn the lights on.

13    Q.   Okay.  Because I noticed that for your squad

14    it appeared to turn on I think at what would be Fifth

15    and Green Street.  I don't know if you watched the video

16    again, but am I accurate in that?

17    A.   Yes.

18    Q.   Would that have been because you pressed a

19    button?

20    A.   Yes.

21    Q.   In responding to this call did you activate

22    your lights?

23    A.   No.

24    Q.   And did you exceed the speed limit?

25    A.   I don't recall, but I don't think so.

Contains Confidential Portions

Page 29

1                   OFFICER ANDREW WILSON

2          Q.   It wasn't an emergency call?

3          A.   Right.

4          Q.   And when you arrived you didn't activate

5     your lights at that point either?

6          A.   No.

7          Q.   You just parked your car?

8          A.   Yeah.

9          Q.   And what did you see when you arrived at the

10    Fifth and -- I'm sorry -- Sixth and Green Street area?

11         A.   I saw Officer Young had his vehicle parked

12    at the same area that I parked at and that Richard

13    Turner was in the area.

14         Q.   Do you recall what he was doing?  I am

15    sorry.  I should have said do you recall what Richard

16    Turner was doing since there were two people you

17    referred to there.

18         A.   At that exact moment that I was pulling up I

19    don't recall what he was doing.

20         Q.   And what did you do when you pulled up?  Did

21    you park behind Officer Young?

22         A.   Yes.

23         Q.   And what did you do after you parked behind

24    Officer Young?

25         A.   I got out of my squad car and spoke with

Contains Confidential Portions

Page 30

1                  OFFICER ANDREW WILSON

2   Officer Young.

3          Q.   And what did -- what did you say to Officer

4   Young and what did he say to you?

5          A.   I don't remember specifically what was said,

6   but I was asking him what was going on.

7          Q.   Do you remember him telling you what was

8   going on?

9          A.   I think he told me that he asked Richard to

10  leave.

11         Q.   Leave that area?

12         A.   Yes.

13         Q.   And was Richard still in the area?

14         A.   Yes.

15         Q.   So he had not I guess followed Officer

16  Young's directions yet?

17         A.   Right.

18         Q.   Once you arrived did Officer Young -- did he

19  again tell Richie to leave the area?

20         A.   I don't remember if he said it again after I

21  arrived, but I think so.

22         Q.   In parking your car, the -- the camera in

23  the vehicle is in the front of it, correct?

24         A.   Yes.

25         Q.   And in parking your car the camera is

Page 31

OFFICER ANDREW WILSON

1
2    pointed kind of away from where the -- where most of the

3    events happened?

4         A.   Yes.

5         Q.   Is there any protocol for trying to park

6    your car where the camera can see?

7         A.   I don't recall if there's a protocol

8    specifically saying that.  Our protocol is mostly

9    concerned with parking where it's safe.

10        Q.   Okay.  Is there any kind of preference or

11   directive you've been given to try and park where the

12   camera can see?

13        A.   I don't know.

14             MR. BRUNNER:  Can see what, counsel?

15        Q.   (By Mr. Carmichael) Can see whatever the --

16   the events that are transpiring.

17        A.   I don't know.

18        Q.   Okay.  I think after you arrived Richie

19   crossed the street.  Is that when he took off the

20   construction tag that you were talking about earlier?

21        A.   Yes.

22        Q.   Okay.  That was on the opposite side of the

23   street that you were on?

24        A.   Yes.

25        Q.   And what happened when he took that tag off

Contains Confidential Portions

Page 32

OFFICER ANDREW WILSON

1

2  and you said threw it to the ground?

3          A.   He took the tag off, threw it to the ground,

4  and that's what happened.

5          Q.   And what did you do after that?

6          A.   I didn't do anything after that.

7          Q.   Did anyone else do anything?

8          A.   Officer Young told him to pick it up.

9          Q.   Okay.  And what happened?

10         A.   He picked it up.

11         Q.   What was Richie doing?  Besides I guess

12 playing with the tag, was he walking around at the time?

13              MR. BRUNNER:  Objection, form as to playing

14 with the tag.  If you understand his question, you can

15 answer.

16              THE WITNESS:  Could you repeat the question.

17         Q.   (By Mr. Carmichael)  Yeah.  So Richie had

18 grabbed that tag.  After he did that was he walking

19 around places or did he kind of remain still?

20         A.   I don't remember what he did after he threw

21 the tag on the ground and picked it up.

22         Q.   When you were there on the scene was Richie

23 kind of moving around constantly?

24         A.   He was moving around, taking pauses.

25         Q.   He didn't sit down anywhere?

Contains Confidential Portions

Page 33

1                   OFFICER ANDREW WILSON

2          A.    Not that I remember.

3          Q.    We had talked about the construction tag

4    before.  Was there anything else about Richie's behavior

5    at that point that struck you as unusual?

6          A.    Not leaving when officers asked him to leave

7    and touching the ground with his hands.

8          Q.    Anything else?

9          A.    No.

10         Q.    You said not leaving when officers told him.

11   In prior instances had Richie been told to leave and he

12   went ahead and did that?

13         A.    Yes.  From what I've been told also he

14   sometimes leaves just upon seeing police.

15         Q.    And you said touching the ground with his

16   hands.  What was kind of odd about that for you?

17         A.    Just strange behavior.  Normally he would

18   not do that, just I mean randomly dragging his hands

19   across the ground.  I had never seen him do that before.

20         Q.    Was he kind of bent over and dragging his

21   hands across the ground?

22         A.    Yes.

23         Q.    Okay.  He wasn't like getting down on the

24   ground?

25         A.    No.

Contains Confidential Portions

Page 34

OFFICER ANDREW WILSON

1

2      Q.    While Richie was exhibiting this behavior

3   did you and Officer Young talk about Richie and the

4   behavior at all?

5      A.    Yes.

6      Q.    And do you recall what was said?

7      A.    I don't recall exactly what was said.

8   Something to the effect that he was acting strangely.

9      Q.    Is that when you suggested you might call an

10  ambulance for an evaluation?

11     A.    Yes.

12     Q.    And you did call an ambulance for an

13  evaluation?

14     A.    Yes.

15     Q.    And that type of call to the ambulance, is

16  that an emergency call?

17     A.    No.

18     Q.    So that they would have just been directed

19  to the area, is that how it works?

20     A.    Yes.

21     Q.    In the same -- in the same way you kind of

22  went to the area as well, you know, normally obeying

23  speed limits and --

24     A.    Yes.

25     Q.    Okay.  Did Officer Young comment at any

Contains Confidential Portions

Page 35

1                    OFFICER ANDREW WILSON
2      point that you and Richie were friends?
3             A.   I don't remember that.
4             Q.   Did Officer Young comment that since he felt
5      you and Richie were friends you could handle it and he
6      was going to leave?
7             A.   I don't remember that.
8             Q.   Did Officer Young at some point get into his
9      car as if he was going to leave?
10            A.   Yes.
11            Q.   And did you have the understanding Officer
12     Young was going to leave at that point?
13            A.   To clarify, I don't know if he got into his
14     car as though he were going to leave.  He did get into
15     his car.  I didn't know if he was going to leave at that
16     point or not.
17            Q.   You don't recall if he told you he was going
18     to leave?
19            A.   I don't remember that, no.
20            Q.   And when Officer Young got into his car did
21     you talk to Officer Talbott and tell him you were going
22     to keep an eye on Richie for a little bit?
23            A.   I remember telling either Young or Talbott
24     that.  I don't remember which one.
25            Q.   Okay.  And Officer Talbott -- while and you

Contains Confidential Portions

1                    OFFICER ANDREW WILSON

2    and Officer Young were interacting with Richie and while

3    you were talking to Officer Young, Officer Talbott, he

4    remained in the squad car; is that correct?

5          A.   I believe so.

6          Q.   Did you yourself tell Mr. Turner at some

7    point that he needed to leave?

8          A.   I think so.  Yes.

9          Q.   Do you recall if that was before or after

10   you had called for the ambulance?

11         A.   I believe that would have been before

12   calling for the ambulance.

13         Q.   Okay.  When speaking with Officer Young did

14   you indicate to him you didn't believe Richie was going

15   to leave the area?

16         A.   No.

17         Q.   After you called the ambulance did you tell

18   Richie to do anything else?

19         A.   I told him to come to me, and then I told

20   him to sit down.

21         Q.   Did Richie come over to your area?

22         A.   Yes.

23         Q.   About how close did he get to you?

24         A.   About the same distance that you and I are.

25         Q.   Okay.  A couple feet?

Page 37

1           OFFICER ANDREW WILSON

2       A.   Yes.

3       Q.   And what was Richie doing when he came over

4  to you?

5       A.   When he came over to me is when he did the

6  thing where he touched his hands on the ground.

7       Q.   Was he talking to himself at that point?

8       A.   I don't remember if he was at that point.

9       Q.   He was at some point talking to himself?

10      A.   He does that often.

11      Q.   Was it understandable?

12      A.   No.

13      Q.   And after Richie came over to you and he

14  dragged his hands across the ground what happened after

15  that?

16      A.   At that time I began asking him questions.

17      Q.   What type of questions did he ask him?

18      A.   I asked questions to evaluate his mental

19  state to see if he could care for himself.

20      Q.   Okay.  And just generally what were those?

21      A.   What -- what's today's date or what day is

22  it?

23      Q.   And what were his responses?

24      A.   I believe he said that it was November 2nd.

25      Q.   Okay.

Contains Confidential Portions

Page 38

1          OFFICER ANDREW WILSON

2          A.   And he may have said something else.

3          Q.   Okay.  And did he say anything else besides

4    that?

5          A.   Yes, but I couldn't understand what he was

6    saying.

7          Q.   Okay.  Did you ask him any other questions

8    besides what day it was?

9          A.   I don't think so.

10         Q.   When you call the ambulance do you get some

11   kind of confirmation that they're responding?

12         A.   Yes.

13         Q.   So when you did call the ambulance did you

14   get some kind of confirmation that someone was

15   responding to it?

16         A.   Actually now that I think about it we don't

17   typically get a confirmation unless we ask for it.

18         Q.   Okay.

19         A.   And, no, I had not asked for a confirmation.

20         Q.   Okay.  But when you call for an ambulance

21   are you --

22         A.   It's assumed as long as it's --

23              MR. BRUNNER:  You got to let him get his

24   question all the way out before you start answering.

25         Q.   (By Mr. Carmichael)  Yeah.  I was about to

Page 39

OFFICER ANDREW WILSON

1

2    ask you what you were answering, which was when you call

3    for an ambulance do they actually come?

4          A.   Yes.

5          Q.   Okay.  And it's assumed that they will

6    respond unless somebody tells you otherwise?

7          A.   Yes.

8          Q.   All right.  And did they give you any type

9    of ETA?

10          A.   No.

11          Q.   If you asked for it, could they give you

12   one?

13          A.   Yes.

14          Q.   Okay.  And since I'm not familiar with it,

15   the ambulance, is that affiliated with the hospital here

16   or a private ambulance?

17          A.   There are multiple ambulance companies.

18          Q.   Okay.  Are the ambulance companies attached

19   to the fire departments?

20          A.   I believe that they're attached to the

21   hospitals.

22          Q.   Okay.  I was just trying to understand that

23   a little bit because where I'm from the ambulance is

24   part of the fire department.

25          A.   Uh-huh.

Page 40

<sup>1</sup>                    OFFICER ANDREW WILSON

<sup>2</sup>          Q.    So I take it up here they're -- they're not

<sup>3</sup>    part of the fire department; is that right?

<sup>4</sup>          A.    The companies that I typically use are

<sup>5</sup>    associated with Carle and what used to be Provena.

<sup>6</sup>          Q.    With the hospitals.  Okay.

<sup>7</sup>          MR. BRUNNER:  You nodded your head there.

<sup>8</sup>    You have to say something out loud.

<sup>9</sup>          THE WITNESS:  Yes.

<sup>10</sup>          Q.    (By Mr. Carmichael)  Sorry.  I caught you

<sup>11</sup>    with the coffee.

<sup>12</sup>              And when you say you typically use, do you

<sup>13</sup>    call for a specific one or do you just call for an

<sup>14</sup>    ambulance?

<sup>15</sup>          A.    You can call for a specific one.

<sup>16</sup>          Q.    Okay.  In this particular instance do you

<sup>17</sup>    recall if you called for a specific one or just for an

<sup>18</sup>    ambulance?

<sup>19</sup>          A.    Just for an ambulance.

<sup>20</sup>          Q.    So you told Richie to come there, you talked

<sup>21</sup>    to him.  What happened -- and he dragged his hands

<sup>22</sup>    across the ground.  What happened after that?

<sup>23</sup>          A.    He started to walk away.

<sup>24</sup>          Q.    Okay.  And where was he headed?

<sup>25</sup>          MR. BRUNNER:  Objection, foundation.

Contains Confidential Portions

Page 41

1          OFFICER ANDREW WILSON

2          THE WITNESS:  I don't know.

3          Q.   (By Mr. Carmichael)  He walked in the

4   opposite direction of you?

5          A.   Away from me.

6          Q.   Away from you.  And did you say anything to

7   him when he started to walk away?

8          A.   I told him to come to me and sit down.

9          Q.   And did Richie respond?

10         A.   Initially I think he may have stopped and

11  began coming towards me, but ultimately he kept moving

12  away from me.

13         Q.   And where did he go as he moved away from

14  you?

15         A.   He crossed the street.

16         Q.   Was that Green Street?

17         A.   Yes.

18         Q.   And I'm not -- I'm not familiar with the

19  directions, but which way did he head?

20         A.   He began moving northwest.

21         Q.   Okay.  And along Green Street?

22         A.   He crossed at a diagonal.  It's an

23  intersection.

24         Q.   He crossed the Green and Sixth Street

25  intersection?

Contains Confidential Portions

Page 42

1                    OFFICER ANDREW WILSON

2          A.   Yes.

3          Q.   And he stayed on -- or he went -- you guys

4     were on Sixth Street, and he went to Green Street?

5          A.   Yes.

6          Q.   And I'm not sure which side that would be.

7     Is that the north side?

8          A.   He went -- yeah.  He went from the southeast

9     corner to the northwest corner.

10          Q.   Okay.  And he was moving down Green Street?

11          A.   He moved from the southeast corner of the

12     intersection to the northwest corner of the intersection

13     and then moved west down Green Street.

14          Q.   Okay.  Did he stop at any point?

15          A.   No.

16          Q.   And what did you do when he started to do

17     that?

18          A.   Following him.

19          Q.   And how were you moving when you followed

20     him?

21          A.   I was walking briskly.

22          Q.   When Richie was moving away from you were

23     his pants kind of falling down?

24          A.   Yes.

25          Q.   Was he having trouble moving very fast?

Page 43

OFFICER ANDREW WILSON

1

2    A.   Yes.

3    Q.   Was he kind of shuffling?

4    A.   Yes.

5    Q.   And were you able to catch up to him walking

6    briskly?

7    A.   Yes.

8    Q.   And so he had proceeded west down Green

9    Street.  Did he turn at some point?

10   A.   Yes.

11   Q.   And is that when he went into this walkway?

12   A.   Yes.

13   Q.   And that's near a hotel?

14   A.   Yes.

15   Q.   And the walkway, that's probably five or six

16   feet wide?

17   A.   Approximately, yeah.

18   Q.   As Richie was moving -- continued to move

19   away from you and go down the walkway were you talking

20   to him?

21   A.   Yes.

22   Q.   And what were you saying?

23   A.   Prior to that I was calling out his name to

24   get a response, and then I told him to stop.

25   Q.   And were you telling him to stop repeatedly?

Contains Confidential Portions

Page 44

1                    OFFICER ANDREW WILSON

2          A.    I don't remember.

3          Q.    Was Mr. -- did Richie respond in any way --

4          A.    No.

5          Q.    -- that you could -- did he make any audible

6    noises that you could hear?

7          A.    Other than what he's normally doing, no.

8          Q.    Kind of talking to himself?

9          A.    Right.

10         Q.    So he continued to do that?

11         A.    I believe so.

12         Q.    As Richie moved away from you did you talk

13   to Officer Young?

14         A.    No.

15         Q.    You just started following Richie?

16         A.    Yes.  I remember looking and exchanging

17   looks with Officer Young, but I don't recall saying

18   anything.

19         Q.    Did Officer Young come with you?  Did you

20   see him come with you?

21         A.    He followed behind me.

22         Q.    You were aware that Officer Young was

23   following with you then?

24         A.    Yes.

25         Q.    As you entered the walkway where was Richie?

Contains Confidential Portions

Page 45

1          OFFICER ANDREW WILSON

2      A.   Approximately halfway down the walkway.

3      Q.   Okay.  And was there anybody else that you

4  could see in the walkway besides you and Richie?

5      A.   No.

6      Q.   Had Richie slowed down at all as he entered

7  the walkway?

8      A.   No.

9      Q.   Was he breathing hard at all from moving

10  around?

11      A.   I don't know.

12      Q.   Did Richie sit down in the walkway?

13      A.   No.

14      Q.   As you entered the walkway did you know

15  where Officer Young was at?

16      A.   Yes.

17      Q.   And where was he at?

18      A.   He was at the front of the walkway -- or the

19  front of the alley.

20      Q.   Okay.  And as you caught up to Richie -- I'm

21  sorry.

22           When you caught up to Richie where were you

23  two located in that walkway?

24      A.   When I caught up to Richie he was a little

25  farther than halfway down the alley, and Officer Young

Contains Confidential Portions

Page 46

1                    OFFICER ANDREW WILSON

2    was at the mouth of the alley.

3              Q.   Okay.  Had you looked back to see where

4    Officer Young was at then at some point?

5              A.   Yes.

6              Q.   Did Richie initiate physical contact with

7    you?

8              A.   No.

9              Q.   And could you tell me generally what

10   happened in the alley.

11             A.   I told Richard Turner to stop, he did not

12   stop.  I jogged a little bit to catch up to him, put my

13   hand on his shoulder.  He tried to pull away, and then

14   he turned around and shoved me.

15             Q.   When you say he turned around and shoved

16   you, he used one of his hands and put it on your body?

17             A.   Yes.

18             Q.   Okay.  And where did he put his hand?

19             A.   I don't recall exactly where he put his

20   hand, but I know that in that push and the ensuing

21   flailing that he was doing that he knocked my radio off

22   of my chest.  So I believe it was the chest area.

23             Q.   Okay.  And was it just one hand?

24             A.   I don't remember.

25             Q.   When you say he knocked the radio off, you

Contains Confidential Portions

Page 47

OFFICER ANDREW WILSON

1  mean the cord part with the microphone that's --

3       A.   Yes.

4       Q.   -- up on your lapel?

5            MR. BRUNNER:  You got to let him get his

6  question all the way out before you answer.  Okay?

7            THE WITNESS:  Okay.

8            MR. BRUNNER:  So listen to his whole

9  question again and then answer.

10      Q.   (By Mr. Carmichael)  Yeah.  You mean the

11 corded part that's up on your -- hanging from your

12 shoulder I guess?

13      A.   Yes.

14      Q.   And those things do fall off all the time,

15 don't they?

16           MR. BRUNNER:  Objection, form.

17           THE WITNESS:  No.

18      Q.   (By Mr. Carmichael)  I mean you can -- you

19 could knock that thing off getting in or out of your

20 car, right?

21      A.   I suppose it's possible.

22      Q.   So as Richard pushed you with his hand what

23 happened after that?

24      A.   After he pushed me and struggled with me and

25 knocked in my radio off I tried to kind of get a better

Contains Confidential Portions

Page 48

1                    OFFICER ANDREW WILSON

2      grip, a better hold of him, and Officer Young came to

3      me.

4           Q.   When you say a grip, what were you trying to

5      grip, his arm?

6           A.   I was trying to at that time grab his

7      shoulder and one of his hands.

8           Q.   Would that have been his right side?

9           A.   Yes.

10          Q.   Okay.  And then Officer Young approached.

11     And did he grab his left side?

12          A.   Yes.

13          Q.   And what happened after Officer Young had

14     arrived and grabbed Richie's left side?

15          A.   We managed to get his arms under control and

16     then, because he was still struggling and trying to pull

17     away from us, we took him down to the ground.

18          Q.   When you say you took him down to the

19     ground, how did you do that?

20          A.   I don't remember exactly how we did that,

21     but I think we walked forward to the point where we

22     could put him down on the ground.

23          Q.   Okay.  And when Richie went down on the

24     ground did he just go falling forward?  Did he go on his

25     knees and then down?

Contains Confidential Portions

Page 49

OFFICER ANDREW WILSON

1

2      A.   I don't remember exactly how he went down,

3   but between the way that we were doing it and the fact

4   that we were holding his arms I don't believe that he

5   went down very quickly.

6      Q.   Okay.  When you say he didn't go down very

7   quickly, is that because you were holding him, trying

8   to, you know, I guess manage him going down?

9      A.   Right.

10     Q.   Okay.  Did you and Officer Young exchange

11  any words or anything that lead you guys to decide you

12  were going to put him on the ground?

13     A.   Yes, I think so.

14     Q.   Okay.  Do you know what if anything you

15  said?

16     A.   I think just that we needed to put him on

17  the ground, something along those lines.

18     Q.   Okay.  Could you have attempted to handcuff

19  Richie while he was standing?

20     A.   Not with the way that he was moving.  No.

21     Q.   Was he still trying to get away?

22     A.   Yes.

23     Q.   So when Richie was on the ground was he on

24  his stomach?

25     A.   Yes.

Contains Confidential Portions

Page 50

1          OFFICER ANDREW WILSON

2      Q.   Okay.  And what did you do when Richie was

3  on the ground on his stomach?

4      A.   Began to handcuff him.

5      Q.   What did Officer Young do?

6      A.   Helped me handcuff him.

7      Q.   Okay.  Did you see where he was holding

8  Richie or what he was doing?

9      A.   Other -- I know that he was holding his left

10  arm.

11      Q.   Did you see Officer Young put his knee on to

12  Richie's body?

13      A.   I don't remember that.

14      Q.   Did you see Officer Young grab Richie's head

15  with his hand?

16      A.   I don't remember that.

17      Q.   Did you put your knees on Richie's body?

18      A.   I don't think that I did.

19      Q.   Did you use your knees to -- to pin his arm?

20      A.   Yeah.  I think -- I think that I did.

21      Q.   Okay.  And how -- how did you do that?

22      A.   I think that I used my knee to help keep his

23  arm in a position along with my hand so that we could

24  handcuff.

25      Q.   Okay.  Would you have used your -- did you

Contains Confidential Portions

Page 51

1                OFFICER ANDREW WILSON

2  use your knee to keep his arm down on the ground?

3        A.   No.  To -- I think I used it to push his arm

4  closer to his other arm.

5        Q.   Okay.  And that was behind it to cuff him

6  behind his back?

7        A.   Yes.

8        Q.   And what was Richie doing while you and

9  Officer Young had him on the ground?

10        A.   He was struggling still and yelling.

11        Q.   When you say struggling, what do you mean?

12  Was he rocking?  Was he -- what was he doing?

13        A.   Rocking in a way that somebody would I guess

14  if they were trying to get free.

15        Q.   Did he try to get his legs under him so he

16  could stand back up?

17        A.   I think so.

18        Q.   And what did you do to try and prevent that?

19        A.   I just focused on keeping his right arm

20  under control so I could get him in handcuffs.

21        Q.   Okay.  Did anyone else arrive at any point

22  to help you and Officer Young?

23        A.   Yes.

24        Q.   And who was that?

25        A.   Sergeant Frost.

Contains Confidential Portions

Page 52

1            OFFICER ANDREW WILSON

2        Q.   Okay.  And do you recall when he arrived?

3        A.   I believe he arrived after we had managed to

4   handcuff Mr. Turner.

5        Q.   Did Officer Talbott arrive at any point?

6        A.   Yes.

7        Q.   Do you recall when Officer Talbott arrived?

8        A.   I believe he arrived shortly before Sergeant

9   Frost.

10       Q.   Okay.  And what did Officer Talbott do?

11       A.   I don't recall what he was doing at that

12   time.

13       Q.   Okay.  Do you recall Officer Talbott being

14   on Richie's legs?

15       A.   Yes.

16       Q.   Okay.  Did you have Richie in the cuffs by

17   the time Officer Talbott got there, or do you recall

18   that sequence?

19       A.   I don't remember if we had handcuffed him

20   prior him arriving or not.

21       Q.   And when you handcuffed Richie how did you

22   do that?

23       A.   I had my one hand on his shoulder, another

24   hand on his hand with it behind his back, and then put

25   the handcuffs on.  Pretty standard procedure.

Contains Confidential Portions

Page 53

1           OFFICER ANDREW WILSON

2       Q.   And did you have to use more than one set?

3       A.   I believe we used two sets.

4       Q.   Okay.  And why is that?

5       A.   Because of Richard Turner's size.  He's a

6  little wider than typical.

7       Q.   After you got the handcuffs on him was

8  anything else put on Richie to restrain him?

9       A.   I think hobbles were used.  Yeah.

10       Q.   Okay.  And what's a hobble?

11       A.   Like a hobble is a strap with a mechanism

12  that you can use to bind someone's feet together.

13       Q.   And was one of those put onto Richie's legs?

14       A.   Yes.

15       Q.   Was more than one put onto him?

16       A.   No, I don't think so.

17       Q.   Was anyone holding the strap once the hobble

18  was put on?

19       A.   I don't know if anybody was holding the

20  strap after it was put on.

21       Q.   Because what a hobble does is it puts the

22  people -- puts the person's legs together, right?

23       A.   Yes.

24       Q.   So you could move your legs, you just have

25  to move both of them at once?

Contains Confidential Portions

Page 54

OFFICER ANDREW WILSON

1

2          A.    Yes.

3          Q.    But if somebody holds the strap to the

4    hobble, then it's harder for the person to move their

5    legs, right?

6          A.    Yeah.  If the person's actively stopping

7    them from moving their legs.  Yeah.

8          Q.    After Richie Turner was cuffed and hobbled

9    what happened then?

10          A.    After he was cuffed and hobbled he stopped

11    yelling at some point.

12          Q.    You're not -- are you sure when that

13    happened?

14          A.    I don't remember when he stopped yelling.

15          Q.    And after he stopped yelling -- I guess

16    after he was cuffed and hobbled and you had noticed he

17    stopped yelling what happened next?

18          A.    After that we checked to see if he was

19    breathing.

20          Q.    Was there a particular reason that you

21    checked to see if he was breathing?

22          A.    Sergeant Frost directed us to see if he was

23    breathing.

24          Q.    Okay.  Do you know if there was a reason why

25    Sergeant Frost said check and see if he's breathing?

Contains Confidential Portions

Page 55

1                OFFICER ANDREW WILSON

2              MR. BRUNNER:  Objection, foundation.

3              THE WITNESS:  I don't know.  I think it was

4    because he stopped yelling.

5         Q.   (By Mr. Carmichael)  Okay.  Was there

6    anybody that had noticed that -- that Richard Turner had

7    stopped breathing?

8              MR. BRUNNER:  Same objection.

9              THE WITNESS:  Sorry.  Could you repeat the

10   question.

11        Q.   (By Mr. Carmichael)  Yeah.  I was just

12   asking if there was any of you who appeared to notice

13   that Richard Turner had stopped breathing?

14        A.   No.

15        Q.   Okay.  So who checked to see if Turner was

16   still breathing?

17        A.   I checked.

18        Q.   And what did you do to check?

19        A.   I put my head near his nose and mouth to see

20   if I could feel anything on my face as far as exhalation

21   or inhalation of air, and then I checked to see his --

22   if his chest was rising and falling.

23        Q.   And this was when he was still face down on

24   the ground?

25        A.   No.  I believe he was turned to his side.

Contains Confidential Portions

Page 56

1              OFFICER ANDREW WILSON

2         Q.    Okay.  You had -- so when Sergeant Frost

3    asked you to check the breathing did you move Richie

4    Turner?

5         A.    Yes.

6         Q.    Okay.  And how did you move him?

7         A.    Moved him onto his side.

8         Q.    Did you pick him up and push him to one side

9    or lift up one side I guess?

10        A.    Yeah, I think so.

11        Q.    Did you need help?

12        A.    I think it was myself and someone else.

13        Q.    Okay.  I just remember you saying he was a

14   bigger guy.  So I assumed that you would probably need

15   some help.

16             MR. BRUNNER:  He said he was a wider guy.

17        Q.    (By Mr. Carmichael)  A wider guy.  When you

18   -- I guess he was on -- he was on his side.  Was he kind

19   of balanced on his arm then, his cuffed --

20        A.    I think that he would have been laying on

21   one arm.

22        Q.    Okay.  And what did you find when you

23   checked for breathing?

24        A.    That he was not breathing.

25        Q.    Okay.  Did you hear anything when you

Contains Confidential Portions

Page 57

1          OFFICER ANDREW WILSON

2  checked to see if he was breathing?

3          A.   Anything?

4          Q.   Any -- any exhalation or any gasps of air?

5          A.   No.

6          Q.   Okay.  Did any of the other officers

7  indicate they had heard him gasp for air or exhale air?

8          A.   No.

9          Q.   And when you looked at his stomach to see --

10  or I'm sorry -- his chest to see if it was rising and

11  falling did you see anything?

12          A.   No.

13          Q.   And what happened next?

14          A.   After that we got an AED.

15          Q.   And when you say we got an AED, who was

16  that?

17          A.   I believe it was myself and Officer Talbott.

18          Q.   Where did you get it from?

19          A.   The rear of Sergeant Frost's squad car.

20          Q.   Why did two of you go to get the AED?

21          MR. BRUNNER:  Objection, foundation.  You

22  can answer if you understand.

23          THE WITNESS:  I went to get the AED just to

24  go get it because I think I was closest.  I don't know

25  why the second officer came.

Contains Confidential Portions

Page 58

1              OFFICER ANDREW WILSON

2         Q.   (By Mr. Carmichael)  Did you -- what

3    happened when you went to get the AED?  What happened

4    next?

5         A.   Brought it back to Mr. Turner and applied

6    it.

7         Q.   And where was Mr. Turner when you came back?

8    Where was he positioned?

9         A.   He was positioned on his side or on his back

10   kind of partway just laying on his hands or laying on

11   his arm.

12        Q.   Okay.  Had he been -- I guess had he at that

13   point been rolled to more be on his back then?

14        A.   Even when he was on his side it was I think

15   kind of a halfway position.  I think he was still in

16   that position.

17        Q.   Okay.  Was Mr. Turner -- when you came back

18   with the AED was he still cuffed?

19        A.   Yes.

20        Q.   And his arms were cuffed behind his back?

21        A.   I believe so.

22        Q.   And was he still hobbled?

23        A.   I believe so.

24        Q.   And when you came back with the AED you said

25   you applied it.  What does that mean?

Contains Confidential Portions

Page 59

OFFICER ANDREW WILSON

1

2    A.   You take the contact patches and put them on

3    his chest in order to get the machine to work.

4        Q.   Okay.  Had somebody cut his shirt so you

5    could apply those patches?

6        A.   I don't remember if somebody cut his shirt

7    or opened his shirt, but his chest was bare.

8        Q.   Okay.  And what happened when you applied

9    the AED?

10       A.   It advised that there was a heartbeat and do

11   not shock.

12       Q.   Prior to you applying the AED had anyone

13   checked his -- Mr. Turner's pulse?

14           MR. BRUNNER:  Objection, foundation.

15           THE WITNESS:  I don't know.

16       Q.   (By Mr. Carmichael)  What happened after you

17   applied the AED and it said there was a pulse?

18       A.   Began to prepare for CPR.

19       Q.   And when you say began to prepare, what's

20   that?

21       A.   Getting a face mask ready.

22       Q.   And where was that located?

23       A.   My pocket with medical equipment.

24       Q.   In the AED?

25       A.   No.  Officers' pockets.

Contains Confidential Portions

Page 60

1        OFFICER ANDREW WILSON

2        Q.   Okay.  And you said began preparing.  What

3   happened after you began preparing?

4        A.   The ambulance arrived.

5        Q.   Okay.  So did anyone start CPR on Mr.

6   Turner?

7        A.   I don't think so.  No.

8        Q.   Okay.  Was he still wearing the handcuffs

9   and the hobble when you were preparing to start CPR?

10       A.   Yes.

11       Q.   And what happened when the ambulance

12  arrived?

13       A.   The EMTs took over.

14       Q.   Did they start CPR?

15       A.   I don't recall exactly.  I think they did.

16       Q.   Did they start CPR when Mr. Turner was on

17  the ground or at some other point?

18       A.   I don't remember.

19       Q.   At some point Mr. Turner was loaded onto I

20  guess a gurney or something to be loaded into the

21  ambulance?

22       A.   Yes.

23       Q.   Was he still handcuffed at that point?

24       A.   I don't know.

25       Q.   Was he still wearing the hobble?

Contains Confidential Portions

1                  OFFICER ANDREW WILSON

2        A.   I don't know.

3        Q.   Did you help load Mr. Turner into the

4   ambulance?

5        A.   No.

6        Q.   Once the EMTs arrived what did you do?

7        A.   Gave them space to work.  I think I was

8   talking to other officers.

9        Q.   Okay.  Did you ride with the EMTs or

10  anything to the hospital?

11       A.   No.

12       Q.   Did you during this process at all call for

13  a full medical response from the ambulance?

14       A.   I don't believe I did.

15       Q.   Did you hear someone else?

16       A.   Yes, I think so.

17       Q.   Okay.  And what does that mean?

18       A.   It means for them to expedite their

19  response.

20       Q.   Did you hear the ambulance arriving?

21       A.   Yes.

22       Q.   They had turned on their lights and sirens?

23       A.   Yes.

24       Q.   Do you know how long elapsed between you

25  attempting to start CPR and the ambulance arriving?

Contains Confidential Portions

Page 62

1          OFFICER ANDREW WILSON

2     A.   No.

3     Q.   Have you had CPR training before?

4     A.   Yes.

5     Q.   Have you had training in using the mask?

6     A.   Yes.

7     Q.   Do you know about how long it takes you to

8  get that ready to use?

9     A.   A few seconds.

10     Q.   Okay.  Did Richie have any weapons on him?

11     A.   No.

12     Q.   When Richie was in the alley had -- had he

13  attempted to attack anybody?

14     A.   No.

15     Q.   Could you have continued to follow Richie

16  down that alley?

17     A.   Yes.

18     Q.   Could you have asked for a backup to come

19  and assist you?

20     A.   Yes.

21     Q.   Could you have asked for either Officer

22  Talbott or Sergeant Frost to circle around and cut

23  Richie off?

24     A.   Yes.

25     Q.   Could you have waited for the ambulance to

Contains Confidential Portions

Page 63

1                 OFFICER ANDREW WILSON

2    arrive before you attempted to take Richie into custody?

3         A.   Yes.

4         Q.   Were crisis intervention -- certified crisis

5    intervention officers available for you to contact?

6         A.   Yes.

7         Q.   Could you have contacted one of those?

8         A.   Yes.

9         Q.   When you perform your job do you rely on

10   your training?

11        A.   Yes.

12        Q.   And do you generally follow your training

13   when performing your job?

14        A.   Yes.

15        Q.   I know we talked a little bit earlier about

16   some of your training.  Do you also receive training

17   periodically as an officer?

18        A.   Yes.

19        Q.   Does that consist of some classroom

20   training?

21        A.   Yes.

22        Q.   You also have some materials you're assigned

23   to read on your own time?

24        A.   Yes.

25        Q.   And you also try to stay current on

Contains Confidential Portions

Page 64

1                OFFICER ANDREW WILSON

2    department policies and procedures?

3         A.   Yes.

4         Q.   Is part of your job to try to follow

5    department policies and procedures?

6         A.   Yes.

7         Q.   And do you generally try to follow

8    department policies and procedures when you do your job?

9         A.   Yes.

10        Q.   Do you recall when was the last time you had

11   CPR training?

12        A.   No.

13        Q.   Do you recall how often you're trained in

14   CPR?

15        A.   Every year.

16        Q.   Okay.  Is there a certification that comes

17   along with that?

18        A.   Yes.

19        Q.   And you do that about once a year?

20        A.   Yes.

21        Q.   Do you recall in the November 2016 time

22   period how recent your CPR training had been?

23        A.   No.

24        Q.   Have you -- does your CPR training touch on

25   performing CPR on someone in handcuffs?

Contains Confidential Portions

Page 65

```
 1                    OFFICER ANDREW WILSON

 2          A.    No.

 3          Q.    Does a person wearing handcuffs inhibit in

 4    any way you performing chest compressions?

 5          A.    I don't know.

 6          Q.    Have you ever done CPR on someone in

 7    handcuffs?

 8          A.    No.

 9          Q.    Do you recall when the last time you had use

10    of force training was?

11          A.    No.

12          MR. BRUNNER:  Chris, when you get a chance

13    can we have a break when you get to a good break spot.

14          MR. CARMICHAEL:  I'm at one now actually.

15                    (Recess taken.)

16          Q.    (By Mr. Carmichael)  So, Officer Wilson, do

17    you recall when your last use of force training was?

18          A.    No.

19          Q.    How often are you trained on use of force?

20          A.    I believe we're trained on use of force once

21    a year as well.

22          Q.    Is there a particular time of year that

23    occurs?

24          A.    I don't know if there's a particular time or

25    if it's just scheduling.
```

Contains Confidential Portions

Page 66

1          OFFICER ANDREW WILSON

2          Q.    Do you recall when prior to November of 2016

3    you had received use of force training?

4          A.    No.

5          Q.    Was use of force training part of your

6    initial three-month training?

7          A.    Yes.

8          Q.    And then when you were on the job as a

9    probationary officer did you receive any additional use

10   of force training?

11         A.    Yes.

12         Q.    In your use of force training do you recall

13   anything in that training that says it's okay to kneel

14   on someone's back?

15         A.    I don't recall that specifically.

16         Q.    Okay.  In your use of force training is it

17   ever discussed that a person could potentially

18   suffocate?

19         A.    Yes.

20         Q.    And what -- what was discussed about

21   potential suffocation?

22         A.    They discussed -- the part that I remember

23   is they discussed a concept called the piggy pile where

24   there's too many officers on one person, that they can

25   suffocate.

Contains Confidential Portions

1                OFFICER ANDREW WILSON

2        Q.   Were there words or terms used about

3   positional asphyxia?  Is that --

4        A.   Yes.

5        Q.   Do you recall that?

6        A.   Yes.  That was part of the training as well.

7        Q.   Okay.  And what was talked about positional

8   asphyxia?

9        A.   That if a person is put into a certain

10  position, that they can suffocate.

11       Q.   And what position or positions would that

12  be?

13       A.   Face down with pressure on top of them.

14       Q.   And what are you taught about -- about the

15  possibility of suffocation?  What are you taught to do

16  in response to that?

17       A.   To be careful to avoid those positions.

18       Q.   And you used a term that -- maybe more of a

19  colloquialism -- piggy pile?

20       A.   That's right.  Like you said, a

21  colloquialism.

22       Q.   And that's when there's several officers and

23  they're on top of a person?  Is that --

24       A.   Yes.

25       Q.   Okay.  And what can happen then?

Contains Confidential Portions

Page 68

1               OFFICER ANDREW WILSON

2          A.   Positional asphyxia.

3          Q.   Okay.  Besides I guess trying to avoid that,

4     is there anything else that can be done in response to

5     that issue of positional asphyxia?

6          A.   What do you mean?

7          Q.   I mean is there any particular, you know,

8     response that happens if -- is there a concern that then

9     you do something besides trying to avoid it?

10          A.   If you discover that somebody's not

11     breathing, then you do CPR and AED, et cetera.

12          Q.   Okay.  If somebody is in one of those

13     positions that could lead to positional asphyxia, is

14     that something that should -- is their breathing

15     something that should be checked on right away?

16               MR. BRUNNER:  Objection, form, incomplete

17     hypothetical.

18               THE WITNESS:  I think their breathing should

19     be checked if it's determined that they're not

20     breathing.

21          Q.   (By Mr. Carmichael)  Have you received any

22     training on deescalation?

23          A.   Yes.

24          Q.   And what type of training have you received?

25          A.   I believe that it was covered during the

Contains Confidential Portions

1          OFFICER ANDREW WILSON

2   police academy.

3          Q.   Have you received any training subsequent to

4   that on deescalation?

5          A.   I received deescalation training in the CIT

6   class that we previously discussed.

7          Q.   And what type of training did you receive on

8   deescalation?

9          A.   Deescalation is a part of the use of force

10  training.

11         Q.   And what were you trained as far as

12  deescalation goes?

13         A.   To -- to try to avoid going up with a

14  escalation scale if possible and to talk to people when

15  possible.

16         Q.   And what's an escalation scale?

17         A.   So the use of force scale begins with verbal

18  and then moves up in intensity depending on the

19  effectiveness of your previous actions.

20         Q.   And in deescalation training is there

21  discussions about how to I guess use those different

22  levels?

23         A.   Deescalation training would entail going

24  down the scale.

25         Q.   Okay.  So if for example you had gone up

OFFICER ANDREW WILSON

1

2    from verbal to some type of physical, you might go back

3    down?  Is that what you're saying?

4         A.   Yes.

5         Q.   Okay.  And were there particular situations

6    that you were trained in to do that?

7         A.   Yes.

8         Q.   Okay.  What types of situations?

9         A.   An example of the situation would be a

10   suicidal individual.

11        Q.   Okay.  Besides a suicide, any other

12   situations where you were trained to try and use some

13   deescalation?

14        A.   I don't recall specifics.  I generally try

15   to deescalate whenever possible.

16        Q.   Could you give me an example of where you've

17   actually done a deescalation?

18        A.   I think the best example would be suicidal

19   callers.  Do you want a specific example?

20        Q.   Yeah.  I just want you to give me sort of

21   how it went up and how you went back down.

22        A.   Off the top of my head if you have a vehicle

23   that comes back stolen or something, that immediately

24   due to the nature of the crime would denote an

25   escalation of the use of force scale to possible use of

Contains Confidential Portions

OFFICER ANDREW WILSON

1
2  firearms.  But then by talking or determining what's
3  happening to the suspect or whoever is involved, then
4  you can move it back down to a hands-on or even just a
5  verbal in the situation.
6      Q.   In dealing with use of force and
7  deescalation is there any discussion and training about
8  giving people time to comply?
9      A.   Yes.
10     Q.   Okay.  In those trainings is there any
11 discussion of I guess multiple uses of the same level
12 before you escalate?
13     A.   Yes.
14     Q.   Okay.  Are -- in your use of force and
15 deescalation training are there times where you should
16 avoid going up in escalating force?
17     A.   Yes.
18     Q.   Okay.  Could you give me any examples of
19 those.
20     A.   This is speaking generally, but if it's a
21 child, a pregnant woman, something along those lines
22 it's really situation dependent.
23     Q.   Okay.  Have you received any training on
24 dealing with people with mental health issues?
25     A.   Yes.

Contains Confidential Portions

Page 72

1                    OFFICER ANDREW WILSON

2          Q.    Okay.  When did you receive that training?

3          A.    I received training in that regard at PTI

4    and the crisis intervention training.

5          Q.    And PTI stands for?

6          A.    The Police Training Institute.

7          Q.    That was the three months --

8          A.    Yes.

9          Q.    -- when you were initially hired?

10         A.    Yes.

11         Q.    Okay.  And what did you learn from those

12   trainings?

13         A.    During the crisis intervention training I

14   think everything that we learned was covered in your

15   previous question.  And PTI it's hard for me to

16   distinguish which training was when because its been so

17   long, but generally how to deal with people who are

18   mentally ill.

19         Q.    Is the approach you take in dealing with

20   people who are mentally ill different from how you might

21   approach an ordinary person?

22         A.    Yes.

23         Q.    Okay.  In what ways?

24         A.    They have a harder time communicating.

25         Q.    Do they have a harder time understanding as

1           OFFICER ANDREW WILSON

2   well?

3           A.   I think it's a case-by-case basis.  Mentally

4   ill is a pretty -- a pretty wide field of people.

5           Q.   Can people with mental illness have trouble

6   understanding directions?

7           A.   Yes.

8           Q.   When approaching someone who has mental

9   illness is your approach more like one of a firefighter

10  or a paramedic rather than maybe a law enforcement

11  capacity?

12           MR. BRUNNER:  Objection, form.

13           THE WITNESS:  I don't know how to answer

14  that question.  Law enforcement capacity is a wide

15  ranging field as well.

16           Q.   (By Mr. Carmichael)  Well, when you approach

17  someone with mental illness are you there more to

18  provide assistance than necessarily arrest someone?

19           A.   It depends on what is going on with the

20  mentally ill person.

21           Q.   Okay.  When someone is mentally ill can

22  their actions be out of their own control?

23           A.   Yes.

24           Q.   Is that part of the consideration that you

25  received in that training?

Contains Confidential Portions

Page 74

1              OFFICER ANDREW WILSON

2         A.    Yes.

3         Q.    And so when you're approaching someone who

4    is acting in ways that they can't control how does your

5    training tell you to deal with that?

6         A.    To be understanding of that.

7         Q.    Be more patient?

8         A.    Yes.

9         Q.    Have you received any training on dealing

10   with people that might have what's called excited

11   delirium?

12        A.    Yes.

13        Q.    And when did you receive that training?

14        A.    I received excited delirium training during

15   the Police Training Institute.

16        Q.    Any other time?

17        A.    I believe there was also departmental

18   training.

19        Q.    What did you learn from that training?

20        A.    That there is a condition called excited

21   delirium which can be caused by any number of things but

22   generally results in a -- I guess a generalized

23   situation where the person is displaying certain

24   symptoms.

25        Q.    And what were those?  What are some of the

Contains Confidential Portions

Page 75

1                    OFFICER ANDREW WILSON

2    symptoms that you recall?

3            A.    Aggressiveness, either unintelligible speech

4    or something along the lines that they can't -- they're

5    saying things that are out of context, sweating, taking

6    clothes off, disproportionate strength.

7            Q.    Any others you recall?

8            A.    None that come to mind off the top of my

9    head.

10           Q.    And do you recall how you then approach

11   dealing with someone who might or could have this

12   excited delirium?

13           A.    Yes.

14           Q.    Okay.  How do you approach someone like

15   that?

16           A.    For an individual with excited delirium you

17   wait for backup and wait for a ambulance and sedative,

18   and then detain the person and sedate them.

19           Q.    And why is the person sedated?

20           A.    Because they're dangerous typically or that

21   they are not in control of their actions.

22           Q.    And has anything in particular happened when

23   people with excited delirium have been encountered?

24                 MR. BRUNNER:  Objection, form and

25   foundation.

Contains Confidential Portions

Page 76

1          OFFICER ANDREW WILSON

2          Q.   (By Mr. Carmichael)  So I guess I was asking

3    more specifically about, you know, does anything happen

4    to the person with excited delirium?

5          A.   They are transported to the hospital

6    typically.

7          Q.   Okay.  And were -- I guess were there

8    encounters with people with excited delirium where those

9    people had heart attacks or medical conditions as a

10   result of their encounter with the police?

11              MR. BRUNNER:  Objection, foundation.

12              THE WITNESS:  The situation of excited

13   delirium, whatever is causing the excited delirium I

14   think can cause other health problems.

15         Q.   (By Mr. Carmichael)  Well, I was just trying

16   to get an understanding if the protocol you described

17   for handling someone that could have excited delirium

18   was put into place because of instances where people

19   with that possible condition had had some type of heart

20   attack or some type of medical condition.

21         A.   I don't know why the policy was put into

22   place.

23         Q.   Okay.  When you were dealing with Richard

24   Turner did you consider the possibility that he might

25   have had some of the symptoms for excited delirium?

Contains Confidential Portions

Page 77

1               OFFICER ANDREW WILSON

2       A.   No.

3       Q.   And why not?

4       A.   Because he wasn't displaying what I had been

5  taught was the symptoms for excited delirium.

6       Q.   And what symptoms did you feel he should

7  have displayed for you to have understood that he might

8  have excited delirium?

9       A.   I think more violent tendencies, being more

10 verbal than is maybe expected, or the overheating and

11 the sweating and removing of clothing.

12      Q.   Prior to November of 2016 had you personally

13 encountered anybody that had excited delirium or was

14 identified as having that?

15      A.   I have dealt with individuals with excited

16 delirium before.  I don't remember if it was before or

17 after.

18      Q.   Okay.  In I guess the instances you dealt

19 with people with excited delirium what types of symptoms

20 did they exhibit?

21      A.   So do you want a specific example?

22      Q.   Yeah.  Sure.

23      A.   One case of excited delirium that I

24 responded to the individual was completely naked,

25 visibly sweating, was destroying everything in their

Contains Confidential Portions

1                  OFFICER ANDREW WILSON

2   apartment, had thrown a chair that was in their kitchen

3   all the way across their living room through the living

4   room window, and had gone across the courtyard of the

5   apartment complex that I was in.

6             This individual then proceeded to punch out

7   a glass window.  And then while his arm was in the hole

8   created by his fist used the sides of his arms to break

9   out the glass surrounding that window and had

10  lacerations all up and down his body.

11            He was bleeding all over the room, continued

12  to vacate all the furniture in the apartment and was

13  standing in piles of glass and was claiming that he was

14  Jesus Christ and that he was going to be God.

15        Q.   Do you happen to remember the person's name

16  or where it occurred?

17        A.   I don't remember the person's name, and I

18  know that it considered on campus in the morning.

19        Q.   Okay.  You say on campus?

20        A.   Around the campus area, Campustown of

21  Champaign.

22        Q.   Okay.  And any other instances where you

23  encountered anybody with excited delirium?

24        A.   I can't recall any other instances right

25  now.

Page 79

OFFICER ANDREW WILSON

1

2      Q.    Okay.  Do you remember what happened in

3  response to you encountering that person?

4      A.    Yes.

5      Q.    What happened?

6      A.    Backup was called.  After officers and an

7  ambulance arrived the individual was handcuffed and

8  sedated and transported to the hospital.

9      Q.    Did -- were you the first person there?

10     A.    No.

11     Q.    Okay.  Did you make the assessment that the

12 person might have excited delirium?

13     A.    I -- do you mean -- what do you mean by

14 that?

15     Q.    Well, I mean had the officer that preceded

16 you or officers made that determination before you had

17 gotten there, or was that --

18     A.    I don't recall who made the determination of

19 whether the person was in excited delirium or not.

20     Q.    Okay.

21     A.    But after -- after I arrived it became

22 apparent.

23     Q.    Did the person allow you to handcuff them?

24     A.    No.  They did not allow us to handcuff them.

25     Q.    Okay.

Contains Confidential Portions

Page 80

1            OFFICER ANDREW WILSON

2            MR. BRUNNER:  And I'm afraid that may be

3  misconstrued.  Are you saying were handcuffs eventually

4  applied or was the person voluntarily allowing

5  handcuffs?

6            MR. CARMICHAEL:  When I said allowed I meant

7  volunteer -- voluntary.

8            MR. BRUNNER:  Okay.

9            THE WITNESS:  No.

10       Q.   (By Mr. Carmichael)  Okay.  Have you

11  received training in preparing police reports?

12       A.   Yes.

13       Q.   And what type of training have you received

14  on preparing police reports?

15       A.   We received scenarios and prepare reports

16  while in PTI.

17       Q.   And is there a particular way they tell you

18  to prepare reports or you were trained to prepare

19  reports?

20       A.   To prepare them to the best of your ability

21  to include details that you can remember.

22       Q.   And how soon after something happens are you

23  supposed to prepare a report?

24       A.   It depends on the situation.

25       Q.   Is there a general rule that a report is

Contains Confidential Portions

Page 81

1                    OFFICER ANDREW WILSON

2    supposed to be completed within a certain amount of

3    time?

4         A.   Reports are typically completed within a day

5    of the occurrence.

6         Q.   Okay.  Are reports typically completed at

7    the end of the shift?

8         A.   Yes.

9         Q.   Do you speak with other officers before

10   preparing your reports?

11        A.   Could you clarify.

12        Q.   Well, if other officers were involved, do

13   you speak with those officers before preparing your

14   report?

15        A.   I don't typically, no.

16        Q.   When you prepared your report for the

17   incident involving Richard Turner did you speak with any

18   officers before you prepared your report?

19        A.   I spoke with many officers.  Do you mean

20   about the situation or could you clarify a little bit

21   more.

22        Q.   Yes.  Yeah.  Did you speak with any of the

23   other officers about your preparation of your report or

24   about the events so you could prepare your report?

25        A.   I don't remember specifically speaking with

Contains Confidential Portions

Page 82

1                    OFFICER ANDREW WILSON

2    any other officers about the particulars of my report.

3         Q.    Okay.  So immediately before preparing your

4    report did you talk with the officers about the events

5    that happened?

6         A.    I don't remember talking to them

7    specifically about the events that happened.  I may have

8    talked with officers after the call prior to -- you

9    know, when they were loading him into the ambulance

10   about what was happening during the call.

11        Q.    After that do you recall speaking with the

12   other officers about what happened?

13        A.    No.

14        Q.    I believe you prepared your report the next

15   day, November 17th, 2016.  So you waited a day to

16   prepare your report?

17        A.    No.  I -- my report was submitted on the

18   17th.

19        Q.    It was submitted.  Okay.  So when did you

20   start preparing your report?

21        A.    I started preparing my report on the 16th.

22        Q.    Okay.  You hadn't finished it?

23        A.    I belive I had finished it on the 16th.

24        Q.    Okay.  You just hadn't turned it in?

25        A.    Correct.

Contains Confidential Portions

Page 83

                    OFFICER ANDREW WILSON

1

2          Q.   Did you show any of the other officers or

3    your supervisor your report before you submitted it?

4          A.   Yes.

5          Q.   Who did you show it to?

6          A.   I believe I showed my report to a supervisor

7    prior to it getting approved.

8          Q.   And who did you show it to?

9          A.   I believe I showed it to Lieutenant Myer

10   (ph).

11         Q.   And why did you show your report to

12   Lieutenant Myer?

13         A.   To be approved for grammatical errors and et

14   cetera.

15         Q.   Did you make any changes to your report?

16         A.   I don't believe that I did.  I don't

17   remember.

18         Q.   When you prepared this report did you

19   prepare -- or I guess did you work on it more than on

20   more than one occasion?

21         A.   Yes, I think so.

22         Q.   Do you remember how many times you went in

23   and worked on the report?

24         A.   Because it was so long ago I don't recall

25   exactly how many times I worked on this report.

Contains Confidential Portions

Page 84

1          OFFICER ANDREW WILSON

2          Q.   Do you have a particular way you do things

3     that you kind of typically do reports?

4          A.   Could you clarify.

5          Q.   Well, I was trying to figure out, you know,

6     if you prepare like an initial draft of the report and

7     then you go back and take a look at it and see if you're

8     going --

9          A.   I typically will create a report as a rough

10    draft, read it, and review it, correct anything, and

11    then submit to a supervisor.

12         Q.   And when you say submit it to a supervisor,

13    is that before you formally turn in the report?

14         A.   That's before it is submitted to records.

15         Q.   Okay.  And before it's submitted it's -- I

16    guess is it still in draft form then?

17         A.   Yes.

18              MR. BRUNNER:  Before it's submitted to

19    which?

20              MR. CARMICHAEL:  To records.  I'm sorry.

21              THE WITNESS:  Yes.

22         Q.   (By Mr. Carmichael)  Is there a particular

23    program you use to prepare reports?

24         A.   Yes.

25         Q.   Okay.  What's that?

Contains Confidential Portions

Page 85

1             OFFICER ANDREW WILSON

2        A.    It is A.R.M.S.

3        Q.    A.R.M.S.  And can you save drafts in

4   A.R.M.S.?

5        A.    Yes.

6        Q.    Does it save individual versions of drafts

7   or does it just kind of save over?

8        A.    Save over I think.  I don't know how the

9   A.R.M.S. software works.  I just use it.

10       Q.    Okay.  When you use it it doesn't appear to

11  have versions?

12       A.    No, not that I've seen.

13       Q.    Okay.  In your encounter with Mr. Turner I

14  believe you were wearing a microphone; is that right?

15       A.    Yes.

16       Q.    And what was the purpose of wearing that

17  microphone?

18       A.    To record the interaction.

19       Q.    And I guess were you doing that as part of

20  your training or just generally you were doing that?

21       A.    As part of our training.

22       Q.    Was that so Officer Talbott could listen?

23       A.    It's for a record -- for general

24  recordkeeping purposes same as the report.

25       Q.    Okay.  I was just trying to figure out if

Contains Confidential Portions

Page 86

OFFICER ANDREW WILSON

1  
2      that was specific to you being a probationary officer or
3      that just occurs generally.
4              A.    Generally.
5              Q.    Okay.  Do you wear a microphone currently
6      when you do your job?
7              A.    I'm not serving as patrol currently.
8              Q.    Okay.  When you were serving in patrol did
9      you continue to wear a microphone --
10             A.    Yes.
11             Q.    -- when you weren't a probationary officer?
12             A.    Yes.
13             Q.    And how is that recorded?
14             A.    It -- you turn it on -- or it's the same as
15     the camera system on the car that I described earlier.
16             Q.    Okay.  Does that activate when you activate
17     the camera system on the car or is that activated a
18     different time?
19             A.    They activate simultaneously.
20             Q.    Okay.  So when you turned on the camera
21     system for the car your microphone turned on as well?
22             A.    Yes.  With the exception of -- and this is
23     probably too much detail.  But the 30 seconds prior to
24     turning on your camera the camera has that saved and it
25     records it but there's no audio.

Contains Confidential Portions

Page 87

1            OFFICER ANDREW WILSON

2          Q.   Okay.  Have you ever I guess curtailed a

3    conversation with another officer because you were

4    wearing a microphone and you knew you were being

5    recorded?

6          A.   No.

7          Q.   Have you ever avoided discussing something

8    with another officer because you knew you were being

9    recorded?

10         A.   Private conversations, these generally don't

11   happen during calls.

12         Q.   Can you shut the microphone off?

13         A.   Yes.

14         Q.   And how can you do that?

15         A.   By flipping a switch on the bottom of the

16   receiver.

17         Q.   Is that receiver attached to you?

18         A.   Yes.

19         Q.   Is there a general policy for when you're

20   supposed to turn the microphone on and off?

21         A.   Yes.

22         Q.   Can you tell me what that is.

23              MR. BRUNNER:  Are you talking about now or

24   back then?

25              MR. CARMICHAEL:  Back then in 2016.

Contains Confidential Portions

Page 88

1              OFFICER ANDREW WILSON

2              THE WITNESS:  The policy to the best of my

3    knowledge because its been a while is to activate your

4    camera system which includes the microphone prior to

5    enforcement action.

6         Q.   (By Mr. Carmichael)  And when you say

7    enforcement action I just wanted to understand what you

8    mean.

9         A.   It's a general term.  It's really up to

10   interpretation.

11        Q.   Okay.  Does that include stopping to talk to

12   someone?

13        A.   Again, it's up to interpretation by

14   individual officers.  I typically turn mine on whenever

15   I speak with somebody.

16              (Off the record discussion.)

17        Q.   (By Mr. Carmichael)  I wanted to ask you

18   about when Mr. Turner had put his hand on you and pushed

19   you back or pushed you or shoved you you said.

20        A.   Uh-huh.

21        Q.   Did that move you physically?

22        A.   Yes.

23        Q.   Okay.  And how did it?

24        A.   Moved me backwards, but I retained a grip on

25   his shoulder or his clothing.

Contains Confidential Portions

Page 89

OFFICER ANDREW WILSON

1

2      Q.   And did you get any bruises from that?

3      A.   No.

4      Q.   Suffer any injuries?

5      A.   No.

6      Q.   And when I asked you before about

7  approaching someone with mental illness I think I

8  inartfully or inarticulately described or tried to

9  compare your approach on that to maybe the approach a

10  firefighter or a ambulance driver might take.

11          Do you remember me doing that?

12      A.   Yeah.

13      Q.   Do you recall from any of your training

14  about approaching someone with mental illness the phrase

15  or statement that a call for service involving someone

16  with mental illness does not necessarily warrant the use

17  of police authority or enforcement?

18      A.   Do I recall that phrase?

19      Q.   Yeah.  Do you recall learning that in

20  training?

21      A.   I don't recall learning that specific

22  phrase.

23      Q.   Okay.  Do you recall learning that point

24  during training?

25      A.   Yes.

Contains Confidential Portions

Page 90

1              OFFICER ANDREW WILSON

2        Q.    Okay.  And why do calls involving somebody

3    with mental illness may not call for the use of police

4    authority or enforcement?

5        A.    Because in my interpretation of it it would

6    be because the call isn't related necessarily to

7    enforcing laws, but it is related to that person's

8    well-being.

9        Q.    In your crisis intervention training did you

10   learn techniques about how to obtain control of a

11   situation without using force?

12       A.    Yes.

13       Q.    And what are some of those techniques?

14       A.    To use a calm voice even if they can't

15   understand what you're saying, to make yourself seem as

16   non-threatening as possible.

17       Q.    And are there particular ways that you learn

18   to try to seem non-threatening?

19       A.    To use your first name, introduce yourself

20   as a friend, possibly have somebody speak on your behalf

21   if they have anybody who they're more familiar with.

22       Q.    When you approach someone who appears to

23   have what you may believe to be excited delirium are you

24   instructed to treat the person as if they had a medical

25   emergency and require immediate medical attention?

Contains Confidential Portions

Page 91

1                    OFFICER ANDREW WILSON

2          A.    That sounds correct.

3          Q.    Is that one of the reasons that the EMS is

4    dispatched and you wait for them to arrive?

5          A.    Yes.

6          Q.    When speaking with someone with mental

7    illness should more than one officer attempt to engage

8    that person?

9          A.    I believe the training indicates that it's

10   better to do one-on-one.

11         Q.    And why is that?

12         A.    I believe it's again to appear as

13   non-threatening as possible.

14         Q.    And more officers may appear more

15   threatening?

16         A.    Right.

17         Q.    When a training is in-service what does that

18   mean?

19         A.    In-service training?

20         Q.    Yes.

21         A.    I believe that means training administered

22   by the department.  I'm not sure exactly that

23   terminology.  I don't know where you're getting that

24   term from.  I don't know where you're getting that term

25   from, so I'm not sure exactly what the context is.

Contains Confidential Portions

Page 92

1              OFFICER ANDREW WILSON

2         Q.   Do you remember what particular organization

3    provided that certification for the -- for the certified

4    intervention training?

5         A.   I do not remember the exact name of the

6    organization that administered it.

7

8    (CONFIDENTIAL PORTIONS CONTINUE ON NEXT PAGE)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            OFFICER ANDREW WILSON

2        Q.   (By Mr. Carmichael)  What did you do to get

3   ready for the deposition today?

4        A.   I reviewed my report.  I reviewed video of

5   the incident that was available, and I spoke with the

6   lawyers present.

7        Q.   (By Mr. Carmichael)  And about how long did

8   you spend doing those things?

9        A.   Well, the videos were however long the

10  videos were; although, I did not watch all of the videos

11  that was present in one section because they were

12  disjointed.  So I don't know how long I spent doing

13  that.

14            Approximately maybe an hour watching videos,

15  maybe less.  And then 15 minutes, 20 minutes of reading

16  my report over the course of, you know, multiple weeks

17  just perusing it.  And then I don't remember -- two

18  hours yesterday approximately speaking with the city

19  counsel.

20       Q.   Did you look at any other documents besides

21  your report?

22       A.   Not that I can recall.

23       Q.   And the videos you watched, do you recall

24  which ones those were?

25       A.   I watched my squad car video.  I watched the

Contains Confidential Portions

Page 102

1                    OFFICER ANDREW WILSON

2    video from Gameday Spirit.  I watched video from an ATM

3    across the street, and I watched video from I think

4    Hometown Pantry.  That was the disjointed video where I

5    did not watch all of them.

6            Q.   The Hometown Pantry video?

7            A.   Yes.

8            Q.   Was that a video of kind of of the sidewalk?

9            A.   It was a video of the two corners of the

10   store and the sidewalk.

11           Q.   Okay.  And when you say the two corners,

12   were they on separate feeds?

13           A.   I don't know how their camera system is set

14   up, but it looks like they have one camera aiming down

15   one way and another camera aiming down the other street.

16           Q.   Okay.  Were you able to watch those videos

17   simultaneously or were they played separately?

18           A.   You had to locate each video separately and

19   play it and try to put it together yourself.

20           Q.   Did you watch any of the other squad videos?

21           A.   I only watched my squad video.

22           Q.   Did reviewing all this material help you

23   refresh your recollection?

24           A.   Correction.  I do remember now also watching

25   Sergeant Frost's squad video.

Contains Confidential Portions

1           OFFICER ANDREW WILSON

2           Q.    Okay.

3           A.    Sorry.

4           Q.    Did -- reviewing this material and watching

5     those videos, did it help you remember events?

6           A.    Yes.

7           Q.    Did anything in the videos or reading your

8     report -- anything in particular stand out to you that

9     helped you specifically remember something?

10          A.    Not particularly, no.

11          Q.    I was just trying to figure out if, you

12    know, when you watched it you would be like oh, I had

13    forgotten that occurred, if anything struck you like

14    that.

15          A.    Maybe dialog.  But nothing struck me as

16    being surprising or anything.

17          Q.    Dialog between you and someone else?

18          A.    Because of the way the videos are recorded

19    it's mostly the dialog involving me and others.

20          Q.    Okay.  Besides talking to the attorneys did

21    you talk to anybody else about your deposition today?

22          A.    Yes.

23          Q.    Who else?

24          A.    I spoke with an FOP lawyer, and then later I

25    spoke with my current girlfriend.

Contains Confidential Portions

Page 104

1           OFFICER ANDREW WILSON

2           MR. CARMICHAEL:  Okay.  All right.  We can

3    stop for a minute, and I'll review everything and see if

4    I'm all done.

5               (Recess taken.)

6           Q.   (By Mr. Carmichael)  All right.  Could Mr.

7    Turner have been trying to get away from you in the

8    alley because he didn't know who you were?

9           MR. BRUNNER:  Objection, foundation.

10          THE WITNESS:  I don't know really what he

11   was thinking.

12          Q.   (By Mr. Carmichael)  When you were on the

13   ground with Mr. Turner could he have been struggling

14   because he was having difficulty breathing?

15          MR. BRUNNER:  The same objection.

16          THE WITNESS:  He could have.  I don't know.

17          Q.   (By Mr. Carmichael)  When Mr. Turner you

18   said had pushed you --

19          A.   Uh-huh.

20          Q.   -- did he do anything else besides that?

21          A.   Yes.  It's hard to describe because of how

22   erratic his movements were, but it was pushing and then

23   trying to get away while simultaneously flailing his

24   arms.  I don't know if it was at me or in general, but

25   flailing wildly.

Contains Confidential Portions

Page 105

1            OFFICER ANDREW WILSON

2        Q.   Okay.  And in flailing wildly did he make

3    contact with you?

4        A.   Yes.  And that's also how my radio was

5    knocked off.

6        Q.   Okay.  And when you say made contact with

7    you when he knocked off your radio, do you know where he

8    had made contact with you?

9        A.   No.

10       Q.   Okay.  And you said that that's because he

11   was flailing his arm about?

12       A.   Uh-huh.

13       Q.   That would be the arm that you didn't have

14   -- you had grabbed onto one of his arms, right?

15       A.   I had grabbed onto the clothing above his

16   right shoulder.

17       Q.   Okay.  Then at some point did you grab his

18   arm?

19       A.   Yes.

20       Q.   Okay.  And what was his other arm doing?

21       A.   Flailing with that arm until Officer Young

22   controlled it.

23       Q.   Okay.  And was that moments after you were

24   able to grab Mr. Turner's arm?

25       A.   I don't know the timeframe between grabbing

1        OFFICER ANDREW WILSON

2   my arm -- or between grabbing his arm and Officer Young

3   grabbing the other arm.  Several seconds would be my

4   best judgment.

5        Q.   Did Mr. Turner make contact with you

6   anywhere else that you recall?

7        A.   Not that I recall.

8        Q.   Okay.  How about his legs, did he kick you

9   at all?

10       A.   I don't believe he kicked me.  No.

11       Q.   Okay.  And principally he was flailing his

12  arms and trying to get away.  Is that an accurate

13  description?

14       A.   I don't know why he was flailing his arms.

15       Q.   Okay.  But he was trying to get away from

16  where you had grabbed him?

17       A.   He was pulling away from me.  Yes.

18            MR. CARMICHAEL:  Okay.  And I do want to

19  mark his report as -- we'll just mark it as Exhibit 1.

20            Okay.  That's all I have.

21    (Wilson Exhibit No. 1 was marked for identification.)

22            MR. BRUNNER:  Can I mark Exhibit 2.  This is

23  Defendant's 1310.

24    (Wilson Exhibit No. 2 was marked for identification.)

25

Contains Confidential Portions

Page 107

1                    OFFICER ANDREW WILSON

2                         EXAMINATION

3   BY MR. BRUNNER:

4        Q.   Sir, I've shown this exhibit to counsel, and

5   I'm now showing to you what's been marked as Exhibit

6   Number 2.

7             Taking a look at this document does it

8   refresh your memory about of what step of the field

9   training program you were in at the time of the incident

10  on November 16th, 2016?

11       A.   Yes.  This document indicates that I was on

12  Step 5.

13       Q.   And beyond what the document indicates, is

14  that consistent with your memory, that you were in Step

15  5 at the time of the November 2016 event with Mr.

16  Turner?

17       A.   Yes.

18       Q.   You've been asked a number of questions

19  today about your training as I understand from 2015

20  through at least January of 2017.  Do you remember all

21  the details of those trainings?

22       A.   No.

23       Q.   Would you defer to the training materials as

24  to what you were trained on?

25       A.   Yes.

Page 108

OFFICER ANDREW WILSON

1

2        Q.    I want to make sure I did not misunderstand

3    your testimony about your report.

4              Did you ever show your report to anyone in

5    your chain of command prior to it being submitted for

6    approval by Lieutenant Myers?

7        A.    No.

8        Q.    And did you make any changes to your report

9    based on a comment from someone in your chain of command

10   prior to it being submitted to Lieutenant Myers for

11   approval?

12       A.    No.  Not that I recall with the exception of

13   possibly a minor grammatical error.

14       Q.    Do you remember that for sure?

15       A.    No.

16             MR. BRUNNER:  Okay.  That's all the

17   questions I have.

18

19                        EXAMINATION

20   BY MR. CARMICHAEL:

21       Q.    I just wanted to ask you one thing.

22             What's -- your chain of command, what does

23   that mean?

24       A.    That would indicate -- chain of command as a

25   patrol officer I would be patrol officer, and then you

Contains Confidential Portions

1                    OFFICER ANDREW WILSON

2   have your immediate supervisor which is a sergeant.

3   Which then the supervisor above that would be a

4   lieutenant.  And then the supervisor above that is the

5   deputy chief.  Then the supervisor above that is the

6   chief of police, and that's the chain of command.

7        Q.   And who was your supervising sergeant in

8   November of 2016?

9        A.   I don't recall who my supervising sergeant

10  was that day.

11       Q.   Okay.  I'm just trying to understand if you

12  were showing something to your chain of command who

13  might that be?

14       A.   If I was showing somebody something in my

15  chain of command?

16       Q.   Yes.  If you were showing somebody a report.

17       A.   The supervising -- it's usually whatever

18  supervisor is available.  Typically it would be the

19  sergeant of that shift of that section.

20       Q.   Okay.  Do you consider other patrol officers

21  in your chain of command?

22       A.   No.  Another patrol officer would not be in

23  the chain of command.

24            MR. CARMICHAEL:  Okay.  That's all I have.

25

Contains Confidential Portions

Page 110

1                    OFFICER ANDREW WILSON

2                         EXAMINATION

3    BY MR. BRUNNER:

4         Q.   Did you show any of your patrol officers who

5    were not in your chain of command your report prior to

6    submitting it for approval?

7         A.   No.

8         Q.   Did you make any changes to your report

9    based upon any comment from any patrol officer who was

10   not in your chain of command?

11        A.   No.

12             MR. BRUNNER:  That's all the questions I

13   have.

14             MR. CARMICHAEL:  Okay.  We're done.

15             MR. BRUNNER:  Sir, you have the opportunity

16   to receive a copy of your transcript if you would like

17   to review it for transcription errors and sign off on

18   that, or you can waive that right.

19             Do you choose to do one or the other?

20             THE WITNESS:  I'll waive that right.

21             MR. BRUNNER:  Okay.  Thank you.

22             (The deposition concluded at 2:05 p.m.)

23

24

25

Contains Confidential Portions

Page 112

1

2                       CERTIFICATE OF REPORTER

3

4           I, Sandra J. Rynders, a Certified Shorthand

5     Reporter (IL), do hereby certify that the witness whose

6     testimony appears in the foregoing deposition was duly

7     sworn by me pursuant to 5 ILCS 255/2 (from Ch. 101,

8     par.2); that the testimony of said witness was taken by

9     me to the best of my ability and thereafter reduced to

10    typewriting under my direction; that I am neither

11    counsel for, related to, nor employed by any of the

12    parties to the action in which this deposition was

13    taken, and further that I am not a relative or employee

14    of any attorney or counsel employed by the parties

15    thereto, nor financially or otherwise interested in the

16    outcome of the action.

17    Dated: October 23, 2018

18

19           _____

                       Sandra J. Rynders

20

21

22

23

24

25

Page 1 of 4



# CHAMPAIGN POLICE DEPARTMENT
## SUPPLEMENTAL REPORT

C16-10659

#16-15002

## SUPPLEMENTAL DETAIL

| Case Number: CC1610659 Supp:#A1615002 | Officer: 7741 | Date Entered: 11/17/2016 | Date/Time of Orig. Rpt. 11/16/2016 08:38 | |
|---|---|---|---|---|

| Incident Adr: 00708 S SIXTH ST CHAMPAIGN | | Title of Report: DISORDERLY CONDUCT/ASSIST SICK |
|---|---|---|

| Officer Injured: Y | Use of Force: N |
|---|---|

## PROPERTY

### Tag# 29362 Description SQUAD CAR 52 VIDEO

| Loss 1 Recv | Quantity 1.000 Measure Value .00 | Serial # 52 Evidence? YES | Loc 601 E GREEN ST | Disposition CPD EVIDENCE |
|---|---|---|---|---|

| Drug Code NA | Property Code 900-IN CAR VIDEO |
|---|---|

## NARRATIVE

This is a supplement to the original report.

On 11/16/2016 at 0847 hrs I responded with my Field Training Officer, Officer Talbott #7105, to Hometown Pantry (601 E Green St) for a report of a disorderly subject.

Prior to my arrival I read the dispatch ticket which stated that the disorderly subject, Richard Turner, was consuming alcohol in the area, pulling garbage out of garbage cans, and walking in the street. It should be noted that Turner has a history of mental illness, a history of alcohol and substance abuse, and that I have had several interactions with Turner in the past.

Officer Young #701 was already on scene and addressing Turner's disorderly behavior upon my arrival. At this time both Officer Young and Turner were on the southeast corner of Sixth St and Green St. After I positioned my squad car on the east side of Sixth St I spoke with Officer Young to determine if any action had been taken thus far. Officer Young informed me that he had told Turner to leave the area.

After speaking with Officer Young I turned my attention to Turner. At this time Turner appeared to be complying with Officer Young's request to leave the area, crossing Sixth St walking westbound. After Turner crossed Sixth St he picked up a small plastic caution sign off of a gate at 519 E Green St. Turner then forcefully threw the caution sign on to the sidewalk without provocation. Officer Young told Turner to pick up the sign and

WILSON,ANDREW D          officer's initials  AW ✓ approved____TT____ (CC1610659 - #A1615002)

place it back where it belonged before telling Turner to leave again. It should be noted that while I have seen Turner display erratic behavior in the past, this action struck me as uncharacteristic of his typical behavior due to its forceful nature.

Turner then began walking around in the vicinity of Sixth and Green St, crossing both Green St and Sixth St several times while still displaying erratic behavior, to include speaking to himself unintelligibly and making seemingly random hand gestures and movements. Turner repeatedly departed and returned to the southeast corner of Sixth St and Green St despite being told repeatedly to leave the area. Turner's inability or refusal to leave the area was again uncharacteristic of his typical behavior based on my past experiences with him. After Turner failed to depart the southeast corner of Sixth St and Green St a number of times and continued to cross Sixth St and Green St with apparent disregard for traffic or pedestrian crossing signals I called for an ambulance to come and evaluate him. The purpose of this evaluation was to determine if Turner was too intoxicated or otherwise unable to properly care for himself and if he would need to be involuntarily admitted to a medical care facility.

I then told Turner to come to me and to wait (for Arrow Ambulance to arrive). Turner initially complied by walking towards me and waiting. During this time I began working to determine Turner's level of intoxication and mental state. When I asked Turner "what day of the week is it?" he responded "it's November 2nd" before trailing off into non-relevant and somewhat incomprehensible conversation. Before I could ask follow-up questions and before I could call the reporting person for additional information on Turner's earlier drinking and disorderly behavior, Turner began to walk north towards Green St again. I called out to Turner and again asked him to come to me and wait. Turner again initially complied, but seconds later began walking north towards Green St. Turner was then told to come back and sit down on the curb in order to prevent him from walking off and potentially harming himself prior to being evaluated. Turner did not comply, and instead began running north across Green St. I began following Turner as he ran west across Sixth St to the northwest corner of the intersection.

Officer Young and I then followed Turner into the north-south alley between Chipotle Mexican Grill and TownePlace Suites on Green St. While in

the alley I managed to catch up to Turner. After I had closed the distance
between Turner and myself I again told him to stop and sit down. Turner
disregarded my order and began running north again. At this time I
attempted to grasp Turner's outer layer of clothing in order to prevent
him from running any further before being evaluated by responding
emergency medical personnel. Upon making physical contact with Turner he
immediately began attempting to pull away. When I did not let go Turner
began aggressively resisting me, to include pushing me, grabbing my radio
microphone, and pulling it off of my uniform.

I then grasped Turner's right arm at the wrist and at the bicep in an
attempt to control his movement and prevent him from hurting himself or
myself. Turner continued to resist my attempts to control his movement.
Due to Turner's physical control of my radio I was unable to transmit any
radio traffic. Officer Young then began attempting to control Turner's
left side. Turner did not comply with orders to stop and continued to
resist, eventually being placed on the ground in a face down position.
Officer Young and I continued to struggle with Turner as we attempted to
place his arms into proper handcuffing position behind his back. During
this time Turner was still attempting to stand up and was resisting our
efforts to place his hands behind his back. Officer Talbott then grabbed
and maintained control of Turner's legs to prevent him from using them to
further resist detention. Shortly thereafter Sergeant Frost arrived on
scene and secured Turner's legs with a leg hobble while Officer Young and
I succeeded in placing Turner in handcuffs. It should be noted that two
pairs of handcuffs were used due to Turner's size. Turner was yelling
loudly throughout the process of detaining him but I was unable to
determine what he was saying as his speech was largely unintelligible. To
my knowledge Turner did not receive any injuries during this incident.

Several moments after Turner was placed into the aforementioned restraints
he ceased resisting and shortly thereafter ceased yelling. Sergeant Frost
then asked me and Officer Young to determine if Turner was breathing.
After turning Turner onto his back I placed the left side of my face near
Turner's nose and mouth while looking at his chest and determined that he
was not breathing. Sergeant Frost, Officer Talbott, Officer Young, and I
then immediately began rendering medical aid and Arrow Ambulance was told
to expedite their response to our location in the alley. I retrieved the
AED kit from Sergeant Frost's squad car and assisted Officer Young in

unpacking and operating it. The AED advised that Turner's heart was beating and did not advise a shock. Emergency medical personnel then arrived as Officer Young and I were preparing a breath mask for Turner.

Emergency medical personnel then transported Turner to Carle Hospital via Arrow Ambulance. Officer Talbott rode with the ambulance as they transported Turner. I then travelled separately to Carle Hospital in my squad car. I then waited at the Carle Hospital Emergency Room until Turner was pronounced deceased at 0942 hrs.

During my physical struggle with Turner I did receive a small cut to my right hand's little finger. I did not receive any other injuries as a result of this incident.

Nothing further to report.

| Copied by | | | Entered/filed by | | |
|---|---|---|---|---|---|
| Miscellaneous LEADS #'s | | | | | |
| Reporting officer signature | #741 | Date: 4/17/16 | Supervisor signature | | Date and Badge: 11.17.16 |
| No secondary dissemination without consent from CHAMPAIGN POLICE DEPARTMENT | | | | | |

WILSON,ANDREW D        officer's Initials ⟨⟨  approved ___ Tm ___   (CC1610659 - #A1615002)