E-FILED
Wednesday, 14 August, 2019  11:14:18 PM
Clerk, U.S. District Court, ILCD

# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

CHANDRA TURNER, as Special )
Administrator of the Estate )
of RICHARD TURNER, deceased, )
and CHANDRA TURNER, )
individually, ) NO. 17 cv 02261
)
Plaintiff, ) DEPOSITION OF
) CHESTER L.
vs. ) EPPERSON, JR.
)
CITY OF CHAMPAIGN, a )
municipal corporation, )
CHAMPAIGN POLICE OFFICER )
YOUNG, CHAMPAIGN POLICE )
OFFICER WILSON, CHAMPAIGN )
POLICE OFFICER TALBOTT, )
CHAMPAIGN POLICE SERGEANT )
FROST, )
)
Defendants. )

The deposition of Mr. Chester L. Epperson,
Jr., taken by the defendants before
Mary M. Elliott, CSR, RPR, RMR, and Notary Public,
at 10:42 a.m., February 12, 2019, at the Winnebago
County Courthouse, Third Floor, Conference Room 6,
Rockford, Illinois.

1   APPEARANCES:
2   HENDERSON PARKS, LLC
3   BY: MR. CHRISTOPHER W. CARMICHAEL
     140 South Dearborn
     Suite 1020
4   Chicago, Illinois 60603
5   312-262-2905
     ccarmichael@henderson-parks.com
6       On behalf of the plaintiff.
7
8   THOMAS, MAMER & HAUGHEY, LLP
     BY: MR. JUSTIN N. BRUNNER
          MR. DAVID E. KRCHAK
9   PNC Bank Building
     30 East Main Street
10  Suite 500
     Champaign, Illinois 61824-0560
11  217-351-1500
     justin@tmh-law.com
12  krchak@tmh-law.com
13      On behalf of the defendants.

INDEX

EXAMINATION                         PAGE
By Mr. Brunner...........................  4
By Mr. Carmichael........................ 269
By Mr. Brunner........................... 273


EXHIBITS

EXHIBIT NO.                       MARKED
No. 1   e-mail......................    4
No. 2   Notice of Deposition.........   48
No. 3   e-mail.....................    50
No. 4   invoice.....................   52




Signature Page........................... 274

Certificate............................. 275

1           (Epperson Deposition Exhibit
2        No. 1 was marked for
3        identification by Attorney
4        Brunner.)
5           CHESTER L. EPPERSON, JR.,
6   having been first duly sworn, was examined and
7   testified as follows:
8           EXAMINATION
9   BY MR. BRUNNER:
10     Q.   Sir, can you state your full name?
11     A.   It's Chester L. Epperson, Jr.
12     Q.   Okay.  And you go by "Chet"?
13     A.   Yes.
14     Q.   And you understand you're under oath here
15  today; correct?
16     A.   Yes.
17     Q.   And you're answering my questions "yes."
18  That's perfect.  If you answer with an "uh-huh" or
19  an "huh-uh," I may ask you to restate your answer.
20  It's not to be rude; it's just to make sure the
21  court reporter gets it clearly.  Okay?
22     A.   Yes.
23     Q.   If there's a question I ask you and you
24  don't understand, can you let me know that?

1       A.  Yes.
2       Q.  I'm happy to try and rephrase or anything
3   so that you can understand.  Okay?
4       A.  Yes.
5       Q.  If you answer a question, is it fair for
6   me to assume you understood what I asked you?
7       A.  Yes.
8       Q.  And if you need a break at any time, can
9   you let me know that?
10      A.  Yes.
11      Q.  All right.  If you ask for a break and
12  I'm in the middle of asking you a question and you
13  haven't answered yet, I may just ask you to answer
14  that before we go to a break; okay?
15      A.  Fair enough.
16      Q.  Sir, you understand that there's a
17  protective order in this case; correct?
18      A.  Yes.
19      Q.  And you're aware of your obligations
20  under that order as far as confidential materials
21  you have received?
22      A.  Yes.
23      Q.  I understand you are here to testify as
24  an expert; is that correct?

1       A.  Yes.
2       Q.  Do you have personal knowledge of any of
3   the facts of the occurrence surrounding Mr. Turner's
4   interaction with police in November of 2016?
5       A.  Just from the materials that were
6   provided to me for this case.
7       Q.  So just to be clear, do you have any
8   personal knowledge from something you personally
9   observed on that day?
10      A.  Besides the information that was provided
11  to me?
12      Q.  (Nods head.)
13      A.  No.
14      Q.  Everything that you would know would be
15  based on something that someone's either told you
16  or something that you've reviewed; correct?
17      A.  Not someone has told me.  It's files and
18  items that have been provided to me, but no one's
19  told me anything.
20      Q.  Okay.  And I'm not trying to trick you
21  here; all I'm trying to say is, you've gained
22  knowledge by looking at documents surrounding this
23  event; correct?
24      A.  That's correct.

1       Q.  You're -- do you have any personal
2   knowledge from something that you went and
3   observed in Champaign, Illinois, to do with this
4   case?
5       A.  I did not.
6       Q.  And to that extent, have you ever done a
7   site visit of the location where this event
8   occurred?
9       A.  I did not.
10      Q.  And you're testifying here today based on
11  your specialized knowledge; is that correct?
12      A.  Knowledge, expertise, academic training,
13  experience.
14      Q.  And what -- how would you describe your
15  specialized knowledge, expertise, training and
16  experience kind of in a nutshell?
17      A.  I was a law enforcement officer for, I
18  believe, 35 years, rose through every rank of the
19  Rockford Police Department and served as chief of
20  police for ten years; instituted several reforms
21  in the department to include the Commission on
22  Accreditation For Law Enforcement Agencies; called
23  in for a special administrative investigation for
24  an in-custody death that our department

1   experienced with two civil rights attorneys and
2   two individuals who had experience with the United
3   States Department, Civil Rights Division; made
4   several reforms in terms of policy, procedure,
5   training, supervision, early warning systems, and
6   accountability systems to make our department much
7   more effective and efficient to where we're at at
8   that particular time.  I retired in November of
9   2015.
10          In July of 2015, I was appointed to the
11  Eastern District of Louisiana for the New Orleans
12  Police Department consent decree reporting to a
13  federal district judge and a team of monitors that
14  look over the 485 consent decree paragraphs to
15  assist the New Orleans Police Department to get in
16  compliance with constitutional policing standards.
17          In December of 2015, I was appointed to
18  the United States Virgin Islands District Court
19  with their monitoring team for the Virgin Islands
20  Police Department.  It's an older consent decree,
21  and there's approximately 100 paragraphs.  Both of
22  my assignments on both teams have to do with use
23  of force, policy training supervision, anything
24  that touches with use of force, all less lethal

1  weapons, and also how the department interacts
2  with the mentally ill.  And then shortly after I
3  retired, I started some expert witness work and
4  have had several cases since my retirement
5  including this one.
6      Q.  And you're here today pursuant to a
7  notice of deposition; is that correct?
8      A.  That's correct.
9      Q.  And prior to receiving that notice, you
10  prepared a report in this case; is that correct?
11     A.  Yes, I did.
12     Q.  Do you have a copy of your report with
13  you today?
14     A.  Yes, I do.
15     Q.  At Page -- I'm sorry; at Paragraph 33 of
16  that report, in the final two lines, I believe you
17  indicate that your opinions in this case are
18  partly assessing whether actions were consistent
19  with constitutional standards, professional
20  policing practices and standards within the field
21  of law enforcement.  Can you describe to me what
22  you meant by that?
23     A.  The constitutional standards -- and I
24  cover that at the end with one of my opinions with

1  the excessive use of force on Page 31, the failure
2  of the Champaign Police Department and the
3  officers that are mentioned in their use of
4  excessive and unwanted force that led to the death
5  of Richard Turner.  The constitutional standard
6  would be Graham vs. Connor.  And I pretty much
7  explain that in my report where the department
8  didn't meet that threshold of Graham vs. Connor.
9      I also touched upon professional policing
10  practices.  The International Association of
11  Chiefs of Police -- and I provided a document and
12  a citation in my report for that on dealing with
13  the mentally ill, dealing also with the Police
14  Executive Research Forum, that they provided some
15  information on how to deal with the mentally ill
16  that's called -- an article that I placed in there
17  was "Re-engineering Use of Force."  And it had to
18  do specifically with critical incident teams,
19  crisis intervention teams.  And I have also added
20  a document in my report from the COPS office on
21  internal investigations and the thoroughness and
22  effectiveness of internal investigations.
23     Q.  What do you mean when you say "COPS
24  office"?

1      A.  So I inserted a 2003 United States
2  Department of Justice Office, a community-oriented
3  policing service.  They refer to it as a COPS
4  office, C-O-P-S.  It's a document entitled
5  "Standards and Guidelines for Internal Affairs:
6  Recommendations from a Community of Practice."
7  And I cite -- specifically cited Page 29 of that
8  report in my report -- of their report in my
9  report.
10     Q.  And in your report at Paragraph 35 you
11  reference a wide-ranging body of knowledge and
12  literature about police practices and standards.
13  Is that separate from the documents that you've
14  already indicated that you're referring to in this
15  report?
16     A.  So in Paragraph 35, the wide-ranging body
17  of knowledge and literature about police practices
18  and standards would include everything I have
19  mentioned in my report and on -- as testimony
20  today and other wide information that's available
21  out there.  Specifically the knowledge and the
22  literature is with the critical incident team, the
23  CIT team that I mentioned in my report that I
24  believe starts on Paragraph 71.  The Illinois Law

1  Enforcement Training Standards Board provides a
2  40-hour block of instruction free of charge.  I
3  personally attended that.  I had my entire command
4  staff and supervisors attend that, that course.
5  Myself and a deputy chief were the last ones that
6  were certified in my agency.  And so that's what
7  I'm referring to when I talk about the
8  wide-ranging body of knowledge and literature
9  that's available.
10     Q.  Okay.  So just to kind of wrap this up,
11  all I'm trying to understand is, are you relying
12  on any literature that you've not referenced in
13  your report?
14     A.  No.
15     Q.  And specifically at Paragraph 22 of your
16  report you mention a number of specific pieces of
17  literature including that COPS document you
18  referred to, the International Association of
19  Chiefs of Police document you referred to, and
20  then elsewhere you've mentioned some other things
21  in this report; correct?
22     A.  That's correct.
23     Q.  So beyond those things, is there -- if
24  I'm understanding correctly, there's no other

1  literature that you are citing as a basis for your
2  opinion?
3     A.  That's correct.  Everything that I cited
4  for my opinion, basis of my opinion are documents
5  that are included on Page -- on Paragraph 22.  I'm
6  also stating as a general -- other statement that
7  there is a vast amount of literature out there
8  that's available but for this particular incident
9  is that this is the information that I used.
10    Q.  And you reference an IL462-2005 in that
11 Paragraph 22?
12    A.  Yes.
13    Q.  Can you indicate what that is, please?
14    A.  And I apologize for that.  I should have
15 put that down here, but it's the Petition for
16 Involuntary/Judicial Admission, and it's on the
17 bottom of -- it's a five-page document, Illinois
18 462-2005.  It's a Petition for Involuntary/Judicial
19 Admission.
20    Q.  Now, I did not see where that document
21 was referenced anywhere else in your report.  Is
22 it?  And if I missed it, I apologize.
23    A.  When I went over it this morning, I
24 remember seeing it in here.  Just bear with me.

1     Q.  Maybe I can short-cut this for you here.
2     A.  Okay.
3     Q.  Is it your intent to rely upon that
4  document in formulating your opinions in this
5  case?
6     A.  Yes.
7     Q.  Okay.  Beyond that document and the ones
8  we've already discussed, any other document or
9  literature -- I'm not talking about materials from
10 this case.  Let me back up.
11       Beyond the involuntary admission document
12 that you just referred to and the other literature
13 that you referred to, any other trade literature
14 that you intend to rely upon or authoritative
15 texts that you intend to rely upon in formulating
16 your opinion in this case?
17    A.  No.  Everything that I've tendered my
18 opinion on is based on materials that I provided
19 in my report.
20    Q.  Okay.  Is it your position that you're an
21 expert on constitutional law?
22    A.  No.
23    Q.  And are you an attorney?
24    A.  I am not.

1     Q.  I notice that you are a nonlawyer hearing
2  officer for the ARDC?
3     A.  Yes.
4     Q.  What does that involve?
5     A.  I'm appointed by the Illinois Supreme
6  Court on a yearly basis -- I think it's been since
7  2013 -- as there's -- if an attorney in the state
8  of Illinois is investigated by the ARDC.  And then
9  there's a hearing.  And there's two attorneys, and
10 then there's a nonlawyer.  I'm one of the
11 nonlawyers that's been appointed by the Supreme
12 Court to listen to misconduct that's been
13 conducted by an attorney in Illinois and then
14 render a decision, guilty, not guilty, and then
15 any punishment.
16    Q.  Okay.  And so you're adjudicating whether
17 there's been a violation of the Code of
18 Professional Responsibility for attorneys?
19    A.  That's correct.
20    Q.  You are not adjudicating whether there's
21 been a violation of the United States Constitution
22 in that capacity?
23    A.  That's correct.
24    Q.  Now, we're going to get to the documents

1  you've reviewed, but have you spoken with anyone
2  about this case?
3     A.  Yes.
4     Q.  And I don't want to hear the specific
5  conversations you've had with counsel for
6  Mr. Turner, but you've spoken with Mr. Turner's
7  counsel?
8     A.  Yes.
9     Q.  Have you spoken with Chandra Turner?
10    A.  No.
11    Q.  Or John Turner?
12    A.  No.
13    Q.  Have you spoken with anyone else from the
14 Turner family?
15    A.  No.
16    Q.  In speaking with Mr. Turner's counsel
17 about this case, is that the first time that
18 you've communicated with the law firm that employs
19 Mr. Turner's counsel?
20    A.  Could you repeat that question?
21    Q.  Yeah.  Is this the first case where
22 you've ever communicated with Mr. Turner's
23 counsel?
24    A.  With Mr. Carmichael?

1     Q.  Is this the first case where you've ever
2 communicated with the law firm that represents
3 Mr. Turner's sister in this case?
4     A.  What do you mean by "communication"?
5     Q.  Have you ever had a prior case where you
6 have worked with Mr. Turner's counsel?
7     A.  Not worked with him.
8     Q.  Okay.  And -- but there's been some form
9 of communication between you and Mr. Turner's
10 counsel outside of a case where you were working
11 with him?
12     A.  Yes.
13     Q.  And what context was that?
14     A.  The police department was a defendant in
15 an in-custody death in Rockford, Illinois.
16     Q.  And "the police department" being the
17 Rockford Police Department?
18     A.  Yes, Rockford Police Department was the
19 defendant.
20     Q.  And were you the chief of police at that
21 time?
22     A.  Yes, I was.
23     Q.  Were you a named defendant in the case?
24     A.  No.

1     Q.  And do you recall the plaintiff in that
2 case or the decedent in custody?
3     A.  I don't remember his first name.  The
4 last name was Johnson.
5     Q.  Do you remember the name of any of the
6 Rockford Police Department officers who were sued
7 in that case?
8     A.  I don't recall.
9     Q.  Do you believe the City of Rockford was
10 an individual defendant?
11     A.  Yes.
12     Q.  About what time frame was that?
13     A.  Roughly 2008 and 2010.  I just don't
14 recall the date but somewhere, I think, around
15 that time.
16     Q.  And I should have said this at the
17 beginning, but if you ever do not recall
18 something, you don't have to apologize to me; just
19 let me know that.
20     A.  Okay.
21     Q.  Is there anything we've talked about
22 already that you guessed on but you didn't recall?
23     A.  No.
24     Q.  If there's something that you feel like

1 you can give me an estimation on, that's fine, but
2 I do not want you guessing today; okay?
3     A.  Okay.
4     Q.  Were you deposed in that case, the
5 Johnson case?
6     A.  Yes.
7     Q.  And was that in your capacity as chief?
8     A.  Yes.
9     Q.  Where was the location of the in-custody
10 death?
11     A.  It was in Rockford, Illinois.
12     Q.  In the police station?
13     A.  No, 600 North Longwood.
14     Q.  Can you spell that street name?
15     A.  Yes; North -- it's just North by itself
16 and then Longwood, L-o-n-g-w-o-o-d Street;
17 Longwood Street.
18     Q.  Besides testifying in a deposition, did
19 you provide any other testimony in that case?
20     A.  No.
21     Q.  Did you provide an affidavit in that
22 case?
23     A.  No.
24     Q.  Did that case go to trial?

1     A.  No.
2     Q.  Did it settle?
3     A.  Yes.
4     Q.  Do you know approximately when?
5     A.  No.
6     Q.  Do you know the amount?  Well, was it a
7 confidential settlement?
8     A.  I don't recall.
9     Q.  Do you know the amount?
10     A.  No.
11     Q.  Who was the attorney who took your
12 deposition?
13     A.  The plaintiff's attorney was Victor
14 Henderson.
15     Q.  Aside from that interaction with
16 Mr. Henderson in that particular case, have you
17 had any other interactions with the law firm that
18 represents Mr. Turner's sister in this case prior
19 to this case?
20     A.  Yes.
21     Q.  When was that?
22     A.  Approximately two years ago.
23     Q.  In what context?
24     A.  I sent Mr. Henderson an e-mail.

1     Q.  Regarding what?
2     A.  That I was a police practice expert and
3  that I was passing my information along to him.
4     Q.  Would this coincide roughly with the time
5  when you started doing consulting?
6     A.  I think it was shortly after that, but
7  yes, somewhere around that time.  I just can't
8  give you an exact date.
9     Q.  Did you receive a response from
10 Mr. Henderson?
11    A.  Yes.
12    Q.  Do you recall what that was?
13    A.  I don't recall.
14    Q.  Any other communication with the law firm
15 that represents Mr. Turner's sister in this case
16 aside from the Johnson case, the e-mail to
17 Mr. Henderson?
18    A.  Oh, just being contacted initially about
19 the case, about the Turner case, but nothing
20 besides the times I've told you.
21    Q.  And I do not want to know what case it
22 would have been on, but have you ever been
23 contacted to consult with their law firm prior to
24 this Turner case?

1     A.  Yes, I have.
2     Q.  And what year was that?
3     A.  I provided that I had sent some
4  information to Mr. Henderson about my availability
5  work as an expert.  It was sometime after that I
6  was contacted.
7     Q.  Did you do a report in that case?
8     A.  I did not.
9     Q.  Were you deposed?
10    A.  I was not.
11    Q.  Did you testify?
12    A.  No.
13    Q.  Were you paid compensation?
14    A.  No.
15    Q.  Did you provide consulting work for free
16 in that case?
17    A.  I gave about a ten-, fifteen-minute
18 consultation opinion.
19    Q.  Okay.  So aside from the Johnson -- I'm
20 sorry.  Was that consultation with Mr. Henderson
21 directly?
22    A.  It was -- there was another attorney on
23 the phone.  And it was a woman, and I don't recall
24 her name.

1     Q.  Aside from the Johnson case, the e-mail
2  to Mr. Henderson, and this conversation that we
3  just talked about, did you have any other contacts
4  with Mr. Turner's sister's law firm prior to the
5  Turner case?
6     A.  No.
7     Q.  Did you ever receive any compensation
8  from that law firm prior to the Turner case?
9     A.  No.
10    Q.  Do you know who Jack Ryan is?
11    A.  I'm sorry?
12    Q.  Do you know who Jack Ryan is?
13    A.  No.
14    Q.  Have you ever done --
15    A.  Oh, I'm sorry.
16    Q.  -- consulting with Jack Ryan?
17    A.  I'm sorry.  Go ahead.
18    Q.  Do you know who Jack Ryan is?
19    A.  I was thinking of another person by Jim
20 Ryan.  That's what I was thinking.  Jack Ryan, the
21 police consultant?
22    Q.  Yes.
23    A.  Yes.
24    Q.  And whenever you started consulting, did

1  you begin doing that under Mr. Ryan?
2     A.  No.
3     Q.  Did you receive referrals from Mr. Ryan?
4     A.  No.
5     Q.  Did you ask him to send you referrals?
6     A.  No.
7     Q.  Did you alert him to the fact that you
8  were going to be consulting kind of in a manner
9  like you did with Mr. Henderson?
10    A.  No.
11    Q.  No relationship with Mr. Ryan at all?
12    A.  What do you mean by "relationship"?
13    Q.  What interactions have you had with
14 Mr. Ryan in the last ten years?
15    A.  He was contacted by the Rockford Police
16 Department to do some training in internal affairs
17 when I was chief of police.
18    Q.  Beyond that, any interactions with him?
19    A.  That is the first and only contact, and I
20 didn't contact him for the training.  I've had no
21 contact with him.
22    Q.  Have you had any direct communications
23 with the Champaign Police Department about this
24 case?

1      A.  No.
2      Q.  Have you had any direct communications
3  with anyone from the city of Champaign about this
4  case?
5      A.  No.
6      Q.  Have you overheard any type of admission
7  from anyone from the City of Champaign regarding
8  the Turner case?
9      A.  No.
10      Q.  Have you had any prior interaction with
11  the Champaign Police Department or the City of
12  Champaign?
13      A.  Prior to this case?
14      Q.  Yes.
15      A.  Yes.
16      Q.  On what occasions?
17      A.  So I've had communication, association
18  with the current chief and the previous chief on
19  various chief meetings when I was chief of police.
20      Q.  What's the names of those two
21  individuals?
22      A.  Current Chief Anthony Cobb; and the prior
23  chief is -- I can't think of his first name but
24  Finney, F-i-n-n-e-y.

1      Q.  And Cobb is C-o-b-b?
2      A.  I will tell you in one second.  C-o-b-b,
3  Anthony.
4      Q.  Have you ever spoken with Chief Finney or
5  Chief Cobb regarding the Turner case?
6      A.  No.
7      Q.  Have you had any interaction with anyone
8  else from the command staff beyond those chiefs?
9      A.  No.
10      Q.  Did you ever provide any training to the
11  Champaign Police Department?
12      A.  I don't believe so.
13      Q.  Did you ever provide any support to the
14  Champaign Police Department in the form of
15  investigations, support or otherwise?
16      A.  No.
17      Q.  And as I understand, counsel for
18  Mr. Turner's sister sent you some paperwork to
19  review for this case?
20      A.  I'm sorry?
21      Q.  You received some paperwork regarding the
22  Turner case to review; is that correct?  Let's
23  back up.
24          If you look at Paragraph 22 of your

1  report, you list some materials that you reviewed.
2  Correct?
3      A.  Okay.
4      Q.  How did you receive those materials?
5      A.  I received those from the law firm.
6      Q.  You've listed a number of things -- when
7  you say "the law firm," I'm sorry, you're
8  referring to the law firm of the plaintiff in this
9  case?
10      A.  Yes.
11      Q.  Is this list on Paragraph 22 exhaustive
12  of everything that you received regarding the
13  Turner case as far as discovery materials?
14      A.  Yes.
15      Q.  Under audio/video, you list dashcam video
16  Sergeant Frost, dashcam video Officer Young.  Is
17  that correct?
18      A.  That's correct.
19      Q.  Was Officer Young's dashcam operational
20  during any of this interaction?
21      A.  You know, I don't recall.
22      Q.  Is it possible that you viewed the squad
23  video of the vehicle driven by Officer Talbott and
24  Officer Wilson?

1      A.  I can't recall.
2      Q.  Did you view the -- any of the five other
3  squads videos related to this Turner incident?
4      A.  I did not.
5      Q.  Is there any particular -- was that a
6  choice by you to not review those?
7      A.  Yes.
8      Q.  What was the reason for that choice?
9      A.  These officers were involved, and I also
10  had a problem with some of the audio -- not the
11  audio but maneuvering some of the information.
12  But I was able to come up with my report and be
13  exhaustive with the materials that I had.  I
14  didn't see a need to obtain any additional
15  information.
16      Q.  This mentions a video path of incident.
17  Can you please describe that for me?
18      A.  I was provided a video of the path of
19  where the incident went down between the
20  buildings.
21      Q.  And what's your understanding of where
22  that -- the origin of that video?
23      A.  In Champaign, Illinois, from where
24  Mr. Turner took off shuffling from the officers

1    and then the officers pursued him.
2    Q.  Do you know who recorded that video?
3    A.  Yes.
4    Q.  Who?
5    A.  Attorney Carmichael.
6    Q.  Do you know the date?
7    A.  I do not know.
8    Q.  Do you know the time it was recorded?
9    A.  I do not.
10    Q.  Can you describe the weather conditions?
11    A.  Appear to be a clear day, daylight hours.
12    Q.  Can you explain to me the speed with
13    which the video showed the alleged path of the
14    incident?
15    A.  I cannot.
16    Q.  Do you have a copy of that video still?
17    A.  Yes.
18    Q.  I'm going to show you what's been marked
19    as Exhibit No. 1.  I am going to represent to you
20    that these are some communications sent to me by
21    counsel for Mr. Turner.  And the first page
22    appears to be an e-mail from Mr. Carmichael to
23    yourself; is that correct?
24    A.  Yes.

1    Q.  Is this how you received the video?
2    A.  Yes.
3    Q.  Can you still access the video via that
4    link?
5    A.  I don't know if you can or not.
6    Q.  Does it require a password?
7    A.  No.
8    Q.  Have you received a video in any other
9    format?
10    A.  I don't believe so.
11    Q.  If you look at the next page -- the next
12    two pages; I'm sorry -- can you identify those for
13    me, please?  What is it?
14    A.  This is a letter to me from Henderson
15    Parks dated December 3, reference Turner, et al.
16    v. City of Champaign, addressed to me.
17    Q.  And it's regarding materials that were
18    sent to you for review?
19    A.  Yes.
20    Q.  Were you sent any materials via another
21    letter?  Well, I'll save that question.
22    A.  Okay.
23    Q.  You received all the things that are
24    actually marked on this letter?

1    A.  Yes.
2    Q.  The next page references -- it appears to
3    be an e-mail again to you December 4, 2018,
4    attachment coroner's report?
5    A.  Yes.
6    Q.  And some other documents?
7    A.  Yes.
8    Q.  The next page appears to be an e-mail to
9    you attaching a certain production of policies and
10    then training materials; is that correct?
11    A.  That's correct.
12    Q.  And then on the second page of this
13    document you reference having some issues with
14    accessing all the electronic video.  Did you ever
15    resolve those issues so you could access them all?
16    A.  Yes.
17    Q.  There's a mention on this third --
18    Page No. 3 of that e-mail of a flash drive that
19    was sent to you.  Did you receive that?
20    A.  Yes.
21    Q.  Do you know what materials were on that
22    flash drive?
23    A.  The materials on the second page of
24    Exhibit 1.

1    Q.  Those were on the flash drive that you
2    received?
3    A.  Yes.
4    Q.  And then the final page of this Exhibit
5    No. 1, that mentions a complaint that you --
6    that's an e-mail that you received from
7    Mr. Turner's counsel; correct?
8    A.  Yes.
9    Q.  And you received a complaint through that
10    e-mail?
11    A.  Yes.
12    Q.  Aside from these documents reflected in
13    Exhibit No. 1, did you receive any other
14    communication that provided you with facts about
15    the Turner case?
16    A.  I don't believe so.
17    Q.  Do you know for sure?
18    A.  If my memory serves me, that's all I can
19    recall right now.
20    Q.  Turning back to your report, Paragraph 22
21    under the audio/video section, there was a
22    reference to a stationary video of incident.  What
23    is that?
24    A.  That stationary video would have been --

1    I had -- there was two cameras that were playing
2  on my computer screen.  And one showed Mr. Turner
3  coming over to some garbage cans.  The left one I
4  didn't see much movement on that, but they were on
5  for quite a bit of time.  But that's -- the
6  stationary video, I believe, was from one of the
7  businesses that was up on a pole.  I don't believe
8  it was on the squad car.
9    Q.  Do you know the origin of that video,
10  what business it was from or who was doing the
11  recording?
12    A.  I can't recall.
13    Q.  And do you know the name of the program
14  that opened when you looked at that video?
15    A.  I can't remember the name.
16    Q.  You think it was a view from like a pole
17  and then a street-level view side by side?
18    A.  I can't recall.
19    Q.  Did you review any other surveillance
20  videos beyond those mentioned in Paragraph 22 of
21  your report here?
22    A.  No, I did not.
23    Q.  Did you review any other audio materials
24  beyond what might have been included in those

1  videos mentioned in Paragraph 22?
2    A.  No.
3    Q.  Continuing in that Paragraph 22 under
4  investigative materials, you list city
5  investigation.  What are you referring to there?
6    A.  I'm referring to the city investigation,
7  the administrative review that was done by the
8  lieutenant.
9    Q.  Do you know the lieutenant's name?
10    A.  Lieutenant Myers.
11    Q.  Did you review any of the police reports
12  from the City of Champaign regarding this
13  incident?
14    A.  Yes, I did.
15    Q.  Where are those mentioned in this
16  Paragraph 22?
17    A.  They would have been mentioned under
18  investigative materials.  City investigation
19  include -- anything with the city I included in
20  that.
21    Q.  Okay.
22    A.  So when I say "city investigation," I'm
23  talking about Myers's report, and I'm talking
24  about the whole document.  I guess I could have

1  put them all up, but there was several that were
2  in there.  There was Myers' report, several
3  supplemental -- I think they called them
4  supplemental reports that the officers filled out
5  that were at the scene.
6    Q.  Did you review the multi-jurisdictional
7  task force investigation?
8    A.  I did, and that was a part of also that
9  packet under the city investigation.
10    Q.  That task force was not operated by the
11  City of Champaign; correct?
12    A.  That's correct.
13    Q.  It was overseen by the Illinois State
14  Police eventually?
15    A.  Yes.
16    Q.  And that included coordination with the
17  Champaign County Sheriff's Office?
18    A.  Yes.
19    Q.  The University of Illinois Police
20  Department?
21    A.  Yes.
22    Q.  And you reviewed all of those materials?
23    A.  Yes.
24    Q.  You're claiming you did that under this

1  category of city investigation?
2    A.  Yes.
3    Q.  You mentioned coroner's report here.
4  What exactly did you review from the coroner's
5  report?
6    A.  That's that last document that I think I
7  requested under the Exhibit 1.  So I requested a
8  coroner's report along with a tox report.  So I
9  would have reviewed those two reports and at least
10  a couple other ones on there.
11    Q.  Would it help you refer to them if you
12  had them in your materials to just let me know
13  what the Bates numbers were on those documents?
14    A.  I don't have them with me.
15    Q.  Okay.  Do you know about how long they
16  were?
17    A.  The coroner's report was 30 pages, 20 to
18  30 pages, something like that.  I don't recall the
19  page numbers on the tox report on how long that
20  was.
21    Q.  Did you review the production of
22  materials provided by the coroner in response to
23  our subpoena?  It was about 819 pages.
24    A.  I don't recall reading that.

1  Q.  Under the next line you mentioned
2  training records.  What are you referring to
3  there?
4  A.  In the production of materials there were
5  training records that specifically had Sergeant
6  Frost, Officer Wilson, Officer Talbott, and
7  Officer Young's training records.  There were
8  quite a few, I would say maybe a couple hundred
9  documents that were either requests of classes
10  that they went to, classes that they attended.
11  Q.  I'm going to jump in to help out here.
12  The reason I'm asking this is because on the next
13  page, on Paragraph 22 you mentioned specifically
14  reviewing D650 through 1806-Personnel, which I'm
15  going to represent to you included the training
16  records.  So I'm curious if there was a separate
17  set of training records that you reviewed beyond
18  those.
19  A.  No.  In D650 to 1806 that you just
20  referred to, I believe the training records of
21  those officers that I mentioned in my report were
22  in that Bates stamp area.
23  Q.  Did you review the personnel files at
24  D1817 through 1870?

1  A.  I'm sorry; could you repeat that again?
2  Q.  Did you review the personnel files at
3  D1817 through 1870?
4  A.  And personnel files for who?
5  Q.  Officers Young, Talbott, Frost, and
6  Wilson.
7  A.  Personnel files in terms of discipline,
8  in terms of counseling sessions?
9  Q.  I'm asking what -- if you recall having
10  reviewed any personnel files that were at those
11  Bates stamps.
12  A.  I can't recall right now.
13  Q.  Up here -- I'm going to kind of ask about
14  the next four things in this Paragraph 22.  You
15  have Champaign police policies.  You mentioned
16  three things, and then you mentioned other
17  materials, CPD Policies 240 through 253.  Where
18  did these first three come from: conflict
19  management, restraining devices, and use of force?
20  A.  I requested crisis intervention team,
21  CPD policies and procedures on crisis
22  intervention, restraining devices and a training
23  bulletin on December 26.  And also between 240 and
24  253 -- it might be a duplication, but the use of

1  force policy I know was in there, and I think the
2  restraining devices.  So I may have added that
3  twice.
4  Q.  Okay.  So it might just be a partial
5  repeat of those others?
6  A.  Yes, sir, I'm thinking that's what
7  occurred.
8  Q.  In your report there is no opinion that
9  anyone from the City of Champaign violated the
10  restraining devices policies; correct?
11  A.  That's correct.
12  Q.  In your report there's no opinion that
13  anyone from the City of Champaign violated the use
14  of force policy; correct?
15  A.  In my report?
16  Q.  In your report you issue no opinion that
17  someone from the City of Champaign violated the
18  Champaign Police Department's policy -- internal
19  departmental policy on use of force; correct?
20  A.  Well, I opinionated starting on
21  Paragraph 81 of my report that the officers' use
22  of excessive and unwanted force led to the death
23  of Richard Turner.
24  Q.  In there did you indicate anywhere that

1  the force used was in violation of the Champaign
2  Police Department's policy either in Paragraph 81
3  or elsewhere in this?
4  A.  I'm looking now.  So on Paragraph 81, in
5  the middle part of Paragraph 81, the Champaign
6  Police Department, comma, however, failed to
7  assess, appreciate, and adhere to their
8  policies -- standard policy practices and
9  constitutional standards of this incident.
10  Q.  Can you refer me to the section or
11  subpart of the Champaign Police Department use of
12  force policy that was specifically violated in
13  this case and show me where you've made that
14  opinion known in your report that was issued to
15  us?
16  A.  On Champaign policy use of force, 1.3.1,
17  Subsection A, force necessary to accomplish lawful
18  objectiveness -- objectives.
19  Q.  Where's that mentioned in your report?
20  A.  I mentioned in --
21  Q.  Let me rephrase my question.  In your
22  report that you issued to disclose your expert
23  opinions in this case, where do you mention
24  Champaign use of force policy at Section 1.3.1,

1  Subsection A?
2      A.  It's not in my report.
3      Q.  Okay.  Do you mention any subsection or
4  section of this use of force report specifically
5  in your opinions that you've disclosed in your
6  report in this case?
7      A.  Could you repeat the question, please?
8      Q.  In your report in this case that
9  discloses your opinion do you make any specific
10  reference to any subsection of the Champaign
11  Police Department use of force policy?
12      A.  No.
13      Q.  Turning back to Paragraph 22, you
14  mentioned a review of D484 through 500, dispatch?
15      A.  Yes.
16      Q.  What were those materials?
17      A.  Those were materials that were in the
18  dispatch of -- on Paragraph 23 and 24 of my
19  report, that I would have retrieved that
20  information from someone calling the 911 center,
21  communication from the complainant and then from
22  the dispatcher to the officer.
23      Q.  So beyond the reference to -- I'm sorry;
24  beyond the reference in your report to a reporting

1  person calling the dispatch center and then that
2  information being communicated to the officers,
3  did you otherwise rely upon these dispatch records
4  in issuing your opinion?
5      A.  I don't understand your question.
6      Q.  In issuing your opinion, you relied on
7  the dispatch records at least in regard to the
8  reporting person and the fact that certain
9  information was relayed to the officers from the
10  reporting person; correct?
11      A.  I'm just having a hard time with your
12  question.
13      Q.  Okay.  So whenever you look at
14  Defendant's 484 through 500, there's an initial
15  dispatch ticket, there's some additional
16  information about people who were on the shift,
17  and then there are logs of specific times.  What
18  part of that did you rely upon in issuing your
19  report as reflected here?
20      A.  Would have been the initial call and how
21  the officers were dispatched to the call regarding
22  Richard Turner and then the amount of time from
23  the dispatch until Richard Turner was deceased in
24  custody.  Would have used that information.

1      Q.  Beyond that particular time frame, did
2  you otherwise evaluate time frames in the case
3  from one event to another based on the dispatch
4  records?
5      A.  No, that's the only time frame.
6      Q.  In this Paragraph 22 you mention a
7  discovery review-Turner.  What does that mean?
8      A.  It's -- I had requested all of the
9  documents that were part of the case so I could
10  take a look at it, is there something that I may
11  be wanting to review.
12      Q.  The only things you received are the
13  things that were referenced in Exhibit 1?
14      A.  Yes.
15      Q.  Did you review D501 through 649 regarding
16  Turner's other contacts with the Champaign Police
17  Department?
18      A.  No, I did not.
19      Q.  Did you review D1871 through 74 including
20  the photos of the officers involved in this
21  incident?
22      A.  Yes.
23      Q.  Did you review D1875, field training
24  officer report?

1      A.  Yes, I did.
2      Q.  Did you review D1876 through 1982 which
3  were reports of contacts with Richard Turner for
4  mental health issues from 2014 through 2016?
5      A.  I did not.
6      Q.  Did you review D1983 through 2138 which
7  are e-mails and communications?
8      A.  I don't recall.
9      Q.  Did you review D2960 through 3012 which
10  is the sheriff's subpoena response?
11      A.  No.
12      Q.  Did you review D3013 through 3104 which
13  is the probation department's subpoena response?
14      A.  No.
15      Q.  Did you review D3013 through 6710 which
16  is a subpoena response from Presence?
17      A.  No.
18      Q.  Did you review photos on a CD marked as
19  D6711?
20      A.  I don't recall.
21      Q.  Did you review D6712 through 6962 which
22  is Carle's subpoena response?
23      A.  No.
24      Q.  Carle with an "E"?

1    A. No.
2    Q. Did you review any medical records of
3  Mr. Turner in this case?
4    A. Just the medical record -- the medical
5  report from the coroner's office.
6    Q. In Paragraphs 35 and 36 it mentioned
7  you're reserving the right to change your opinions
8  upon receiving additional access and review of
9  materials. Are there materials that you believe
10  that you have exchanged in this case that you have
11  not reviewed that would affect your opinions?
12    A. Not right now.
13    Q. Including the ones that we've just -- I'm
14  sorry.
15      The materials that we just went over that
16  you indicated you did not review, do you believe
17  that any of those would affect your opinions
18  issued in this case?
19    A. No.
20    Q. Did you review documents marked as
21  Turner 1 through 303?
22    A. I don't know what that document is.
23    Q. Did you receive any kind of summary of
24  discovery records from Plaintiff's counsel?

1    A. Yes.
2    Q. Is that a summary that you created or one
3  that was provided to you by counsel for
4  Mr. Turner's sister in this case?
5    A. One that was provided.
6    Q. When did you receive that?
7    A. I don't want to guess, but it's after I
8  was retained and up until I tendered my report.
9    Q. And that summary identifies facts or data
10  that Turner's counsel provided to you?
11    A. It's a Turner discovery review updated
12  September 26 of 2018.
13    Q. So in your report, whenever you mention
14  that Paragraph 22 that you reviewed a discovery
15  review/Turner, you were referring to this summary
16  provided by Plaintiff's counsel? Page No. 6,
17  under other materials, says discovery review/
18  Turner. Is that the summary that you received
19  from Plaintiff's counsel?
20    A. Yes, sir.
21    Q. Do you have a copy of that document that
22  you have not marked up?
23    A. I've got some markings on it.
24    Q. How many pages is it?

1    A. It's nine pages.
2    Q. And can you describe the format of that
3  document to me?
4    A. It appears to be in a Word -- or
5  Microsoft Word table with three columns.
6    Q. What are the titles of the columns?
7    A. Bates stamp, date, and description.
8    Q. Do you know who provided the description?
9    A. I do not.
10    Q. But that was in there when you received
11  this document from Plaintiff's counsel?
12    A. Yes.
13    Q. And you considered -- you reviewed this
14  document and considered it in formulating your
15  opinions; correct?
16    A. I didn't formulate my opinion off this
17  Turner discovery review. This was a document that
18  would assist me in my -- make sure that I have all
19  the documents to render an opinion, but I wouldn't
20  have made an opinion off this document.
21    Q. But you considered it in the process of
22  reaching your opinions?
23    A. The materials are in here to make sure
24  that I had everything.

1    Q. Was that a yes?
2    A. Yes.
3    Q. I'm going to ask that you preserve that
4  document in the event I believe it's responsive to
5  prior document requests and the notice of today's
6  deposition.
7    A. Yes.
8    Q. I'm going to also, unless you have a
9  clean copy of that document, reserve the right to
10  ask you questions based on that document when it's
11  actually produced to us unless you have a clean
12  copy here today and we can get it over with.
13    MR. CARMICHAEL: I don't, and we're
14  going to -- that one's within the work product
15  scope.
16    MR. BRUNNER: We don't have to debate
17  that right now.
18      (Epperson Deposition Exhibit
19      No. 2 was marked for
20      identification by Attorney
21      Brunner.)
22  BY MR. BRUNNER:
23    Q. I'm going to mark Exhibit No. 2. You've
24  seen this document before, sir?

1    A.  Yes.
2    Q.  This is the Notice of Deposition?
3    A.  Yes.
4    Q.  I want you to take a look at the second
5    page, the very top two lines under the Roman
6    Numeral II.  Do you have any other communications
7    that identify facts or data that Plaintiff's
8    attorney provided and that you considered in
9    forming the opinions that you ended up expressing
10   in this case beyond those that we've already
11   talked about?
12   A.  No.
13   Q.  You see right below that it asks for any
14   communications -- oh, I'm sorry; above that.  If
15   you take a look at Exhibit No. 1 -- I'm sorry; I
16   can't do this right.  Take a look at Exhibit
17   No. 2.  If you look at the bottom of page under
18   small Roman Numeral I, it requests communications
19   between Plaintiff's attorney and yourself that
20   relate to compensation for your study or
21   testimony?
22   A.  Yes.
23   Q.  Have there been any such communications?
24   A.  Yes.

1            (Epperson Deposition Exhibit
2            No. 3 was marked for
3            identification by Attorney
4            Brunner.)
5    BY MR. BRUNNER:
6    Q.  I'm going to mark Exhibit No. 3.  Can you
7    take a look at this and identify it for me,
8    please?
9    A.  Yes, I can identify it.
10   Q.  Say that again?
11   A.  I can identify it.
12   Q.  What is it?
13   A.  It's an e-mail correspondence between
14   Attorneys Carmichael and Henderson and myself
15   being retained for this case.  There's a document
16   that I provided, my usual and customary fee
17   schedule, and they provided the $4,000 retainer,
18   and there's a copy of the check.
19   MR. BRUNNER:  Okay.  I should probably
20   black out the routing and account numbers on this
21   check.  Do you agree to that for this exhibit?
22   MR. CARMICHAEL:  Sure.
23   MR. BRUNNER:  So I'm marking that in the
24   official copy.

1    BY MR. BRUNNER:
2    Q.  Have you had any communications with
3    Plaintiff's counsel regarding compensation beyond
4    those that are explicitly contained within this
5    Exhibit 3?
6    A.  Yes.
7    Q.  What other communications have you had?
8    A.  I sent the letter to the law firm for my
9    final invoice.
10   Q.  When was that?  What date did you send
11   that?
12   A.  February 12, 2019.
13   Q.  Today?
14   A.  Oh, I'm sorry.  That's -- no, I'm
15   confused.  That's what I'm going to give you for
16   my invoice for you.  I'm sorry.  Just hang on.  It
17   was February 10 that I mailed this.
18   Q.  Sent by U.S. mail only?
19   A.  Yes.
20   Q.  Do you have a copy of that that you have
21   not marked up?  Do you have a copy of that
22   document that does not have your handwriting
23   highlighting on it?
24   A.  No, this is a clean copy.

1    MR. BRUNNER:  Can we mark that as an
2    exhibit?  I'm assuming that Plaintiff's counsel
3    had not received that by the time that they
4    provided us these documents since you just sent it
5    in the mail on the 10th.
6    THE WITNESS:  I just -- just for the
7    Court, if you don't mind omitting or redacting,
8    that's my home address.  I don't have a P. O. box.
9    So if you could white that out.
10           (Epperson Deposition Exhibit
11           No. 4 was marked for
12           identification by Attorney
13           Brunner.)
14   BY MR. BRUNNER:
15   Q.  So I'm going to mark as Exhibit 4 this
16   document that you're handing to me that you're
17   representing is the invoice.  The date towards the
18   bottom is February 10, 2019.  And at the top we
19   are going to mark out the home address that begins
20   with the number 1.  Is that correct?
21   A.  Thank you.
22   Q.  Have I identified this correctly, sir?
23   A.  Yes, you have.
24   Q.  All right.  So if I'm reading this right,

1  you received a $4,000 retainer on this case?
2     A.  Yes.
3     Q.  And then you did work in the amount of
4  $3,000?
5     A.  Yes.
6     Q.  Is that beyond the retainer amount?
7     A.  Yes.
8     Q.  So how many hours have you expended on
9  working on this case?
10    A.  I came up with 62.25 hours.
11    Q.  Do you itemize that work anywhere?
12    A.  Yes.
13    Q.  And it's not itemized in Exhibit No. 4
14  that you've provided as your billing statement;
15  correct?
16    A.  That's correct.
17    Q.  Is there anything in this billing
18  statement that can alert us to the specific tasks
19  that you performed in preparation of your opinions
20  or report in this case?
21    A.  Not in Exhibit 4.  It's not listed there.
22    Q.  Have you provided anything to that effect
23  to Plaintiff's counsel's office?
24    A.  Yes.

1     Q.  And was that sent with the invoice?
2     A.  Yes.
3     Q.  Can we mark that as part of this Exhibit
4  No. 4?
5        MR. CARMICHAEL:  If you -- Chief, do you
6  have a clean copy?
7        THE WITNESS:  Yes.
8        MR. CARMICHAEL:  Okay.
9        THE WITNESS:  Is that okay?
10       MR. BRUNNER:  So Exhibit 4 was one page.
11  We're -- we're now adding a page to the back of it
12  that includes the itemization.
13  BY MR. BRUNNER:
14    Q.  Beyond the itemization listed in this
15  second page of Exhibit No. 4, do you have any
16  other itemization of the work that you performed
17  in this case?
18    A.  No.
19    Q.  And if I look at Exhibit No. 3, there's a
20  page that includes your usual and customary fee
21  schedule?
22    A.  Yes.
23    Q.  Do you know which option was used in this
24  case?

1     A.  The plaintiff did the 4,000, the Option 2
2  first -- or Option 3, 4,000 retainer.
3     Q.  So you did -- and then pursuant to that
4  option, you did up to 25 hours of case
5  development, and then that covers -- I'm sorry;
6  let me back up.
7        How much was the first 25 hours of case
8  development?  Was that $4,000?
9     A.  Well, the whole -- and I know it might be
10  a little confusing because I'm re-changing it, but
11  bottom line it's 60 hours of work to get an
12  expert's report.
13    Q.  60 hours of work to get an expert's
14  report?
15    A.  Right.  It's under Option 2.
16    Q.  I'm just trying to understand the
17  ultimate dollar figure that you ended up with here
18  because if you took your hours times 2 -- if you
19  took 62.25 hours times $200 per hour, it would be
20  quite a bit more than the $7,000 that you've
21  billed.  Is that correct?
22    A.  Yeah, according to what you did, but
23  that's not how I operate.
24    Q.  So if I understand, under Exhibit No. 3,

1  you did not actually proceed under Option 3, you
2  proceeded under a different option?
3     A.  Yeah, he's got $4,000 retainer, Option 2
4  case development flat fee with expert's report is
5  7,500.  That's my error.  I think my final --
6  what's my final bill?  It's 3,004, so I shorted
7  myself 500.  I don't like the finance side of the
8  business -- I can't stand it -- billing people,
9  trying to get money from people.  So I wish
10  somebody else -- I could hire somebody to do it.
11  I like just doing the work.
12    Q.  All right.  So just so I understand,
13  because that's all that this is about is,
14  initially you were proceeding under Option 3, and
15  you received a $4,000 retainer?
16    A.  Right.
17    Q.  At some point you proceed under Option 2,
18  but rather than charging a $7500 plat fee, you've
19  charged a $7,000 flat fee in effect for about
20  62.5 hours of work?
21    A.  Yeah.  I shorted myself.
22    Q.  Is that correct?
23    A.  And I shorted myself, but it's my
24  mistake, and so I eat the cost.

1      Q.  Is there an additional invoice for work
2  that you performed in formulating your opinions
3  for Mr. Turner's counsel that you have not
4  provided other than this one in Exhibit 4?
5      A.  No, this is it.  This is the final unless
6  we go to trial.
7      Q.  Okay.  Beyond the communications in
8  Exhibit 3 and Exhibit 4, do you have any other
9  communications with Plaintiff's counsel's office
10  regarding compensation?
11      A.  And I should say something on -- and I
12  don't have it here, but there's a cover letter
13  describing that these are my -- this is my
14  final -- this is my invoice and what's due.  And I
15  put a date on that.  So there were actually three
16  pieces of paper, so I just wanted to tell you
17  that.
18      Q.  Thank you.
19      A.  But nothing else.
20      Q.  We can just ask counsel to supplement
21  that?
22      A.  Yeah, I don't have a copy of it.  So I
23  don't know why it wasn't in there.
24      Q.  So beyond the things in Exhibit 3 and

1  Exhibit 4, any other communications about
2  compensation with the Plaintiff's attorney's
3  office?
4      A.  No.
5      Q.  How did you set your rates for
6  compensation?
7      A.  Talking to some other experts and looking
8  online what other experts charge in the industry.
9      Q.  And you made those decisions in 2016 when
10  you went over to full-time consulting?
11      A.  2016, 2017.  And I have a new fee
12  schedule, and I'm going to change it again because
13  that's way too confusing for people.  It's going
14  to be really easy, retainer and hourly fee.  It's
15  just way too confusing.  Confuses me.
16      MR. BRUNNER:  Yeah.  We've been going for
17  about an hour.  Does anybody need a quick break?
18      THE WITNESS:  I'm fine.  I'm good.  I'd
19  rather keep going.
20      MR. BRUNNER:  I could use a little drink
21  of water, so we'll just take a minute here.
22      THE WITNESS:  Okay.
23      (A brief recess was taken.)
24  BY MR. BRUNNER:

1      Q.  Sir, you mentioned earlier that you were
2  in law enforcement for a number of years.  About
3  how many years?
4      A.  34 years.
5      Q.  And that's from 1985 to 2016?
6      A.  Actually started in 1981.
7      Q.  Okay.  Where was your job in 1981?
8      A.  I started as a police cadet in the
9  Rockford Police Department from 1981 until 1983.
10      Q.  And then was there a gap in your
11  employment -- in your police employment between
12  '83 and 1985?
13      A.  And then in 1983 at the end of the year
14  until 1985 I went to Lake Forest, Illinois, as a
15  patrol officer.
16      Q.  And then in '85 you returned to Rockford?
17      A.  Yes.
18      Q.  And then you were there continuously
19  through --
20      A.  November 13, 2015.
21      Q.  When you were a cadet in 1981, did you go
22  to any kind of police training academy?
23      A.  No.
24      Q.  What about -- at any point in time have

1  you went to any police training academy as -- let
2  me figure out a different way to ask this.
3      Did you ever go to Western Illinois
4  University to their police training program?
5      A.  No.
6      Q.  Did you ever go to the University of
7  Illinois Police Training Institute in Champaign?
8      A.  No.
9      Q.  Did you ever go to a comparable program?
10      A.  A better program.
11      Q.  Okay.  What would you claim is the better
12  program?
13      A.  Chicago Police Academy.
14      Q.  And where is that?
15      A.  It's -- I believe they're still on West
16  Jackson Street.
17      Q.  And what year were you there?
18      A.  19- -- end of '83, top of '84 for their
19  12 -- it's either 10 or 12 weeks.
20      Q.  So you had been working as a patrol
21  officer for at least a year prior to going to the
22  academy?
23      A.  I left here in 1983, the end of '83, as a
24  police cadet, and I was hired by the Lake Forest

1    Police Department around the same time. And I
2    went to the police academy.
3       Q. Okay. So I'm not trying to be difficult
4    here; I just want to get an understanding. When
5    you worked from 1981 to '83 in Rockford, was that
6    all on-the-job training?
7       A. Yes.
8       Q. You did not go to any academy; correct?
9       A. That's correct.
10      Q. And then in '83 to '84 roughly, you go to
11   the Chicago Police Academy?
12      A. Yes.
13      Q. And during that time you're working as
14   patrol officer in Lake Forest?
15      A. Yes.
16      Q. And then you continued to work in Lake
17   Forest through '85?
18      A. That's right.
19      Q. Returning to Rockford in '85?
20      A. May of '85.
21      Q. And during that whole time, 1981 through
22   '85 when you returned, what was your rank or
23   ranks?
24      A. Well, a police cadet -- there's nothing

1    higher as a police cadet. You're in a training
2    program, full-time training program. And then a
3    patrol officer in Lake Forest, then left Lake
4    Forest and was hired here as a patrol officer.
5       Q. And over the years you eventually became
6    chief in Rockford?
7       A. Yes.
8       Q. Can you tell me your rank changes over
9    time up through chief and the years that those
10   occurred?
11      A. 1985 through 1995, a patrol officer; 1995
12   through 2002, a police sergeant.
13      Q. Of a patrol division?
14      A. It was patrol, and then I was an
15   administrative sergeant.
16      Q. Can you explain the difference?
17      A. Patrol is on the street driving a squad
18   that you're responsible for. There's three
19   shifts, so one of the three shifts.
20   Administrative position, I worked directly for the
21   deputy chief and assistant deputy chief of
22   operations with all administrative matters within
23   that bureau.
24      Q. What were your duties in that role?

1       A. Planning -- logistical planning,
2    equipment, developing memos, policies, ordering
3    equipment, budgeting, planning for large scale
4    events that were in Rockford. That would be the
5    parades, festivals, 4th of July activities, et
6    cetera.
7       Q. Do you know what year you switched from a
8    patrol sergeant to an administrative sergeant?
9       A. 1995 I was promoted to sergeant, and I
10   stayed as a patrol sergeant for two years. In
11   1997 I came inside and was assigned to
12   administration.
13      Q. Since 1997 have you worked in a patrol
14   capacity?
15      A. No.
16      Q. Even as a command officer in a patrol
17   capacity?
18      A. No.
19      Q. So it's fair to say the last time you had
20   a regular patrol assignment would have been 1997;
21   correct?
22      A. I just want to be clear in your question,
23   though. Patrol assignment in terms of just doing
24   that and nothing else?

1       Q. When was the last time that your
2    responsibilities -- your day-to-day
3    responsibilities included handling a patrol
4    assignment or supervising a patrol assignment?
5       A. I was chief of police. I went on calls
6    and was responsible for, obviously, the whole
7    entire department. I would stop cars, check out
8    suspicious activity and direct officers if I was
9    in the field as a police chief. So that's why I
10   asked you the -- trying to seek clarification what
11   you meant by was that just solely that job or --
12   you know, once you're a police officer, you don't
13   give up the right being a police officer. I mean,
14   some do, some don't, but I didn't.
15      Q. Yeah, I'm just trying to clarify here.
16   So from 1997 forward, you were in more of an
17   administrative command role than a direct
18   on-the-street supervisory officer of patrol
19   officers?
20      A. That's correct.
21      Q. After 2002 what did your rank change to?
22      A. In 2002 I was promoted to lieutenant.
23      Q. Were you ever a particular division?
24      A. I was the chief compliance officer and

1   also in charge of the records bureau, specifically
2   Freedom of Information, FOIA, release of records,
3   expungements, also implementing a new records
4   management system within the police department.
5       Q.  How long were you in that role?
6       A.  One year.
7       Q.  '02 to '03?
8       A.  Yes.
9       Q.  Did your title change in '03?
10      A.  Yes.
11      Q.  To what?
12      A.  Promoted to deputy chief of police of
13  administration, all administrative matters within
14  the organization.
15      Q.  So you had broader responsibilities than
16  when you were a lieutenant and you were doing more
17  compliance records and FOIA issues?
18      A.  Well, I had responsibility of the records
19  clerks within the organization.
20      Q.  So were you the deputy chief over a
21  particular division?
22      A.  Yes, administration.  There was five
23  bureaus.  I was -- I was over -- I commanded the
24  administrative section of the police department.

1       Q.  What were the other bureaus at that time?
2       A.  Personnel, investigations, special
3   operations, and patrol.
4       Q.  Can you tell me the difference between
5   those bureaus at the time when you were the deputy
6   chief over the administrative bureau?
7       A.  Sure.  The administrative bureau had
8   everything to do with every administrative matter
9   within the police organization from purchasing,
10  budgeting, records, evidence and property,
11  vehicles, personnel.  Had to do everything with
12  people, primarily dealings with the collective
13  bargaining unit, several of those in terms of
14  contracts and grievances.
15      Q.  Would hiring and training fall under
16  personnel?
17      A.  Yes.
18      Q.  Investigation?
19      A.  Anything to do with an investigation,
20  whether it be a juvenile or an adult, and also
21  included narcotic investigations, gang
22  investigations, domestic violence.
23      Q.  Special ops?
24      A.  Special ops would -- at the time we had a

1   housing unit, so they were assigned to the public
2   housing areas of town.  Also there was a tactical
3   team and there was a community policing unit.
4       Q.  What does community policing mean in the
5   Rockford Police Department under the special ops
6   division back in that 2003 time frame?
7       A.  There was a few officers that -- there
8   was two or three officers that were assigned to
9   particular areas of the city that worked with the
10  aldermen, worked in particular troubled
11  neighborhoods in restoring if there was chaos or
12  if there was an apartment problem, landlord
13  problem, landlord/tenant issues like that, problem
14  solving.
15      Q.  And what was the patrol bureau's area
16  back in that time?
17      A.  Responsible for all the patrol shifts.
18  There were three at the time.
19      Q.  Back at that time in 2003 did Rockford
20  have a crisis intervention training program?
21      A.  Yes.
22      Q.  Or crisis intervention team?
23      A.  Yes.
24      Q.  What bureau did they fall under?

1       A.  It was -- I don't want to guess --
2   somewhere in the operation side.  I know it wasn't
3   investigations.  I just don't remember which
4   bureau.
5       Q.  Operations as opposed to the
6   administrative bureau?
7       A.  Right; correct.
8       Q.  Did you become CIT -- I'm sorry; when I
9   say "CIT," you understand what I'm referring to?
10      A.  Yes, I do.
11      Q.  And CIT certification means what?
12      A.  Certification through the state of
13  Illinois to attend their 40-hour program, being
14  exposed to how to deal with the mentally ill or
15  those that are having a behavioral issue, how to
16  de-escalate those situations and come out to a
17  peaceful resolution.
18      Q.  And I believe in your report you say that
19  in 2003 there were at least recommendations that
20  CIT should be pursued by police departments?  I
21  have to find the exact reference here.  Okay.  So
22  I'm looking at your report at Paragraph No. 71.
23  This actually continues through Paragraph No. 73,
24  I believe.  Is that entire section a quote?

1      A.  Yes, it is.
2      Q.  Just -- I was asking that because at the
3  beginning, 71 has an opening quote mark, and the
4  closing one appears to be at the end of 73 with a
5  citation; correct?
6      A.  That's correct.
7      Q.  So since at least 2003, ILETSB has
8  provided state-certified crisis intervention team
9  training; is that correct?
10     A.  Yes.
11     Q.  And did you receive that training in
12  2003?
13     A.  No.
14     Q.  When did you receive that training?
15     A.  I believe it was in 2014.
16     Q.  When you say you believe, do you know one
17  way or the other?
18     A.  I do because it was in the fall.  And I
19  retired in the fall and winter, and I wouldn't
20  have taken the course if it was a year prior.
21     Q.  Explain that again.
22     A.  I retired in November of '15.  And I
23  remember the course being offered in October, and
24  I wouldn't have taken the course when I'm going to

1  retire in November.
2      Q.  Before you --
3      A.  So it was the year prior.
4      Q.  Okay.  So for that reason you think it's
5  fall, probably October of 2014 that you took the
6  course?
7      A.  Yes.
8      Q.  Prior to that had you been certified in
9  crisis intervention team?
10     A.  No.
11     Q.  Why did you do it at that point in time?
12     A.  I had several -- as a chief of police, we
13  had several situations that resulted in either
14  officers getting injured or not having some good
15  outcomes with dealing with the mentally ill and
16  just looking at nationwide the incidents that were
17  occurring.  And we had -- prior to being appointed
18  chief of police, we had a pretty good relationship
19  with the local Rosecrance which does the crisis
20  intervention training.  And one of the deputy
21  chiefs was really encouraging our department to
22  get as many officers as possible.  We had several
23  incidents involving the Taser that I wasn't too
24  happy about and the outcomes of those, how the

1  officers used them when they were dealing with the
2  mentally ill.  So we emphasized to our -- at the
3  time then the Taser came out and said that
4  departments should -- there was some litigation
5  that was going on with the Taser with -- deploying
6  the Taser.  And our legal department advised me
7  that I should take the Tasers out of service,
8  which I did.  And at the same time we enhanced the
9  training with the mentally ill.  And one of the
10  requirements that we had is that if you were going
11  to use -- once we phased the Tasers back and if
12  you were going to use the Taser where it was going
13  to be required for sergeants and above, you had to
14  go through the 40-hour training.
15         And right before my retirement, out of
16  300 officers, we had nearly -- I believe it was
17  103 officers that had gone through that 40-hour
18  course.  And if I'm going to ask my supervisors
19  and commanders to do something, then I should do
20  it, too.  So that's why I attended the class.  It
21  was very beneficial.
22     Q.  You said about 103 out of how many?
23     A.  We had roughly -- you know, it could
24  change -- it's like the stock market.  You know,

1  you hire and you let people go, but roughly about
2  300 officers.  And we had at one time a little
3  over like 103, 104 officers that had gone through
4  that 40-hour program.
5      Q.  Is there a reason you remember that
6  specific number?
7      A.  Our staff was bragging about the number,
8  that to have that many people that can attend, go
9  to a 40-hour class, it takes a big commitment from
10  a chief of police to allow -- you know, when you
11  let personnel or someone go for 40 hours,
12  especially if they're in patrol, there is going to
13  have to be some sort of backfill to have that many
14  people.  But that was a commitment that we had,
15  and we felt that it was worthwhile to have our
16  personnel trained in CIT.
17     Q.  And the reason that personnel had to
18  complete CIT was so that they could use their
19  Tasers again?
20     A.  That's correct.
21     Q.  There was no general requirement that all
22  officers complete CIT just for the sake of having
23  completed it in your department when you were
24  chief?

1     A.  I'm sorry; I didn't understand your
2   question.
3     Q.  Was there any requirement that officers
4   complete CIT training just for the sake of having
5   completed it as opposed to for the ability to use
6   their Taser in the field?
7     A.  No, we did both.  We also had -- we
8   instituted -- one of the deputy chiefs --
9   actually, strike that.
10        One of the -- yes, one of the assistant
11  deputy chiefs had -- one of our officers who
12  worked for Rosecrance at one time had a master's
13  degree, I believe, either in psychology or
14  sociology, developed a curriculum and actually
15  went down to Memphis.  There's the thing called
16  the Memphis process where they started at.  So if
17  you couldn't get everybody into the 40-hour class,
18  then we developed an eight-hour course.  So if you
19  couldn't attend the 40-hour course, we had
20  in-service training that you would at least be
21  exposed to eight-hour training.
22    Q.  And that eight-hour training was mandated
23  for all officers in the Rockford Police
24  Department?

1     A.  Yes.
2     Q.  What time frame was that mandated?
3     A.  I don't recall.
4     Q.  Do you remember the name of that program
5   beyond the Memphis course?
6     A.  I don't.
7     Q.  Does the name Mental Health First Aid for
8   Public Safety describe the course you're talking
9   about?
10    A.  The course in Rockford?
11    Q.  This Memphis program --
12    A.  Model.  That's what they call it.  It's
13  the Memphis model.  That's what it's referred to
14  as.  I think the guy's name is Dupont.
15    Q.  Have you ever heard of a similar
16  eight-hour course called whatever I just said,
17  Mental Health First Aid for Public Safety?
18    A.  I have not.
19    Q.  What were the subject matters of the
20  eight-hour course that was mandated for Rockford
21  officers at some point in time that you're not
22  sure of?
23    A.  I can't recall.
24    Q.  Did you complete that course?

1     A.  I don't remember.
2     Q.  Who was the deputy chief who was -- my
3   notes here aren't exact.  I apologize.
4        You mentioned a deputy chief who maybe
5   was encouraging that Tasers be phased out?
6     A.  No.
7     Q.  Or did I understand that wrong?
8     A.  No, the city legal department advised us
9   because of some litigation that was taking place
10  to remove the Tasers.  They were changing the
11  preferable area to deploy the Taser.  There was
12  some controversy going on.  So my legal director
13  directed me to remove the Tasers.
14    Q.  You mentioned that someone had a
15  relationship with Rosecrance, and then you
16  mentioned something about a deputy chief
17  encouraging certain activity?
18    A.  Yes.
19    Q.  What were you talking about there?
20    A.  The deputy chief had a relationship with
21  Rosecrance and was encouraging the department and
22  myself as chief to continue that relationship with
23  Rosecrance and get as many officers trained as
24  possible.

1     Q.  What was that deputy chief's name?
2     A.  His name is Greg Lindmark.  Can't contact
3   him.  He committed suicide about three years ago.
4     Q.  What area was he over?
5     A.  Support services and then -- support
6   services and then investigations.
7     Q.  You also mentioned an assistant deputy
8   chief who was involved in these decisions
9   surrounding the Memphis model curriculum?
10    A.  Yes.
11    Q.  Who was that person?
12    A.  Mike Dalke, D-a-l-k-e.  He's currently
13  assistant deputy chief.
14    Q.  What division was he over at that time?
15    A.  He was an assistant deputy chief.
16    Q.  Over a particular bureau?
17    A.  Oh, administration, personnel, I believe.
18  And it had -- he commanded the training area.
19    Q.  Starting in 2003, you were a deputy chief
20  over the administrative bureau; correct?
21    A.  Yes.
22    Q.  Did that change over time?
23    A.  Yes.
24    Q.  Did you become a deputy chief over a

1   different bureau?
2     A. I continued being a deputy chief in --
3   started in 2003; and sometime in late 2005 the
4   deputy chief of personnel retired, and I assumed
5   his area and -- along with administration up until
6   I was promoted to chief of police.
7     Q. When did that promotion occur?
8     A. April 12 of 2006. You really tested my
9   memory. It's good.
10     Q. If you don't remember for sure, just let
11  me know.
12     A. No, it's good.
13     Q. So April of 2006 you become chief. Did
14  you serve continuously as chief after that?
15     A. Yes.
16     Q. And then you were -- were you over all
17  bureaus?
18     A. As chief of police, you're responsible
19  for the entire department, all the bureaus.
20     Q. How many deputy chiefs did you have under
21  you in each bureau during your tenure? Was it
22  like one per bureau, two on some of them, for
23  example?
24     A. Well, there were some retirements and

1   making some movements around, but there were, I
2   believe, four bureaus when I took over, and then I
3   think it went down to three.
4     Q. Four because administrative and personnel
5   had been combined by that point?
6     A. Where they were at, I had left it that
7   way. I believe that the special operations --
8   when they left, I think I folded that in with
9   patrol, but that -- but I believe when I retired
10  there were three bureaus.
11     Q. So have we covered all the ranks that you
12  attained as a police officer?
13     A. Yes.
14     Q. And your assignments within those ranks,
15  we covered all of those?
16     A. No, we didn't.
17     Q. What have we missed so far?
18     A. When I was a patrol officer for ten
19  years, there was a couple years after, roughly
20  1987, I was assigned as a field training officer.
21  And I held that additional assignment up until my
22  promotion to sergeant.
23     Q. So '87 to '95?
24     A. Yes.

1     Q. And that was an additional assignment,
2   meaning you had a regular full-time assignment?
3     A. A full-time assignment as a patrol
4   officer and then an additional responsibility as
5   being a field training officer, FTO.
6     Q. And did you do that daily?
7     A. It wasn't daily; but over those eight
8   years I trained 22 officers.
9     Q. Is the training process -- was the
10  training process at the Rockford Police Department
11  the same during your tenure as chief as it was
12  back between 1987 and 1995?
13     A. I believe so.
14     Q. And describe to me if -- I'm sorry.
15     Are there various steps or levels in that
16  process?
17     A. There are.
18     Q. What are the steps?
19     A. I don't recall what the specific steps
20  are. But I should rephrase it. I believe they're
21  called phases, but -- some refer to it as steps,
22  but there's a phase. Go through one phase, you
23  graduate out of that where you stay in that phase,
24  and then you move on to the next phase.

1     Q. Do you recall how long that process
2  takes?
3     A. I don't recall.
4     Q. And I'm talking about really anytime from
5  '87 to '95 or once you became the chief from 2006
6  forward.
7     A. On how long the phases are?
8     Q. Yeah.
9     A. I know there's length; I just don't -- I
10  can't give you a specific because I just can't
11  recall.
12     Q. Do you have a general recollection of
13  approximately how long they were in total or
14  either -- or in part?
15     A. I want to say, estimate again, might be
16  somewhere around three months, two to three
17  months. But again, that's what just comes to me
18  if you wanted something from me to project. But
19  again, you know, without having something right in
20  front of me, having that RPD document and FTO, I
21  guess I'm speculating. I shouldn't do that.
22     Q. What I'm really trying to get at is, do
23  you know generally about how long it took to get
24  from start to finish through the phases in the

1    Rockford Police Department's training program?
2        A.   No, I can't recall that.
3        Q.   Do you think it was less than a year?
4        A.   Yes.
5        Q.   How much?
6        A.   Less than six months.
7        Q.   And then at the end of that six-month
8    period, what would be the status of the officer
9    who had completed the program successfully?
10       A.   Well, the individual that -- the officer
11   who, we'll say, graduates out of that phase then
12   goes on their own as a patrol officer.  Once you
13   hire somebody -- and at least in Rockford there's
14   a year and a half probationary period.  So between
15   your school time and then your FTO time, it all
16   combines together, so you're still a probationary
17   police officer until that year and a half expires.
18       Q.   At any point during that year and a half
19   is the officer allowed to do solo patrols?
20       A.   The recruit?
21       Q.   Is the probationary officer allowed to do
22   solo patrols at any point during that
23   one-and-a-half-year probationary period?
24       A.   Well, once the patrol officer is out of

1    the phases -- and I believe there are five -- then
2    he or she is put into a vehicle by themself, and
3    they answer calls and investigate incidents just
4    like any other patrolman would.
5        Q.   So that's within less than six months
6    after completion of the academy?
7        A.   I don't --
8        Q.   I'm just trying to get the timing here.
9    You have a year-and-a-half probationary period.
10   At some point at the beginning of that includes
11   attendance at an academy?
12       A.   Yes.
13       Q.   Is that -- do you know how many hours
14   that academy is?
15       A.   I don't know the hours.  I know there's
16   weeks.  It's either 10 or 12 weeks.
17       Q.   At the end of that period then the
18   probationary officer goes into this phase training
19   program that lasts less than six months; correct?
20       A.   Approximately six months field training
21   program.
22       Q.   And then after that the officer is
23   allowed to do solo patrols although they remain a
24   probationary officer?

1        A.   That's correct.
2        Q.   Does -- is that generally an accurate
3    summary of the entire process?
4        A.   Yes.
5        Q.   And then when an officer is doing field
6    patrols, what does their probationary status
7    involve?  For example, are there check rides with
8    FTOs during that time?
9        A.   When I was on the job, there were no
10   check rides.  There was --
11       Q.   You're talking '87 to '95?
12       A.   No, I'm talking up until 2015 as chief of
13   police.
14       Q.   Okay.
15       A.   There were -- once you graduated or you
16   completed that five-week -- or those five phases,
17   whatever that duration is, then you were out on
18   your own and you were monitored, assessed.  And I
19   believe that there were biweekly reports that were
20   due from your supervisor where you and I, if we've
21   been on for some time, they're not going to assess
22   us that often, they're going to assess that new
23   person more frequently.
24       Q.   Okay.  And those reports would be based

1    upon ride-alongs with the officer?
2        A.   I don't recall sergeants riding with
3    officers unless there was a specific issue.  It
4    would be on police reports, listening to calls or
5    going to the call.  You know, if there was a hot
6    call, if there was a man with a gun, the sergeant
7    shows up and there's a recruit officer, you're
8    obviously going to monitor to see how he or she
9    handles the call.
10       Q.   In the Rockford Police Department were
11   officers in their probationary phase forbidden
12   from speaking with people who were suspected of
13   having a mental illness during a call?
14       A.   No.
15       Q.   Why did you leave your job as a police
16   chief?
17       A.   I had 30 years in in May of 2015, and
18   financially it wasn't -- the way the pension
19   system works with the Article 3 downstate pension,
20   you actually start losing money.  And I did
21   approximately ten years, and I felt that I
22   could -- that's enough I can contribute to the
23   city.  And I wanted to do other things.  And I was
24   appointed to the monitoring team in New Orleans,

1 and they wanted me to travel more, and I was
2 taking vacation. And I would be taking all my
3 vacation time to go do another monitoring job. So
4 it was just the right timing.
5 Q. Okay. So when you retired, you were able
6 to take your pension and also do some other
7 traveling and monitoring jobs?
8 A. Yes.
9 Q. How did you -- did you apply to be a
10 monitor in New Orleans?
11 A. I did not.
12 Q. How did that position come your way?
13 A. In approximately 2007, after making
14 several attempts for reforming the Rockford Police
15 Department, a good friend of mine who's since
16 retired with the Illinois State Police called me,
17 and he was recommending that I get together with
18 someone that he knew that went through similar
19 issues with reforming the Elgin, Illinois, Police
20 Department. And I met that individual, and he
21 assisted me with several issues within the police
22 department and was more of a mentor on how to
23 reform things. And he was a friend of somebody
24 else who's done some reform work, and that

1 somebody else was working with the monitoring team
2 in New Orleans, saw the work that I was doing in
3 Rockford, and asked if I would be interested in
4 working with the monitoring team in New Orleans.
5        And then the person that I was initially
6 introduced to was a monitor in Oakland,
7 California, and then he became the monitor in the
8 U.S. Virgin Islands.
9 Q. Okay. Can you identify these persons?
10 A. Sure.
11 Q. The good friend, I believe, in the ISP.
12 A. Right. His name is Rick Rokusek.
13 Q. Spell the last name.
14 A. It's R-o-k-u-s-e-k.
15 Q. And then I believe you were recommended
16 to speak with someone else from him?
17 A. Yes, Chuck Gruber, G-r-u-b-e-r.
18 Q. And then did Mr. Gruber refer you to
19 someone else who became a mentor?
20 A. Yes -- well, the mentor was Gruber, but
21 both of them -- but I have more contact with
22 Gruber. But the third person is Dennis Nowicki.
23 Q. And Mr. Nowicki's spelling?
24 A. N-o-w-i-c-k-i.

1 Q. Do any of those people do litigation
2 consulting that you're aware of?
3 A. Well, Gruber is with -- well, they're
4 both with the monitoring team. So if you consider
5 that litigation.
6 Q. Mr. Gruber does consulting for attorneys
7 in civil rights litigation; correct?
8 A. Yes; yes.
9 Q. Is that what he mentored you on?
10 A. No, reforming the police department and
11 how to bring in practices and procedures and how
12 to set systems up, how to protect officers and
13 protect the community, how to have an effective
14 use of force management system in place and --
15 Q. I thought by this point that you got --
16 speaking with these people that you already were
17 doing work to reform the Rockford Police
18 Department which is why you were asked to be
19 involved in the New Orleans monitoring team.
20 A. Yeah. I started as chief in 2006. I
21 didn't meet Gruber until 2007. It was some years
22 later that I met Nowicki.
23 Q. Do you know about when?
24 A. I don't recall.

1 Q. What's your official title in relation to
2 this New Orleans monitoring project? Do you have
3 a title?
4 A. I'm just on the monitoring team. You're
5 a federal monitor.
6 Q. Do you have to travel to New Orleans?
7 A. Yes.
8 Q. How often?
9 A. Every six, seven weeks.
10 Q. Pay for that out of pocket?
11 A. Yes.
12 Q. Are you reimbursed?
13 A. Yes.
14 Q. By the U.S. government?
15 A. No, we're private contractors.
16 Q. Through a law firm?
17 A. Yes.
18 Q. What's the law firm?
19 A. Sheppard, Mullin & Richter out of
20 Washington, D.C.
21 Q. When you travel to New Orleans every six
22 to seven weeks -- Is that what you said?
23 A. Roughly, uh-huh.
24 Q. How long do you stay typically?

1    A.  For a week.
2    Q.  Are your accommodations reimbursed?
3    A.  Yes.
4    Q.  Where do you stay down there?
5    A.  At the Sheraton.
6    Q.  Food reimbursed?
7    A.  Yes.
8    Q.  Drink?
9    A.  No.
10   Q.  Nonalcoholic drinks, I guess?
11   A.  Yes.
12   Q.  And then do you do any kind of written
13   reports as a result of your work there?
14   A.  Yes.
15   Q.  How often do you do those?
16   A.  Whenever the monitor wants us to look
17   into a particular area.
18   Q.  Who's the monitor?
19   A.  Jonathan Aronie.
20   Q.  Is he an attorney with Sheppard Mullin?
21   A.  Yes.
22   Q.  How do you spell his last name?
23   A.  I believe it's A-r-o-n-i-e, but -- I
24   might be wrong, but that's the closest I can get.

1    Q.  When you do a report, is that authored
2    directly by you, or is it a team report?
3    A.  It's a team report.  There's no names on
4    the report.
5    Q.  So do you ever sign your name to one of
6    those reports?
7    A.  No.
8    Q.  But you contribute to them on occasion?
9    A.  Yes.
10   Q.  And then you're also a federal monitor
11   for the U.S. Virgin Islands?
12   A.  Yes.
13   Q.  How often do you travel there?
14   A.  Every five weeks.
15   Q.  How long do you stay when you travel?
16   A.  Four to six days.
17   Q.  Travel and accommodations are reimbursed?
18   A.  Yes.
19   Q.  Who's the monitor?
20   A.  Chuck Gruber.
21   Q.  The individual you mentioned before?
22   A.  Yes.
23   Q.  Is that G-r-u-b-e-r?
24   A.  That's correct.

1    Q.  Why is it -- I'm sorry; is there a
2    difference between the New Orleans monitoring and
3    the Virgin Islands monitoring in that there's an
4    individual as opposed to the law firm for the
5    Virgin Islands?
6    A.  He actually has his own company.  It's
7    called Charles Gruber & Associates, but you
8    don't have to be -- it doesn't have to be an
9    attorney firm, it can be an LLC, it can --
10   management companies.  It doesn't have to be an
11   attorney firm.
12   Q.  Do you also do written reports in
13   relation to the Virgin Islands?
14   A.  Yes.  No names.
15   Q.  Unsigned by you?
16   A.  Yes.
17   Q.  How many people are on these federal
18   monitoring teams?
19   A.  For which team?
20   Q.  For either one.  Sorry; I thought you
21   were saying four, the number.  Let's start with
22   New Orleans.
23   A.  There's nine of us.
24   Q.  And the nine of you, are all of you on

1    the similar travel pattern where you go for one
2    week every six to seven weeks?
3    A.  Yeah, the consent decree's built that
4    there has to be somebody there once a week
5    or there's -- we call it in-house but -- someone
6    who lives there that actually would be there, but
7    there has to be a monitor there once a week.
8    Q.  And what about the number of people on
9    this monitoring team for the Virgin Islands?
10   A.  I think there's six of us.
11   Q.  Is the consent decree similar in
12   requiring someone there once a week?
13   A.  No, it's not.
14   Q.  What are your actual duties whenever you
15   go on these trips?  And if there's a difference
16   between the two, please describe them.
17   A.  Yeah.  Like I said earlier in my
18   testimony is that primarily I look at all uses of
19   force, serious uses of force and all force whether
20   it be policy, training, supervision, oversight,
21   use of force review boards, looking at these to
22   ensure that if they do have a use of force that
23   it's in alignment with their policy and, of
24   course, with Graham v. Connor; with both agencies,

1    listening to audio interviews of use of force
2    investigations, supervisory investigation reports,
3    attending their use of force review board
4    meetings, and then on both of them any complaints
5    if a citizen comes in and complains and alleges
6    some serious misconduct of, let's say, excessive
7    force and then anything else the monitors want me
8    to do. They have you look into other things
9    besides your specialty.
10       Q.   What is the specialty that you are tasked
11   with for these?
12       A.   Use of force.
13       Q.   And you had mentioned at one point
14   serious use of force?
15       A.   Yes.
16       Q.   Are you reviewing every handcuffing to
17   make sure the use of force is appropriate under
18   constitutional standards?
19       A.   No.
20       Q.   What types of events would constitute
21   serious use of force that you would review?
22       A.   So both departments have force levels.
23   And four is the highest force level for one, and
24   the other one has one. So they're inverse. So

1    both -- the highest force levels of both agencies
2    we look at those eyes on to ensure that they're --
3    and those are serious use of force. Those are
4    shootings.
5        Q.   Okay; hold on. So both of them use a
6    one-to-four scale, but they -- one of them goes to
7    one to four, the other goes four to one?
8        A.   That's correct.
9        Q.   What is in the most serious level for
10   these departments that you're looking at? You
11   started to say shootings.
12       A.   Yeah, they're both similar: Choke holds;
13   neck holds; shootings; a person's injured in
14   hospital care; applying the CEW, the Taser, more
15   than two cycles; several -- I believe one of them
16   is using several uses of force -- force types on
17   someone. There's a whole laundry list of what
18   defines a serious use of force under both
19   policies.
20       Q.   Do you have a document that lays that
21   out?
22       A.   I don't.
23       Q.   And I'm not necessarily talking about
24   with you here right now. Do you have a document

1    that lays out what the use of force is under --
2    that constitutes a serious use of force under
3    either policy?
4        A.   Yes.
5        Q.   What document would that be?
6        A.   It would be their use of force policy
7    that would have their force levels.
8        Q.   So does every use of force that's
9    followed by hospital care constitute a serious use
10   of force under those policies?
11       A.   If the person required medical care and
12   you had two -- let's say, two or more Taser
13   applications. But not every hospital -- to answer
14   your question, no, not every hospital on -- I
15   believe on both of them, if there's hospital
16   requirement as a result of the use of force, it
17   becomes a higher level, not the lowest level use
18   of force.
19       Q.   The reason I'm asking this is that
20   shooting is apparent to me, choke hold is apparent
21   to me. Can you just try and define this hospital
22   section that would constitute a serious use of
23   force any further?
24       A.   I'd have to look back at the policy. And

1    I'm always referring back to them, so I don't have
2    it with me. I can't recall.
3        Q.   Who makes the determination of whether a
4    use of force resulted or caused a medical
5    condition that requires hospitalization? Is that
6    something that you make?
7        A.   No, that would be the officer at the
8    scene or the supervisor. If a person is a subject
9    of a use of force incident that requires medical
10   attention care, the policy requires a particular
11   force level.
12       Q.   Did you read anything in preparation for
13   today's deposition?
14       A.   Yes.
15       Q.   What did you read?
16       A.   I read my report.
17       Q.   Anything else?
18       A.   Some other documents I had on some
19   classes that I've taken.
20       Q.   Can you describe those any further?
21       A.   What questions you were going to ask me.
22       Q.   What are the documents on classes that
23   you've taken that you have reviewed in preparation
24   for your deposition here today?

1    A.  How to prepare for a deposition.
2    Q.  Oh, what I was going to ask --
3    A.  What you're going to ask.
4    Q.  When did you take those classes?
5    A.  I've been taking them ongoing for the
6  last three years.
7    Q.  Where do you take those classes?  Or how
8  do you --
9    A.  They have them at different places in the
10  United States located --
11    Q.  The United States --
12    A.  In the United States.
13    Q.  Can you be any more specific than that, a
14  particular institution?
15    A.  It's SEAK, S-E-A-K.  They're out of
16  Massachusetts.  They have a website.
17    Q.  And through this SEAK organization,
18  that's the organization that provides all your
19  training about --
20    A.  Not all of my training but --
21    Q.  Let me finish my question.
22       Is that the organization that provides
23  all your training about preparing for depositions?
24    A.  Not all my training.

1    Q.  Okay.  Any other organizations?
2    A.  You know, anything that I can see in the
3  website, if I see something where someone's
4  testified, whether it be a newspaper clipping or a
5  video clip or you can just go to YouTube and you
6  can type in "police depositions," and you can just
7  sit in front of your computer and watch people be
8  deposed.  So, I mean, there's tons of ways --
9    Q.  You're not talking about exclusively the
10  SEAK website --
11    A.  Right.
12    Q.  -- just Internet research?
13    A.  Correct.
14    Q.  How many hours of SEAK training have you
15  had in the last three years?
16    A.  Four days.
17    Q.  Is that like one four-day course?
18    A.  Two two-day courses.
19    Q.  Do you know when those were?
20    A.  Spring of 2017 and, I believe,
21  November of 2018.
22    Q.  Do you remember the titles of those
23  courses?
24    A.  One was a conference where they brought

1  speakers in, and the second one is how to -- I
2  think it's how to prepare a bulletproof expert's
3  report or something similar to that.
4    Q.  Would it help you jog your memory if you
5  looked back at those materials that you looked at
6  a little bit earlier to prepare for your
7  deposition so that you can have your memory jogged
8  about what the titles are?
9    A.  I don't have those materials with me.
10    Q.  What was the first conference where they
11  brought in speakers?
12    A.  It would have been the one in May or
13  April of 2017.
14    Q.  Do you know what the title of the
15  conference was or any of the courses?
16    A.  They're national or a yearly conference
17  that they have.  It was a buffet of speakers.
18    Q.  Were you required to attend any of those
19  based on your jobs as a federal monitor or
20  otherwise?
21    A.  No.
22    Q.  Who paid for those courses?
23    A.  I did.
24    Q.  Have you been reimbursed?

1    A.  No.  Well, let me strike that.  It's my
2  LLC that paid for it.
3    Q.  Has your LLC been reimbursed for those
4  courses by anyone?
5    A.  No.
6    Q.  Anything else that you read in
7  preparation for your deposition today?
8    A.  My report and then the supporting
9  documents I went over.
10    Q.  The supporting documents that are cited
11  in your report?
12    A.  Yes.
13    Q.  Okay.  Anything else?
14    A.  I believe that's all.
15    Q.  Did you speak with anyone in preparation
16  for your deposition?  All I want to know is a
17  name, not the content of the conversation at this
18  point.
19    A.  Yes.
20    Q.  Who did you speak to?
21    A.  Attorney Carmichael.
22    Q.  Anyone else?
23    A.  No.
24    Q.  Is that the first time you had talked to

1    Mr. Carmichael?
2      A.  No.
3      Q.  You've worked with him throughout this
4    case on a number of issues including your
5    communications about receiving documents?
6      A.  That's correct.
7      Q.  Have you spoken with Attorney Henderson
8    in preparation for today's deposition?
9      A.  No.
10     Q.  Have you spoken with him at all about
11   this case?
12     A.  No.
13     Q.  Beyond any communication that might be
14   reflected in the documents that we looked at
15   earlier; correct?
16     A.  The only thing would be is that -- the
17   answer to your question is there's no
18   communication with Attorney Henderson.  He has
19   been included as a cc on the e-mails.  I just
20   wanted that on the record.
21     Q.  Okay.  Anyone else other than Attorney
22   Carmichael that you spoke with in preparation for
23   your deposition?
24     A.  No.

1      MR. BRUNNER:  We've been going another
2    hour.
3      THE REPORTER:  Take five minutes.
4      MR. BRUNNER:  Yeah.
5      (A brief recess was taken.)
6    BY MR. BRUNNER:
7     Q.  A quick follow-up question:  Did you
8    speak with anyone besides Plaintiff's attorneys in
9    preparing your report in this case?
10     A.  No.
11     Q.  For example, did you speak with
12   Mr. Gruber?
13     A.  No.
14     Q.  Earlier I asked you some questions about
15   Jack Ryan.  And I think I meant to ask them, too,
16   about --
17     A.  Oh, excuse me a second.  Your question
18   was speak about this particular case?
19     Q.  Yeah.
20     A.  So Gruber, you contacted Gruber because
21   he contacted me.  I think you were seeking him to
22   be -- so that would be the only conversation.
23     Q.  Okay.  And I'll move to strike that
24   because of consulting expert privilege in this

1    case, but --
2      A.  Okay.
3      Q.  -- other than the thing you just talked
4    about --
5      A.  I just want to be up front.  You asked me
6    a question.
7      Q.  Yeah.  Other than the thing you talked
8    about, have you had any other conversations with
9    Mr. Gruber in relation to this case?
10     A.  No.
11     Q.  Did Mr. Gruber contact you about working
12   with Plaintiff's law firm in this case?
13     A.  No.  He was contacted by you.
14     Q.  Excuse me?
15     A.  He was contacted by your firm.
16     Q.  Okay.  I'm going to move to strike again.
17   I'm asking you a specific question.
18      Did Mr. Gruber contact you about working
19   with Plaintiff's counsel in this case?
20     A.  No.
21     Q.  Thank you.  Do you receive referrals from
22   Mr. Gruber generally?
23     A.  Yes.
24     Q.  And he's mentored you in this process of

1    your transition to becoming a litigation
2    consultant and testifying expert?
3      A.  A little bit but more on the front end as
4    when I was reforming the Rockford Police
5    Department.
6      Q.  Did you review any reports regarding
7    events that happened with Mr. Turner prior to the
8    911 call by Cheryl Ebl?
9      A.  I believe I Googled when I was retained
10    because I didn't have any documents a newspaper
11   article.
12     Q.  Do you recall the newspaper?
13     A.  Champaign or Urbana.
14     Q.  Did you rely upon that newspaper article
15   in formulating your opinions in this case?
16     A.  No.
17     Q.  Is that something that you would
18   typically rely upon in formulating your opinions?
19     A.  Not newspapers, no.
20     Q.  Aside from that, did you review any of
21   the reports or documents or recordings about
22   events that occurred with Mr. Turner prior to the
23   phone call by Cheryl Ebl to 911?
24     A.  No.

26 (Pages 101 to 104)

1    Q.  Is there a particular reason why?
2    A.  No.
3    Q.  And I'm not suggesting you should or
4  shouldn't; I'm just trying to get your
5  understanding here.
6        So did any of the reports of activity
7  prior to Ms. Ebl's call have any impact on your
8  opinion in this case?
9    A.  So I'm not aware of what documents you're
10  talking about, so I can't offer you an explanation
11  on something I'm not aware of.
12    Q.  Okay.  You indicated earlier that you did
13  review the multijurisdictional task force's
14  reporting?
15    A.  Yes.  And, I'm sorry; yes, there was a
16  statement made by -- I want to say Love, something
17  Love, if I'm right.  It's a witness.  I believe I
18  did read that, and that was a --
19    Q.  Did you mention that in your report
20  anywhere?
21    A.  I don't think so.
22    Q.  Did you rely on his statement in
23  formulating your opinions?
24    A.  I did not.

1    Q.  Any other witness statements that you
2  reviewed that you relied upon in formulating your
3  opinions?
4    A.  No.
5    Q.  Your opinion is based on the totality of
6  the circumstances that the officers confronted
7  whenever they were interacting with Mr. Turner?
8    A.  I'm sorry?
9    Q.  Are your opinions based on all of the
10  circumstances that the officers confronted when
11  they were interacting with Mr. Turner?
12    A.  Yes, what the officers -- the totality in
13  what they knew at the time.
14    Q.  And to you what is -- is there a specific
15  start time that you consider to be the relevant
16  totality of circumstances?
17    A.  It would be -- the start time for me with
18  my method would be what did the officers know at
19  the time of the incident, what were they told,
20  what did they know.
21    Q.  So --
22    A.  And that would be moving it forward, not
23  from what some other witness gave the police
24  department or the multijurisdictional task force

1  information because that's not what the officers
2  knew.  It's what they knew at the time and what
3  did they assess at the time in my method is
4  important.  And that moves that forward, not what
5  some third party knew that didn't tell the
6  officers because that doesn't give them any
7  advantage.  They don't know that information.
8    Q.  So what they know at the time could
9  include things that they knew from prior years of
10  experience with Mr. Turner; correct?
11    A.  Yes, and I noted that in my report of
12  their prior experience with Mr. Turner.
13    Q.  Okay.  But earlier when I asked you about
14  what documents you reviewed, you did not review
15  the prior police contacts with the Champaign
16  Police Department and Mr. Turner or the 2014
17  through 2016 mental health contacts with
18  Mr. Turner and the Champaign Police Department?
19    A.  That's correct.
20    Q.  What did you base your opinions about
21  officers' prior contacts with Mr. Turner upon?
22    A.  The fact is that Officers Wilson,
23  Talbott, Young, and Sergeant Frost all had prior
24  experience with Mr. Turner and his behavior.  And

1  in fact, Sergeant Frost had an incident that had
2  occurred a few months earlier, I believe April of
3  2016, of what he thought was similar in nature.
4  But all the officers in the reports that I read
5  all had experience with Mr. Turner.
6        In fact, one of the officers -- and I
7  believe it was Wilson -- stated that I used to jog
8  by the location and give him money and went to his
9  house.  And so he knew him probably on -- I'm
10  assuming on a personal basis if somebody invites
11  you to your house.
12    Q.  Okay.  So we kind of got around to
13  answering my question there, which was you're
14  basing your opinions about officers' prior
15  contacts on their police reports and their
16  depositions; is that correct?
17    A.  So the police reports that they tendered
18  and the depositions and the questions that were
19  asked.
20    Q.  Okay.  And no other documents; correct?
21    A.  That's all the information that I have,
22  yes.
23    Q.  Okay.  And there are times in your report
24  when you talk about the Champaign Police

1 Department having had contacts with Turner in the
2 past. What are you basing that upon? Something
3 in addition to what we've just talked about?
4     A. Well, the department can't have -- so the
5 answer to your question is it's not a physical
6 thing, it's not the department, it's the officers.
7 So when I'm speaking -- when I say Champaign
8 Police Department, it's not the brick and mortar,
9 it's the personnel that had contact. They do
10 represent Champaign Police Department. They're
11 not individual officers that are freelancing;
12 they're part of the Champaign Police Department.
13     Q. So when you reference the Champaign
14 Police Department's prior contacts in your report,
15 you're basing that upon some individual officers'
16 contacts with Mr. Turner; correct?
17     A. Yes. It has to be a body, it can't be
18 brick and mortar.
19     Q. And are you charging all of the officers
20 with knowledge of things that a different officer
21 has done when encountering Mr. Turner in the past?
22 So are you suggesting -- when you say Champaign
23 Police Department has a long history with
24 Mr. Turner, for example, are you suggesting that

1 Mr. Wilson should be charged with whatever
2 knowledge Officer Frost has of prior contacts with
3 Turner?
4     A. Yeah. Wilson -- from my read, Wilson --
5 I shouldn't say "Wilson"; it's Officer Wilson --
6 Talbott, and Young all stated in their report and
7 in their depositions that they all -- they were
8 familiar with Mr. Turner.
9     Q. Here's my specific question: Are you
10 charging any of those people with the knowledge
11 that someone else had? I'm assuming that what --
12 regardless of how it may be stated in your report,
13 you're expecting Wilson to know what Wilson knows
14 about Turner, Talbott to know what Talbott knows
15 about Turner, Young to know what Young knows,
16 Frost to know what Frost knows and not -- this
17 question is getting really long, but I'm trying to
18 explain to you because I feel like I'm asking you
19 something and we're going in different directions
20 here.
21     But when you say Champaign Police
22 Department has a long history with Mr. Turner, are
23 you suggesting that Wilson is charged with all the
24 knowledge that the Champaign Police Department

1 might have about Mr. Turner?
2     A. You only -- when you say "charge," you
3 mean allege or some -- I'm just trying -- you can
4 only be responsible for what you know. You can't
5 be responsible for something that you don't know.
6 But you can be responsible from -- if you've heard
7 some information in terms of -- you know, at the
8 front desk, if you call the front desk, you can
9 get a list of people that are -- and I write that
10 down in my report, that's knowledge. I mean, I
11 didn't actually write out the piece of paper, but
12 I've heard that there's a piece of paper, there's
13 a log at the front desk.
14     Q. Okay. Did you listen to the 911
15 recording of Cheryl Ebl calling in?
16     A. I did not.
17     Q. Did you have any indication that she was
18 babbling?
19     A. I didn't listen to the recording.
20     Q. Do you have any indication from the
21 documents or materials that you've reviewed
22 that Ms. Ebl was inconsistent with what she
23 reported?
24     A. I only can go from what I read in the

1 911 dispatch information. I can't come to that
2 conclusion.
3     Q. Did you have any indication that there
4 was a delay of a particular time between Ms. Ebl's
5 observation and Mr. Turner and her report?
6     A. No.
7     Q. Did you review any information indicating
8 that Ms. Ebl had some sort of grudge against
9 Mr. Turner when she made this call?
10     A. No.
11     Q. Do you have any reason to doubt that
12 Ms. Ebl was being truthful when she made her
13 report to 911?
14     A. I have no idea.
15     Q. Officers -- I'm sorry.
16     Police officers regularly rely upon
17 reports made to police dispatcher by reporting
18 persons in conducting their duties; correct?
19     A. Correct.
20     Q. Have you seen any indication that the
21 things Ms. Ebl reported were later determined to
22 be false?
23     A. Not from what I've read.
24     Q. For example, any indication that her

1   report about Mr. Turner drinking wine was false?
2        A.  No, from -- I don't have any reason to
3   doubt Paragraph 23 and 24.  I don't have any
4   independent information to doubt 23 and 24.
5   23, to me, is backed up because I actually see
6   Mr. Turner with his -- as is described later with
7   his pants kind of hanging down, and he's around
8   some boxes, and I believe he had a wine bottle in
9   his hand.  So I don't have any reason to doubt
10  23 and 24 unless there's some other document out
11  there that says -- that doubt, but I'm not aware
12  of.
13       Q.  No, part of our job here is to understand
14  everything that you are basing your opinion on,
15  and I'm just trying to understand that.  So when
16  you're saying 23 and 24, you're referring to those
17  paragraphs of your report?
18       A.  Yes.
19       Q.  No doubt that Ms. Ebl was being truthful
20  when she reported that Mr. Turner was drinking
21  wine in front of a particular intersection?
22       A.  I don't have any opinion on that.
23       Q.  Have you reviewed anything to indicate
24  that she was being untruthful when she said he was

1   yelling at passersby?
2        A.  No.
3        Q.  Have you reviewed anything indicating
4   that she was being untruthful when she said he was
5   pulling trash out of garbage cans?
6        A.  No.
7        Q.  Have you reviewed anything to indicate
8   Ms. Ebl was being untruthful whenever she said
9   Mr. Turner was currently in the roadway?
10       A.  No.
11       Q.  And Officer Young was aware of Ms. Ebl's
12  report whenever he arrived at the location based
13  upon your review of the police reports?
14       A.  Yes.
15       Q.  Did you review any videos of Mr. Turner
16  and Mr. Young interacting?
17       A.  I don't recall reviewing a video of the
18  two interacting.
19       Q.  Correct me if I'm wrong.  Your report
20  contains no criticism of Mr. Young's conduct up to
21  the point that Mr. Wilson arrived; is that
22  correct?  I'm going to reask it because --
23       A.  No, I'm looking.
24       Q.  -- there's a little pause here.

1        A.  No, I'm looking.  That's correct, there's
2   no criticism.
3        Q.  Do you claim -- in your report you do not
4   claim that you've reviewed something that
5   indicates Officer Young gave a false report about
6   his observation that Turner was sitting upon his
7   arrival?  I'm going to reask that.
8            Do you claim that Officer Young gave a
9   false report about observing Turner sitting upon
10  arrival?
11       A.  No.
12       Q.  Observing Turner moving around on the
13  ground?
14       A.  No.
15       Q.  Do you claim that Young gave a false
16  report about Turner's pants being partly down and
17  exposing his buttocks?
18       A.  No.
19       Q.  Do you claim that Young gave a false
20  report about Turner abruptly trying to stand up
21  and pull up his pants?
22       A.  No.
23       Q.  Do you claim Young gave a false report
24  about Turner being unkempt?

1        A.  No.
2        Q.  Do you claim that Young gave a false
3   report about Turner having large wet spots on his
4   sweater?
5        A.  No.
6        Q.  Do you claim that Young gave a false
7   report about Turner speaking unintelligibly when
8   he arrived?
9        A.  No.
10       Q.  Do you claim Young give a false report
11  about Turner moving around while he was talking?
12       A.  No.
13       Q.  Do you claim that Young gave a false
14  report about Turner not being responsive to a
15  request by Mr. Young?
16       A.  No.
17       Q.  Do you claim that Young gave a false
18  report about Mr. Turner touching a locked bicycle
19  or the back to that bicycle?
20       A.  No.
21       Q.  Do you claim that Mr. Young -- that
22  Officer Young was being -- do you claim that
23  Officer Young was giving a false report when he
24  indicated that Turner moved away from Officer

1    Young whenever Officer Young asked him to leave
2    the bicycle alone?
3       A.  No.
4       Q.  Based upon the reports you reviewed,
5    Officers Wilson and Talbott arrive on the scene;
6    is that correct?
7       A.  Yes.
8       Q.  And they were also aware that the
9    reporting person had made claims about Turner
10   drinking wine, yelling at passersby, pulling trash
11   out of garbage cans, and currently being in the
12   roadway; correct?
13      A.  That's correct.
14      Q.  Do you know what Wilson's status was
15   whenever he arrived at that call?
16      A.  Wilson was a probationary police officer.
17      Q.  Where does that term come from?
18      A.  That's my term.
19      Q.  That's how you would describe him
20   personally?
21      A.  Yes.
22      Q.  Do you know what step of his training
23   program he was on?
24      A.  I believe it said that -- in the reports

1    that he was in his final stage in what Champaign
2    calls the observation period.
3       Q.  Can you explain the difference between
4    the steps in the Champaign Police Department's
5    training program?
6       A.  I don't have a copy of their policy on
7    FTO. I'm only assessing that from what they said
8    in the police reports. I don't have a copy of the
9    policy.
10      Q.  What police reports are you referring to?
11      A.  That he -- well, your question was what
12   was the status. I said PPO.
13      Q.  And then I think I asked --
14      A.  And then your question was what phase he
15   was in, and I said the phase he was in was that
16   from the report that I read that he was in his
17   final stage and he was being observed by
18   FTO Talbott. And then I followed up -- I think
19   you asked another question, and I don't have a
20   copy of their -- I think you asked me a question
21   specifically about their training program or
22   FTO program. I don't have a copy of their policy.
23      Q.  Well, earlier when we looked at
24   Exhibit -- I'm sorry; your report at Paragraph 22,

1    you indicated you reviewed D650 through 1806 which
2    included training records?
3       A.  Okay.
4       Q.  Correct?
5       A.  Uh-huh.
6       Q.  Is that a yes?
7       A.  Yes.
8       Q.  And in there did you review the documents
9    starting at D1283 regarding Wilson's training in
10   particular?
11      A.  I don't recall.
12      Q.  Did you review D1310 regarding Step 5,
13   the phase that he was in at the time?
14      A.  I don't recall.
15      Q.  Do you recall in Step 5 what -- I'm
16   sorry; do you know in Champaign Police
17   Department's Step 5 what the responsibilities are
18   of a person in that position?
19      A.  No.
20      Q.  Is it your understanding that Officer
21   Wilson had been released to do solo rides by that
22   point in time?
23      A.  Yes.
24      Q.  And what's that understanding based on?

1    Police reports?
2       A.  I don't have the policy in front of me,
3    so I can't recite -- I can't define what that is.
4    I only can go from what I read in my reports and
5    what was in their deposition.
6       Q.  Do you know when Officer Wilson was
7    graduated to Step 5?
8       A.  I think there may have been a date, and I
9    just can't recall what that was in the reports.
10      Q.  Do you have any reason to doubt that it
11   was August 12, 2016, as reflected on
12   Defendant's 1310?
13      A.  If you say that's what it is, I'm okay
14   with that.
15      Q.  And upon being in that step, he was
16   supposed to be on the solo patrol; is that
17   correct?
18      A.  Okay.
19      Q.  Is that your understanding?
20      A.  Okay. Yes.
21      Q.  And that there will be monthly check
22   rides with available FTOs to monitor his progress
23   on the solo patrol; is that correct?
24      A.  Yes.

1    Q.  Do you know when Officer Wilson completed
2  his academy training?
3    A.  I don't remember the date.  I remember
4  reading it in the deposition, but I can't recall
5  the date.
6    Q.  Do you believe it was more or less than
7  six months prior to his graduation to Step 5?
8    A.  I can't recall.
9    Q.  If I understood correctly from your
10 earlier testimony, from the Rockford Police
11 Department, upon completion of the academy, the
12 phases were approximately six months or perhaps
13 less than six months; correct?
14   A.  Yes.
15   Q.  And that upon completion of those phases
16 the probationary officer was allowed to do solo
17 rides, solo patrol?
18   A.  That's correct.
19   Q.  Was that policy based on some kind of
20 national standard or state law?
21   A.  No.
22   Q.  It was just an internal departmental
23 policy in Rockford; is that correct?
24   A.  I can't recall.

1    Q.  Do you recall how many hours of training
2  Officer Wilson had completed at University of
3  Illinois Police Training Institute?
4    A.  I believe it's around 400.
5    Q.  And that's based on some document you
6  reviewed?
7    A.  I believe it's in the training -- in the
8  training document that I reviewed, and I know that
9  because the state was going to go to 565 or 580,
10 but they're around 400-something.  I don't think
11 they went up to the 500.
12   Q.  In your report at paragraph something --
13 in your report at Paragraph 74 you indicated that
14 you had reviewed the training records including
15 records for Officer Wilson; correct?
16   A.  Yes.
17   Q.  And on Page 29 of your report you
18 indicate that Officer Wilson had 16 hours of
19 training?
20   A.  Yes.
21   Q.  Does that -- is that all the training
22 that Officer Wilson had received by November of
23 2016 when he encountered Mr. Turner?
24   A.  I'm sorry; could you ask the question

1  again?
2    Q.  I'm trying to understand your reference
3  here to 16 hours.  Are you indicating that Mr. --
4  that Officer Wilson had received only 16 hours of
5  training by the time that he encountered
6  Mr. Turner in November of 2016?
7    A.  This is 16 hours that I had that were --
8  and I believe I referenced that in 74 -- specific
9  courses were extrapolated from the training
10 records which pertain to the incident involving
11 Richard Turner.  I'm not sure if I saw those
12 records.  I know there was 400 hours.  I didn't
13 know if those specific classes were listed in the
14 training records, but this is what -- this is what
15 Officer Andrew Wilson had received in training
16 with CPD that had something to do similar.  I
17 wanted to stay consistent with everybody else.
18   Q.  Did you perform any kind of analysis of
19 how many hours he received during his basic
20 orientation course prior to going into Step 1 at
21 CPD?
22   A.  I'm sorry; what --
23   Q.  This number 16, does this take into
24 consideration any training that Mr. -- that

1  Officer Wilson received during his 240-hour basic
2  orientation course in December of 2015?
3    A.  I'd have to look at those courses.  And I
4  don't think those courses were listed on there
5  that were in there.  I saw that, and my memory
6  is -- recalls there's a large block; and like I
7  said, I think it's like 400, could be more than
8  400.  I know it's at least 400 hours.
9    Q.  What was Wilson's normal day-to-day --
10 I'm sorry.
11   What were Wilson's normal day-to-day
12 duties in November of 2016?
13   A.  He was assigned with Field Training
14 Officer Michael Talbott.
15   Q.  Daily?
16   A.  That day he was.
17   Q.  On the particular date when he
18 encountered Mr. Turner, he had a ride-along by
19 Field Training Officer Talbott; correct?
20   A.  I'm confused.  The first question you
21 said about who's he with, and I think I answered
22 on November 16, he's with his field training
23 officer on November 11, 2016.
24   Q.  Did Officer Wilson have a field training

1 officer with him every day in November of 2016?
2 A. I don't know.
3 Q. What about in October?
4 A. I don't know.
5 Q. September?
6 A. Don't know.
7 Q. August?
8 A. Don't know.
9 Q. And I believe you said the term
10 probationary police officer is your word. Where
11 does that term come from?
12 A. It's in our industry standard. You could
13 either call it -- if you don't like PPO, you can
14 call it a recruit officer. I don't know. It's
15 just my years of being in policing is that when
16 you have a recruit, that's normally what you refer
17 to them.
18 Q. Is it a derogatory term?
19 A. No. We're a -- law enforcement's a
20 paramilitary organization. There is a pecking
21 order. And he's at the low end of the pecking
22 order. He's a probationary police officer who can
23 be terminated by the chief of police or their
24 commission.

1 Q. Would you call him a rookie? That word
2 is not used in your report anywhere.
3 A. Yeah. To me -- my definition of a rookie
4 would be somebody who's been on a little bit, you
5 know, that's a little bit seasoned. But he's not
6 a rookie. He's a probationary officer.
7 Q. Do you know how far away he was from
8 completing his final step?
9 A. I don't know.
10 Q. Would that make any difference in your
11 opinion, any of your opinions you've rendered?
12 A. That -- I'm sorry; your question was --
13 Q. Would it make any difference to any of
14 the opinions you've rendered to know how far away
15 Officer Wilson was from completing the final step
16 of the Champaign Police Department training
17 program?
18 A. No.
19 Q. Why not?
20 A. His conduct was egregious. So was the
21 other conduct of the other officers. If -- for
22 instance, hypothetically, if he was going to
23 graduate or be out of his field training program
24 two months later or two weeks later, it's not

1 going to make a difference to me. I would have
2 rendered the same opinion. His conduct on dealing
3 with Richard Turner and the other officers and the
4 sergeant was unwarranted.
5 Q. What's your understanding of Officer
6 Talbott's role on the date that himself and
7 Mr. Wilson encountered Mr. Turner?
8 A. So Mr. -- Mr. Talbott is a field training
9 officer that sat in the vehicle while a
10 probationary police officer stood outside the car
11 alone at times and dealt with somebody who was in
12 a behavioral crisis.
13 Q. What is your understanding of what
14 Officer Talbott's typical role was at that point
15 in time?
16 A. He was indifferent.
17 Q. Okay. I'm going to ask you to listen to
18 my specific question; okay?
19 Was he a field training officer every
20 specific day in records that you've reviewed?
21 A. On this particular day, November 11, he
22 was a field training officer for Officer Wilson.
23 Q. Have you reviewed any policies indicating
24 what his role was as a field training officer in

1 Step 5 of the program after Officer Wilson --
2 A. No, I stated I don't have --
3 Q. Sorry; I've got to finish your question.
4 Have you reviewed any specific policies
5 indicating what Officer Talbott's role was as a
6 field training officer for someone like Officer
7 Wilson who was in Step 5 of the program and had
8 been doing solo rides?
9 A. No. And I stated that I had not seen
10 that policy.
11 Q. Okay. If I ask you something I've
12 already asked you, I apologize. Sometimes I'm
13 trying to be comprehensive.
14 Does your opinion about Officer Talbott's
15 role as a field training officer -- is that
16 impacted in any way by what step Officer Wilson
17 was in the field -- in the training program?
18 A. I don't understand the question.
19 Q. Do your opinions about what Officer
20 Talbott should or should not have been doing as a
21 field training officer have any basis in what step
22 Officer Wilson was in the program?
23 A. I can't give you an answer to that
24 because I don't know what the policy is.

1     Q.  Because you didn't review it?
2     A.  That's correct.
3     Q.  Is it your opinion that it's
4  constitutionally prohibited for a field training
5  officer to allow a probationary officer in his
6  last month of training to handle an interaction
7  with a person who has mental health issues?
8     A.  No.
9     Q.  Do you have any information about the
10  number of times that Officer Wilson had
11  encountered a person with mental health issues
12  during his solo patrol prior to his
13  interaction with Mr. Turner on November 11 of
14  2016?
15     A.  No.
16     Q.  Do you have any information about the
17  number of times that Officer Wilson had
18  encountered an individual with mental health
19  issues during any of his other steps of his
20  training including when he had a field training
21  officer with him all the time prior to the point
22  in time whenever he interacted with Mr. Turner?
23     A.  Okay.  Excuse me; you're asking me three
24  questions in that one question.

1     Q.  I didn't mean to.
2     A.  I know.
3     Q.  So do you have any information about when
4  Officer Wilson -- I'm sorry.
5     Do you have any information about how
6  many times Officer Wilson interacted with an
7  individual who had mental health issues during
8  Step 1 of his training?
9     A.  No.
10     Q.  During Step 2?
11     A.  No.
12     Q.  During Step 3?
13     A.  No.
14     Q.  During Step 4?
15     A.  No.
16     Q.  During Step 5?
17     A.  No.
18     Q.  What videos did you review that -- I'm
19  sorry.
20     Did you review any videos that captured
21  Officer Wilson or Officer Young's interactions
22  with Mr. Turner near the corner of Sixth and Green
23  Street?
24     A.  Yes.

1     Q.  Which videos?
2     A.  It's the video where Young and -- or, I'm
3  sorry; excuse me -- Mr. Turner leaves the corner
4  and is walking toward the camera and the --
5  Officers Wilson and Young then are walking across
6  the street in the same path that Mr. Turner was
7  walking.  And then the final piece of that review
8  was Officer Talbott walking in the same path as
9  Officers Wilson and Young and that at some point
10  it appears that he sees something and takes off
11  running from a walk.
12     Q.  Did you review any of the videos that
13  show Mr. Turner throwing down a sign?
14     A.  Yes, I did.
15     Q.  Did you review any videos showing that
16  Mr. Turner's pants were falling down and his
17  buttocks was exposed during his interaction with
18  Officer Wilson and Officer Young?
19     A.  I didn't see the officers in the video,
20  but I did see that his pants were coming off his
21  body.
22     Q.  Now, that was in the time frame when
23  officers had arrived?
24     A.  I believe so.

1     Q.  And, I apologize.  Earlier I think you
2  made -- I thought you made a reference to
3  November 11, 2016, and I think I repeated that.
4  The date of this event was November 16 of 2016;
5  correct?  I believe Paragraph 23 of your report is
6  mistaken on that date.
7     A.  On Page 23?
8     Q.  Paragraph 23.
9     A.  Oh, I'm sorry; 23.  Okay.  I'm sorry.
10     Q.  All I'm saying is, I think it says
11  November 11.  To correct the record, I believe the
12  date was November 16, 2016; is that correct?
13     A.  I'm sorry; yes.  Thank you.  My error.
14     Q.  Did you review any of the interviews of
15  witnesses who observed Mr. Turner's interaction
16  with Officer Wilson and Officer Young prior to the
17  point where he departed from the corner of Sixth
18  and Green?
19     A.  Yes, their written interviews are -- yes.
20     Q.  Whose did you review?
21     A.  I just don't recall.  I reviewed a couple
22  of them.
23     Q.  Do you recall what they said?
24     A.  I believe it confirmed that he was out in

1  front begging for some money. And the rest of it
2  I just don't remember.
3      Q.  Do you recall any witnesses reporting
4  that the officers were not aggressive with
5  Mr. Turner?
6      A.  No.
7      Q.  Did you review the interview of Steven
8  Roland?
9      A.  I can't recall.
10     Q.  What about Daniel Miller?
11     A.  I can't recall.
12     Q.  Calvin Welch?
13     A.  I can't recall.
14     Q.  In evaluating a situation where police
15  officers are interacting with a citizen, is it
16  your common practice to review reports of the
17  witnesses who observed that interaction?
18     A.  If it calls for it.
19     Q.  Is there any reason that it was not
20  called for in this case?
21     A.  Well, the death of Richard Turner didn't
22  occur in front of the witnesses. It occurred when
23  Officers Wilson and Talbott and Young shuffled
24  after Mr. Turner in the long hall, outdoor hall.

1  The use of force incident didn't occur where
2  witnesses would have observed that.
3      Q.  From Page 6 through Page 37 of your
4  report you make numerous opinions about things
5  that occurred prior to that contact in the alley;
6  correct? Let's not worry about the page numbers
7  because I don't want you to have to flip through
8  it.
9      A.  I'm just looking through to verify what
10  you're telling me.
11     Q.  In your report you make numerous opinions
12  about what officers allegedly did wrong prior to
13  the contact with Mr. Turner in the alleyway;
14  correct?
15     A.  I don't think they're all things that the
16  officers did wrong; some of it's reporting what
17  the officers did and what their interaction was
18  with Mr. Turner.
19     Q.  Are you telling me sitting here today
20  that you have no criticisms of the officers'
21  conduct prior to the moment that they touched
22  Mr. Turner in the alley?
23     A.  Yes, I do have criticisms.
24     Q.  Okay. So that's my point. You have

1  criticisms of the time prior to the touch, but you
2  did not -- you do not remember reviewing the
3  statements of the witnesses taken by the
4  multijurisdictional police force about the
5  officers' interaction with Mr. Turner prior to the
6  touch?
7      A.  I stated that I recalled reading one or
8  two of them, but I can't recall all of them.
9      Q.  Including the individuals we talked
10  about?
11     A.  Right, the names you provided.
12     Q.  And now having reframed this issue, is
13  there any reason why you would not consider those
14  witnesses' statements in formulating your opinions
15  about the officers?
16     A.  Yes.
17     Q.  Why?
18     A.  The witnesses didn't have interactions
19  with Mr. Turner. The witnesses did not have --
20  did not have the powers invested into them. And
21  they could have, but the law enforcement officers
22  are the ones -- specifically Wilson, Talbott, and
23  Young were closest to Mr. Turner. They're the
24  ones that needed to de-escalate the situation and

1  take Mr. Turner into control. They're already
2  admitting to what they didn't do correctly in
3  their own reports and in their depositions. I
4  don't need a witness to tell me they did something
5  wrong. On their own volition they already
6  admitted to their lack of following the policy of
7  Champaign PD and then ultimately the supervisor
8  Frost who came and his lack of supervision. So I
9  don't need a witness to tell me what these
10  officers did wrong and be critical. They're
11  already being critical of themselves in their
12  admittance of their police report and in their
13  deposition.
14     Q.  And similarly, you would ignore the
15  statements of eyewitnesses who were complimentary
16  of what officers did with Mr. Turner?
17     A.  Well, the fact is that it doesn't
18  matter if they're complimentary or not.
19  Mr. Turner died in police custody, and it was
20  avoidable. They chose not to make it avoidable.
21     Q.  Eyewitness observations are irrelevant to
22  your determination of what police did or did not
23  do in this case; is that what you're telling me?
24     A.  No, I'm not saying that. There's no

1 eyewitnesses that saw the final moment or the
2 moment before. The fact of the matter is, during
3 the altercation, during their interactions with
4 Mr. Turner, they failed to follow their policy
5 because they were not trained properly in CIT,
6 they didn't evaluate all of their options, and
7 they had a lack of a supervisor who would have
8 inserted himself and who could have taken control
9 and could have avoided the in-custody death of
10 Richard Turner.
11 Q. Okay. I understand that you want to
12 repeat a number of opinions, and that's fine.
13 What I need you to do is really pay attention to
14 my question, and that'll help us move along as we
15 go here.
16 A. I am paying attention to your question.
17 Q. And I appreciate that.
18 A. I don't think you like the answer I'm
19 giving you.
20 Q. No, I'm not sure that you're grasping
21 quite the thing that I'm asking, so let me ask it
22 again, and try and answer just the question.
23 So you're telling me that no one observed
24 the final moments; correct?

1 A. That's what I said, yes.
2 Q. But in your analysis of this case you
3 consider the totality of the circumstances;
4 correct?
5 A. That's correct.
6 Q. Including the things that led up to those
7 final moments; correct?
8 A. That's correct.
9 Q. Including the things after the moment
10 that the reporting person made a call to the 911
11 dispatcher; correct?
12 A. Correct.
13 Q. And in that time frame of the totality of
14 circumstances that you're considering, there were
15 eyewitnesses to what the police officers were
16 doing with Mr. Turner; correct?
17 A. Okay.
18 Q. Is that correct?
19 A. Like I said, I can't recall reading all
20 of the statements. I said that I believe I read
21 one or two of them. I remember reading something
22 about Love.
23 Q. If there were eyewitnesses during the
24 time of this totality of circumstances when police

1 officers were with Mr. Turner, would their
2 observations be of any importance to your
3 analysis?
4 A. No.
5 Q. You would exclude all eyewitness
6 observations beyond the reports of the officers?
7 A. If they can render some -- witness
8 something that I didn't see that the officers said
9 differently. But you have officers who were on
10 the record with their own police report and then
11 their own deposition, so they've already admitted
12 that they erred. And --
13 Q. I just want to for the record say I don't
14 think there's been any admission of error in this
15 case. That's your take on this. But I just don't
16 want this to be misread at a later date that I'm
17 acquiescing on that.
18 So in the videos that you watched could
19 you see the entire interaction from the moment
20 that Officer Young arrived through the moment that
21 Officer Wilson arrived?
22 A. No.
23 Q. In the videos you watched could you see
24 the entire interaction from the moment Officer

1 Wilson arrived till the moment that there was a
2 contact in the alleyway?
3 A. No.
4 Q. And eyewitnesses who observed those
5 interactions would be irrelevant to your
6 decision-making process in this case?
7 A. Well, it wouldn't be irrelevant. They
8 certainly can have an opinion. But I'm going to
9 go on what the officers stated in their police
10 report and what they knew, what they did, and how
11 they were supervised. The citizens aren't the
12 ones that took Mr. -- or shuffled after
13 Mr. Turner; it was the officers. It's the
14 officers' actions that we're talking about, not
15 the witnesses'.
16 Q. Any reason to doubt that Steven Roland
17 was telling the truth in his statements?
18 A. I can't recall seeing the statement, so I
19 can't --
20 Q. Do you have any reason to doubt that
21 Steven Roland was telling the truth?
22 A. Well, I would hope that any
23 investigation -- if the multijurisdictional task
24 force took a statement and a person was lying that

35 (Pages 137 to 140)

1    they should take charges up on the person or vet
2    that out in some investigation. So I don't have
3    an -- as I sit here today, I can't -- like I say,
4    I can't recall I read that statement.
5        Q. Have you reviewed any document indicating
6    to you that the statements made by Steven Roland
7    were inaccurate?
8        A. I haven't seen the document.
9        Q. Have you read any document or other
10   materials indicating the statements made by Calvin
11   Welch were inaccurate?
12       A. I have not seen that document.
13       Q. Have you reviewed any document indicating
14   the statements made by Daniel Miller were
15   inaccurate?
16       A. No.
17       Q. Have you reviewed any document or
18   material indicating the statement made by any
19   purported eyewitness to the events involving
20   Mr. Turner was inaccurate?
21       A. No.
22       Q. Do you claim that Officer Wilson gave a
23   false report about his observation that Mr. Turner
24   crossed Sixth Street westbound?

1       A. No.
2       Q. Do you claim that his report was false
3    about Mr. Turner picking up a sign and throwing it
4    on the sidewalk?
5       A. No.
6       Q. Do you claim that Officer Wilson's report
7    was false in saying that Mr. Turner took that
8    action without provocation?
9       A. Took what action?
10      Q. Throwing the sign on the sidewalk without
11   provocation.
12      A. No.
13      Q. Do you claim that Officer Wilson gave a
14   false report about Mr. Turner actually complying
15   with Officer Young's command to put the sign back?
16      A. No.
17      Q. Do you claim that Officer Wilson give a
18   false report about Mr. Turner walking around and
19   crossing the street several times after that?
20      A. No.
21      Q. Do you claim that Officer Wilson gave a
22   false report about Mr. Turner speaking to himself
23   unintelligibly during this time period?
24      A. No.

1       Q. Do you claim Officer Wilson give a false
2    report about Mr. Turner making seemingly random
3    hands gestures and movements during this time
4    period?
5       A. No.
6       Q. In your report you make no opinion about
7    how the situation would have specifically turned
8    out differently if Mr. Talbott -- I'm sorry; if
9    Officer Talbott had gotten out of the vehicle;
10   correct?
11      A. No.
12      Q. Do you say in your report if Officer
13   Talbott had gotten out of the vehicle the event
14   would have occurred this way or that way?
15      A. Can you tell me where I'm referring to
16   that in my report?
17      Q. I don't think it's in there, and I'm just
18   trying to confirm --
19      A. Oh; okay.
20      Q. So in your report, I do not see an
21   opinion on how the situation would have resulted
22   or been different if Officer Talbott had gotten
23   out of the car; is that correct?
24      A. I'm just going to refer to my report real

1    quick because I think there's something in there
2    what you're asking, and I want to make sure that
3    I'm properly answering your question.
4       Q. Well, to be fair, you say in your
5    report --
6       A. Can I just take a second?
7       Q. Yeah. I'm going to get back to that
8    question. I'm going to kind of get you there.
9       So in your report you say Officer Talbott
10   should have gotten out of the car?
11      A. Yes.
12      Q. And that's based on what?
13      A. Well, based on why would you leave a
14   recruit officer, a probationary police officer out
15   alone with somebody who's in a mental health
16   crisis or behavioral crisis? It's absurd, as I
17   said in my report. I've been a field training
18   officer and I've trained over 22 people, and I've
19   never heard of such a thing. It's safety of the
20   officer, safety of Turner. It's absurd.
21      Q. Do we need to take a break or --
22      A. No, I'm fine.
23      Q. Okay. What I'm asking is: What is the
24   basis for your opinion that Officer Talbott should

1    have gotten out of the car?  For example, can you
2    point me to a piece of literature, can you point
3    me to a policy, can you point me to some kind of
4    standard that says a field training officer in
5    this particular position must get out of the car
6    whenever their probationary officer is talking
7    with someone?
8        A.  So right now, as I sit here today, I
9    can't answer that question because I can't
10   pinpoint to where it's going to be.  But I can
11   tell you from my experience of over 30 years as a
12   police officer and any other police officer that's
13   experienced with CIT training would not allow
14   someone to sit in a car and interact alone,
15   specifically a recruit officer who was not CIT
16   trained.
17       Q.  So it's solely based on your experience?
18       A.  Experience, training.
19       Q.  Not --
20       A.  But Wilson -- but Talbott -- I'm not done
21   answering the question.
22       Q.  That's fine.
23       A.  But Talbott wouldn't know that anyhow
24   because he wasn't CIT trained anyhow.  So he

1    didn't appreciate the situation, didn't look at
2    the thoroughness and the totality of it.
3        Q.  I'd like you to appreciate the question
4    I'm asking you, which is:  Are there any other
5    literature or standard you can point me to?
6        A.  Not right now.
7        Q.  Okay.  Thank you.  Are you advocating
8    that Officer Talbott and Officer Wilson should
9    have both confronted Mr. Turner at the same time?
10       A.  I don't like the word "confronted."  But
11   approached and had a conversation and dialogue
12   with Mr. Turner, yes.
13       Q.  Are you indicating that Officers Talbott,
14   Wilson, and Young should have all been speaking
15   with Mr. Turner or having this dialogue with him
16   at the same time?
17       A.  No.
18       Q.  Why is that?
19       A.  Well, in a behavioral crisis, a person
20   that is suffering from some episode, it's usually
21   better preferred that you would have one person
22   that would be having the discussions as opposed to
23   three different people.  Again, by the lack of
24   those three individuals who were not CIT trained,

1    they wouldn't appreciate that.  So if you're not
2    trained, you do things that you probably shouldn't
3    do.
4        Q.  Didn't they have one person talking to
5    Mr. Turner who was Mr. Wilson -- or Officer Wilson?
6        A.  I don't recall.
7        Q.  Do you think it would have been
8    detrimental to Mr. Turner if Officer Wilson,
9    Officer Young, and Officer Talbott had all been
10   talking to him at the same time or having this
11   dialogue with him?
12       A.  No, I said that you shouldn't have all
13   three people talking with him.  I think an initial
14   question, should all three of them been around or
15   been out approaching Mr. Wilson, and yes, from an
16   officer's safety standpoint, you want to protect
17   yourself and you want to protect Mr. Turner.  But
18   usually the best course of action is to have one
19   person do the speaking.
20       Q.  Are you aware of how Officer Talbott was
21   monitoring the situation?
22       A.  Yes.
23       Q.  How?
24       A.  He was sitting in his squad car.

1        Q.  Was he doing anything to monitor the
2    conversation?
3        A.  I believe he was listening to a device on
4    the -- if I recall, the dashcam video recorder, I
5    believe.  That's how he heard what was going on.
6        Q.  So is it your understanding that the
7    audio -- I'm sorry.
8            Is it your understanding that Officer
9    Wilson had a microphone on his body that was
10   recording and transmitting audio to the squad car
11   where Officer Talbott was?
12       A.  I believe so.
13       Q.  And that Officer Talbott was listening to
14   that audio?
15       A.  I believe so.
16       Q.  And you've heard that audio?
17       A.  Yes.
18       Q.  And you can hear Officer Wilson speaking
19   in it?
20       A.  Yes.
21       Q.  And you can hear Mr. Turner making
22   certain sounds in it?
23       A.  I wasn't able to hear all the sounds, but
24   yes.

37 (Pages 145 to 148)

1    Q.  Do you have any reason to believe that
2  Officer Talbott could not hear those same things
3  whenever he was sitting in the squad car?
4    A.  No.
5    Q.  How far away was Officer Talbott's squad
6  car from the location whenever Officer Wilson was
7  talking with Mr. Turner?
8    A.  I don't recall the actual feet, but I
9  know I have it in my report.
10   Q.  Would you like to point me to that?
11   A.  I'm not finding it, but I was sure that I
12  put it in my report.  I know they said how many
13  feet they were away from each other.
14   Q.  Are you aware of -- or can you describe
15  to me the relative familiarity that the officers
16  had with Turner, who was the most familiar with
17  him and who was the least?
18   A.  So my review is that all three of them
19  were aware of Mr. Turner, all three being Officers
20  Wilson, Talbott, and Young and then when Sergeant
21  Frost arrived that Sergeant Frost had known
22  Mr. Turner for some time and also reported that
23  there was a similar, like incident that he had in
24  April of 2016.  As I testified earlier, I believe

1  that Officer Wilson stated that he knew him from
2  the neighborhood when he went to school and
3  actually had been to his house before.
4    Q.  So between Wilson, Young, and Talbott,
5  Wilson had the most experience with Mr. Turner?
6    A.  I believe that's what -- yes, from the
7  reading.  But all of them had some knowledge and
8  knew Mr. Turner.
9    Q.  In your report from Paragraphs 37 through
10  47, you offer various opinions about the alleged
11  failure to follow conflict management and crisis
12  intervention policies and procedures?
13   A.  Okay.
14   Q.  Is that correct?
15   A.  Yes.
16   Q.  Where do those policies and procedures
17  come from?  Are they internal policies of the
18  Champaign Police Department?
19   A.  It's a -- I am referring to the conflict
20  management and crisis intervention policy, 41.14.
21   Q.  And that, to your understanding, is a
22  state statute?
23   A.  I'm referring to the -- right in 37, the
24  Champaign Police Department has a conflict

1  management and crisis intervention policy.  It's
2  their own policy.
3    Q.  So it's an internal police department
4  policy; correct?
5    A.  Just one second.  Yes.
6    Q.  Do you agree that a CIT officer would be
7  more likely to be helpful if Mr. Turner had been
8  stable and taking his medications?
9    A.  No.
10   Q.  Why is that?  Well, first of all, do you
11  have any kind of training or experience in
12  medications, the effect of the medications that
13  Mr. Turner was taking?
14   A.  No.
15   Q.  Do you agree that a CIT officer would be
16  more successful in trying verbal de-escalation
17  techniques on a mentally ill person who's not
18  running away from them?
19   A.  Yes.
20   Q.  Do you agree that a CIT officer would
21  likely be more successful in trying verbal
22  de-escalation techniques on a mentally ill person
23  who was capable of understanding what was going
24  on?

1    A.  Yes and no.
2    Q.  Why is that?
3    A.  Because you have a policy -- CPD --
4  Champaign Police Department has a policy, and
5  their policy is pretty robust, a very thorough
6  policy.  And the reason why I said yes or no is
7  because I've seen a lot of agencies that have good
8  policies, but their follow-through is really
9  abysmal.  And you have to have supervisors who
10  have roll call training, you have to keep
11  reinforcing the policy.  So you could have -- you
12  could have a non-CIT officer who appreciates,
13  understands, and has been trained on how to deal
14  with the mentally ill without going to the 40-hour
15  class.  The 40-hour class is good; but just
16  because you go to a 40-hour class doesn't mean
17  that you've got the key, that you can do
18  everything, and those that are not CIT trained
19  aren't good enough.
20   Q.  So, for example, an eight-hour class in
21  Rockford you're talking about, that might be
22  sufficient for an officer to interact with a
23  mentally ill person?
24   A.  The class itself is not.  The class

1    itself gains some exposure to an officer, but the
2    continual follow-up roll call, round-table
3    discussions, maybe an encounter or an incident
4    that really didn't turn out that well and talk
5    about it at roll call, that's really where the
6    adult learning principles come in place, not just
7    somebody doing an eight-hour class or 40-hour
8    class.
9       Q.  Is it your position that a patrol officer
10   cannot speak -- approach and speak to a person
11   with mental illness when dispatched to that
12   location?
13       A.  They can.
14       Q.  They can?
15       A.  They can.
16       Q.  And they can have that conversation prior
17   to a CIT officer arriving?
18       A.  They could.
19       Q.  What do you know about -- what's the
20   basis of your knowledge about community elements,
21   meaning, where did you learn about it, what
22   documents and what materials taught you about
23   that?
24       A.  Defendant's 251 addresses community

1   elements.
2       Q.  So this is the internal police department
3   policy?
4       A.  Yes.
5       Q.  And do you know anything about where
6   community elements typically responds to crises or
7   behavioral health incidents?
8       A.  So there's -- you want me to read this?
9       Q.  I'm asking if you know anything about
10   that.
11       A.  Well, just from what I'm reading in their
12   policy.  That's how I found out about it.  It's
13   under local resources.  Starts off at the front
14   desk, then community elements and community
15   elements clinicians.
16       Q.  Are you aware of community elements
17   responding to any street corners in response to a
18   call from any law enforcement agencies in
19   Champaign County?
20       A.  I only know about community elements from
21   the four corners of this piece of paper.
22       Q.  Do you know how quickly community
23   elements can respond to a request to engage with a
24   mentally ill person?

1       A.  No, that's not on here.
2       Q.  Do you know if community elements
3   typically responds to requests to engage with
4   mentally ill persons once they are transported to
5   an ER for evaluation?
6       A.  I don't know.
7       Q.  Did you review any -- or if I'm
8   understanding correctly, you didn't review any of
9   the prior records about Mr. Turner's involuntary
10   commitments or attempted involuntary commitments
11   between 2014 and 2016 including to the extent that
12   community elements was involved?
13       A.  I did not.
14       Q.  Your opinions about allowing Mr. Turner
15   to talk with family members are based upon the
16   internal police department policy; is that
17   correct?
18       A.  Yes, it's noted here in their policy.
19       Q.  Is there any state law requiring that?
20       A.  No.
21       Q.  Is there --
22       A.  Not that I'm aware of.
23       Q.  Is there any state law requiring
24   contacting a behavioral health provider like

1   community elements when confronting a mentally ill
2   person in the field?
3       A.  Not that I can recall.
4       Q.  Is there any state law requiring use of a
5   CIT officer when confronting a mentally ill person
6   in the field?
7       A.  No.
8       Q.  Are you aware of the prior attempts by
9   Champaign Police Department to ever contact
10   relatives of Mr. Turner in the event that he was
11   picked up after being in contact with the police
12   department?
13       A.  I'm not.
14       Q.  Are you aware of the extent to which
15   Mr. Turner did or did not advise that he wanted
16   any members of his family contacted when he was
17   previously hospitalized for an involuntary
18   admission?
19       A.  I'm not aware.
20       Q.  Are you aware of Mr. Turner's family
21   having reached out to the Champaign Police
22   Department to provide their contact information in
23   the event that he was picked up?
24       A.  I'm not aware of that.

1    Q.  In your experience, do family members
2 contact police departments at times to record
3 their contact information in the event that their
4 loved one, whether they have a mental health
5 issue, Alzheimer's, autism, PTSD, are you aware of
6 family members contacting -- I'm going to restart
7 that whole thing.
8        So in your experience at the Rockford
9 Police Department, were there times when family
10 members would contact the department to alert them
11 to a family member who had a mental health issue
12 or Alzheimer's or autism or PTSD?
13    A.  Yes.
14    Q.  And that family members would provide
15 contact information about those conditions to the
16 police?
17    A.  Yes.  There's actually a system set up --
18 and I'm not sure that they have it down in
19 Champaign, but you can set up a system in the 911
20 center where you can give that mental health or --
21 it doesn't have to be someone who has -- it can be
22 autism, several issues that you can have that's
23 preloaded.  So if Chet Epperson shows up on a
24 call, the information would show up that I have

1 maybe some mental issue and there's a doctor's
2 contact, next of kin to call in case, you know,
3 I'm unconscious or I'm fighting with the police.
4    Q.  Are you aware of anyone having done that
5 for Mr. Turner?
6    A.  I'm not.
7    Q.  And reporting that to the Champaign
8 Police Department prior to this incident?
9    A.  I'm not.
10    Q.  In Paragraph 75 of your report you make
11 some statements about Officer Young being aware of
12 a list that was maintained on mental health
13 incidents.  Do you know when that list was
14 actually created?
15    A.  I'm not sure if -- I don't know when he
16 was aware.  There was a name, I think, in the
17 deposition.  However, I want to point out on 75 to
18 follow up on that is the -- in 7-3 of '14 when the
19 revision date of the Champaign Police Department
20 policy was in effect, under local resources, the
21 front desk maintains a current list of resources
22 they can utilize during situations -- so they have
23 information they can use.
24    Q.  Do you have any indication of the

1 specific information about Mr. Turner in that
2 list?
3    A.  I don't know.
4    Q.  You would agree that it would be easier
5 to have Mr. Turner talk with a family member if he
6 was not running away from officers?
7    A.  I'm sorry; repeat the question.
8    Q.  It would be easier for Mr. Turner to
9 communicate with a family member if he was not
10 running away from officers?
11    A.  Yes and no.
12    Q.  Or if he had provided any family member
13 names?
14    A.  Yes and no.
15    Q.  Or contact information?
16    A.  Yes and no.
17    Q.  Why do you say potentially no on all
18 those questions?
19    A.  Because if there was well-trained
20 officers that knew how to deal with a mentally ill
21 person -- Young, Wilson, and Talbott, if they
22 would have adhered to their policy, and Sergeant
23 Frost, who failed to insert himself at the
24 scene -- and he knew why he was going there --

1 could have afforded some other alternatives.  So
2 that's why I said no in those.
3    Q.  Okay.  And having a family member respond
4 or behavioral health professional respond to the
5 scene would not be made more difficult by the fact
6 that Mr. Turner was running away from officers?
7    A.  Well, Mr. Turner ran away from officers
8 at the latter part, not at the former part.  So
9 it's always important at the -- on the front end
10 is to develop a relationship and have a game plan
11 as to what you're going to do with a person who's
12 in a mental behavioral crisis at issue or mental
13 health issue.
14    Q.  Part of that plan was that Wilson
15 requested a medical evaluation; correct?
16    A.  He did.
17    Q.  Did you review the METCAD recording about
18 that?
19    A.  I did not.
20    Q.  Did you review the squad audio recording?
21    A.  I did not.
22    Q.  Did you review the dispatch sheet?
23    A.  No.
24    Q.  Did you review the ambulance personnel's

1  report?
2      A.  No.
3      Q.  You claim --
4      A.  I'm sorry; the ambulance report for
5  request of --
6      Q.  The ambulance personnel report regarding
7  information they received about a Code 25-A-2.
8      A.  Which is what?  I'm not sure about that
9  code.
10     Q.  Did you review that report is my
11 question.
12     A.  But I just want to know what report
13 because there's two ambulance reports that I'm
14 aware of, if you're talking about that one.  I was
15 talking about the one -- I'm thinking about the
16 one at the end where the ambulance arrived and
17 then took Mr. Turner to the hospital.  I thought
18 that's the one you were referring to.
19     Q.  And so you did review an ambulance
20 report, that one you're talking about?
21     A.  Right.
22     Q.  And that has some comments in it about
23 Wilson's request for medical evaluation?
24     A.  Yes, it did.

1      Q.  Okay.  Do you claim that Wilson gave a
2  false report about his observation that Turner's
3  throwing of the sign seemed uncharacteristic to
4  him?  Do you claim that Officer Wilson was falsely
5  reporting that Turner's throwing of the sign was
6  uncharacteristic?
7      A.  No, he's reporting what he's observing.
8      Q.  Do you claim that Wilson gave a false
9  report when he said that Turner was engaging in
10 erratic behavior including speaking to himself
11 unintelligibly and making seemingly random hand
12 gestures and movements?
13     A.  No.
14     Q.  Do you claim that Wilson gave a false
15 report when he said that Turner was repeatedly
16 returning and entering the roadway?
17     A.  No.
18     Q.  Do you claim that Wilson gave a false
19 report when he said that any of these activities
20 were uncharacteristic of Turner?
21     A.  No.
22     Q.  You do claim Wilson had no plan in your
23 report.  I believe it's around Paragraph 77
24 through 80.  Is that correct?

1      A.  Yes.
2      Q.  Isn't it fair to say that Wilson had a
3  plan, which was for an ambulance to evaluate
4  Mr. Turner and for Mr. Turner to wait around until
5  that could be done?
6      A.  The problem with that is is that Wilson
7  doesn't need an ambulance to evaluate Mr. Turner.
8  By Illinois state law, he can make that evaluation
9  himself, call for the ambulance and have him
10 transported to the hospital.  Wilson, Talbott, and
11 Young didn't know about how to use the Illinois
12 state petition for a mental health person.  So
13 they're going to call an ambulance, and they're
14 going to punt and have the ambulance make the
15 decision.  To me, that's no plan.  That's not a
16 plan.
17     Q.  Did you review the audio recording where
18 Wilson and Young talk about whether or not they
19 should have Mr. Turner evaluated by a medical
20 professional?
21     A.  No.
22     Q.  Did you review the audio in which
23 Mr. Wilson asks Mr. Turner about the date?
24     A.  I read reports on that.

1      Q.  And do you claim that Wilson was lying in
2  his report when he said the purpose of this
3  evaluation was to determine if Turner was too
4  intoxicated or otherwise unable to properly care
5  for himself and if he would need to be
6  involuntarily admitted to a medical care facility?
7      A.  Yes.
8      Q.  You think that's a lie?
9      A.  No, it's not a lie.  That's what he's
10 saying.
11     Q.  So there are multiple reasons why Wilson
12 called an ambulance according to his report?
13     A.  Multiple reasons, but he really didn't
14 know what he was doing.  He didn't make a
15 determination because he had his shadow FTO
16 officer sitting in the car and didn't offer him
17 any assistance.
18     Q.  Would it be --
19     A.  And he had a supervisor who didn't insert
20 himself who was CIT trained.
21     Q.  Would it be improper for Wilson to
22 request an ambulance for a person who appears to
23 be intoxicated and repeatedly going into the
24 roadway?

1    A. No.

2    Q. Would it be improper for Wilson to

3 request an ambulance to --

4    A. Excuse me. Excuse me; I'm going to say

5 yes. For what reasons?

6    Q. For what reasons? I'm not following.

7    A. You asked me a question, would it be

8 improper. I said no. I'm going to say yes, it

9 would be. For what reason you want to call for an

10 ambulance? So he's walking in the roadway?

11    Q. Okay. Do you think it would be improper

12 for Wilson to request an ambulance to check out

13 whether Mr. Turner was having any medical issues

14 that could explain his bizarre behavior?

15    A. That's okay.

16    Q. I want to understand what I perceive as a

17 conflict in your report which is at Paragraph 79.

18 You criticize the officers' reliance on an

19 ambulance, and then at Paragraphs 86 through 87

20 you say it was appropriate to summon an ambulance.

21 Can you please square those opinions for me, if

22 you can?

23    A. Yes. You want an answer for this?

24    Q. Yes.

1    A. So it's not consistent because they're

2 punting off to the ambulance, and they're not

3 taking the -- not making the determination to take

4 him in to -- petition for involuntary/judicial

5 admission because of their lack of training. So

6 they're wanting the ambulance to make the

7 decision. It's --

8    Q. What's -- I'm sorry; go ahead.

9    A. They're wanting the ambulance to make the

10 decision for the petition for involuntary/judicial

11 admission. My world, when I was a patrol officer,

12 I had the right to take someone in if they're

13 exhibiting these bizarre behaviors, that I could

14 take him into protective custody and take him to

15 the hospital. That's not what they're doing.

16 They're calling the ambulance to make the

17 decision. They should have made the decision

18 there that this is what we want to do, and they

19 should have consulted with Sergeant Frost.

20    Q. Based on the observations that have been

21 reported, do you think that Mr. Turner qualified

22 for involuntary admission at that point in time

23 when the ambulance was called?

24    A. Sure. The officer has to use his best

1 judgment and has to be -- you know, has to

2 articulate. And I believe that they've

3 articulated, they just weren't -- they were not,

4 from what I've read, familiar with how to take

5 someone into protective custody. Thus they called

6 the ambulance. It's good they called the

7 ambulance but they're really not making the

8 determination. And really the sad thing about the

9 whole case is, you had a CIT Sergeant Frost that

10 was there who didn't insert himself.

11    Q. Okay. Just to help us because we've been

12 here for awhile and we have limited time, my

13 question is really, did Mr. Turner qualify for

14 involuntary admission based on the materials

15 you've reviewed prior to him running away from the

16 corner of Sixth and Green?

17    A. From what I've read, yes.

18    Q. What is the standard for involuntary

19 admission? Do you need to refer to a document?

20    A. I'm going to read right from the

21 document. It's the petition for involuntary/

22 judicial admission. And under the second page --

23 there's five pages. It's two of five -- you have

24 to check off the box. And there's one, two,

1 three, four, five reasons that you can check off.

2 You have to articulate as to why you want to take

3 the person into protective custody, and then you

4 have to meet with the doctor.

5    Q. Any reason why Mr. Wilson could not have

6 completed -- I'm sorry; any reason why Officer

7 Wilson could not have completed one of those

8 reports once Mr. Turner was evaluated for

9 potential medical issues and transported to the

10 hospital?

11    A. I don't know how to answer that.

12    Q. Are you saying that once the ambulance

13 personnel arrived there was no way that Mr. Wilson

14 could have went to the -- once the ambulance

15 personnel arrived there was no way for Officer

16 Wilson to go to the hospital and complete the

17 petition for involuntary admission?

18    A. Certainly could have.

19    Q. Okay.

20    A. But there's no indication on the record

21 that that's what he was going to do. And that's

22 the basis of my opinion that he lacked the

23 appreciation for this.

24    Q. And you did not review any of the records

1    from 2014 to 2016 where officers of the Champaign
2    Police Department called the ambulance, had
3    Mr. Wilson -- Mr. Turner transported to the
4    hospital, and then completed the petition at the
5    hospital?
6       A.  I did not.
7       Q.  And you mentioned when you were referring
8    to that petition that officer would have to
9    speak with a doctor; is that correct?
10      A.  Yes.  In my experience, the doctor's
11    going to want to speak to you and get some more
12    information.
13      Q.  And that would occur where?
14      A.  At the hospital emergency room.
15      Q.  You're familiar with the March 2016
16    publication by the International Association of
17    Chiefs of Police entitled "Improving Police
18    Response to Persons Affected by Mental Illness"?
19      A.  I can't recall that document.
20      Q.  I believe you reference it in your
21    report.
22      A.  An IACP?  It's -- my report refers to
23    dealing with the mentally ill dated December 1,
24    1997.

1      Q.  Okay.  And you've referenced that at --
2      A.  Yeah.
3      Q.  -- Footnote 45 of your report?  Are you
4    familiar with the more recent publication from
5    March 2016 regarding "Improving Police Response to
6    Persons Affected by Mental Illness"?
7      A.  I can't recall that.
8      Q.  Are you aware that in this document the
9    International Association of Chiefs of Police has
10    recommended that a course in Mental Health First
11    Aid for Public Safety is a promising program, an
12    eight-hour course specifically designed for police
13    officers helping them better understand mental
14    illness and providing them with effective response
15    options to de-escalate incidents without
16    compromising safety?
17      A.  Okay.
18      Q.  Have you heard of that program before?
19      A.  Like I said, I haven't seen that
20    document, so I can't opinionate on it.
21      Q.  Whenever you reviewed Mr. Wilson's -- I'm
22    sorry; when you reviewed Officer Wilson's and
23    Officer Talbott's training, you noted that they
24    had completed the Mental Health First Aid for

1    Public Safety course in June of 2016; correct?
2      A.  Which officers?
3      Q.  Talbott and Wilson.
4      A.  Okay.  Just a second.  Yes.
5      Q.  And that was an eight-hour training
6    session?
7      A.  Yes, it's eight hours, 6-16 of '16.  6-16
8    of 2016.
9      Q.  So in Paragraph 59 of your opinions you
10    state it was inappropriate to have untrained
11    police officers deal with the situation.  In fact,
12    Officer Wilson and Officer Talbott had both had
13    this Mental Health First Aid for Public Safety
14    training, an eight-hour course, just several
15    months before this incident?
16      A.  Okay.
17      Q.  Is that correct?
18      A.  You're telling me -- like I said, I
19    haven't seen that document, so I can't opinionate
20    on the document.  I'm only going on what you're
21    telling me.
22      Q.  I'm going on your report which
23    specifically lists them having completed that
24    training based on your review of the training

1    records.
2      A.  Right.  And I have no lesson plan, I have
3    no document to take a look at it.
4      Q.  Did you not review Defendant's 1293 which
5    was included in the materials that you stated you
6    reviewed on Paragraph 22?
7      A.  I can't recall.
8      Q.  You provide multiple opinions
9    about Officer -- I'm sorry; you provide multiple
10    opinions about Sergeant Frost's alleged failures
11    to supervise; correct?
12      A.  Yes.
13      Q.  And you claim that the incident escalated
14    because of the lack of supervision and lack of
15    following departmental policy specifically at
16    Paragraph 60 of your report?
17      A.  Yes.
18      Q.  Frost had a visual or line of sight on
19    the officers' interactions with Turner from prior
20    to the point where Turner took off from the corner
21    of Sixth and Green; correct?
22      A.  Okay.
23      Q.  Is that correct based on what you've
24    reviewed?

1    A.  Yes.
2    Q.  Sergeant Frost also could overhear audio
3  conversations from his radio while officers were
4  interacting with Mr. Turner; correct?
5    A.  Yes.
6    Q.  Officer Frost could visually observe
7  Turner including seeing him moving his head
8  rapidly side to side?
9    A.  Yes, he stated that when he was sitting
10  in his squad car.
11    Q.  And Sergeant Frost did hear the request
12  for an ambulance; correct?
13    A.  Yes.
14    Q.  I didn't see in your opinion -- you know,
15  you criticize Sergeant Frost in a number of these
16  paragraphs, but do you state in here an opinion on
17  how the situation would have changed if Officer
18  Frost had gotten out of his car and walked up to
19  Mr. Turner?
20    A.  Yes.  In Paragraph 51 of my report, it's
21  actually on Page 18, it talks about Sergeant Frost
22  sitting in his car.  He had prior experience with
23  Richard Turner.  He responded to the scene because
24  the other sergeant was nonresponsive.  And on the

1  top of 18, like halfway down, Sergeant Frost
2  merely sat in the squad as the CIT-certified
3  officer, allowed three officers to interact with
4  Turner.  He failed in his position as a supervisor
5  from knowing or at least inquiring if the officers
6  were CIT trained.  Sergeant Frost should have
7  inquired.  Once Sergeant Frost arrived on the
8  scene, he should have exited his squad and engaged
9  in dialogue with Officers Wilson, Turner, and the
10  two.  Difficult to manage a supervisor from the
11  seat of his squad car.
12    Q.  Here's my question:  Have you rendered an
13  opinion on what outcome would have occurred if
14  Sergeant Frost had exited his vehicle at that
15  point in time and approached Mr. Turner?
16    A.  Yeah, he would have -- the opinion would
17  be is that he would be able to assist these
18  officers who were not 40-hour CIT trained, and
19  then Sergeant Frost would have been able to
20  take -- specifically on Paragraph 57, Sergeant
21  Frost was part of the CPD crisis negotiation
22  training.  And I found this in the monthly
23  training logs.  He would have been able to
24  possibly implement, maintain and further develop

1  adequate listening skills, practice developing
2  rapport, assist subjects in crisis resolving the
3  situation, et cetera, and it's on Page 20 at the
4  bottom.  It's one, two, and three.  This was taken
5  right from Sergeant Frost's monthly attendance
6  logs.  Three consistent objectives were listed on
7  the training sheet.  So there's a wealth of
8  knowledge, and he let three guys hanging out there
9  on their own with Mr. Turner.
10    Q.  You list some of his training starting on
11  Page 27 through 28.  It's fair to say that
12  Sergeant Frost is significantly more experienced
13  in CIT than you are; correct?
14    A.  Yes.
15    Q.  He has had training since at least 1999,
16  as reported by you, continuing --
17    A.  Yes.
18    Q.  -- up through beyond the point, I
19  believe, in 2014 whenever you received CIT
20  training for the first time?
21    A.  Yes.
22    Q.  Do you believe that Sergeant Frost could
23  have had a more nuanced approach to the situation
24  than you might based on your relatively limited

1  training compared to him?
2    A.  A nuanced?
3    Q.  Yeah.  Do you believe that CIT-trained
4  individuals including individuals who have been
5  trained for years and years might have a different
6  opinion on what the appropriate response is in
7  this situation?  Is there room for difference in
8  opinion?
9    A.  I've -- it's hard for me to fathom him
10  sitting in the car with this amount of experience.
11  It appears to me that there's probably more of a
12  rest and retirement mode.  You see a lot of these
13  sergeants who just really don't interact.  I
14  mean --
15    Q.  Move to strike.  I think --
16    A.  I was trying to answer your --
17    Q.  Well, I'll let you answer it, I guess.
18    A.  I was trying to answer it.  I think I've
19  rendered my opinion in that, is that -- I mean,
20  it's like a schoolteacher.  You can't teach behind
21  a desk.  You've got to get out and interact.  And
22  I think this is the case with Sergeant Frost.  I
23  complimented him on his wealth of training.  The
24  fact is he didn't insert himself.

1    Q.  And you don't know anything about whether
2  Sergeant Frost's decisions were based in part on
3  the concern about outnumbering Mr. Turner with
4  having too many officers in front of him when
5  Officer Wilson was talking to him?
6    A.  I don't know that, and it wasn't noted in
7  Lieutenant Myers's administrative report which
8  should have -- if you're going to do an
9  administrative report, as I noted, that very
10  question that you just asked should have been
11  considered in there.  They're self-critical
12  analysis.
13    Q.  We'll get to that report.  Is it your
14  position that -- when Sergeant Frost walked up,
15  how many officers should have been having a
16  dialogue with Mr. Turner?
17    A.  As I said before, it's good that you'd
18  have one person talking that's in a behavioral
19  crisis.  And when a person's in that situation,
20  they get overwhelmed with a lot of people talking,
21  red lights and sirens.  And that's not the case
22  here, but the more you can limit the conversation
23  to one person the better off you are.
24    Q.  Where should the other three officers

1  have gone while Frost was talking to Turner?
2    A.  Right around Frost.
3    Q.  Just standing behind him?
4    A.  I --
5    Q.  I'm trying to understand your concept of
6  having one person talk to him.  Where do the other
7  officers go while Frost is having that
8  conversation?
9    A.  Well, they can choose what they want to
10  do.  They can stand back.  If Frost just had a --
11  Frost just had -- he said in the record he just
12  had an experience with Mr. Turner back in April.
13  Hey, Richie, it's Sergeant Frost.  Remember me
14  from April?  Maybe the other officers will back
15  off if Richie's going to be more compatible with
16  Sergeant Frost.  It's difficult for me to say,
17  well, what could have been done here, what could
18  have been done there.  I wasn't there at the
19  scene.  All I know is you had a very talented
20  sergeant who didn't insert himself.
21    Q.  Should the other officers have gotten out
22  of Richard's line of sight?
23    A.  No.
24    Q.  Did you review Sergeant Olson's squad

1  video?
2    A.  No.
3    Q.  You reviewed the City of Champaign police
4  reports; right?
5    A.  Yes.
6    Q.  Which mentioned his squad video; correct?
7    A.  Yes.
8    Q.  Any reason why you didn't review his
9  video?
10    A.  No.  I didn't review it.  He was
11  non-responsive, which was said by Sergeant Frost.
12  And there wasn't a reason for me to read his
13  video.  He wasn't at the scene.
14    Q.  Well, that's not correct, is it?
15    A.  That's what Sergeant Frost said.
16    Q.  I'm not sure that's what Sergeant Frost
17  said.  My question is:  Do you know when Sergeant
18  Olson arrived at the scene?
19    A.  I do not know.
20    Q.  What could Sergeant Olson have provided
21  that Sergeant Frost could not have provided?
22    A.  I don't know if he was CIT -- no, I do
23  know.  I think I went through his record.  He
24  wasn't CIT trained.

1    Q.  Did --
2    A.  Forty hours.
3    Q.  Did you ever miss a radio call whenever
4  you were a supervisor?
5    A.  Tried not to.
6    Q.  Did you?
7    A.  Can't remember.
8    Q.  Does missing a call indicate that that's
9  a failure to respond that shows a lack of
10  appreciation of the role and importance of first
11  line supervisors?
12    A.  You better have a damn good reason as to
13  why you didn't answer a call with a mental health
14  crisis and putting officers that are not trained
15  and not to be nonresponsive, yes.
16    Q.  A damn good reason could include that he
17  was on another call at the moment whenever the
18  call came in; correct?
19    A.  Dispatch should have known that.  They
20  wouldn't have dispatched the sergeant if the
21  sergeant was already on the call because you call
22  off the dispatcher and say I'm on a certain call.
23    Q.  I need you to listen to my question and
24  answer it so that we can keep this moving along.

1      A good reason for Sergeant Olson to not
2  respond to the dispatch might be that he was on
3  another call at the time?
4      A.  I don't know.
5      Q.  There's any number of legitimate reasons
6  that a sergeant might miss a radio communication
7  including dealing with another officer, dealing
8  with a citizen on scene, being on the phone.
9  That's correct; right?
10     A.  Those are all excuses, sure.
11     Q.  Would it make any difference in your
12 conclusions if you took the time to look at the
13 videos and determined when Sergeant Olson arrived
14 on the scene?
15     A.  No.
16     Q.  What departmental policy did Sergeant
17 Olson violate?  You mentioned something along
18 those lines at Paragraph 50 and, I believe, at
19 Paragraph 68.  But I don't see where you
20 identified the policy.
21     A.  Yeah, I'm referring to the question about
22 the policy.  So Footnote 61 comes from Frost's
23 deposition where he admits in his deposition it's
24 the department policy.  I'm going off Frost's

1  deposition.
2      Q.  You haven't reviewed an actual policy?
3      A.  No, I'm going off a seasoned patrol
4  sergeant who probably knows his policies pretty
5  well.
6      Q.  Have you reviewed the actual policy?
7      A.  No, I have not.
8      Q.  Thank you.
9      A.  I'm going off the sergeant.
10     Q.  At any rate, the violation you're
11 claiming would be a violation of an internal
12 police department policy?
13     A.  That's correct.
14     Q.  Where's the ambulance during all this
15 interaction before Mr. Turner leaves the corner?
16     A.  I don't know.
17     Q.  Did you review any documents that you
18 might look back at now to help jog your memory?
19     A.  I don't have any documents in front of me
20 to do that.
21     Q.  You're aware that the ambulance was
22 staged nearby?
23     A.  No.
24     Q.  Do you know what time they became staged

1  nearby?
2      A.  No.
3      Q.  What's the point of staging an ambulance
4  whenever police are interacting with a mentally
5  ill person generally?
6      A.  Well, it can be two things.  It can be
7  multiple things:  One, it could be if the
8  ambulance doesn't want to interfere with the
9  police department or they've been told not to come
10 to the scene.
11     Q.  What about the safety of ambulance
12 personnel?
13     A.  That's multiple.  That's another one.
14     Q.  So until the scene's in control, it may
15 not make sense for the ambulance personnel to be
16 interacting with the scene?
17     A.  Possibility.
18     Q.  The situation certainly evolved whenever
19 Turner ran away from the corner of Sixth and
20 Green; correct?
21     A.  When he shuffled away, it changed.
22     Q.  And you watched the video, some overhead
23 video of that event?
24     A.  When he was crossing the street?

1      Q.  Yes.
2      A.  Yes.
3      Q.  And do you know the source of that video?
4      A.  I can't recall at this time.
5      Q.  And --
6      A.  It's not a police camera.  It's a
7  building or pole.
8      Q.  And whenever Turner crosses the street,
9  he crossed in the pedestrian crosswalks?
10     A.  I don't think so.  I thought he went
11 diagonally.
12     Q.  Through the intersection?
13     A.  I think it was the other side of the
14 intersection.
15     Q.  What do you mean, "the other side"?
16     A.  He's not in the intersection.  So if you
17 have an intersection, he's -- if that's north up
18 here, he's south of the intersection.
19     Q.  So did you watch a video in which he
20 crossed from the southeast corner of the
21 intersection to the northwest corner?
22     A.  I can't remember the directions.  I just
23 know he crossed it at a diagonal.  I can't
24 remember what intersection it was.

1    Q.  And Frost was one of the officers who was
2  observing Turner at that point in time?
3    A.  Yes.
4    Q.  And whenever you reviewed that video of
5  Mr. Turner crossing the road, the officers were
6  just walking behind him at first; correct?
7    A.  Appeared to be, yes.
8    Q.  Mr. Turner was definitely moving faster
9  than them?
10   A.  I think the officers referred to him as
11 shuffling.
12   Q.  I'm asking based on your observation of
13 the video, were the officers moving faster, or was
14 Mr. Turner moving faster?
15   A.  Turner was.
16   Q.  At that point Turner was no longer
17 present to engage in any conversation with the
18 officers, was he?
19   A.  Yeah, I don't know if he was yelling back
20 at them or if they were yelling back at him.  I
21 just don't know.
22   Q.  When Turner left the corner of Sixth and
23 Green, were officers able to engage in
24 conversation with him if they stayed at the corner

1  of Sixth and Green?
2    A.  No.
3    Q.  Based on your observation of the video?
4    A.  That's correct.
5    Q.  When Turner left the corner of Sixth and
6  Green, were officers able to provide CIT resources
7  to him at that corner?
8    A.  No.
9    Q.  Whenever Turner left the corner of Sixth
10 and Green, were officers able to provide family
11 resources to Turner at the corner?
12   A.  No.
13   Q.  When Turner left that corner, were
14 officers able to provide behavioral health
15 resources to him at that corner?
16   A.  No.
17   Q.  Is it your opinion that Mr. Turner
18 disobeyed the police officers and fled the
19 immediate area instead of waiting for the
20 ambulance to arrive as he was directed?
21   A.  Well, he didn't listen to the officers,
22 so he chose not to.
23   Q.  Is it your opinion that at that point the
24 officers should not have followed him?

1    A.  I think they should have followed him.
2    Q.  Why is that?
3    A.  Find out where he was going.
4    Q.  What purpose would that serve?
5    A.  Well, they indicated that he was pretty
6  upset.  And he was heavyset.  And maybe he was
7  going to walk to his sister's house or to a
8  relative's house, or maybe he was going to walk
9  somewhere where he was going to calm down.  There
10 was really no -- the whole thing took what,
11 62, 64 minutes.  There was really no hurry.  I
12 mean, the guy -- to me, the guy looked like he was
13 out of shape.  It even said it in the coroner's
14 report that he suffered from some medical issues.
15 So overweight, obese, he's not going to run too
16 fast, and they could have waited him out.
17   Q.  Were any of these comments about him
18 going to his sister's or somewhere else mentioned
19 in the police reports?
20   A.  No.
21   Q.  Those are things you're speculating about
22 right now?
23   A.  Right.
24   Q.  About where Turner might be --

1    A.  Oh, you asked me a question.  You asked
2  where he could have gone.  I'm just answering
3  that.
4    Q.  I appreciate that you're answering the
5  question, but I'm trying to understand so the
6  record is clear where things are coming from.
7        So in your comment about where Mr. Turner
8  might have been going, those are all things that
9  are based on speculation or potential
10 possibilities?
11   A.  Correct.
12   Q.  Okay.  This bit about 62 minutes to
13 64 minutes, what is the start time and stop time
14 that you used to calculate that?
15   A.  I took the start time of 0838 and then
16 the stop time at the hospital.  I believe the
17 hospital record indicates the time he was
18 deceased.
19   Q.  Can you tell me the time from 0838, which
20 is the time of Cheryl Ebl's call; correct?
21   A.  Yes.
22   Q.  How much time passed from then to the
23 point that Officer Young got on the scene?
24   A.  I don't recall.

1     Q.  How much time passed from when Officer
2  Young got on the scene to when Officer Wilson and
3  Talbott arrived?
4     A.  I can't recall.
5     Q.  How much time passed from then until
6  Mr. Turner left from the corner?
7     A.  I can't recall.
8     Q.  How much time passed from the moment he
9  left from the corner till the moment Sergeant
10  Frost arrived?
11     A.  I can't recall.
12     Q.  How much time passed from the moment
13  Sergeant Frost arrived to the time that ambulance
14  personnel took over?
15     A.  I can't recall.
16     Q.  How much time passed from the moment
17  ambulance personnel took over till the moment they
18  arrived in the ambulance at the ER, which I think
19  was your stopping point; right?
20     A.  Yeah.  64.
21     Q.  How much time passed from the time the
22  ambulance personnel took over to the time they
23  arrived at the ER?
24     A.  I don't know.

1     Q.  So when you say 62 or 64 minutes, I'm not
2  saying this -- well, when you say 62 or 64 minutes
3  were involved in this interaction, that's not the
4  amount of time from the point that Turner left the
5  corner to the point that ambulance personnel took
6  over his care; correct?
7     A.  That's correct.
8     Q.  And in Paragraph 91 of your report you
9  indicate that the officers could have followed
10  Richard Turner until he stopped.  Is that opinion
11  regardless of when or where Mr. Turner might have
12  stopped?
13     A.  I don't know.
14     Q.  So how long should officers -- or how
15  long could officers have followed Mr. Turner based
16  on your opinion?
17     A.  Could have followed him all day long if
18  they wanted to.  Maybe that would have alleviated
19  him dying in custody.
20     Q.  So taken to its logical conclusion, how
21  many officers should have walked behind Mr. Turner
22  for the rest of the day?
23     A.  I don't know that.  I just know from my
24  experience with this particular case.  That's why

1  I noted the 64 minutes.  It was rather quickly
2  what occurred, and there was no need -- there was
3  no time limit.  Nobody was saying, hey, we need
4  you to get on this call and go somewhere else.
5  They could have taken some additional time.
6     Q.  What was at the end of that alleyway that
7  Mr. Turner was walking north through?
8     A.  I can't recall.
9     Q.  Have you taken into account that
10  Mr. Turner was going to be quickly back into a
11  situation where he was in danger of crossing roads
12  with traffic as he had done multiple times during
13  the prior interactions before he decided to flee?
14     A.  Could be.
15     Q.  Does that pose any danger to Mr. Turner
16  that the officers should be concerned about?
17     A.  Sure.
18     MR. CARMICHAEL:  Why don't we take a
19  quick five-minute break?
20     MR. BRUNNER:  Can I do like two more
21  questions and we'll wrap a little thing up?
22     MR. CARMICHAEL:  You're going to wrap a
23  thing up?
24     MR. BRUNNER:  A little topic.

1     MR. CARMICHAEL:  Oh, sweet.  I thought
2  you were going to wrap up all the way.
3     MR. BRUNNER:  Not all the way.  Let's
4  just take our break.
5     (A brief recess was taken.)
6  BY MR. BRUNNER:
7     Q.  So in all the things we've been talking
8  about so far up to the point that Richard Turner
9  ends up in the alleyway heading north, had anyone
10  from the Champaign Police Department touched
11  Turner during this interaction based on the
12  materials you reviewed?
13     A.  Yeah, I believe Officer Turner, I think,
14  touched his shoulder.
15     MR. KRCHAK:  Officer who?
16     A.  I'm sorry; Young -- thank you; I was
17  thinking about a different -- something else --
18  touched him on the shoulder.
19  BY MR. BRUNNER:
20     Q.  When was that?
21     A.  I'm pretty sure I put it in my report.
22     Q.  So I'm talking about prior to the point
23  that Officer Wilson touches Turner's shoulder --
24     A.  That's what I meant to say; I'm sorry.

1    Yeah.

2    Q.  -- in the alleyway?

3    A.  Yeah.

4    Q.  Have you reviewed anything indicating

5 that anyone touched Turner?

6    A.  I don't believe so.

7    Q.  So what we've been talking about thus far

8 are decisions that led to the moment where Officer

9 Wilson touches Mr. Turner; is that correct?

10    A.  Yes.

11    Q.  And in your report you make a number

12 of -- issue a number of opinions about those

13 decisions having resulted in Mr. Turner's death

14 including -- at Paragraph 47 there's a statement

15 that these officers and supervisor deliberately

16 ignored the available options which resulted in

17 the in-custody death of Mr. Turner.  Correct?

18    A.  Yes.

19    Q.  And that's because -- is that statement

20 made because eventually they have a contact with

21 Mr. Turner which you claim results in his death?

22 Let me back up.

23    Do you claim that the violation of the

24 policy of the Champaign Police Department in and

1 of itself caused Mr. Turner to die?

2    A.  No.

3    Q.  At Paragraphs -- Paragraph 81 near the

4 bottom of the page there's a sentence that starts

5 with, "Furthermore, the lack of a plan on how to

6 deal with this incident, lack of mental health

7 training, and failed supervision caused and

8 resulted in the death of Mr. Turner."  In what

9 sense did those things cause his death?

10    A.  Well, it's like -- as you referred to

11 earlier in the deposition, it's the totality.  You

12 have three officers who are not CIT trained,

13 40-hour CIT training, you have a supervisor -- you

14 have a policy that provides some guidelines, and

15 you have a supervisor who's highly qualified in

16 training and doesn't insert himself into following

17 through on the policy and his role as a

18 supervisor.

19    Q.  So is it fair to say that what you're

20 saying in these points including -- let's just get

21 one more in here.  In Paragraph 91 you indicate

22 that the officer set the motions in place to

23 struggle with Richard Turner?

24    A.  On 91?

1    Q.  91.

2    A.  Okay; yes.

3    Q.  The second sentence, the officer set the

4 motions in place to struggle with Richard Turner?

5    A.  Yes.

6    Q.  Is it fair to say that in that comment

7 and the last two we were talking about, what

8 you're really saying is that there was poor

9 decision-making by the police in these initial

10 interactions before they touched Mr. Turner and

11 that that created a situation whereby Mr. Turner

12 was eventually subdued with use of force?

13    A.  Could you repeat that question again?

14    Q.  Yeah.  I'm just trying to summarize these

15 points together.  And if it's not fair, let me

16 know.

17    Are you trying to say that some allegedly

18 poor decision-making by the police when they were

19 confronting a mentally ill person created a

20 situation where use of force ultimately was used

21 and that that use of force caused the mentally ill

22 person's death?

23    A.  Yes.  Yes to your question.  And also

24 what I want to insert is that there was no urgency

1 in Paragraph 91 coupled -- there was no urgency to

2 physically struggle with Turner.  And the officers

3 set the motion in place.  It wasn't Turner who set

4 the motions in place, it was the officers.

5    Q.  And Turner had no role in anything that

6 happened up to the point that the officers had

7 physical contact with him?  Is that your position?

8    A.  What do you mean by "no role"?

9    Q.  Turner ran away at some point; right?

10    A.  Yes.

11    Q.  Are you claiming he has no responsibility

12 for running away from the police when they were

13 directing him to do otherwise?

14    A.  Let him go.  He hasn't committed a crime.

15 As I said before, follow him, get ahold of a

16 family member.

17    Q.  And then after these initial interactions

18 there on the corner and Mr. Turner gets into the

19 alleyway, each of the officers had a different

20 degree of contact with Mr. Turner; correct?

21    A.  That's correct.

22    Q.  So let's talk first about Wilson's

23 contact with him in the alleyway.  Is it your

24 opinion that Officer Wilson had absolutely no

1  reason to touch Mr. Turner in the alleyway, that
2  he should have just followed him as long as he
3  needed to?
4     A.  Yeah.  My position is that just follow
5  him, as you said, just continually follow him.  I
6  don't believe that there was a reason for
7  detention, for a stop.
8     Q.  I thought earlier you said that there was
9  a basis for involuntary admission.
10     A.  There was.
11     Q.  Wouldn't that be a reason for detaining a
12  person till they could be transported for the
13  involuntary admission?
14     A.  I think we're grouping the two together.
15  I think they lost that opportunity when he's
16  fleeing on them.
17     Q.  So here's my --
18     A.  They can't have it -- CPD can't have it
19  both ways.  You can't say, well, we're going to
20  call for an ambulance or we're going to call for
21  an involuntary admission.  That's going to give us
22  the right to go track him down and chase him down.
23  And if they want to do that, then fine.  Call the
24  ambulance and get on the phone and say, hey, I'm

1  going to take this guy into protective custody,
2  he's going down this alleyway and he's going on
3  Fifth Street or Seventh Street.  That was another
4  option they could have done.
5     Q.  In the recordings there were updates that
6  went to the ambulance personnel where the
7  officers had followed Mr. Turner and where they
8  had subdued him?
9     A.  That's correct.  You are correct.
10     Q.  So my question is:  If there was a basis
11  to involuntarily admit Mr. Turner at the corner of
12  Sixth and Green and he ran away, would there be
13  grounds to detain him pending admission?
14     A.  I would be -- my opinion would be, you're
15  on slippery slope or you're on thin ice by making
16  that detention.  I think you have to be very
17  careful.  And what they ultimately did is, he
18  ended up dying, and that was avoidable.  They
19  didn't need to do that.
20     Q.  What I'm asking, is there grounds for a
21  civil seizure in the event that someone has a
22  basis to be involuntarily admitted and has now
23  started to run away from that person?
24     A.  There is, but the other thing is -- that

1  I forgot to tell you is the officer said he was no
2  threat to himself or to anybody else.  And that's
3  one of the other -- he did exhibit these signs and
4  symptoms of -- that he was going through some
5  crisis.  But for the record, the officer had said
6  that, that he was no threat to anyone.
7     Q.  At what specific moment did the officer
8  indicate that?
9     A.  I have it in my report.  I can find it if
10  you want me to.
11     Q.  Sure.  You know what?  I can find it
12  later.  Let's keep this moving.
13     Isn't it fair to say that a reasonable
14  officer could have perceived that a person who
15  qualified for involuntary admission and was
16  fleeing from the officer into traffic and towards
17  another traffic area could have at least posed a
18  risk of danger to himself?
19     A.  We're talking about this incident?  Or
20  are we talking about --
21     Q.  We're talking about a reasonable
22  officer --
23     A.  So we're not talking about this incident?
24     Q.  Is it fair to say -- let me just ask my

1  question.
2     Is it fair to say that a reasonable
3  officer could conclude that a mentally ill person
4  who qualified for involuntary admission who had
5  fled the officer contrary to his commands posed a
6  risk of harming himself in his continued flight in
7  an area where there were streets and traffic
8  driving?
9     A.  And what would the endangerment be based
10  on all the stuff you just told me in that
11  hypothetical situation?
12     Q.  Do you think there's any danger that that
13  person who had previously walked into the roadway
14  multiple times might again walk into a roadway
15  potentially where vehicles could run into him?
16     A.  Possibly.
17     Q.  Based on the materials you reviewed, is
18  it possible that Mr. Turner was exhibiting signs
19  of a health crisis that was not due to a mental
20  crisis, for example, some underlying health issue
21  like a stroke?
22     A.  Possibly.
23     Q.  Or cardiac issue?
24     A.  Possibly.

1    Q.  Is it your opinion that Mr. Turner was
2  not a threat to himself whenever he fled from
3  officers on the corner of Sixth and Green?
4    A.  Yes, it's my opinion, and also it's the
5  opinion of the officer that -- and I have that in
6  my report -- that he's not a threat.
7    Q.  I understand the way you're trying to
8  characterize what the officer said, but I am
9  asking, is it your opinion that when he fled from
10  Sixth and Green, given all the things you know
11  about what Mr. Turner had been doing up to that
12  point, that he posed absolutely no danger to
13  himself?
14    A.  He did not.
15    Q.  So why should officers have followed him
16  at all?
17    A.  Could have chose not to.
18    Q.  Is it your opinion that they should have
19  just let him go away at that point in time?
20    A.  Possibly they could have.
21    Q.  But is that what you're saying they
22  should have done?
23    A.  There's a lot of things that they should
24  have done -- that they should have done that they

1  didn't do.
2    Q.  Listen to my question, please.
3    Are you saying that the officers should
4  have let him go away when Mr. Turner ran away from
5  the corner of Sixth and Green?
6    A.  That's a possibility.
7    Q.  Moving on, the purpose of involuntary
8  admission is for the safety of the individual to
9  be admitted or the safety of other persons; right?
10    A.  I heard your question; I'm just looking
11  up something.
12    Q.  And you're referring to that petition for
13  admission?
14    A.  Yes, I am.  So to answer your question,
15  there's several reasons for the petition.
16    Q.  One of which is to provide for the
17  person's safety?
18    A.  Oh, it's the last one of the five, in
19  need of immediate hospitalization for the
20  prevention of such harm.
21    Q.  Do the Graham factors apply in a
22  situation when an officer's trying to decide
23  whether to detain a person through a civil seizure
24  for mental evaluation?

1    A.  No.
2    Q.  As opposed to a criminal activity?
3    A.  No.  It's use of force.  It's different
4  than a detention.
5    Q.  Are you suggesting that the ambulance
6  should have continued to move to the point that
7  Mr. Turner eventually decided to stop fleeing from
8  officers?
9    A.  It's a possibility.
10    Q.  How long should that go on?
11    A.  They'd have to take it by a case-by-case
12  basis and have some communication with Sergeant
13  Frost and his commander instead of the officers.
14    Q.  Do you claim that Officer Wilson gave a
15  false report when he said in the alleyway he asked
16  Turner to stop and sit down?
17    A.  No.
18    Q.  That his report was false in that Turner
19  disregarded him and began running north again?
20    A.  No.
21    Q.  Do you claim that Officer Wilson gave a
22  false report that he attempted to grasp Turner's
23  outer layer of clothing in order to prevent him
24  from running any further?

1    A.  No.
2    Q.  Do you dispute Wilson's report that upon
3  making physical contact Turner immediately began
4  attempting to pull away?
5    A.  No.
6    Q.  And that when Wilson did not let go
7  Turner began aggressively resisting including
8  pushing, grabbing his radio microphone, and
9  pulling it off his uniform?  Do you dispute that
10  Wilson -- I'm sorry; do you claim that Wilson made
11  a false report when he said that Turner was
12  resisting by shoving Wilson, grabbing at his
13  microphone, and knocking it off his uniform?
14    A.  No.
15    Q.  Do you claim that Officer Young gave a
16  false report when he said that Turner was reaching
17  at him and grabbing at the left side of Young's
18  body and his duty belt?
19    A.  No.
20    Q.  What's a duty belt?
21    A.  It could be two things.  It could be the
22  belt -- your belt that's holding up your pants; it
23  could also be your duty belt that holds all your
24  equipment.

1  Q. What kind of equipment for a police
2  officer is contained in a duty belt?
3  A. A weapon, OC spray, asp, PR-24, conducted
4  energy device, rubber gloves, extra ammunition,
5  flashlight, handcuff keys.
6  Q. And it could be typical in your
7  experience for an officer to keep those kind of
8  weapons and materials in their duty belt?
9  A. Yes.
10  Q. Were -- taking Wilson and Young's reports
11  about Turner's behavior into consideration, were
12  Turner's actions at that point in the alleyway
13  assault on a police officer?
14  A. I'm sorry; repeat the question.
15  Q. We've talked about some things from
16  Wilson and Young's reports that you do not dispute
17  as being true?
18  A. Uh-huh.
19  Q. So considering those things, were
20  Turner's actions in the alleyway assault?
21  A. No.
22  Q. Why not?
23  A. He's merely trying to get away from the
24  officers. That's why he ran across the street or

1  shuffled across the street. He's not being
2  assaultive.
3  Q. So a citizen can push an officer, grab at
4  the officer's microphone, pull it from their
5  uniform and grab at an officer's duty belt, and
6  that does not constitute assault?
7  A. We're talking about Richard Turner.
8  We're not just talking about a person. We're
9  talking about Richard Turner who was drinking and
10  his pants down out in front of a business, and
11  officers were trying to interact with him. And
12  then he takes off from the officer. And the
13  officer's mind is, we either want to call an
14  ambulance or want to take him to the hospital. So
15  we're not -- I can't put my arms around just any
16  citizen; we're talking about Richard Turner.
17  Q. Okay. So when any citizen fails to obey
18  the commands of a police officer, fails to obey
19  the lawful commands of a police officer, runs away
20  from them, when they're caught and touched, the
21  citizen pushes the police officer, grabs at their
22  microphone, grabs at the officer's duty belt, does
23  that constitute an assault or battery on a police
24  officer?

1  A. Well, in the first part of your question,
2  what was the reason for -- that they're running
3  after him? You asked -- in your question you
4  asked that question.
5  Q. So here's -- we'll take it to this:
6  Based on the facts that you've reviewed of the
7  situation including the facts that occurred in the
8  alleyway as the situation evolved over time, your
9  opinion is that Mr. Turner in no way assaulted the
10  police officers that were attempting to stop his
11  movement; correct?
12  A. That's correct.
13  Q. And he in no way obstructed their
14  investigation; is that correct?
15  A. That's correct.
16  Q. And the basis for your opinion is what?
17  A. He's in a mental health crisis. He needs
18  mental assistance. He's not committed a crime.
19  Of any crime that I reported in my report is at
20  best it's a minor traffic violation because he's
21  potentially got an open can of alcohol or bottle
22  of alcohol and he's walking in the roadway. He's
23  not a threat to the officers because he's taking
24  off, so that's two pieces of Graham that they

1  missed. And the third piece is he's not resisting
2  arrest. He's trying to get away from the
3  officers. Those are the three-prong tests of
4  Graham vs. Connor, severity of the crime, we have
5  a minor traffic violation, and we have a person
6  who is not a threat to the officers because, as I
7  noted in my report and is said in the officer's
8  report at deposition, either one or the other,
9  that he wasn't a threat to himself or to the
10  officers. And the third one, he's just trying to
11  get away.
12  Q. Okay. I'm not trying to be rude, but
13  it's 3:00 o'clock. We have limited time today.
14  So I'm going to ask that you listen to my question
15  and then respond to my question.
16  A. I'm answering your -- you're asking me a
17  question --
18  Q. What I'm talking about is the time frame.
19  A. Will you let me finish?
20  Q. No. You can answer in a minute.
21  A. So you're going to cut me off?
22  Q. You can answer in a minute.
23  A. I was trying to finish something. You
24  asked me a question, and I am not going to be

1   rude. You asked me a question. You don't like
2   the answer. I'm trying to give you the answer.
3      Q. That isn't the case, sir. I'm going to
4   ask you to listen to what I'm asking. You're
5   talking to me about drinking and things that are
6   occurring prior to Richard Turner leaving the
7   corner. I'm talking about a different time
8   period, which is whenever the officers are in the
9   alleyway; okay? And what I'm asking is, whenever
10  there's certain conduct, what does that
11  constitute? And so my understanding from what
12  you've been telling me is that if a person is in
13  mental health crisis, that person can push an
14  officer, grab at their microphone, grab at their
15  duty belt. You would not consider any of those
16  activities to constitute an assault on the
17  officer; correct?
18     A. No.
19     Q. Okay. Explain.
20     A. Okay. Because the officers put themself
21  in that situation. They forced the issue to be
22  combative with Richard Turner. They allowed
23  themselves to be so close to Richard Turner, and
24  thus it ends up in a struggle and ends up in a use

1   of force event.
2      Q. So --
3      A. I wasn't done. They have different
4   options. And I can't take it one sliver by
5   looking in the alley when there's -- with Wilson
6   and with Talbott and with Young. I'm looking at
7   the totality of the circumstances. I can't take
8   that one piece of moment in time because it all
9   led up to it.
10     Q. And I'm asking you about in your totality
11  of circumstances analysis, anytime a person's in
12  mental health crisis and an officer touches that
13  person, is it your opinion that the person can
14  react by pushing the officer, grabbing their
15  microphone and grabbing at their duty belt and all
16  of that is acceptable behavior of the person in
17  mental health crisis?
18     A. You know, as weird as it may sound to
19  you, sometimes it is. Really our whole
20  alternative is -- for Champaign PD is to get
21  Richard Turner some mental health assistance.
22  Pushing and shoving kind of comes with the job.
23     Q. There we go. So we're getting close to
24  you answering my actual question. And I'm not

1   trying to be rude, I'm really --
2      A. You don't have to apologize.
3      Q. I'm trying to work with you here.
4         So if you're not afraid to say it, say
5   it. Whenever a person in mental health crisis
6   pushes an officer who touches them, reaches for
7   their microphone and reaches for their duty belt
8   which could include weapons including a gun, that
9   does not constitute an assault on the officer?
10     A. I never said about a gun. I never said
11  anything about a gun. I haven't reported it in my
12  report. You're changing the facts.
13     Q. Okay. Then --
14     A. Each circumstance -- each incident is
15  different. From what I've read and what I
16  assessed, I'm giving you an answer. There was
17  nothing in the report about grabbing a gun.
18     Q. Where's the duty belt? You said that a
19  duty belt can contain a weapon. I assume that was
20  a gun. Is that correct?
21     A. Firearm.
22     Q. A firearm?
23     A. Uh-huh.
24     Q. Is another name for a firearm a gun?

1      A. Same thing.
2      Q. Okay. Thank you. All of these contacts
3   occurred before Mr. Turner was in a prone position
4   and before anyone was putting any pressure on his
5   back; correct?
6      A. Yes.
7      Q. And during this time would you say that
8   Turner's activity did not constitute resisting
9   arrest? Are you saying that Turner's activity
10  during this time in the alleyway with Officer
11  Young and Officer Wilson did not constitute
12  resisting arrest?
13     A. Well, he's being uncooperative with the
14  officers. So I can't put your round hole in the
15  round answer because I wouldn't have arrested him.
16  And that's why I opinionated the way I
17  opinionated.
18     Q. Yeah. My question isn't what would you
19  have done and would you have arrested him. My
20  question is: Do the things that are established
21  that Mr. Turner did in that alleyway constitute
22  resisting arrest, in your opinion?
23     A. No.
24     Q. So we could perhaps save some time here.

1    Is it your opinion that any -- any force
2  whatsoever applied by the police officers to
3  Mr. Turner after he fled from the corner of Sixth
4  and Green would have been unreasonable?
5    A.  The force that Mr. Turner -- or the force
6  that the officers used in this particular
7  incident, I opinionated it was unwarranted and it
8  was excessive.
9    Q.  Okay.  We need to talk a little more
10  specifically.  So whenever Mr. Wilson touched
11  Mr. Turner's shoulder, was that an unreasonable
12  use of force?
13    A.  No.
14    Q.  Whenever Officer Young and Officer Wilson
15  attempted to control Mr. Turner's arms while he
16  was standing up in the alley, was that an
17  unreasonable use of force?
18    A.  No.
19    Q.  Whenever the three of them fell to the
20  ground or were taken down to the ground, was that
21  an unreasonable use of force?
22    A.  Yes.
23    Q.  In what way?
24    A.  Mr. Turner did not need to be taken down

1  to the ground.
2    Q.  Isn't that safer for the officers to take
3  an individual who's resisting to the ground?
4    A.  Well, I wouldn't have taken him to the
5  ground, so it's not a safer -- to answer your
6  question, no.  In that particular situation, no,
7  it's not safer.  I'm okay with the first two that
8  you described to me, and I said yes.  Taking him
9  to the ground is escalating the situation.
10    Q.  So how long should the officers have
11  stood upright holding Mr. Turner's arms?
12    A.  As long as it would take to talk to him.
13    Q.  As long as it would take for what?
14    A.  Well, even go back before that.  They
15  still could have followed him.  He probably would
16  have stopped at some point.  He was in no hurry.
17    Q.  Do you claim that putting Mr. Wilson in a
18  prone position caused any injury to him?
19    MR. CARMICHAEL:  Turner, you mean?
20    MR. BRUNNER:  I'm sorry.
21  BY MR. BRUNNER:
22    Q.  Do you claim that putting Mr. Turner into
23  a prone position caused any harm to him?
24    A.  It's not a -- you know, every situation

1  is different.  And that particular one, based on
2  his weight and who he is and the fact that he
3  shuffled, ran from the officers, I don't think
4  it's -- it's not a good spot.
5    Q.  Do you claim that putting Mr. Turner into
6  a prone position caused harm to him?
7    A.  Yes.
8    Q.  What is the basis for your claim?
9    A.  It's not a good position for Mr. Turner
10  to be in due to his condition, his heaviness, him
11  shuffling across the street, getting away from the
12  officers, and he's identified to be in some mental
13  behavioral health issue crisis.
14    Q.  What was Mr. Turner's weight at the time
15  of this event?
16    A.  I don't recall.
17    Q.  What was Mr. Turner's height?
18    A.  I don't recall.
19    Q.  What was his build?
20    A.  Large.
21    Q.  Muscular?
22    A.  I don't know.
23    Q.  Did you review the coroner's report?
24    A.  Yes.

1    Q.  What was Officer Wilson's weight?
2    A.  I don't recall.
3    Q.  Height?
4    A.  I don't recall.
5    Q.  Build?
6    A.  I don't recall.  Well, Wilson, video,
7  medium height.  I just couldn't give you -- can't
8  give you an approximate.
9    Q.  What was Officer Young's weight?
10    A.  I don't recall.
11    Q.  Height?
12    A.  I don't recall.
13    Q.  Build?
14    A.  I don't recall.
15    Q.  Do you claim that it was after --
16    A.  Oh, wait.  Just a second.  I'm sorry.
17  Both -- I take that back.  Young and Wilson
18  were both -- appeared to me both similar in
19  stature and height as they were walking across the
20  street, but that's just from a camera view.
21    Q.  From the top of a building?
22    A.  Yeah, I'm just giving you approximate.
23  I'm trying to give you something.
24    Q.  Okay.  And I'm just trying to clarify.

1    A.  Yeah.
2    Q.  After Officers Wilson and Young had
3  Mr. Turner in a prone position, do you claim that
4  their attempt to place his arms in a handcuffing
5  position was an unreasonable use of force?
6    A.  No.
7    Q.  And at that point Mr. Turner was
8  attempting to avoid being handcuffed?
9    A.  Well, let me go back and say -- I'm
10  sorry; if I can go back to the -- it's not
11  unreasonable.  I said that it was unreasonable.
12  It's not.  But I can't even get there because if
13  you go back to your earlier question, you said is
14  a takedown a reasonable use of force.  I said it
15  was.  So thus, if that is, you can't handcuff him.
16    Q.  I might have missed something there.  I
17  thought you said a takedown was not reasonable.
18    A.  I did.
19    Q.  And that --
20    A.  So anything else --
21    Q.  Anything beyond holding Turner's arms in
22  the alley was unreasonable, in your opinion?
23    A.  Correct.  When Wilson put his -- when
24  Wilson first touched him when they were

1  controlling his arms, I didn't have a problem with
2  it, when they took him to the ground and
3  everything afterwards.
4    Q.  When two officers are trying to control a
5  person on the ground who's in a prone position and
6  attempting to avoid having his hands cuffed, is it
7  appropriate for one officer to try and control one
8  arm and the other officer to try and control the
9  other arm?
10    A.  That's a possibility.
11    Q.  If the person who's in the prone position
12  is rolling and curling his body and moving his
13  legs in an effort to avoid the handcuffing and the
14  arm control, is it appropriate to place a knee on
15  the person's shoulder blade?
16    A.  I would really be careful in getting
17  involved in putting a knee on a shoulder blade
18  with a person -- if we're talking about Richard
19  Turner, it's a bad spot to be in.
20    Q.  Okay.  I recognize it may be kind of a
21  habit to say "I" this or that, but I'm not really
22  asking about what you personally would do.  In a
23  situation where a person is prone, in a prone
24  position and is avoiding having his hands cuffed,

1  despite the fact that two officers are trying to
2  control his arms, is it appropriate for the
3  officer to put a knee on the person's shoulder
4  blade?
5    A.  The officers should seek other
6  alternatives before they place the knee on the
7  shoulder blade.
8    Q.  What are those alternatives?
9    A.  Talk to him, ask him for cooperation.
10  There's some maneuvers that you can do with some
11  joint manipulations with your fingers that you
12  wouldn't have to put pressure up on the shoulder
13  blade area.
14    Q.  Did you mention any of those maneuvers in
15  your report that discloses your expert opinions?
16    A.  No.
17    Q.  Any other alternative that could be
18  sought to placing a knee on a shoulder blade?
19    A.  Just the ones I've told you about.
20    Q.  And whenever an individual is in a prone
21  position rolling and curling his body and moving
22  his legs in an attempt to defeat two officers
23  trying to control his arms for handcuffing, is it
24  appropriate to use a hand to prevent the person's

1  head from lifting and turning off the ground?
2    A.  It's not appropriate.
3    Q.  Why?
4    A.  Again, there's other alternatives that
5  you can do as opposed to putting pressure on the
6  cranial part of your body.
7    Q.  Does it depend on how much pressure is
8  used?
9    A.  Could be.
10    Q.  Did you do any analysis of how much
11  pressure was used in this case on Mr. Turner's --
12    A.  No.
13    Q.  Did you do any analysis of how much
14  pressure was exerted with a knee placed on
15  Mr. Turner?
16    A.  No.
17    Q.  Do you know how to do that analysis?
18    A.  No.
19    Q.  Did you mention in your report disclosing
20  your opinions any of the alternatives to holding a
21  person's head on the ground, an alternative manner
22  of controlling a person's head from lifting and
23  turning or beating against the pavement?
24    A.  No.

55 (Pages 217 to 220)

1    Q.  Have you ever put someone in a prone
2  position during an arrest?
3    A.  I think so.
4    Q.  When was the last time that you would
5  have done that?  What year?
6    A.  I've been retired for three years, so it
7  had to be sometime between 2015 and 1985.
8    Q.  Do you think in your role as a chief in
9  2006 and beyond you would have restrained anyone
10  in a prone position?
11    A.  I don't recall.
12    Q.  How many times would you say that you've
13  restrained a person in a prone position?
14    A.  I can't recall.
15    Q.  You mentioned in Paragraph 93 of your
16  report that officers placed Richard Turner in a
17  position where he could potentially suffocate
18  because the air was being pushed out of his lungs.
19  What is the basis for that opinion?  What
20  methodology did you employ to arrive at that
21  opinion?
22    A.  Just one second.  There's some over -- if
23  you want me to keep looking, but there's something
24  I had heard on the -- so on 62, Sergeant Frost --

1  to answer your question, 62, Paragraph 62,
2  Sergeant Frost's dashcam video indicates he
3  arrived at the final location where Richard Turner
4  was secured at 905 hours.
5    Q.  You have to slow down a little bit
6  because she's --
7    A.  Oh, I'm sorry.
8    Q.  -- writing.
9    THE WITNESS:  Do you want me to reread
10  it?  Should I read --
11    THE REPORTER:  You can continue on.
12    A.  Okay.  Once he arrives, you can hear a
13  moaning sound, and it appears someone is grasping
14  for air.  That's footnoted in both those sentences
15  in Sergeant Frost's dashcam video.  I can't see
16  Richard Turner, but I'm hearing this.  Unless one
17  of the officers is moaning, I'm assuming it's
18  going to be Richard Turner.
19  BY MR. BRUNNER:
20    Q.  So it was your interpretation of the
21  audio that Mr. Turner was gasping for air?
22    A.  Yes.
23    Q.  Did Mr. Turner suffocate?  You mentioned
24  at Paragraph 93 that he could potentially

1  suffocate.
2    A.  Could potentially, uh-huh.
3    Q.  So did he suffocate?
4    A.  I don't believe so.  I don't have --
5  strike that.
6    Q.  Do you have any basis --
7    A.  Excuse me.  Strike that.  I'd have to see
8  the medical report, and I don't have it in front
9  of me.  There is a -- just one second.  I know
10  you're in a hurry, but I want to make sure that
11  I'm on the --
12    Q.  I'm not in a hurry, and I want you to
13  take all the time that you need to provide your
14  full and complete answers to me, which I believe
15  you've been doing thus far.
16    A.  So not the complete -- on 93 it comes
17  under the cause of death.  So the Champaign County
18  Coroner's Office report indicated the cause of
19  death, and I write in 93 what that is.
20    Q.  And so in Paragraph 93, you repeat
21  something that you read from the Champaign County
22  Coroner's Office?
23    A.  That's correct.
24    Q.  Okay.  Did you do any kind of calculation

1  to determine the amount of force that was exerted
2  on Mr. Turner while he was in a prone position?
3    A.  I did not.
4    Q.  I noticed in your resume at Page 41 you
5  mentioned a force science analysis certification?
6    A.  Yes.
7    Q.  Did that provide you any training on how
8  to calculate the amount of force exerted on a
9  person during a prone restraint?
10    A.  I don't recall.
11    Q.  At any rate, in this case you did not
12  complete any calculations or include them in your
13  report; correct?
14    A.  That's correct.
15    Q.  Did you determine the amount of time that
16  any officer was on top -- I'm sorry; did you
17  determine the amount of time that any body part of
18  any officer was in contact with any body part of
19  Mr. Turner?
20    A.  No.
21    Q.  When you were chief of police
22  of Champaign -- I'm sorry; when you were chief of
23  police of the Rockford Police Department, how many
24  people would be restrained in a prone position per

1  year?
2      A.  I don't know.
3      Q.  Do you know what percentage of those
4  people died after being restrained in a prone
5  position?
6      A.  I don't know.
7      Q.  You have no criticism of the officers'
8  decision to use two sets of cuffs behind Turner's
9  back as opposed to one set; correct?
10     A.  Correct.
11     Q.  Do you claim that Officer Talbott was
12 falsifying his report when he claimed that Turner
13 was yelling, swinging his arms about, and kicking
14 his feet, moving side to side, not in cuffs,
15 actively struggling and noncompliant to verbal
16 commands whenever Talbott arrived in the alleyway?
17     A.  No.
18     Q.  Do you claim that Talbott falsified his
19 report that Turner was repeatedly pulling his
20 knees up towards his chest in a manner consistent
21 with trying to get up?
22     A.  No.
23     Q.  I didn't see where you specifically say
24 anything about this in your report, but do you

1  have an opinion that you have yet to disclose --
2  let me start over.
3      You have made no opinion that Officer
4  Talbott's placement of a knee on Turner's left leg
5  was inappropriate; correct?
6      A.  Correct.
7      Q.  And you've issued no opinion that Officer
8  Talbott's decision to hold Turner's right foot
9  with his hands was inappropriate?
10     A.  Correct.
11     Q.  And do you debate -- I'm sorry; do you
12 claim that Officer Young falsified his report that
13 he shifted his knee off of Turner's shoulder and
14 his hand off of Turner's head in order to pin
15 Turner's left arm against his side with the
16 assistance of his knees?
17     A.  No.
18     Q.  Was that an unreasonable -- you have made
19 no opinion in your report that Young's act of
20 using his knees to assist in pinning Turner's left
21 arm to his side was an unreasonable use of force;
22 correct?
23     A.  Well, in Paragraph 81, the last two
24 sentences speaks on the failures could have been

1  avoided which would have prevented the death of
2  Richard Turner, the acts, omissions, and failures.
3  The next page addresses use of -- their use of
4  excessive and unwanted force, and I've already
5  testified that anything after the takedown was
6  inappropriate.
7      Q.  Okay.  That may stand a little different
8  than what you've testified to today, but my point
9  is --
10     A.  I'm just putting that on the record.
11     Q.  Yeah.  In your report you may speak
12 generally about the officers using unreasonable
13 force, but are you critical in your report about
14 Officer Young's use of his knees to pin Turner's
15 left arm to his left side?
16     A.  I didn't specifically address that.
17     Q.  In your report did you address any
18 alternative technique that Officer Young should
19 have employed in that situation?
20     A.  As opposed to using his knee on his
21 shoulder or --
22     Q.  As opposed to using his knees to pin
23 Turner's arm to his side.
24     A.  Well, I have to go back.  Just let him

1  go.  I wouldn't have used the force to begin with.
2  I think I've testified to that.
3      Q.  What I'm getting at is, is there some
4  control technique that a reasonable officer would
5  know he should have used rather than the one that
6  Young used?
7      A.  Well, there are several alternatives.
8  And I don't know what Champaign PD teaches in
9  terms of movements and how to control people, so I
10 can't opinionate on that because I don't know.
11     Q.  Are those alternatives mentioned in your
12 report?
13     A.  No.
14     Q.  And you reviewed defensive tactic
15 training materials for these officers?
16     A.  Yes.  Well, their hours that they had.  I
17 don't think I saw the lesson plans.  If they were
18 in there, then I just don't recall it.  But I do
19 have their hours.
20     Q.  If they were in Defendant's 650 through
21 1806, you don't remember?
22     A.  Not right now, I don't recall.
23     Q.  Are you claiming that when Talbott
24 arrived he should have pulled Wilson and Young off

1  of Turner? I'm sorry. Are you claiming that when
2  Talbott arrived -- in your report, you have issued
3  no opinion that when Talbott arrived he should
4  have pulled Wilson and Young away from Turner;
5  correct?
6     A. I'm sorry?
7     Q. In your report you have made no opinion
8  that Talbott should have pulled Wilson and Young
9  away from Turner; correct?
10     A. That's correct.
11     Q. You've made no opinion that Young should
12  have pulled Wilson away from Turner; correct?
13     A. That's correct.
14     Q. Did you see Frost's vehicle prior to the
15  point when his squad video turned on?
16     A. I don't recall.
17     Q. Did you review any videos where he turned
18  the corner of Green Street -- I'm sorry; turned
19  the corner from Sixth Street onto Green Street?
20     A. I don't recall the video, but I recall
21  him, I believe, stating something in his report
22  about that.
23     Q. In your report you've made no opinion
24  that Officer Talbott's or Officer Frost's use of

1  the hobble was unreasonable; correct?
2     A. Again -- no, I haven't. But I just want
3  to follow up that -- again, I don't want to keep
4  repeating myself, but anything after the takedown,
5  I've already opinionated on that, so --
6     Q. Okay. But you have -- and I get that. I
7  appreciate it. That's a fair response. But you
8  have not identified the hobble itself as having
9  been an unreasonable use of force specifically or
10  that there was an alternative technique that
11  should have been employed for the hobble; is that
12  correct?
13     A. Correct.
14     Q. What did Sergeant Frost say when he
15  walked up to the scene?
16     A. I don't remember.
17     Q. Is it fair to say it would be recorded on
18  this audio recording that you reviewed?
19     A. I believe so.
20     Q. Okay. Let's move along.
21     Is it fair to say that beyond your
22  general criticism of officers having used force,
23  in your report you issue no opinion about any
24  specific movement or control technique having been

1  unreasonable?
2     A. Well, I do opinionate in the force that
3  it's unwarranted and it's excessive. I did state
4  that in my report but not any specific tactic or
5  maneuver that they did. But the fact is that they
6  did use force on Mr. Turner, due to the
7  circumstances and the totality that it was
8  unwarranted.
9     Q. I think we've already established that --
10  let me back up.
11     Are restraints such as handcuffs or a
12  hobble used, in your experience, for the safety of
13  responding medical personnel?
14     A. That's one reason, but the other is to
15  secure someone that may be combative to control
16  that person.
17     Q. Officer safety?
18     A. Yes.
19     Q. I apologize if I already asked this: In
20  your report you issue no opinion to say that
21  Officer Frost should have pulled the other
22  officers away from Turner when he arrived; is that
23  correct?
24     A. That's correct.

1     Q. And I believe you've indicated that you
2  may have reviewed some statements about other
3  witnesses, what they allegedly observed in the
4  alleyway, but those do not affect your opinion; is
5  that correct?
6     A. At this time.
7     Q. Including the opinion that you issued in
8  your written report?
9     A. Yes, at this time.
10     Q. What do you mean, "at this time"? Are
11  you saying you're going to listen to them and
12  maybe change your opinion?
13     A. No.
14     Q. You're aware that at some point during
15  the interaction the officers called for a medical
16  upgrade?
17     A. I'm not sure what you mean by that.
18     Q. In your review of materials involving
19  this case did you notice that the officers had
20  called for a medical upgrade at some point?
21     A. I don't know what you mean by "a medical
22  upgrade."
23     Q. Okay; that's fair enough. So did you
24  review anything indicating that the officers

1  reported that Mr. Turner was unconscious and they
2  were not certain whether he was breathing?
3      A. I don't recall.
4      Q. Do you recall reviewing anything in which
5  that information was relayed to the ambulance
6  which was staged nearby?
7      A. I don't recall.
8      Q. And do you criticize specifically the
9  first aid care or the medical care that officers
10 provided to Mr. Turner prior to the ambulance
11 arriving? I think --
12     A. I do, and I'm just trying to find my --
13     Q. Paragraph 61, I think, start covering
14 some of these issues.
15         So let me ask you some more pointed
16 questions. Have you reviewed anything to indicate
17 that Sergeant Frost or any of the officers falsely
18 reported that Frost noticed that Turner appeared
19 to not be breathing?
20     A. No.
21     Q. Have you reviewed anything indicating
22 that Sergeant Frost asked the officers to check
23 Mr. Turner's breathing?
24     A. No.

1      Q. I'm sorry; have you reviewed anything
2  indicating that Sergeant Frost made a false report
3  when he said he told officers to check
4  Mr. Turner's breathing?
5      A. No.
6      Q. When he told them to roll Mr. Turner onto
7  his back?
8      A. No.
9      Q. Have you reviewed anything indicating
10 that officers falsely reported that Wilson could
11 not feel breaths or see Mr. Turner's chest rising?
12     A. No.
13     Q. Have you reviewed anything indicating
14 that officers -- that Frost did not tell the other
15 officers to get an AED?
16     A. No.
17     Q. What is an AED?
18     A. I can't think of the acronym, what it is.
19     Q. Do you know what its basic function is?
20     A. Yes.
21     Q. Have you received training on it?
22     A. Yes, some time ago.
23     Q. First aid training?
24     A. Yes.

1      Q. How long ago?
2      A. 2013, '14. It was before I retired.
3      Q. Do you know anything that must be done in
4  order to apply an AED to a person?
5      A. There's several steps that you have to go
6  through.
7      Q. Have you reviewed anything indicating
8  that -- that there were false reports about
9  Officer Young having to cut through multiple
10 shirts on Mr. Turner in order to get access to his
11 chest to place the AED pads?
12     A. Repeat your question again.
13     Q. Have you reviewed anything indicating
14 that the officers falsified their report that
15 Mr. -- that Officer Young had to cut through
16 multiple shirts in order to gain access to
17 Mr. Turner's chest to apply the AED pads?
18     A. No.
19     Q. And Wilson and Young placed those pads;
20 correct?
21     A. Yes.
22     Q. Sergeant Frost saw two gasps for air in
23 this time frame?
24     A. I believe so.

1      Q. The AED said that no shock was needed?
2      A. I can't recall that.
3      Q. Have you ever reviewed anything
4  indicating that officers falsified a report that
5  the AED indicated that no shock was needed?
6      A. No.
7      Q. And after that is it your understanding
8  that Sergeant Frost advised the officers to get
9  the CPR mask ready?
10     A. Yes.
11     Q. And then EMS arrived when officers were
12 starting to get the masks ready; is that correct?
13     A. I thought I provided some information on
14 it. I'm just trying to find it before I answer
15 that question. I thought there was a time gap
16 that I noted.
17     Q. So just to kind of help, it's your
18 impression that somewhere in your report you
19 indicate the gap in time between the moment on the
20 audio whenever Sergeant Frost indicates something
21 to the effect that officers should get the CPR
22 mask ready and the moment whenever EMS arrives and
23 takes over?
24     A. I believe I noted something in the report

1    about that, that there was a -- watching the
2    dashcam of Sergeant Frost, there seemed to be a
3    time gap in there.
4        Q.  Okay.  Subsequently the officers removed
5    the handcuff from one of Mr. Turner's hands; is
6    that correct?
7        A.  I didn't read that.
8        Q.  And they removed the hobble?
9        A.  Back on the handcuff, the ambulance said
10   that he was handcuffed.  That's where I think
11   there's a discrepancy.  The officers in their
12   deposition said that they had removed the
13   handcuffs when they pushed him over on his side to
14   get the AED, but the ambulance crew said that he
15   was still handcuffed.
16       Q.  I think maybe your recollection of all
17   these things isn't quite on point, but the basic
18   sequence of events is, at some point Mr. Turner
19   was still handcuffed, and then he was -- one of
20   the handcuffs was released before he was placed in
21   the ambulance.  Is that your understanding?
22       A.  No, it's not.
23       Q.  And the hobble was taken off before he
24   was placed in the ambulance?

1       A.  I don't recall anything about the hobble.
2    It's just the handcuffs were -- the officers said
3    they removed them, but the ambulance crew said on
4    Page 22, 61 of my report, the ambulance crew,
5    Arrow Ambulance personnel Michael Kingery stated
6    when he arrived on scene Richard Turner was face
7    up handcuffed and his legs restrained.
8        Q.  Right.  And then after that the handcuff
9    was removed before he was placed in the ambulance?
10       A.  Okay.
11       Q.  Is that correct?  Or you don't recall?
12       A.  I don't remember reading that.  I
13   remember him having his handcuffs -- taken to the
14   ambulance that way.  That's not what I assessed.
15       Q.  Sergeant Frost instructed Talbott to
16   drive the ambulance; is that correct?
17       A.  I don't recall.
18       Q.  Do you have an opinion that the handcuffs
19   hampered the ambulance personnel's ability to do
20   their job?
21       A.  Just from my training as a police
22   officer, you can release those handcuffs to allow
23   better circulation and breathing on an individual
24   who apparently is having difficulty breathing,

1    would certainly assist.  And again, I'm not a
2    physician; but from my training as a law
3    enforcement officer, to release those hands as
4    soon as you can would certainly assist the
5    individual.
6        Q.  And you're aware from reviewing the
7    documents that the ambulance personnel started CPR
8    on Mr. Turner when he was still cuffed?
9        A.  Yes.
10       Q.  And that, at least according to the
11   ambulance personnel, this must not have been an
12   impediment to them immediately starting CPR?
13       A.  Okay.
14       Q.  Is that correct?
15       A.  That's what they say.
16       Q.  And all your opinions about what the
17   officers should have done upon providing medical
18   care to Mr. Turner are based on your first aid
19   training over the years; is that correct?
20       A.  On which medical care?
21       Q.  On Paragraph 61 I believe you indicate
22   that your various opinions about what officers
23   should have done upon recognizing that Mr. Turner
24   was not breathing, all of those are based on your

1    first aid training; is that correct?
2        A.  First aid training, reading reports as an
3    expert, and also working with the consent decree.
4        Q.  What do you mean, "reading reports as an
5    expert"?
6        A.  Reading in-custody reports of people that
7    are in this particular situation.  So it's not
8    just my first aid training; it's as a former
9    police officer and now as a person who's still in
10   the field, I read police reports.  I look at
11   documents.
12       Q.  So in your role as a litigation
13   consultant in lawsuits, reading those reports has
14   helped form your opinion about what these officers
15   should have done in this particular case?
16       A.  Not just that, also my first aid training
17   and my practical experience.
18       Q.  You say that Sergeant Frost should have
19   recognized that removing the handcuffs from an
20   individual who was not breathing was necessary in
21   order to properly begin life support.  What do you
22   base that opinion on, if anything, beyond what
23   we've already talked about?
24       A.  I think we've covered it.  It would have

1 been much more efficient to release the handcuffs
2 for someone who's not combative anymore, who
3 apparently is on his way to dying, and release
4 those handcuffs so they can start some life
5 support.
6    Q.  Is there a possibility that upon release
7 of those handcuffs if the person revived that they
8 could continue to be combative as they had been
9 seconds before?
10    A.  That's a possibility.
11    Q.  And that there could be safety concerns
12 for the officers and the medical personnel at that
13 point?
14    A.  Sure.  Then you'd re-handcuff the person.
15    Q.  Do you have any opinion -- first of all,
16 I don't see it in your report, so you have no
17 opinion in this case about how the police
18 officers' actions or inactions with Mr. Turner
19 interacted with the care provided by other people
20 such as the ambulance or the hospital; is that
21 correct?  For example, do you claim that
22 Mr. Turner's chance of surviving was reduced by a
23 certain amount based upon the police officers'
24 actions or inactions?

1    A.  I'm not following your question.
2    Q.  Which I think is fair because it's not in
3 your report, but I'm just trying to clarify.  Are
4 you issuing any opinion that the officers' actions
5 reduced Mr. Turner's chance of surviving and that
6 he would have survived if they had acted sooner
7 based on the interventions that he got from
8 ambulance and hospital personnel afterwards?
9 Still not following me?  There's -- all right.
10       We'll get to the medical issues in a
11 minute, but my basic point is, can you tell me
12 that something specifically that the officers
13 should have done during those minutes between the
14 point they recognized he's not breathing and the
15 point the ambulance personnel take him would have
16 made a difference in Turner's ultimate state in
17 this case?
18    A.  So you're talking about in the alleyway;
19 you're not talking about the initial call?
20    Q.  Right.  So we've moved beyond use of
21 force to medical care; okay?  And what I'm saying
22 is, from the moment that the officers should have
23 realized that Turner had some problem to the
24 moment that the ambulance personnel took over, is

1 there something that you're claiming should have
2 been done in there that would have had -- would
3 have resulted in a different outcome for
4 Mr. Turner?
5    A.  And what's the start point and the end
6 point?
7    Q.  I believe I just stated them.  So the
8 moment that Sergeant Frost asks officers to check
9 Mr. Turner's breathing to the moment that
10 ambulance personnel take over, are you opining
11 that there's a specific thing that officers did or
12 did not do which would have resulted in a
13 different outcome for Mr. Turner?
14    A.  The only thing that I would opinionate
15 on -- again, I'm not a medical expert -- is, I
16 would have released the handcuffs.  I noted that
17 in my report.
18    Q.  And -- okay.  Beyond that being noted in
19 your report, you're not saying Mr. Turner would
20 have survived if the officers would have just done
21 X during that time period?
22    A.  Yeah, I'm not a medical -- I can't
23 provide that medical.  The other thing that I
24 noted -- and I know it's in my report somewhere --

1 is that time lapse that I saw between when CPR was
2 going to be started or the breathing was going to
3 be started and when the ambulance arrived.  And
4 I'm sure I noted that in my report.  So that would
5 be the two things that could have assisted.
6    Q.  Now, you ultimately said that -- you made
7 some statements in Paragraph 93 of your report as
8 to the cause of Mr. Turner's death.  In the
9 meantime here you've said today that you're not a
10 medical expert; correct?
11    A.  Yes.
12    Q.  Do you have any undergraduate training in
13 medicine?
14    A.  No.
15    Q.  Did you go to medical school?
16    A.  No.
17    Q.  Have you had any specific training in
18 determining cause of death?
19    A.  No.
20    Q.  Have you ever served as a medical
21 examiner?
22    A.  No.
23    Q.  Have you ever worked in a coroner's
24 office?

1    A.  No.
2    Q.  Paragraph 93 near the top of Page 37, you
3  state, "While the manner of death was ruled
4  accidental, the physical and mental stress created
5  by the actions of the officers in response were a
6  contributing factor."  So if I'm understanding
7  correctly, there you're just repeating something
8  from the coroner's report about the restraint
9  being a contributing factor?
10    A.  Yes.
11    Q.  You have made no independent analysis of
12  what factors contributed to Mr. Turner's death?
13    A.  Just the ones that I've listed here in
14  93 from the coroner's office.
15    Q.  Okay.  You've repeated what the coroner
16  said.  You have not independently determined the
17  cause of Mr. Turner's death; correct?
18    A.  Correct.
19    Q.  You write here, "The officers placed
20  Richard Turner in a position where he could
21  potentially suffocate because the air was being
22  pushed out of his lungs and then placed weight
23  onto his body which further caused the air to
24  expel from his lungs."  I think we've covered this

1  mostly, but you've done no studies of the forces
2  that were involved or that were exerted upon
3  Mr. Turner during officers' interactions with him;
4  is that correct?
5    A.  Correct.
6    Q.  And your final sentence of that
7  paragraph, you say, "The position that the
8  officers had Richard Turner in was precarious.
9  The force used was excessive and led to Richard
10  Turner's death."  So there are you conducting any
11  analysis of how the officers' actions were an
12  actual cause of death as opposed to just working
13  off of the coroner's notes about restraint being a
14  contributing factor?
15    A.  A combination of the two, the officers'
16  actions -- and I think I've opinionated that in my
17  report -- that there was several alternatives that
18  the officers could have taken in their initial
19  reaction dealing with Richard Turner and then to
20  the end of what occurred.  We talked about the
21  force.  So I think if you look at the totality,
22  certainly there was a different outcome that the
23  officers could have pursued, and Richard Turner
24  quite possibly would be living today.

1    Q.  And at least in your report all of the
2  alternatives that you've posited were things that
3  the officers should have done before they
4  contacted -- before they made contact physically
5  with Mr. Turner; is that correct?
6    A.  I'm sorry; I didn't --
7    Q.  I'll ask it again.  You did posit some
8  alternatives about what officers should have done
9  before they made physical contact or touch with
10  Mr. Turner; correct?
11    A.  Yes.
12    Q.  And those are in your report?
13    A.  Yes.
14    Q.  In your report there are no alternatives
15  explained for alternative control tactics or
16  actual uses of force; is that correct?
17    A.  That's correct.  I just stated those
18  today, but they're not in my report.
19    Q.  Okay.  And ultimately, the last part of
20  this sentence you say the forced used -- I'm going
21  to paraphrase a bit here -- the force used led to
22  Richard Turner's death.  You used that word "led."
23  Are you saying to a reasonable degree of medical
24  certainty the force used caused Mr. Turner's

1  death?
2    A.  I'm going to go right with what my
3  sentence says, the force used was excessive,
4  comma, and led to Richard's death based on all the
5  other things we've talked about today.
6    Q.  Okay.  So here's what I'm getting at:
7  Your opinion could be read as if you are making a
8  causation -- I'm sorry; your statement here could
9  be read as you making a statement that you're
10  determining medical causation here, that force
11  caused death.  I'm asking, is that what you intend
12  this sentence to say, and is that the opinion that
13  you're giving?
14    A.  No, I'm not.  I'm not giving that
15  opinion.  I'm not a doctor, and I'm saying that
16  the force was excessive, it was unnecessary, and
17  it was unwarranted.  And unfortunately, the
18  officers used that force, they had him on the
19  ground in a prone position.  He's in a bad shape,
20  and then he ultimately died.  And it could have
21  been avoided.  I'm not making that opinion based
22  on a medical doctor.
23    Q.  So you're ultimately saying force was
24  used, he died, the force led -- there was a series

1  of events where force was used, and at the end of
2  those events Mr. Turner died?
3      A.  Yeah, force used, and there were some --
4  as you've asked me and I have opinionated on,
5  there could have been some alternatives on the
6  maneuvers that the officers made.  I don't
7  necessarily believe that they should have made
8  those.  And those were all contributing factors.
9      Q.  You recognize that the autopsy report
10 listed a number of other health problems that
11 Mr. Turner had; correct?
12     A.  Yes.
13     Q.  Cardiac arrhythmia is mentioned in your
14 report, Paragraph 93?
15     A.  Yes.
16     Q.  Do you know what that term means?
17     A.  I believe I do, but I'm not going to tell
18 you what it is because I don't know the actual
19 medical definition, so I --
20     Q.  Okay.  You also mentioned that the
21 cardiac arrhythmia was due to cardiomegaly with
22 left ventricular hypertrophy?
23     A.  Yes.
24     Q.  Do you know what that means?

1      A.  I do not.
2      Q.  You mentioned that there were significant
3  contributing conditions of chronic cardiac and
4  neuropsychological toxicities with cocaine abuse.
5  Do you know what that means?
6      A.  Appears to be cocaine abuse.
7      Q.  Okay.  All these things we've just
8  covered are things that you are just copying from
9  something that you received from the coroner?
10     A.  Right.  I footnoted it.  Champaign County
11 Coroner's report.
12     Q.  You also mentioned morbid obesity,
13 schizophrenia, and physical and mental stress
14 during restraint by law enforcement.
15     A.  Yes.
16     Q.  So just so I'm clear, sitting here today
17 and the time you wrote your report, you cannot say
18 how any of these particular factors did -- I'm
19 sorry; sitting here today, you cannot say that one
20 factor or another here contributed from a medical
21 standpoint to Mr. Turner's death?
22     A.  I'm sorry; I can't opinionate on any
23 medical.
24     Q.  Did you review anything indicating that

1  Mr. Turner had broken ribs from this interaction?
2      A.  From what?
3      Q.  From this interaction?
4      A.  I did not.
5      Q.  Did you review anything indicating that
6  he had a collapsed lung?
7      A.  No.
8      Q.  A crushed chest cavity?
9      A.  No.
10     Q.  Neck trauma?
11     A.  No.
12     Q.  Head trauma?
13     A.  No.
14     Q.  Did you review anything indicating that
15 Mr. Turner was beaten during this incident?
16     A.  No.
17     Q.  Punched?
18     A.  No.
19     Q.  Slapped?
20     A.  No.
21     Q.  Kicked?
22     A.  No.
23     Q.  Hit with a baton?
24     A.  No.

1      Q.  Or an asp?
2      A.  No.
3      Q.  Tased?
4      A.  No.
5      Q.  Maced?
6      A.  No.
7      Q.  Did you review anything indicating that
8  blows were delivered to Mr. Turner after he was
9  handcuffed?
10     A.  No.
11     Q.  Did you review any reports from anyone
12 from the coroner's office indicating that no
13 visible trauma was apparent on Mr. Turner after
14 the incident?
15     A.  I believe I read that.
16     Q.  Did you review anything from the
17 coroner's office about lack of visible contusions
18 or pressure marks on Mr. Turner's neck?
19     A.  I believe I read that.
20     Q.  No signs of obvious external trauma to
21 the head or body?
22     A.  Correct.
23     Q.  Did you review any of the medical records
24 from Presence or Carle hospitals?

1    A. No.

2    Q. Did you review any of the records

3 regarding Mr. Turner's compliance or noncompliance

4 with his medication regime?

5    A. No.

6    Q. You make some criticisms in your report

7 about the internal investigation?

8    A. It's actually an administrative

9 investigation.

10    Q. I apologize. Do you make some notes

11 about the administrative review conducted

12 following the incident? Do you have any opinions

13 on that that aren't reflected in your report?

14    A. No.

15    Q. The report at Paragraph 9 you discuss the

16 principles of using noninvolved police agencies to

17 investigate via the task force. Isn't that what

18 happened here? The Turner incident was

19 investigated by the University of Illinois Police

20 Department, Champaign County Sheriff's Office, and

21 Illinois State Police?

22    A. Yes. But that's not a criticism that I

23 made.

24    Q. Just to the extent it was implied in your

1 report, I wanted to make sure to address it.

2    A. Implied that I criticized it?

3    Q. Yeah.

4    A. On No. 9?

5    Q. Yeah, because I didn't see where it was

6 addressed anywhere else.

7    A. I didn't criticize 9.

8    Q. Okay.

9    A. We used 9 as a template for Rockford when

10 we implemented ours.

11    Q. You've issued no decision criticizing the

12 opinion of the state's attorney's office in this

13 case; is that correct?

14    A. That's correct.

15    Q. I'm assuming that would be beyond your

16 scope of expertise to evaluate whether the

17 charging decision was correct?

18    A. That's correct.

19    Q. You've spent a significant amount of time

20 in your report talking about training on CIT

21 issues, but I did not see where you discussed

22 training on use of force. Do you claim that there

23 was deficient training on use of force in this

24 case beyond anything that you've stated in your

1 report here?

2    A. I'm sorry; ask the last question.

3    Q. Do you claim -- it's correct that in your

4 report you do not specifically criticize the City

5 of Champaign for failing to train officers on

6 appropriate use of force techniques; is that

7 correct?

8    A. That's correct.

9    Q. Paragraph 70 you mention that Officers

10 Young, Talbott, and Wilson did not possess the

11 state of Illinois CIT training for officers. Is

12 that a mandated training for police officers,

13 something mandated by the state?

14    A. So it's not a mandate, but it's offered

15 by the state of Illinois. So to reword it would

16 be the Illinois Training and Standards Board. So

17 it's not state mandated that you have to do this.

18    Q. Okay. Do you claim that the training

19 records that you have noted in Paragraph 74, the

20 table, reflect all the training that these

21 officers received?

22    A. It does not reflect all the training.

23    Q. At the bottom of this table on Page 29 at

24 Footnote 99 you indicate this training summary is

1 based on Defendant's 1817 through 1870, which is

2 about 53 pages. The training records are actually

3 at 650 to 1806, which is 1157 pages. I just want

4 to make sure whether this is -- what you reviewed

5 to come up with the information in this table.

6    A. I'm sorry; could you tell me those

7 numbers again that you said? 650 to --

8    Q. 650 to 1806 versus 1817 through 1870.

9    A. Yeah. It's going to be my error because

10 this took me a long time to go through these

11 records, and I know that these records weren't

12 60 pages long.

13    Q. How did you decide what to include in

14 this list and what to not list here?

15    A. So on 74 on the bottom the table provides

16 classes, dates, and hours of the instruction from

17 the involved officers. Specific courses were

18 extrapolated from the training records which

19 pertain to the incident involving Richard Turner.

20 I tried to take the classes that they had been

21 trained in that had anything to do with CIT and

22 then mirror it up.

23    Q. So what was your --

24    A. And I guess --

Q. -- test, I guess, of whether it pertained
to the incident?
A. Well, CIT was a given.
Q. Okay.
A. And crisis negotiator conference I noted
because I've sent several officers, and I know
what they talk about at crisis negotiation.
Verbal communication skills --
Q. I notice sometimes use of force is
mentioned, and then other times it's not. For
example, it appears that Sergeant Frost only had
serious use of force refresher in 2003 and then a
use of force training in 2015.
A. So I examined their records. There were
several memos and documents. And then for each
one of the officers there was a table -- I believe
they probably use PowerDMS, which is a database.
And for him I only put down what was there. So if
there was a gap or if some of the officers didn't
have these, I couldn't find it.
Q. So at a minimum, even with the ones you
have included in here, you would agree that the
City of Champaign has provided training to these
particular officers on some of the subjects that

are pertinent to their incident with Mr. Turner
including CIT or Mental Health First Aid for
Public Safety?
A. And I've noted that in here. But there's
other courses that didn't have anything to do with
the incident at all that I just -- I didn't
mention.
Q. Okay.
A. But they were robust. Your document --
the Document 650 to 1806 took a long time to go
through.
Q. In your report in Paragraphs 41 through
44, somewhere in there, you say the Champaign
Police Department policy comports to the
International Association of Chiefs of Police
concepts and issues paper referencing dealing with
the mentally ill?
A. Yes.
Q. Do you have any reason -- do you still
stand by that statement?
A. I do.
Q. Are you aware -- have you reviewed any
facts in your preparation of this case that lead
you to conclude that prior to November 2016 the

City of Champaign had a long-standing practice or
pattern of failing to supervise officers?
A. I'm not aware of that.
Q. Have you reviewed anything that's led you
to conclude that prior to November of 2016 the
City of Champaign had a long-standing pattern or
practice of interacting with mentally ill
individuals in an inappropriate manner?
A. I'm not aware of that.
Q. I think we've covered this. You have not
spoken with Mr. Turner's family, and I assume you
did not know them prior to this incident?
A. That's correct.
Q. You have no opinion on his life
expectancy?
A. That's correct.
Q. You've made no opinion that you believe
this -- I'm sorry; you've issued no opinion that
the actions of officers Young, Wilson, Turner --
I'm sorry; it's getting to be a long day.
You've issued no opinion that the
officers -- you've issued no opinions that the
actions of Officers Young, Wilson, Talbott, and
Sergeant Frost were motivated by some kind of

racial animus?
A. No.
Q. Is that correct?
A. That's correct.
Q. You have not suggested that their actions
were motivated by some type of animus towards
Mr. Turner's actual or perceived disability; is
that correct?
A. That's correct.
Q. You have some experience as a chair of a
subcommittee of the International Association of
Chiefs of Police on hate crimes?
A. Yes.
Q. Have you reviewed anything to indicate to
you that the actions of these officers were the
result of some kind of hate towards Mr. Turner?
A. No.
Q. Was it your opinion -- I believe you've
already covered it. Do you have any other
personal interactions with the Champaign Police
Department?
A. I met Anthony -- Chief Cobb two months
ago at a meeting, a chiefs' meeting.
Q. So beyond what we've already talked

1   about, have you had any other interactions with
2   the police department?
3       A.  No.
4       Q.  Did you talk with Chief Cobb at that
5   meeting about the Turner case at all?
6       A.  No.
7       Q.  Or about anything to do with the City of
8   Champaign?
9       A.  No.
10      Q.  I want to make sure that later you're not
11  going to come up and say Chief Cobb told me this
12  or that at the meeting.  Do you remember any
13  specific conversation with him about any topics?
14      A.  The topics, so -- just so we're on the
15  same page, so the meeting is called CLIC, C-L-I-C,
16  Chiefs of Larger Illinois Cities.  It was started
17  years ago.  It went dormant.  Myself and Chief
18  Powell from Aurora back in 2008 resurrected that
19  committee.  It's Waukegan, Elgin, Naperville,
20  Aurora, Champaign-Urbana, Bloomington-Normal, and
21  Belleville and Springfield get together on --
22      Q.  No Decatur?
23      A.  And Decatur -- and get together on a
24  quarterly basis.  We get together on a quarterly

1   basis and talk about things from 10:00 o'clock in
2   the morning to 2:00 o'clock in the afternoon.
3   Sometimes agendas are set; sometimes agendas were
4   not set.  There's no bylaws, there's no rules.
5   One chief will host the meeting.  You sit around
6   and you roundtable.  There could be things about
7   mental health, it could be use of force, it could
8   be about policies, it could be about collective
9   bargaining.  I retired in '15, and they just asked
10  me to come back on and facilitate those meetings.
11  And I did the first facilitation down in Aurora,
12  and that was back on the 29th of November.
13      Q.  Okay.  Do you recall any comments from
14  Chief Cobb specifically on any of those topics
15  that we've talked about?
16      A.  Oh, we all talked.
17      Q.  Do you recall a comment made by Chief
18  Cobb?
19      A.  He talked, but I can't tell you what he
20  said because they don't take notes, there was no
21  stenographer, there's no audio recording, and I
22  can't remember what was said.
23      Q.  Okay.
24      A.  I can tell you that this case was not

1   spoken about.
2       Q.  Is there anything that would jog your
3   memory such as later you looked at a note that
4   would remind you Chief Cobb said this or that
5   during our conversation?
6       A.  About the meeting down there?
7       Q.  About any of your interactions with Chief
8   Cobb.
9       A.  Could be.
10      Q.  What documents could jog your memory
11  about that?
12      A.  I've been retired since November of 2015.
13      Q.  Okay.  Is there a document-type thing?
14      A.  Ask me the question you want to ask me,
15  and I'll tell you what you want to know.
16      Q.  Is there a document type that you have in
17  mind that could jog your memory about something
18  that you may later claim Chief Cobb said to you
19  like notes that you took or something at these
20  meetings?
21      A.  I don't recall.
22      Q.  Have you ever been sued before in a civil
23  case?
24      A.  Personally?

1       Q.  Yes.
2       A.  No.
3       Q.  Have you ever been sued in your
4   professional capacity?
5       A.  Yes.
6       Q.  And how many times?
7       A.  Oh, strike that.  No, I have not been
8   sued personally, and I've not been sued
9   professionally in my capacity as chief of police.
10      Q.  How many lawsuits were you involved in as
11  a chief of police?
12      A.  Representing the department?
13      Q.  Yeah, where the department or --
14      A.  Because I'm the head of the department.
15      Q.  Yeah.  How many lawsuits were you
16  involved in where an officer was sued or the City
17  of Rockford was sued that you became involved in
18  the case?
19      A.  Well --
20      Q.  I mean, consulting with the attorneys or
21  otherwise.
22      A.  I'm involved in every case when the
23  department was sued.  I'm the chief of police.
24      Q.  About how many cases would you say that

1   was?
2       A.  There could be anywhere from 11 to 15 at
3   a time.  And how do I know that?  Because we put a
4   meeting together with the city legal department at
5   my office on a bimonthly basis and had a
6   spreadsheet listing of all the cases, when we were
7   sued, and what the status of the case were -- what
8   the status of the case was.  When we receive civil
9   litigation, we immediately looked in to see if
10  there was an internal investigation or did we need
11  to conduct an administrative investigation.
12      Q.  About how many cases per year?
13      A.  I don't know.
14      Q.  I think you said 11 to 15?
15      A.  Well, that's a total.  I mean, some of
16  them were, you know, old, old cases.
17      Q.  Were you saying that there were always 11
18  to 15 --
19      A.  On a spreadsheet I remember --
20      Q.  Hold on.  It's really hard for her to
21  write what both of us say.
22          There were generally about 10 to 15 cases
23  at any time from 2006 to 2015 or so?  Is that what
24  you're saying?  Or am I --

1       A.  That's my memory.
2       Q.  Okay.  In your report at Pages -- or
3   Paragraphs 7 and 34 you mentioned that you've
4   reviewed over 1500 high risk police
5   investigations.  Did those all involve the use of
6   force?
7       A.  1500 high risk police investigations
8   and -- no, would include use of force.
9       Q.  Did those all involve incidents with a
10  person who had mental or behavioral health issues?
11      A.  Could be.
12      Q.  All 1500 involved that?
13      A.  No, part of them.
14      Q.  Okay.  Is it your position that the use
15  of force lawsuits brought against the department
16  while you were chief is a sign that you were
17  providing poor training to your personnel?
18      A.  No.
19      Q.  Paragraph 8 you talked about working with
20  civil rights attorneys.  Are those the individuals
21  you've mentioned previously?
22      A.  Yes.
23      Q.  Remind me of their names.
24      A.  Christy Lopez and Kelli Evans.

1       Q.  And you've worked with them in what
2   capacity?
3       A.  We called for an outside administrative
4   investigation for an officer-involved fatal
5   shooting in 2009, and they provided that
6   administrative investigation and made
7   recommendations -- 33 recommendations, and they
8   were implemented within 18 months without any
9   court-enforced intervention.
10      Q.  How did the attorneys get involved in the
11  first place?
12      A.  They were referred to by Chuck Gruber.
13      Q.  Was there a lawsuit?
14      A.  There was no lawsuit.  There was much
15  city uproar and a lot of divisions and marches.
16  And this is a way to reform the department as
17  difficult as it was, but it put it right out front
18  what the problem was.
19      Q.  In your report at Paragraph 13 you
20  mention CALEA accreditation?
21      A.  Yes.
22      Q.  Any idea on Champaign's status as a
23  CALEA-accredited organization?
24      A.  I don't know if they are.

1       Q.  Okay.
2       A.  Well, excuse me.  I thought I read it in
3   their policy, but maybe not.  I thought there was
4   something on here.  But -- so I don't know.
5       Q.  At any rate you wouldn't know the year
6   that they were accredited?
7       A.  No.
8       Q.  In your work mentioned in your report at
9   Paragraph --
10      A.  Actually -- if I can, actually, it looks
11  like they belong to I-L-E-A-P; ILEAP.  It's the
12  Illinois Law Enforcement Accreditation through the
13  Illinois Chiefs of Police.
14      Q.  Okay.
15      A.  This is state-wide.  This is national.
16      Q.  ILEAP is state-wide, and CALEA is
17  national?
18      A.  Correct.
19      Q.  In your report at Paragraphs 15 through
20  16 and 19 you were mentioning a number of
21  violations.  Are those all limited to just use of
22  force constitutional violations?
23      A.  No, they're not all -- some of them are
24  use of force, and some of them are not use of

1 force.
2 Q. In your report at Paragraph 18 you
3 mention a "Roadmap to Reform in the Rockford
4 Police Department" that I believe you thought was
5 publicly available that I did not find in Quick
6 Search. Do you have a copy of that document?
7 A. Yes, I do.
8 Q. What does it say about CIT?
9 A. I don't think there's anything in there
10 about CIT.
11 MR. BRUNNER: Questions?
12 MR. KRCHAK: No.
13 BY MR. BRUNNER:
14 Q. One final point, I guess: I believe you
15 testified earlier that you have not reviewed any
16 of the course materials for the Mental Health
17 First Aid for Public Safety course that Officers
18 Talbott and Wilson completed on or around June 16
19 of 2016. Is that correct?
20 A. Correct.
21 MR. BRUNNER: Okay. That's all I have.
22 EXAMINATION
23 BY MR. CARMICHAEL:
24 Q. Chief, whatever training that -- whatever

1 mental health training that Officers Wilson and
2 Talbott received, was it sufficient in your
3 opinion?
4 MR. BRUNNER: Objection; leading.
5 A. So I didn't see the lesson plan or the
6 specific information; but in the noted table is --
7 I believe they had eight hours of training. And
8 the CIT training is 40 hours of training. And
9 I've inserted that actual information into my
10 report, but I don't have their lesson plan.
11 BY MR. CARMICHAEL:
12 Q. Based on what occurred, does their
13 training appear to have been sufficient?
14 A. Well, no. Their response with Mr. Turner
15 from the onset of the call until he started to run
16 away was -- it was deficient. It was -- it does
17 not conform to what I know and what I see in
18 practicality in CIT training in their interactions
19 with Mr. Turner.
20 Q. Are your opinions also based on your
21 experience in addition to the materials provided?
22 A. They are. They're based on my
23 experiences over 30 years as a law enforcement
24 officer and now as a litigation specialist.

1 Q. I know you have conducted some trainings
2 before. Have you trained law enforcement
3 personnel on abiding by constitutional standards?
4 A. Yes, I have.
5 Q. Have you trained law enforcement
6 personnel on use of force standards?
7 A. Yes, I have.
8 Q. In being a monitor, do you ever review
9 situations to determine if the use of force was
10 constitutionally appropriate?
11 A. Yes, that's one of my duties is to look
12 at -- review, assess the consent decree incidents
13 that pertain to uses of force and to see if those
14 conform to agency policy and also constitutional
15 with the Graham vs. Connor.
16 Q. I know you were asked some questions
17 about your report in Paragraphs 81 and 87. I know
18 you reference policies there. I just wanted to
19 ask you, when you're referencing those policies,
20 does that include the Champaign use of force
21 policy?
22 A. In 81?
23 Q. Yeah.
24 A. Yes, it does. The series of the

1 excessive and unwanted force would be
2 Paragraphs 81 and to the end. It has to do with
3 use of force when I'm talking about the
4 unwarranted and excessive use of force.
5 Q. So is it your opinion that there was a
6 violation of the Champaign use of force policy
7 here?
8 A. Yes, their use of force -- this use of
9 force incident and this particular incident did
10 not conform to Champaign policy. And that should
11 have been noted in an internal investigation, and
12 it should have been noted in Lieutenant Myers'
13 administrative investigation.
14 Q. And you were asked a lot of specific
15 questions trying to break down different aspects
16 of the use of force here. Is it your opinion that
17 overall the use of force here was unreasonable as
18 opposed to specific aspects?
19 MR. BRUNNER: Objection; leading.
20 A. The first two incidents that I noted
21 that -- the touching I was okay with at the
22 beginning that -- I believe it was Officer Wilson
23 and then the trying to control him. Anything
24 beyond that specifically from the takedown going

1  forward was excessive and was not necessary.  It
2  was unwarranted.
3      MR. CARMICHAEL:  All right.  That's all I
4  have.
5              EXAMINATION
6  BY MR. BRUNNER:
7    Q.  Those policies you were talking about
8  just a minute ago, those were all internal
9  department policies of the Champaign Police
10 Department, right, as far as the use of force
11 policy and claiming it was violated?
12   A.  Yes.
13     MR. BRUNNER:  Okay.  Thank you.
14     MR. CARMICHAEL:  Reserve signature.
15     (Whereupon, the deposition
16     concluded at 4:18 p.m.)
17     * * * * *
18
19
20
21
22
23
24

1           S I G N A T U R E
2
3      I hereby certify that I have read the
4  foregoing transcript of my deposition given at the
5  time and place aforesaid, consisting of
6  Pages 1 through 275, inclusive, and have listed
7  all corrections or changes on the attached sheet,
8  and I do again subscribe and make oath that the
9  same is a true, correct, and complete transcript
10 of my deposition so given as aforesaid as it now
11 appears.
12
13     _____
               Deponent
14
15
16 _____
      Date
17
18
19
20
21
22
23
24

1          C E R T I F I C A T E
2      I, MARY M. ELLIOTT, Certified Shorthand
3  Reporter, Registered Professional Reporter,
4  Registered Merit Reporter, and Notary Public, do
5  hereby certify that I am a court reporter doing
6  business in the city of Rockford; that I reported
7  in shorthand the testimony of Mr. Chester L.
8  Epperson, Jr., on the 12th day of February, 2019,
9  that signature was not waived; and that the
10 foregoing is a true and correct transcript of my
11 shorthand notes so taken aforesaid.
12     I further certify that I am neither
13 counsel for nor related to or employed by any of
14 the parties to this action and that I am not a
15 relative or employee of any counsel employed by
16 the parties hereto or financially interested in
17 the action.
18     Dated at Freeport, Illinois, this 27th day
19 of February, 2019.
20
21
22     Mary M. Elliott
       Certified Shorthand Reporter
       License No. 084-002018
23     Registered Professional Reporter
       Registered Merit Reporter
24