E-FILED
Friday, 15 November, 2019  03:32:10 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS**
**Urbana Division**

| | |
|---|---|
| **CHANDRA TURNER, as Special Administrator of the Estate of RICHARD TURNER, deceased, and CHANDRA TURNER, individually,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-2261** |
| **CITY OF CHAMPAIGN, et al.,** | |
| **Defendants.** | |

**ORDER**

This matter is before the Court on the Motion for Summary Judgment (#43) filed by Defendants Champaign Police Officers Young, Wilson, Talbott, and Champaign Police Sergeant Frost (collectively "Officers") and the Motion for Summary Judgment (#49) filed by Defendant City of Champaign ("City").[1] Plaintiff Chandra Turner, as Special Administrator of the Estate of Richard Turner, deceased, and individually ("Plaintiff") filed a Response Brief in Opposition (#62). In turn, Defendants filed Reply briefs (#64, 66) For the reasons discussed below, the Officers' and City's Motions for Summary Judgment (#43, #49) are GRANTED.

**I.    Introduction**

Plaintiff's Amended Complaint alleges claims arising from an event that occurred on November 16, 2016, between Richard Turner ("Turner") and Champaign Police Officers. On November 16, 2016, Defendant Officers were conducting a welfare check on Turner when he died. The Amended Complaint brings claims under Illinois State law and 42 U.S.C. § 1983, alleging that Defendant Officers Young, Wilson, and Talbott used

---

[1] The City adopted the arguments presented in the Champaign Officers' Motion, and the Court will refer to the Champaign Officers and the City collectively as "Defendants."

excessive force while restraining Turner and that Defendant Officers Talbott and Frost failed to intervene. The Amended Complaint further asserts wrongful death, battery, and intentional infliction of emotional distress under Illinois law against Officers Young, Wilson, Talbott and Frost. The Amended Complaint brings a claim under Illinois' Survival Act, 755 ILCS 5/27-6, *et seq.* Finally, the Amended Complaint seeks recovery from the City under theories of respondeat superior and indemnification. Count IX alleges an alternative claim under *Monell* as to the City.

Defendants move for summary judgment as to all counts, arguing that the facts of the case are undisputed and that Defendants' use of force was reasonable in light of Plaintiff's actions. Defendants further argue that the Officers' are entitled to qualified immunity.

## II.    Material Facts[2]

The Court construes the evidence in the light most favorable to Plaintiff as the non-moving party. *See Lovett v. Herbert*, 907 F.3d 986, 990 (7th Cir. 2018).

On November 16, 2016, around 8:00 a.m. a woman called the police non-emergency line to request a check on Turner's welfare after she observed him holding a partly empty bottle of wine, hollering at people, and pulling the sleeve out of a trash can near the University of Illinois campus in Champaign, Illinois. Cherly Ebl Deposition, #47-1, p. 13-15; 24-25. The Officers were all familiar with Turner, and the parties agree that Turner did not normally behave this way.[3] Thomas Frost Deposition, #47-5, p. 55-56. The Officers knew that Turner often walked away when the police appeared. Young Deposition, #47-2, p. 17.

---

[2] Defendant Officers' Motion for Summary Judgment contains 103 material facts. Plaintiff does not dispute over 60 of these material facts. Most of the Court's material facts come from the undisputed material facts. The remaining facts come from the video evidence and the Defendant Officers' undisputed testimony. The Court will note where a fact is disputed.

[3] Sergeant Frost encountered Turner in a similar incident in April 2016. Thomas Frost Deposition, #47-5, p. 125-129. Sergeant Frost described Turner's November 2016 behavior as a "mirror image" of Turner's April 2016 behavior. *Id.* at 126. According to Frost, in April 2016, the officers were able to coax Turner into an ambulance to take him to the hospital.

Officers were dispatched to check on Turner's welfare and when Officer Young arrived, he observed Turner moving back and forth on the ground with his buttocks exposed. Young Deposition, #47-2, p. 22-23. Officer Young approached Turner and Turner got up and they started walking toward each other. Video at 8:55:50; Young Deposition, #47-2, at 24. Officer Young asked Turner how he was doing, and Turner incoherently responded while making sporadic movements with his arms and body. Officer Young was unable to understand Turner. Video at 8:55:58-8:56:26; Young Deposition, #47-2, at 24. Young testified that Turner was babbling and talking gibberish. Young Deposition, #47-2, at 25. In the video, Officer Young walked away, and Turner turned and walked the other direction. Video at 8:56:26.

As Officers Wilson and Talbott approached in their vehicle[4], Turner was standing next to some bicycles. Video at 8:56:47. Officer Young testified that he asked Turner to step away from the bicycles and that Turner complied. Young Deposition, #47-2, at 26.

The following events occur on the video from 8:57:01-8:58:25. When Officers Wilson and Talbott exited their stopped car, Turner walked in front of the vehicle, turned around, crossed Sixth Street[5], and took a small tag off a nearby building and threw it to the ground. Officer Young commanded Turner to return the tag, and Turner complied. While Turner was returning the tag, Officer Wilson told Officer Young that "Normally, he's not as messed up as he is today." Turner proceeded to move around intermittently and crossed Sixth Street again. Officer Wilson suggested that someone would probably "call for him again." Officer Young returned to his vehicle and Officer Wilson said, "I'm going to keep an eye on him for a little bit." To which Officer Young responded "OK." Officer Young walked over to talk to Officer Talbott while Officer Wilson approached Turner. Young Deposition, #47-2, p. 35.

---

[4] Officer Wilson was a newer officer and was doing his required monthly ride with a field training officer (Talbott) on the day of the incident. Frost Deposition, #47-2, p. 59.

[5] Most interactions between the officers and Turner occurred on or near the intersection of Green Street and Sixth Street. This is a highly trafficked area on the campus of the University of Illinois at Urbana-Champaign.

From 8:58:20-9:01:25, the video shows the following sequence. Turner continued to move his arms erratically and speak incoherently to Officer Wilson. Officer Wilson asked Turner to leave. Turner crossed Sixth Street again and continued to move around aimlessly and unsteadily. Officer Wilson again asked Turner to leave. Meanwhile Officers Young and Wilson discussed Turner's behavior. Officer Young noted that Turner "seems a little bit more out of it than usual." To which Officer Wilson responded "Yeah, he does." Officer Wilson then said, "I don't think he's gonna leave the area, because I don't think he can tell which way is which." Officer Wilson testified that Turner was not an immediate danger to himself or someone else at this point. Andrew Wilson Deposition, #47-3, p. 11. The officers discussed calling an ambulance for Turner because they worried he was too intoxicated to care for himself. Officer Young suggested seeing if Turner knew the current date and time.

At 9:01:26, Officer Wilson approached Turner and asked him to come toward him. Turner faced Officer Wilson, but remained several feet away, waving his arms in the air, with his buttocks exposed. At this point, Wilson radioed for an ambulance and asked Turner "what day of the week is it?" Turner responded, "November 2nd, between Thanksgiving and…" The rest of Turner's response is unintelligible except for the words "today" and "America." Officer Young approached the conversation, and he and Officer Wilson asked Turner to sit on the curb. Turner turned and ran away from the officers across Green Street. Officer Wilson notified dispatch and Sergeant Frost turned the corner in his vehicle and drove down Green Street to look for Turner. Sergeant Frost asked Officer Wilson if he planned to "involuntary" Turner, and Wilson responded "10-4." Video at 9:01:28-9:03:20.

Turner continued to walk away from the officers. Video at 9:03:35; Wilson Deposition, #47-3, p. 41. Video footage is temporarily unavailable as the officers follow Turner down a walkway that led to an alley about one-half block north of Green Street. Video at 9:03:42; Wilson Deposition, #47-3; p. 41-43. Officer Wilson continued to call Turner's name to get him to stop. Wilson Deposition, #47-3, p. 43.

Sergeant Frost approached the scene in his vehicle while the officers were following Turner on foot. Frost Deposition, #47-5, p. 62; 65. Sergeant Frost reported that he saw Turner "flailing his arms up and down" making "quick head jerks" and acting "manic." *Id*. at 70.

The remaining video is sourced from Sergeant Frost's vehicle. On the audio, Turner is heard making incoherent sounds while Sergeant Frost approaches. A fenced-in dumpster obscures much of the view from this point forward, but the video partially shows officers struggling to restrain Turner. Accordingly, the remaining facts come from the parties undisputed material facts, officers' depositions, and the radio audio.

Officer Wilson caught up to Turner when he was over one-half-way through the alley. Wilson Deposition, #47-3, p. 44-45. Wilson testified that he told Turner to stop, but that Turner didn't stop and so Officer Wilson put his hand on Turner's shoulder. *Id*. at 46. The parties agree that this was the first instance of physical contact between the officers and Turner. Turner tried to pull away and then turned around and shoved Officer Wilson. *Id*. at 46, 88, 104-06. When Turner pushed Officer Wilson, Officer Wilson's radio fell off and Wilson tried to get a better grasp of Turner on his right side. *Id*. at 47-48. Importantly, Plaintiff does not dispute any of the above facts, including the fact that Turner shoved Officer Wilson, thereby escalating the interaction.

For the remaining material facts, Plaintiff denies only the "characterizations" of Turner's behavior as detailed below. *See* Plaintiff's Response, #62, p. 4.

Officer Young approached and grabbed Turner's left side. *Id*. at 48; Young Deposition, #47-2, p. 46-47. Officer Young testified that Turner was trying to grab Officer Young with both arms and resisting the officers. Young Deposition, #47-2, p. at 47. The Officers' Motion states that Turner was "aggressively reaching and grabbing toward Officer Young with both arms." Officers' Motion, ¶ 46. Plaintiff does not deny that Turner reached and grabbed toward Office Young, but denies the characterization of this behavior as aggressive. Plaintiff's Response, #62, p. 4.

Officer Young and Wilson both testified that they pulled Turner to the ground while holding onto him. *Id*. at 49; Wilson Deposition, #47-3, p. 48. At this point, they are

all on the ground. Young Deposition, #47-2, p. 49. Plaintiff does not dispute that Turner continued to kick and grab at the officers. Turner also ignored the officers' commands. But, Plaintiff disputes that Turner's actions were intentional or aggressive. Instead, Plaintiff argues that Turner's actions were a result of his mental illness.

While on the ground, the officers turned Turner onto his stomach and attempted to handcuff him. Wilson Deposition, #47-3, p. 50; Young Deposition, #47-2, p. 49. During this time, Officer Young used his right knee to prevent Turner from getting up and held his head down with his open palm. Young Deposition, #47-2, p. 50.[6] Officer Young testified that Turner continued to resist and attempted to get up. *Id*. at 54. Officer Young yelled at Turner to "stop" and "relax." *Id*. Officer Wilson placed Turner's right arm behind his back and Officer Young placed Turner's left arm behind his back, positioning him to be handcuffed. *Id*. at 55. Plaintiff again disputes that any of Turner's actions were intentional or aggressive, but does not otherwise dispute these facts.

While Turner is on the ground, but before he is handcuffed, Officer Talbott arrived and tried to control Turner's legs. *Id*. at 57.[7]  Officer Talbott testified that he put one or both knees on one of Turner's legs and used his hands to hold Turner's other leg. Michael Talbott Deposition, #47-4, p. 27.

The officers eventually managed to handcuff Turner's hands, but he continued to resist and move his legs.[8] Young Deposition, #47-32, p. 56. From 9:04 a.m. to 9:05 a.m., the audio[9] on the video conveys the following conversation. Sergeant Frost radioed the officers asking, "where'd you guys end up at?" Officer Talbott explained where they were in the alley and requested a hobble, a restraint that ties an individual's legs together. Sergeant Frost responded "10-4" indicating that he would bring the hobble.

When Frost arrived with the hobble, the other officers were at Turner's sides and feet and not on top of him. Frost Deposition, #47-5, p. 95-96. Sergeant Frost started to

---

[6] Officer Wilson also testified to using his knee to get Turner's arm in a position to handcuff him. Wilson Deposition, #47-3, p. 50. Neither party includes this fact in its material facts.

[7] Up until this point, Officer Talbott had remained in the police vehicle.

[8] The officers used two sets of handcuffs due to Turner's size.

[9] The video at this point shows a dashboard camera from Sergeant Frost's vehicle as he drives.

apply the hobble with Officer Talbott's help. *Id*. at 107. While they were attempting to put the hobble on, Turner continued to kick his feet and was able to get out of the hobble on the first attempt. *Id*. at 108. Sergeant Frost tried again and was able to get the hobble on. *Id*. The hobble was not connected (or "hog-tied") to Turner's handcuffs. *Id*. at 109.

A few seconds later, starting at 9:07:14, the audio includes the following conversation. Once the hobble was connected, Sergeant Frost asked, "is he still breathing?" One of the officers checked Turner to see if he was breathing.[10] Sergeant Frost then directed the officers to "roll him over on his back" and the officers complied. Officer Wilson stated, "I'm not feeling any breath." Sergeant Frost instructed the officers to get the automatic external defibrillator ("AED") out of the back of his car "real quick." Officers Wilson and Talbott quickly ran to get the AED.

The view on the video remains obstructed, but one can hear the officers calling Turner's name. Video, 9:08:00. Officer Young testified that while Officers Wilson and Talbott retrieved the AED, he began cutting Turner's clothes open so that they could apply the AED pads. Young Deposition, #47-2, p. 64. Sergeant Frost radioed for a "full medical upgrade" noting that Turner was unconscious and that he not sure if Turner was breathing. Video at 9:08:23.

At 9:08:20 on the Video, Officer Wilson returned with the AED. Officer Talbott went to the corner to flag down the ambulance. Talbott Deposition, #47-4, p. 32. Once the AED was set up, the machine instructed the officers to apply the pads and to not touch Turner while the AED was analyzing. The AED machine advised the officers "no shock needed, begin CPR."

At 9:09:24, the ambulance pulled up to the alley, and Sergeant Frost directed the officers to get the CPR masks. After a few seconds, Sergeant Frost says, "pull it out" and Officer Wilson responded, "that's what I was trying to do." Officer Wilson testified that

---

[10] Officer Wilson testified that he checked Turner to see if he was breathing. Wilson Deposition, #47-3, p.55. Officer Talbott testified that he believed Officer Young was the one who checked for breathing. Talbott Deposition, #47-4, p. 31. Officer Young testified that he checked for a pulse at Turner's neck, but did not find one. Young Deposition, #47-2, p. 63.  Young testified that he heard an exhale but did not see Turner's chest rise or any other indication of breathing. *Id*.

while he was trying to get the CPR face mask out of his pocket and ready, the ambulance arrived and the paramedics took over. Wilson Deposition, #47-3, p. 59. Officer Young similarly testified that as he was getting his mouthguard out, the paramedics arrived. Young Deposition, #47-2, p. 65.

The parties agree that less than three minutes transpired from the time when the officers noticed Turner was not breathing until the point where the paramedics were at Turner's side. Turner was still wearing the handcuffs and hobble when the paramedics arrived. Wilson Deposition, #47-3, p.60. The paramedics requested that the officers remove the handcuffs and hobble, and the officers immediately complied. Michael Lynch Deposition, #47-6, p.74; Michael Kingery Deposition, #47-7, p. 61.

The paramedics observed that Turner did not have a pulse and was not breathing. Kingery Deposition, #47-7, p. 29-30, 36-39. At the paramedic's request, Officer Talbott drove the ambulance to the hospital. Talbott Deposition, #47-4, p. 33. The paramedics attempted to revive Turner, administering the cardiac drug epinephrine and performing CPR, but Turner never regained a heartbeat or started breathing independently. Kingery Deposition, #47-7, p. 35-39, 43, 46-47, 62; Lynch Deposition, #47-6, p. 38, 40-43, 51, 57.

Turner received about twenty minutes of critical care at the emergency room before being declared dead at 9:42 a.m. Sarah Katherine Ryle Cherian Deposition, #47-8, p. 14-69, 18-19.

## III.   Opinion Evidence

### a.  Medical Opinions

None of the medical experts, including paramedics, physicians, deputy coroner and forensic pathologist, observed evidence of trauma to Turner. Kingery Deposition, #47-7, p. 30; Lynch Deposition, #47-6, p. 31; Dr. Cherian Deposition, #47-8, p. 20, 37; Sara Rand Deposition, #47-9, p. 23; Shiping Bao Deposition, #47-10, p. 43.

The Coroner, Duane Northrup, concluded that the manner of Turner's death was "accidental." Deaths that are "accidental" are usually "unintentional" as "there was some sort of external occurrence that caused or contributed to the death." Northrup Deposition, #62-7, p. 33-34. The Coroner noted that accidental deaths could be caused by the

8

decedent's own actions or the decedent's prior lifestyle or health condition. *Id*. at 99-100. The Coroner agreed that Turner's health conditions, including schizophrenia, cocaine abuse, and morbid obesity, were other circumstances that could contribute to an accidental death. *Id*. at 103.

Turner's Toxicology Report found caffeine and cotinine (from nicotine use) in Turner's system. Toxicology Report, #62-13. The Toxicology Report did not report positive findings for alcohol or any drugs beyond caffeine and nicotine. *Id*.

Dr. Bao, the forensic pathologist who performed Turner's autopsy, determined that Turner's cause of death was cardiac arrhythmia. In other words, his heart was beating too fast in ventricular fibrillation. Autopsy Report, #62-14; Bao Deposition, #47-10, p. 66-67. Turner's arrhythmia was caused by his enlarged heart and insufficient blood supply to one of his heart's chambers. *Id*. at 41-42; 67. The autopsy noted that the cause of death was "triggered by physical and mental stress during restraint by law enforcement." Autopsy Report, #62-14. But, in his deposition, Dr. Bao opined that Turner's enlarged heart condition was chronic and developed over a period of years. Bao Deposition, #47-10, p. 72. Dr. Bao further opined that the physical and mental stress caused by the officers' restraint could not have caused Turner's enlarged heart condition. According to Dr. Bao and Dr. Vilke, the officers' use of force and the physical/mental stress caused by the restraint could not have caused Turner's death, but "could be" a contributing factor. *Id*. at 37; 73-74; Vilke Affidavit, #46-2, p. 1-2. Plaintiff does not dispute that the officers' use of force did not cause Turner's death. *See* Plaintiff's Response, #62, p.4 (stating that Plaintiff does not dispute the officer's material fact #99: "The officers' use of force did not cause Turner's death").

Dr. Gary Vilke reviewed the autopsy report and agreed with Dr. Bao's conclusions. Vilke Deposition, #47-11, p. 21. Dr. Vilke concluded that Turner experienced cardiac arrest while restrained by the officers. Vilke Deposition, #47-11, p. 27. Vilke testified that leaving the handcuffs and hobble on Turner did not contribute to Turner's death. *Id*. at 73; Vilke Affidavit, #46-2, p. 13. Nor did the officers' decision to use the AED instead of starting CPR. Vilke Affidavit, #46-2, p. 13. The medical experts testified as to other

potential causes of death including Turner's schizophrenia and cocaine use. Bao Deposition, #47-10, p. 71-72.

### b. Champaign Police Department Policies

The Champaign Police Department has policies governing Crisis Intervention Training ("C.I.T"). Champaign Police Department Policy and Procedure ("Policy"), #62-12. Under the Policy, "no individual shall be arrested for behavioral manifestations of mental illness that are not criminal in nature." *Id*. at 41.13.1(B).  When mentally ill people generate repeated calls for non-criminal behavior, "it is important for responders to look beyond the immediate incident, to consider the underlying conditions that prompted the call, and to tailor a more lasting solution for the situation." *Id*. at 41.13.1(D). "The standard of care for C.I.T. officers in reaching a disposition in a call involving an individual with mental illness will include considering first the least restrictive environment possible to meet the needs of the individual and the community." *Id*. at 41.13.2(A)(2). One conflict management and crisis intervention objective under the Policy is "[t]o provide officer intervention as a calm third party, to reduce tension and hostility, and to restore order without unnecessary force." *Id*. at 14.14.2(A)(1). The second objective is "[t]o provide officers with awareness of the basic precautions that should be taken to ensure officer and citizen safety and survival during police response to various conflict situations." *Id*. at 14.14.2(A)(2).

As noted, Plaintiff contends that Turner's mental impairment caused his actions and that Turner could not comprehend the officers' commands. Sergeant Frost testified that he received C.I.T, which teaches officers how to recognize issues associated with mental health patients including "how to talk to people and how to deescalate their anger or their frustration." Frost Deposition, #47-5, p. 114-15. Frost testified that he did not use his C.I.T with Turner because Turner was "beyond conversation" when Frost arrived. *Id*. at 115-16. Officer Wilson also testified that he had training in handling mental ill individuals, including C.I.T. Wilson Deposition, #47-3, p. 72-75. Wilson acknowledged learning techniques to obtain control of a situation without using force. *Id*. at 90.

Plaintiff's expert, Chester Epperson, is a retired police officer who opined that the Champaign Police Department failed to follow their Conflict Management and Crisis Intervention Policy and Procedure. Chester Epperson Report, #63-5A, p. 11. According to Epperson, "[t]he actions of the Champaign Police Department do not align with their stated policy" and the officers "did not consider the available options when interacting with Richard Turner." *Id*. at ¶ 37, 38. Epperson opined that Officers Young, Wilson, and Talbott "failed to intervene early-on with their interaction with Richard Turner in an attempt to diffuse the situation. The officers failed because they did not consider, appreciate, and or assess their options. The officers 'lost control' of the incident scene and, by default, resorted to physical force against Richard Turner as their only option." *Id*. at ¶ 43.

Epperson concluded that the officers "were indifferent to the Champaign Police Department Policy and Constitutional and policing standards on how it relates to dealing with those in mental health crisis. These officers and supervisor deliberately ignored the available options, which resulted in the in-custody death of Richard Turner." *Id*. at ¶ 47. Epperson further opined that Frost "did not take control and or provide sound supervision for this incident" and that "the incident escalated because of his lack of supervision." *Id*. at ¶ 60.

According to Epperson, "the officers used excessive force under the circumstances" and the officers should not have seized Turner. *Id*. at ¶ 84. Epperson concluded that the officers' "actions and non-actions contributed in the death of Richard Turner." *Id*. at ¶ 95. Epperson was not aware of any long-standing pattern or practice of the Champaign Police Department's interaction with mentally ill individuals in an inappropriate manner. Epperson Deposition, #47-12, p. 259.

## IV.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to

decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences that are only supported by speculation or conjecture. *See Singer,* 593 F.3d at 533. In addition, this court "need not accept as true a plaintiff's characterization of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill. 2010).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)).

Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-323. If the nonmovant does not come forward with evidence that would reasonably permit the finder of fact to find in his favor on a material question, then the court must enter summary judgment against him. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

## V.    Analysis

The Officers and the City moved for summary judgment on all counts of Plaintiff's Amended Complaint (#51). Plaintiff's Amended Complaint contains the following claims: Count I alleges excessive force under 42 U.S.C. § 1983, against officers Young, Wilson, and Talbott; County II alleges failure to intervene under 42 U.S.C. § 1983 against

officers Talbott and Frost; Count III alleges a violation of the Illinois Wrongful Death Act against officers Young, Wilson, Talbott, and Frost; Count IV alleges a violation of the Illinois Survival Act against officers Young, Wilson, Talbott, and Frost;  Count V alleges battery under Illinois law against officers Young, Wilson, and Talbott; Count VI alleges intentional infliction of emotional distress under Illinois law against officers Young, Wilson, Talbott, and Frost; Count VII alleges the City is liable for the above claims under the theory of respondeat superior; Count VIII alleges the City should indemnify the Champaign Officers for their liability; and Count XI alleges an alternative claim under *Monell* as to the City. The Court will address each count separately.

### a.  Count I - Excessive Force under 42 U.S.C. § 1983

Count I of Plaintiff's Complaint alleges that officers Young, Wilson, and Talbott used excessive, unnecessary, and/or unreasonable force against Turner in violation of Turner's rights under the United States Constitution. Plaintiff further alleges the officers' "conduct was intentional, willful, malicious, in reckless disregard for, deliberately indifferent to and/or callously indifferent to Mr. Turner's constitutional rights."

Plaintiff's argument falls under the Fourth Amendment. "In determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment, we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion." *Williams v. Indiana State Police Dept*, 797 F.3d 468, 472 (7th Cir. 2015). The Court considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Additional considerations include whether the individual was under arrest, suspected of committing a crime, armed, or was interfering or attempting to interfere with the officers in the execution of their duties. *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992). "An officer's use of force is unreasonable if in light of all those circumstances at the time of the seizure, the officer used greater force than was reasonably necessary to effectuate the seizure." *Williams*, 797 F.3d at 473.

The Seventh Circuit has cautioned district courts:

> [S]ummary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations. *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir.2009). This principle is particularly relevant where, as here, the one against whom force was used has died, because the witness most likely to contradict the officer's testimony—the victim—cannot testify.

*Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010).

As an initial matter, the parties dispute the point at which the officers seized Turner and whether the officers' actions prior to that seizure are relevant. "[C]aselaw does not clearly establish that an officer may be liable under the Fourth Amendment solely for his pre-seizure conduct that led to the encounter." *Williams*, 797 F.3d at 483. But, pre-seizure conduct is relevant to Turner's Fourth Amendment claim because "the reasonableness of the seizure is evaluated in light of the totality of the circumstances." *Id*. Accordingly, the officers may not be held liable under the Fourth Amendment solely for their conduct leading up to the seizure, but the interaction leading up to the seizure is relevant to the Court's determination of excessive force.

When police were called to check on Turner, he had not committed a crime and was not under arrest. Plaintiff argues that Turner did not pose an immediate risk to the safety of the officers or others. According to Plaintiff, officers "created their own exigency" instead of allowing Turner to walk away. While Turner did not have a weapon and did not vocalize any threats to the officers or others, he was wandering in the middle of the street in a highly trafficked area on the University of Illinois campus on a weekday morning.  Even if Turner was not a violent risk, he posed a risk to those driving through campus and to himself while stumbling aimlessly through the busy streets. Therefore, a reasonable officer would have found that, while it was slight, Turner posed a risk to himself and others.[11] Because of this risk, the officers were justified in using some amount of force.

---

[11] Plaintiff maintains that Turner's non-violent history in prior police interactions makes the officers' use of force unreasonable. But, under the Fourth Amendment, the Court asks whether the officers' actions were

Plaintiff also maintains that Turner was not actively resisting arrest or attempting to evade arrest by flight. The officers were not attempting to arrest Turner. Instead, the officers were attempting to get Turner to the hospital for an involuntary mental health commitment. Even so, "seizures made to effectuate an involuntary mental health commitment are analyzed under the Fourth Amendment's 'probable cause' standard." *Fitzgerald v. Santoro*, 707 F.3d 725, 732 (2013). "Generally speaking, a mental-health seizure is lawful if there is probable cause to believe that the person seized is a danger to herself or others." *Bruce v. Guernsey*, 777 F.3d 872, 876 (7th Cir. 2015).

In this case, an individual familiar with Turner called in to request a welfare check because he was not acting normally. When officers arrived, Turner was making sporadic movements, was incoherent, and was unable or unwilling to respond to the officer's questions. The officers familiar with Turner noted that he was acting worse than normal. They were concerned that Turner was unable to leave the area on his own. Turner was crossing busy streets while apparently unaware of his surroundings. The officers had also received a report of Turner holding a partly empty bottle of wine. Given these facts, the officers had probable cause to believe that Turner needed immediate medical care. That being so, even if Turner was not actively resisting *arrest*, he was resisting the officers.[12] Thus, the Court finds that the officers were reasonable in their decision to seize Turner and that Turner was actively resisting the officers.

Considering the totality of the circumstances, including the factors identified in *Graham*, and that Turner had not committed a crime and officers were not seeking to arrest him, the Court finds that no reasonable jury could conclude that the officers were unreasonable in their decision to use limited force to restrain Turner. As a result, the

---

reasonable in light of the particular situation. Nevertheless, the Court does consider whether the officers in question were aware of this history as it is a part of the totality.

[12] Plaintiff also disputes whether Turner's resistance was "active." But, Plaintiff agrees that Turner continually walked away from the officers, did not answer their questions, and did not comply with their requests. Plaintiff also does not contest that Turner shoved Officer Wilson after Wilson touched Turner's shoulder, but disputes whether that shove was "aggressive." Whether or not Turner was acting aggressively or intending his actions, a reasonable officer would have concluded that Turner was resisting.

Court next decides whether any reasonable jury could find that the force used was unreasonable.

Plaintiff's Complaint does not specify which of the officers' acts were excessive. Looking to the facts in the light most favorable to Plaintiff, the Court finds that the earliest point at which the officers seized Turner was when Officer Wilson touched Turner's shoulder. *See U.S. v. Griffin*, 652 F.3d 793, 800 (7th Cir. 2011). Accordingly, in its analysis the Court considers the following actions by the officers: (1) Officer Wilson touching Turner's shoulder; (2) Officers Young and Wilson moving Turner to the prone position; (3) Officer Young putting his knee on Turner's shoulder and his hand on Turner's head; (4) Officer Wilson using his knee to get Turner's arm in position to handcuff him; and (5) Officer Talbott attempting to control Turner's legs to apply the hobble. Additionally, the Court will consider all circumstances leading up to Wilson touching Turner's shoulder in determining whether the officers' conduct was reasonable under the Fourth Amendment.

In determining if the force used was excessive, the Court finds it helpful to compare the facts of this case to those in *Cyrus v. Town of Mukwonago*, 624 F.3d 856 and *Fitzgerald v. Santoro*, 707 F.3d 725 (7th Cir. 2013). As in this case, the plaintiffs in *Cyrus* and *Fitzgerald* were not criminal suspects, but police were called to both scenes for assistance. As detailed below, the plaintiff in *Cyrus* died and the plaintiff in *Fitzgerald* suffered significant injuries as a result of their interactions with police.

In *Cyrus*, Nickolos Cyrus suffered from bipolar disorder and schizophrenia episodes. *Id.* at 857. The local police were familiar with Cyrus. *Id.* One day, Cyrus walked into a partially built home wearing nothing but a bathrobe. Police were called to the property, and one of the officers asked Cyrus to leave. *Id.* at 859. Cyrus ignored the officer's requests and attempted to return into the house. *Id.*

The officer fired his Taser at Cyrus, striking him in the back. *Id.* Cyrus attempted to stand up but immediately fell over and was lying on his stomach. *Id.* The officer ordered Cyrus to remain on the ground and put his hands behind his back. *Id.* Another officer arrived on the scene, and Cyrus attempted to stand up, but fell. *Id.* The first officer

16

Tasered Cyrus a second time, and Cyrus barrel rolled down an unfinished gravel driveway. *Id.* The officers claimed that the barrel roll was an attempt to evade the officers, but the plaintiff disputed this.

The officers commanded Cyrus to show his hands, but Cyrus was lying on his stomach and did not immediately comply, so the officers attempted to remove his hands to handcuff him. *Id.* at 860. One officer grabbed Cyrus's left arm and the other used his knee to control Cyrus. *Id.* The officers were still unable to remove both hands, and the first officer again deployed the Taser into Cyrus's backside several times. *Id.* There was conflicting evidence on how many times the Taser was deployed while Cyrus was on the ground. *Id.* The officer testified that he used the Taser on Cyrus a total of six times, and the autopsy findings were consistent with six Taser shots, but the Taser's internal readout showed 12 trigger pulls. *Id.* The officers eventually handcuffed Cyrus. When they rolled him on his back, they discovered he was not breathing. Cyrus was pronounced dead later that day at the hospital. *Id.*

The District Court found the material facts to be undisputed, held the force used was reasonable under the circumstances, and granted the defense's motion for summary judgement. *Id.* at 862. The Seventh Circuit reversed and concluded that the conflicting evidence as to how much forced was used and the extent to which Cyrus resisted arrest made summary judgment inappropriate. *Id* at 863.

On the contrary, in *Fitzgerald v. Santoro*, 707 F.3d 725 (7th Cir. 2013), the Seventh Circuit upheld the district court's grant of summary judgment, finding no reasonable jury could find the officers used excessive force. As with this case and *Cyrus*, the plaintiff in *Fitzgerald* was neither a criminal suspect nor arrestee, but rather subject to civil detention for self-protection. After the plaintiff resisted the officers, they used "arm bar" and "wrist lock" techniques "to de-escalate the situation" and get the plaintiff onto a gurney. *Id.* at 734. Once on the stretcher, the officers handcuffed the plaintiff to the stretcher. The plaintiff continued to resist inside the ambulance, and the officers again had to restrain her by using a wrist lock and grabbing her arm. *Id.* Plaintiff's active resistance finally ceased. At the hospital she was diagnosed with fractures in her right arm.

17

The Court found the officers' actions were objectively reasonable because they "used minimally forceful techniques designed to ... prevent escalation. They did not strike or beat [the plaintiff]; they did not attempt to completely disable her. The officers held her arm and wrist in a firm manner meant to induce cooperation." *Fitzgerald*, 707 F.3d at 734.

Ultimately, the facts of this case are far more aligned with *Fitzgerald* than *Cyrus*.

Unlike *Cyrus*, there is no dispute here as to the amount of force used by the officers. Plaintiff does not dispute any of the officers' material facts involving their use of force. The parties agree that (1) Officer Wilson touched Turner's shoulder; (2) Officers Young and Wilson moved Turner to the prone position; (3) Officer Young put his knee on Turner's shoulder and his hand on Turner's head; (4) Officer Wilson used his knee to get Turner's arm in position to handcuff him; and (5) Officer Talbott attempted to control Turner's legs to apply the hobble. There is no question of fact regarding the officers' actions, or even a different interpretation of those actions, for the jury to evaluate.

Furthermore, the force used by the officers in *Cyrus* is far beyond that used here. In *Cyrus*, the officer deployed multiple Taser shots on an individual who was on the ground and unarmed. In this case, the officers did not deploy a Taser, strike, beat, or use any other significant force.  Instead, similarly to the officers in *Fitzgerald*, the officers here "used minimally forceful techniques designed to … prevent escalation." *Fitzgerald*, 707 F.3d at 734. While the Court recognizes that Plaintiff is unable to give testimony as to the force used, the Officers' position is supported by the audio, medical findings of no trauma to Turner's body, and the officers' calm and friendly demeanor toward Turner prior to the death.

Also, unlike in *Cyrus*, the extent to which Turner resisted the officers is not in dispute in this case. In *Cyrus*, testimony conflicted on whether Cyrus was running or walking away from police and whether he was rolling to evade police. In this case, Plaintiff does not dispute Turner's actions. Instead, Plaintiff only disputes the officers' characterization of intent underlying those actions. Plaintiff does not dispute that Turner shoved Officer Wilson, or that Turner kicked, grabbed, and disobeyed the officers'

commands. While Plaintiff disputes that these acts were intentional, Turner's intent is irrelevant to what a reasonable officer on the scene would have perceived.

In the end, this case is wholly distinguishable from *Cyrus*. The only similarities in the two cases are that both individuals died while police were attempting to handcuff them and both individuals suffered with mental illness.

While the Court views the facts in the light most favorable to Plaintiff, it also "give[s] considerable leeway to law enforcement officers' assessments regarding the degree of force appropriate in dangerous situations." Even giving Plaintiff the benefit of the doubt, no reasonable jury could find that the officers used excessive force. There is no evidence the officers used force greater than necessary to restrain Turner. Like in *Fitzgerald*, the officers seized Turner in a firm manner to encourage cooperation.

Even if a reasonable jury could find that the force used was excessive, Plaintiff's claim would be barred by the officers' qualified immunity. "Public officials are immune from suit under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *City and County of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765 (2015). "Qualified immunity, in effect, affords enhanced deference to officers' on-scene judgments about the level of necessary force." *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 725 (7th Cir. 2013). "[E]ven if the plaintiffs demonstrate that excessive force was used, they must further establish that it was objectively unreasonable for the officer to believe that the force was lawful—i.e., they must demonstrate that the right to be free from the particular use of force under the relevant circumstances was 'clearly established.'" *Id*. "A constitutional right is 'clearly established' for qualified-immunity purposes where "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "In other words, 'existing precedent must have placed the … constitutional question beyond debate.'" *Reichle v. Howards*, 132 S. Ct. 2088 (2012).

The Supreme Court has described qualified immunity as an "exacting standard" and encouraged courts "not to define clearly established law at a high level of generality."

*Sheehan*, 135 S. Ct. at 1774-1776. The Court stressed that "qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures. *Id*. at 1776.

The events of this case do not display any clearly established constitutional right that the officers violated. In fact, Seventh Circuit case law put the officers on notice that their acts were permissible. For example, in *Estate of Phillips*, police were called to a hotel where Mr. Phillips was acting in a strange and disorderly manner and was uncooperative with management. *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 588 (7th Cir. 1997). Police arrived on the scene and attempted to question Phillips, but he responded only with "unintelligible sounds." *Id*. Because Phillips was holding a ballpoint pen in each hand, the officers grabbed his wrists, at which point a struggle arose. *Id.* The officers continued to struggle with Phillips and eventually got him to the floor. *Id.* at 589. The officers used their knees to restrain Phillips, handcuff him, and eventually restrain his legs. *Id*. An officer then called an ambulance and someone noticed that Phillips was no longer breathing. *Id*. The Seventh Circuit noted that while the struggle was intense, it was not marked with any violent behavior by the officers. *Id.* at 588. The officers were not shouting or being abusive. *Id.*

Turner's case is marked with similarities with *Estate of Phillips*. In both cases, officers were called to the scene because an individual was acting strangely. Both Turner and Phillips gave unintelligible responses to the officers' questions. Like Phillips, Turner began to resist vehemently once officers initiated contact. The officers in this case were not violent, abusive, or yelling at Turner. Sadly, Mr. Turner and Mr. Phillips both died during their interactions with police. But death on its own is insufficient to show that the officers were responsible. *Id*. at 594. *Estate of Phillips* shows that the officers were put on notice that acts such as touching Turner's shoulder and then countering his resistance by pulling him to the ground, forcing him into the prone position, and using force to handcuff and hobble him had previously been found constitutional under similar circumstances.

Plaintiff cites to the Champaign Police Department Policy and Procedure which offers officers clear guidance on handling situations involving mental illness. But, Plaintiff's expert's testimony that the officers did not follow their training does not by itself negate qualified immunity.[13] *Id.* at 1777 ("Even if an officer acts contrary to her training, however, that does not itself negate qualified immunity where it would otherwise be warranted."). "So long as 'a reasonable officer could have believed that his conduct was justified' a plaintiff cannot 'avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadline confrontation was imprudent, inappropriate, or even reckless.'" *Id.* (quoting *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002)).

In conclusion, the Court finds that viewing the facts in the light most favorable to Plaintiff, no reasonable jury could find that the officers used excessive force. Even if a reasonable jury could find that the officers used excessive force, the officers are entitled to qualified immunity under these facts. The Court grants Defendants' Motion as to Count I, excessive force. [14]

### b. Count II - Failure to Intervene under 42 U.S.C. § 1983

Count II alleges that Officer Talbott and Sergeant Frost failed to intervene to prevent the misconduct in violation of Turner's rights under the United States Constitution. "The fate of plaintiff's failure to intervene claim is closely linked to that of her excessive force claim since, by definition, if there was no excessive force then there can be no failure to intervene." *Abdullahi v. City of Madison*, 423 F. 3d 763, 767-68 (7th Cir. 2005). Thus, the Court grants Defendants' Motions as to Count II, failure to intervene.

---

[13]  It is not clear that the officers did in fact fail to follow their training, but the Court views the facts in the light most favorable to Plaintiff.

[14] Defendants further argue that the officers' use of force did not cause Turner's death. The Court notes that both the forensic pathologist who completed the autopsy and the reviewing physician agreed that the officers' use of force did not cause Turner's death. Bao Deposition, #47-10, p. 37; 73-74; Vilke Affidavit, #46-2, p. 1-2. Plaintiff does not contest this fact. *See* Plaintiff's Response, #62, p.4 (stating that Plaintiff does not dispute the officer's material fact #99 "The officers' use of force did not cause Turner's death"). Regardless, it is unnecessary for the Court to decide this argument because of its other rulings. This also applies to Defendants' argument that Turner's sister lacks standing for certain damages.

c.  **State Law Claims: Counts III, IV, V, VI – Wrongful Death, Survival, Battery, and Intentional Infliction of Emotional Distress**

Defendants argue that they have blanket immunity from Plaintiff's state law claims under the Illinois Tort Immunity Act. "Section 4–102 of the Act immunizes local public entities and public employees for failure to: (1) establish a police department; (2) otherwise provide police protection; or, if police protection is provided, (3) failure to provide adequate police protection service." *Payne v. City of Chicago*, 16 N.E.3d 110, 118 (Ill. App. (1st Dist. 2014)) (citing 745 ILCS 10/4–102 (West 2004)). Section 4-102 does not contain an exception to immunity for willful and wanton conduct. *Id*. But, section 2-202 applies when an officer is engaged in the "execution or enforcement" of any law. 745 ILCS 10/2–202 (West 2004). Unlike section 4-102, section 2-202 includes an exception to immunity for willful and wanton misconduct. *Id*.

The parties dispute whether the officers were "providing police protection" or engaged in the "enforcement" of a law. "Generally, the question of whether a police officer is executing and enforcing the law under section 2–202, rather than providing police protection or service under section 4–102, is a factual determination which must be made in light of the circumstances involved." *Payne*, 16 N.E.3d at 119. "However, the question may be decided as a matter of law where the evidence is undisputed or susceptible to only one possible interpretation." *Id*. "Police efforts to aid, assist, or rescue individuals are within the scope of 'police protection or service' and are covered under section 4–102 of the Act." *Id*.

In *Payne*, the court noted that officers were not responding to a call that a crime was committed, were not investigating a crime, making an arrest, issuing a citation, or quelling a breach of the peace. *Id*. Instead, police were called to the home in response to a call for police assistance when a person called 911 to report that the plaintiff was high on drugs and destroying the house. *Id*. "The police were there not to enforce or execute any law, nor to provide any medical attention (as other personnel were dispatched and on the scene), but rather to provide police assistance to subdue plaintiff for plaintiff's own

safety and the safety of his family members." *Id*. at 120-21. Accordingly, the court found that section 4-102 applied.

Here too officers were called to the scene not to enforce a law, but to "provide police assistance to subdue plaintiff for plaintiff's own safety and the safety of [others]." While in their depositions officers noted that Turner had violated some minor laws by jaywalking, there is no dispute that the officers were seizing Turner only for his own safety and to help him obtain medical care. The audio on the video leaves no question that officers approached Turner only because of the requested welfare check and because Turner "seem[ed] a little bit more out of it than usual" and appeared to be unable to "tell which way is which." In addition, the officers called for an ambulance before making any physical contact with Turner. On the video, Officer Wilson tells Sergeant Frost that he is going to "involuntary" Turner, meaning they were going to take him in for an involuntary mental check at the hospital. The officers never mentioned arresting Turner or made any indication that they were enforcing a law when they seized Turner. The undisputed material facts show that the officers were attempting to aid Turner, not enforce the law against him. Accordingly, section 4-102 applies in this case and there is no exception for willful and wanton misconduct.

As a result, Plaintiff's claims of wrongful death, survival, battery, and intentional infliction of emotional distress are barred by the Illinois Tort Immunity Act. The Court grants Defendants' Motions as to Counts III, IV, V, and VI.

### d. Counts VII & VIII – Respondeat Superior & Indemnification

Plaintiff's Complaint asks that if the Officers are found liable on Counts I-VI, the City be found liable for any judgment because the Officers were employed by and acting as agents of the City. Because the Court grants summary judgment as to Counts I-VI in favor of Defendants, the Court also grants summary judgment as to Counts VII and VIII for Defendants.

### e. *Monell* Liability

In the alternative to the above claims, Plaintiff argues that the Champaign Police Department has a long standing and widespread pattern and practice of failing to

properly supervise, monitor, and control officers when encountering persons with mental illness. Plaintiff presents no evidence in support of this claim. Plaintiff's own police practices expert testified that he was not aware of any long-standing pattern or practice of the Champaign Police Department's interaction with mentally-ill individuals in an inappropriate manner. Epperson Deposition, #47-12, p. 259. At the summary judgment stage, Plaintiff cannot rely on allegations in the pleadings, but "instead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Defendants' Motion as to Count VIV is granted.

## VI.    Conclusion

For these reasons, the Officers' and City's Motions for Summary Judgment (#43, 49) are granted.


**IT IS, THEREFORE, ORDERED:**

**Defendants' Motions for Summary Judgment (#43, #49) are GRANTED. The Court directs the Clerk to enter judgment in Defendants' favor and against Plaintiff. All pending motions are denied as moot, and this case is terminated with the parties to bear their own costs. All deadlines and settings on the Court's calendar are vacated.**

ENTERED this 15th day of November, 2019.


_____s/ERIC I. LONG_____
UNITED STATES MAGISTRATE JUDGE