E-FILED
Wednesday, 25 November, 2020  09:34:19 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

November 25, 2020

To:
Shig Yasunaga
UNITED STATES DISTRICT COURT
Central District of Illinois
U.S. Courthouse
Urbana , IL 61802-3369

| | |
|---|---|
| No. 19-3446 | CHANDRA TURNER, Special Administrator of the Estate of RICHARD TURNER, deceased, and CHANDRA TURNER, individually, Plaintiff - Appellant<br><br>v.<br>CITY OF CHAMPAIGN, et al., Defendants - Appellees |

**Originating Case Information:**

District Court No: 2:17-cv-02261-EIL
Central District of Illinois
Magistrate Judge Eric I. Long

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:         Entire record returned consisting of

Other (specify items):          1 envelope containing USB drive containing video; 1 Flash Drive, #44 of exhibits

**NOTE TO COUNSEL:**
If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                              **Received by:**

<u>     11/25/2020     </u>                    <u>    s/J. Bartell         </u>

form name: **c7_Mandate**(form ID: **135**)

In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 19-3446

CHANDRA TURNER, as Special Administrator of the Estate of
RICHARD TURNER, deceased, and CHANDRA TURNER, individu-
ally,

*Plaintiff-Appellant,*

*v.*

CITY OF CHAMPAIGN, et al.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:17-cv-02261-EIL — **Eric I. Long**, *Magistrate Judge.*

———————————

ARGUED SEPTEMBER 17, 2020 — DECIDED NOVEMBER 3, 2020

———————————

Before KANNE and HAMILTON, *Circuit Judges.*[*]

HAMILTON, *Circuit Judge.* Richard Turner died during an
encounter with police officers in Champaign, Illinois. The

———————————

[*] Then-Circuit Judge Barrett was a member of the panel when this case
was argued but did not participate in the decision and judgment. The ap-
peal is resolved by a quorum of the panel pursuant to 28 U.S.C. § 46(d).

officers were trying to detain him to protect himself and others and to take him to a hospital for evaluation of his mental health. With hindsight we can say that his death might have been avoided. In this suit by Mr. Turner's estate, however, the central question is not whether officers used best police practices but whether they violated his rights under the Fourth Amendment by using excessive force against him. The district court found that undisputed facts, including a coroner's findings that Mr. Turner suffered no physical trauma but died of a cardiac arrhythmia, showed that the officers did not use excessive force. We agree and affirm summary judgment for the defendants.

I.   *Facts for Purposes of Summary Judgment*

In reviewing a grant of summary judgment, we view the evidence in the light most favorable to Mr. Turner's estate, the non-moving party, giving the estate the benefit of reasonable inferences that can be drawn in its favor. *Alicea v. Thomas*, 815 F.3d 283, 288 (7th Cir. 2016). The estate must rely on the officers' own testimony and the surveillance and dashboard camera footage that captured parts of the encounter. As a result, almost all of the facts we recount below are undisputed. We note where a fact is in dispute.

Mr. Turner was a homeless member of the Champaign community and was well-known to police. On the morning of November 16, 2016, someone called the police to check on Mr. Turner. He was walking in the streets, speaking to passersby, and rummaging through trash near the University of Illinois campus. Sergeant Thomas Frost, the most senior officer involved in this case, had known Mr. Turner for decades. He first noticed Mr. Turner's mental health deteriorate around 2010. Since then, police had often been dispatched to check on

No. 19-3446                                                    3

him and had hospitalized him on numerous occasions without a struggle. One of those incidents had occurred as recently as April 2016.

When officers responded on November 16, Mr. Turner seemed to them more disoriented than usual. Officer Young arrived first and spotted Mr. Turner on the corner of Green Street and Sixth Street. He was on the ground, rolling around with his pants down. Officer Young parked, approached him on foot, and asked how he was doing. Mr. Turner began flailing his arms and babbling unintelligibly. Officer Young told him not to yell at people on the street and then returned to his squad car to wait for backup.

When Officers Talbott and Wilson arrived, Mr. Turner walked past their car and jaywalked across Sixth Street. No traffic was present as he crossed. On the other side of the street, Mr. Turner pulled a construction tag from a building but put it back when Officer Young yelled at him to return it. Mr. Turner then crossed Sixth Street again. Officer Wilson, who was a trainee under Officer Talbott's supervision, approached and told Mr. Turner to leave the area. Mr. Turner did not comply. Instead, he began walking back and forth across the street several times. Seeing this behavior, Officer Wilson asked aloud whether Mr. Turner could leave the area given how disoriented he seemed. So Officer Wilson commanded Mr. Turner to approach and asked him what day of the week it was. Mr. Turner responded incoherently. The officers decided to detain Mr. Turner for his own protection and to send him to a hospital for mental-health treatment. Officer Wilson called for an ambulance.

While waiting for the ambulance, Officer Young approached Officer Wilson and asked Mr. Turner to sit on the

curb. Mr. Turner instead turned and ran away across Green Street. He kept running. Officers Young and Wilson decided to pursue him on foot. Officer Talbott followed behind them. Officer Wilson testified that they caught up to Mr. Turner halfway down an alley north of Green Street. After unsuccessfully commanding Mr. Turner to stop, Officer Wilson grabbed Mr. Turner's shoulder. That was the first physical contact between the police and Mr. Turner that morning.

The parties dispute how to characterize what happened next. They agree, though, that Mr. Turner immediately pulled away and shoved Officer Wilson, knocking his radio off his uniform. A struggle ensued, during which it is undisputed that Mr. Turner was also grabbing at Officer Young with both hands. Officers Young and Wilson both testified that they responded by pulling Mr. Turner to the ground and turning him on his stomach. Then, while trying to handcuff him, Officer Young pressed his right knee onto Mr. Turner's shoulder to prevent him from moving. Officer Talbott then arrived and attempted to control Mr. Turner's flailing legs. He placed his knees on one leg and his hands on the other. Working together, the three officers were eventually able to handcuff Mr. Turner, but he was still kicking his legs.

As these officers were struggling to restrain Mr. Turner, Sergeant Frost heard the radio chatter and decided to help. Video from Sergeant Frost's dashboard camera shows him driving to the scene. By the time Mr. Turner was handcuffed, Sergeant Frost was close. He radioed to ask where the officers had ended up. Officer Talbott told him and asked him to bring a hobble—a strap used to restrain a person's legs. Sergeant Frost arrived with the hobble, which he and Officer Talbott then placed around Mr. Turner's legs. At first Mr. Turner

kicked out of the hobble, so the officers secured it a second time.

None of this physical contact between Mr. Turner and the officers was captured on video. But the estate does not dispute that Mr. Turner continued to struggle against the officers during the entire process. The estate argues that Mr. Turner reacted this way because he was likely having difficulty breathing.

On the audio recording, shortly after securing the hobble, Sergeant Frost asked, "is he still breathing?" The officers quickly determined that Mr. Turner was not breathing. They rushed to get a portable defibrillator from a patrol car. Once the defibrillator was activated, it advised the officers not to administer a shock but to begin CPR. Around this time, the ambulance arrived and the paramedics took over. Less than three minutes elapsed from the moment the officers noticed that Mr. Turner was not breathing until the paramedics arrived. The paramedics had the officers remove the handcuffs and hobble, and they rushed Mr. Turner to the hospital. They tried to revive him in the ambulance, but he never regained a pulse.

An autopsy later determined that Mr. Turner died from cardiac arrhythmia—his heart gave out after beating too fast during the encounter. The autopsy also showed that this arrhythmia was likely caused by an underlying condition. Mr. Turner had an enlarged heart and insufficient blood supply to one of his heart's chambers. The medical evidence showed no other causes of death. There were no signs of suffocation or trauma to Mr. Turner's body.

II. *Procedural History*

After Mr. Turner's death, his sister Chandra Turner filed this lawsuit as administrator of his estate. Seeking relief under 42 U.S.C. § 1983, the estate alleged Fourth Amendment violations by Officers Young, Wilson, and Talbott for using excessive force against Mr. Turner and by Officer Talbott and Sergeant Frost for failing to intervene. The estate also asserted state-law claims for wrongful death, battery, and intentional infliction of emotional distress against Young, Wilson, Talbott, and Frost. Finally, the complaint sought to hold the City of Champaign liable under state law through respondeat superior and indemnification, and under federal law under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978) (local government may be liable for damages under § 1983 for injuries caused by unconstitutional policy, custom, or practice).

The district court granted summary judgment to the defendants on all counts. Relying primarily on *Fitzgerald v. Santoro*, 707 F.3d 725 (7th Cir. 2013), the district court held that the officers acted legally to detain Mr. Turner and used reasonable force in response to his resistance. The court also held that qualified immunity would protect the officers even if they acted unreasonably because the case so closely resembles *Estate of Phillips v. Milwaukee*, 123 F.3d 586 (7th Cir. 1997), where we affirmed summary judgment for the officers in a similarly unfortunate fatal encounter between police and a mentally ill person who violently resisted efforts to detain him. The district court also dismissed the estate's state-law claims because Illinois law provides absolute tort immunity for officers carrying out protective functions, as distinct from law-enforcement functions.

We affirm. Reviewing the district court's decision de novo, e.g., *Alicea*, 815 F.3d at 288, we agree that this case closely mirrors *Estate of Phillips* and that the undisputed facts show that the officers here used reasonable force. The district court also correctly concluded that Illinois law bars the plaintiff's state tort claims.

III. *Fourth Amendment Claims for Excessive Force*

The estate's Fourth Amendment claims fail because the officers did not use excessive force. A claim for excessive force under § 1983 invokes the Fourth Amendment's protection against unreasonable seizures. The reasonableness standard is objective, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The *Graham* standard is fact-intensive, asking whether each use of force was reasonable under the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "If the suspect is mentally ill, the officer's awareness of his mental illness is also a factor." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010).

This case raises two distinct issues under this standard. The first is whether Officer Wilson's initial decision to grab Mr. Turner's shoulder was reasonable, which depends on whether the officers' decision to detain Mr. Turner for his own protection was supported by probable cause. The second is whether, in light of Mr. Turner's resistance, it was reasonable to pull him to the ground, pin down his shoulder and legs, and handcuff and hobble him. We address these in turn.

A. *Protective Detention of Mr. Turner*

"[A] mental-health seizure is lawful if there is probable cause to believe that the person is a danger to herself or others." *Bruce v. Guernsey*, 777 F.3d 872, 876 (7th Cir. 2015). Here, Mr. Turner was repeatedly crossing both Sixth and Green Streets while seemingly unaware of his surroundings. The available video shows that when Mr. Turner crossed the streets, there was little traffic passing. But the officers' impression that Mr. Turner was more disoriented than usual, coupled with his unintelligible speech and repeated forays into the street, gave the officers probable cause to detain him for his own safety and that of others. The estate's expert witness on policing acknowledged this probable cause in his deposition. Dkt. 47-12 at 166–67. We have found probable cause for protective detention in other cases with less compelling evidence of danger. See, e.g., *Bruce*, 777 F.3d at 876–77 (affirming dismissal of Fourth Amendment claim against officer who, based on dispatcher's report that plaintiff was possibly suicidal, detained her until another officer arrived); *Fitzgerald*, 707 F.3d at 733 (affirming summary judgment for defendants; dispatcher told officers detainee was suicidal, detainee appeared intoxicated and admitted she was on antidepressants and going through a difficult period, but also told police at scene that she was not in fact suicidal); *Estate of Phillips*, 123 F.3d at 592 (affirming summary judgment for defendants where man in hotel room gave unintelligible answers to police and was clenching ballpoint pens in both hands).

We are not saying that Officer Wilson and Young's decision to chase Mr. Turner down the alley exhibited best police practices. The estate argues that Mr. Turner's death might have been avoided if the officers had instead continued to

monitor him from a distance and waited until the ambulance arrived, as they had on prior occasions. The Champaign Police Department's own policies train officers responding to calls involving persons with mental illnesses to "consider[] first the least restrictive environment possible to meet the needs of the individual and the community." Dkt. 62-11 (Ex. 12) at 41.13.2(A)(1). This approach can include "officer intervention as a calm third party, to reduce tension and hostility, and to restore order without unnecessary force." *Id*. at 41.14.2(B)(1).

With the benefit of hindsight, one can say that perhaps such an approach might have saved Mr. Turner's life. But police training policies and best practices, while relevant, do not define what is reasonable under the Fourth Amendment. *United States v. Brown*, 871 F.3d 532, 536–37 (7th Cir. 2017) ("The excessive-force inquiry is governed by constitutional principles, not police-department regulations… . Put another way, a police officer's compliance with the rules of his department is neither sufficient nor necessary to satisfy the Fourth Amendment's reasonableness requirement."); see also *Mays v. Dart*, 974 F.3d 810, 823–24 (7th Cir. 2020) (discussing *Brown* and expert testimony on police practices and standards for disease prevention). Here, once the officers had probable cause to detain Mr. Turner, they had the constitutional power to do so. The officers' decision to detain Mr. Turner did not violate the Fourth Amendment.

With the lawful power to detain Mr. Turner came the legal power to use reasonable force to accomplish the detention. *Graham*, 490 U.S. at 396 ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect

it."); *United States v. Place*, 462 U.S. 696, 702 (1983). That principle applies to protective detention as well. *Graham*, 490 U.S. at 395 (Fourth Amendment standard applies to all claims for excessive force arising from any type of seizure of free citizen); *Bruce*, 777 F.3d at 875 ("The Fourth Amendment of the Constitution governs mental-health seizures."). Accordingly, Officer Wilson did not violate the Fourth Amendment when he caught up with Mr. Turner and grabbed his shoulder to stop his flight. Since Mr. Turner never submitted to the authority of spoken police commands, this physical contact was the moment police first seized him. See *United States v. Griffin*, 652 F.3d 793, 800 (7th Cir. 2011); see generally *California v. Hodari D.*, 499 U.S. 621, 625–26 (1991).

### B. *Bringing Mr. Turner to the Ground and Restraining Him*

Mr. Turner did not respond to the first physical contact by complying with the officers' commands. The undisputed facts show that he resisted the officers actively and continually. He was not offering merely passive resistance to lawful detention; in such cases significant force can violate the Fourth Amendment. Unlike when someone is passively refusing to move or follow lawful commands, the police may use significant force to subdue someone who is actively resisting lawful detention. Compare *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (recognizing prohibition against more than minimal force against only passive resistance), citing *Phillips v. Community Ins. Corp.*, 678 F.3d 513, 525 (7th Cir. 2012) (in turn collecting cases), with *Fitzgerald*, 707 F.3d at 734 (arm-bar and wrist-lock techniques that broke protective detainee's arm were not excessive because she was actively resisting attempts to place her into an ambulance; "We have repeatedly upheld officers' use of force in the face of suspects resisting arrest."),

and *Estate of Phillips*, 123 F.3d at 592–93 (officers could tackle, handcuff, and hobble a detainee who continued to struggle and kick throughout; "amount of force that is justified increases as the confrontation escalates").

The undisputed facts show that Mr. Turner's behavior qualified as active resistance. When Officer Wilson grabbed his shoulder, Mr. Turner shoved Officer Wilson and began grabbing at Officer Young. The officers then took Mr. Turner to the ground, where Mr. Turner kept resisting and trying to pry himself away from the officers. The officers all testified that this resistance continued throughout the encounter. Even after Mr. Turner was handcuffed, they needed a hobble because he kept kicking his legs. The hobble had to be attached twice because Mr. Turner's flailing legs broke free on the first attempt.

In this respect, as the district court recognized, the facts closely resemble *Estate of Phillips*, where we found no excessive force. In *Estate of Phillips*, the police detained a man with mental health needs who was speaking unintelligibly in a hotel room. The man actively resisted and a struggle ensued. The officers brought him to the ground and handcuffed him, but he continued to kick violently. Officers responded by pressing a knee on his right shoulder to keep him in place. They also restrained his legs with a hobble. About a minute later, medical personnel arrived. At that point Mr. Phillips was no longer breathing. He was rushed to the hospital but died the following day. We held "that these actions of the officers amount[ed] to an objectively reasonable response to the escalating situation they faced." 123 F.3d at 593–94.

Here too, the escalating force against Mr. Turner was a constitutionally permissible response to his continued

resistance. As in *Estate of Phillips*, officers placed Mr. Turner in a prone position, pinned down his shoulder, handcuffed him, and hobbled him. And just as in *Estate of Phillips*, each of these actions was reasonable under the Fourth Amendment. After Mr. Turner shoved Officer Wilson and continued resisting, it was reasonable to place him in a prone position to handcuff him. Placing a knee on Mr. Turner's shoulder was also not excessive given the undisputed evidence of his continued resistance on the ground. Finally, pinning down Mr. Turner's legs and attaching a hobble were reasonable given the undisputed testimony that he kept kicking and that he maneuvered out of the hobble when it was first applied.

Unfortunately, also as in *Estate of Phillips*, "[t]hat force, it turned out, when combined with Mr. [Turner's] other health problems, resulted in [his] death." See 123 F.3d at 594. But legally, it was not "deadly force" because it did not "carry a substantial risk of causing death or serious bodily harm." *Id.* at 593. Rather, at each step of the encounter, the undisputed facts show that the officers used a reasonable amount of force. Critically, Mr. Turner's body showed no signs of suffocation or trauma from the officers' force. The officers "did not hogtie, choke or transport Mr. [Turner]. Nor were his medical conditions," including his enlarged heart, "observable to the untrained eye." *Id.* at 594. In situations like this, where an officer's force causes unexpectedly severe injuries due to a hidden condition, reasonableness is assessed objectively based only on what the officer knew at the time force was applied. *Id.* ("question is not whether the officers' actions aggravated an undiscovered injury or condition, but whether their actions were objectively reasonable under the circumstances").

The same principle applies when an officer reasonably mistakes medical symptoms as resistance. For instance, in *Smith v. Ball State University*, 295 F.3d 763 (7th Cir. 2002), the plaintiff went into diabetic shock while driving and was unresponsive when officers arrived. As officers used force to remove him from his car, another officer arrived on the scene and misread the scenario as an active struggle. He ran in to deliver a knee strike to the plaintiff but missed, instead knocking the plaintiff and the other officers to the ground. In rejecting the plaintiff's excessive force claim, we explained: "Although we accept as true the fact that Smith was not actively resisting, a reasonable officer who happened on the scene could reasonably misconstrue Smith's unresponsiveness as resistance requiring the minimal use of force." *Id.* at 771; see also *Padula v. Leimbach*, 656 F.3d 595, 603 (7th Cir. 2011) (same where no evidence showed officers were aware of arrestee's hypoglycemic episode).

On the other hand, when officers observe medical symptoms that cannot reasonably be mistaken as resistance, they may not respond with force. An example is *McAllister v. Price*, 615 F.3d 877 (7th Cir. 2010). As in *Smith* and *Padula*, the plaintiff in *McAllister* suffered a diabetic episode while driving. *Id.* at 879. When police arrived, they suspected he was a drunk driver. *Id.* at 883. Finding him unresponsive to their commands, officers pulled him from his car, slammed him to the ground, and kneed him in the back. *Id.* at 886. In assessing Mr. McAllister's excessive force claim, we distinguished *Smith* because "McAllister has come forward with enough evidence so that a jury could infer that Price's mistaken belief that McAllister was intoxicated was unreasonable. It was clear to Price, as it was to the other witnesses, that McAllister was impaired…. Multiple eyewitness observed McAllister to be

convulsing or twitching, and at least one concluded that McAllister was not intoxicated." *Id.* at 883. We therefore reversed summary judgment for the officers because "nothing in *Smith* suggests that McAllister's diabetic condition is wholly irrelevant if Price should have been aware of it." *Id.*

Here, the estate argues that Mr. Turner was not resisting the officers but only struggling to breathe. The estate, however, has offered no evidence supporting this theory, and the autopsy results contradict it. Nor is there any evidence showing that, even if this were true, the officers were aware of it before Sergeant Frost asked if Mr. Turner was breathing. The estate therefore lacks the kind of evidence that raised a genuine issue of fact in *McAllister*. Without such evidence, we must conclude that the officers here—like the officers in *Smith*—reasonably interpreted Mr. Turner's movements as resistance. The district court properly granted summary judgment for the defendants on the estate's excessive force claims against Officers Wilson, Young, and Talbott.

Since no excessive force was used against Mr. Turner, we also affirm summary judgment on the estate's claims against Sergeant Frost and Officer Talbott for failure to intervene. "The fate of [a] plaintiff's failure to intervene claim is closely linked to that of her excessive force claim since, by definition, if there is no excessive force then there can be no failure to intervene." *Abdullahi v. City of Madison*, 423 F.3d 763, 767–68 (7th Cir. 2005). Without evidence of a constitutional violation, the district court also properly granted summary judgment on the estate's *Monell* claim against the City of Champaign. See *Brown v. Polk County*, 965 F.3d 534, 541 (7th Cir. 2020) ("[T]here was no constitutional violation. That finding defeats the *Monell* claim too.").

IV. *State-Law Claims*

The state-law tort claims of Mr. Turner's estate fail for a different reason: this was a mental health detention rather than a criminal arrest. Section 4-102 of the Illinois Tort Immunity Act provides: "Neither a local public entity nor a public employee is liable … for failure to provide adequate police protection." 745 ILCS 10/4-102. Unlike § 2-202 of the Act, which applies when officers are engaged in the "execution or enforcement" of law, § 4-102 provides absolute immunity with no exception for willful and wanton conduct. Compare *id.* with 745 ILCS 10/2-202. When interpreting state-law provisions like these, we look to decisions from state intermediate appellate courts "unless there are persuasive indications that the state supreme court would decide the issue differently." *Much v. Pacific Mut. Life Ins. Co.*, 266 F.3d 637, 643 (7th Cir. 2001). We therefore follow the Illinois Appellate Court's decision in *Payne v. City of Chicago*, holding that protective mental-health detentions, unlike criminal arrests, are covered by § 4-102's absolute immunity provision. 16 N.E.3d 110, 118 (Ill. App. 2014).

As in *Payne*, the officers here were acting in a protective role. From the beginning of the encounter, the officers at the scene were concerned with Mr. Turner's well-being. They called for an ambulance to take him to the hospital and indicated over the radio that they were detaining him involuntarily for his own protection rather than for breaking the law. Mr. Turner's estate concedes as much. The officers' actions are therefore covered by § 4-102's blanket immunity, and no state-law claims may proceed against the officers or the City of Champaign.

The judgment of the district court is AFFIRMED.



CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## FINAL JUDGMENT

November 3, 2020

Before:        MICHAEL S. KANNE, Circuit Judge

               DAVID F. HAMILTON, Circuit Judge*

| No. 19-3446 | CHANDRA TURNER, Special Administrator of the Estate of RICHARD TURNER, deceased, and CHANDRA TURNER, individually, Plaintiff - Appellant<br><br>v.<br>CITY OF CHAMPAIGN, et al., Defendants - Appellees |
|---|---|
| **Originating Case Information:** | |
| District Court No: 2:17-cv-02261-EIL<br>Central District of Illinois<br>Magistrate Judge Eric I. Long | |

The judgment of the District Court is AFFIRMED, with costs, in accordance with the decision of this court entered on this date.

* Then-Circuit Judge Barrett was a member of the panel when this case was argued but did not participate in the decision and judgment. The appeal is resolved by a quorum of the panel pursuant to 28 U.S.C. § 46(d).

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit